# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **QING LU** § <br> 363 Parkview Ave. § <br> Gaithersburg, MD 20878, § <br>     *Plaintiff* § <br> § <br> v. § <br> § <br> **DISTRICT OF COLUMBIA** § <br> 441 Fourth St., NW, 6th Fl. South § <br> Washington, D.C. 20001; § <br> § <br> **C.G. WHITESCARVER** § <br> 2621 Jamestown Ln., Apt. 303 § <br> Alexandria, VA 22314; § <br> § <br> and § <br> § <br> **SYDNEY LESTER** § <br> 17400 Avenleigh Dr. § <br> Ashton, MD 20861, § <br> § <br>     *Defendants* § | Civil Action No. __1:20-cv-461__ |

## PLAINTIFF'S ORIGINAL COMPLAINT

*Qing Lu sues under the 1st Amendment and D.C. Whistleblower Protection Act. A District employee of over 12 years, management described her as a "highly effective performer" of her Fire Protection Engineer duties. She repeatedly reported her belief that coworker "S.B."—who earlier admitted to ethics violations—fraudulently claimed eight weeks' paid parental leave. Def. Lester (Fire Protection Manager) proposed a 10-day unpaid suspension of her and Def. Whitescarver (Chief Building Official) imposed an eight-day suspension. Charging her with providing misleading information, they implied a citizen loses whistleblower/free-speech rights by making further reports once government management instructs her to trust them that no wrongdoing occurred.*

## II. JURISDICTION[1]

1. This Court has federal question (28 U.S.C. § 1331) jurisdiction because the suit arises under the First Amendment of the United States Constitution, as enforced under 42 U.S.C. § 1983 (deprivation of rights under color of D.C. law).

2. Per 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the D.C. Whistleblower Protection Act (DCWPA) claims, arising from the same events.

3. Defendants Whitescarver and Lester are subject to this Court's jurisdiction as persons who knowingly acted in the District of Columbia under color of law against Plaintiff, in violation of her rights under federal and D.C. law. As well, the DCWPA authorizes naming individual city managers as defendants.

## III. ADMINISTRATIVE EXHAUSTION OF REMEDIES

4. No administrative exhaustion is required as to the federal claims.

5. Plaintiff's union initially invoked arbitration on her behalf as to the imposed eight-day suspension. But by later agreement with the District, the scheduled arbitration was cancelled and this outcome agreed to be a "final determination" of the issues that were to be raised in the anticipated arbitration. That is, the parties agreed no relief would be granted in arbitration, with the result that Plaintiff now only may obtain whatever relief is available from this Court, versus the range of relief often available from a negotiated grievance process.[2]

---

[1] Assertions in this pleading are made in addition and in the alternative to each other and apply to both causes of action. They are based on the limited information available pre-discovery and so subject to correction/clarification as the case develops.
[2] *See generally* D.C. Code § 1-615.56 (barring concurrent arbitration and court actions over the same claim of violation of the DCWPA).

## IV. PARTIES AND SERVICE

6. Plaintiff is an individual, residing in Gaithersburg, Maryland, who may be contacted by way of the undersigned attorney.

7. She is a Fire Protection Engineer in the D.C. Department of Consumer and Regulatory Affairs (DCRA).

8. Defendant District of Columbia is a creation of the U.S. Constitution, operating as a municipality, and may be served as follows:

    8.1. Karl Racine, Attorney General/in care of Darlene Fields, Gale Rivers, Regina Brown, or Marjorie Thomas/Office of the D.C. Attorney General/441 Fourth St., NW, 6th Fl. South/Washington, D.C. 20001 ***and***

    8.2. The Honorable Muriel Bowser, Mayor/in care of Karl Racine, Darlene Fields, Gale Rivers, Regina Brown, or Marjorie Thomas/Office of the D.C. Attorney General/441 Fourth St., NW, 6th Fl. South/Washington, D.C. 20001.

9. Defendants C.G. (Clarence Garret) Whitescarver and Sydney Lester are sued in their individual capacities for claims under 42 U.S.C. § 1983 and those raised under the DCWPA.[3] They may be served at addresses indicated in the caption or otherwise served in person.

---

[3] In contrast with federal employee whistleblower law, the D.C. equivalent allows (at § 1-615.54) suit against "…in his or her personal capacity, any District employee, supervisor, or official having personal involvement in the prohibited" action at issue.

10. When he imposed the eight-day unpaid suspension, C.G. Whitescarver was the DCRA Chief Building Official. When he proposed 10 days' suspension, Sydney Lester was the Fire Protection Manager, DCRA, Permit Operations Division.

## V. FIRST AMENDMENT CLAIMS

*A. Legal Background*

11. Plaintiff's claims of violation of her First Amendment rights are raised against Defendants Lester and Whitescarver in their individual capacities. (No federal free-speech claim is raised against the District as a municipality as a whole.)

12. A public employee raising a claim of First Amendment retaliation generally must prove: (1) she spoke as a citizen on a matter of public concern; (2) her interest in speaking out on the matter outweighed the government's interest in promoting the efficiency of public services; (3) the employee's speech was a substantial or motivating factor in prompting the retaliatory act; and (4) if the government asserts it would have taken the same action even in the absence of the employee's speech, that this is untrue.

13. Deprivations of federal free-speech rights may be raised under 42 U.S.C. § 1983 against government officials in their individual capacities where their challenged actions were taken under color of law of the District of Columbia, e.g., where their actions were taken in their capacities as government officials.

14. While government officials often are deemed immune from liability for discretionary acts, this does not extend to their violation of clearly established rights, often such as ones of free speech.

15. The First Amendment does not protect merely against government conduct that silences free speech: it reaches even actions that have a deterrent or chilling effect on the exercise of such rights.

### B. Relevant Factual Claims

16. Plaintiff's reporting of her belief that S.B. (and his wife S.C.B.) in 2016 engaged in benefit fraud against the District was a matter of public concern.

    16.1. For example, it would be a significant waste of government resources if an employee were absent for some eight weeks and yet was paid, when the basis cited for the paid leave turned out to have been false.

    16.2. As well, D.C. law makes it a crime to commit fraud (Code at § 22-3221), forge a public record (§ 22-3242(a)(3)), commit perjury (§ 22-2402), or make false statements under oath or affirmation (§ 22-2404) [e.g., in S.B. declaring the leave application form he submitted was accurate].

    16.3. The position held by S.B. (and Plaintiff) of Fire Protection Engineer is classified by D.C. as a "safety sensitive" position, subjecting incumbents to criminal background checks, possibly traffic-record checks, and drug and alcohol screening. The City understands that a person holding a fire engineer position who cannot be trusted can cause harm to the public.

    16.4. As well, any fraud would appear to have been aided by S.B.'s wife S.C.B. Given that she is a full-time contractor of another D.C. agency, her trustworthiness or lack thereof also is a matter of public concern.

17. Plaintiff's interest in making one or more of her reports outweighed any counter-interest of the government in promoting efficiency in public services.

   17.1. Here the disclosures related to believed inefficiencies and fraud in public services being provided, so the public and government had an aligned interest with Plaintiff in protecting her ability to make such reports.

   17.2. For example, had her disclosures been taken seriously, they might have prevented future fraud, such as by D.C. implementing a system of verifying the authenticity of materials submitted for such paid leave, rather than assuming what an employee initially submits is reliable.

18. Plaintiff's reports were a substantial or motivating factor in the actions she challenges. In fact, those reports were cited as a basis for disciplining her.

   18.1. As to the proposed 10-day suspension without pay issued in April 2019 by Defendant Lester, it recommends punishing Plaintiff for "knowingly and willfully reporting false or misleading information or purposefully omitting facts, to any supervisor." It goes on to claim Plaintiff "grossly violated" the rule against employees misleading supervisors.

   18.2. Consistent with the discipline's being based on Plaintiff's exercise of her free-speech rights, the proposal detailed Plaintiff's reports—of her belief that S.B. committed benefit fraud—to: (a) HR management; (b) the D.C. Office of Inspector General; (c) the Board of Ethics and Government; (d)

      the Department of Regulatory and Consumer Affairs (DCRA) Director; (e) the Mayor; and (f) members of the media.[4]

  18.3.  As to the eight-day suspension imposed by the decision of June 27, 2019 issued by Defendant Whitescarver, the discipline was described as being based on Plaintiff's reporting information specifically to the Mayor, on February 5 and 6, 2019.

      18.3.1.  These reports were said to willfully seek to "obfuscate the record of the [related] investigations and interactions."

      18.3.2.  Plaintiff also was asserted to have failed to fully concede to the conclusions of the investigations. That is, the severity of the punishment was in part because of the fact she continued to exercise her free speech rights to make reports rather than blindly trusting that government management was truthfully reporting well-founded and accurate conclusions to her.

19.  The defendants would not have taken the same action absent Plaintiff's protected speech, given that her disclosures were cited to justify the discipline.

20.  At the time of Defendants' violations, the right of government employees to speak out on matters on public concern was clearly established, at least when such reporting was outside the scope of an employee's ordinary job duties.

---

[4] Since the disciplinary charge was making misleading statements to a supervisor, the decision to reference Plaintiff's disclosures to the media was irrelevant to proving misconduct. The fact of their inclusion confirms a motive to silence Plaintiff's speech.

21. Defendants Lester and Whitescarver took the proposed and imposed suspensions under the color of law in that they issued them in their roles as management officials of the District of Columbia government, on official letterhead. As a result, D.C. deprived Plaintiff of over a week of pay.

22. An official proposal to deny an employee 10 days (i.e., two weeks) of pay for her exercise of her free-speech rights can objectively be expected to have a chilling effect on her willingness to speak out in the future. Here, had the proposal not been issued, the later eight-day suspension could not have been imposed, so Plaintiff suffered actual economic harm as a result of the proposal.

23. Also relevant to the chilling effect, in a face-to-face meeting around May 29, 2019, Defendant Whitescarver warned Plaintiff that her continued pursuit of her disclosure of S.B.'s actions could result in termination. DCRA Chief Administrative Officer Tiffany Crow had told Plaintiff by email on April 30 that Plaintiff's job may depend on her willingness to treat the matter as closed.

## VI. D.C. WHISTLEBLOWER PROTECTION ACT

*A. Legal Background*

24. Under the DCWPA (D.C. Code § 1-615.53), a "supervisor" may not take or threaten to take a prohibited personnel action, or otherwise retaliate, against an employee for making a "protected disclosure."

25. Among matters included in protected disclosures are ones made to a supervisor or public body of what the employee "reasonably believes" to evidence a gross misuse or waste of public resources or funds; an abuse of authority connected

to administration of a public program; or violation of a federal, state, or local law, rule, or regulation. D.C. Code § 1-615.52(a)(6).

26. Once an employee demonstrates it is more likely than not that her disclosures were a contributing factor in the challenged personnel action, the burden shifts to the District to show by clear and convincing evidence it would have taken the same action for "legitimate, independent reasons" even if the employee made not made the protected disclosure.

27. A claim under the DCWPA may be brought against the District, individual supervisors responsible for the challenged actions, or—as here—both.

*B. Relevant Factual Claims*

28. As persons with the authority to effectively recommend or take remedial or corrective action for misconduct, Defendants Whitescarver and Lester were "supervisors."

29. As a law enforcement body, the D.C. Office of Inspector General is a "public body" for purposes of disclosures to it being protected.

30. The Mayor is a "supervisor" to whom Plaintiff made protected disclosures, as the Mayor has authority to effectively recommend or take action to address violations and the misuse of government resources.[5]

---

[5] Until a deposition of the Mayor, Plaintiff is not able to say whether the Mayor herself believes Plaintiff misled her or whether the Mayor's staff merely assumed the Mayor ought to have felt misled by Plaintiff's disclosures.

31. One or more of Plaintiff's disclosures were protected in that they were based on her reasonable belief that S.B. fraudulently claimed paid parental leave and that this constituted one or more categories of wrongdoing under the DCWPA.

32. There appears to have been a gross misuse/waste of public resources or funds, given the payment of some eight weeks of leave by the D.C. government (and related loss of services from S.B. during that period) for a childbirth that does not appear to have occurred (or at least that Plaintiff believed had not).

33. There appears to have been an abuse of authority, in S.B.'s using his position as a District employee to obtain a benefit (extended paid leave) to which he does not appear to have been entitled.

34. There was a violation of a federal, state, or local law—if correct that no child was born as claimed—given that one or more of the submitted documents (application; birth certificate; and/or medical certification) would have been fraudulent and undeserved benefits obtained by way of deception.

35. Among the laws/rules/regulations that fraudulently obtaining paid parental leave likely would violate is one or more of these…

    35.1. DPM, Chapter 16, Section 1605.4(b) prohibits employees of the District from making false statements, such as:

        35.1.1. Misrepresenting or falsifying or concealing material facts related to an official matter.

        35.1.2. Knowingly and willfully making an incorrect entry on an official record.

      35.1.3. Knowingly and willfully reporting false or misleading information or purposefully omitting material facts to a supervisor.

35.2. D.C. Code § 22-3221 makes it a criminal offense to engage in conduct intended to defraud or obtain the property of another by means of a false or fraudulent pretense or representation, where the offender obtains the property of another person or causes another person to lose property.

35.3. Under § 22-3242, the penalty for forgery is set as up to 10 years for fraud involving certain documents such as financial instruments and a "public record, or instrument filed in public office or with a public servant."

35.4. As well, D.C. law makes it a crime to commit perjury (§ 22-2402), or to make false statements under oath or affirmation (§ 22-2404).

35.5. An employee applying for paid leave for the birth of a child must certify that the information provided is accurate and that the employee is eligible for the requested leave, also acknowledging an understanding that making of a false statement on the application is a violation of law subject to criminal penalties.[6]

36. As to one or more of her disclosures/reports, Plaintiff reasonably believed that the information that she provided evidenced one or more of the above-identified categories of wrongdoing (e.g., gross waste of funds, violation of law).

---

[6] *See, e.g.,* dchr.dc.gov/sites/default/files/dc/sites/dchr/page_content/attachments/dc_fml_form_1_application_0.docx

37. Among reasons it was reasonable for Plaintiff to believe this are those such as one or more of the following:

   37.1. Her observations in prior years of what looked to her to be S.B.'s erroneous reporting of hours and needless claiming of overtime.

   37.2. In December 2016, S.B. was documented to have agreed to pay a $1,000 fine and receive ethics training for violating the District Code of Conduct conflict-of-interest rules as to a matter S.B. handled at work involving S.B.'s domestic partner (later, spouse), S.C.B. (She is the same person involved in his claiming of paid parental leave for birth of a child.)

      37.2.1. The fact that S.B. may have submitted a birth certificate or a medical certification of the anticipated birth does not rule out fraud, as fake ones are readily and inexpensively available on the internet.[7]

   37.3. When Plaintiff sought confirmation that management authenticated the documents submitted by S.B. to justify paid leave, management repeatedly refused to answer directly, instead insisting she accept their general assurance that they found no wrongdoing and that S.B. and his wife S.C.B. testified they did nothing wrong.

   37.4. Plaintiff was aware of S.B.'s having a pending trial for a serious traffic violation, such that he might want to hide the reason for his absence from his employer.

---

[7] *See, e.g.,* www.superiorfakedegrees.com/fake-birth-certificates/.

37.5. On June 22, 2016, he told coworkers he would be away for a long time. On June 23 the court case was closed. On June 24th he returned to work.

37.6. Plaintiff's observations of the public Facebook postings of S.B. and his family caused her to doubt that the claimed child had been born.

37.6.1. For example, on the day the birth was said to have occurred, S.C.B. made a handful of Facebook postings, but none mentioned her labor or the childbirth.

37.6.2. Her posts from the day before and day of the purported delivery were later taken down from Facebook, while other postings remained up.

37.7. As well, the child thereafter pictured with S.B. and S.C.B. appeared to be one elsewhere identified as the child of an out-of-country relative.

38. The conduct of S.B. and S.C.B. at the office also caused Plaintiff to be dubious of the claimed birth. For example, S.C.B. volunteered to the staff at the end of April 2016 that she was pregnant. At the time, she was not noticeably pregnant, but she was later said to have given birth in mid-May, this being described as past the expected due date.

39. Reports Plaintiff received from third-parties also caused her to doubt the legitimacy of S.B.'s receipt of paid parental leave benefits. For example:

39.1. One permit expeditor told Plaintiff she had seen S.C.B. at the office prior to the birth with what appeared to be a foreign object in an odd triangle shape under her clothes, as if to mimic pregnancy.

39.2. A coworker told Plaintiff that a date S.B. had shown pictures of a newborn actually was prior to the date later reported for its birth.

39.3. A coworker told Plaintiff that when S.B. was asked about how the baby was doing, he responded that she was doing well and walking around. But this was at just four months after the purported birth, when babies typically don't take their first step until between nine and 12 months.

40. At all times relevant to her claims, the District of Columbia and its DCRA department were an employer under terms of the DCWPA.

41. Some of Plaintiff's disclosures were to the D.C. Office of Inspector General, which constitutes a DCWPA "public body" as a law enforcement agency.

41.1. For example, around June 27, 2016 she made an initial report of her concerns to the OIG hotline, referencing the lack of indications of pregnancy as compared to the pending court matter that could have given S.B. a reason to seek leave to avoid disclosing.

42. Plaintiff understood that OIG would or was conducting some sort of investigation but later discovered OIG had referred the issue to DCRA, treating it not as criminal or fraudulent, but as a run-of-the-mill HR matter.[8]

43. Among recipients of Plaintiff's disclosures were one or more persons who are considered "supervisors" under the WBPA, that is, persons who had the

---

[8] As noted elsewhere today, Plaintiff herself eventually was made the subject of an investigation, following S.B. filing a formal harassment complaint against her.

authority to take or effectively recommend discipline, direction of staff, or evaluate their performance, exercising authority with independent judgment.

44. For example, her reports reached DCRA management such as then-Director Melinda Bolling, then-Chief Administrative Officer Walter Crawford, then-Chief Building Officer Lynn Underwood, and by hand-off from Director Bolling, Deputy Chief Building Officer Chris Bailey.[9]

45. Plaintiff also sought to work through DCHR staff, such as Lissette Ortiz and Ellen Brennan, and was denied meetings with Director Ventris Gibson and Associate Director for Policy and Compliance Justin Zimmerman.

46. It was after Plaintiff failed to get a full response from working at lower levels that she reported the matter to the City Council and Mayor/Executive Office of the Mayor.

   46.1. An in-person report to the Mayor (whom Plaintiff encountered in the Permit Center) and a follow-up email to her were cited as the basis for the eight-day suspension. As earlier, the Mayor is a "supervisor," having authority to correct violations and misuses of government resources.

---

[9] Lynn Underwood and Chris Bailey met with Plaintiff on August 15, 2017 and (per Underwood's email to Ingrid Jackson of that date) instructed Plaintiff not to contact anyone further about the matter other than HR staff. This appears to have been an illegal order not to contact persons including members of Council. *Compare* D.C. Code § 1-615.53 (prohibition on supervisor interfering with or denying right of employee to furnish information to the Council or one of its members). Thus, to the extent discipline is shown to have been based on non-compliance with that order, it was a violation of the DCWPA for being based on refusal to comply with an illegal order. To the extent the Mayor may be regarded as a member of the council, suspending Plaintiff for providing information to the Mayor also violated that prohibition.

47. The overall pattern was one in which Plaintiff's disclosures were not adequately investigated and then each subsequent entity would take the earlier inadequate investigations into account in joining in assuming no wrongdoing occurred and so the matter should be closed.

48. For example, it appears the initial report to OIG was handed off to DCRA without OIG's conducting its own fact-finding, resulting in Plaintiff's reporting being "deemed insufficient to open an investigation."

49. DCRA then appears to have accepted S.B.'s claims of entitlement to leave at face value, without attempting to authenticate the materials S.B. submitted.

50. The Board of Ethics and Government Accountability (BEGA) jointly interviewed S.B. and S.C.B. under oath and then decided it lacked jurisdiction, with its investigator speculating to Plaintiff that the baby had been adopted [though that would have been inconsistent with S.B.'s and S.C.B.'s accounts].

51. HR likewise assumed that DCRA and BEGA handled the matter properly.

52. Finally, the Mayor's office assumed that the matter had been reviewed adequately by the other offices, such that nothing further should be done.

### VII. HARM SUFFERED

53. As above, Plaintiff was subjected to a proposed 10-day suspension and from that an eight-day suspension was imposed. These caused her to suffer lost pay and benefits, as well as to endure significant emotional distress, humiliation and embarrassment, and loss to her personal and professional reputations, and served to reduce her willingness to exercise her free-speech rights in the future.

    53.1. What has happened to Plaintiff as a result of her disclosures also can be expected to have chilled the willingness of other employees to speak out on such matters of public concern, knowing they too could lose pay.

54. As noted above, Plaintiff also was subjected to an investigation (apparently initiated by OGC staff and/or due to S.B. filing a complaint against her) of whether she stalked and harassed S.B. This investigation fell within the DCWPA definition of "retaliating" ("conducting or causing to be conducted an investigation of an employee…because of a protected disclosure…"). This in turn caused further emotional distress and reputational damage for her.[10]

55. Under the DCWPA prohibition against "or retaliating in any other manner" because of an employee's protected disclosure, Plaintiff additionally asserts that she has been denied telework based on more stringent standards than those applied to employees who have not made protected disclosures.

    55.1. As compared to the June 27, 2019 suspension decision, DCRA began a telework program that same month.

    55.2. Plaintiff twice was made to apply and both times was informed her application was approved.

    55.3. Yet the Department still has not let her actually start it, while allowing similarly-situated employees who are not whistleblowers do so.

---

[10] The proposed 10-day suspension said it addressed "**only**" (emphasis original) the "dishonest statements made by Ms. Lu," but it did so just after referencing that she had been investigated for having had "stalked and harassed" S.B. and his wife S.C.B., thus managing to smear her reputation with those claims without charging them.

55.4. Explanations have been pretextual, such as relying on her lack of access at home to Accela software, when other non-managers appear to be unable to access it from home either and yet are allowed to telework.

56. Among further harms, Plaintiff has had to pay to hire an attorney to protect her rights in these matters.

## VIII. RELIEF SOUGHT

4. Plaintiff thus seeks relief such as the following against Defendants:

    4.1. A declaration that one or more Defendants violated Plaintiff's rights under the D.C. whistleblower law and/or First Amendment, such that the proposed suspension and imposed suspension should be deemed void and all related adverse references in her files removed.

    4.2. An award of back pay and benefits as a result of voiding the suspension.

    4.3. To the extent the denial of telework is shown to have been based on Plaintiff's protected disclosures, an order that the denial cease.

    4.4. To the extent that the investigation of Plaintiff violated the DCWPA, an order that it be sealed and retained solely in counsel's litigation files, not to be disclosed to any other D.C. employee/official or third party.

    4.5. An order that Defendants submit reports to the Court outlining efforts to prevent future violations of such rights by them.

    4.6. An award of compensatory damages.

    4.7. An award of attorney fees, expenses, and costs of court.

4.8. To the extent judgment is entered against multiple Defendants based on the same cause of action, an order that they are jointly and severally liable for payment of related damages.

4.9. Such other and further relief in law and equity as may be appropriate.

## PRAYER

FOR SUCH REASONS, Plaintiff requests that judgment be entered in her favor and that Defendants be denied relief of any kind.

Respectfully Submitted,

SCHLEICHER LAW FIRM, PLLC

By: /s/ David R. Schleicher
  David R. Schleicher
  DC Bar No. 428001
  david@gov.law

  1227 N. Valley Mills Dr., Ste. 208
  Waco, Texas 76710
  (254) 776-3939
  (254) 776-4001 fax

  1629 K St., NW, Ste. 300
  Washington, D.C. 20006
  (202) 540-9950
  (202) 683-6130 fax

ATTORNEYS FOR PLAINTIFF LU