UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

| | | |
|---|---|---|
| QING LU, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 20-cv-00461 (APM) |
| | § | |
| DISTRICT OF COLUMBIA, et al., | § | |
| Defendants. | § | |

## PLAINTIFF'S STATEMENT OF FACTS
## FOR WHICH THERE IS NO GENUINE ISSUE,
## IN SUPPORT OF HER MOTION FOR PARTIAL SUMMARY JUDGMENT

Per the Local Rules and the Court's MSJ scheduling order, Plaintiff Lu identifies the following as relevant facts for which there is no material dispute. After identification of the parties, she addresses the conflict-of-interest/ethics disclosures, then the leave fraud disclosures, next the Lawson Investigative Report (IR), then the proposed and imposed suspension, then administrative exhaustion,[1] and finally telework denial and items not otherwise categorized.

References to "dec. ¶" are to paragraph numbers within Plaintiff's declaration appearing in the Appendix. References to "Tr." are to the court reporter transcription of Lawson's witness interviews during his investigation of Plaintiff. Each asserted fact is underlined to visually distinguish it from the sometimes lengthy evidentiary citations offered in support of it.

---

[1] At the time of the drafting of these Facts, Defendants had not yet withdrawn the defense of failure to exhaust administrative remedies and removing this section now would throw off other citations.

### A. The Parties and Their Roles[2]

1. Plaintiff Qing "Luchi" Lu is a Fire Protection Engineer in the D.C. DCRA. *Compare* Complaint ¶7 *with* Answer ¶7 (admitted); App. 498 (dec. ¶1).

2. During Ms. Lu's more than a decade as a Fire Protection Engineer with DCRA, "her performance has continually been that of a highly effective performer." App. 30 (Lester's proposal at 4). *Also see* App. 52 (Chief Administrative Officer's email to Plaintiff, "I hear that, when not lodging complaints without evidence, you are a valued employee"). *Also see* App. 498 (dec. ¶2).

3. Defendant District of Columbia is a creation of the U.S. Constitution, operating as a municipality. *Compare* Complaint ¶8 *with* Answer ¶8 (admitted). [D.C. is sued only under the D.C. Whistleblower Protection Act (WPA), not the First Amendment.]

4. Defendants C.G. (Clarence Garret) Whitescarver and Sydney Lester are sued in their individual capacities for claims under 42 U.S.C. § 1983 and those raised under the District of Columbia Whistleblower Protection Act. *Compare* Complaint ¶9 *with* Answer ¶9 (admitted, though denying violations).

5. When he proposed a 10-day suspension, Sydney Lester was the Fire Protection Manager, DCRA, Permit Operations Division. *Compare* Complaint ¶10 *with* Answer ¶10 (admitted). *Also see* App. 498 (dec. ¶5).

6. When he imposed the eight-day unpaid suspension, C.G. Whitescarver was the DCRA Chief Building Official. *Compare* Complaint ¶10 *with* Answer ¶10 (admitted). *Also see* App. 498 (dec. ¶6).

---

[2] What Defendants admitted in their Answer from among what Plaintiff pled in her Complaint is repeatedly cited as evidence, so the Answer appears starting at App. 3, the Complaint at App. 375.

7.    Tiffany Crowe was the Chief Administrative Officer (CAO) during the period in which telework was in dispute. App. 32 (title in cc: list for proposal at 6); App. 356-357 (emails between Crowe and Plaintiff).

8.    S.B., the subject of Plaintiff's disclosures, is a fellow DCRA fire engineer. App. 54 (IR 1); App. 499 (dec. ¶8).

**B. Plaintiff Lu's Ethics Disclosures about S.B. and Their Connection to Lawson's Investigation of Her for Her Fraud Disclosures About S.B.**

9.    In August 2016, Plaintiff disclosed to management her belief that coworker S.B. was handling projects submitted by his wife's company, in violation of ethics/conflict-of-interest rules. *See* App. 345-348 (emails discussing the disclosures and management's response); App. 499 (dec. ¶9).

10.   HR Specialist Mia Brown and Special Investigator Tyrone Lawson were among those to whom Plaintiff Lu disclosed S.B.'s conflicts of interest and what she regarded as Defendant Sydney Lester's failure to take adequate corrective action. App. 345-346 (Plaintiff email with Mia Brown and Investigator Lawson listed as recipients); App. 499 (dec. ¶10).

11.   Defendant Sydney Lester's initial response to Plaintiff Lu's ethics disclosures was that Plaintiff's reports about S.B. had become "more and more serious as time progressed" and that her recent allegations [i.e., the ethics disclosures] "have now placed us at the stage where the allegations have legal implications that cannot be ignored." App. 348 (S. Lester email of 8/31/2016). *Also see* App. 499 (dec. ¶11).

12.   Defendant Lester also responded to Plaintiff Lu's ethics disclosures about S.B. by asserting that "there is no evidence to conclude any" S.B. wrongdoing occurred. App. 348 (email); *see* App. 499 (dec. ¶11).

13. <u>Notwithstanding Defendant Lester's assertion that there was "no evidence" of wrongdoing in relation to Plaintiff's ethics disclosures about S.B., S.B. went on to admit to multiple violations and to agree to pay a $1,000 fine.</u> App. 23-26 (Negotiated Disposition).  *Also see* App. 499 (dec. ¶12) (Plaintiff awareness of outcome).

14. [Though they later proved true,] <u>Mr. Lester initially had persuaded agency legal counsel that Plaintiff's reports about S.B. conflicts of interest should be disbelieved because of a purported "long held personal vendetta" by Plaintiff against S.B.</u> *See* App. 398 (August 23, 2016 email discussion among management officials).

15. [In contrast to Mr. Lester's negative reaction to Plaintiff's reports about S.B.'s ethics violations,] <u>BEGA told Plaintiff they "greatly appreciate your assistance and cooperation" on the subject.</u> *See* App. 400 (BEGA email of November 1, 2016); App. 499 (dec. ¶14).

16. <u>The portrayal of Plaintiff as having a "vendetta" against S.B. persists among D.C. management even now, after S.B. admitted to ethics violations and paid a fine.</u> *See* App. 402-403 (Crowe dep. 23:22 – 24:4) (describing Plaintiff's actions related to examination of the leave fraud issues to be serving Plaintiff's "vendetta").

17. <u>S.B. responded to Plaintiff's ethics disclosures with a February 2, 2017 email to management official Christopher Bailey, objecting that Plaintiff reported him to the D.C. Board of Ethics and Government Accountability office (BEGA) for "misconduct in performing my duties here at work that involves my wife."</u> App. 342 (2/2/2017 email); App. 419-420 (S.B. dep. at 91:22 – 92:9) (acknowledging the email included this reference to the ethics disclosures). *Also see* App. 411-412 (S.B. dep. 25:22 – 26:7; 27:4-9) (S.B. identifying the fine he had to pay as "all initiated by Ms. Lu").

18.   S.B.'s complaint to management that Plaintiff was mistreating him by reporting him to BEGA was made even though he had about two months earlier admitted to wrongdoing as to the allegations for which Plaintiff reported him. *Compare* App. 342 (S.B.'s email complaining) *with* App. 23-26 (Negotiated Disposition signed by S.B. on "12/5/2016").

19.   Investigator Lawson considered Plaintiff's earlier ethics disclosures as to S.B. to be sufficiently relevant to his misconduct investigation of her that—when interviewing her about the fraud disclosures—he had her confirm it was she who had reported S.B. and his wife for the conflicts of interest [i.e., the earlier ethics disclosures]. App. 273 (Tr. at 14:12-20).   *Also see* App. 500 (dec. ¶15) (basis for Plaintiff conclusion IR connected to ethics disclosures).

20.   Investigator Lawson considered Plaintiff Lu's earlier ethics disclosures to be sufficiently relevant to his Investigative Report as to her fraud disclosures that he included Plaintiff's earlier email to him about the ethics disclosures in the RI. App. 65 (IR at 12, noting Exhibit 11 to IR includes Plaintiff's ethics disclosures to BEGA and to Lawson). *Also see* App. 500 (dec. ¶15) (basis for Plaintiff conclusion IR connected to ethics disclosures).

### C. Plaintiff's Fraud Disclosures About S.B. and the Reasonableness of Her Belief that Serious Wrongdoing Occurred

21.   Even Defendant Sydney Lester—the official who proposed the 10-day suspension for Plaintiff's purportedly knowingly lying in alleging S.B. committed leave fraud—answered that "I would say I'm not certain" when asked how certain he was that S.B. was innocent of the fraud. App. 430 (dep. 30:15-19).

22.   Plaintiff Lu was aware that S.B. recently had demonstrated a willingness to engage in work-related misconduct for personal gain, as reflected by his admission to ethics violations and paying a related fine. *See* App. 75 (IR at 22-23, recounting Plaintiff's

alerting someone that S.B.'s wife was a permit runner and he was fined $1,000 by BEGA, with Plaintiff including a link to the BEGA public webpage for S.B.'s Negotiated Disposition). *Also see* App. 499 (dec. ¶12) (awareness of S.B. admission and fine).

23.   A consideration in Plaintiff's concluding that S.B. would be capable of claiming paid parental leave for a nonexistent child was that in prior years she observed S.B. to erroneously report his hours worked and needlessly claim overtime. App. 500 (dec. ¶17).

24.   One consideration in Plaintiff's concluding S.B. could have claimed paid parental leave for a nonexistent child was that she observed that fake birth certificates were readily available on the internet. *See, e.g.,* www.superiorfakedegrees.com/fake-birth-certificates/. *Also see* App. 500 (dec. ¶18).

25.   One consideration in Plaintiff's concluding S.B. could have claimed paid parental leave for a nonexistent child was that she was not aware of anyone looking into the issue's having told her they had verified the authenticity of the document(s) S.B. submitted. *See, e.g.,* App. 464 (BEGA investigator Corrales dep. 31:2-6) (did not authenticate record S.B. relied on). *Also see* App. 500-501 (dec. ¶¶19-20) (no one told Plaintiff they had authenticated his supporting documents and she likely would have dropped matter if they had).

26.   A consideration in Plaintiff's concluding that S.B. claimed paid parental leave for a nonexistent child, *despite management's repeated assurances no wrongdoing occurred*, was that the initial reaction to her ethics disclosures about SB [the ones to which he later admitted and for which he paid a fine] also had been management's telling her there was no evidence of wrongdoing by S.B. *See* App. 348 (S. Lester email of 8/31/2016); App. 499 (dec. ¶13) (their disregard of earlier ethics disclosures as untrue was a factor in Plaintiff not fully conceding to their position as to leave fraud disclosures).

27.  A consideration in Plaintiff's concluding that S.B. claimed paid parental leave for a nonexistent child was that multiple components of D.C. government pointed to other components as having confirmed there was no wrongdoing, such that it was not clear to Plaintiff that any of them had thoroughly investigated her fraud disclosures. *Compare, e.g.,* App. 65 (IR at 12, documenting that OIG closed the complaint and referred it to DCRA) and App. 343 (OIG log showing closed 7/14/2018 because "Deemed insufficient to open an investigation") *with* App. 350 (Crowe letter at 1, asserting OIG conducted independent analysis of documentation). *Also see* App. 501 (dec. ¶21)

28.  A consideration in Plaintiff's concluding that S.B. claimed paid parental leave for a nonexistent child was that her research on S.B. indicated he was scheduled to appear for a criminal (traffic-related offense) trial in the month following the claimed birth. *See* App. 349 (Charles County District Court case information relied on by Plaintiff, showing trial set for June 2016); App. 501 (dec. ¶23).

29.  A consideration in Plaintiff's concluding that S.B. claimed paid parental leave for a nonexistent child was that Plaintiff understood S.B. to have told coworkers on June 22, 2016 he would be gone a long time, but after the criminal case was closed on June 23, to have returned to work on June 24. App. 501 (dec. ¶24).

30.  A consideration in Plaintiff's concluding that S.B. claimed paid parental leave for a nonexistent child was her observation that S.B.'s wife posted publicly about other matters on Facebook on the day of the purported childbirth, while Plaintiff did not see any posts mentioning a birth—something that did not make sense to Plaintiff (who is herself the mother of a child). App. 501-502 (dec. ¶25).

31. <u>A consideration in Plaintiff's concluding that S.B. claimed paid parental leave for a nonexistent child was the timing of when S.B.'s wife told the DCRA staff she was pregnant, as compared to Plaintiff not then observing her to be noticeably pregnant, and then the child's being reported to have been born past the due date a couple of weeks later.</u> App. 502 (dec. ¶26.)

32. <u>A consideration in Plaintiff's concluding that S.B. claimed paid parental leave for a nonexistent child was that a female customer told Plaintiff she had seen S.B.'s wife at the office prior to the birth with what appeared to be a foreign object in an odd triangle shape under her clothes (i.e., as if to mimic pregnancy.</u> App. 502 (dec. ¶27); *also see* App. 397 (April 2018 email from a customer to Plaintiff making the observation).

33. <u>A consideration in Plaintiff's concluding that S.B. claimed paid parental leave for a nonexistent child was that Plaintiff understood a coworker to have told her that a date S.B. had shown pictures of a newborn actually was prior to the date later reported for its birth.</u> App. 502 (dec. ¶28).

34. <u>A consideration in Plaintiff's concluding that S.B. claimed paid parental leave for a nonexistent child was that she understood a coworker to have told her (Plaintiff) that when S.B. was asked about how the baby was doing, S.B. responded that she was doing well and walking around, which puzzled Plaintiff because this was four or fewer months after the purported birth, when she understands babies typically don't take their first step until between nine and 12 months.</u> App. 502 (dec. ¶29); *also see* App. 467-468 (Alec Petrillo-Groh dep. 14:11 – 15:21) (surprised by S.B.'s claim that child was walking around, when the child would have been within four months of the purported birth).

35.  <u>Another consideration in Plaintiff's concluding that S.B. claimed paid parental leave for a nonexistent child was that it appeared to Plaintiff from the families' *public* Facebook posts that it was not S.B./his wife who had a newborn and instead was S.B.'s stepmother.</u> App. 503 (dec. ¶31).

36.  <u>Even management officials could not agree among themselves how long it was reasonable for Plaintiff to continue to believe S.B. engaged in leave fraud.</u> *Compare* App. 483 (Investigator Lawson saying first six months or year [dep. 80:14-17]); App. 14 (Defendant's Answer, Sixth Defense, "never reasonable"); 47 (Int. 20 response—"never reasonable"—sworn to at App. 50 by Lester, Whitescarver, and Crowe); App. 452-453 (Whitescarver not disputing six months to one year period as reasonable [dep. 66:17 – 67:12]); and App. 430 (Lester testifying that as of his deposition, he was still uncertain whether or not S.B. actually committed leave fraud [dep. 30:15-19]).

37.  <u>A factor in Plaintiff's concluding that a coworker's fraudulently claiming paid leave for a nonexistent child likely would rise to the level of serious wrongdoing (for which her reporting would be protected) was that she understands HR policies to prohibit the making of false statements under oath and intentional misrepresentations.</u> App. 503 (dec. ¶32); *also see, e.g.,* DPM, Chapter 16, Section 1605.4(b) (as at <u>edpm.dc.gov/chapter/16/#section-1605</u>) (viewed 2/2/2022).

38.  <u>A factor in Plaintiff's concluding that a coworker's fraudulently claiming paid leave likely would rise to the level of serious wrongdoing (for which her reporting would be protected) was that she understood honesty to be important to the work of persons in positions like S.B.'s and hers.</u> *See* App. 503 (dec. ¶33) (understood honesty important as deal with fire safety issues); *also see* App. 34 (Whitescarver decision, noting importance of honesty).

39.   <u>A factor in Plaintiff's concluding that a coworker's fraudulently claiming paid leave for a nonexistent child likely would rise to the level of serious wrongdoing (for which her reporting would be protected) was that she understands such conduct could readily rise to the level of a criminal offense.</u> App. 503 (dec. ¶34) (could be crime under multiple laws, so rising to level of violation of law/rule/regulation). *Also see, e.g.,* D.C. Code § 22-3221 (crime to engage in conduct intended to defraud or obtain the property of another by means of a false or fraudulent pretense or representation, where the offender obtains the property of another person or causes another person to lose property) *and* D.C. Code §§ 22-2402, 22-2404, and 22-3242 (crime to commit perjury or to otherwise make false statements under oath or affirmation, and if a public record is involved, penalty can be up to 10 years for fraud).

40.   <u>A factor in Plaintiff's concluding that a coworker's fraudulently claiming paid leave for a nonexistent child likely would rise to the level of serious wrongdoing (for which her reporting would be protected) was that, at least at the time, the form used to obtain the leave historically required a certification and included a false statement warning.</u> *See, e.g.,* dchr.dc.gov/sites/default/files/dc/sites/dchr/page_content/attachments/dc_fml_form_1_application_0.docx (viewed 2/2/2022).  *Also see* App. 503-504 (dec. ¶35) (form as she saw it was under oath and included false statement warning).

41.   <u>A factor in Plaintiff's concluding that a coworker's fraudulently claiming paid leave for a nonexistent child likely would rise to the level of serious wrongdoing (for which her reporting would be protected) is that she understands wrongdoing by public employees and how tax dollars spent to be a matter of strong public interest.</u> App. 504 (dec. ¶36).

42. <u>A factor in Plaintiff's concluding that a coworker's fraudulently claiming paid leave for a nonexistent child likely would rise to the level of serious wrongdoing (for which her reporting would be protected) was that she understands the public to be interested in situations in which a government employee misuses position for personal benefit.</u> App. 504 (dec. ¶37).

43. <u>A factor in Plaintiff's concluding that a coworker's fraudulently claiming paid leave for a nonexistent child likely would rise to the level of serious wrongdoing (for which her reporting would be protected) was that BEGA took it very seriously when it came to agree with me that S.B. was misusing his job for the personal benefit of him and his wife.</u> App. 504 (dec. 38). *Also see* App. 23-26 (BEGA/S.B. agreement imposing $1,000 fine for S.B.'s admitted misuse of his position to handle projects submitted by his wife's company).

44. <u>A factor in Plaintiff's concluding that a coworker's fraudulently claiming weeks of paid leave would rise to the level of gross misuse/waste of public resources or funds is that the District would be deprived of the employee's services during the period of absence while fraudulently receiving pay.</u> App. 504-505 (dec. ¶¶40-41) (paid during absence and rough calculation of over $15,000 as unjustified cost to D.C. based on eight weeks' leave).

45. <u>A factor in Plaintiff's concluding that a coworker's fraudulently claiming weeks of paid leave would rise to the level of an abuse of authority is that it would involve an employee's using his or her position to obtain a benefit (paid leave) to which they were not entitled.</u> App. 505 (dec. ¶42).

46. <u>Chief Administrative Officer Tiffany Crowe admitted that there was no reason for her conclusion that Plaintiff should have known her disclosures were inaccurate other than that</u>

management told Plaintiff they had investigated it and there was nothing to it. App. 403-404 (dep. 24:17 – 25:4).

47.  CAO Tiffany Crowe testified that even if the investigation had found that S.B. did engage in leave fraud, Plaintiff still would have been disciplined: it was the way she went about pursuing the disclosures that justified discipline, for "the behavior is the problem, not the belief or disbelief in the outcome." App. 404 (dep. 25:12-20).

**D. Tyrone Lawson's Investigation of and Report on Plaintiff**

48.  Investigator Lawson's report included multiple references to Plaintiff's earlier ethics disclosures about S.B. that culminated in S.B.'s admission of guilt and paying a fine. *See, e.g.,* App. 58 (IR at 5, quoting S.B.'s email complaining of Plaintiff making the conflict-of-interest report to BEGA); App. 65 (IR at 12, referencing the Exh. 11 email sent to Lawson in 2016 that was about the ethics disclosure); App. 345-346 (IR Exh. 11, the September 2016 email in which Plaintiff discusses her ethics disclosures and management's resistance to exploring the conflict-of-interest assertions Plaintiff lodged).

49.  In spite of Investigator Lawson's related references and exhibits and interview questions about Plaintiff's prior ethics disclosures [see paragraph above] about S.B., Lawson's IR failed to anywhere mention in its 35 pages that Plaintiff was right about S.B.'s conflict of interest violations and that S.B. admitted to violations and paid a $1,000 fine. *Compare* App. 54-88 (Lawson IR) *with* App. 23-26 (Negotiated Disposition of BEGA charges against S.B.).

50.  The Lawson IR uses assertions that Plaintiff violated criminal law—such as with its claims that multiple witnesses spoke of Plaintiff "stalking" S.B. and that Plaintiff admitted to the elements of criminal stalking—to disparage her. *See* App. 80 (IR at 27, asserting Plaintiff's

acknowledgement of guilt as to the criminal violation) *and* App. 62 (IR at 9, asserting Mr. Mutia testified awareness of the stalking and that it has been going on for a long time). [The falseness of these accounts by Lawson, with additional examples, are detailed in separate paragraphs below.]

51.     Investigator Lawson three times misled his readers in reporting on his interview of S.B. as involving discussion of Plaintiff Lu's "stalking." *Compare* App. 57-59 (IR at 4-6) *with* App. 89-115 (transcript of interview) (no uses of words "stalk" or "stalking").

52.     Investigator Lawson also was deceptive in recounting that S.B. complained to him that Plaintiff had "stalked and harassed him" since May 2016. *Compare* App. 57 (IR at 4) *with* App. 89-115 (transcript of interview) (no uses of words "stalk" or "stalking").

53.     Investigator Lawson was dishonest in reporting how S.B. told Lawson that S.B. and a management official had discussed Plaintiff's "stalking/harassment" of S.B. *Compare* App. 59 (IR at 6) *with* App. 89-115 (transcript with no mentions of "stalk" or "stalking" *and with* App. 96-97 (transcript at 8:6-12) (S.B. says management official discussed with Plaintiff all the "stuff" Plaintiff was doing and told S.B. to alert him "if any of this starts again"; no reference to discussing "stalking" with management).

54.     Investigator Lawson falsely reported that S.B. explained S.B. had no idea what triggered Plaintiff Lu's "stalking" and harassing him. *Compare* App. 59 (IR at 6) *with* App. 89-115 (Tr.) (no mention of "trigger" or "triggering" nor of "stalk" or "stalking") *and with* App. 105 (Tr. at 17:3-7) (Lawson suggests S.B. has no idea why Ms. Lu is "targeting" S.B.; S.B. responds "All I can say, she's trying to get me to lose my job.")

55.      Investigator Lawson lied in recounting that S.B. told Lawson that S.B. feels "seriously alarmed and disturbed" by Ms. Lu's viewing something on Facebook. *Compare* App. 59

(IR at 6) *with* (App. 89-115) (S.B. transcript with no S.B. use of words "alarmed" or "disturbed"). *Also see* App. 481 (Lawson dep. 77:13-19) (Lawson would not be surprised if no mention in S.B. interview transcript of S.B.'s being seriously alarmed and disturbed).

56.   The actual source for Investigator Lawson's wording of "seriously alarmed and disturbed" is the D.C. stalking law. *See* App. 80 (IR at 27, quoting D.C. Code) *and* App. 482-483 (Lawson dep. 79:15 – 80:5) (Lawson admission not a coincidence that his recounting of witness testimony tracks the stalking criminal law elements even though the witnesses did not actually use such terms).

57.   Investigator Lawson claimed he is unaware the D.C. stalking law specifically excludes constitutionally protected activity [*compare* App. 474 (dep. 32:3-13) *with* D.C. Code § 22-3133(b)] though he read the text of the law "several times" prior to preparing the Investigative Report. App. 474 (dep. 32:15-17).

58.   Given that he read the stalking law "several times" before preparing his IR (App. 474), Investigator Lawson likely was aware that there is a risk of imprisonment for those found guilty under it. *See* D.C. Code 22-3134 (penalties for violation of stalking law).

59.   Investigator Lawson misled the readers of his Investigative Report by recounting that S.B. told him of a particular day of the month on which the child at issue was born. *Compare* App. 59 (IR at 6) *with* App. 102 (Tr. at 14:1-12) (discussing month and year, but making no mention of the day of the month).

60.   Investigator Lawson lied in describing his interview of Harrison Shelton as being regarding a complaint that Plaintiff Lu "stalked" and harassed S.B. *Compare* App. 60 (IR at 7) *with* App. 116-120 (Tr.) (no mention of "stalk" or "stalking" during interview).

61. <u>Investigator Lawson fabricated his claim that Harrison Shelton stated he had "heard about Ms. Lu's stalking of" S.B. "from other co-workers…"</u> *Compare* App. 60 (IR at 7) *with* App. 116-120 (Tr.) (no mention of "stalk" or "stalking"). *Also see* App. 117-118 (Tr. at 2:20 – 3:8) (Mr. Shelton testifying only of hearing second-hand "rumors" Ms. Lu made "comments" about S.B.; no mention of stalking).

62. <u>Investigator Lawson fabricated his claim that interviewee Syed Hashmi told Lawson "he has been aware of Ms. Lu's stalking of" S.B. and that "it has been going on a long time."</u> *Compare* App. 61 (IR at 8) *with* App. 121-129 (Tr.) (no mention of word "stalk" or "stalking") and App. 124 (Tr. at 4:11-14) (reference to "long time" is to overall disputes between S.B. and Plaintiff Lu, versus to "stalking").

63. <u>Investigator Lawson lied when reporting</u> (App. 62—IR at 9) <u>that interviewee Samuel Mutia "stated he has been aware of Ms. Lu's stalking of" S.B. regarding use of paid family leave and that "it has been going on for a long time."</u> *Compare* App. 232-240 (Tr.) (no use of words "stalk" or "stalking" in interview, nor references to "going on" or "long time").

64. <u>Investigator Lawson was deceitful when recounting that he and interviewee Chrys Edet discussed Ms. Lu's "stalking" of S.B., with Edet purportedly saying he knew "it has been going on for a long time."</u> *Compare* App. 62 (IR at 9) *with* App. 241-246 (Tr.) (no mention of "stalk" or "stalking" and no reference to anything going on for a long time).

65. <u>Investigator Lawson poisoned the well in his interview of management official Christopher Bailey by telling Bailey that Lawson was investigating Plaintiff for "persistent stalking and possible sexual harassment," when no allegations of sexual harassment were ever made.</u> *Compare* App. 248 (Tr. at 2:4-11) *with* App. 54-88 (Lawson's IR, making no reference to any allegations of sexual harassment).

66.   Investigator Lawson fabricated his claim that he was told by management official
Christopher Bailey of a discussion with CAO Crawford that Bailey identified as the "last
time he heard about Ms. Lu's stalking of" S.B. *Compare* App.63 (IR at 10) *with* App. 247-
259 (Tr. with sole mention of "stalk" or "stalking" being Investigator Lawson's at start of
interview [App. 248 at 2:4-11]).

67.   Investigator Lawson demonstrated open hostility toward Plaintiff's engaging in disclosure
activity, such as by telling her at least seven times during his interview of her that matters
related to whether S.B. engaged in leave fraud were none of her business. *See* App. 260-
341, at 331 (Tr. 72:6-10) (first and second instances of "none of your business"); 331 (Tr.
72:12) (third); 337 (Tr. 78:8-9) (fourth); 337 (Tr. 78:12) (fifth); 337 (Tr. 78:14-15) (sixth);
and 338 (Tr. 79:4) (seventh). *Also see* App. 485 (dep. 100:13-19) (Investigator Lawson
stipulating that he told Plaintiff eight times during the interview that what had gone on with
S.B. was none of her business); App. 506 (dec. ¶46).

68.   Yet, as a general proposition, Investigator Lawson agreed that as a general matter one
employee's misconduct "is the business of all employees." App. 486 (dep. 101:11-17).

69.   During Investigator Lawson's interview of Plaintiff Lu, he questioned why she had
contacted the *Washington Post* about the leave fraud issue when the newspaper is not part
of DCRA Human Resources. App. 310 (Tr. at 51:16-20). *Also see* App. 506 (dec. ¶47).

70.   During Investigator Lawson's interview of Plaintiff, he questioned why she had contacted
CNN when it is not part of DCRA Human Resources. App. 311 (Tr. at 52:1-8). *Also see*
App. 506 (dec. ¶47).

71. <u>During Investigator Lawson's interview of Plaintiff, he questioned why she contacted (news station) WTOP when it is not DCRA Human Resources.</u> App. 312 (Tr. at 53:1-4). *Also see* App. 506 (dec. ¶47).

72. <u>During Investigator Lawson's interview of Plaintiff, he pushed her to admit that she contacted NBC Universal and that it is not part of DCRA Human Resources.</u> App. 312-13 (Tr. at 53:21 – 54:7). *Also see* App. 506 (dec. ¶47).

73. <u>The D.C. Department of Human Resources advises staff that they have a right to communicate with members of the D.C. Council.</u> *See, e.g.,* "Whistleblower Protections and Obligations" at [www.dchr.dc.gov/page/whistleblower-protections-and-obligations](http://www.dchr.dc.gov/page/whistleblower-protections-and-obligations) (viewed 2/2/2022); App. 506 (dec. ¶48) (she understood management was not permitted to keep employees from communicating with Council).

74. <u>During Investigator Lawson's interview of Plaintiff, he pushed her to admit that she reported her concerns about leave fraud by S.B. to Councilmember Brianne Nadeau.</u> App. 313-14 (Tr. at 54:21 – 55:9). *Also see* App. 506 (dec. ¶48).

75. <u>During Investigator Lawson's interview of Plaintiff, he pushed her to admit that she reported her concerns about leave fraud by S.B. to Councilmembers Michele Blackwell and Elissa Silverman.</u> App. 314 (Tr. at 55:10-17). *Also see* App. 506 (dec. ¶48).

76. <u>Investigator Lawson acknowledged ("Personally, yes") that he thought it was inappropriate for Plaintiff Lu to interact with these council members.</u> App. 484 (dep. 83:10-20).

77. <u>During Investigator Lawson's interview of Plaintiff Lu, he repeatedly pushed her to acknowledge her report of parental leave fraud by S.B. was weak because Ms. Lu had never seen S.B.'s wife's "nude body while she was wearing a pillow or "fake pregnancy belly."</u> App. 64 (IR at 11); App. 325 (Tr. at 66:14-20); App. 326-27 (Tr. at 67:22 – 68:11)

(repeatedly pushing her to admit she had not seen S.B.'s wife in the nude). *Also see* App. 506 (dec. ¶50).

78. <u>During Investigator Lawson's interview of Plaintiff, he rejected her request that he interview her coworker Alec whom she cited as part of the basis for her belief that leave fraud occurred.</u> App. 326 (Tr. at 67:7-18) (Lawson: "I don't care what somebody else told you about somebody else" and "I don't need to talk to Alec" as he was not complaining). *Also see* App. 487 (dep. 109:3-9) (Lawson agreeing he declined to speak with the witness that Plaintiff requested Lawson interview). *Also see* App. 506 (dec. ¶51).

79. <u>When Plaintiff Lu attempted to tell Investigator Lawson what coworker Alec had said about the matter, Lawson stopped her, saying it would be hearsay</u> [transcribed as "heresy"]. App. 216 (Tr. 67:7-9). *Compare* App. 250 (Bailey/Lawson Tr. at 4:16-22) (Lawson allowing witness to recount what they had been told Plaintiff was told in a meeting with others for which the witness was not present). *Also see* App. 506 (dec. ¶52).

80. <u>During Investigator Lawson's interview of Plaintiff, he ordered her not to say anything further about the leave fraud issues to "the press" or "anybody else in DCRA, or anywhere," other than DCRA Human Resources.</u> App. 333 (Tr. at 74:4-13). *Also see* App. 506 (dec. ¶49).

81. <u>During his interview of Plaintiff Lu, Investigator Lawson complained that she raised the leave fraud concerns with members of the "Council," with the "Washington Post, WTOP, City Paper, CNN."</u> App. 337 (Tr. at 78:2-5).

82. <u>Investigator Lawson falsely reported that during his interview of Plaintiff, she "stated her complaint against" S.B. and his wife "is based on speculation and conjure."</u> *Compare* App. 65 (IR at 12) *with* App. 330-31 (Tr. at 71:16 – 72:3) (Lawson interrupting and cutting

Plaintiff off when she attempts to give a full response to his assertion her reports are based on "conjure and speculation"). *Also see* App. 507 (dec. ¶53).

83.  Investigator Lawson's report to management remarked on Plaintiff's having reported her leave fraud assertions to "Councilmembers" and "news media service." App. 71 (IR at 18).

84.  Investigator Lawson's report to management included attachments of Plaintiff's emails to media outlets about her reports she believed S.B. had engaged in leave fraud. App. 74 (IR at 21, referencing the report's Exhibit 29 consisting of emails with the Washington Post).

85.  Investigator Lawson's report to management included multiple adverse descriptions of Plaintiff's contacts with media outlets. App. 75—IR at 22, as to CNN; App. 76 (IR at 23, as to WTOP, NBC Universal, and Washington Post); App. 77 (IR at 24, as to City Paper).

86.  Investigator Lawson's report to management falsely cited Plaintiff's communications with Councilmembers as misconduct. *Compare* App. 77-78 (IR at 24-25) *with* dchr.dc.gov/page/whistleblower-protections-and-obligations (viewed 1/24/2022) (DC DCRA webpage noting employee right to freely communicate with council members) and D.C. Official Code §1-615.53 (prohibition on supervisor interfering with or denying right of employee to furnish information to the Council or one of its members).

87.  Investigator Lawson lied to management when his report *twice* claimed that "Ms. Lu admitted" to engaging in a course of conduct that aligned with a violation of the criminal stalking law. *Compare* App. 80 (IR at 27, claim of Plaintiff admission, also setting out elements of a violation) *and* 85 (IR at 32, repeating Lawson's false representation as to Plaintiff admitting guilt) *with* App. 260-341 (Tr. of Lawson interview of Plaintiff, containing no admission she knew her conduct would cause S.B. to fear for his safety, feel seriously alarmed/disturbed/frightened, or suffer emotional distress, *nor containing any*

*discussion of such issues* beyond Lawson's speculation (denied by Plaintiff) [App. 333-34—IR at 72:17 – 73:2] that S.B. hesitates to bring child to work because of Plaintiff's "haunting" and "stalking" S.B.). *Also compare with* App. 339 (IR at 80:7-8, Plaintiff explaining she meant well and did not mean to "hurt anybody or be malicious about something"). *Also see* App. 507 (dec. ¶54).

88. Among the grounds for Investigator Lawson's concluding Plaintiff "grossly violated" rules against falsification as to official matters and in communications with supervisors was that Plaintiff contacted media outlets and members of City Council after being ordered not to communicate with anyone but HR. *See* App. 80-81 (IR at 27-28, making at least six references to media outlets and at least two to her communicating with council members).

89. Among the grounds for Investigator Lawson's concluding Plaintiff "grossly violated" rules against failing to follow instructions were that she contacted media outlets and council members after being ordered to report matters solely to HR. App. 81-5 (IR 28-32, referencing communications with CNN, Washington Post, WTOP, and three council members).

90. While the body of the Lawson Investigative report makes more than 20 uses of the word "stalking" and its variants (App. 54-88), Investigator Lawson could not name a single witness who actually used such a word in his interviews of them. *Compare* App. 474-475 (dep. 32:18 – 33:4). That is, not even S.B. ever used the term. App. 478 (dep. 50:8-11).

91. The Lawson IR and his interview eventually frightened Plaintiff out of making further disclosures. *See* App. 35 (decision at 3, noting no repeating of Plaintiff's conduct at issue between March 27, 2019 and the June 2019 date of the decision). *Also see* App. 507 (dec. ¶47) (factors leading her to be less willing to speak out in the future).

92. In contrast to his extensive investigation of Plaintiff's disclosures/conduct, Investigator Lawson was not assigned to investigate whether her reports S.B. engaged in fraud were true. *See* App. 471 (dep. 22:6-14) (did not know why he was not assigned to investigate accuracy of Plaintiff's fraud disclosures).

93. Investigator Lawson inaccurately reported that Mr. Lester knew S.B. had a child born during use of FMLA in 2016; instead, this was Lawson's "paraphrase." *See* App. 479 (Lawson dep. 70:7 – 71:12) (acknowledgement that may not really be in the transcript).

94. Investigator Lawson agreed that, if an employee did submit fraudulent documents in support of a claim for paid leave based on a child that did not exist, he would find it to rise to the level of criminal misconduct. App. 488-489 (dep. 115:12 – 116:2).

95. Investigator Lawson agreed that sometimes birth certificates may be forged, in that it is his view that "anything can be forged." App. 472-473 (dep. 26:14 – 27:4).

**E. Defendant Lester's Proposed 10-Day Suspension of Plaintiff**

96. Rather than the typical process in which a Letter of Counseling/Reprimand would precede a decision to propose a suspension, as to Plaintiff Lu the Defendants first proposed the discipline and then followed up with a counseling/warning letter. *Compare* App. 27 (April 2, 2019) proposed suspension from Lester *with* App. 350 (CAO Crowe April 22, 2019 letter detailing the history, asserting the matter is closed, and noting the letter will be put in Plaintiff's "official personnel folder" along with App. 52 (cover email to the Crowe letter, including threat that Ms. Lu needed to "consider this matter closed, as your very job may depend on it"). *Also see* App. 507 (dec. ¶57).

97. The District's disciplinary policies (excerpt begins at App. 366) identify progressive discipline as involving verbal counseling, then a reprimand, then "corrective action"

(suspension of fewer than 10 days), and finally "adverse action" (suspension of 10 or more days). App. 368, 371, and 372.  [Policy also at edpm.dc.gov/issuances/discipline/.] *Also see* App. 507 (dec. ¶57).

98.   By starting with a 10-day proposed suspension rather than first trying a reprimand and a less-than-10-day suspension, Defendant Lester skipped two steps of progressive discipline. *See* App. 368, 371, and 372 (policy outlining standard steps); App. 30 (Douglas factor analysis in proposal, noting no prior reprimands or other prior corrective/adverse actions). *Also see* App. 507 (dec. ¶57) (Plaintiff's understanding of the standard process).

99.   The disciplinary proposal also violated standard procedures by only giving Ms. Lu six days to respond. *Compare* App. 31 (proposal at 5) *with* App. 373 (D.C. policy requiring the employee be given 10 days to respond to a proposed suspension of 10 or more days). *Also see* App. 508 (dec. ¶59).

100.  Defendant Lester summarized the basis for the proposed suspension as being that Plaintiff was told her reports were mistaken and instructed that she should stop making them, but nonetheless she persisted. App. 424-425 (dep. 21:20 – 22:6).

101.  Tyrone Lawson's Investigative Report was a fundamental basis for Mr. Lester's proposed suspension of Plaintiff. App. 29 (proposal at 3, explaining the Lawson "investigation results and conclusions below provide the backdrop for this proposal"). *Also see* App. 431-432 (Lester dep. 31:18 – 32:5) (Mr. Lester's primary basis for decision to propose discipline was Lawson IR).

102.  Proposing Official Lester did not seek any information beyond what was presented to him in the Lawson IR. App. 434-435 (Lester dep. 35:21 – 36:1).

103.  Defendant Lester testified that if Plaintiff Lu had never reported her belief that S.B. engaged in leave fraud, she never would have been disciplined: he knew of no other reason she would have been suspended. App. 429 (dep. 28:4-13).

104.  Defendant Lester in deposition agreed that, if an employee had obtained eight weeks of paid parental leave based on a child that turned out not to exist, it would constitute serious misconduct. App. 426 (dep. 24:15-22).

105.  Defendant Lester in deposition agreed that if an employee had submitted a document under oath that they knew to be untrue, it would be serious misconduct. App. 426 (dep. 25:1-4).

106.  S.B., a coworker of Plaintiff's, said in deposition he would assume that it would be serious misconduct if a DCRA employee were to claim paid parental leave for a non-existent child. App. 410 (dep. 19:10-15).

107.  Proposing Official Lester's more recent testimony at least three times contradicts his assertions in the April 2019 disciplinary proposal as to its basis. *Compare* App. 27 (proposal at 1, asserting it addresses "**only** the dishonest statements made by Ms. Lu") (emphasis original) *with* App. 40 (Int. 1 response that "Plaintiff's discipline was based on a course of harassing conduct over two and a half years towards her coworker, S.B..."). *Also see* App. 41 (repeating the "course of harassing conduct over two and a half years" wording in response to Int. 5) *and* App. 47 (response to Int. 20, repeating this wording). Mr. Lester's declaration under penalty of perjury as to the interrogatory responses appears at App. 50.

108.  Asked if it was relevant to his disciplinary proposal that Plaintiff contacted D.C. Council members, Defendant Lester responded that he "wouldn't say it would be irrelevant. It if was in the [Lawson investigative] report it would be relevant." App. 438 (dep. 44:8-10).

109.   The disciplinary proposal criticized Plaintiff for her communications with members of the D.C. Council. App. 29 (proposal at 3) (asserting she made dishonest statements "over and over and over" to them).

110.   The disciplinary proposal criticized Plaintiff for her communications with the media. App. 29 (proposal at 3) (asserting she made dishonest statements "over and over and over" to them).

111.   Proposing Official Lester is unsure if "there are protections under D.C. law for people who report what they believe to be wrongdoing" by employees. App. 423 (dep. 13:4-10).

112.   The harm Defendant Lester testified to having been caused by Plaintiff's conduct was "tension in the workplace" and no other harm "that I'm aware of." App. 428 (dep. 26:12-18).

113.   Defendant Lester's conclusion that Plaintiff Lu had disrupted the workplace was not based on his observations as the supervisor of Plaintiff and S.B. *See* App. 433 (dep. 34:1-5) (Lester conclusion based solely on Lawson IR and what Lawson said to Lester on the subject).

114.   Defendant Lester did not know if Investigator Lawson had looked into whether or not it was actually true that S.B. engaged in leave fraud. App. 439 (dep. 53:19-22).

115.   When S.B. complained to Defendant Lester about Plaintiff mistreating him, Mr. Lester did not meet with Plaintiff to hear her side of the story. App. 436-437 (dep. 37:21 – 38:1).

### F. Defendant Whitescarver's Imposed Eight-Day Suspension of Plaintiff

116.   Deciding Official Whitescarver's more recent testimony at least three times contradicts his assertions in the June 2019 disciplinary decision for its basis. *Compare* App. 33 (decision at 1, identifying a single charge, related to misleading the Mayor on two days in February

2019) *with* App. 40 (Int. 1 response that "Plaintiff's discipline was based on a course of harassing conduct over two and a half years towards her coworker, S.B..."). *Also see* App. 41 (repeating the "course of harassing conduct over two and a half years" wording in response to Int. 5) *and* App. 47 (response to Int. 20, repeating this wording). Mr. Whitescarver's declaration under penalty of perjury as to the interrogatory responses appears at App. 50.

117.  Defendant Whitescarver's sworn interrogatory testimony that Plaintiff was disciplined for "a course of harassing conduct over two and a half years towards her coworker, S.B..." (*id.*) contradicts his deposition testimony that the discipline was not for harassment. *Compare* App. 451 (dep. 39:1-7) (final charge was misleading the Mayor, not insubordination or harassment because that is what was received from proposing official).

118.  Defendant Whitescarver was aware that even an accurate whistleblower disclosure leads to some disruption. App. 454 (dep. 69:14-18).

119.  Defendant Whitescarver claims he made his decision to discipline Plaintiff for purportedly lying about S.B. without knowing S.B. had admitted wrongdoing and paid a fine in relation to Plaintiff's earlier ethics disclosures. *See* App. 446 (dep. 17:7-11).

120.  Defendant Whitescarver's view of whether or not S.B. committed leave fraud is based entirely on what he heard second-hand from HR and Lawson's Investigation. App. 448 (dep. 26:8-13). *Also see* App. 449 (dep. 27:9-14) (did not review any documents outside of what was in the Lawson IR).

121.  Defendant Whitescarver disciplined Plaintiff for her reports to the Mayor notwithstanding his deposition testimony that an employee is generally allowed to report "to the IG and to

anyone else they care to" any matter "they feel is a violation of District law or is a case of fraud or abuse." App. 442-443 (dep. 11:17 – 12:3).

122.  Defendant Whitescarver testified that if Plaintiff Lu had never reported her belief that S.B. engaged in leave fraud, she never would have been disciplined: he was unaware of "any other issues that would have caused the suspension." App. 447 (dep. 21:9-16).

123.  Defendant Whitescarver in deposition agreed that, if an employee had obtained eight weeks of paid parental leave based on a child that turned out not to exist, it would constitute serious misconduct. App. 444 (dep. 14:9-18)

124.  Defendant Whitescarver in deposition agreed that if an employee had submitted a document under oath that they knew to be untrue, it would be serious misconduct. App. 445 (dep. 15:15-22).

125.  Defendant Whitescarver's decision did not comply with D.C. disciplinary policy in that it was issued 86 days from the proposal (April 2 to June 27, 2019), while policy requires a decision in 45 days. *Compare* App. 33 (decision date) *with* App. 372 (45-day deadline). [Or 76 days if measuring from receipt of Plaintiff's answer on April 12, 2019.] *Also see* App. 508 (dec. ¶62).

126.  Defendant Whitescarver's decision relied on the proposal, which in turn had relied heavily on the Lawson Investigative Report. *See* App. 29 (proposal at 3, explaining the Lawson "investigation results and conclusions below provide the backdrop for this proposal") *and* App. 33 (decision, citing the proposal and noting Whitescarver's "full review of the supporting documentation") *and* App. 34 (decision: "I hereby adopt the evidence, recommendations, rationale, and conclusions of the proposing official").

127. Part of why Plaintiff was suspended was that she had not surrendered to management's view that there was no wrongdoing by S.B.  *See* App. 34 (decision, referencing appearance she had not "fully conceded" to the investigatory conclusions).

128. The decision acknowledged that Plaintiff had no prior disciplinary record. App. 34. *Also see* App. 507 (dec. ¶58).

129. The discipline was issued in part for the purpose of quieting Plaintiff. *See* App. 33 at ¶9 (decision: "It is hoped that the proposed 10 day suspension will impress upon her the need for her to stop engaging in making false statements about her coworkers").

**G. Administrative Exhaustion Under the WPA**

130. Plaintiff's union initially invoked arbitration on her behalf as to the imposed eight-day suspension. App. 15-20 (Settlement Agreement); App. 508 (dec. ¶63).

131. By later agreement with the District in December 2019, the scheduled arbitration was cancelled and this outcome agreed to be a "final determination" of the issues that were to be raised in the anticipated arbitration. App. 15-20 (Settlement Agreement); App. 508 (dec. ¶64)

132. That is, the parties agreed no relief would be granted in arbitration, with the result that Plaintiff now only may obtain whatever relief is available from this Court, versus the range of relief often available from a negotiated grievance process. App. 15-20 (Settlement Agreement); App. 508 (dec. ¶65)

133. The District of Columbia agreed in particular that "it will not assert that the grievance in this matter is pending or in anyway [*sic*] precludes Ms. Lu from initiating any lawsuit against the Agency in any court of law." App. 15, ¶2(d). App. 15-20 (Settlement Agreement).

**H. Denial of Telework and Other Matters**

134.   As compared to the February 2019 disclosures to the Mayor cited to discipline Plaintiff and the June 2019 suspension decision (App. 33), it was in August 2019 that Plaintiff submitted a request to telework and then was approved for it by her supervisor. *See* App. 356 (Plaintiff email from October 2019 noting timeline) *and* 508 (dec. ¶68).

135.   Chief Administrative Officer Tiffany Crowe was the one who had sent Plaintiff the April 2019 email warning her that her job could depend on Plaintiff's willingness to drop the claims of fraud (App. 52 and App. 508 [dec. ¶67]).

136.   It was unusual for CAO Crowe to get involved in decisions about individual employees being approved/disapproved for telework. *See* App. 405 (Crowe dep. 59:1-5). *Also see* App. 509 (dec. ¶68) (Plaintiff's observation of same).

137.   Ms. Crowe claimed that Plaintiff could not be allowed to telework because she did not have access to a VPN. App. 406-407 (Crowe dep. 69:22 – 70:3); App. 509 (dec. ¶69).

138.   Plaintiff alerted Ms. Crowe that while she was being barred from teleworking under the claim she could not do so without a VPN, her colleagues [who weren't whistleblowers] were teleworking. App. 357 (email); App. 509 (dec. ¶¶69-70).

139.   Among these was Plaintiff's coworker S.B., who testified that he was allowed to telework without a VPN. App. 415-416 (dep. 36:16 – 37:6).

140.   Neither Plaintiff nor the officials involved in the discipline are aware of any other DCRA employees ever being disciplined for misleading management officials. App. 434 (Lester dep. 35:3-6); App. 450 (Whitescarver dep. 34:4-16); App. 509 (dec. ¶71 as to Plaintiff).

141.   While S.B. did not like Plaintiff reporting him, there were no disruptive confrontations between them, with them instead both continuing to perform at high levels. *See* App. 508 (dec. ¶61).

142.   Plaintiff's reports to the Mayor that formed the basis for the sole disciplinary charge in the disciplinary decision (App. 33) did not disrupt or impede the work of the Mayor. *See* App. 48 (Defendants' answer to Int. 22 asking for factual basis of any related factual contention, providing no specific answer and instead general statements about disruption of the overall workplace); App. 459-460 (DCRA Director Chrappah dep. 22:3 – 23:4) (not unusual or particularly inappropriate for people to excitedly approach Mayor when seeing her); App. 457 (Director Chrappah dep. 11:6-22) (Mayor's office never contacted him about Plaintiff's comments to Mayor nor about anything else related to Plaintiff Lu) *and* App. 458 (Chrappah dep. 12:15-20) (he expects that if Mayor's office did have a concern about a DCRA employee [e.g., Ms. Lu], the Mayor's office would have let him know about it). *Also see* App. 492-494 (DCRA Deputy Director Shirley Kwan-Hui deposition testimony at 13:15 – 15:08 that she could recall no discussion of Plaintiff with the Director nor any communications from the Mayor's office asserting they considered Plaintiff to have been disruptive).

143.   Apart from the frustration any person might feel at being the subject of a coworker's whistleblowing, S.B.'s work performance was not adversely affected by Plaintiff's disclosures. *See* App. 414 (dep. 29:8-17) (he maintained high performance ratings).

144.   Investigator Lawson's experience is that it is typical for a person who is the subject of a whistleblower disclosure to be upset about it. App. 476-477 (dep. 39:17 – 40:3).

145. <u>S.B.'s understanding is that his complaints are what initiated the Lawson investigation of Plaintiff</u>. App. 417-418 (dep. 40:17 – 41:2).

146. <u>Defendant D.C. has acknowledged that it is in the public interest for employees to be "free to report waste, fraud, abuse of authority, violations of law, or threats to public health or safety without fear of retaliation or reprisal."</u> D.C. Code Ann. § 1-615.51.

147. <u>Defendants Lester and Whitescarver relied on their positions and authority as D.C. government officials to propose and impose the suspension on Plaintiff</u>. *See* App. 25-30 (proposal issued by Defendant Lester, on official letterhead and citing his position as "Fire Protection Manager, DCRA, Permit Operations Division") *and* App. 31-35 (decision issued by Defendant Whitescarver as Chief Building Officer for the "Department of Consumer and Regulatory Affairs" and on official letterhead).

148. <u>Plaintiff has become more hesitant to speak out given that DCRA Chief Administrative Officer Tiffany Crowe told Plaintiff by email on April 30, 2019 that, "You need to consider this matter closed, as your very job may depend on it."</u> App. 36-37 (email); App. 507 (dec. ¶56).

149. Notwithstanding District HR's proclamation that employees have the right to communicate with Council members, <u>the (now former) Chief Building Officer instructed Plaintiff that she could raise concerns about leave fraud solely to HR from now on.</u> *Compare* www.dchr.dc.gov/page/whistleblower-protections-and-obligations *and* App. 10 (Answer at ¶44, admitting to substance of the conversation asserted in Plaintiff's Complaint at ¶44, n. 8 [App. 338]). *Also see* WPS § 1-615-53 (prohibition on reprisal for employee exercising right to furnish information to a Councilmember). *Also see* App. 509 (dec. ¶74).

150. <u>Plaintiff Lu mitigated her damages, such as by trying to take training and enter special programs when offered at work to help improve her resume and make it more likely she can be promoted (even though labelled a stalker); she has tried to continue to perform at a high level in spite of stress; she has sought professional care to try to make the stress and anxiety manageable, such as with counseling and medication; and she has pursued this lawsuit to try to get the discipline off her record as she believes it can easily hold her back from a promotion.</u> App. 509-510 (dec. ¶75).

Respectfully Submitted,

SCHLEICHER LAW FIRM, PLLC
1629 K St., NW, Ste. 300
Washington, D.C. 20006
(202) 540-9950
(202) 683-6130 fax


By:   /s/ David R. Schleicher_____
        David R. Schleicher
        DC Bar No. 428001
        david@gov.law

ATTORNEYS FOR PLAINTIFF LU