## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

QING LU,

               *Plaintiff*,

        v.

DISTRICT OF COLUMBIA, *et al*.,

              *Defendants.*

Civil Action No. 1:20-cv-00461-APM

## DEFENDANTS' RESPONSE TO PLAINTIFF'S "STATEMENT OF FACTS FOR WHICH THERE IS NO GENUINE ISSUE IN SUPPORT OF HER MOTION FOR PARTIAL SUMMARY JUDGMENT"

Defendants District of Columbia (the District), Sydney Lester, and Clarence Whitescarver herein respond to Plaintiff's "Statement of Facts for Which There is No Genuine Issue in Support of Her Motion for Summary Judgment."  Pl.'s SUMF [77-1]; *see* Fed. R. Civ. P. 12(d) and 56(b)(2)(A).  As discussed below, Plaintiff's 150 statements of "fact" are nearly devoid of any purely factual or material statements.  The facts Plaintiff does offer are couched within immaterial, argumentative, and misleading statements designed to obfuscate that Plaintiff does no more than refer to her statements as "whistleblower disclosures" in this First Amendment and District of Columbia Whistleblower Protection Act (DCWPA) case.  *But see Lane v. Franks*, 573 U.S. 228, 241 (2014); *Coleman v. District of Columbia*, 794 F.3d 49, 58-59 (D.C. Cir. 2015).

      "A non-movant" survives a motion for summary judgment when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party" or the Court can find that the non-moving party would be entitled to judgment as a matter of law. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (quotation marks omitted); *see* Fed. R. Civ. P. 56(a).

"[T]he substantive law [ ] identif[ies] which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  But Plaintiff must do more than simply draw her own conclusions to state a material fact.  *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).  "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  And, "[i]n ruling on a motion for summary judgment the court must determine first whether the moving party has met its burden of production." *Laningham*, 813 F.2d at 1241.  "Only [genuine] disputes over facts that might affect the outcome of the suit" need to "be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Laningham*, 813 F.2d at 1241.  Here, Plaintiff fails in all material respects.

| Plaintiff's Statement of Undisputed Material Fact | Defendants' Response |
|---|---|
| 1.  Plaintiff Qing "Luchi" Lu is a Fire Protection Engineer in the D.C. DCRA. *Compare* Complaint ¶7 *with* Answer ¶7 (admitted); App. 498 (dec. ¶1). | 1.  Undisputed. |
| 2.  During Ms. Lu's more than a decade as a Fire Protection Engineer with DCRA, "her performance has continually been that of a highly effective performer." App. 30 (Lester's proposal at 4). *Also see* App. 52 (Chief Administrative Officer's email to Plaintiff, "I hear that, when not lodging complaints without evidence, you are a valued employee"). *Also see* App. 498 (dec. ¶2). | 2.  Undisputed but not material. |
| 3.  Defendant District of Columbia is a creation of the U.S. Constitution, operating as a municipality. *Compare* Complaint ¶8 *with* Answer ¶8 (admitted). [D.C. is sued only under the D.C. Whistleblower Protection Act (WPA), not the First Amendment.] | 3.  Undisputed but not material. |
| 4.  Defendants C.G. (Clarence Garret) Whitescarver and Sydney Lester are sued in their individual capacities for claims | 4.  Undisputed. |

| | |
|---|---|
| under 42 U.S.C. § 1983 and those raised under the District of Columbia Whistleblower Protection Act. *Compare* Complaint ¶9 *with* Answer ¶9 (admitted, though denying violations). | |
| 5.  When he proposed a 10-day suspension, Sydney Lester was the Fire Protection Manager, DCRA, Permit Operations Division. *Compare* Complaint ¶10 *with* Answer ¶10 (admitted). *Also see* App. 498 (dec. ¶5). | 5.  Undisputed but not material. |
| 6.  When he imposed the eight-day unpaid suspension, C.G. Whitescarver was the DCRA Chief Building Official. *Compare* Complaint ¶10 *with* Answer ¶10 (admitted). *Also see* App. 498 (dec. ¶6). | 6.  Undisputed but not material. |
| 7.  Tiffany Crowe was the Chief Administrative Officer (CAO) during the period in which telework was in dispute. App. 32 (title in cc: list for proposal at 6); App. 356-357 (emails between Crowe and Plaintiff). | 7.  Disputed, unsupported, and not material. Defendants do not dispute that Tiffany Crowe was the District of Columbia Department of Consumer and Regulatory Affairs' (DCRA) Chief Administrative Officer (CAO).  However, Defendants deny that telework was "in dispute." Defendant Sydney Lester approved Plaintiff's telework application and forwarded Plaintiff's concerns to Ms. Crowe to figure out what was already keeping Plaintiff from starting telework. *See, e.g.*, Defs.' SUMF [79] ¶¶ 83-85; Defs.' Response to Pl.'s SUMF ¶ 134; Defs.' Ex. 11 [79-11] at 7-9; Ex. A at 11-12 (Lu Tr. 94:16-95:2). |
| 8.  S.B., the subject of Plaintiff's disclosures, is a fellow DCRA fire engineer. App. 54 (IR 1); App. 499 (dec. ¶8). | 8.  Disputed in part, but immaterial.  Defendants do not dispute that S.B. and Plaintiff were coworkers.  However, Defendants dispute Plaintiff's conclusory characterization of her conduct throughout her statement of facts as "disclosures."  *See* Defs' Mot. to Dismiss or for Summary Judgment, Statement of Undisputed Material Facts (SUMF), and Memorandum of Points and Authorities [79] and supporting Exhibits 1-16 [79-1 to 79-16]. |
| 9.  In August 2016, Plaintiff disclosed to management her belief that coworker S.B. was handling projects submitted by his wife's company, in violation of ethics/conflict-of-interest rules. *See* App. 345-348 (emails discussing the disclosures | 9.  Disputed in part.  Defendants do not dispute that Plaintiff shared her beliefs about S.B. with several different people at DCRA in August 2016.  *See* Defs.' SUMF [79] ¶¶ 8-17.  However, on August 16, 2016, Plaintiff wrote to Permit Operations Division Chief, Gary Englebert, in |

| | |
|---|---|
| and management's response); App. 499 (dec. ¶9). | part: "We don't have any proof to assert that he has assigned his wife jobs . . . to himself" and further stated that "it would be quite time consuming to dig out permits that are issued to [his wife's business] and to her.  The best way for you to control . . . will be more people to watch him for you."  Defs.' Ex. 5 [79-5] at 6-7.  Plaintiff's loosely cited claim that she told DCRA Human Resources (HR) that she "reported to Gary Englebert [her] concern of a possible conflict of interest in [S.B.'s] conducts" and provided proof when asked to do so on September 1, 2016, Pl.'s App. [77-2] at 346; *accord.* Defs.' SUMF [79] ¶ 16; *cf.* Defs.' SUMF [79] ¶ 13; is not a protected statement about S.B. or anyone else, *see* Defs.' Response to Pl.'s SUMF ¶¶ 10, 19. |
| 10.  HR Specialist Mia Brown and Special Investigator Tyrone Lawson were among those to whom Plaintiff Lu disclosed S.B.'s conflicts of interest and what she regarded as Defendant Sydney Lester's failure to take adequate corrective action. App. 345-346 (Plaintiff email with Mia Brown and Investigator Lawson listed as recipients); App. 499 (dec. ¶10). | 10.  Disputed in part.  Defendants do not dispute that Plaintiff addressed her September 29, 2016 email to Mia Brown and Tyrone Lawson (at DCRA) before forwarding it to the Board of Ethics and Government Accountability (BEGA) on October 27, 2016.  *See* Pl.'s App. [77-2] at 345-46.  Defendants dispute Plaintiff's conclusion that this email "disclosed" anything. *See* Defs.' Mot. [79] at 68.  *Compare* Defs.' SUMF [79] ¶¶ 8-12, 14-15 (describing the DCRA investigation and reporting of S.B.'s conflict of interest to BEGA), *with id.* at ¶ 16 (reproducing relevant portions of Plaintiff's September 29, 2016 email). |
| 11.  Defendant Sydney Lester's initial response to Plaintiff Lu's ethics disclosures was that Plaintiff's reports about S.B. had become "more and more serious as time progressed" and that her recent allegations [i.e., the ethics disclosures] "have now placed us at the stage where the allegations have legal implications that cannot be ignored." App. 348 (S. Lester email of 8/31/2016). *Also see* App. 499 (dec. ¶11). | 11.  Undisputed but incomplete and thus misleading.  The full email states as follows:<br><br>You have been a member of the Fire Protection Engineering Review team for several years and during that time you have made several allegation about the conduct of your co-worker [S.B.]. These allegations became more and more serious as time progressed. You have made some recent allegations which have now placed us at a stage where the allegations have legal implications that cannot be ignored. We have contacted our legal staff and at this time, after their review, there is no evidence to conclude any wrong doing. |

|  | Since you have made these allegations, if you are in possession of any proof that backs up your allegations you should present them. Both Mr. Gary Englebert and I are available to mee[t] with you to discuss any proof that exists.<br><br>Defs.' SUMF [79] ¶ 12 (quoting Ex. 1 at 60); *see* Defs.' Response to Pl.'s SUMF ¶¶ 9, 19. |
|---|---|
| 12.  Defendant Lester also responded to Plaintiff Lu's ethics disclosures about S.B. by asserting that "there is no evidence to conclude any" S.B. wrongdoing occurred. App. 348 (email); *see* App. 499 (dec. ¶11). | 12.  Disputed in part.  Defendants dispute that Plaintiff's email qualifies as a disclosure, but do not dispute that Mr. Lester sent an email inviting Plaintiff to provide proof of her allegations against S.B. to himself and Mr. Englebert on August 31, 2016.  *See* Defs.' Response to Pl.'s SUMF ¶¶ 9, 11. |
| 13.  Notwithstanding Defendant Lester's assertion that there was "no evidence" of wrongdoing in relation to Plaintiff's ethics disclosures about S.B., S.B. went on to admit to multiple violations and to agree to pay a $1,000 fine. App. 23-26 (Negotiated Disposition).  *Also see* App. 499 (dec. ¶12) (Plaintiff awareness of outcome). | 13.  Disputed in part, misleading, and not material.  Defendants do not dispute that S.B. paid a fine after DCRA investigated the allegations and reported those findings to BEGA for further action in September 2016.  *See* Defs.' SUMF [79] ¶¶ 10-11, 14-15 (citing Ex. 5 [79-5]).  However, Plaintiff mischaracterizes Mr. Lester's August 31, 2016 email which more fully states:  "We have contacted our legal staff and at this time, after their review, there is no evidence to conclude any wrong doing."  Defs.' SUMF [79] ¶ 12 (quoting Ex. 1 at 60); *see id.* at ¶ 13 (citing Defs.' Ex. 9 [79-9] at 4); Defs.' Response to Pl.'s SUMF ¶¶ 9 (Sept. 1, 2016), 11 (Aug. 31, 2016). |
| 14.  [Though they later proved true,] Mr. Lester initially had persuaded agency legal counsel that Plaintiff's reports about S.B. conflicts of interest should be disbelieved because of a purported "long held personal vendetta" by Plaintiff against S.B. *See* App. 398 (August 23, 2016 email discussion among management officials). | 14.  Disputed, incomplete, misleading, and not material.  Plaintiff does not provide a citation to any part of the record explaining how her commentary that her allegations about S.B.'s conflict of interest later proved true or that Lester had persuaded agency counsel.  *See, e.g.,* Defs.' Response to Pl.'s SUMF ¶¶ 9, 22. Instead, the record shows the following:<br><br>On August 23, 2016, DCRA OGC referred S.B. to the Board of Ethics and Government Accountability (BEGA), writing in part, that it was doing so out of an "abundance of caution" after Mr. Englebert and Mr. Lester "indicated . . . that [Plaintiff] has a long held personal vendetta |

| | |
|---|---|
| | against [S.B.] for unknown reasons" and "that they believe this allegation is unlikely to be true" but "agree[d] that they [could not] confirm whether the allegation is true or not because they are not on the same floor as the employees when they are at the permit counter, issuing permits."<br><br>Defs.' SUMF [79] ¶ 11 (quoting Ex. 5 [79-5] at 5); *see also* Defs.' Response to Pl.'s SUMF ¶¶ 9, 11, 19. |
| 15.  [In contrast to Mr. Lester's negative reaction to Plaintiff's reports about S.B.'s ethics violations,] <u>BEGA told Plaintiff they "greatly appreciate your assistance and cooperation" on the subject.</u> *See* App. 400 (BEGA email of November 1, 2016); App. 499 (dec. ¶14). | 15.  Disputed in part.  Plaintiff's statement is unsupported by the record and misleading.  Plaintiff's commentary characterizing Mr. Lester's reaction as "negative" is argumentative and conclusory.  *See* Defs.' Response to Pl.'s SUMF ¶¶ 9, 11, 14.  Defendants do not dispute that BEGA sent Plaintiff an email on November 1, 2016, stating, in part:  "Thank you for meeting with Ms. Corrales last week.  Please note that our investigations are *confidential*, so we cannot provide updates as our investigations are ongoing.  We do, however, greatly appreciate your assistance and cooperation."  Defs.' Ex. 5 [79-5] at 1 (emphasis in original); *see* Defs.' SUMF [79] ¶ 17 (citing Ex. 5 [79-5] at 1).[1] |
| 16.  <u>The portrayal of Plaintiff as having a "vendetta" against S.B. persists among D.C. management even now, after S.B. admitted to ethics violations and paid a fine.</u> *See* App. 402-403 (Crowe dep. 23:22 – 24:4) (describing Plaintiff's actions related to examination of the leave fraud issues to be serving Plaintiff's "vendetta"). | 16.  Disputed.  Plaintiff's statement is misleading and unsupported by the record.  Defendants do not dispute that Plaintiff's conduct towards S.B. demonstrates a "vendetta."  *See, e.g.,* Defs.' Mem. [79] at 32-50 (citing Defs.' SUMF [79] and Exhibits [79-1 to 79-16]).  Tiffany Crowe was not speaking on behalf of "management" in her deposition.  She was noticed as a fact witness, not a Rule 30(b)(6) witness, and defendants note their continuing objection to Plaintiff's treatment of her as a Rule 30(b)(6) witness.  *See* Ex. B at 1 (Pl.'s Deposition Notice); Ex. C at 1 (02/01/2021 Email A. Daniel to D. Schleicher & M. Blecher at 2:56 p.m.); Ex. D at 10, 22, 39 (Crowe Tr. 10:17-19, 22:1-4, 79:12-14); Ex. E at 9 (Lester Tr. 9:21-22). |

---

[1]     Defendants note their continuing objection to Plaintiff submitting records marked with her emphases (highlighting) and presented without discovery Bates Numbers for the Court's consideration.  *Compare* Defs.' Ex. 5 [79-5] at 1, *with* Pl.'s App. [77-2] at 400.

| | |
|---|---|
| 17.  S.B. responded to Plaintiff's ethics disclosures with a February 2, 2017 email to management official Christopher Bailey, objecting that Plaintiff reported him to the D.C. Board of Ethics and Government Accountability office (BEGA) for "misconduct in performing my duties here at work that involves my wife." App. 342 (2/2/2017 email); App. 419-420 (S.B. dep. At 91:22 – 92:9) (acknowledging the email included this reference to the ethics disclosures). *Also see* App. 411-412 (S.B. dep. 25:22 – 26:7; 27:4-9) (S.B. identifying the fine he had to pay as "all initiated by Ms. Lu"). | 17.  Disputed in part.  Defendants dispute that Plaintiff made a protected disclosure.  *See* Defs.' Response to Pl.'s SUMF ¶¶ 9-14.  Defendants do not dispute that S.B. sent an email on February 2, 2017, stating, in relevant part, that: <br><br> I have remained fairly [quiet] over the years since Ms. Luchi Lu[ ]began her relentless pursuit of direct and indirect personal attacks against me at work.  This all started in late 2007 towards early 2008 . . . and she still continues to do this for some unknown reason . . . . <br><br> In recent months, she escalated this behavior . . . .  At that point it became very clear to me that her objective is to first damage my reputation here at work, smear my name throughout the Agency as someone that cannot be trusted (defamation of character), which obviously is designed as an attempt to end my career as a District Government employee. Seeing that this is the case, it is a threat to my livelihood, which helps to put food on the family table, therefore threatening my family. <br><br> Again, just a week ago during our morning meeting on 1/26/2017, which was held on the floor of the Permit Center, she found the time to do a google search on 'fake pregnancies' [ ] yes, bizarre!  Knowing that I was the Reviewer assigned to the Fire review counter after the meeting ends, she made sure that a printed copy of her google 'findings' was left on top of the stamps in the drawer for me to see it.  One may ask, what is her motive?  For me it was a direct non-verbal accusation at me (us) that my wife's pregnancy last year was faked in order for me to have been granted paid family leave (PFL) . . . . <br><br> I believe this is clear harassment, and her conduct only serves to generate a hostile work environment; this need to be addressed as soon as possible and should be documented for the record.  This conduct does not belong in our work place! |

| | |
|---|---|
| | Defs.' SUMF [79] ¶ 25 (quoting Ex. 1 at 40); *cf.* Defs.' Response to Pl.'s SUMF ¶ 143 (reproducing S.B.'s testimony in response to Plaintiff's request for him to compare his $1,000 fine to her suspension).<br><br>On February 7, 2017, Plaintiff "asked 'to hear some update from' DCRA HR as to 'whether it has been substantiated ([S.B.] did not have a baby in May 2016), or unsubstantiated (he did).'" Defs.' SUMF [79] ¶ 28 (quoting Ex. 1 at 62). DCRA HR told Plaintiff that there was nothing wrong with S.B.'s parental leave application and that she needed to stay out of his personal life. *See* Defs.' SUMF [79] ¶¶ 29-38.<br><br>Moreover, Plaintiff admits that no adverse action was taken against her by any defendant until DCRA OGC assigned Mr. Lawson to investigate S.B.'s November 8, 2018 email complaining that her harassment based on his family and use of parental leave persisted. *See* Defs.' SUMF [79] ¶¶ 67-68; Ex. F at 3 (Admission No. 3). |
| 18.  S.B.'s complaint to management that Plaintiff was mistreating him by reporting him to BEGA was made even though he had about two months earlier admitted to wrongdoing as to the allegations for which Plaintiff reported him. *Compare* App. 342 (S.B.'s email complaining) *with* App. 23-26 (Negotiated Disposition signed by S.B. on "12/5/2016"). | 18.  Disputed in part.  Defendants dispute the accuracy of Plaintiff's conclusion that the email described above was a "complaint to management that Plaintiff was mistreating him by reporting him to BEGA." *See* Defs.' Response to Pl.'s SUMF ¶ 17; Pl.'s App. [77-2] at 26. |
| 19.  Investigator Lawson considered Plaintiff's earlier ethics disclosures as to | 19.  Disputed, misleading, unsupported, and not material.  The transcript[2] that Plaintiff |

---

[2]      Defendants note their continuing objection to Plaintiff's references and citations to transcripts that she subsequently had made from the audio recordings of the interviews that Mr. Lawson conducted during his investigation. *See, e.g.*, Defs.' Response to Pl.'s SUMF ¶¶ 51-55, 60-67, 69-72, 74-75, 77-82, 87; *cf.* Pl.'s App. [77-2] at 1, 89-341.  On April 14, 2021, Defendants objected to Plaintiff's use of these transcripts in Mr. Lawson's deposition. *See* Ex. G at 32(Lawson Tr. 63:3-17).

There is no evidence that either deciding official—Mr. Lester (who proposed Plaintiff for a 10-day suspension on Apr. 2, 2019) or Mr. Whitescarver (who imposed Plaintiff's eight-day suspension on June 27, 2019)—reviewed the recordings of the investigative interviews that

| | |
|---|---|
| S.B. to be sufficiently relevant to his misconduct investigation of her that— when interviewing her about the fraud disclosures—he had her confirm it was she who had reported S.B. and his wife for the conflicts of interest [i.e., the earlier ethics disclosures]. App. 273 (Tr. at 14:12-20). *Also see* App. 500 (dec. ¶15) (basis for Plaintiff conclusion IR connected to ethics disclosures). | subsequently had made from the audio recording of her interview with Mr. Lawson on February 12, 2019, does not support her conclusion *now* that Mr. Lawson was interested in S.B.'s conflict of interest when he included the October 27, 2016 email that Plaintiff sent to BEGA, forwarding her September 29, 2016 email, stating, in part: "[T]he fact is [S.B.] has taken **TWO fatherhood leaves for TWO children,** one early in 2015, one this year a few months ago. . . ." Defs.' SUMF [79] ¶ 16 (quoting Defs.' Ex. 1 [79-1] at 58 (emphasis in original)); *see* Defs.' Ex. 1 [79-1] at 57-61; *cf.* Pl.'s App. [77-2] at 272-74, 510. |
| 20.  Investigator Lawson considered Plaintiff Lu's earlier ethics disclosures to be sufficiently relevant to his Investigative Report as to her fraud disclosures that he included Plaintiff's earlier email to him about the ethics disclosures in the RI. App. 65 (IR at 12, noting Exhibit 11 to IR includes Plaintiff's ethics disclosures to BEGA and to Lawson). *Also see* App. 500 (dec. ¶15) (basis for Plaintiff conclusion IR connected to ethics disclosures). | 20.  Disputed, unsupported, and not material. Again, Plaintiff's citation to the Investigative Report does not support her conclusion because the report states:<br><br>Ms. Lu stated that on June 27, 2016, she filed a complaint with the D.C. Office of the Inspector General (OIG) stating that [S.B.]'s wife had faked the pregnancy of their [Redacted in Plaintiff's Appendix] . . . so that [S.B.] could fraudulently obtain PFL for the fake pregnancy. . . .<br><br>On Thursday, September 29, 2016, Ms. Lu sent an email of her complaint against [S.B.] to Mia Brown and Special Investigator Lawson.  On Thursday, October 27, 2016 Ms. Lu forwarded her complaint to Board of Ethics and Government Accountability (BEGA) Investigator Ileana Corrales (Exhibit # 11).  Ms. Lu was presented with the email printout for her review and confirmed that she prepared and sent the emails.<br><br>Pl.'s App. [77-2] at 65; *see* Defs.' Response to Pl.'s SUMF ¶ 19 (quoting Plaintiff's email to OIG on June 27, 2016). |
| 21.  Even Defendant Sydney Lester—the official who proposed the 10-day | 21.  Undisputed but incomplete and not material. In context, Mr. Lester testified that he relied on |

Plaintiff subsequently had transcribed in preparation for Mr. Lawson's April 14, 2021 deposition. *See id.* at 28 (Lawson Tr. 54:18-55:1).

| | |
|---|---|
| suspension for Plaintiff's purportedly knowingly lying in alleging S.B. committed leave fraud—answered that "I would say I'm not certain" when asked how certain he was that S.B. was innocent of the fraud. App. 430 (dep. 30:15-19). | "[w]hat the HR people and the folks who are supposed to be looking into these things . . . provided" to conclude that S.B. did not commit leave fraud, Ex. E at 15 (Lester. Tr. 29:14-16), and that the most convincing evidence that S.B. submitted an honest application for parental leave was that "he got the approval by the HR folks that has to deal with that kind of issue," *id.* at 17 (Lester Tr. 31:3-4). |
| 22.  Plaintiff Lu was aware that S.B. recently had demonstrated a willingness to engage in work-related misconduct for personal gain, as reflected by his admission to ethics violations and paying a related fine. *See* App. 75 (IR at 22-23, recounting Plaintiff's alerting someone that S.B.'s wife was a permit runner and he was fined $1,000 by BEGA, with Plaintiff including a link to the BEGA public webpage for S.B.'s Negotiated Disposition). *Also see* App. 499 (dec. ¶12) (awareness of S.B. admission and fine). | 22.  Disputed, misleading, unsupported, and not material.  Defendants do not dispute that Plaintiff became aware of BEGA's December 2016 disposition.

However, Plaintiff's undated conclusion that "S.B. recently had demonstrated a willingness to engage in work-related misconduct for personal gain" is not supported by BEGA's subsequent description of two improper actions identify incidents that occurred 14 months (Aug. 3, 2015) and 4 months (Feb. 12, 2016) before Plaintiff started complaining about S.B.'s use of parental leave and possible conflict of interest.  *See* Pl.'s App. [77-2] at 75; Defs.' SUMF [79] ¶ 7. Plaintiff had no evidence of BEGA's investigation and disposition when she contacted the District of Columbia Office of Inspector General (OIG) to look into her "speculation that the baby set up could be a fraud" on June 27, 2016, Defs.' SUMF [79] ¶ 7 (quoting Ex. 1 [79-1]); *see id.* ¶¶ 8-9 (Plaintiff's unsubstantiated allegations about a conflict of interest between June and August 2016), six months before BEGA's December 8, 2016 disposition, *see* Pl.'s App. [77-2] at 26.

Moreover, in February 2017, Plaintiff did not mention BEGA's negotiated disposition when she "asked 'to hear some update from' DCRA HR as to 'whether [her June 27, 2016 allegations to OIG had] been substantiated ([S.B.] did not have a baby in May 2016), or unsubstantiated (he did).'"  Defs.' SUMF [79] ¶ 28 (quoting Ex. 1 at 62).  DCRA HR told Plaintiff "the agency has confirmed all required documentation needed for an approval."  Defs.' SUMF [79] ¶ 35 |

| | |
|---|---|
| | (quoting Defs.' Ex. 1 [79-1] at 74).  Plaintiff responded, in part, that she "figured he may have submitted forged document but I certainly have no proof myself." *Id.* ¶ 36 (quoting Defs.' Ex. 6 [79-6] at 1).  Likewise, Plaintiff did not mention BEGA's disposition to the Mayor when she accused S.B. of committing fraud and forgery crimes related to his parental leave almost two years later on February 5 and 6, 2019.  *See* Defs.' Ex. 1 [79-1] at 145-50; Defs.' Ex. 12 [79-12] at 7-24; Pl.'s App. [77-2] at 26. |
| 23.  A consideration in Plaintiff's concluding that S.B. would be capable of claiming paid parental leave for a nonexistent child was that in prior years she observed S.B. to erroneously report his hours worked and needlessly claim overtime. App. 500 (dec. ¶17). | 23.  Disputed, misleading, and unsupported. Defendants do not dispute that "Plaintiff 'firmly believe[s]' S.B. is a 'dishonest' person."  Defs.' SUMF [79] ¶ 4 (quoting Defs.' Ex. 12 [79-12] at 51).  However, "Plaintiff . . . has never reviewed S.B.'s electronic time sheets, leave requests, or personnel records."  Defs.' SUMF [79] ¶ 3 (citing Defs.' Ex. 12 at 46-47 (Qing Lu Deposition Tr. at 135-36)).  Nor do Plaintiff's citations identify any statement about S.B.'s use of parental leave for which she offered her observations about S.B.'s earlier time and attendance as proof that he subsequently committed a fraud and forgery crime.  *See* Defs.' Ex. 1 [79-1] at 145-50; Defs.' Ex. 12 [79-12] at 7-24. |
| 24.  One consideration in Plaintiff's concluding S.B. could have claimed paid parental leave for a nonexistent child was that she observed that fake birth certificates were readily available on the internet. *See, e.g.,* www.superiorfakedegrees.com/fake-birth-certificates/. *Also see* App. 500 (dec. ¶18). | 24.  Disputed in part.  In February 2017, DCRA HR informed Plaintiff that S.B. had submitted sufficient documentation to obtain parental leave and Plaintiff wrote that she "figured he may have submitted forged document but I certainly have no proof myself."  Defs.' SUMF [79] ¶ 36; *see id.* at ¶¶ 28-35.  Defendants do not dispute that Plaintiff purchased a fake birth certificate and subsequently presented her ability to do so as evidence that S.B. submitted a forged document to obtain parental leave.  *See, e.g.*, Defs.' Ex. 1 [79-1] at 7-8, 42-43, 147.  *See generally id.* at 111 ("For illustration, I purchased a document from http://www.buyafakediploma.com/, the shipment alone cost $40 for next day FedEx delivery.") |
| 25.  One consideration in Plaintiff's concluding S.B. could have claimed paid parental leave for a nonexistent child was | 25.  Disputed, misleading, and unsupported.  In February 2017, DCRA HR informed Plaintiff that S.B. had submitted sufficient documentation |

| | |
|---|---|
| that she was not aware of anyone looking into the issue's having told her they had verified the authenticity of the document(s) S.B. submitted. *See, e.g.*, App. 464 (BEGA investigator Corrales dep. 31:2-6) (did not authenticate record S.B. relied on). *Also see* App. 500-501 (dec. ¶¶19-20) (no one told Plaintiff they had authenticated his supporting documents and she likely would have dropped matter if they had). | to obtain parental leave and Plaintiff wrote that she "figured he may have submitted forged document but I certainly have no proof myself." Defs.' SUMF [79] ¶ 36; *see id.* at ¶¶ 28-35.  On March 5, 2017, Plaintiff told OIG that DCRA HR had informed her that it had "verified the documents [S.B.] had submitted for paternity leave approval" and that "'the documents have met the government standard for approval.'"  *Id.* at ¶ 29 (quoting Defs.' Ex. 7 [79-7] at 4). |
| | Plaintiff then repeatedly asked DCRA HR, OIG, BEGA, the Executive Office of the Mayor (EOM), and the District of Columbia Department of Human Resources (DCHR) to investigate her evolving allegations about S.B. and was unequivocally informed that there was nothing wrong with S.B.'s parental leave application years before she told the Mayor that S.B. had committed a fraud and forgery crime that she had no evidence of on February 5 and 6, 2019.  *See, e.g.*, Defs.' SUMF [79] ¶¶ 7, 37-56, 72-74; *cf.* Defs.' Response to Pl.'s SUMF ¶ 22. |
| | Furthermore, Plaintiff's statement does not offer any indication of what other authentication or verification of S.B.'s parental leave application she "believe[s]" would have caused her to drop the matter between 2017 and 2019, *see* Pl.'s App. [79-1] at 501 (Pl.'s Decl. ¶ 20 (Feb. 3, 2022)), and is not supported by her reference to a deposition she took in November 2021, *see* Pl.'s App. [77-2] at 463. |
| 26.  A consideration in Plaintiff's concluding that S.B. claimed paid parental leave for a nonexistent child, *despite management's repeated assurances no wrongdoing occurred*, was that the initial reaction to her ethics disclosures about SB [the ones to which he later admitted and for which he paid a fine] also had been management's telling her there was no evidence of wrongdoing by S.B. *See* App. 348 (S. Lester email of 8/31/2016); App. 499 (dec. ¶13) (their disregard of earlier ethics disclosures as untrue was a factor in | 26.  Disputed, misleading, and unsupported. Plaintiff does not identify who in "management" she is referring to when she spoke to multiple managers and agencies between 2016 and 2019. <br><br>Plaintiff wrote former DCRA Chief Building Official (CBO) Lynn Underwood with allegations that S.B. had a conflict of interest for which she had no evidence at the time; Mr. Lester invited her to present evidence of her allegations about S.B.'s conflict of interest to himself and Mr. Underwood; Mr. Underwood investigated; DCRA OGC reported the issue to |

| | |
|---|---|
| Plaintiff not fully conceding to their position as to leave fraud disclosures). | BEGA; and BEGA reached out to Plaintiff. *See, e.g.*, Defs.' SUMF [79] ¶¶ 8-15; Defs.' Response to Pl.'s SUMF ¶¶ 9, 11, 22; Ex. F at 2 (Admission No. 1).<br><br>There is no evidence that Plaintiff subsequently reported her beliefs about S.B.'s use of parental leave to Mr. Lester. *See* Defs.' Ex. 1 [79-1] at 36, 40 (S.B.'s emails copying Mr. Lester).<br><br>Between February 2017 and November 2018, Plaintiff asked DCRA HR, OIG, BEGA (including the same investigator Plaintiff spoke with about S.B.'s conflicts of interest), EOM, and DCHR to investigate her allegations that S.B. committed parental leave fraud and was told that there was nothing wrong with S.B.'s parental leave application. *See, e.g.*, Defs.' SUMF [79] ¶¶ 7, 28-56, 72-74; *cf.* Defs.' Response to Pl.'s SUMF ¶ 22.<br><br>On November 28, 2018, DCRA OGC assigned Mr. Lawson to investigate S.B.'s complaint that Plaintiff was harassing him. *See* Defs.' Ex. 1 [79-1] at 1. |
| 27.  <u>A consideration in Plaintiff's concluding that S.B. claimed paid parental leave for a nonexistent child was that multiple components of D.C. government pointed to other components as having confirmed there was no wrongdoing, such that it was not clear to Plaintiff that any of them had thoroughly investigated her fraud disclosures</u>. *Compare, e.g.,* App. 65 (IR at 12, documenting that OIG closed the complaint and referred it to DCRA) and App. 343 (OIG log showing closed 7/14/2018 because "Deemed insufficient to open an investigation") *with* App. 350 (Crowe letter at 1, asserting OIG conducted independent analysis of documentation). *Also see* App. 501 (dec. ¶21) | 27.  Disputed, misleading, and unsupported. Defendants do not dispute that between February and November 2017, Plaintiff repeatedly asked DCRA HR, OIG, BEGA, EOM, and DCHR to investigate her allegations about S.B.'s wife's pregnancy, their daughter, and his use of parental leave and was unequivocally informed that there was nothing wrong with S.B.'s parental leave application years before she told the Mayor that S.B. had committed a fraud and forgery crime that she had no evidence of on February 5 and 6, 2019. *See, e.g.*, Defs.' SUMF [79] ¶¶ 7, 28-56, 72-74; *cf.* Defs.' Response to Pl.'s SUMF ¶ 22.<br><br>However, Plaintiff's reference to the OIG log is from her earlier interactions with OIG that led her to contact DCRA HR. *See, e.g.*, Defs.' SUMF [79] ¶¶ 23-24, 28-37, 39-42. *Compare* Defs.' Ex. 1 [79-1] at 52-56, *with* Pl.'s App. [77-2] at 343-44 (June 27, 2016 to Jan. 11, 2017). |

| | |
|---|---|
| | Furthermore, Ms. Crowe's April 2019 letter providing DCRA's official response to Plaintiff's comments to the Mayor about S.B. on February 5 and 6, 2019, could not have contributed to Plaintiff's beliefs about OIG's response to her request for OIG to investigate her allegations in May 2017, or what she had already said to the Mayor in February 2019. *See* Defs.' SUMF [79] ¶¶ 39-42 (May 2017), 75 (Feb. 8, 2019); *cf.* Pl.'s App. [77-2] at 350 (Apr. 22, 2019). |
| 28.  A consideration in Plaintiff's concluding that S.B. claimed paid parental leave for a nonexistent child was that her research on S.B. indicated he was scheduled to appear for a criminal (traffic-related offense) trial in the month following the claimed birth. *See* App. 349 (Charles County District Court case information relied on by Plaintiff, showing trial set for June 2016); App. 501 (dec. ¶23). | 28.  Disputed in part.  This statement is misleading and unsupported.  Defendants do not dispute that Plaintiff offered S.B.'s court date for a traffic-related offense as a basis for asking OIG to investigate her "speculation that the baby set up could be a fraud" on June 27, 2016, Defs.' SUMF [79] ¶ 7 (quoting Ex. 1 [79-1]).  Plaintiff later explained that she changed her approach after learning that S.B. had submitted sufficient documentation to take parental leave and she did not offer S.B.'s traffic court date as a reason for telling the Mayor in February 2019, that S.B. submitted forged documents to fraudulently obtain parental leave.  *Id.* at ¶ 32 (quoting Ex. 1 [79-1]); *see id.* at ¶¶ 28-57, 72-73; Defs.' Ex. 1 [79-1] at 145-50; Defs.' Ex. 12 [79-12] at 7-24. |
| 29.  A consideration in Plaintiff's concluding that S.B. claimed paid parental leave for a nonexistent child was that Plaintiff understood S.B. to have told coworkers on June 22, 2016 he would be gone a long time, but after the criminal case was closed on June 23, to have returned to work on June 24. App. 501 (dec. ¶24). | 29.  Disputed and unsupported.  Defendants do not dispute that Plaintiff made a similar statement when asking OIG to investigate her "speculation that the baby set up could be a fraud" on June 27, 2016, Defs.' SUMF [79] ¶ 7 (quoting Ex. 1 [79-1]).  Plaintiff later explained that she changed her approach after learning that S.B. had submitted sufficient documentation to take parental leave and she did not offer S.B.'s traffic court date as a reason for telling the Mayor in February 2019. that S.B. submitted forged documents to fraudulently obtain parental leave.  *Id.* at ¶ 32 (quoting Ex. 1 [79-1]); *see id.* at ¶¶ 28-57, 72-73; Defs.' Ex. 1 [79-1] at 145-50; Defs.' Ex. 12 [79-12] at 7-24. |
| 30.  A consideration in Plaintiff's concluding that S.B. claimed paid parental leave for a nonexistent child was her observation that S.B.'s wife posted | 30.  Disputed in part.  Defendants do not dispute that Plaintiff makes this claim but it does not make her "belief" in the act reasonable.  Defendants do not dispute that after Plaintiff |

| | |
|---|---|
| publicly about other matters on Facebook on the day of the purported childbirth, while Plaintiff did not see any posts mentioning a birth—something that did not make sense to Plaintiff (who is herself the mother of a child). App. 501-502 (dec. ¶25). | learned that S.B. had submitted sufficient documentation to take parental leave, she switched her "approach[ ]," Defs.' SUMF [79] ¶ 32 (quoting Ex. 1 [79-1] at 95), "during the weekend of February 18 and 19," 2017, and began accusing S.B.'s wife of manufacturing the appearance of a daughter on her Facebook page, *id.* at ¶ 31 (quoting Ex. 7 [79-7] at 2). *See, e.g.*, *id.* at ¶¶ 22, 28-30, 33-56. |
| 31. A consideration in Plaintiff's concluding that S.B. claimed paid parental leave for a nonexistent child was the timing of when S.B.'s wife told the DCRA staff she was pregnant, as compared to Plaintiff not then observing her to be noticeably pregnant, and then the child's being reported to have been born past the due date a couple of weeks later. App. 502 (dec. ¶26.) | 31. Disputed in part and unsupported. Plaintiff's citation does not establish when she understood S.B.'s wife told other DCRA staff that she was pregnant. *See* App. 502. Defendants do not dispute that Plaintiff did not believe S.B.'s wife looked pregnant or looked like she had a past due pregnancy when asking OIG to investigate her "speculation that the baby set up could be a fraud" on June 27, 2016. Defs.' SUMF [79] ¶ 7 (quoting Ex. 1 [79-1]). |
| 32. A consideration in Plaintiff's concluding that S.B. claimed paid parental leave for a nonexistent child was that a female customer told Plaintiff she had seen S.B.'s wife at the office prior to the birth with what appeared to be a foreign object in an odd triangle shape under her clothes (i.e., as if to mimic pregnancy. App. 502 (dec. ¶27); *also see* App. 397 (April 2018 email from a customer to Plaintiff making the observation). | 32. Disputed, misleading, and unsupported. Plaintiff asked OIG to investigate one set of allegations in *June 2016* and repeatedly asked DCRA HR, OIG, BEGA, EOM, and DCHR to investigate another set of allegations between *February and November 2017. See, e.g.*, Defs.' Response to Pl.'s SUMF ¶¶ 24, 28-31.<br><br>Defendants' do not dispute that Plaintiff later used an April 2018 email from a female customer as a basis for repeating her claims that S.B. and his wife faked a pregnancy, but this occurred *after* she obtained a copy of S.B.'s first email about her harassing him over his wife's pregnancy, their daughter, and his use of parental leave. *See* Defs.' SUMF [79] ¶ 57 (Feb. 20, 2018); *cf.* Defs.' Ex. 1 [79-1] at 124.<br><br>Plaintiff's appendix conveniently omits her earlier emails telling the customer that S.B. and his wife faked a pregnancy. Overall, Plaintiff's statement is unsupported by the full email chain from two years after the pregnancy in question because the customer told Plaintiff: "I thought to myself that something may be wrong with the baby but I never imagined that it wasn't a baby." Pl.'s App'x [77-2] at 397 (04/03/2018 Email |

| | from S. Major to L. Lu (Hotmail)); *see* Ex. H at 12-16.[3] |
|---|---|
| 33.  A consideration in Plaintiff's concluding that S.B. claimed paid parental leave for a nonexistent child was that Plaintiff understood a coworker to have told her that a date S.B. had shown pictures of a newborn actually was prior to the date later reported for its birth. App. 502 (dec. ¶28). | 33.  Disputed, misleading, and unsupported. Plaintiff cites her own declaration—which she attaches to her motion, produced after the close of discovery and more than 11 months after her deposition—as support for this proposition. Plaintiff's declaration does not provide any details about when an unidentified coworker "told her that a date S.B. had shown pictures of a newborn was prior to the date later reported for its birth," *cf.* Pl.'s App. [77-2] at 502 (Decl. ¶ 28).  Defendants do not dispute that Plaintiff made statements about S.B. showing photographs to coworkers in May and June of 2016, as part of her request for OIG to investigate her "speculation that the baby set up could be a fraud" on June 27, 2016, Defs.' SUMF [79] ¶ 7 (quoting Ex. 1 [79-1]).  Again, however, Plaintiff changed her "approach[ ]" *after* she learned that S.B. had submitted sufficient documentation to qualify for parental leave and seeing pictures of a little girl on S.B.'s wife's Facebook page in February 2017, before going on to tell the Mayor in February 2019, that S.B. submitted forged documents to fraudulently obtain parental leave.  *Id.* at ¶ 32 (quoting Ex. 1 [79-1]); *see id.* at ¶¶ 33-57, 72-73; Defs.' Ex. 1 [79-1] at 145-50; Defs.' Ex. 12 [79-12] at 7-24. |
| 34.  A consideration in Plaintiff's concluding that S.B. claimed paid parental leave for a nonexistent child was that she understood a coworker to have told her (Plaintiff) that when S.B. was asked about how the baby was doing, S.B. responded that she was doing well and walking around, which puzzled Plaintiff because this was four or fewer months after the purported birth, when she understands | 34.  Disputed, misleading, and unsupported. Although Plaintiff's declaration does not provide any details about when she spoke with Mr. Petrillo-Groh about his conversation with S.B., *cf.* Pl.'s App. [77-2] at 502 (Decl. ¶ 29), Plaintiff was aware that S.B. took **TWO fatherhood leaves for TWO children,** one in early 2015, one" in 2016.  Defs.' SUMF [79] ¶ 16 (quoting Defs.' Ex. 1 [79-1] at 58 (Sept. 29, 2016)), and was told that S.B. had submitted sufficient |

---

[3]      Although the single page email included in Plaintiff's Appendix [77-2] at page 397 with two highlighted sentences was produced in Plaintiff's discovery responses, Defendants note that the email produced in discovery was the final email in a five-page email chain that they have entered without Plaintiff's subsequent highlighting and state their objection to Plaintiff introducing this email and any other record that has been similarly stripped of context and completeness.  *Compare* Pl.'s App. [77-2] at 397, *with* Ex. H at 12-16.

| | |
|---|---|
| babies typically don't take their first step until between nine and 12 months. App. 502 (dec. ¶29); *also see* App. 467-468 (Alec Petrillo-Groh dep. 14:11 – 15:21) (surprised by S.B.'s claim that child was walking around, when the child would have been within four months of the purported birth). | documentation to take parental leave for another child in 2016 by DCRA HR in February 2017, *see id.* at ¶¶ 28-38; before speaking with Mr. Petrillo-Groh about his earlier conversation with S.B. "sometime in 2018" when she was trying to find proof for her earlier allegations about S.B.'s family and his use of parental leave.  Defs.' Ex. 8 [79-8] at 14; *see, e.g.*, Defs.' SUMF [79] ¶¶ 57-59, 61-66.  Moreover, "Plaintiff saw a little girl with S.B.'s wife in the ladies' room at DCRA in October 2018" before she told the Mayor that S.B. committed fraud and forgery crimes in February 2019.  Defs.' SUMF [79] ¶ 60 (citing Defs.' Ex. 12 at 75-77, 81-82); *see id.* at ¶¶ 72-74.<br><br>Additionally, Mr. Petrillo-Groh could not testify to any details about his conversation with S.B. that would have given Plaintiff a reasonable basis for concluding that this conversation was anything more than a miscommunication based on everything else that she knew.  *See* Pl.'s App [77-2] at 467-68 (A. Petrillo-Groh Dep. 14:5-6, 14:19-20, 15:2-3). |
| 35.  <u>Another consideration in Plaintiff's concluding that S.B. claimed paid parental leave for a nonexistent child was that it appeared to Plaintiff from the families' *public* Facebook posts that it was not S.B./his wife who had a newborn and instead was S.B.'s stepmother.</u> App. 503 (dec. ¶31). | 35.  Disputed, misleading, and unsupported. Plaintiff cites her own declaration—which she attaches to her motion, produced after the close of discovery and more than 11 months after her deposition—as support for this proposition. After reviewing S.B.'s wife's Facebook in February 2017, Plaintiff merely concluded that S.B.'s daughter was the daughter of a family friend named R.B.  *See* Defs.' SUMF [79] ¶¶ 31-32, 40.  Plaintiff concluded that S.B.'s daughter is his half-sister only after learning from S.B. in November 2018 that R.B. is his stepmother.  *See* Defs.' SUMF [79] ¶¶ 63, 66-67. Plaintiff had no support for this speculation. |
| 36.  <u>Even management officials could not agree among themselves how long it was reasonable for Plaintiff to continue to believe S.B. engaged in leave fraud.</u> *Compare* App. 483 (Investigator Lawson saying first six months or year [dep. 80:14-17]); App. 14 (Defendant's Answer, Sixth Defense, "never reasonable"); 47 (Int. 20 | 36.  Disputed, not material, misleading, and unsupported.  In their interrogatory responses, Defendants stated that:  "Plaintiff's belief was never reasonable because her communications in 2016 and 2017 were not based on actual knowledge of S.B.'s private personnel matter. Plaintiff's discipline was based on a course of harassing conduct over two and a half years |

response—"never reasonable"—sworn to at App. 50 by Lester, Whitescarver, and Crowe); App. 452-453 (Whitescarver not disputing six months to one year period as reasonable [dep. 66:17 – 67:12]); and App. 430 (Lester testifying that as of his deposition, he was still uncertain whether or not S.B. actually committed leave fraud [dep. 30:15-19]).

towards S.B., regarding the birth of his [redacted] in [redacted] and use of parental leave, discussed in the Investigative Report previously produced at Bates Nos. 00000151-00000185, with supporting materials exhibited at Bates Nos. 00000186-00000301." Pl.'s App. [77-2] at 47-48 (Defs.' Second Am. Responses to Pl.'s First Set of Interrogatories No. 20).

Plaintiff offers no evidence suggesting that Mr. Lawson was a "management official[ ]" and, in any event, he says nothing about whether Plaintiff's beliefs were reasonable on Page 80 of his April 14, 2021 deposition transcript. *See* Pl.'s App. [77-2] at 483. To the contrary, the Investigative Report states only that Mr. "Lawson informed Ms. Lu that the first six (6) months of her complaining or even the first year of her complaining might have been reasonable but she has continued her complaining for two and a half years." He does not state whether her underlying beliefs were reasonable. *See* Defs.' Ex. 1 [79-1] at 26.

Based on that, Plaintiff asked Mr. Whitescarver "if you agree with this statement, that the first six months of reporting or even the first year of her reporting about [S.B.] might have been reasonable", not whether her beliefs were reasonable. *Id.* at 453 (Whitescarver Tr. 67:4-7); *accord id.* at 452-53 (Whitescarver Tr. 66:17-67:3). Mr. Whitescarver did not "particularly disagree with that statement," *id.* at 453 (Whitescarver Tr. 67:11-12), and elsewhere testified that Plaintiff's reporting became false "somewhere in [February] 2017 [when] she had a meeting with Walter Crawford" and that "was the turning point as far as I'm concerned as to when she got factual information to act upon to know that going forward that this has been investigated and found not to be accurate." Defs.' Ex. 15 [79-15] at 9-10 (Whitescarver Tr. 32:19-33:1); *see id.* at 9 (Whitescarver Tr. 32:9-33:8); Defs.' SUMF [79] ¶¶ 28, 30, 32-35 (quoting Defs.' Ex. 1 [79-1]); *see also* Defs.'

|  | SUMF [79] ¶¶ 29, 31, 36 (quoting Defs.' Exs. 6, 7 [79-6, 79-7]).<br><br>Similarly, Mr. Lester was not asked whether Plaintiff's beliefs were reasonable, but testified that his conclusion that S.B. did not fraudulently obtain parental leave was based on "[w]hat the HR people and the folks who are supposed to be looking into these things . . . provide," Ex. E at 15 (Lester Tr. 29:14-16)., indicated that he understood Plaintiff's question about how sure he was on a scale of 0 or 1 to 100 about S.B.'s veracity to be a guessing game, *see id.* at 15-16 (Lester Tr. 29:22-30:19), and further testified that the most convincing evidence that S.B. properly obtained parental leave was that "he got the approval by the HR folks that has to deal with that kind of issue," *id.* at 17 (Lester Tr. 31:3-4). *Cf.* Pl.'s App. [77-2] at 429-31 (Lester Tr. at 28, 30-31). |
|---|---|
| 37.  A factor in Plaintiff's concluding that a coworker's fraudulently claiming paid leave for a nonexistent child likely would rise to the level of serious wrongdoing (for which her reporting would be protected) was that she understands HR policies to prohibit the making of false statements under oath and intentional misrepresentations. App. 503 (dec. ¶32); *also see, e.g.,* DPM, Chapter 16, Section 1605.4(b) (as at edpm.dc.gov/chapter/16/#section-1605) (viewed 2/2/2022). | 37.  Disputed, not supported, and argumentative. This statement says nothing about whether Plaintiff had any actual knowledge or proof that S.B. fraudulently took paid leave when she told the Mayor that he had done so on February 5 and 6, 2019.  *See* Defs.' SUMF [79] ¶¶ 72-74; *cf. id.* at ¶¶ 19-24, 28-56.<br><br>Plaintiff's citation to a webpage viewed by someone on February 2, 2022, and the declaration she signed on February 3, 2022, say nothing about when she came to understand that "HR policies prohibit the making of false statements under oath and intentional misrepresentations."  *See* Pl.'s App. [77-2] at 510; *cf.* Defs.' SUMF [79] ¶ 77 (Apr. 2, 2019). |
| 38.  A factor in Plaintiff's concluding that a coworker's fraudulently claiming paid leave likely would rise to the level of serious wrongdoing (for which her reporting would be protected) was that she understood honesty to be important to the work of persons in positions like S.B.'s and hers. *See* App. 503 (dec. ¶33) (understood honesty important as deal with fire safety issues); *also see* App. 34 | 38.  Disputed, not supported, and argumentative. This statement says nothing about whether Plaintiff had any actual knowledge or proof that S.B. fraudulently took paid leave when she told the Mayor that he had done so on February 5 and 6, 2019.  *See* Defs.' SUMF [79] ¶¶ 72-74; *cf. id.* at ¶¶ 19-24, 28-56.<br><br>Plaintiff's citation to the February 3, 2022 declaration—which amounts to nothing more |

| | |
|---|---|
| (Whitescarver decision, noting importance of honesty). | than a self-serving statement—says nothing about when she came to understand "honesty to be important to the work of persons in positions like S.B.'s and hers."  *See* Pl.'s App. [77-2] at 510. |
| 39.  A factor in Plaintiff's concluding that a coworker's fraudulently claiming paid leave for a nonexistent child likely would rise to the level of serious wrongdoing (for which her reporting would be protected) was that she understands such conduct could readily rise to the level of a criminal offense. App. 503 (dec. ¶34) (could be crime under multiple laws, so rising to level of violation of law/rule/regulation). *Also see, e.g.,* D.C. Code § 22-3221 (crime to engage in conduct intended to defraud or obtain the property of another by means of a false or fraudulent pretense or representation, where the offender obtains the property of another person or causes another person to lose property) *and* D.C. Code §§ 22-2402, 22-2404, and 22-3242 (crime to commit perjury or to otherwise make false statements under oath or affirmation, and if a public record is involved, penalty can be up to 10 years for fraud). | 39.  Disputed, unsupported, and argumentative. Defendants to not dispute that Plaintiff claims to be reporting criminal conduct when she told the Mayor on February 5 and 6, 2019, that S.B. fraudulently took paid leave.  *See* Defs.' SUMF [79] ¶¶ 72-74.  Plaintiff testified that she has no legal training, *see* Defs.' Ex. 12 [79-12] at 48 (Lu Tr. 136:13-137:18), and this statement does not show that Plaintiff developed any actual knowledge or proof that S.B. committed a fraud and forgery crime, especially since she told DCRA HR in February 2017, that she had no proof to show that S.B. had submitted forged documents to obtain approval of his parental leave application, *see* Defs.' SUMF ¶ 36. |
| 40.  A factor in Plaintiff's concluding that a coworker's fraudulently claiming paid leave for a nonexistent child likely would rise to the level of serious wrongdoing (for which her reporting would be protected) was that, at least at the time, the form used to obtain the leave historically required a certification and included a false statement warning. *See, e.g.,* dchr.dc.gov/sites/default/files/dc/sites/dchr/ page_content/attachments/dc_fml_form_1_ application_0.docx (viewed 2/2/2022). *Also see* App. 503-504 (dec. ¶35) (form as she saw it was under oath and included false statement warning). | 40.  Disputed, unsupported, and argumentative. Prior to speaking with and emailing the Mayor on February 5 and 6, 2019, Plaintiff had not seen and did not know what documents S.B. submitted to obtain parental leave.  *See* Defs.' SUMF [79] ¶ 72; *see also* Ex. 12 [79-12] at 13-15 (Lu Tr. 13:15-15:10).  Plaintiff does not identify "the time" that she is referring to with this statement beyond a webpage viewed by someone on February 2, 2022, and the declaration that she signed on February 3, 2022.  *Cf.* Defs.' SUMF [79] ¶¶ 7, 19-79 (June 27, 2016 to June 27, 2019). |
| 41.  A factor in Plaintiff's concluding that a coworker's fraudulently claiming paid leave for a nonexistent child likely would | 41.  Disputed, unsupported, and argumentative. Plaintiff testified that she had not seen S.B.'s paycheck and that she did not know how much |

| | |
|---|---|
| rise to the level of serious wrongdoing (for which her reporting would be protected) is that she understands wrongdoing by public employees and how tax dollars spent to be a matter of strong public interest. App. 504 (dec. ¶36). | money he made from the District Government before speaking to the Mayor on February 5, 2019. *See* Ex. A. at 9 (Lu Tr. 38:5-9, 38:17-21). |
| 42.  A factor in Plaintiff's concluding that a coworker's fraudulently claiming paid leave for a nonexistent child likely would rise to the level of serious wrongdoing (for which her reporting would be protected) was that she understands the public to be interested in situations in which a government employee misuses position for personal benefit. App. 504 (dec. ¶37). | 42.  Disputed, unsupported, and argumentative. This statement says nothing about whether Plaintiff had any actual knowledge or proof that S.B. fraudulently took paternity leave when she told the Mayor that he had done so on February 5 and 6, 2019. *See* Defs.' SUMF [79] ¶¶ 72-74; *cf. id.* at ¶¶ 19-24, 28-56.  And, in fact, multiple District agencies examined Plaintiff's allegations, found they were unsubstantiated, and informed her of those findings.  *See generally* Defs.' SUMF [79] ¶¶ 19-56. |
| 43.  A factor in Plaintiff's concluding that a coworker's fraudulently claiming paid leave for a nonexistent child likely would rise to the level of serious wrongdoing (for which her reporting would be protected) was that BEGA took it very seriously when it came to agree with me that S.B. was misusing his job for the personal benefit of him and his wife. App. 504 (dec. 38). *Also see* App. 23-26 (BEGA/S.B. agreement imposing $1,000 fine for S.B.'s admitted misuse of his position to handle projects submitted by his wife's company). | 43.  Disputed, unsupported, and argumentative. BEGA takes all complaints seriously.  Plaintiff knowing that S.B. was fined by BEGA does not support her conclusion that S.B. committed parental leave fraud or that BEGA helped to covered it up when she asked BEGA to look into her allegations.  *Compare* Defs.' SUMF [79] ¶ 18, *with id.* ¶¶ 45-48, 73.  Indeed, the BEGA investigator whom Plaintiff met with as part of BEGA's investigation into DCRA's reports that S.B. had a possible conflicts of interest is the same BEGA investigator who found nothing wrong with S.B.'s parental leave application. *Compare* Defs.' SUMF ¶¶ 8-17, 45-47, Defs.' Ex. 1 [79-1] at 80-82, *and* Ex. F at 2 (Admission No. 1), *with* Defs.' Response to Pl.'s SUMF ¶¶ 15, 20, *and* Defs.' Ex. 5 [79-5] at 1.

Moreover, BEGA did not come to agree with Plaintiff's original request for DCRA to watch S.B. because his wife was visiting the office between June and August 2016—BEGA fined S.B. for two earlier conflicts of interest occurring on August 3, 2015, and February 12, 2016.  *Compare* Defs.' SUMF [79] ¶¶ 7-9, *with id.* at ¶¶ 13-18, *and* Pl.'s App. [77-2] at 24-25. |
| 44.  A factor in Plaintiff's concluding that a coworker's fraudulently claiming weeks of paid leave would rise to the level of | 44.  Disputed, unsupported, and argumentative. Plaintiff testified that she had not seen S.B.'s paycheck and that she did not know how much |

| | |
|---|---|
| gross misuse/waste of public resources or funds is that the District would be deprived of the employee's services during the period of absence while fraudulently receiving pay. App. 504-505 (dec. ¶¶40-41) (paid during absence and rough calculation of over $15,000 as unjustified cost to D.C. based on eight weeks' leave). | money he made from the District Government before speaking to the Mayor on February 5, 2019.  *See* Ex. A. at 9 (Lu Tr. 38:5-9, 38:17-21). Plaintiff's two back-of-the-envelope calculations on how much she would have been paid on March 1, 2021, *id.* at *id.* at 26-27 (Lu Tr. 263:19-264:10) ("$10K"), and February 3, 2022, Pl.'s App. [77-2] (Lu Decl. ¶ 41 ("$15,000")), are neither consistent with nor material to what she knew at the time she spoke to the Mayor in February 2019. |
| 45.  A factor in Plaintiff's concluding that a coworker's fraudulently claiming weeks of paid leave would rise to the level of an abuse of authority is that it would involve an employee's using his or her position to obtain a benefit (paid leave) to which they were not entitled. App. 505 (dec. ¶42). | 45.  Disputed, unsupported, and argumentative. This statement says nothing about whether Plaintiff had any actual knowledge or proof that S.B. fraudulently took paternity leave when she told the Mayor that he had done so on February 5 and 6, 2019.  *See* Defs.' SUMF [79] ¶¶ 72-74; *cf. id.* at ¶¶ 19-24, 28-56. |
| 46.  Chief Administrative Officer Tiffany Crowe admitted that there was no reason for her conclusion that Plaintiff should have known her disclosures were inaccurate other than that management told Plaintiff they had investigated it and there was nothing to it. App. 403-404 (dep. 24:17 – 25:4). | 46.  Disputed, unsupported, misleading, and not material.  Defendants object to Plaintiff's attempt to describe her discipline through Ms. Crowe's testimony.  *See* Defs.' Response to Pl.'s SUMF ¶¶ 8, 16.  Ms. Crowe appeared for deposition as a fact witness and was not involved in the investigation of Plaintiff's conduct towards S.B.  *Cf.* Defs.' Response to Pl.'s SUMF ¶ 16; Defs.' Ex. 1-2, 4 [79-1 to 79-2, 79-4].  The letter that Ms. Crowe separately sent to Plaintiff by email was DCRA's response to Plaintiff about her allegations to the Mayor on February 5 and 6, 2019.  *See* Pl.'s App. [77-2] at 52 (Apr. 30, 2019 email), 350-55 (letter dated Apr. 22, 2019); Ex. D at 13, 34-37, 40 (Crowe Tr. at 13:7-16, 74:4-75:20, 76:5-14, 77:3, 80:6-14); *cf.* Defs.' SUMF [79] ¶¶ 72-75.  Ms. Crowe's letter to Plaintiff concluded:  "As communicated to you numerous times previously by DCRA, OIG, BEGA, DCHR, and EOM, this matter has been fully investigated by numerous agencies and is closed.  No further action will be taken on your complaint."  Pl.'s App. [77-2] at 355; *see* Ex. D at 11, 13, 20, 24-25, 29 (Crowe Tr. at 11:17-19, 13:12-16; 20:4-7; 24:17-25:20, 29:16-17); Ex. E at 6-9 (Lester Tr. 6:20-9:9); *cf.* Defs.' SUMF [79] ¶¶ 28-38. |

| | |
|---|---|
| 47.  CAO Tiffany Crowe testified that even if the investigation had found that S.B. did engage in leave fraud, Plaintiff still would have been disciplined: it was the way she went about pursuing the disclosures that justified discipline, for "the behavior is the problem, not the belief or disbelief in the outcome." App. 404 (dep. 25:12-20). | 47.  Undisputed, but misleading, unsupported, and incomplete as cited.  Plaintiff did not make any disclosures and Ms. Crowe was not giving Rule 30(b)(6) testimony.  *See* Defs.' Response to Pl.'s SUMF ¶¶ 8, 16.  Defendants do not dispute that Ms. Crowe testified that Plaintiff's underlying behavior was the main problem.  *See* Ex. D at 14-18, 21-31 (Crowe Tr. 14:20-15:13, 16:22-17:6, 18:2-17, 21:3-17, 22:6-21, 23:2-16; 24:9-11, 25:17-31:13). |
| 48.  Investigator Lawson's report included multiple references to Plaintiff's earlier ethics disclosures about S.B. that culminated in S.B.'s admission of guilt and paying a fine. *See, e.g.,* App. 58 (IR at 5, quoting S.B.'s email complaining of Plaintiff making the conflict-of-interest report to BEGA); App. 65 (IR at 12, referencing the Exh. 11 email sent to Lawson in 2016 that was about the ethics disclosure); App. 345-346 (IR Exh. 11, the September 2016 email in which Plaintiff discusses her ethics disclosures and management's resistance to exploring the conflict-of-interest assertions Plaintiff lodged). | 48.  Disputed in part, not material, and unsupported.  Plaintiff's claim that Mr. Lawson's inclusion of her statements about S.B.'s use of parental leave on September 29, 2016 (forwarded to BEGA on October 27, 2016) and that S.B.'s complaint about her harassing him about his family and use of parental leave on February 2, 2017, are not "multiple references to Plaintiff's earlier," unidentified, statements about S.B.'s "ethics."  *See* Defs.' Response to Pl.'s SUMF ¶¶ 9, 17, 19-20.  Nor do Plaintiff's citations in support of this statement show that S.B. "admi[tted] guilt and pa[id] a fine."  *See* Defs.' Response to Pl.'s SUMF ¶¶ 49. |
| 49.  In spite of Investigator Lawson's related references and exhibits and interview questions about Plaintiff's prior ethics disclosures [see paragraph above] about S.B., Lawson's IR failed to anywhere mention in its 35 pages that Plaintiff was right about S.B.'s conflict of interest violations and that S.B. admitted to violations and paid a $1,000 fine. *Compare* App. 54-88 (Lawson IR) *with* App. 23-26 (Negotiated Disposition of BEGA charges against S.B.). | 49.  Disputed in part, not material, and unsupported.  Defendants do not dispute that the Investigative Report does not "anywhere mention in its 35 pages that . . . S.B. admitted [ethics] violations and paid a $1,000 fine."  *See* Defs.' SUMF [79] ¶ 70.

However, Plaintiff does not offer any support for her conclusion that she "was right about S.B.'s conflict of interest violations" or that Investigator Lawson "failed" to look into whether S.B. paid a fine for his conflicts of interest in December 2016 as part DCRA OGC's investigation into S.B.'s November 8, 2018 complaint about Plaintiff's continuing parental leave harassment.  *See, e.g.*, Defs.' Response to Pl.'s SUMF ¶¶ 17-20, 22, 43.  *Compare* Defs.' SUMF [79] ¶¶ 63-76 (describing DCRA OGC's investigation of Plaintiff's conduct, Nov. 2018 to Feb. 2019), *with id.* at ¶¶ 8-18 (describing |

| | DCRA OGC's investigation of S.B.'s conflict of interest, ca. Aug. to Sept. 2016), *and* Pl.'s App. [77-2] at 23-26 (BEGA's December 2016 negotiated disposition). |
|---|---|
| 50.  The Lawson IR uses assertions that Plaintiff violated criminal law—such as with its claims that multiple witnesses spoke of Plaintiff "stalking" S.B. and that Plaintiff admitted to the elements of criminal stalking—to disparage her. *See* App. 80 (IR at 27, asserting Plaintiff's acknowledgement of guilt as to the criminal violation) *and* App. 62 (IR at 9, asserting Mr. Mutia testified awareness of the stalking and that it has been going on for a long time).  [The falseness of these accounts by Lawson, with additional examples, are detailed in separate paragraphs below.] | 50.  Disputed, not material, misleading, and unsupported.  Plaintiff does not cite anything to support her conclusory allegation that Mr. Lawson "uses assertions that Plaintiff violated criminal law . . . to disparage her."  *See* Defs.' Response to Pl.'s SUMF ¶¶ 56, 63-64, 80; *cf. id.* at ¶ 144.  The Investigative Report and Exhibits prepared by Mr. Lawson describe Plaintiff's conduct over a two and a half year period that she "should have known would cause a reasonable person in [S.B.'s] circumstances to . . . fear" for his or his family's "safety"; "[f]eel seriously alarmed, disturbed, or frightened; or [ ] [s]uffer emotional distress."  D.C. Code § 22-3133(a)(3).  *See generally* Defs.' Ex. 1 [79-1] at 1-150.  Although Plaintiff denies that S.B. is the victim of her conduct, she does not deny the underlying conduct.  *See, e.g.*, Defs.' SUMF [79] ¶ 78 (quoting Defs.' Ex. 3 [79-3]).<br><br>What is more, Mr. Lawson did not discipline Plaintiff and was not involved in any adverse action.  *See* Defs.' SUMF ¶¶ 67-69, 76; *cf. id.* at ¶¶ 77 (Mr. Lester's disciplinary proposal), 79 (Mr. Whitescarver's disciplinary decision). |
| 51.  Investigator Lawson three times misled his readers in reporting on his interview of S.B. as involving discussion of Plaintiff Lu's "stalking." *Compare* App. 57-59 (IR at 4-6) *with* App. 89-115 (transcript of interview) (no uses of words "stalk" or "stalking"). | 51.  Disputed, not material, unsupported, and argumentative.  As Mr. Lawson explained in his deposition:<br><br>[Plaintiff's Counsel]:  Do you think it's a coincidence that, when you recounted these interviews, you used words from the stalking statute, and then when we go to the transcript, those words are not there?<br><br>[District's Counsel]:  Objection.  Form.  You can answer.<br><br>[Mr. Lawson]:  No, because part of an investigation or investigative report is that I take my perception, my – my view point of what a person is saying, and then I transcribe it as to |

| | what it means to the investigation of the topic and the subject matter or to the target of the investigation.<br><br>So if you tell me what – if you tell me one thing, I may interpret that to mean, well, I was in fear of this women looking on – going as far as looking on the Internet and trying to find my personal accounts to – to interfere with my life.<br><br>Pl.'s App. [77-2] at 482-83 (Lawson Tr. 79:21-80:10); *see, e.g.*, Defs.' SUMF [79] ¶¶ 67-71; Defs.' Response to Pl.'s SUMF ¶ 50; *cf.* Defs.' Response to Pl.'s SUMF ¶ 144.<br><br>What is more, Mr. Lawson did not discipline Plaintiff and was not involved in any adverse action. *See* Defs.' SUMF ¶¶ 67-69, 76; *cf. id.* at ¶¶ 77 (Mr. Lester's disciplinary proposal), 79 (Mr. Whitescarver's disciplinary decision). |
|---|---|
| 52.  Investigator Lawson also was deceptive in recounting that S.B. complained to him that Plaintiff had "stalked and harassed him" since May 2016. *Compare* App. 57 (IR at 4) *with* App. 89-115 (transcript of interview) (no uses of words "stalk" or "stalking"). | 52.  Disputed, not material, unsupported, and argumentative.  Plaintiff offers no support for her conclusion that Mr. Lawson "was deceptive" in describing her conduct towards S.B.  *See, e.g.*, Defs.' Response to Pl.'s SUMF ¶¶ 50-51; *cf.* Defs.' Response to Pl.'s SUMF ¶ 144.  Mr. Lawson was investigating S.B.'s November 8, 2018 complaint that Plaintiff was harassing him. *See* Defs.' SUMF [79] ¶¶ 67-68.<br><br>What is more, Mr. Lawson did not discipline Plaintiff and was not involved in any adverse action. *See* Defs.' SUMF ¶¶ 67-69, 76; *cf. id.* at ¶¶ 77 (Mr. Lester's disciplinary proposal), 79 (Mr. Whitescarver's disciplinary decision). |
| 53.  Investigator Lawson was dishonest in reporting how S.B. told Lawson that S.B. and a management official had discussed Plaintiff's "stalking/harassment" of S.B. *Compare* App. 59 (IR at 6) *with* App. 89-115 (transcript with no mentions of "stalk" or "stalking" *and with* App. 96-97 (transcript at 8:6-12) (S.B. says management official discussed with Plaintiff all the "stuff" Plaintiff was doing and told S.B. to alert him "if any of this | 53.  Disputed, not material, unsupported, and argumentative.  Plaintiff offers no support for her conclusion that Mr. Lawson "was dishonest" in describing her conduct towards S.B.  *See, e.g.*, Defs.' Response to Pl.'s SUMF ¶¶ 50-52; *cf.* Defs.' Response to Pl.'s SUMF ¶ 144.<br><br>What is more, Mr. Lawson did not discipline Plaintiff and was not involved in any adverse action. *See* Defs.' SUMF ¶¶ 67-69, 76; *cf. id.* at |

| | |
|---|---|
| starts again"; no reference to discussing "stalking" with management). | ¶¶ 77 (Mr. Lester's disciplinary proposal), 79 (Mr. Whitescarver's disciplinary decision). |
| 54.  Investigator Lawson falsely reported that S.B. explained S.B. had no idea what triggered Plaintiff Lu's "stalking" and harassing him. *Compare* App. 59 (IR at 6) *with* App. 89-115 (Tr.) (no mention of "trigger" or "triggering" nor of "stalk" or "stalking") *and with* App. 105 (Tr. at 17:3-7) (Lawson suggests S.B. has no idea why Ms. Lu is "targeting" S.B.; S.B. responds "All I can say, she's trying to get me to lose my job.") | 54.  Disputed, unsupported, and argumentative. Plaintiff offers no support for her conclusion that Mr. Lawson "falsely reported" anything about Plaintiff's conduct towards S.B.  *See, e.g.*, Defs.' Response to Pl.'s SUMF ¶¶ 50-52; *see also* Defs.' SUMF [79] ¶ 25 (S.B.'s Feb. 2, 2017 email); *cf.* Defs.' Response to Pl.'s SUMF ¶ 144.<br><br>What is more, Mr. Lawson did not discipline Plaintiff and was not involved in any adverse action.  *See* Defs.' SUMF ¶¶ 67-69, 76; *cf. id.* at ¶¶ 77 (Mr. Lester's disciplinary proposal), 79 (Mr. Whitescarver's disciplinary decision). |
| 55.  Investigator Lawson lied in recounting that S.B. told Lawson that S.B. feels "seriously alarmed and disturbed" by Ms. Lu's viewing something on Facebook. *Compare* App. 59 (IR at 6) *with* (App. 89-115) (S.B. transcript with no S.B. use of words "alarmed" or "disturbed"). *Also see* App. 481 (Lawson dep. 77:13-19) (Lawson would not be surprised if no mention in S.B. interview transcript of S.B.'s being seriously alarmed and disturbed). | 55.  Disputed, not material, unsupported, and argumentative.  Plaintiff offers no support for her conclusion that Mr. Lawson "lied" in describing her conduct towards S.B.  *See, e.g.*, Defs.' Response to Pl.'s SUMF ¶¶ 50-52; *see also* Defs.' SUMF [79] ¶ 67 (S.B.'s Nov. 8, 2018 email); *cf.* Defs.' Response to Pl.'s SUMF ¶ 144.<br><br>What is more, Mr. Lawson did not discipline Plaintiff and was not involved in any adverse action.  *See* Defs.' SUMF ¶¶ 67-69, 76; *cf. id.* at ¶¶ 77 (Mr. Lester's disciplinary proposal), 79 (Mr. Whitescarver's disciplinary decision). |
| 56.  The actual source for Investigator Lawson's wording of "seriously alarmed and disturbed" is the D.C. stalking law. *See* App. 80 (IR at 27, quoting D.C. Code) *and* App. 482-483 (Lawson dep. 79:15 – 80:5) (Lawson admission not a coincidence that his recounting of witness testimony tracks the stalking criminal law elements even though the witnesses did not actually use such terms). | 56.  Undisputed, but not material.  Mr. Lawson did not discipline Plaintiff and was not involved in any adverse action.  *See* Defs.' SUMF ¶¶ 67-69, 76; *cf. id.* at ¶¶ 77 (Mr. Lester's disciplinary proposal), 79 (Mr. Whitescarver's disciplinary decision). |

| | |
|---|---|
| 57.  Investigator Lawson claimed he is unaware the D.C. stalking law specifically excludes constitutionally protected activity [*compare* App. 474 (dep. 32:3-13) *with* D.C. Code § 22-3133(b)] though he read the text of the law "several times" prior to preparing the Investigative Report. App. 474 (dep. 32:15-17). | 57.  Undisputed but not material.  Mr. Lawson completed the Investigative Report on February 23, 2019, and was deposed on April 14, 2021. *See* Pl.'s App. [77-2] at 474 (Lawson Tr. 79:2-17)).  Mr. Lawson did not discipline Plaintiff who was subsequently charged with making false and misleading statements to a supervisor in violation of the regulations governing employee conduct.  *See* Defs.' SUMF ¶¶ 67-69, 76; *cf. id.* at ¶¶ 77 (Mr. Lester's disciplinary proposal), 79 (Mr. Whitescarver's disciplinary decision). |
| 58.  Given that he read the stalking law "several times" before preparing his IR (App. 474), Investigator Lawson likely was aware that there is a risk of imprisonment for those found guilty under it. *See* D.C. Code 22-3134 (penalties for violation of stalking law). | 58.  Disputed, not material, and unsupported.  Again, Mr. Lawson did not discipline Plaintiff who was subsequently charged with making false and misleading statements to a supervisor in violation of the regulations governing employee conduct.  *See* Defs.' SUMF ¶¶ 67-69, 76; *cf. id.* at ¶¶ 77 (Mr. Lester's disciplinary proposal), 79 (Mr. Whitescarver's disciplinary decision).  Nevertheless, Mr. Lawson testified that imprisonment is "not up to" him because such a decision is part of "the criminal justice process involving a jury and a judge." Ex. G at 15 (Lawson Tr. 31). |
| 59.  Investigator Lawson misled the readers of his Investigative Report by recounting that S.B. told him of a particular day of the month on which the child at issue was born. *Compare* App. 59 (IR at 6) *with* App. 102 (Tr. At 14:1-12) (discussing month and year, but making no mention of the day of the month). | 59.  Disputed, not material, unsupported, and argumentative.  Plaintiff offers no facts supporting her conclusion that Mr. Lawson intentionally "misled" anyone or that the "readers" of his report were in fact misled by this statement.  *Cf.* Defs.' Response to Pl.'s SUMF ¶ 144.  There is no evidence that the exact date of S.B.'s daughter's birth was known to Plaintiff and that date is not material to the First Amendment or District of Columbia Whistleblower Protection Act claims she raises against her discipline for making false and misleading statements to the Mayor about S.B. on February 5 and 6, 2019.  *See, e.g.*, Defs.' SUMF [79] ¶¶ 67-79.

What is more, Mr. Lawson did not discipline Plaintiff.  *See* Defs.' SUMF ¶¶ 67-69, 76; *cf. id.* at ¶¶ 77 (Mr. Lester's disciplinary proposal), 79 (Mr. Whitescarver's disciplinary decision). |

| | |
|---|---|
| 60.  Investigator Lawson lied in describing his interview of Harrison Shelton as being regarding a complaint that Plaintiff Lu "stalked" and harassed S.B.  *Compare* App. 60 (IR at 7) *with* App. 116-120 (Tr.) (no mention of "stalk" or "stalking" during interview). | 60.  Disputed, not material, unsupported, and argumentative.  Plaintiff offers no support for her conclusion that Mr. Lawson "lied" in describing her conduct towards S.B.  *See, e.g.*, Defs.' Response to Pl.'s SUMF ¶¶ 50-52; *cf.* Defs.' Response to Pl.'s SUMF ¶ 144.<br><br>What is more, Mr. Lawson did not discipline Plaintiff.  *See* Defs.' SUMF ¶¶ 67-69, 76; *cf. id.* at ¶¶ 77 (Mr. Lester's disciplinary proposal), 79 (Mr. Whitescarver's disciplinary decision). |
| 61.  Investigator Lawson fabricated his claim that Harrison Shelton stated he had "heard about Ms. Lu's stalking of" S.B. "from other co-workers…"  *Compare* App. 60 (IR at 7) *with* App. 116-120 (Tr.) (no mention of "stalk" or "stalking").  *Also see* App. 117-118 (Tr. At 2:20 – 3:8) (Mr. Shelton testifying only of hearing second-hand "rumors" Ms. Lu made "comments" about S.B.; no mention of stalking). | 61.  Disputed, not material, unsupported, and argumentative.  Plaintiff offers no support for her conclusion that Mr. Lawson "fabricated" his description of her conduct towards S.B.  *See, e.g.*, Defs.' Response to Pl.'s SUMF ¶¶ 50-52; *cf.* Defs.' Response to Pl.'s SUMF ¶ 144.<br><br>What is more, Mr. Lawson did not discipline Plaintiff.  *See* Defs.' SUMF ¶¶ 67-69, 76; *cf. id.* at ¶¶ 77 (Mr. Lester's disciplinary proposal), 79 (Mr. Whitescarver's disciplinary decision). |
| 62.  Investigator Lawson fabricated his claim that interviewee Syed Hashmi told Lawson "he has been aware of Ms. Lu's stalking of" S.B. and that "it has been going on a long time."  *Compare* App. 61 (IR at 8) *with* App. 121-129 (Tr.) (no mention of word "stalk" or "stalking") and App. 124 (Tr. At 4:11-14) (reference to "long time" is to overall disputes between S.B. and Plaintiff Lu, versus to "stalking"). | 62.  Disputed, not material, unsupported, and argumentative.  Plaintiff offers no support for her conclusion that Mr. Lawson "fabricated" his description of her conduct towards S.B.  *See, e.g.*, Defs.' Response to Pl.'s SUMF ¶¶ 50-52; *cf.* Defs.' Response to Pl.'s SUMF ¶ 144.<br><br>What is more, Mr. Lawson did not discipline Plaintiff.  *See* Defs.' SUMF ¶¶ 67-69, 76; *cf. id.* at ¶¶ 77 (Mr. Lester's disciplinary proposal), 79 (Mr. Whitescarver's disciplinary decision). |
| 63.  Investigator Lawson lied when reporting (App. 62—IR at 9) that interviewee Samuel Mutia "stated he has been aware of Ms. Lu's stalking of" S.B. regarding use of paid family leave and that "it has been going on for a long time."  *Compare* App. 232-240 (Tr.) (no use of words "stalk" or "stalking" in interview, nor references to "going on" or "long time"). | 63.  Disputed, not material, unsupported, and argumentative.  Plaintiff offers no support for her conclusion that Mr. Lawson "lied" when reporting what Mr. Mutia said.  *See, e.g.*, Defs.' Response to Pl.'s SUMF ¶¶ 50-52; *cf.* Defs.' Response to Pl.'s SUMF ¶ 144.<br><br>What is more, Mr. Lawson did not discipline Plaintiff.  *See* Defs.' SUMF ¶¶ 67-69, 76; *cf. id.* at ¶¶ 77 (Mr. Lester's disciplinary proposal), 79 (Mr. Whitescarver's disciplinary decision). |
| 64.  Investigator Lawson was deceitful when recounting that he and interviewee | 64.  Disputed, not material, unsupported, and argumentative.   Plaintiff offers no support for |

| | |
|---|---|
| Chrys Edet discussed Ms. Lu's "stalking" of S.B., with Edet purportedly saying he knew "it has been going on for a long time." *Compare* App. 62 (IR at 9) *with* App. 241-246 (Tr.) (no mention of "stalk" or "stalking" and no reference to anything going on for a long time). | her conclusion that Mr. Lawson "was deceitful" in describing her conduct towards S.B.  *See, e.g.*, Defs.' Response to Pl.'s SUMF ¶¶ 50-52; *cf.* Defs.' Response to Pl.'s SUMF ¶ 144.<br><br>What is more, Mr. Lawson did not discipline Plaintiff.  *See* Defs.' SUMF ¶¶ 67-69, 76; *cf. id.* at ¶¶ 77 (Mr. Lester's disciplinary proposal), 79 (Mr. Whitescarver's disciplinary decision). |
| 65.  Investigator Lawson poisoned the well in his interview of management official Christopher Bailey by telling Bailey that Lawson was investigating Plaintiff for "persistent stalking and possible sexual harassment," when no allegations of sexual harassment were ever made. *Compare* App. 248 (Tr. at 2:4-11) *with* App. 54-88 (Lawson's IR, making no reference to any allegations of sexual harassment). | 65.  Disputed, not material, unsupported, and argumentative.  Plaintiff offers no support for her conclusion that Mr. Lawson "poisoned the well" when he interviewed Mr. Bailey on December 10, 2018.  *See, e.g.*, Defs.' Ex. 1 [79-1] at 9-10; Defs.' Response to Pl.'s SUMF ¶¶ 50-52; *cf.* Defs.' Response to Pl.'s SUMF ¶ 144.  Mr. Bailey had already provided a written statement describing Plaintiff's conduct related to S.B.'s wife's pregnancy, their daughter, and his use of parental when he forwarded S.B.'s first complaint to DCRA HR in February 2017.  *See, e.g.*, Defs.' SUMF [79] ¶¶ 25-27. |
| 66.  Investigator Lawson fabricated his claim that he was told by management official Christopher Bailey of a discussion with CAO Crawford that Bailey identified as the "last time he heard about Ms. Lu's stalking of" S.B. *Compare* App.63 (IR at 10) *with* App. 247-259 (Tr. With sole mention of "stalk" or "stalking" being Investigator Lawson's at start of interview [App. 248 at 2:4-11]). | 66.  Disputed, not material, unsupported, and argumentative.  Plaintiff offers no support for her conclusion that Mr. Lawson "fabricated" his description of her conduct towards S.B.  *See,* Defs.' Response to Pl.'s SUMF ¶¶ 50-52; *cf.* Defs.' Response to Pl.'s SUMF ¶ 144.<br><br>What is more, Mr. Lawson did not discipline Plaintiff.  *See* Defs.' SUMF ¶¶ 67-69, 76; *cf. id.* at ¶¶ 77 (Mr. Lester's disciplinary proposal), 79 (Mr. Whitescarver's disciplinary decision). |
| 67.  Investigator Lawson demonstrated open hostility toward Plaintiff's engaging in disclosure activity, such as by telling her at least seven times during his interview of her that matters related to whether S.B. engaged in leave fraud were none of her business. *See* App. 260-341, at 331 (Tr. 72:6-10) (first and second instances of "none of your business"); 331 (Tr. 72:12) (third); 337 (Tr. 78:8-9) (fourth); 337 (Tr. 78:12) (fifth); 337 (Tr. 78:14-15) (sixth); and 338 (Tr. 79:4) (seventh). *Also see* App. | 67.  Disputed, not material, unsupported, and argumentative.  Plaintiff's conduct between June 27, 2016 and February 6, 2019, does not qualify as a protected disclosure.  *See generally* Defs.' Mem. [79] at 31-70.  It was not Plaintiff's job to try to start investigations into her conclusory beliefs about a coworker's wife's pregnancy, the existence of their daughter, and her coworker's use of parental leave during that period.  *See, e.g.*, Defs.' SUMF [79] ¶ 3.  It is unsupported, and argumentative for Plaintiff to state "Mr. |

| | |
|---|---|
| 485 (dep. 100:13-19) (Investigator Lawson stipulating that he told Plaintiff eight times during the interview that what had gone on with S.B. was none of her business); App. 506 (dec. ¶46). | Lawson demonstrated open hostility toward" her.  *Cf.* Defs' Response to Pl.'s SUMF ¶ 144.<br><br>What is more, Mr. Lawson did not discipline Plaintiff.  *See* Defs.' SUMF ¶¶ 67-69, 76; *cf. id.* at ¶¶ 77 (Mr. Lester's disciplinary proposal), 79 (Mr. Whitescarver's disciplinary decision). |
| 68.  Yet, as a general proposition, <u>Investigator Lawson agreed that as a general matter one employee's misconduct "is the business of all employees."</u> App. 486 (dep. 101:11-17). | 68.  Undisputed, but not material.  Mr. Lawson's personal opinions on general matters are not material.  Mr. Lawson did not discipline Plaintiff.  *See* Defs.' SUMF ¶¶ 67-69, 76; *cf. id.* at ¶¶ 77 (Mr. Lester's disciplinary proposal), 79 (Mr. Whitescarver's disciplinary decision). |
| 69.  <u>During Investigator Lawson's interview of Plaintiff Lu, he questioned why she had contacted the *Washington Post* about the leave fraud issue when the newspaper is not part of DCRA Human Resources.</u> App. 310 (Tr. at 51:16-20). *Also see* App. 506 (dec. ¶47). | 69.  Undisputed, but not material.  Mr. Lawson did not discipline Plaintiff and her lawsuit was filed more than one-year after her February 12, 2019 interview.  *See* D.C. Code § 1-615.54(2); Defs.' SUMF ¶¶ 67-69, 76, 90; *cf. id.* at ¶¶ 77 (Mr. Lester's disciplinary proposal), 79 (Mr. Whitescarver's disciplinary decision). |
| 70.  <u>During Investigator Lawson's interview of Plaintiff, he questioned why she had contacted CNN when it is not part of DCRA Human Resources.</u> App. 311 (Tr. at 52:1-8). *Also see* App. 506 (dec. ¶47). | 70.  Undisputed, but not material.  Mr. Lawson did not discipline Plaintiff and her lawsuit was filed more than one-year after her February 12, 2019 interview.  *See* D.C. Code § 1-615.54(2); Defs.' SUMF ¶¶ 67-69, 76, 90; *cf. id.* at ¶¶ 77 (Mr. Lester's disciplinary proposal), 79 (Mr. Whitescarver's disciplinary decision). |
| 71.  <u>During Investigator Lawson's interview of Plaintiff, he questioned why she contacted (news station) WTOP when it is not DCRA Human Resources.</u> App. 312 (Tr. at 53:1-4). *Also see* App. 506 (dec. ¶47). | 71.  Undisputed, but not material.  Mr. Lawson did not discipline Plaintiff and her lawsuit was filed more than one-year after her February 12, 2019 interview.  *See* D.C. Code § 1-615.54(2); Defs.' SUMF ¶¶ 67-69, 76, 90; *cf. id.* at ¶¶ 77 (Mr. Lester's disciplinary proposal), 79 (Mr. Whitescarver's disciplinary decision). |
| 72.  <u>During Investigator Lawson's interview of Plaintiff, he pushed her to admit that she contacted NBC Universal and that it is not part of DCRA Human Resources.</u> App. 312-13 (Tr. at 53:21 – 54:7). *Also see* App. 506 (dec. ¶47). | 72.  Undisputed, but not material.  Mr. Lawson did not discipline Plaintiff and her lawsuit was filed more than one-year after her February 12, 2019 interview.  *See* D.C. Code § 1-615.54(2); Defs.' SUMF ¶¶ 67-69, 76, 90; *cf. id.* at ¶¶ 77 (Mr. Lester's disciplinary proposal), 79 (Mr. Whitescarver's disciplinary decision). |
| 73.  <u>The D.C. Department of Human Resources advises staff that they have a right to communicate with members of the D.C. Council. *See, e.g.,* "Whistleblower</u> | 73.  Disputed in part, misleading, and not material.  District of Columbia employees do not have a right to continually make false and misleading accusations about their coworkers to |

| | |
|---|---|
| Protections and Obligations" at www.dchr.dc.gov/page/whistleblower-protections-and-obligations (viewed 2/2/2022); App. 506 (dec. ¶48) (she understood management was not permitted to keep employees from communicating with Council). | the Mayor, the District of Columbia Council, or anyone else. *See, e.g.*, Defs.' SUMF [79] ¶¶ 67-79; *cf.* 6-B DCMR § 1605.4(b). |
| 74.  <u>During Investigator Lawson's interview of Plaintiff, he pushed her to admit that she reported her concerns about leave fraud by S.B. to Councilmember Brianne Nadeau.</u> App. 313-14 (Tr. 54:21 – 55:9). *Also see* App. 506 (dec. ¶48). | 74.  Undisputed, but not material.  Mr. Lawson did not discipline Plaintiff and her lawsuit was filed more than one-year after her February 12, 2019 interview.  *See* D.C. Code § 1-615.54(2); Defs.' SUMF ¶¶ 67-69, 76, 90; *cf. id.* at ¶¶ 77 (Mr. Lester's disciplinary proposal), 79 (Mr. Whitescarver's disciplinary decision). |
| 75.  <u>During Investigator Lawson's interview of Plaintiff, he pushed her to admit that she reported her concerns about leave fraud by S.B. to Councilmembers Michele Blackwell and Elissa Silverman.</u> App. 314 (Tr. at 55:10-17). *Also see* App. 506 (dec. ¶48). | 75.  Undisputed, but not material.  Mr. Lawson did not discipline Plaintiff and her lawsuit was filed more than one-year after her February 12, 2019 interview.  *See* D.C. Code § 1-615.54(2); Defs.' SUMF ¶¶ 67-69, 76, 90; *cf. id.* at ¶¶ 77 (Mr. Lester's disciplinary proposal), 79 (Mr. Whitescarver's disciplinary decision). <br><br> Defendants do not dispute that Plaintiff contacted Councilmembers Michele Blackwell and Elissa Silverman with her conclusory and speculative allegations about S.B.'s wife's pregnancy, their daughter, and his use of parental leave after she was told by DCRA HR, OIG, BEGA, EOM, and DCHR that there was nothing wrong with S.B.'s application for and use of parental leave.  *See, e.g.*, Defs.' SUMF [79] ¶¶ 61-62; Defs.' Ex. 1 [79-1] at 138-39.  On October 17, 2018, Councilmember Silverman's office informed Plaintiff that "[t]he Council does not have the authority to take action against individual DC government employees."  Defs.' Ex. 1 [79-1] at 138 (10/17/2018 Email from M. Blackwell to L. Lu at 5:39 p.m.). |
| 76.  <u>Investigator Lawson acknowledged ("Personally, yes") that he thought it was inappropriate for Plaintiff Lu to interact with these council members.</u> App. 484 (dep. 83:10-20). | 76.  Undisputed, but not material.  Mr. Lawson's personal opinion has no bearing on any issue in this case.  Mr. Lawson did not discipline Plaintiff and her lawsuit was filed more than one-year after her February 12, 2019 interview.  *See* D.C. Code § 1-615.54(2); Defs.' SUMF ¶¶ 67-69, 76, 90; *cf. id.* at ¶¶ 77 (Mr. Lester's |

| | disciplinary proposal), 79 (Mr. Whitescarver's disciplinary decision). |
|---|---|
| 77.  During Investigator Lawson's interview of Plaintiff Lu, he repeatedly pushed her to acknowledge her report of parental leave fraud by S.B. was weak because Ms. Lu had never seen S.B.'s wife's "nude body while she was wearing a pillow or "fake pregnancy belly." App. 64 (IR at 11); App. 325 (Tr. at 66:14-20); App. 326-27 (Tr. at 67:22 – 68:11) (repeatedly pushing her to admit she had not seen S.B.'s wife in the nude). *Also see* App. 506 (dec. ¶50). | 77.  Undisputed, but not material.  Mr. Lawson did not discipline Plaintiff and her lawsuit was filed more than one-year after her February 12, 2019 interview.  *See* D.C. Code § 1-615.54(2); Defs.' SUMF ¶¶ 67-69, 76, 90; *cf. id.* at ¶¶ 77 (Mr. Lester's disciplinary proposal), 79 (Mr. Whitescarver's disciplinary decision).<br><br>Defendants do not dispute that Plaintiff did not see under S.B.'s wife's clothes before telling OIG on June 27, 2016, that she did not think S.B.'s wife looked pregnant, or before repeatedly accusing S.B.'s wife of wearing a fake pregnancy belly around DCRA to appear pregnant between February 2017 and February 2019.  *See, e.g.*, Defs.' SUMF [79] ¶¶ 7, 25-26, 72-73. |
| 78.  During Investigator Lawson's interview of Plaintiff, he rejected her request that he interview her coworker Alec whom she cited as part of the basis for her belief that leave fraud occurred. App. 326 (Tr. at 67:7-18) (Lawson: "I don't care what somebody else told you about somebody else" and "I don't need to talk to Alec" as he was not complaining). *Also see* App. 487 (dep. 109:3-9) (Lawson agreeing he declined to speak with the witness that Plaintiff requested Lawson interview). *Also see* App. 506 (dec. ¶51). | 78.  Undisputed, but misleading and not material.  Mr. Lawson did not discipline Plaintiff and her lawsuit was filed more than one-year after her February 12, 2019 interview.  *See* D.C. Code § 1-615.54(2); Defs.' SUMF ¶¶ 67-69, 76, 90; *cf. id.* at ¶¶ 77 (Mr. Lester's disciplinary proposal), 79 (Mr. Whitescarver's disciplinary decision).  Moreover, Mr. Petrillo-Groh has nothing to add to Plaintiff's defense, *see* Defs.' Response to Pl.'s SUMF ¶ 34. |
| 79.  When Plaintiff Lu attempted to tell Investigator Lawson what coworker Alec had said about the matter, Lawson stopped her, saying it would be hearsay [transcribed as "heresy"]. App. 216 (Tr. 67:7-9). *Compare* App. 250 (Bailey/Lawson Tr. at 4:16-22) (Lawson allowing witness to recount what they had been told Plaintiff was told in a meeting with others for which the witness was not present). *Also see* App. 506 (dec. ¶52). | 79.  Undisputed, but misleading and not material.  Mr. Lawson did not discipline Plaintiff and her lawsuit was filed more than one-year after her February 12, 2019 interview.  *See* D.C. Code § 1-615.54(2); Defs.' SUMF ¶¶ 67-69, 76, 90; *cf. id.* at ¶¶ 77 (Mr. Lester's disciplinary proposal), 79 (Mr. Whitescarver's disciplinary decision).  Moreover, Mr. Petrillo-Groh has nothing to add to Plaintiff's defense.  *See* Defs.' Response to Pl.'s SUMF ¶ 34. |
| 80.  During Investigator Lawson's interview of Plaintiff, he ordered her not to say anything further about the leave fraud | 80.  Disputed, not material, and unsupported. Plaintiff has not introduced any evidence that Mr. Lawson had authority to have "ordered her |

| | |
|---|---|
| issues to "the press" or "anybody else in DCRA, or anywhere," other than DCRA Human Resources. App. 333 (Tr. at 74:4-13). *Also see* App. 506 (dec. ¶49). | not to" do anything. *See* Ex. G. at 36-37 (Lawson Tr. 147:3-148:15). Plaintiff was investigated for harassing S.B. and disciplined for making false and misleading statements about him to the Mayor on February 5 and 6, 2019. *See, e.g.*, Defs.' SUMF [79] 67-69, 71-79.<br><br>What is more, Mr. Lawson did not discipline Plaintiff. *See* Defs.' SUMF ¶¶ 67-69, 76; *cf. id.* at ¶¶ 77 (Mr. Lester's disciplinary proposal), 79 (Mr. Whitescarver's disciplinary decision). |
| 81.  During his interview of Plaintiff Lu, Investigator Lawson complained that she raised the leave fraud concerns with members of the "Council," with the "Washington Post, WTOP, City Paper, CNN." App. 337 (Tr. at 78:2-5). | 81.  Disputed in part, not material, and misleading.  Mr. Lawson did not discipline Plaintiff and her lawsuit was filed more than one-year after her February 12, 2019 interview. *See* D.C. Code § 1-615.54(2); Defs.' SUMF ¶¶ 67-69, 76, 90; *cf. id.* at ¶¶ 77 (Mr. Lester's disciplinary proposal), 79 (Mr. Whitescarver's disciplinary decision).  Defendants do not dispute that Plaintiff made statements to councilmembers and the media, but she has not identified anything that she is claiming is protected speech for Mr. Lawson to be "complain[ing]" about. *See, e.g.*, Defs.' SUMF [79] ¶¶ 56-66. |
| 82.  Investigator Lawson falsely reported that during his interview of Plaintiff, she "stated her complaint against" S.B. and his wife "is based on speculation and conjure." *Compare* App. 65 (IR at 12) *with* App. 330-31 (Tr. at 71:16 – 72:3) (Lawson interrupting and cutting Plaintiff off when she attempts to give a full response to his assertion her reports are based on "conjure and speculation"). *Also see* App. 507 (dec. ¶53). | 82.  Disputed, not material, misleading, and unsupported.  Mr. Lawson did not discipline Plaintiff and her lawsuit was filed more than one-year after her February 12, 2019 interview. *See* D.C. Code § 1-615.54(2); Defs.' SUMF ¶¶ 67-69, 76, 90; *cf. id.* at ¶¶ 77 (Mr. Lester's disciplinary proposal), 79 (Mr. Whitescarver's disciplinary decision).  Plaintiff offers no fact to dispute the conclusion that her statements about S.B. and his wife were not based on speculation and conjecture.  *See* Defs.' SUMF [79] ¶¶ 7, 31-33, 36, 63-66, 72-73; *see also* Defs.' Response to Pl.'s SUMF ¶ 51.  And Plaintiff "[p]retty much" admitted she was speculating. Pl.'s App. [77-2] 330 (Transcript Line 71:17). |
| 83.  Investigator Lawson's report to management remarked on Plaintiff's having reported her leave fraud assertions to "Councilmembers" and "news media service." App. 71 (IR at 18). | 83.  Undisputed, but misleading and not material.  Plaintiff has not identified anything that she said to councilmembers or the media that she is claiming is protected speech. *See, e.g.*, Defs.' SUMF [79] ¶¶ 56-66. |

| | |
|---|---|
| 84.  Investigator Lawson's report to management included attachments of Plaintiff's emails to media outlets about her reports she believed S.B. had engaged in leave fraud. App. 74 (IR at 21, referencing the report's Exhibit 29 consisting of emails with the Washington Post). | 84.  Undisputed but misleading.  Plaintiff has not identified any statement that she made to councilmembers or the media that she is claiming is protected speech.  *See, e.g.*, Defs.' SUMF [79] ¶¶ 56-66. |
| 85.  Investigator Lawson's report to management included multiple adverse descriptions of Plaintiff's contacts with media outlets. App. 75—IR at 22, as to CNN; App. 76 (IR at 23, as to WTOP, NBC Universal, and Washington Post); App. 77 (IR at 24, as to City Paper). | 85.  Undisputed but misleading.  Plaintiff has not identified any statement that she made to councilmembers or the media that she is claiming is protected speech.  *See, e.g.*, Defs.' SUMF [79] ¶¶ 56-66. |
| 86.  Investigator Lawson's report to management falsely cited Plaintiff's communications with Councilmembers as misconduct. *Compare* App. 77-78 (IR at 24-25) *with* dchr.dc.gov/page/whistleblower-protections-and-obligations (viewed 1/24/2022) (DC DCRA webpage noting employee right to freely communicate with council members) and  D.C. Official Code §1-615.53 (prohibition on supervisor interfering with or denying right of employee to furnish information to the Council or one of its members). | 86.  Disputed, misleading, not material, and argumentative.  Mr. Lawson did not discipline Plaintiff. Defs.' SUMF ¶¶ 67-69, 76, 90; *cf. id.* at ¶¶ 77 (Mr. Lester's disciplinary proposal), 79 (Mr. Whitescarver's disciplinary decision). Plaintiff has not identified any statement that she made to the any member of the District of Columbia Council after DCRA HR, OIG, BEGA, EOM, and DCHR told her that there was nothing wrong with S.B.'s parental leave application or after Plaintiff saw a little girl with S.B.'s wife at DCRA that Plaintiff claims is protected speech.  *See* Defs.' SUMF [79] ¶¶ 61-66; *cf.* Defs.' SUMF [79] ¶¶ 28-60, 67; Defs.' Response to Pl.'s SUMF ¶¶ 73-75. District of Columbia employees do not have a right to continually make false and misleading accusations about their coworkers to the Mayor, the District of Columbia Council, or anyone else. *See, e.g.*, Defs.' SUMF [79] ¶¶ 67-79; *cf.* 6-B DCMR § 1605.4(b). |
| 87.  Investigator Lawson lied to management when his report *twice* claimed that "Ms. Lu admitted" to engaging in a course of conduct that aligned with a violation of the criminal stalking law. *Compare* App. 80 (IR at 27, claim of Plaintiff admission, also setting out elements of a violation) *and* 85 (IR at 32, repeating Lawson's false representation as to Plaintiff admitting guilt) *with* App. 260- | 87.  Disputed, misleading, not material, unsupported, and argumentative.  Mr. Lawson did not discipline Plaintiff. Defs.' SUMF ¶¶ 67-69, 76, 90; *cf. id.* at ¶¶ 77 (Mr. Lester's disciplinary proposal), 79 (Mr. Whitescarver's disciplinary decision).  Plaintiff does not deny "engaging in [the two-and-a-half-year] course of conduct" described in the Investigative Report and attached Exhibits that culminated in her making false and misleading statements to the |

| | |
|---|---|
| 341 (Tr. of Lawson interview of Plaintiff, containing no admission she knew her conduct would cause S.B. to fear for his safety, feel seriously alarmed/disturbed/frightened, or suffer emotional distress, *nor containing any discussion of such issues* beyond Lawson's speculation (denied by Plaintiff) [App. 333-34—IR at 72:17 – 73:2] that S.B. hesitates to bring child to work because of Plaintiff's "haunting" and "stalking" S.B.). *Also compare with* App. 339 (IR at 80:7-8, Plaintiff explaining she meant well and did not mean to "hurt anybody or be malicious about something"). *Also see* App. 507 (dec. ¶54). | Mayor about S.B., his family, and his application for and use of parental leave.  *See* Defs.' Mem. [79] at 29-48; Defs.' SUMF [79] ¶¶ 1-79; Defs.' Ex. 1 [79-1] at 1-150; *cf.* Defs.' Response to Pl.'s SUMF ¶¶ 50-51, 144. |
| 88.  Among the grounds for Investigator Lawson's concluding Plaintiff "grossly violated" rules against falsification as to official matters and in communications with supervisors was that Plaintiff contacted media outlets and members of City Council after being ordered not to communicate with anyone but HR. *See* App. 80-81 (IR at 27-28, making at least six references to media outlets and at least two to her communicating with council members). | 88.  Partially disputed, misleading, and not material.  Mr. Lawson did not discipline Plaintiff.  Defs.' SUMF ¶¶ 67-69, 76, 90; *cf. id.* at ¶¶ 77 (Mr. Lester's disciplinary proposal), 79 (Mr. Whitescarver's disciplinary decision).  Plaintiff has not identified any statement that she made to the any member of the District of Columbia Council after DCRA HR, OIG, BEGA, EOM, and DCHR told her that there was nothing wrong with S.B.'s parental leave application or after Plaintiff saw a little girl with S.B.'s wife at DCRA that Plaintiff claims is protected speech.  *See* Defs.' SUMF [79] ¶¶ 61-66; *cf.* Defs.' SUMF [79] ¶¶ 28-60, 67; Defs.' Response to Pl.'s SUMF ¶¶ 73-75.  Plaintiff was told to not speak to anyone in DCRA other than HR about S.B.'s parental leave in August 2017.  *See* Defs.' Response to Pl.'s SUMF ¶ 149.  Plaintiff was disciplined for making false and misleading statements to the Mayor in February 2019.  *See* Defs.' SUMF [79] ¶¶ 72-79. |
| 89.  Among the grounds for Investigator Lawson's concluding Plaintiff "grossly violated" rules against failing to follow instructions were that she contacted media outlets and council members after being ordered to report matters solely to HR. App. 81-5 (IR 28-32, referencing | 89.  Disputed in part, misleading, and not material.  Mr. Lawson did not discipline Plaintiff.  Defs.' SUMF ¶¶ 67-69, 76, 90; *cf. id.* at ¶¶ 77 (Mr. Lester's disciplinary proposal), 79 (Mr. Whitescarver's disciplinary decision).  Plaintiff has not identified any statement that she made to the any member of the District of Columbia Council after DCRA HR, OIG, |

| | |
|---|---|
| communications with CNN, Washington Post, WTOP, and three council members). | BEGA, EOM, and DCHR told her that there was nothing wrong with S.B.'s parental leave application or after Plaintiff saw a little girl with S.B.'s wife at DCRA that Plaintiff claims is protected speech. *See* Defs.' SUMF [79] ¶¶ 61-66; *cf.* Defs.' SUMF [79] ¶¶ 28-60, 67; Defs.' Response to SUMF ¶¶ 73-75. Plaintiff was told not to speak to anyone in DCRA other than HR about S.B.'s parental leave in August 2017. *See* Response to Pl.'s SUMF ¶ 149. Plaintiff was disciplined for making false and misleading statements to the Mayor in February 2019. *See* Defs.' SUMF [79] ¶¶ 72-79. |
| 90.  While the body of the Lawson Investigative report makes more than 20 uses of the word "stalking" and its variants (App. 54-88), Investigator Lawson could not name a single witness who actually used such a word in his interviews of them. *Compare* App. 474-475 (dep. 32:18 – 33:4). That is, not even S.B. ever used the term. App. 478 (dep. 50:8-11). | 90.  Undisputed, but not material and misleading.  Mr. Lawson was not suggesting witnesses used the word "stalking" and he did not discipline Plaintiff. *See* Defs.' SUMF ¶¶ 67-69, 76; Defs.' Response to Pl.'s SUMF ¶¶ 51; *cf.* Defs' SUMF ¶¶ 77 (Mr. Lester's disciplinary proposal), 79 (Mr. Whitescarver's disciplinary decision).  On February 2, 2017, and November 8, 2018, S.B. complained that Plaintiff was harassing him about his wife's pregnancy, their daughter, and his use of parental leave. *See, e.g.*, Defs.' SUMF [79] ¶¶ 25, 67; *cf.* Ex. I at 15-18 (S.B. Tr. 50:9-51:6, 51:15-18, 52:5-11, 52:19-53:13). |
| 91.  The Lawson IR and his interview eventually frightened Plaintiff out of making further disclosures. *See* App. 35 (decision at 3, noting no repeating of Plaintiff's conduct at issue between March 27, 2019 and the June 2019 date of the decision). *Also see* App. 507 (dec. ¶47) (factors leading her to be less willing to speak out in the future). | 91.  Disputed and misleading.  Plaintiff cites her own declaration—which she attaches to her motion, produced after the close of discovery and more than 11 months after her deposition— as support for this proposition.  On January 18, 2019, Plaintiff wrote to the New York Times from her government email account, repeated her allegations about S.B., and "request[ed] confidentiality and anonymity." Ex. H at 26; *see id.* at 25.  Plaintiff made false and misleading statements to the Mayor about S.B., his family, and his use of parental leave on February 5 and 6, 2019. *See, e.g.*, Defs.' SUMF [79] ¶¶ 72-74.  On the morning of February 7, 2019, Plaintiff received an interview request from Mr. Lawson and was informed that it was her conduct he was |

<table>
<tr>
<td></td>
<td>investigating.  <em>See</em> Defs.' Ex. 3 [79-3] at 3.  That afternoon Plaintiff informed the New York Times that "from now on I'll write to you from my personal account for job safety.  Do you have any update for me?"  Ex. H at 19.  The next day, Plaintiff forwarded the statement she made to the Mayor to Mr. Lawson with a request to be interviewed after the completion of DCRA's investigation into her most recent allegations about S.B.  <em>See</em> Defs.' SUMF [79] ¶ 75.

On February 12, 2019, Mr. Lawson interviewed Plaintiff.  <em>See id.</em> at ¶ 76.  On April 2, 2019, Mr. Lester issued Plaintiff a notice of a proposed 10-day disciplinary suspension for making false and misleading statements to the Mayor.  <em>See id.</em> at ¶ 77.  On April 12, 2019, Plaintiff wrote:  "After my interview with Mr. Lawson on 2-12, I have been working exceptionally hard on my plan review," claimed that she had "stopped while on duty sitting in DCRA business premises, and [ ] thought that was the end of it."  Defs.' Ex. 3 [79-3] at 3, 37.

On Tuesday, May 28, 2019, at 4:01 p.m., Plaintiff wrote the New York Times:  "I am not able to provide you the 'concrete evidence' I thought that's all what you yourself have been digging for.  If it were that easy there would be no need for media's attention."  Ex. H at 20.

On June 27, 2019, Mr. Whitescarver reduced Plaintiff's proposed suspension to eight-days because "there [had] been no reported incidents of [her] having repeated the performance that necessitated the disciplinary action."  Defs.' SUMF [79] ¶ 79 (quoting Defs.' Ex. 4 [79-4] at 4).  Plaintiff has been challenging that decision ever since.  <em>See, e.g.</em>, Defs.' Response to Pl.'s SUMF ¶ 148.</td>
</tr>
<tr>
<td>92.  <u>In contrast to his extensive investigation of Plaintiff's disclosures/conduct, Investigator Lawson was not assigned to investigate whether her reports S.B. engaged in fraud were true.</u>  <em>See</em> App. 471 (dep. 22:6-14) (did not know</td>
<td>92.  Undisputed but not material, misleading, and argumentative.  Investigator Lawson was not specifically assigned to investigate Plaintiff's February 5 and 6, 2019 allegations that S.B. had committed fraud and forgery crimes.  <em>See</em> Defs.' SUMF [79] ¶¶ 72-74.  Nevertheless, Mr. Lawson</td>
</tr>
</table>

| | |
|---|---|
| why he was not assigned to investigate accuracy of Plaintiff's fraud disclosures). | testified that as part of his investigation into Ms. Lu's conduct that he was allowed to review, but not copy, the documents S.B. submitted to DCRA HR to obtain parental leave. Ex. G at 9-10, 35 (Lawson Tr. 25:14-26:5, 146:13-21); *see, e.g.*, Defs.' Ex. 2 [79-2] at 5.<br><br>Moreover, on April 30, 2019, Ms. Crowe provided Plaintiff with DCRA's response to the allegations Plaintiff made to the Mayor. *See* Defs.' Response to Pl.'s SUMF ¶¶ 46-47; *cf., e.g.*, Defs.' SUMF [79] ¶¶ 28-37. |
| 93.  Investigator Lawson inaccurately reported that Mr. Lester knew S.B. had a child born during use of FMLA in 2016; instead, this was Lawson's "paraphrase." *See* App. 479 (Lawson dep. 70:7 – 71:12) (acknowledgement that may not really be in the transcript). | 93.  Disputed, not material, misleading, unsupported, and argumentative.  Mr. Lester issued the disciplinary proposal based on Mr. Lawson's Investigative Report while relying on the determinations made by the people who approved S.B.'s parental leave application and responded to Plaintiff's allegations that it was improper. *See, e.g.*, Defs.' SUMF [79] 77; Defs.' Response to Pl.'s SUMF ¶ 21.  Mr. Lawson did not discipline Plaintiff. *See* Defs.' SUMF ¶¶ 67-69, 76; *cf. id.* at ¶¶ 77 (Mr. Lester's disciplinary proposal), 79 (Mr. Whitescarver's disciplinary decision). |
| 94.  Investigator Lawson agreed that, if an employee did submit fraudulent documents in support of a claim for paid leave based on a child that did not exist, he would find it to rise to the level of criminal misconduct. App. 488-489 (dep. 115:12 – 116:2). | 94.  Undisputed but not material.  Mr. Lawson's personal opinion has no bearing on the issues in this case.  And, Mr. Lawson did not discipline Plaintiff. *See* Defs.' SUMF ¶¶ 67-69, 76; *cf. id.* at ¶¶ 77 (Mr. Lester's disciplinary proposal), 79 (Mr. Whitescarver's disciplinary decision).  Mr. Lawson was deposed as a fact witness, not as a 30(b)(6) or expert. |
| 95.  Investigator Lawson agreed that sometimes birth certificates may be forged, in that it is his view that "anything can be forged." App. 472-473 (dep. 26:14 – 27:4). | 95.  Undisputed but not material.  Mr. Lawson's personal opinion has no bearing on the issues in this case.  Mr. Lawson did not discipline Plaintiff. *See* Defs.' SUMF ¶¶ 67-69, 76; *cf. id.* at ¶¶ 77 (Mr. Lester's disciplinary proposal), 79 (Mr. Whitescarver's disciplinary decision).  Mr. Lawson was deposed as a fact witness, not as a 30(b)(6) or expert.  Plaintiff had (and has) no evidence that S.B. submitted forged documents to fraudulently obtain parental leave. *See, e.g.*, Defs.' SUMF [79] ¶¶ 6, 36, 60, 63, 72. |
| 96.  Rather than the typical process in which a Letter of Counseling/Reprimand | 96.  Disputed in part, misleading, not material, and unsupported.  District of Columbia policy |

| | |
|---|---|
| would precede a decision to propose a suspension, as to Plaintiff Lu the Defendants first proposed the discipline and then followed up with a counseling/warning letter. *Compare* App. 27 (April 2, 2019) proposed suspension from Lester *with* App. 350 (CAO Crowe April 22, 2019 letter detailing the history, asserting the matter is closed, and noting the letter will be put in Plaintiff's "official personnel folder" along with App. 52 (cover email to the Crowe letter, including threat that Ms. Lu needed to "consider this matter closed, as your very job may depend on it"). *Also see* App. 507 (dec. ¶57). | states that mangers "must [ ] gather evidence that supports the appropriate corrective response" and that "strict adherence to the progressive [disciplinary] steps will not always be appropriate" after the facts are gathered.  Pl.'s App. [77-2] at 367-68 (emphases removed).<br><br>In February 2017, DCRA HR told Plaintiff unequivocally that there was nothing wrong with S.B.'s parental leave application, that she needed to stay out of S.B.'s personal life, and that, if she did not stay out of S.B.'s personal life, her conduct would be addressed.  *See* Defs.' SUMF [79] ¶ 37; *see also id.* at ¶¶ 23-37, 50, 58.  Plaintiff repeatedly ignored this warning; S.B. complained about Plaintiff continuing to harass him about his personal life; and DCRA OGC opened an investigation into Plaintiff's conduct in November 2018.  *See, e.g., id.* at ¶¶ 50, 57-59, 66-68.<br><br>On February 5 and 6, 2019, Plaintiff approached and emailed the Mayor and acting DCRA Director Ernest Chrappah to tell them that S.B. had committed fraud and forgery crimes to obtain parental leave.  *See, e.g., id.* at ¶¶ 72-74.  Acting Director Chrappah promised to get a briefing and respond to Plaintiff's allegations.  *See* Defs.' Ex. 1 [79-1] at 145-46 (02/06/2019 Email from E. Chrappah to L. Lu at 10:35 p.m.).<br><br>The investigation into S.B.'s complaint concluded.  Defs.' SUMF [79] ¶ 76.  On April 2, 2019, Mr. Lester issued a notice proposing a 10-day suspension for Plaintiff making false and misleading statements about S.B.'s personal life and the investigations she had caused into his parental leave application based on Mr. Lawson's investigation of her conduct from November 28, 2018 to February 23, 2019.  *See, e.g., id.* at ¶¶ 68-69, 76-77.<br><br>Separately, in April 30, 2019, Plaintiff received the results of DCRA's investigation into her most recent allegations that S.B. had committed fraud and forgery crimes that she reported to the |

| | Mayor and Director Chrappah on February 5 and 6, 2019, further detailing Plaintiff's allegations about S.B.'s use of parental leave to DCRA HR, OIG, BEGA, EOM, DCHR, and the Mayor and Acting Director Chrappah between June 2016 and February 2019. *See* Pl.'s App. [77-2] at 52, 350-55; *see also* Defs.' Response to Pl.'s SUMF ¶¶ 27, 36, 46-47; *cf.* Defs.' SUMF [79] ¶¶ 7, 28-66. |
|---|---|
| 97.  The District's disciplinary policies (excerpt begins at App. 366) identify progressive discipline as involving verbal counseling, then a reprimand, then "corrective action" (suspension of fewer than 10 days), and finally "adverse action" (suspension of 10 or more days). App. 368, 371, and 372.  [Policy also at edpm.dc.gov/issuances/discipline/.] *Also see* App. 507 (dec. ¶57). | 97.  Undisputed but misleading.  The District's policy states that "strict adherence to the progressive steps will not always be appropriate" and "corrective or adverse action might be the appropriate first response, even if the employee has no disciplinary history."  Pl.'s App. [77-2] at 368 (original emphases removed)[4]; *see also* Defs.' Response to Pl.'s SUMF ¶ 96. |
| 98.  By starting with a 10-day proposed suspension rather than first trying a reprimand and a less-than-10-day suspension, Defendant Lester skipped two steps of progressive discipline. *See* App. 368, 371, and 372 (policy outlining standard steps); App. 30 (Douglas factor analysis in proposal, noting no prior reprimands or other prior corrective/adverse actions). *Also see* App. 507 (dec. ¶57) (Plaintiff's understanding of the standard process). | 98.  Undisputed but misleading and argumentative.  Mr. Lester's disciplinary proposal and Mr. Whitescarver's disciplinary decision were "dictated by applying the factors outlined at [6-B DCMR] § 1606.2 . . . which may produce an action that skips one or more of the progressive discipline steps," as described in the District's policy.  Pl.'s App. [77-2] at 368; *see* Defs.' Ex. 2 [79-2] at 4 ("This proposed disciplinary action has taken into account the Douglas factors to include:" (emphasis removed)); Defs.' Ex. 4 [79-4] at 2 ("Douglas Factors." (emphasis removed)). |
| 99.  The disciplinary proposal also violated standard procedures by only giving Ms. Lu six days to respond. *Compare* App. 31 (proposal at 5) *with* App. 373 (D.C. policy requiring the employee be given 10 days to respond to a proposed suspension of 10 or more days). *Also see* App. 508 (dec. ¶59). | 99.  Disputed, not material, and argumentative.  Plaintiff received Mr. Lester's disciplinary proposal on April 2, 2019.  *See, e.g.*, Defs.' SUMF [79] ¶ 77.  Plaintiff was allowed to submit her response "within 10 days," on April 12, 2019.  Pl.'s App. 373; s*ee, e.g.*, Defs.' SUMF [79] ¶ 78. |
| 100.  Defendant Lester summarized the basis for the proposed suspension as being that Plaintiff was told her reports were mistaken and instructed that she should | 100.  Disputed in part and misleading.  Plaintiff was disciplined after making a false claim against S.B. for over two and a half years. *See, e.g.*, Defs.' SUMF [79] ¶ 77 (quoting Defs.' Ex. |

---

[4]      Defendants again not their objection to Plaintiff submitting records that include her highlighting for the Court's consideration.

| | |
|---|---|
| stop making them, but nonetheless she persisted. App. 424-425 (dep. 21:20 – 22:6). | 2 [79-2] at 1-4).  However, Plaintiff mischaracterizes Mr. Lester's undisputed testimony to include reference to instructions:<br><br>[Plaintiff's Counsel]:  And in your own words can you summarize what you believe her to have done wrong that justified suspending her for ten days?<br><br>[Mr. Lester]:  The continuing the conduct even though she had been told that her complaints have been looked into and that, the result was that there was nothing to it.  So after being told that over and over, for it to be continuing I think that, you know, led to action against her.<br><br>[Plaintiff's Counsel]:  And when you say continuing her conduct, what conduct are you referring to?<br><br>[Mr. Lester]:  Conduct of not accepting that the issue that she has raised has been investigated by the appropriate bodies and they have come back to say that there is nothing there.<br><br>Pl.'s App. [77-2] at 424-25 (Lester Tr. 21:20-22:12); *see* Ex. E at 14-16 (Lester Tr. 28:15-29:21, 30:20-31:4); *see also* Defs.' SUMF [79] ¶¶ 7, 23-76. |
| 101.  Tyrone Lawson's Investigative Report was a fundamental basis for Mr. Lester's proposed suspension of Plaintiff. App. 29 (proposal at 3, explaining the Lawson "investigation results and conclusions below provide the backdrop for this proposal"). *Also see* App. 431-432 (Lester dep. 31:18 – 32:5) (Mr. Lester's primary basis for decision to propose discipline was Lawson IR). | 101.  Undisputed but incomplete.  Mr. Lawson's written Investigative Report and attached Exhibits were the basis for Plaintiff's discipline. *See, e.g.*, Defs.' SUMF [79] ¶¶ 68-69, 76-79; Defs.' Ex. 1 [79-1] at 1-150; Pl.'s App. [77-2] at 40-41 (Defs.' Second Am. Responses to Pl.'s First Set of Interrogatories Nos. 1-2); ; *cf.* Pl.'s App. [77-2] at 54-88 (Investigative Report without Exhibits); Pl.'s App. [77-2] at 434-35 (Lester Tr. 35:21-36:5). |
| 102.  Proposing Official Lester did not seek any information beyond what was presented to him in the Lawson IR. App. 434-435 (Lester dep. 35:21 – 36:1). | 102.  Undisputed, but incomplete.  Mr. Lawson's written Investigative Report and attached Exhibits were the basis for Plaintiff's discipline. *See* Defs' Ex. 14 [79-14] at 7-8 (Lester Tr. 35:21-36:2); 20-23 (Lester Tr. 55:18-58:1); *see also* Response to Pl.'s SUMF ¶ 101; Defs' Ex. 2 |

| | [79-2] at 2-3 (citing Investigative Report and Exhibits). |
|---|---|
| 103.  Defendant Lester testified that if Plaintiff Lu had never reported her belief that S.B. engaged in leave fraud, she never would have been disciplined: he knew of no other reason she would have been suspended. App. 429 (dep. 28:4-13). | 103.  Disputed, incomplete, and misleading.  Plaintiff repeatedly reported her conclusory and speculative allegations about S.B.'s wife's pregnancy, their daughter, and his use of parental leave to DCRA HR, OIG, BEGA, EOM, DCHR, and the Mayor and Acting Director Chrappah between June 27, 2016 and February 6, 2019.  *See* Defs.' SUMF [79] ¶¶ 7, 23-24, 28-58, 72-75, 77-78; *cf. id.* at ¶¶ 4, 6, 21-22, 25-27, 59-69.  Mr. Lester testified that he could not say whether he knew of any other reason Plaintiff would have been suspended if she had not engaged in that conduct.  *See* Lester Ex. E at 12-14 (Lester Tr. 26:12-22; 27:18-28:20); *see also* Defs.' Response to Pl.'s SUMF ¶ 100. |
| 104.  Defendant Lester in deposition agreed that, if an employee had obtained eight weeks of paid parental leave based on a child that turned out not to exist, it would constitute serious misconduct. App. 426 (dep. 24:15-22). | 104.  Undisputed but not material.  Plaintiff had (and has) no evidence that S.B. submitted forged documents to fraudulently obtain parental leave or that S.B.'s daughter does not exist.  *See, e.g.,* Defs.' SUMF [79] ¶¶ 6, 36, 60, 63, 72. |
| 105.  Defendant Lester in deposition agreed that if an employee had submitted a document under oath that they knew to be untrue, it would be serious misconduct. App. 426 (dep. 25:1-4). | 105.  Undisputed but not material.  Plaintiff had (and has) no evidence that S.B. submitted forged documents to fraudulently obtain parental leave.  *See, e.g.,* Defs.' SUMF [79] ¶¶ 6, 36, 60, 63, 72. |
| 106.  S.B., a coworker of Plaintiff's, said in deposition he would assume that it would be serious misconduct if a DCRA employee were to claim paid parental leave for a non-existent child. App. 410 (dep. 19:10-15). | 106.  Undisputed, but not material.  S.B. did not discipline Plaintiff and she had (and has) no evidence that S.B. submitted forged documents to fraudulently obtain parental leave.  *See, e.g.,* Defs.' SUMF [79] ¶¶ 6, 36, 60, 63, 67, 72, 77, 79. |
| 107.  Proposing Official Lester's more recent testimony at least three times contradicts his assertions in the April 2019 disciplinary proposal as to its basis.  *Compare* App. 27 (proposal at 1, asserting it addresses "**only** the dishonest statements made by Ms. Lu") (emphasis original) *with* App. 40 (Int. 1 response that "Plaintiff's discipline was based on a course of harassing conduct over two and a half years towards her coworker, S.B...").  *Also* | 107.  Disputed, misleading, unsupported, and argumentative.  Without differentiating between the District, Mr. Whitescarver, and Mr. Lester, Plaintiff asked Defendants to answer three interrogatories that she presents as inconsistent with her disciplinary proposal:  (1) "[i]dentify . . . each communication/disclosure by Plaintiff that you believe justified Plaintiff being suspended for eight days without pay," Pl.'s App. [77-2] at 40 (Interrogatory No. 1); *see also id.* at 40-41 (Interrogatory No. 2 ("ten-day |

| | |
|---|---|
| *see* App. 41 (repeating the "course of harassing conduct over two and a half years" wording in response to Int. 5) *and* App. 47 (response to Int. 20, repeating this wording). Mr. Lester's declaration under penalty of perjury as to the interrogatory responses appears at App. 50. | suspension"); (2) "[b]riefly summarize the factual basis for any contention on your part that Plaintiff's work performance suffered as a result of her making disclosures regarding [S.B.]," *id.* at 41 (Interrogatory No. 5); and (3) "[i]denify . . .each report report/disclosure by Plaintiff about Mr. [B.]'s obtaining paid family leave in 2016-2017 that you contend was intentionally false or misleading, as opposed to being the result of a reasonable belief on Plaintiff's part," *id.* at 47 (Interrogatory No. 20).  In response to each of these questions Defendants referred Plaintiff to the Investigative Report and attached Exhibits as the basis of her discipline.  *See id.* at 40-41, 47 (Defs.' Second Am. Response to Pl.'s First Set of Interrogatories Nos. 1, 2, 5, 20). Plaintiff offers no fact explaining how a referral to the Investigative Report and attached Exhibits is inconsistent with the disciplinary proposal finding that the investigation showed that she made false and misleading statements to the Mayor in February 2019.  *See* Defs.' SUMF [79] ¶¶ 68-79; Defs.' Ex. 2 [79-2] at 1-4; *cf.* Defs.' Ex. 1 [79-1] at 1-150.  *See generally* Defs.' SUMF [79] ¶¶ 7, 18-67; Defs.' Response to Pl.'s SUMF ¶¶ 36, 100-06. |
| 108.  Asked if it was relevant to his disciplinary proposal that Plaintiff contacted D.C. Council members, Defendant Lester responded that he "wouldn't say it would be irrelevant. It if was in the [Lawson investigative] report it would be relevant." App. 438 (dep. 44:8-10). | 108.  Undisputed but incomplete.  Plaintiff has not identified any statement that she made to any member of the council or any such statement that she claims qualifies as protected speech.  *See, e.g.*, Defs.' SUMF ¶¶ 59-67. |
| 109.  The disciplinary proposal criticized Plaintiff for her communications with members of the D.C. Council. App. 29 (proposal at 3) (asserting she made dishonest statements "over and over and over" to them). | 109.  Undisputed, incomplete, and not material. Plaintiff has not identified any statement that she made to any member of the council or any such statement that she claims qualifies as protected speech.  *Compare* Defs.' SUMF ¶¶ 59-67, *with id.* at ¶¶ 22-60, 67, 72. |
| 110.  The disciplinary proposal criticized Plaintiff for her communications with the media. App. 29 (proposal at 3) (asserting she made dishonest statements "over and over and over" to them). | 110.  Undisputed but incomplete and argumentative.  Plaintiff does not identify any statement that she made to any member of the media that she claims was honest or otherwise qualifies as protected speech.  *Compare* Defs.' |

| | SUMF ¶¶ 22-59, 72, *with* Defs.' Response to Pl.'s SUMF ¶¶ 84-85, 88-89. |
|---|---|
| 111.  Proposing Official Lester is unsure if "there are protections under D.C. law for people who report what they believe to be wrongdoing" by employees. App. 423 (dep. 13:4-10). | 111.  Undisputed but not material.  Plaintiff had (and has) no evidence that S.B. submitted forged documents to fraudulently obtain parental leave.  *See, e.g.*, Defs.' SUMF [79] ¶¶ 6, 36, 60, 63, 72.  District of Columbia employees do not have any right to make false and misleading accusations about their coworkers to the Mayor, the District of Columbia Council, or anyone else.  *See, e.g.*, Defs.' SUMF [79] ¶¶ 67-79; *cf.* 6-B DCMR § 1605.4(b).  The following exchange took place during Mr. Lester's deposition:<br><br>[Plaintiff's Counsel]:  Without giving a legal opinion but just your own understanding, can you summarize what your understanding is as to whether or not there are protections under D.C. law for people who report what they believe to be wrongdoing employees?<br><br>[Mr. Lester]:  I'm not sure.<br><br>Pl.'s App. [77-2] at 423 (Lester Tr. 13:4-10).  However, Plaintiff's question does not identify a legal standard recognized by District of Columbia law.  *See, e.g.*, Defs.' Mem. [79] at 63 (legal standard). |
| 112.  The harm Defendant Lester testified to having been caused by Plaintiff's conduct was "tension in the workplace" and no other harm "that I'm aware of." App. 428 (dep. 26:12-18). | 112.  Undisputed but incomplete.  The following exchange took place during Mr. Lester's deposition:<br><br>[Plaintiff's Counsel]:  Do you believe that Ms. Lu's actions caused harm to DCRA?<br><br>[Mr. Lester]:  Well, it caused tension in the workplace, if that's what you're talking about.<br><br>[Plaintiff's Counsel]:  Okay.  Any other harm other than tension in the workplace?<br><br>[Mr. Lester]:  Not that I'm aware of.<br><br>[Plaintiff's Counsel]:  And when you say tension in the workplace are you referring to the relationship between [S.B.] and Ms. Lu? |

| | |
|---|---|
| | [Mr. Lester]:  Yes.<br><br>Pl.'s App. [77-2] at 428 (Lester Tr. 26:12-22). |
| 113.  Defendant Lester's conclusion that Plaintiff Lu had disrupted the workplace was not based on his observations as the supervisor of Plaintiff and S.B. *See* App. 433 (dep. 34:1-5) (Lester conclusion based solely on Lawson IR and what Lawson said to Lester on the subject). | 113.  Disputed and unsupported.  The following exchange took place during Mr. Lester's deposition:<br><br>[Plaintiff's Counsel]:  Your conclusion that Ms. Lu had disrupted the workplace, was that based on anything other than Mr. Lawson's report and what [S.B.] said to you about it?<br><br>[Mr. Lester]:  No. Based on what I -- no.<br><br>Pl.'s App. [77-2] at 433 (Lawson Tr. 34:1-5). |
| 114.  Defendant Lester did not know if Investigator Lawson had looked into whether or not it was actually true that S.B. engaged in leave fraud. App. 439 (dep. 53:19-22). | 114.  Undisputed, not material, and incomplete.  Mr. Lester testified that he relied on the determination and reports of the officials responsible for looking into S.B.'s leave application that he had no reason to doubt.  *See, e.g.*, Defs.' Ex. 4 [79-4] at 20-23 (Lester Tr. 55:18-58:1); Defs.' Response to Pl.'s SUMF ¶¶ 21, 36, 92. |
| 115.  When S.B. complained to Defendant Lester about Plaintiff mistreating him, Mr. Lester did not meet with Plaintiff to hear her side of the story. App. 436-437 (dep. 37:21 – 38:1). | 115.  Undisputed, incomplete, not material, and unsupported.  Plaintiff has not identified which of S.B.'s complaints she believes Mr. Lester should have met with her about or when she should have met with her.  *See* Pl.'s App. [77-2] at 436-37 (Lester Tr. 37:21-38:1).  Mr. Lester testified that he "told [S.B.] to go to HR to have HR deal with" his complaint about Plaintiff and did not meet with Plaintiff because "she thought that she bring it up with HR."  *Id.* at 437 (Lester Tr. 38:16-17); *see* Defs.' SUMF ¶¶ 25, 28, 67; *see also* Defs.' Ex. 1 [79-1] at 36, 40, 62. |
| 116.  Deciding Official Whitescarver's more recent testimony at least three times contradicts his assertions in the June 2019 disciplinary decision for its basis. *Compare* App. 33 (decision at 1, identifying a single charge, related to misleading the Mayor on two days in February 2019) *with* App. 40 (Int. 1 response that "Plaintiff's discipline was based on a course of harassing conduct over two and a half years towards her | 116.  Disputed, misleading, unsupported and argumentative.  Again, without differentiating between the District, Mr. Whitescarver, and Mr. Lester, Plaintiff asked Defendants to answer three interrogatories that she presents as inconsistent with her disciplinary proposal:  (1) "[i]dentify . . . each communication/disclosure by Plaintiff that you believe justified Plaintiff being suspended for eight days without pay," Pl.'s App. [77-2] at 40 (Interrogatory No. 1); *see* |

| | |
|---|---|
| coworker, S.B...”). *Also see* App. 41 (repeating the “course of harassing conduct over two and a half years” wording in response to Int. 5) *and* App. 47 (response to Int. 20, repeating this wording). Mr. Whitescarver’s declaration under penalty of perjury as to the interrogatory responses appears at App. 50. | *also id.* at 40-41 (Interrogatory No. 2 (“ten-day suspension”); (2) “[b]riefly summarize the factual basis for any contention on your part that Plaintiff’s work performance suffered as a result of her making disclosures regarding [S.B.],” *id.* at 41 (Interrogatory No. 5); and (3) “[i]dentify . . .each report report/disclosure by Plaintiff about Mr. [B.]’s obtaining paid family leave in 2016-2017 that you contend was intentionally false or misleading, as opposed to being the result of a reasonable belief on Plaintiff’s part,” *id.* at 47 (Interrogatory No. 20).  In response to each of these questions Defendants referred Plaintiff to the Investigative Report and attached Exhibits as the basis of her discipline.  *See id.* at 40-41, 47 (Defs.’ Second Am. Response to Pl.’s First Set of Interrogatories Nos. 1, 2, 5, 20).  Plaintiff offers no fact explaining how a referral to the Investigative Report and attached Exhibits is inconsistent with the disciplinary decision finding that the investigation showed that she made false and misleading statements to the Mayor in February 2019.  *See* Defs.’ SUMF [79] ¶¶ 68-79; Defs.’ Ex. 4 [79-4] at 1-4; *cf.* Defs.’ Ex. 1 [79-1] at 1-150.  *See generally* Defs.’ SUMF [79] ¶¶ 7, 18-67; Defs.’ Response to Pl.’s SUMF ¶ 36. |
| 117.  Defendant Whitescarver’s sworn interrogatory testimony that Plaintiff was disciplined for “a course of harassing conduct over two and a half years towards her coworker, S.B...” (*id.*) contradicts his deposition testimony that the discipline was not for harassment. *Compare* App. 451 (dep. 39:1-7) (final charge was misleading the Mayor, not insubordination or harassment because that is what was received from proposing official). | 117.  Disputed, misleading, unsupported, and argumentative.  Again, without differentiating between the District, Mr. Whitescarver, and Mr. Lester, Plaintiff asked Defendants to answer three interrogatories.  *See, e.g.*, Defs.’ Response to Pl.’s SUMF ¶¶ 36, 107, 116.  Even construing the first question as asking Mr. Whitescarver to “[i]dentify . . . each communication/ disclosure by Plaintiff that [he] believe[s] justified Plaintiff being suspended for eight days without pay,” Pl.’s App. [77-2] at 40 (Interrogatory No. 1); Plaintiff has not identified how referring her the Investigative Report prepared in response to S.B.’s harassment complaint and describing her communications over a two and a half year period is inconsistent with the conclusion that her communications with DCRA HR about S.B.’s parental leave application in February 2017 show that she made false and misleading |

| | |
|---|---|
| | statements to the Mayor about S.B. committing fraud and forgery crimes in February 2019. *See, e.g.,* Defs.' SUMF [79] ¶¶ 67-74, 78-79; Defs.' Response to Pl.'s SUMF ¶ 36 (quoting Defs.' Ex. 15 [79-15] at 9-10 (Whitescarver Tr. 32:19-33:1))) |
| 118.  Defendant Whitescarver was aware that even an accurate whistleblower disclosure leads to some disruption. App. 454 (dep. 69:14-18). | 118.  Undisputed, but not material.  Plaintiff has not identified any statement that she claims is "an accurate whistleblower disclosure."  *See* App. 454. |
| 119.  Defendant Whitescarver claims he made his decision to discipline Plaintiff for purportedly lying about S.B. without knowing S.B. had admitted wrongdoing and paid a fine in relation to Plaintiff's earlier ethics disclosures. *See* App. 446 (dep. 17:7-11). | 119.  Disputed in part and argumentative. Defendants object to Plaintiff characterizing Mr. Whitescarver's testimony as a "claim" without any evidence to dispute his testimony and to Plaintiff referring to her own conduct as "purported[ ]" without identifying any fact establishing that what she said to the Mayor on February 5 and 6, 2019, was not false and misleading.  *See, e.g.,* Defs.' SUMF [79] ¶¶ 72-79.

The following exchange took place during Mr. Whitescarver's deposition:

[Plaintiff's Counsel]:  Were you aware that in December 2016 he paid a $1,000 fine and agreed to take training based on an admitted violation of ethics rule?

[Mr. Whitescarver]:  I am now.  I was not at the time of this corrective action.

Pl.'s App. [77-2] at 446 (Whitescarver Tr. 17:7-11). |
| 120.  Defendant Whitescarver's view of whether or not S.B. committed leave fraud is based entirely on what he heard second-hand from HR and Lawson's Investigation. App. 448 (dep. 26:8-13). *Also see* App. 449 (dep. 27:9-14) (did not review any documents outside of what was in the Lawson IR). | 120.  Undisputed, but not material and argumentative.  Defendants do not dispute that Mr. Lawson's investigation is the basis of Plaintiff's discipline for making false and misleading statements about S.B. to the Mayor. *See, e.g.,* SUMF [79] ¶¶ 67-79. |
| 121.  Defendant Whitescarver disciplined Plaintiff for her reports to the Mayor notwithstanding his deposition testimony that an employee is generally allowed to | 121.  Undisputed but not material, incomplete, unsupported, and argumentative.  Plaintiff was disciplined for telling the Mayor that S.B.'s committed a fraud and forgery crime after |

| | |
|---|---|
| report "to the IG and to anyone else they care to" any matter "they feel is a violation of District law or is a case of fraud or abuse." App. 442-443 (dep. 11:17 – 12:3). | DCRA HR, OIG, BEGA, EOM, and DCHR repeatedly told her that there was nothing wrong with S.B.'s parental leave application. *See, e.g.*, Defs.' SUMF [79] ¶¶ 6-7, 19-79. District of Columbia employees do not have any right to make false and misleading accusations about their coworkers to the Mayor, the District of Columbia Council, or anyone else. *See, e.g.*, Defs.' SUMF [79] ¶¶ 67-79; *cf.* 6-B DCMR § 1605.4(b). |
| 122.  Defendant Whitescarver testified that if Plaintiff Lu had never reported her belief that S.B. engaged in leave fraud, she never would have been disciplined: he was unaware of "any other issues that would have caused the suspension." App. 447 (dep. 21:9-16). | 122.  Disputed, incomplete, and misleading. Plaintiff repeatedly reported her conclusory and speculative allegations about S.B.'s wife's pregnancy, their daughter, and his use of parental leave to DCRA HR, OIG, BEGA, EOM, DCHR, and the Mayor and Acting Director Chrappah between June 27, 2016 and February 6, 2019.  *See* Defs.' SUMF [79] ¶¶ 7, 23-24, 28-58, 72-75, 77-78; *cf. id.* at ¶¶ 4, 6, 21-22, 25-27, 59-69.  The following exchange took place during Mr. Whitescarver's deposition:<br><br>[Plaintiff's Counsel]:  Do you have any reason Ms. Lu would have ended up being suspended if she had never reported her belief that [S.B.] fraudulently obtained paid parental leave?<br><br>. . . .<br><br>[Mr. Whitescarver]:  I'm not aware of any other issues that would have caused the suspension.<br><br>Pl.'s App. [77-2] at 447 (Whitescarver Tr. 21:9-16). |
| 123.  Defendant Whitescarver in deposition agreed that, if an employee had obtained eight weeks of paid parental leave based on a child that turned out not to exist, it would constitute serious misconduct. App. 444 (dep. 14:9-18) | 123.  Undisputed but not material.  Plaintiff had (and has) no evidence that S.B. submitted forged documents to fraudulently obtain parental leave or that S.B.'s daughter does not exist.  *See, e.g.*, Defs.' SUMF [79] ¶¶ 6, 36, 60, 63, 72. |
| 124.  Defendant Whitescarver in deposition agreed that if an employee had submitted a document under oath that they knew to be untrue, it would be serious misconduct. App. 445 (dep. 15:15-22). | 124.  Undisputed but not material.  Plaintiff had (and has) no evidence that S.B. submitted forged documents to fraudulently obtain parental leave or that S.B.'s daughter does not exist.  *See, e.g.*, Defs.' SUMF [79] ¶¶ 6, 36, 60, 63, 72. |

| | |
|---|---|
| 125.  Defendant Whitescarver's decision did not comply with D.C. disciplinary policy in that it was issued 86 days from the proposal (April 2 to June 27, 2019), while policy requires a decision in 45 days. *Compare* App. 33 (decision date) *with* App. 372 (45-day deadline). [Or 76 days if measuring from receipt of Plaintiff's answer on April 12, 2019.] *Also see* App. 508 (dec. ¶62). | 125.  Partially disputed, incomplete, and not material.  The policy only requires a final decision within 45 days of an employee's written response.  *See, e.g.*, Pl.'s App. [77-2] at 372. Plaintiff abandoned her claim that Mr. Whitescarver's decision was not timely under the District of Columbia's disciplinary policies when she agreed to end arbitration and pursue this case as a First Amendment and District of Columbia Whistleblower Protection Act case. *See* 6-B DCMR §§ 1623.6, 1627.1, 1636; Am. Answer [76] ¶¶ 5, 11-15, 24-27; Am. Compl. [58] ¶¶ 5, 11-15, 24-27; Ex. H at 2, 9; *see also* Response to Pl.'s SUMF ¶¶ 130-33. |
| 126.  Defendant Whitescarver's decision relied on the proposal, which in turn had relied heavily on the Lawson Investigative Report. *See* App. 29 (proposal at 3, explaining the Lawson "investigation results and conclusions below provide the backdrop for this proposal") *and* App. 33 (decision, citing the proposal and noting Whitescarver's "full review of the supporting documentation") *and* App. 34 (decision: "I hereby adopt the evidence, recommendations, rationale, and conclusions of the proposing official"). | 126.  Undisputed but incomplete.  Mr. Lester's proposal to suspend Plaintiff for 10 days relied on Mr. Lawson's investigation of Plaintiff's conduct and Mr. Whitescarver's decision to suspend Plaintiff for 8 days relied on Mr. Lawson's investigation, Mr. Lester's disciplinary proposal, and Plaintiff's responses. *See, e.g.*, Defs.' SUMF [79] ¶¶ 67-79. |
| 127.  Part of why Plaintiff was suspended was that she had not surrendered to management's view that there was no wrongdoing by S.B.  *See* App. 34 (decision, referencing appearance she had not "fully conceded" to the investigatory conclusions). | 127.  Undisputed but incomplete and argumentative.  Plaintiff was suspended because she has "not fully conceded to the conclusions of the investigation or supervisory direction provided to" her.  Pl.'s App. [77-2] at 34; *accord.* Defs.' SUMF [79] ¶ 79; *cf., e.g.*, Defs.' SUMF [79] ¶¶ 6-7, 36, 72-74. |
| 128.  The decision acknowledged that Plaintiff had no prior disciplinary record. App. 34. *Also see* App. 507 (dec. ¶58). | 128.  Undisputed but not material.  Both Mr. Lester's April 2, 2019 disciplinary proposal and Mr. Whitescarver's June 27, 2019 disciplinary decisions acknowledged that Plaintiff did not have a "past disciplinary record."  6-B DCMR § 1606.2(c); *see* Defs.' Ex. 2 [79-2] at 4, Defs.' Ex. 4 [79-4] at 2; *cf.* Defs.' Response to Pl.'s SUMF ¶ 98.  *See generally* 6-B DCMR § 1606.3 ("All of these factors shall be considered and balanced to arrive at the appropriate remedy. While not all of these factors may be deemed |

| | relevant, consideration should be given to each factor based on the circumstances."). |
|---|---|
| 129.  The discipline was issued in part for the purpose of quieting Plaintiff. *See* App. 33 at ¶9 (decision: "It is hoped that the proposed 10 day suspension will impress upon her the need for her to stop engaging in making false statements about her coworkers"). | 129.  Disputed, incomplete, unsupported, and argumentative.  Defendants object to Plaintiff's allegation that she was disciplined "for the purpose of quieting" her.  Plaintiff was disciplined because made false and misleading statements about her coworker for over two years and needs to stop doing so.  *See* 6-B DCMR § 1605.4(b); Defs.' SUMF [79] ¶¶ 77, 79; *cf.* Defs.' SUMF [79] ¶¶ 6-7, 19-74. |
| 130.  Plaintiff's union initially invoked arbitration on her behalf as to the imposed eight-day suspension. App. 15-20 (Settlement Agreement); App. 508 (dec. ¶63). | 130.  Undisputed but not material.  *See* Ex. H at 8.  However, Plaintiff can only rely on the Settlement Agreement "to the extent necessary to enforce [the] Agreement or as required by law."  *Id.* at 18 (Agreement ¶ 3); *cf.* Pl.'s SUMF [77-1] at 1 n.1. |
| 131.  By later agreement with the District in December 2019, the scheduled arbitration was cancelled, and this outcome agreed to be a "final determination" of the issues that were to be raised in the anticipated arbitration. App. 15-20 (Settlement Agreement); App. 508 (dec. ¶64) | 131.  Undisputed but not material.  Defendants do not dispute that Plaintiff withdraw from arbitration.  *See* Ex. H at 2}.  However, Plaintiff can neither rely on the agreement to end arbitration nor offer parole evidence interpreting the Settlement Agreement "in any judicial or administrative proceeding."  *Id.* at 18 (Agreement ¶ 4); *see* Defs.' Response to Pl.'s SUMF ¶ 130; *cf.* Pl.'s App. [77-2] at 508 (02/03/2022 Lu Decl. ¶¶ 64-65 (appearing to offer commentary on the Settlement Agreement)). |
| 132.  That is, the parties agreed no relief would be granted in arbitration, with the result that Plaintiff now only may obtain whatever relief is available from this Court, versus the range of relief often available from a negotiated grievance process. App. 15-20 (Settlement Agreement); App. 508 (dec. ¶65) | 132.  Disputed in part and unsupported.  The terms of the Settlement Agreement that Plaintiff signed to end the arbitration process do not support Plaintiff's conclusions about the relief available to her from this Court or the arbitration process.  *See* Defs.' Response to Pl's SUMF ¶¶ 130-31; Pl.'s App. [77-2] at 17-18 (Settlement Agreement ¶¶ 2, 4); *cf., e.g., id.* at 17 (Settlement Agreement ¶ 2.e. (allowing Plaintiff to return to arbitration if a court determining its jurisdiction finds that she "did not adequately exhaust her administrative remedies")). |
| 133.  The District of Columbia agreed in particular that "it will not assert that the grievance in this matter is pending or in anyway [*sic*] precludes Ms. Lu from initiating any lawsuit against the Agency in | 133.  Undisputed but not material.  The District has not made this argument.  *Compare* Pl.'s SUMF [77-2] at 1 n.1 ("At the time of the drafting of these Facts, Defendants had not yet withdrawn the defense of failure to exhaust |

| | |
|---|---|
| any court of law." App. 15, ¶2(d). App. 15-20 (Settlement Agreement). | administrative remedies and removing this section now would throw off other citations."), *with id.* at 27 ("G. Administrative Exhaustion Under the WPA" (emphasis removed)), *id.* at ¶¶ 130-33, *and, e.g.*, Am. Answer [76] (answering Plaintiff's Amended Complaint). |
| 134. <u>As compared to the February 2019 disclosures to the Mayor cited to discipline Plaintiff and the June 2019 suspension decision (App. 33), it was in August 2019 that Plaintiff submitted a request to telework and then was approved for it by her supervisor.</u> *See* App. 356 (Plaintiff email from October 2019 noting timeline) *and* 508 (dec. ¶68). | 134. Undisputed but incomplete, not material, and argumentative. On June 13, 2019, Ms. Crowe "distributed DCRA's first formal" telework policy. Defs.' SUMF [79] ¶ 80. Defendants do not dispute that Mr. Lester approved Plaintiff's August 13, 2019 telework application. *See id.* at ¶¶ 83-84. |
| 135. <u>Chief Administrative Officer Tiffany Crowe was the one who had sent Plaintiff the April 2019 email warning her that her job could depend on Plaintiff's willingness to drop the claims of fraud</u> (App. 52 and App. 508 [dec. ¶67]). | 135. Undisputed, not material and incomplete. Ms. Crowe sent Plaintiff a letter detailing DCRA's response to Plaintiff's February 5 and 6, 2019 statements to the Mayor in an email on April 30, 2019, stating, in part:<br><br>The attached letter from me is DCRA's response to your latest (Feb. 5, 2019) complaint about [S.B.]. DC government has investigated your complaint and found it without merit. You need to consider this matter closed, as your very job may depend on it. I hear that, when not lodging complaints without evidence, you are a valued employee. Please devote your energy to your job, do it well, and cease this activity [omitted[5]]. Again, please consider this matter closed.<br><br>Pl.'s App. [77-2] at 52 (04/30/2019 Email from T. Crowe to L. Lu). As Ms. Crowe explained in the following exchange during her deposition:<br><br>[Plaintiff's Counsel]: I want to go back up to the first page. You say in this e-mail to Ms. Lu, "You need to consider this matter closed as your very job may depend on it." |

[5] Although the green highlighting in this record is Plaintiff's post discovery notation, the original gray highlighting and notation ("- I hear you. Will do!") appear to be original to Plaintiff's response to Ms. Crowe's email. Pl.'s App. [77-2] at 52 (04/30/2019 Email from T. Crowe to L. Lu, et al.); *see id.* at (04/30/2019 Email from L. Lu to T. Crowe, et al.).

| | What did you mean by that? |
|---|---|
| | [Ms. Crowe]:  So after reviewing all of the materials and seeing the prior disciplinary actions, you know, in the progressive discipline steps and at an agency's discretion in some regard, employees for certain egregious acts may be terminated. |
| | So I wanted Ms. Lu, who seems to value her job and enjoy working at DCRA and be a valuable member of the community, to recognize that this particular matter was not one that was going to conclude in a way that she had desired based on the evidence as we had it, so ... |
| | [Plaintiff's Counsel]:  Well, was this one way of saying to her if you keep doing what you've been doing then you may end up fired? |
| | [Ms. Crowe]:  If you continue to violate the District government's guidelines for employee behavior you may be terminated.  I think that's a reasonable statement, yes. |
| | Ex. D at 12-15 (Crowe Tr. 14:20-15:21); *see also* Defs.' Response to Pl.'s SUMF ¶ 47. |
| 136.  It was unusual for CAO Crowe to get involved in decisions about individual employees being approved/disapproved for telework. *See* App. 405 (Crowe dep. 59:1-5). *Also see* App. 509 (dec. ¶68) (Plaintiff's observation of same). | 136.  Undisputed but not material and incomplete.  On September 4, 2019, Mr. Lester asked Mr. Crowe to respond to Plaintiff's inquiry about how long it would take to hear back on the telework application he had approved.  *See* Defs.' Ex. 7-8; Response to Pl.'s SUMF ¶ 134.  This was unusual.  *See* Defs.' SUMF [79] ¶ 85. |
| 137.  Ms. Crowe claimed that Plaintiff could not be allowed to telework because she did not have access to a VPN. App. 406-407 (Crowe dep. 69:22 – 70:3); App. 509 (dec. ¶69). | 137.  Disputed in part but not material. Defendants do not dispute that Plaintiff could not start telework because she did not have a VPN.  *See* Defs.' SUMF [79] ¶¶ 86-89. Defendants object to Plaintiff's characterization of Ms. Crowe's statement as a "claim" because Plaintiff offers no evidence to suggest that she identified "colleagues approved for telework" who did not have access to the technology that they needed to do their jobs from home.  Pl.'s App. [77-2] at 509 (02/03/2022 Lu Decl. ¶ 69); |

| | |
|---|---|
| | *see* Defs.' SUMF [79] ¶¶ 86-89.  Plaintiff testified that she asked two coworkers, with different job titles, who reported to a different manager at the time, how long it took for their telework applications to get approved, without knowing whether or not they needed the same technology she did to do their job or talking to anyone else who had not been allowed to start teleworking after their manager approved their application. Ex. A at 11, 16-21 (Lu Tr. 94:16-17, 105:11-110:20). |
| 138.  <u>Plaintiff alerted Ms. Crowe that while she was being barred from teleworking under the claim she could not do so without a VPN, her colleagues [who weren't whistleblowers] were teleworking</u>. App. 357 (email); App. 509 (dec. ¶¶69-70). | 138.  Disputed in part.  Plaintiff has not identified any statement that she is claiming qualifies as protected speech under the First Amendment or DCWPA.  Nor does Plaintiff's October 7, 2019 email identify any employee who Plaintiff claims was "exactly situated." Pl.'s App. [77-2] at 357 (10/07/2019 Email from L. Lu to T. Crowe at 11:15 a.m.); *see* Defs.' Response to Pl.'s SUMF ¶ 137.  Furthermore, Ms. Crowe testified that she looked into whether there were other people who had been allowed to telework under the policy who should not have been and was told that there was no one who was teleworking who should not have been.  *See* Defs.' SUMF [79] ¶¶ 88-89. |
| 139.  <u>Among these was Plaintiff's coworker S.B., who testified that he was allowed to telework without a VPN</u>. App. 415-416 (dep. 36:16 – 37:6). | 139.  Disputed, incomplete, misleading, not material, and unsupported.  Before DCRA implemented a formal telework policy, Mr. Lester allowed Plaintiff to work from home without a VPN or access to Accella software. *See* Ex. A. at 15 (Lu Tr. 104:6-20).  Plaintiff did not ask S.B. whether he submitted a telework application, had it approved by Mr. Lester, and was subsequently allowed to work from home after DCRA implemented a telework policy in June 2019.  *See* Pl.'s App. [77-2] at 415 (Plaintiff's Counsel:  "All right.  Prior to the pandemic, were you allowed to telework at all?"); *cf.* Ex. I at 19-20 (S.B. Tr. 96:17-97:9) (S.B.:  ". . . . I facilitated work, and that is when I may have been doing some teleworking, even while I'm on paid family leave. . . .").  Plaintiff neither asked S.B. whether he had submitted an application to telework nor told Ms. Crowe that he was teleworking before Ms. Crowe |

| | |
|---|---|
| | discovered that DCRA had no information that anyone was improperly teleworking in the fall of 2019. *See* Defs.' Response to Pl.'s SUMF ¶¶ 137-38. |
| 140.  Neither Plaintiff nor the officials involved in the discipline are aware of any other DCRA employees ever being disciplined for misleading management officials. App. 434 (Lester dep. 35:3-6); App. 450 (Whitescarver dep. 34:4-16); App. 509 (dec. ¶71 as to Plaintiff). | 140.  Undisputed but not material.  District of Columbia employees do not have any right to make false and misleading accusations about their coworkers to the Mayor. *See, e.g.*, Defs.' SUMF [79] ¶¶ 67-79; *cf.* 6-B DCMR § 1605.4(b).  Plaintiff did not (and does not) have any evidence that S.B. committed the fraud and forgery crimes she reported to the Mayor on February 5 and 6, 2019. *See, e.g.*, Defs.' SUMF [79] ¶¶ 6-7, 36, 72-74. |
| 141.  While S.B. did not like Plaintiff reporting him, there were no disruptive confrontations between them, with them instead both continuing to perform at high levels. *See* App. 508 (dec. ¶61). | 141.  Disputed and unsupported.  Plaintiff cites her own declaration—which she attaches to her motion, produced after the close of discovery and more than 11 months after her deposition— as support for this proposition.  Plaintiff's self-serving conclusion ignores the records of S.B.'s complaints about and her own conduct that were captured by the Investigative Report prepared by Mr. Lawson on February 23, 2019, on which her proposed 10-day suspension was based on April 2, 2019. and her eight-day suspension was decided on June 27, 2019. *See, e.g.*, Defs.' SUMF [79] ¶¶ 23-28, 65-69, 71, 76-79. |
| | Both times that S.B. complained that Plaintiff was confronting him about his use of parental leave in the DCRA workplace she was actively trying to get someone to investigate her conclusory and speculative allegations about his family and parental leave. *See id.* at ¶¶ 25 (Feb. 2, 2017), 67 (Nov. 8, 2018); *cf. id.* at ¶¶ 24 (Jan. 11, 2017), 26-38 (Feb. 2 to Feb. 27, 2017), 60-66 (October to November 2018)  For example, on November 8, 2019, Plaintiff wrote a councilmember for an update on the third complaint that she was trying to funnel to OIG through the councilmember exactly 25 minutes before S.B. sent an email to then CAO Walter Crawford complaining about Plaintiff's ongoing harassment of him earlier that morning. *Compare id.* at ¶ 65 (11:21 a.m.), *with id.* at ¶ 67 |

| | |
|---|---|
| | (11:46 a.m.).  *See generally* Defs.' Response to Pl.'s SUMF ¶ 143. |
| 142.  <u>Plaintiff's reports to the Mayor that formed the basis for the sole disciplinary charge in the disciplinary decision</u> (App. 33) <u>did not disrupt or impede the work of the Mayor</u>. *See* App. 48 (Defendants' answer to Int. 22 asking for factual basis of any related factual contention, providing no specific answer and instead general statements about disruption of the overall workplace); App. 459-460 (DCRA Director Chrappah dep. 22:3 – 23:4) (not unusual or particularly inappropriate for people to excitedly approach Mayor when seeing her); App. 457 (Director Chrappah dep. 11:6-22) (Mayor's office never contacted him about Plaintiff's comments to Mayor nor about anything else related to Plaintiff Lu) *and* App. 458 (Chrappah dep. 12:15-20) (he expects that if Mayor's office did have a concern about a DCRA employee [e.g., Ms. Lu], the Mayor's office would have let him know about it). *Also see* App. 492-494 (DCRA Deputy Director Shirley Kwan-Hui deposition testimony at 13:15 – 15:08 that she could recall no discussion of Plaintiff with the Director nor any communications from the Mayor's office asserting they considered Plaintiff to have been disruptive). | 142.  Disputed in part, incomplete, misleading, not material, and unsupported.  Defendants provided an answer to Plaintiff's request for them to "[b]riefly summarize any factual basis for any contention on your part that the work of the Mayor was disrupted or impeded by Plaintiff's February 5-6, 2019 disclosures to the Mayor," Pl.'s App. [77-2] at 48 (Pl.'s Interrogatory No. 22), which she did not previously challenge as substantively inadequate, *see* 10/07/2021 Mot. [71] at 9-11 (asking the Court to overrule Defendants' objections).  Defendants stated that "Plaintiff's conduct on February 5-6, 2019, was the last of many instances in which Plaintiff engaged in a course of generally disruptive and inappropriate conduct towards S.B." that is described by DCRA OGC's investigation of S.B.'s November 8, 2018 complaint about Plaintiff's conduct and DCRA's response to Plaintiff's February 5 and 6, 2019 allegations about S.B. that Ms. Crowe provided, Pl.'s App. [77-2] at 48 (Defs.' Second Am. Response to Pl.'s Interrogatory No. 22). *See generally* Defs.' SUMF [79] ¶¶ 7, 20-69, 71-76.<br><br>Plaintiff did not (and does not) have any evidence that S.B. committed the fraud and forgery crimes she reported to the Mayor on February 5 and 6, 2019.  *See, e.g.*, Defs.' SUMF [79] ¶¶ 6-7, 36, 72-74.  The fact that DCRA's senior leadership did not recall the Mayor or anyone in her office following up on Plaintiff's most recent iteration of her allegations is not evidence that Plaintiff's decision to approach the Mayor was not "the last of many instances in which Plaintiff engaged in a course of generally disruptive and inappropriate conduct towards S.B." Pl.'s App. [77-2] at 48 (Defs.' Second Am. Response to Pl.'s Interrogatory No. 22). *See generally* Defs'. SUMF [79] ¶¶ 7, 20-69, 71-76. |
| 143.  <u>Apart from the frustration any person might feel at being the subject of a</u> | 143.  Disputed in part, incomplete, misleading, not material, and argumentative.  Defendants |

| | |
|---|---|
| coworker's whistleblowing, S.B.'s work performance was not adversely affected by Plaintiff's disclosures. *See* App. 414 (dep. 29:8-17) (he maintained high performance ratings). | restate their continuing objection to Plaintiff's repeated characterization of statements she has yet to identify as "whistleblowing . . . disclosures."  Moreover, Plaintiff's efforts to minimize the impact of her conduct on S.B. mischaracterize his deposition testimony:<br><br>[Plaintiff's Counsel]:  Okay.  I had divided that [$100,000 a year] by 52 weeks, and then by five days a week, and I get about $384.  And then multiply that by an eight-day suspension, over $3,000.  Do you believe it was appropriate for Luchi Lu to suffer about $3,000 loss in pay versus you paying a $1,000 loss?  Or do you think those two situations are completely different?<br><br>[S.B.]:  They are completely different.  Are you asking me if they are different?<br><br>[Plaintiff's Counsel]:  Yes.<br><br>[S.B.]:  Let me put it in perspective for you guys.  If Luchi Lu -- if I had accused Luchi Lu, if she came to work and she had an enlarged abdomen, and she said she is pregnant, and I was walking around the office telling everybody that she is stuffing her belly with prosthetic abdominal whatever to say that she is pregnant, and that she is now about to claim fraudulent leave, what do you think would have happened to me?  I would have been fired. . . .<br>. . . .<br><br>Now, she is going around the office telling employees in the office, and also people who come to DCRA to do business, that my wife is faking pregnancy.  And she is bold enough to discuss that with other employees in the office and say that we are committing fraud.<br><br>And you are asking me if $3,000 is too severe?  If it was in some cases, she would be fired.<br><br>[Plaintiff's Counsel]:  Okay. Have you managed to maintain high performance ratings in spite of |

| | |
|---|---|
| | what has been going on between you and Luchi Lu? |
| | [S.B.]:  I try to do my job despite all this distraction.  I try to stay focused. |
| | [Plaintiff's Counsel]:  And so have you managed to maintain high performance ratings in spite of that stress? |
| | [S.B.]:  Well, I guess -- I guess my -- my job appraisal speaks for itself. I -- I think the answer would be yes. |
| | Ex. I at 10-12 (S.B. Tr. 27:14-28:16, 28:21-29:17); *cf.* Defs.' SUMF [79] ¶¶ 30-38 (describing Plaintiff's reaction to being told she needed to stay out of S.B.'s personal life), 57-59 (describing Plaintiff's reaction to learning that S.B. had complained about her conduct), 78 (describing Plaintiff's defense of her conduct); Response to Pl.'s SUMF ¶ 141 (responding to Plaintiff's claim that she did nothing confrontational). |
| 144.  Investigator Lawson's experience is that it is typical for a person who is the subject of a whistleblower disclosure to be upset about it. App. 476-477 (dep. 39:17 – 40:3). | 144.  Undisputed, but unsupported as cited and not material.  Mr. Lawson's personal experience is not material to Plaintiff's case:<br><br>[Plaintiff's Counsel]:  Based on your experience as a law enforcement officer and misconduct investigator, would you agree it's typical for a person who is the subject of a whistleblower report to be upset about it?<br>. . . .<br><br>[Mr. Lawson]:  Absolutely.  I was terminated for a whistleblower complaint.<br><br>[Plaintiff's Counsel]:  The people that you reported as engaging in misconduct, were they upset you had accused them of wrongdoing?<br>. . . .<br><br>[Mr. Lawson]:  I can't say what other people were feeling.<br>. . . . |

| | |
|---|---|
| | [Plaintiff's Counsel]:  Did you form an opinion about whether or not the officers that you reported for violating the Fourth Amendment were upset at your allegation?<br><br>. . . .<br><br>[Mr. Lawson]:  I can't answer what other people were feeling.  I would expect that they were.<br><br>Pl.'s App. [77-2] at 476-77 (Lawson Tr. 39:17-21, 40:2-7, 40:10-15, 40:19-20); *cf., e.g.*, Defs.' Response to Pl.'s SUMF ¶ 50 (responding to Plaintiff's immaterial accusation that Mr. Lawson intended to disparage her). |
| 145.  <u>S.B.'s understanding is that his complaints are what initiated the Lawson investigation of Plaintiff.</u> App. 417-418 (dep. 40:17 – 41:2). | 145.  Undisputed, but not material and incomplete.  DCRA OGC opened an investigation into Plaintiff's conduct in response to S.B.'s November 8, 2018 complaint that Plaintiff was harassing him.  *See, e.g.*, Defs.' SUMF [79] ¶¶ 25-36, 67-79; Ex. F at 3 (Admission No. 3). |
| 146.  <u>Defendant D.C. has acknowledged that it is in the public interest for employees to be "free to report waste, fraud, abuse of authority, violations of law, or threats to public health or safety without fear of retaliation or reprisal."</u> D.C. Code Ann. § 1-615.51. | 146.  Disputed in part and misleading.  District of Columbia employees do not have any right to make false and misleading accusations about their coworkers to the Mayor, the District of Columbia Council, or anyone else.  *See, e.g.*, Defs.' SUMF [79] ¶¶ 67-79; *cf.* 6-B DCMR § 1605.4(b).  Plaintiff had (and has) no evidence that S.B. submitted forged documents to fraudulently obtain parental leave.  *See, e.g.*, Defs.' SUMF [79] ¶¶ 6, 36, 60, 63, 72.  Defendants do not otherwise dispute the existence of the "Findings and declaration of purpose" of the DCWPA or that the statutory language Plaintiff quotes is found there.  D.C. Code § 1-615.51. |
| 147.  <u>Defendants Lester and Whitescarver relied on their positions and authority as D.C. government officials to propose and impose the suspension on Plaintiff.</u> *See* App. 25-30 (proposal issued by Defendant Lester, on official letterhead and citing his position as "Fire Protection Manager, DCRA, Permit Operations Division") *and* App. 31-35 (decision issued by Defendant | 147.  Undisputed. |

| | |
|---|---|
| Whitescarver as Chief Building Officer for the "Department of Consumer and Regulatory Affairs" and on official letterhead). | |
| 148.  <u>Plaintiff has become more hesitant to speak out given that DCRA Chief Administrative Officer Tiffany Crowe told Plaintiff by email on April 30, 2019 that, "You need to consider this matter closed, as your very job may depend on it."</u> App. 36-37 (email); App. 507 (dec. ¶56). | 148.  Disputed, misleading, and unsupported. Plaintiff own declaration—which she attaches to her motion, produced after the close of discovery and more than 11 months after her deposition— as support for this proposition.  On April 30, 2019, at 12:03 p.m., Ms. Crowe provided Plaintiff with DCRA's response to Plaintiff's allegations about S.B. on February 5 and 6, 2019.  *See* Pl.'s App. [77-2] at 52; *cf. id.* at 350-55; Defs.' Response to Pl.'s SUMF ¶¶ 46-47.  At 4:12 p.m. that same afternoon, Plaintiff responded "Go back to WORK ! MANY THANKS !!"  Pl.'s App. [77-2] at 52 (emphasis in original).<br><br>Less than a week later, on May 6, 2019, Plaintiff was again reaching out to the New York Times. Ex. H at 29.  Although Plaintiff's relationship with the New York Times reporter broke down later that month, *see* Defs.' Response to Pl.'s SUMF ¶ 91;  Ex. H at 20-21, Plaintiff's citation to Mr. Whitescarver's June 27. 2019 disciplinary decision does not support her claim that she has become "more hesitant to speak out" since receiving Ms. Crowe's email.  *See* Pl.'s App. [77-2] at 36-37.<br><br>On June 30, 2019, Plaintiff's union filed a grievance to arbitrate Mr. Whitescarver's disciplinary decision.  *See* Ex. H at 8-11.  On February 14, 2020, DCRA signed the Settlement Agreement ending arbitration.  *See* Pl.'s App. [77-2] at 19.  On February 18, 2020, Plaintiff brought this lawsuit.  *See generally* 02/18/2020 Compl. [1]. |
| 149.  Notwithstanding District HR's proclamation that employees have the right to communicate with Council members, <u>the (now former) Chief Building Officer instructed Plaintiff that she could raise concerns about leave fraud solely to HR from now on.</u> *Compare* | 149.  Disputed in part, incomplete, misleading, not material, and unsupported.  Plaintiff's own unsupported declaration—which she attaches to her motion, produced after the close of discovery and more than 11 months after her deposition— is not support for this proposition.  District of Columbia employees do not have any right to |

| | |
|---|---|
| www.dchr.dc.gov/page/whistleblower-protections-and-obligations *and* App. 10 (Answer at ¶44, admitting to substance of the conversation asserted in Plaintiff's Complaint at ¶44, n. 8 [App. 338]). *Also see* WPS § 1-615-53 (prohibition on reprisal for employee exercising right to furnish information to a Councilmember). *Also see* App. 509 (dec. ¶74). | make false and misleading accusations about their coworkers to the Mayor, the District of Columbia Council, or anyone else. *See, e.g.*, Defs.' SUMF [79] ¶¶ 67-79; *cf.* 6-B DCMR § 1605.4(b).<br><br>Defendants do not dispute that Former Chief Building Official, Lynn Underwood, and Mr. Bailey "had a meeting with Luchi Lu regarding the issue with" S.B. on August 15, 2017.  Defs.' Ex. 1 [79-1] at 88 (08/15/2017 Email from L. Underwood to I. Jackson, C. Bailey, L. Parris, M. Bolling, K. Taylor).  But Mr. Underwood and Mr. Bailey "told [Plaintiff] not to have contact with anyone in DCRA except Human Relations[*sic.*] about this issue," with S.B., *id.*, that she had been emailing then DCRA Director, Melinda Bolling, and her Executive Assistant, Kandace Taylor, about, *id.* at 17 (Investigative Report). *See* Am. Compl. [58] ¶ 44 n.8 (citing to the email produced at Defs.' Ex. [79-1] at 88); Am. Answer [76] ¶ 44 (admitting to the substance of that conversation); *cf.* Ex. H at 35-43 (08/07/2017 Email from L. Lu to M. Bolling). DCRA HR responded to Plaintiff in September 2017.  *See* Defs.' SUMF [79] ¶ 49; Defs' Ex. 1 [79-1] at 91; *see also* Ex. H at 30-35.  And Plaintiff admits that she is not claiming that any adverse employment action was taken against her until November 2018.  *See* Ex. F at 3 (Admission No. 3). |
| 150.  Plaintiff Lu mitigated her damages, such as by trying to take training and enter special programs when offered at work to help improve her resume and make it more likely she can be promoted (even though labelled a stalker); she has tried to continue to perform at a high level in spite of stress; she has sought professional care to try to make the stress and anxiety manageable, such as with counseling and medication; and she has pursued this lawsuit to try to get the discipline off her record as she believes it can easily hold her back from a promotion. App. 509-510 (dec. ¶75). | 150.  Disputed and not material.  Plaintiff's own declaration—which she attaches to her motion, produced after the close of discovery and more than 11 months after her deposition—is not support for this proposition.  Plaintiff testified that she has not sought a promotion since she was disciplined for making false and misleading statements to the Mayor (not stalking).  *See* Defs.' SUMF [79] ¶¶ 72-79; Ex. A at 23-24 (Lu Tr. 253:16-254:20)..<br><br>Moreover, in February 2017, Plaintiff wrote that she wanted to prove that DCRA HR was wrong about her conduct towards S.B.  *See* Defs.' SUMF [79] ¶¶ 31, 37-38.  On May 12, 2017, |

Plaintiff wrote DCRA HR, in part:  "It has been so **spiritually painful** to see this bold lie went through so well.  I feel my intelligence is raped every day."  Defs.' Ex. 1 [79-1] at 73 (emphasis in original); *see* Defs.' SUMF [79] ¶¶ 22, 43 (citing the same email at Defs.' Ex. 1 [79-1] at 72-73).  DCRA HR soon responded, in part:  "I do apologize that this is causing you such pain and encourage you to reach out to Inove (see link below) for assistance in coping."  Defs.' Ex. 1 [79-1] at 72; *see* Defs.' SUMF [79] ¶ 44 (citing the same email).  On December 1, 2017, several days after DCHR informed Plaintiff there was no merit to her allegations against S.B., Plaintiff again wrote to DCRA HR, in part:

The last 18 months was unusual in my life. There were 2 voices in my head.  One constantly saying "this is too wrong too indecent.  How could this possibly happen?!  I must let people know."  [W]hen I am tired of pursuing the other emerging "why should this both YOU?  Did YOU pay him for that 8 weeks" – I've been rejected too many time[s].  I was torn, I blamed myself for not being capable of convincing others.  I was very distressed. . . .  The sence[*sic.*] of failure is overwhelming especially when seeing the party enjoying the huge success of this unbelievable feat [ellipsis omitted]  Hard to digest but now I face it[,] accept it[,] and will move on, give me a little time.

I started pursuing this since last June as you knew. . . .  My tenacity may have caused some extra work on you guys, but I believe I deserve mertis[*sic.*] and credits on helping alert the agency and DC government. . . .  **Can I be granted a couple of days admin leave so I can use them during the holiday season, as a compensation for the actual time off I spent, a reward of my conscienceness[*sic.*], and help of my recovery of my extreme mental stress?**

. . . .  Now I am so mentally exhausted.  I will do my best to stay positive.  I promise you – give me some time – you will see a motivated, hard

working, positive minded, health me next year. . . .

Defs.' Ex. 1 [79-1] at 111-12 (emphasis in original); *see* Defs.' SUMF [79] ¶ 56 (Nov. 28, 2017); *cf.* Defs.' SUMF [79] ¶ 31.  By February 20, 2018, Plaintiff obtained a copy of S.B.'s complaint from a year before and began pursuing her allegations against him anew.  *See, e.g.*, Defs.' SUMF [79] ¶¶ 25, 57-66; *cf.* Defs.' SUMF [79] ¶ 33 ("Sorry I did not keep my promise . . . ." (quoting Defs.' Ex. 1 [79-1] at 74)).

On December 6, 2019, Plaintiff wrote her union that she "made [a] reasonable compromise to resolve this matter with the agency in good will and good gesture before the suspension was implemented."  Ex. H at 3; *see* Defs.' Ex. 3 [79-3] at 37 ("Now I am asking you, the Deciding Officer . . . ."); *cf.* Defs.' SUMF ¶¶ 50, 58.  On December 9, 2019, Plaintiff wrote that she "notified the union that I will NOT accept a letter of reprimand as early as October 21st.  This does not change."  Ex. H at 2.  Eight days later, Plaintiff abandoned the arbitration process started by her union three days after she received Mr. Whitescarver's disciplinary decision.  *See* Defs.' SUMF [79] ¶ 79 (June 27, 2019); Pl.'s App. [77-2] at 18 (Dec. 17, 2019); Ex. H at 8 (June 30, 2019); *cf.* Defs.' Response to SUMF ¶¶ 125, 130-31.

Date:  April 15, 2022

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

*/s/ Alicia M. Cullen*

ALICIA M. CULLEN [1012957]
Chief, Civil Litigation Division, Section III

*/s/ Adam P. Daniel*
ADAM P. DANIEL [1048359]
RYAN MARTINI [888241893]
Assistant Attorneys General
Civil Litigation Division
400 6th Street NW
Washington, D.C. 20001
Phone:  (202) 442-7272; (202) 724-7322
Fax:  (202) 400-2675; (202) 741-0555
Email:  adam.daniel@dc.gov;
ryan.martini@dc.gov
*Counsel for Defendants District of Columbia,*
*Sydney Lester, and C.G. Whitescarver*