UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

+ + + + +

_____
                              :
IN THE MATTER OF:             :
                              :
QING LU,                      :
                              :
          Plaintiff,     :  Civil Action No.
                         :  1:20-cv-00461-APM
     v.                       :
                              :
DISTRICT OF COLUMBIA,         :
et al.,                       :
                              :
          Defendants.    :
                              :
_____:

          Monday,
          March 1, 2021


DEPOSITION OF:


          QING LU


called for examination by Counsel for the

Defendants, pursuant to Notice of Deposition, via

Video Teleconference, when were present on behalf

of the respective parties:

APPEARANCES:

On Behalf of the Defendants:

MATTHEW R. BLECHER, ESQ.
ADAM P. DANIEL, ESQ.
Assistant Attorneys General
Civil Litigation Division
400 6th Street NW
Washington, D.C. 20001
202-727-9624
matthew.blecher@dc.gov
adam.daniel@dc.gov


On Behalf of the Plaintiff:

DAVID R. SCHLEICHER, ESQ.
Schleicher Law Firm, PLLC
1629 K Street NW
Suite 300
Washington, D.C. 20006
david@gov.law


ALSO PRESENT:

AMIR AZADNIV, DC OAG intern
ANNA ELLISON, DC OAG intern
JOE TOWNSON, Videographer

CONTENTS

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Qing Lu | 5 | 262 | | |

EXHIBIT NO.                                      PAGE

None.

1              P-R-O-C-E-E-D-I-N-G-S

2                                    11:13 a.m.

3              VIDEOGRAPHER:  Here begins the video

4      deposition of Qing Luchi Lu taken in the matter

5      of Qing Lu v. District of Columbia, et al., in

6      the U.S. District Court for the District of

7      Columbia, Case No. 1:20-cv-00461-APM.

8              Today's date is March 1, 2021.  The

9      time on the video monitor is 11:13 a.m. Eastern

10     Time.  This deposition is being held remotely via

11     WebEx videoconferencing software.

12             The court reporter is Colleen Herbert

13     on behalf of Neal Gross Court Reporting.  I am

14     Joe Townson, the video camera operator, also on

15     behalf of Neal Gross.

16             Would Counsel please introduce

17     themselves and state who they represent,

18     beginning with the party noticing this

19     deposition?

20             MR. BLECHER:  Yes, good morning,

21     everyone.  My name is Matthew Blecher.  I'm here

22     to represent the District, Mr. Lester, and Mr.

1     Whitescarver in this action.  I have with me my

2     colleague, Adam Daniel, who represents the same

3     parties in this case.

4               MR. SCHLEICHER:  David Schleicher,

5     representing the Plaintiff.

6               MR. BLECHER:  And I suppose I should

7     add that we have two interns on the line, Anna

8     and Amir, who are just listening in.

9               VIDEOGRAPHER:  Will the court reporter

10     please swear in the witness, after which we can

11     proceed?

12     WHEREUPON,

13                         QING LU

14     was called as a witness by Counsel for the

15     Defendants, and after having been first duly

16     sworn, was examined and testified as follows:

17                 DIRECT EXAMINATION

18               BY MR. BLECHER:

19          Q     Okay, great.  So let's go ahead and

20     get into this.  Ms. Lu, as I said, my name is

21     Matt Blecher.  Adam and I represent the District

22     of Columbia, Mr. Lester, and Mr. Whitescarver in

1      the lawsuit that you filed against those

2      individuals and the District in Federal District

3      Court in the District of Columbia.

4              We are here today for your deposition.

5      I don't expect this to take very long, but if at

6      any point you have any questions for us about the

7      way this is proceeding, you need to speak with

8      your lawyer, or need a break for any reason, you

9      just need to say so.  Do you understand that?

10         A     Yes, I do.

11         Q     Great.  For purposes of this

12     deposition, we'll be using the same name

13     abbreviations that are used in your complaint, so

14     SB and SCB.  When I say SB, those are the

15     initials used in your complaint to refer to one

16     of your colleagues.  When I use those initials,

17     do you know who I'm speaking about?

18         A     Okay.

19         Q     Yes, you understand when I say SB?

20         A     Yes, I do.

21         Q     And the same question for SCB.  You

22     know who I'm referring to?

1         A      Yes, yes.

2         Q      Okay.  And we can agree to use those

3    initials for purposes of this deposition, okay?

4         A      Okay.

5         Q      Great.  I'd like to start on February

6    5, 2019.  You allege in your complaint and in

7    your discovery that you had an interaction with

8    the mayor that day.  Am I correct about that?

9         A      Right, yes.

10              MR. SCHLEICHER:  Don't forget to give

11   pause to make sure he's done with his question

12   before you answer.

13              THE WITNESS:  Okay.

14              BY MR. BLECHER:

15        Q      Can you tell me about that

16   interaction?

17        A      That day I was sitting at the second

18   floor of 1100 4th Street, DCRA Permit Center.  I

19   saw Mayor walk by and then I stood up, approached

20   her, and said ma'am, my name is Luchi.  In my

21   agency, there is a co-worker.  He submitted a

22   fake document.  His wife likely was wearing a

1     There was no problem, something like that.  I

2     believe I saw this word paid in some emails from

3     HR of DCRA.

4          Q     Okay, so if I understood what you just

5     said correctly, your belief that SB was getting

6     paid for the leave that he took in 2016 for the

7     birth of a child was based on documents related

8     to his application for leave.  Is that what I

9     understand?

10         A     Yes, yes.

11         Q     Did you review anything that proved

12    that he was, in fact, provided a pay check during

13    the time that he was off?

14         A     No.

15         Q     Okay.  At the time -- well, if you

16    didn't know one way or the other whether he was

17    being paid, am I correct that you wouldn't have

18    known how much he was going to be paid?

19         A      I told you I heard from HR in several

20    emails.  They referred to it as a paid family

21    leave, paid means paid, so from that moment on,

22    so I know he's paid.  They always referred to he

1    -- the document he submitted met the requirement

2    of paid family leave.  There's no problem,

3    everything is fine, or something like that.  In

4    the email, there was the word paid.

5         Q    Okay, and I understand that, but I

6    thought we had established that you didn't review

7    anything that would prove that he was receiving a

8    paycheck during that time?

9         A    No, I didn't.  Of course not.

10        Q    At the time that you approached the

11   mayor on February 5, 2019, did you know the terms

12   of SB's compensation with the District

13   Government?

14        A    I don't know exactly his compensation,

15   but I know government employees' salary is

16   online.

17        Q    Okay.  Right, but at the time that you

18   addressed the mayor on February 5, 2019, you

19   didn't know how much money SB made from the

20   District Government?

21        A    No, I don't.

22        Q    Okay.  The next category of wrongdoing

1        A     Correct.

2        Q     Okay.  Why?

3        A     Why?  Why am I supposed to be

4   reprimanded when someone --

5        Q     Oh, okay.

6        A     Was wearing a pillow and committed a

7   fraud as reported.  He walked away, and I got

8   reprimanded for what?  That's why.

9        Q     Okay.  So all right.  So, the

10  suspension, you're claiming that as an adverse

11  action, adverse personnel action for purposes of

12  your claims.

13           The proposed suspension, are you also

14  alleging that that is an adverse personnel action

15  for purposes of your claims?

16        A     Well, if it goes by the very

17  definition of part DPM what is adverse or

18  corrective.  I never get into the trouble like

19  this.

20           I don't know the definition of how

21  many days is adverse or how many days is

22  corrective.  I don't know the definition.  I

1    never got into a situation before.

2              MR. SCHLEICHER:  He's just asking, are

3    you claiming the proposal is a retaliatory

4    action.

5              THE WITNESS:  Oh yeah.

6              MR. SCHLEICHER:  That's all.

7              THE WITNESS:  Right.  It is

8    retaliatory.

9              MR. BLECHER:  Okay.  That's all I was

10   asking.  Are you claiming that anything else was,

11   any other personnel action was taken against you

12   as retaliation for --

13             THE WITNESS:  The telework.  The

14   telework.

15             BY MR. BLECHER:

16        Q    Oh, telework.  Okay.  Tell me about

17   that.  You're alleging what?

18        A    Okay.  DCRA launched its telework

19   policy in June 2019.  I applied in August.  And

20   after a couple of weeks, I still have not

21   received an email telling me when I can start.

22             Then I asked my supervisor, Sydney

1    Lester then.  Sydney Lester told me, she herself,

2    already approved my application.

3              It is now with HR.  She referred it to

4    a Tiffany Crow (phonetic).  And then I (audio

5    interference) and asked how long it is with my

6    telework application.

7              Ms. Crow -- did you mean to --

8              MR. SCHLEICHER:  I think we're getting

9    an echo.

10             THE WITNESS:  Oh, okay.  Can I

11   continue?

12             MR. BLECHER:  Yes.

13             THE WITNESS:  Oh, okay.  And then I

14   sent an email to Ms. Crow.  I said when, what is

15   the problem with where we are with application?

16             She said, if you want to know where it

17   is, you check my schedule and schedule a meeting

18   with me.  Then I checked her schedule and had a

19   meeting.

20             I waited in the conference room for

21   about 30 minutes.  Nobody showed up.  She also

22   told me when you schedule a meeting of the HR

1      manager, Ms. Reed (phonetic).

2               So, I sent both of them a meeting

3      invitation.  Then I sat in that conference room

4      at that time.  Neither of them showed up.

5               Then I went to the fifth floor where

6      Ms. Crow's office is.  And I asked the

7      receptionist to call her, to remind her that I

8      have a meeting with her.

9               And then that receptionist said okay,

10     you can come into her office.  Then I came in her

11     office.  She said, oh, I forgot.  I thought the

12     meeting is in my office.  I'm sorry for your

13     wait.  Or something like that.

14               Then I just asked her, I said how soon

15     can I start?  She said oh, let me tell you, your

16     application was actually already approved by your

17     supervisor.

18               But, I am doing the working out.  Do

19     you have access to a high speed internet and a

20     VPN?  Something like that.

21               Then I went home and I logged on DC

22     VPN.  I did not have access.  It might have said

1      something, you don't have a number, or you don't

2      have a VPN.

3                     I captured that link.  I sent that

4      back to her.  I said, I do have high speed

5      internet.  It says there should be other things.

6      But, I do not have access to VPN.

7                     It didn't say I needed it.  Then I

8      asked her, are you still involved?  Did you have

9      any meetings with other teleworker applicants

10     about their telework ever, because I knew her

11     position was CAO Chief and (audio interference).

12                    And no.  This one is so special for me

13     that it had to be in my telework application.

14     Even the fact that my application was already

15     approved by my supervisor.

16                    And then I kept pushing her for an

17     update.  Eventually I think sometime in October,

18     the first two days, I received an email from her.

19                    And then she said your telework was

20     denied or something.  And the denial was purely a

21     technical reason or something like that.

22                    I'm confused.  I had a prior review

1      Q      Oh, it's a database.  Okay.

2      A      For -- for review.

3      Q      And you need it to do your job?

4      A      No.  I do not.  Without Accela, I

5    still can do my job.

6      Q      Okay.  So you don't use Accela for

7    your job?

8      A      Not necessarily.

9      Q      Can you explain that, please?

10     A      That is something if you have, it's

11   good.  If you don't have, it does not affect your

12   ability to do your job.

13            It's because we now do new jobs in

14   project docs.  And also probably in 2015 I had my

15   right shoulder frozen shoulder.  I have to do

16   therapy.

17            At that time, Sydney Lester allowed me

18   to work from home.  And I never had home access

19   to Accela.  But, I could always do my work.

20     Q      I honestly don't understand.  I mean,

21   so do you use Accela in your job or not?

22     A      If I have access to it, I use it.  If

1    I do not have access, I can still do my job

2    without any -- without any, you know, bad things.

3              So, I can still continue to do my job.

4    Not affect even.

5         Q    Okay.  So you do use it when you have

6    access to it.  But, if you don't have access to

7    it, you don't use it.

8         A    If I don't have access to it, I can do

9    my job the very same way.  Just like the other

10   engineers.

11        Q    You said you -- two structural

12   engineers had been approved, Sitra and Behom,

13   Behon, is that what you said?

14        A    Right.  Correct.  And Behon.  Ms.

15   Sitra, and Mr. Behon.

16        Q    And you're a fire protection engineer?

17        A    Yes.

18        Q    That's -- that's different, right?

19   Structural and --

20        A    Well, yes.  The name is different,

21   correct.

22        Q    Okay.  Do they report to the same

1       supervisor?

2              A       Yes.   They report to Samir.   Now I

3       report to Samir too.

4              Q       Okay.  At the -- at the time that your

5       telework request was denied you reported -- they

6       reported to Mr. Lester?

7              A       They did not report to Lester.   Both

8       of them at that time reported to Samir.   And I

9       report to Samir too, right now.

10             Q       I'm trying to get apples to apples.

11      So, in 2019, did you -- you reported to Mr.

12      Lester, correct?

13             A       Correct.

14             Q       Okay.   And in 2019, these two

15      individuals, the structural engineers you've

16      mentioned, they reported to Mr. Lester or to

17      someone else?

18             A       Samir.

19             Q       Okay.   And at what point were you

20      reassigned from Lester to Samir?

21             A       In December 2019, I received a paper

22      from HR that told me from that day, Samir would

1    be my supervisor.

2         Q     Okay.  So, after this alleged denial

3    of your telework request.  Which you said was in

4    October.

5         A     Yes.

6         Q     Okay.  And the structural engineers,

7    do they use Accela?

8         A     I do not know.  I don't know whether

9    they use that or not.  It's probably a personal

10   habit if they use it or not. You can ask them.

11        Q     You don't know.  Okay.  So, are you

12   aware of any other employees who experienced

13   delays in getting their telework requests?

14        A     I do not know.  I myself have talked

15   to both Behon and Sitra and myself.  I did not

16   ask any other people.

17              I do not know who else was doing

18   telework.

19        Q     You only asked these two individuals?

20        A     Yes.  These two.

21        Q     Okay.

22        A     I was talking to them and asked the

1     questions.

2         Q     Why did you ask these two individuals?

3     They weren't supervised by the same people.  They

4     didn't do the same job.

5               Why did you ask them and not, I don't

6     know?

7               MR. SCHLEICHER:  Okay.  Did you finish

8     your question?

9               MR. BLECHER:  Yeah.

10              THE WITNESS:  Do I go ahead?

11              MR. SCHLEICHER:  Yeah.

12              THE WITNESS:  The telework is not like

13    a review discipline ability.  We both are plan

14    reviewers.

15              I myself do not know any technical

16    reason why a fire plan reviewer should have

17    access to Accela to do telework, while structural

18    engineers can do telework without them.

19              I do not have any logical technical

20    reason for that.  I think we are about the same.

21    We both are plan -- we all are plan reviewers.

22              MR. BLECHER:  Uh-huh.  Right.  So my

1    question is why did you choose these two to ask?

2    Like what --

3                   (Simultaneous speaking.)

4                   THE WITNESS:  Oh, because --

5                   MR. BLECHER:  Did you just --

6                   THE WITNESS:  They are neighbors.

7    They sat very close to me, and I knew they had

8    been doing telework.

9                   According to my coworkers Sam, Sam

10   offered to tell me.  Sitra actually was doing

11   telework two days per week from home.

12                  This is from Sam Gutierrez (phonetic).

13   He offered to tell me that.

14                  BY MR. BLECHER:

15       Q    Okay.  So, when you were -- when you

16   were trying to evaluate whether your experience

17   with the telework request process was, you know,

18   normal, something other people were experiencing,

19   you talked to two people who you knew were

20   already teleworking. Is that right?

21       A    Correct.

22       Q    And you didn't seek out anybody who

1    had their telework request denied, right?

2         A     No.  I didn't -- no.

3         Q     Okay.

4         A     They never told me.

5         Q     Okay.  I think you said that these

6    individuals were teleworking for some -- at least

7    some time when you approached them.

8               What -- do you know how long they had

9    been teleworking?

10        A     I do not know.  I didn't ask like how

11   many weeks, how many months.  I know it has been

12   for a while.

13        Q     Okay.  So, you don't know whether

14   their telework was approved before or after that

15   policy that went into effect in 2019?

16        A     I do not know.  Sitra showed me an

17   email, the subject matter said, congratulations,

18   your telework has been approved.

19              But, I did not pay attention to the

20   date of that email.

21        Q     Okay.  Okay.  I think I got it.  Okay.

22   So, the proposed suspension, the suspension, the

1    others because none of them was ever suspended.

2    You know, this has some longstanding on me.

3         Q    Okay.  So when you refer to

4    professional standing, character, reputation

5    that's all one thing, is that all one thing?

6         A    And it all was caused by this

7    suspension, you know.  Other people were not

8    suspended so when they compare me to them I am

9    disadvantaged.

10        Q    Okay.  So we're talking about

11   promotion potential within DCRA; you're not

12   alleging any injury associated with your

13   employability outside the District government?

14        A    That will have impact, right.  I mean

15   the record is there.  It takes three to five

16   years to expunge.

17             MR. SCHLEICHER:  He is asking if you

18   are talking about jobs outside of DCRA or just

19   DCRA jobs.

20             THE WITNESS:  DCRA jobs.  I am not

21   talking about --

22             MR. BLECHER:  Okay.

```
 1                    THE WITNESS:  DCRA jobs.

 2                    MR. SCHLEICHER:  Matthew, it's 5:21.

 3      How much longer do you think you are going to go?

 4                    MR. BLECHER:  I don't want to be here

 5      five seconds longer, but I have about ten minutes

 6      left, so I'll be quick.  Do you guys need a

 7      break?

 8                    THE WITNESS:  No.

 9                    MR. SCHLEICHER:  I need to -- yes, I

10      may lose my conference room soon, but I know, you

11      know, we started two hours -- I mean I'll go to

12      5:40, because I've got about ten minutes left.

13                    MR. BLECHER:  All right.  I'll be

14      quick.

15                    BY MR. BLECHER:

16           Q     And so the promotion that you would be

17      seeking within DCRA would be, what is the

18      position to be promoted to, Ms. Lu?

19           A     Nobody told me I would receive a

20      promotion.

21           Q     Okay.  So that's not part of the

22      reputational, professional injury?
```

1         A     No.  Nobody told me they are going to,

2    they are planning to promote me.

3              MR. SCHLEICHER:  No, he's asking you

4    what job are you wanting to get that you are

5    claiming this would hold you back from?

6              THE WITNESS:  I do not know.  That job

7    has not been posted yet.  We are talking

8    something hypothetical.  I don't know.

9              BY MR. BLECHER:

10        Q     Okay.

11        A     There is no post.

12        Q     That's -- so I mean I guess since the

13   suspension in spring of 2019 you haven't sought a

14   promotion within DCRA since then, am I correct

15   about that?

16        A     Mm-hmm.

17        Q     Okay.  So there would be no like hard

18   evidence that you were denied a promotion so far?

19        A     Nobody asked or told me that I want

20   you, that I will be promoted, correct, yes.

21        Q     Since receiving the notification of

22   your suspension, have you received your normal

1              MR. SCHLEICHER:  He's asking is there

2    any reason you could not give complete and

3    truthful answers today.

4              THE WITNESS:  No.  No.

5              BY MR. BLECHER:

6         Q    Okay.  So you have not since we've

7    begun been under the influence of any drugs or

8    alcohol or any other substances that might affect

9    your memory?

10        A    No.

11        Q    Okay.  Is there any testimony that you

12   provided today that you would like to correct?

13        A    My answer is correct.

14        Q    Okay.

15             MR. BLECHER:  It's all yours, David.

16   Have at it.

17                   CROSS EXAMINATION

18             BY MR. SCHLEICHER:

19        Q    Ms. Lu, if you had been told by

20   management officials that they had verified the

21   authenticity of the documentation that had to be

22   provided, would you have dropped the matter?

1        A       Highly likely.

2        Q       Okay.  And I was trying to understand

3    your testimony about not appearing pregnant

4    versus the having the object in her clothes as to

5    SB's wife.

6                Were you saying it was significant

7    that she didn't look pregnant to you at the end

8    of April or that it was more significant to you

9    that co-workers reported it looked like she had

10   something in her clothes in May or both of those

11   together?

12       A       Both of them together.

13       Q       Did anyone with HR or management ever

14   tell you that the leave SB took was unpaid?

15       A       What's that?

16       Q       Did anyone with management or HR ever

17   tell you that the leave that SB took was unpaid?

18       A       No.

19       Q       Do you have an estimate of how much

20   salary SB earned each year?

21       A       Well, it's about the same as my

22   salary.

1          Q      Okay.

2          A      I don't know his salary amount

3     exactly.

4          Q      Okay.  And based on about your salary,

5     were you able to come up with a number estimating

6     how much, if he did fraudulently obtain eight

7     weeks of leave, how much that would cost for the

8     District?

9          A      I think it's more than $10K, but I am

10    not that quick to think of that.

11         Q      Okay.  On the question of whether

12    there was an abuse of authority in an

13    administrative program, can you tell me whether

14    or not you considered the paid family leave

15    operation a program of the District?

16              MR. BLECHER:  Hold on.  Objection to

17    the form.  You may answer.

18              THE WITNESS:  Well, as far as I know

19    whenever an employee takes, asks for or made

20    application for a paid family leave for

21    childbirth, that childbirth must be true and

22    happen.

C E R T I F I C A T E

This is to certify that the foregoing transcript

Deposition of: Qing Lu

In the matter of: Qing Lu v DC

Before: US District Court

Date: 03-01-21

Place: teleconference

were duly recorded and accurately transcribed under

my direction; further, that said transcript is a

true and accurate record of the proceedings; and

that I am neither counsel for, related to, nor

employed by any of the parties to this action in

which this deposition was taken; and further that I

am not a relative nor an employee of any of the

parties nor counsel employed by the parties, and I

am not financially or otherwise interested in the

outcome of the action.

------------------------
Court Reporter