Tiffany Crowe - February 11, 2021

```
 1              UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLUMBIA

 3

 4      _____
                                     )
 5      QING LU,                     )
                                     )
 6              Plaintiff,           )
                                     )
 7          vs.                      )     Civil Action No.
                                     )     1:20-cv-00461-APM
 8      DISTRICT OF COLUMBIA, et al. )
                                     )
 9              Defendants.          )
                                     )
10      _____)

11

12

13

14       VIRTUAL DEPOSITION OF TIFFANY CROWE

15         Thursday, February 11, 2021

16                 12:18 p.m.

17

18

19

20

21

22      Reported by:  Cappy Hallock, RPR, CRR
```

Tiffany Crowe - February 11, 2021

1

2              Virtual Deposition of TIFFANY CROWE,

3      held via WebEx Remote.

4

5

6              Pursuant to Notice, the Virtual

7      Deposition of TIFFANY CROWE was taken commencing

8      at 12:18 p.m. on Thursday, February 11, 2021

9      before Cappy Hallock, Registered Professional

10     Reporter, Certified Realtime Reporter, and Notary

11     Public in and for the State of Maryland.

12

13

14

15

16

17

18

19

20

21

22

Tiffany Crowe - February 11, 2021

```
 1      APPEARANCES:

 2

 3          ON BEHALF OF PLAINTIFF:

 4              DAVID R. SCHLEICHER, ESQUIRE

 5              Schleicher Law Firm, PLLC

 6              1629 K Street, NW, Suite 300

 7              Washington, D.C. 20006

 8              202-540-9950

 9              davod@gov.law

10

11          ON BEHALF OF DEFENDANTS:

12              MATTHEW BLECHER, ESQUIRE

13              Assistant Attorney General

14              Civil Litigation Division, Section III

15              Office of the Attorney General for the

16              District of Columbia

17              400 6th Street, NW

18              Washington, D.C. 20001

19              202-442-9774 (P)   202-730-0586 (F)

20              matthew.blecher@dc.gov

21                  -and-

22
```

Tiffany Crowe - February 11, 2021

```
 1      APPEARANCES:  (Continued)

 2

 3              ADAM P. DANIEL, ESQUIRE

 4              Assistant Attorney General

 5              Civil Litigation Division, Section III

 6              Office of the Attorney General of the

 7              District of Columbia

 8              400 6th Street, NW

 9              Washington, D.C. 20001

10              202-442-7272 (P)   202-400-2675 (F)

11              adam.daniel@dc.gov

12

13

14

15

16

17

18      Also Present:  Luchi Lu

19                     Qing Lu

20                     Amir Azadniv

21                     Anna Ellison

22      Reporter:  Cappy Hallock, RPR, CRR
```

1                     I N D E X

2         Deposition of TIFFANY CROWE

3                 February 11, 2021

4

5    EXAMINATION BY:                          PAGE

6         Mr. Schleicher                        6

7         Mr. Daniel                           71

8         Mr. Schleicher                       76

9

10                    -o0o-

11

12                  E X H I B I T S

13

14   CROWE                                    PAGE

15   Exhibit 10  6-13-19 Telework Policy       56

16             Transmittal Letter

17

18                    -o0o-

19

20

21

22

Tiffany Crowe - February 11, 2021

```
 1                    P R O C E E D I N G S

 2                         - - - - -

 3   WHEREUPON,

 4                      TIFFANY CROWE,

 5           A Witness called for examination, having

 6   been first duly sworn, was examined and testified

 7   as follows:

 8                      EXAMINATION

 9   BY MR. SCHLEICHER:

10       Q     Good morning, Ms. Crowe.   I am David

11   Schleicher, and I will be asking questions on

12   behalf of the plaintiff in this lawsuit, Ms. Lu.

13   If you ask you something that you cannot hear or

14   does not make sense can you let me know that?

15       A     Yes.

16       Q     And to make sure the court reporter

17   can get an accurate transcript, I will try not to

18   interrupt you and if you can do the same for me,

19   that will help.   Is that all right?

20       A     That's fine.

21       Q     Have you had your deposition taken

22   before?
```

Tiffany Crowe - February 11, 2021

```
 1        A    No.
 2        Q    And without going into how the time
 3   was spent, can you give me an estimate of the
 4   total amount of time you spent preparing for
 5   today's deposition, whether like a half hour, five
 6   hours, ten hours?
 7        A    Less than that, so maybe an hour or
 8   so.
 9        Q    Okay, and what documents did you get
10   to review as part of your preparation?
11        A    Anything that was submitted before
12   today.
13        Q    Okay, and --
14        A    Or yesterday, whenever the last thing
15   that was submitted was.
16        Q    Okay, and do you remember prior to
17   today, do you remember any particular documents
18   you got a chance to review in preparation?
19        A    Not specifically.
20        Q    Have you had any involvement in issues
21   dealing with whistleblower complaints prior to
22   today?
```

Tiffany Crowe - February 11, 2021

1          MR. DANIEL:  Just one second, David.

2          Ms. Crowe, we can't talk during your

3   testimony.  You need to only speak -- David, there

4   is an objection.  We will raise it.

5          THE WITNESS:  Okay.

6      A    So have I been involved in

7   whistleblower complaints?  So my role as the,

8   previously as the chief administrative officer at

9   DCRA I was over HR, and so there may have been

10  things that the general counsel brought my way or

11  asked, but specifically where I was the plaintiff

12  or named, not that I can recall.

13     Q    Okay.

14          And you said you were in human

15  resources before?

16     A    No.  I was -- I managed the managers

17  who managed human resources.

18     Q    Okay.  What was your title in that

19  job?

20     A    Chief administrative officer.

21     Q    Okay.

22     A    That's the job in the documents that

Tiffany Crowe - February 11, 2021

1     you have displayed.

2          Q     So you had human resources under you?

3          A     Yes.

4          Q     What is your job now?

5          A     I'm the chief operating officer.

6          Q     For D.C. --

7          A     DCRA, yes.

8          Q     Okay, and when did you get that

9     position?

10         A     I don't know, in the fall.  I started

11    acting in the role in September or October.

12         Q     And I'm not asking for a legal

13    opinion, but what is, generally can you summarize

14    your understanding of whether whistleblower

15    protections apply to DCRA employees?

16              MR. DANIEL:  Objection, calls for a

17    legal opinion.

18              You can answer.

19              You can answer.

20              THE WITNESS:  Okay.

21         A     I assume so.  I would have no

22    objection to any DCRA employee filing a

Tiffany Crowe - February 11, 2021

```
1      whistleblower complaint.  That seems like it would
2      be their right to do so.
3           Q     Okay, and again without asking for a
4      legal conclusion, instead just your own
5      understanding, can you summarize what you
6      understand about whether or not DCRA employees
7      have any first amendment rights in their role as
8      employees?
9           A     All citizens of the United States -- I
10     mean, DCRA employees are afforded the same rights
11     as everyone else.  I do know for whistleblower
12     complaints they have to have a basis for the
13     claim, so ...
14          Q     And in your role as, when you were
15     chief administrative officer, how often did you
16     get involved in employee disciplinary matters?
17               MR. DANIEL:  Just to be clear, she is
18     not here as an organizational witness.  She is
19     just speaking for herself.
20               But you can answer.
21          A     A lot.
22          Q     Okay.
```

Tiffany Crowe - February 11, 2021

1          A     All employee disciplinary matters went

2     through HR, so from my time there in March 2019 to

3     when I stopped overseeing HR there were probably

4     many.

5          Q     All right.

6                Can you see the document I have up on

7     the screen?

8          A     Yes, I can.  It's a little small.

9          Q     Let me go to the one-page view.

10               (Previously marked Plaintiff's Exhibit

11    No. 4, first referral.)

12    BY MR. SCHLEICHER:

13         Q     Is that better?

14         A     Yes.

15         Q     Let me mark this as Plaintiff's

16    Deposition Exhibit 4.

17               Do you see this as the first page, an

18    April 30th, 2019 12:03 p.m. e-mail from you to

19    Luchi Lu?

20         A     Yes.

21         Q     And do you know who Ms. Lu is?

22         A     I do.

Tiffany Crowe - February 11, 2021

Page 12

1          Q      And have you had any interactions with

2     her apart from matters related to the

3     investigation and discipline in this case?

4                 MR. DANIEL:  Objection, vague.

5                 Can you refer to which investigation?

6                 MR. SCHLEICHER:  All right.

7          Q      The investigation of Ms. Lu for

8     intentionally misleading her supervisors that

9     resulted in the discipline that is at issue in the

10    lawsuit, the suspension.  Apart from those matters

11    have you had any interactions with Ms. Lu?

12         A      I don't know.  As I mentioned, I was

13    an executive at DCRA at the time so I interacted

14    with a lot of employees on a regular basis by

15    phone, by e-mail, in person, so I wouldn't want to

16    say no or yes to that given that our paths may

17    have crossed in various capacities.

18         Q      Okay, but not any that you remember as

19    you sit here today?

20         A      I don't recall, so I think that's

21    different than saying none that I remember.  There

22    is nothing that strikes me as particularly

Tiffany Crowe - February 11, 2021

Page 13

1     noteworthy.

2          Q     Okay.

3                And what about SB?

4          A     I don't know if I ever met him in

5     person, but, like I said, you know, DCRA has a lot

6     of employees, so ...

7          Q     Do you remember sending this or do you

8     recognize this April 30th, 2019 e-mail as

9     something you would have sent?

10         A     Yes.

11         Q     And what was this in relation to?

12         A     So let me look, can you go down?  It

13    was the e-mail in which this letter, I believe,

14    was delivered attempting to give Ms. Lu closure on

15    her allegations since based on my review of

16    materials it had been ongoing for quite some time.

17         Q     Okay, and do you know how it ended up

18    that you were the person that sent this letter

19    rather than someone in her chain of command?

20         A     I think someone in her chain of

21    command had previously sent communications to her.

22    They handled the initial phases of the discipline.

Tiffany Crowe - February 11, 2021

1    And so given the escalation and the investigation

2    I was asked to review the materials and reach out

3    to Ms. Lu.

4         Q     And can you think of any other

5    employee situation in which you had sent a letter

6    like this?

7         A     I'm not really at liberty to discuss

8    other personnel matters as a part of this issue

9    but --

10        Q     I'm not --

11        A     It's customary, yeah.

12        Q     It's customary?

13        A     To send letters at the end of an

14   investigation, at the conclusion of disciplinary

15   matters, so yes.

16        Q     And it's customary for those to come

17   from you?

18        A     It would not be out of the ordinary,

19   no.

20        Q     I want to go back up to the first

21   page.  You say in this e-mail to Ms. Lu, "You need

22   to consider this matter closed as your very job

Tiffany Crowe - February 11, 2021

1    may depend on it."

2              What did you mean by that?

3        A     So after reviewing all of the

4    materials and seeing the prior disciplinary

5    actions, you know, in the progressive discipline

6    steps and at an agency's discretion in some

7    regard, employees for certain egregious acts may

8    be terminated.

9              So I wanted Ms. Lu, who seems to value

10   her job and enjoy working at DCRA and be a

11   valuable member of the community, to recognize

12   that this particular matter was not one that was

13   going to conclude in a way that she had desired

14   based on the evidence as we had it, so ...

15       Q     Well, was this one way of saying to

16   her if you keep doing what you've been doing then

17   you may end up fired?

18       A     If you continue to violate the

19   District government's guidelines for employee

20   behavior you may be terminated.  I think that's a

21   reasonable statement, yes.

22       Q     And when you refer to progressive

Tiffany Crowe - February 11, 2021

1    discipline, what do you mean by that?

2        A    It means if you have been suspended or

3    disciplined for things such as dereliction of duty

4    or threats or violence or harassment, those are

5    matters where the Agency has wide discretion in

6    how to handle the discipline.  So progressive

7    typically means you may walk up a chain of

8    consequences or there may -- you may be able to,

9    based on a particular type of breach, say okay,

10   this is a ten-day suspension and then the next

11   step in that is termination.

12            Or for certain matters and what we do,

13   as you know, DCRA has a public safety component.

14   So the things that we do, the work that we do

15   impacts public safety.  So we have to make sure

16   that our employees are able to perform their jobs

17   in a way that keeps the public safe.  So if

18   something is endangering the public or endangering

19   staff then the next step of a particular

20   disciplinary path might be suspension or

21   termination.

22       Q    Did you think Ms. Lu's conduct was

Tiffany Crowe - February 11, 2021

1    endangering the staff or the public?

2         A    I think given the escalation of

3    contact, the length of time that this had been

4    ongoing, the focus on a particular individual to

5    her own detriment and that of her colleagues,

6    possibly.

7         Q    Were you aware when you wrote this

8    that SB had, in December of 2016, admitted to an

9    ethics violation and paid a $1,000 fine?

10        A    Is it in the investigation?

11        Q    That is not mentioned in Mr. Lawson's

12   investigation.

13             MR. BLECHER:  Can we go off the record

14   for a second, David?  Can you put the witness into

15   the waiting room?

16             MR. SCHLEICHER:  Okay.

17             (Witness not present.)

18             (Discussion off the record.)

19             (Witness present.)

20   BY MR. SCHLEICHER:

21        Q    We took a little break there to

22   discuss a background issue that I think we have

Tiffany Crowe - February 11, 2021

Page 18

1      resolved.

2              You were testifying before the break,

3      you mentioned something about escalation of

4      contact.  Can you explain what you meant by that?

5          A    Yes.  I didn't -- like, for me

6      starting mid-March and then being sort of briefed

7      on this in April, the information I had was from

8      the reports as well as seeing e-mails and seeing

9      that her supervisor had already sent her the

10     disciplinary action but it wasn't taking effect,

11     seeing the number of times that the matter had

12     been brought up by Ms. Lu and the direct contact

13     that she was making with her colleague, it seemed

14     to be getting worse rather than resolving itself

15     over the past years.

16             Based on the information that I had,

17     so ...

18         Q    And when you talk about having an

19     investigation are you talking about an

20     investigation you conducted in response to her

21     report to the mayor or some other investigation

22     like the one done by Mr. Lawson?

Tiffany Crowe - February 11, 2021

```
1          A     No.  The investigation done by
2     Mr. Lawson.  The mayoral contact and other items
3     predate my time with the Agency.
4          Q     Okay, so was the primary basis for
5     your drafting this letter information you got from
6     the Lawson investigation?
7          A     And managers at the Agency.  So, you
8     know, I had no reason to doubt the veracity of the
9     investigation or their reports, having spoken with
10    them on separate occasions, not together.  The
11    information I received was consistent.  And
12    reading what, you know, had transpired previously.
13         Q     So what management officials did you
14    get information from that you relied on in
15    drafting this letter?
16         A     I will have to go back and recall, but
17    keep in mind that I was a newish employee.  So I
18    was meeting with every manager in every department
19    at that time so from the time I started to about
20    June I would have weekly meetings with ten to 15
21    managers and they would tell me sort of what
22    challenges they were having, HR, operational and
```

Tiffany Crowe - February 11, 2021

```
 1    otherwise.  So I can go back and gather that
 2    information if there is a way for me to provide it
 3    at a later date.
 4         Q    Well, this was written April 30th and
 5    I see your attached letter was April 22nd, so how
 6    long had you been there at that point?
 7         A    About a month.
 8         Q    Okay.
 9              So -- and I'm talking just about
10    people that you consulted with prior to drafting
11    this letter.  Who was the highest ranking manager
12    or elected official that you spoke with as part of
13    your gathering information to draft this letter?
14         A    Probably the general counsel.  I can't
15    even remember at that time if I -- I think I read
16    the communications from Garret Whitescarver.  I
17    talked to Don Tatum about the matter, you know,
18    so ...
19         Q    So of those -- and excluding
20    discussion with Agency counsel, was
21    Mr. Whitescarver the highest ranking official that
22    you think you spoke to about these matters before
```

Tiffany Crowe - February 11, 2021

1    you drafted this letter?

2        A    Yes.

3        Q    And going back to your phrase about

4    the escalation of contact, what did you consider

5    to be the most serious incident of Ms. Lu

6    harassing or improperly interacting with SB?

7        A    I can't say that I ranked them in

8    order of severity, but the aggregate effect of all

9    of the contacts and the persistence with which she

10   was pursuing the matter was worrisome to me.

11       Q    And are you talking about who she was

12   reporting to or solely about her interactions with

13   SB?

14       A    Primarily her interactions with SB.

15   You know, we have employees contact EOM about a

16   variety of things, and not even just the contact

17   with SB but the -- I don't want to be --

18            THE WITNESS:  Mr. Daniel, can I ask

19   you a question?  I don't want to use the word

20   obsessed because that is subjective.  It's more

21   the -- I want to say persistent because that is

22   factual.  That's an objective statement.

Tiffany Crowe - February 11, 2021

```
1              MR. DANIEL:  Your testimony here is
2       your personal perspective.  It's not on behalf of
3       the Agency so you can answer to how you perceived
4       it.
5              THE WITNESS:  Okay.
6          A   It was concerning to me that she would
7       comment on his family, like, make contacts -- make
8       comments about his wife, about her appearance,
9       that she noticed things, like those types of
10      personal intrusions, and a consistent sharing of
11      that information with various people who are not
12      privy to personal information about a colleague
13      was disturbing to me.
14              Now, I did not rank in severity the
15      incidents and, you know, to whom she reported her
16      concerns, you know.  Employees have the right to
17      escalate concerns to whomever they choose.  That
18      has never been something that I as a manager have
19      had an opinion about.  It's more the way that they
20      treat their colleagues and the environment that we
21      are creating at the Agency, that is my concern.
22          Q   And somebody --
```

Tiffany Crowe - February 11, 2021

1        A      I apologize.  I will mute my phone.

2        Q      You talk about comments regarding SB's

3    wife's appearance.  Are you talking about Ms. Lu

4    reporting that Ms. SB did not appear to be

5    pregnant shortly before the time when the child

6    was said to have been born?

7        A      Absolutely.  Like, that is a very -- I

8    started to say I don't know if you have ever been

9    pregnant.  You haven't been but, you know, those

10   types of things are absolutely inappropriate.

11       Q      And are you talking about her, things

12   that Ms. Lu observed on the public Facebook

13   postings from Ms. SB?

14       A      I mean, while the District does not

15   have standard code of conduct when it comes to

16   viewing and screenshotting your colleague's social

17   media posts, that is also an intrusion.  Even if

18   they have posted it publicly for their friends and

19   family to see you also don't know how -- you don't

20   know the inner workings of anyone's family or

21   personal situation.

22              So to go looking for information about

Tiffany Crowe - February 11, 2021

1    someone's personal life to serve a vendetta seems

2    a little scary to me, particularly when she did

3    what she could do in that circumstance which is

4    report it.

5              An entire investigation was held,

6    which is absolutely what the Agency should have

7    done, but in general when someone reports

8    something the reporter of that thing does not also

9    continue their own investigation into the matter.

10   They don't continue to search for and harass the

11   subject of that investigation.  They allow the

12   process to take place.  And I can say that from my

13   experience participating in other investigations.

14   So this is the only incident in which the person

15   who filed the complaint continued in this matter,

16   in this manner.

17        Q    Apart from Ms. Lu being told by

18   District management or officials that her report

19   had been investigated and there was nothing to it,

20   do you know of any other reason that leads you to

21   conclude she should have known what she was

22   reporting was false?

Tiffany Crowe - February 11, 2021

```
1              MR. DANIEL:  Objection.
2              You can answer.  I'm sorry.
3              THE WITNESS:  Okay.
4         A    No.  I mean, you report something
5    because you have a concern about it.  Right?  And
6    so the investigation concluded, the facts were
7    shared with her.  And at that point, you know, you
8    can believe the facts or not believe the facts but
9    I don't want to speculate about what she knew and
10   when she knew it.  Nor do I -- like --
11        Q    I'm sorry, go ahead.
12        A    Even if -- like, no matter how the
13   investigation turned out, let's say that it turns
14   out that SB had -- the investigation was done, the
15   results were different.  If during the course of
16   that investigation the behavior of the complainant
17   was the same, we would still have the same
18   disciplinary challenge at the Agency if the
19   behavior is the problem, not the belief or
20   disbelief in the outcome.
21        Q    Okay.  So your view was that her
22   harassing of SB, that was the more serious aspect,
```

Tiffany Crowe - February 11, 2021

1    or was it her reporting things she should have

2    known were false?

3              MR. DANIEL:  I'm going to object again

4    to form and speculation.

5              You can answer.

6         A    Yeah.  I mean, I think both are

7    serious so I don't want to get caught in a catch

8    22 in seeming to be an apologist for one bad act

9    or the other.  But, as I said, you know, my focus

10   tends to be the safety of our employees, and

11   that's both the physical safety and emotional

12   safety.  So people have to know that a false claim

13   against them is not something that you will live

14   with forever if an investigation clears you,

15   right, because an investigation could go either

16   way.

17              We pride ourselves on our special

18   investigations being objective.  As a matter of

19   fact, that is something that is key.  There is no

20   side in an investigation like that.  So the

21   emotional safety of employees matters, that once

22   something has been investigated -- because even

Tiffany Crowe - February 11, 2021

1      that is a shadow over someone.

2              Ms. Lu did not keep this a secret, so

3      that employee was a part of an investigation

4      that - you know, he worked at the Agency while the

5      investigation was going on and, you know, so

6      knowing that okay, this is the evidence that you

7      presented, this is what we found, it appears that

8      what you're saying is not accurate, presenting

9      those, that information to her, and then

10     continuing to say the same allegations again, like

11     that could be construed as making false statements

12     which is a serious thing.

13             But also a serious thing is continuing

14     to harass another employee, so ... I think I have

15     answered the question.  I've said the same thing

16     in a different way three times.  I will stop

17     talking now.

18     Q      That's no problem.

19             Okay, so back to my earlier question.

20     I understand you have said that the District told

21     her we have looked at these allegations that you

22     made and there is nothing to them and that would

Tiffany Crowe - February 11, 2021

1    be one reason that you would believe that she

2    should have known her allegations were untrue.

3    And I'm just wanting to make sure there is not any

4    other reason in your mind that tells you that she

5    intentionally lied beyond the fact that the

6    District had told her that it investigated this

7    and decided there wasn't anything to it.

8         A      I think reporting something within

9    your Agency or to people within the government

10   assumes a certain amount of --

11             MR. DANIEL:  I'm going to cut her off.

12   Again, you are -- she is here in her personal

13   capacity.  She is not speaking for the Agency.

14             MR. SCHLEICHER:  You have made that

15   clear and I'm going to object to you cutting her

16   off.  And unless you instruct her not to answer I

17   will ask that she be allowed to speak without --

18             MR. DANIEL:  She can finish the

19   answer.  I want it to be clear that she is

20   speaking for herself, not speaking for the Agency

21   here.

22             MR. SCHLEICHER:  Let's stipulate that

Tiffany Crowe - February 11, 2021

1    for all the questions that it is your position

2    that she is speaking for herself and not the

3    Agency so we don't have this objecting while

4    witnesses are answering.

5         A    Your question was whether or not she

6    should have known that what she was saying was

7    false because the investigation said so, right?

8         Q    No.  Let me ask my question again to

9    make sure that it's clear.

10            So I understand -- well, first I will

11   ask, is it your position that one of the reasons

12   you believe she is intentionally lying is that

13   D.C. staff told her they looked into this and

14   there was nothing to it but she continued to

15   report it?

16        A    Can you show me where I said she was

17   intentionally lying, used those words?

18        Q    She was charged with intentionally

19   misleading management.

20            MR. DANIEL:  I'm going to -- now, can

21   you put her back into the -- can we put her back

22   into the -- take her out again and go off the

Tiffany Crowe - February 11, 2021

```
 1    record?
 2            MR. SCHLEICHER:  I'm going to rephrase
 3    my -- I'm going to start earlier with my question.
 4    I think it may address your concerns.  This is a
 5    fundamental question.
 6       Q    Do you believe that Ms. Lu
 7    intentionally misled management in her reports
 8    about SB?
 9            MR. DANIEL:  I will object again,
10    stipulation or not.  She is speaking for herself,
11    not for the Agency.
12            You can answer.
13            THE WITNESS:  Do I have to answer?
14    Because earlier --
15            MR. DANIEL:  I interrupted the
16    question earlier.  You can answer this one.  I
17    will raise a different objection if it's asked
18    again.
19            Go ahead and answer.
20            THE WITNESS:  Okay.
21       A    Can you repeat the question again?
22       Q    Sure.  My question is do you, Tiffany
```

Tiffany Crowe - February 11, 2021

1    Crowe, believe that Ms. Lu intentionally lied to

2    management in her reports about SB, and feel free

3    to say yes or no or that you formed no opinion or

4    anything else.

5         A    I would say that at this juncture

6    it -- I would say that she had the facts and

7    could -- a reasonable person would conclude from

8    the facts that the allegation she was making had

9    been disproven.  And in my personal capacity that

10   is what I would believe.  So I think not,

11   repeating something that you know is likely false

12   because you didn't like the answer I think, you

13   know ...

14        Q    I'm confused as to your answer.  Let

15   me ask it this way.

16             Does Tiffany Crowe believe that Ms. Lu

17   intentionally misled management in her reports

18   about SB?

19             MR. DANIEL:  Asked and answered.

20        Q    You can answer.

21        A    I think I have answered the question a

22   few times.

Tiffany Crowe - February 11, 2021

1    know when we did.

2           Q      And who is OCTO?

3           A      The Office of the Chief Technology

4    Officer, that's the District's centralized

5    technology to the Agency.

6           Q      So you had to go outside of DCRA to

7    get her a VPN?

8           A      Yes, through Bill and the IT team.

9           Q      But it was unusual for somebody -- at

10   the time that you were the chief -- the CAO?

11          A      Yes, the chief administrative officer.

12   And so if you think about the program, as the

13   employee submits a request, manager approves, if

14   there is an issue, the division had reviews.  If

15   there is any kind of question HR would typically

16   be a place where they could ask the questions.

17   And then HR, there was a HR manager and a manager

18   over that and then me.  So it would not have been

19   typical the way that this played out.

20          Q      Did anybody in that chain tell you

21   that you should not get her a VPN?

22          A      No.

Tiffany Crowe - February 11, 2021

1          Q      So you typically -- where you describe

2    trying to get her a VPN is trying to expedite the

3    process for her?

4          A      I definitely was trying to expedite.

5    If that was the only barrier, then yes.

6                 MR. SCHLEICHER:  Objection, leading.

7                 You can answer.  Sorry.

8          A      As I understood it, that was the only

9    barrier to Ms. Lu being able to telework.  So it

10   seemed like if this was what we were trying to do

11   for the employees, at that point not very many

12   employees were teleworking.  So we launched this

13   policy and there were a lot of restrictions for

14   teleworking.  So for someone who met all of the

15   other criteria, to that extent I tried to see what

16   we could do, especially because she had contacted

17   me, so ...

18         Q      If we can go back, do you have the

19   exhibits from earlier?

20         A      The policy?

21         Q      No.  The exhibits that we looked at

22   this morning.

Tiffany Crowe - February 11, 2021

```
1          A     Yes.
2          Q     If you can pull up -- sorry, still ...
3     plaintiff's designation here.
4                So if you can go back to, this is
5     looking at the deposition exhibit you were looking
6     at earlier, Exhibit 4.  It's on Page 31.
7          A     Okay.
8          Q     It's also up on the screen here as
9     well.
10         A     Okay.  I see it.
11         Q     And so you recognize this as an e-mail
12    from yourself?
13         A     I do.
14         Q     Can you see the date on it?
15         A     April 30th, 2019.
16         Q     And what is the subject of this
17    e-mail, the title?
18         A     Matter Closed.
19         Q     Okay.
20               Can you read just to yourself the
21    first sentence after "Ms. Lu"?
22         A     Yes.
```

Tiffany Crowe - February 11, 2021

Page 75

1        Q      So what is this e-mail responding to?

2        A      It's responding to a complaint that

3    had been made about SB, SB, I believe, in

4    February.

5        Q      And who made that complaint?

6        A      Ms. Lu.

7        Q      And you are -- this is -- and then the

8    letter below that on, in red in the upper

9    left-hand corner, Page 32 -- sorry, just for the

10   record this is Exhibit 4.

11       A      Okay.

12       Q      And the subject heading RE.  Can you

13   read that?

14       A      Out loud or to myself?

15       Q      You can read it to yourself.

16       A      Okay.

17       Q      All right, so what is the purpose of

18   this letter?

19       A      To respond to Ms. Lu's allegations, to

20   answer her question.

21              MR. DANIEL:  I think that's all I

22   have.

Tiffany Crowe - February 11, 2021

Page 76

1              MR. SCHLEICHER:  Just very briefly in

2      follow-up.

3                      EXAMINATION

4      BY MR. SCHLEICHER:

5          Q     So is it your testimony on April 30th,

6      2019 you sent her this response to what she had

7      reported to the mayor in early February?

8          A     The response was in an effort to close

9      the matter, to give Ms. Lu closure since it had

10     been going on since 2016.  It wasn't in response

11     to any -- to just that February notice.  The

12     entire letter details the entire history, so I

13     think this is why even after the investigation

14     this summary was required.

15         Q     But the February 5th, 2019 is a

16     reference to her communications, Ms. Lu's

17     communications to the mayor; is that right?

18         A     Hold on.  Let me see.  I want to go

19     back to the list of complaints.  Give me one

20     second.  Can you scroll down to where it describes

21     the February 5th event?

22         Q     Here, right above the highlighted

Tiffany Crowe – February 11, 2021

1    paragraph on overall Page 37.

2         A    Yes.  There it is.

3              As the most recent complaint that was

4    the one that likely had not been given a full

5    response to Ms. Lu as yet since this was April, so

6    I wanted to make sure that each allegation that

7    was made by Ms. Lu received a response.

8              (Previously marked Plaintiff's Exhibit

9    No. 5, first referral.)

10   BY MR. SCHLEICHER:

11        Q    Okay, and do I understand correctly

12   then your response to her February 5th, 2019

13   report to the mayor comes April 30th which

14   compares to -- let's see, hold on -- the April 2nd

15   proposal to suspend her for ten days?

16        A    Can you scroll down?  Is this the one

17   from Lester?

18        Q    Yes.

19             I just want to make sure that I had

20   the date sequence right, that Mr. Lester -- here,

21   I will scroll down to the end.

22        A    Thank you.

Tiffany Crowe - February 11, 2021

Page 78

1        Q    So we have her report to the mayor on

2    February 5th.

3        A    Don't go so fast.  You're making me

4    dizzy.  What is the exhibit number?

5        Q    5.  Overall Page 38.

6            MR. DANIEL:  My screen has gone blank.

7            MR. SCHLEICHER:  Okay.

8            MR. DANIEL:  Ms. Crowe, do you have

9    Page 38?

10           THE WITNESS:  Yes, I have it.  I can

11   see.

12       A    You said a comparison so you are

13   comparing the letter sent by her supervisor on

14   April 2nd to the summary sent by me by e-mail on

15   April 30th.

16       Q    So I just want to make sure I have the

17   timeline right that we have.  Ms. Lu makes the

18   report to the mayor -- let me start over.

19           Ms. Lu makes the report to the mayor

20   February 5th, 2019.  Then she is proposed for a

21   ten-day suspension April 2nd, 2019.  And then on

22   April 30th, 2019 you respond to her February 5th

Tiffany Crowe - February 11, 2021

Page 79

1     report to the mayor; is that right?

2          A     No.  I wouldn't say it was a response

3     to her report to the mayor, it was a response

4     after that as a conclusion to all of the

5     complaints.  Like, in terms of District government

6     escalation, since it had already been to OIG

7     through our internal administrative channels and

8     to EOM in February, it was okay, this is -- this

9     was the last complaint and here are the actions

10    from every single complaint.  This is, like, the

11    District government doing its due diligence.

12              Now, I believe that I'm here in my

13    personal capacity rather than as someone who was

14    at the Agency during this whole chain of events,

15    but after reviewing the materials I did think,

16    like, separate from the communications from her

17    supervisor, which as I said earlier, I can't -- I

18    can't speak to when or if I saw that message from

19    Lester, but I would want a full summation of every

20    complaint I had made if this was something that I

21    had alleged.

22              So that was what I felt was the

Tiffany Crowe - February 11, 2021

Page 80

1    appropriate thing to do and why I sent this e-mail

2    to Ms. Lu who I had known, who I understood

3    through the materials and her performance reviews

4    and things like that to be a strong employee

5    otherwise.

6         Q    Well, let me ask it this way.  Looking

7    at Exhibit 4, Page 1, your April 30th, 2019 e-mail

8    to Ms. Lu, is the first statement in this letter

9    truthful?  And I read, "The attached letter from

10   me is DCRA's response to your latest (February

11   5th, 2019) complaint about SB."  Was that an

12   accurate statement?

13        A    Yes.  As I said, this is, like, the

14   last complaint that we had, yes.

15             MR. SCHLEICHER:  Okay, that's all we

16   have.  Thank you for your additional time.

17             MR. DANIEL:  I think we are good.  We

18   will read again.  Same e-mail, please just send us

19   all -- send us all three billing requests for the

20   transcripts from today and we will process it.  If

21   you send us an invoice for the order we will send

22   you back an actual order.

Tiffany Crowe - February 11, 2021

Page 82

```
1    UNITED STATES OF AMERICA )

2    STATE OF MARYLAND        )

3

4              I, CAPPY HALLOCK, the reporter before

5    whom the foregoing deposition was taken, do hereby

6    certify that the witness whose testimony appears

7    in the foregoing deposition was sworn by me; that

8    said deposition is a true record of the testimony

9    given by said witness.

10             I further certify that I am neither

11   counsel for, related to, nor employed by any of

12   the parties to the action in which this deposition

13   was taken; and further that I am not a relative or

14   employee of any attorney or counsel employed by

15   the parties hereto, or financially or otherwise

16   interested in the outcome of this action.

17

18

19

20             Cappy Hallock, RPR, CRR

21

22   My Commission expires January 19, 2025
```