UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

+ + + + +

_____
                                :
IN THE MATTER OF:               :
                                :
QING LU,                        :
                                :
        Plaintiff,              :  Civil Action No.
                                :  1:20-cv-00461-APM
v.                              :
                                :
DISTRICT OF COLUMBIA,           :
et. al.,                        :
                                :
        Defendants.             :
_____:


                        Thursday,
                        May 13, 2021

DEPOSITION OF:

            S.B.

called for examination by Counsel for the
Plaintiffs, pursuant to Notice of Deposition, via
videoteleconference, when were present on behalf
of the respective parties:

**APPEARANCES:**

On Behalf of the Plaintiff:

       DAVID R. SCHLEICHER, ESQ.
       CRISARLA HOUSTON, ESQ.
of:    Schleicher Law Firm, PLLC
       1629 K Street, N.W.
       Suite 300
       Washington, D.C. 20006
       (202) 540-9950 (Schleicher)
       (713) 208-5808 (Houston)
       efiling@gov.law (Schleicher)
       info@crisshoustonlaw.com (Houston)

On Behalf of the Defendants:

       ADAM DANIEL, ESQ.
       MATTHEW BLECHER, ESQ.
of:    District of Columbia Office of
       Attorney General
       Civil Litigation Division
       400 6th Street, N.W.
       Washington, D.C. 20001
       (202) 442-7272 (Daniel)
       (202) 442-9774 (Blecher)
       adam.daniel@dc.gov
       matthew.blecher@dc.gov

ALSO PRESENT:

DIANNE CONWAY, Captioner

CONTENTS

WITNESS:          DIRECT  CROSS  REDIRECT  RECROSS

S.B.                 5     114

EXHIBITS:                                    PAGE

Plaintiff

A       Agreed Disposition for BEGA. . . . . . . .82
        Case from December 2016
B       Email from S.B. to Mr. Bailey. . . . . . .86
        on February 2, 2017
C       Family and Medical Leave Form. . . . . . .94
        for D.C.

D       District Court of Maryland . . . . . . . . 100

        Document for S.B. Trial 6/23/2016

E       Case Information for District. . . . . . 105

        Court for Prince George's County

        for S.B. as a Defendant

        Between 2013 and 2014


Defendants


1       Email from S.B. to Mr. Crawford, . . . . . 116

        Mr. Lester, and Mr. Bailey

        November 8, 2018

```
 1                    P-R-O-C-E-E-D-I-N-G-S

 2                         (9:09 a.m.)

 3              MR. DANIEL:  Can we go on the record

 4     at this point?  Excellent.

 5              We are stipulating that S.B. is

 6     appearing here as a District employee but in his

 7     personal capacity.  He is not appearing as a

 8     representative of the District of Columbia.

 9              With that, we can proceed with the

10     witness.

11              MR. SCHLEICHER:  Okay.  S.B., I am

12     David Schleicher, and I will be asking you some

13     questions today on behalf of the Plaintiff in

14     this suit, Luchi Lu.  My co-counsel, Cris

15     Houston, is also with us today.

16              MR. DANIEL:  I'm sorry to interrupt.

17     I believe he still needs to be sworn in.

18              MR. SCHLEICHER:  Good point.

19              THE COURT REPORTER:  S.B., if you can

20     raise your right hand, please.

21     WHEREUPON,

22                   S.B.
```

1    was called for examination by Counsel for the

2    Plaintiff and, having been first duly sworn, was

3    examined and testified as follows:

4                    THE COURT REPORTER:  Thank you, sir.

5            DIRECT EXAMINATION

6                    BY MR. SCHLEICHER:

7            Q     S.B., I will be asking you some

8    questions today on behalf of the Plaintiff, Luchi

9    Lu.  We have discussed already that as an

10   agreement to provide some protection for your

11   privacy I may refer to you as S.B.

12                   I wanted to -- well, first can you let

13   me know if either you don't hear the question or

14   the question doesn't make sense?

15           A     Okay.

16           Q     And the court reporter is taking down

17   both my questions and your answers, so I will try

18   not to interrupt you, and if you will try not to

19   interrupt me that will help him get a more

20   accurate record.  Is that all right?

21           A     I'm -- I'm not understanding.

22           Q     I'm just asking that we -- neither of

1    us interrupt the other one.

2         A     You're asking if the information I

3    provided can be recorded or -- I'm not -- I'm not

4    understanding what you're asking.

5         Q     I'm asking that you do not interrupt

6    my questions, and I will not interrupt your

7    answers.

8         A     Okay.

9         Q     And if you will continue to do as you

10   have been doing and give a verbal answer in

11   addition to any nodding of your head, that will

12   also help the court reporter get a more accurate

13   record.  Is that all right?

14        A     Yes.

15        Q     What do you understand it to mean that

16   a deposition like yours today is given under oath

17   or under penalty of perjury?

18        A     Yes.

19        Q     What do you understand that to mean?

20        A     That I -- I need to be as forthcoming

21   as possible.

22        Q     Have you had your deposition taken

1        before in any other matter?

2              A      If I have had a deposition taken

3        before in any matter?

4              Q      Yes.

5              A      Yes.  I think that would be a BEGA

6        issue, a BEGA record.  I think that was a

7        deposition.

8              Q      Okay.  And when you say BEGA, are you

9        referring to the acronym B-E-G-A for the Ethics

10       and Government Accountability Office?

11             A      Correct.

12             Q      And was that the one that resulted in

13       the $1,000 fine, or was that a different

14       investigation?

15             A      Yes, sir.

16             Q      It was the one related to the case in

17       which you paid a fine?

18             A      I had to pay the fine.

19             Q      Okay.  We've talked about depositions

20       in other settings.  Have you given testimony

21       under oath in any court cases?

22             A      Yes.  I had some personal family

1       a $1,000 fine; is that right?

2            A       That was outside of DCRA.  Again, this

3       was all initiated by Ms. Lu.  So there were --

4       there were -- I mean, I think you probably have a

5       copy of the BEGA reports that would likely

6       describe what the issue was.  So there you have

7       it.

8            Q       Okay.  In what way was the BEGA --

9       B-E-G-A -- fine a result of what Luchi Lu had

10      done?

11           A       What Luchi Lu had done?

12           Q       You said it involved her, that matter

13      also involved her?

14           A       The matter was raised by her.  I -- so

15      there was -- well, the long and short of it is

16      there were two incidents of conflict of interest.

17      So that -- that was that, and, therefore, need to

18      I guess -- I cannot -- I don't think that Lu's

19      level of misconduct was -- there's two matters of

20      conflict of interest and they said okay.

21               Let's define.  I tried to appeal it.

22      They said we considered it, but at the time I --

1    it would have probably caused additional legal

2    expense, so whatever.  I just agreed to whatever

3    it is, whatever it was.

4         Q     And what I'm trying to figure out is,

5    do you believe that Luchi Lu was behind that

6    matter also, behind you ending up having to pay a

7    $1,000 fine?

8         A     Yes.  The matter was reported by her.

9    The original claim was originated by her.

10        Q     Do people in jobs like the one that

11   you and Luchi Lu have make around $100,000 a year

12   very roughly?

13        A     Yes, sir.

14        Q     Okay.  I had divided that by 52 weeks,

15   and then by five days a week, and I get about

16   $384.  And then multiply that by an eight-day

17   suspension, over $3,000.  Do you believe it was

18   appropriate for Luchi Lu to suffer about $3,000

19   loss in pay versus you paying a $1,000 loss?  Or

20   do you think those two situations are completely

21   different?

22        A     They are completely different.  Are

1      you asking me if they are different?

2              Q      Yes.

3              A      They are completely different.

4              Q      And in what way do you understand them

5      to be different?

6              A      Let me put it in perspective for you

7      guys.  If Luchi Lu -- if I had accused Luchi Lu,

8      if she came to work and she had an enlarged

9      abdomen, and she said she is pregnant, and I was

10     walking around the office telling everybody that

11     she is stuffing her belly with prosthetic

12     abdominal whatever to say that she is pregnant,

13     and that she is now about to claim fraudulent

14     leave, what do you think would have happened to

15     me?  I would have been fired.  I would have lost

16     $100,000 a year.

17             Now that is -- I think is a lot of

18     bias when it comes to men versus women in the

19     workplace.  Now, if I was doing that to her, she

20     -- I would have been fired.  No doubt about it.

21             Now, she is going around the office

22     telling employees in the office, and also people

1      who come to DCRA to do business, that my wife is

2      faking pregnancy.  And she is bold enough to

3      discuss that with other employees in the office

4      and say that we are committing fraud.

5              And you are asking me if $3,000 is too

6      severe?  If it was in some cases, she would be

7      fired.

8          Q     Okay.  Have you managed to maintain

9      high performance ratings in spite of what has

10     been going on between you and Luchi Lu?

11         A     I try to do my job despite all this

12     distraction.  I try to stay focused.

13         Q     And so have you managed to maintain

14     high performance ratings in spite of that stress?

15         A     Well, I guess -- I guess my -- my job

16     appraisal speaks for itself.  I -- I think the

17     answer would be yes.

18         Q     Did the stress of Luchi Lu's reports

19     about you ever become so unbearable that you had

20     to seek professional counseling or be prescribed

21     something like an anti-depressant or anti-anxiety

22     drug?

1              MR. DANIEL:  Objection.  You're asking

2       about his medical history.

3              MR. SCHLEICHER:  Well, and this may be

4       something that would be appropriate for a

5       protective order, but I'm trying to gauge the --

6       well, let me ask it -- let me ask it this way.

7              BY MR. SCHLEICHER:

8         Q    Did you ever report to management that

9       your level of stress had become so severe you had

10      to seek counseling or medication?

11             MR. DANIEL:  You're still -- I mean,

12      you're still asking about his medical history.

13      Like this -- this was --

14             MR. BLECHER:  Hold on, hold on.  Let

15      him answer that question.

16             MR. DANIEL:  All right.

17             MR. BLECHER:  Go ahead, David.  Reask

18      it.

19             BY MR. SCHLEICHER:

20        Q    Okay.  The question is:  did you ever

21      report to management that the stress of the

22      situation involving you and Luchi Lu was so

1    don't know.   I -- I guess that was the basis of

2    the investigation, following up on Luchi Lu's

3    claim and also my complaint that I made.

4              So I think he was doing two things at

5    the -- two -- looking at both aspects of the

6    situation, whether or not it was correct that I

7    had a daughter, or true if I had a daughter, and

8    also the accusation or the claim that I made that

9    she was harassing me.

10              So I -- that is my -- that is my

11   personal view of what he was investigating.   I

12   don't know.

13         Q    Did he ask to look at the documents

14   that you submitted for the parental leave

15   request?

16         A    I don't submit anything that is not

17   related to -- that is related to HR to anybody

18   else but HR. HR is the one that approves, reviews

19   documentation for HR leave, nobody else, not my

20   managers, not the -- not the CBO, not the

21   director.   I send it to the HR Department in

22   DCRA.   What they do with the document after that,

1    I don't know.  You have to ask them about that.

2          Q     Are you aware of anyone interviewing

3    your wife about Luchi Lu's allegation of parental

4    leave fraud?

5          A     I don't -- I don't -- I am not aware

6    of anybody asking my wife or this investigator

7    asking my wife anything about parental leave

8    fraud.

9          Q     I saw in Mr. Lawson's -- well, have

10   you had a chance to look at Mr. Lawson's

11   investigative report?

12         A     No, sir.  I haven't seen Mr. Lawson's

13   report.

14         Q     Okay.  He had used the word

15   "stalking," S-T-A-L-K-I-N-G, repeatedly in the

16   report, and I'm wondering if you're aware of

17   anywhere in your interview or anything in writing

18   in which you made the allegation that Luchi Lu

19   was stalking you.

20         A     That is probably one of the -- a very

21   close word to what she is doing -- stalking.

22   Whether it's -- whether it's online stalking

1    through Facebook, or whatever it is, that's a

2    very correct term.  I would agree with that term.

3         Q    Okay.  And my question wasn't whether

4    you agreed with the term.  My question is:  did

5    you use that word in describing your concerns

6    about Luchi Lu?

7         A    I have my emails right here.  I

8    imagine you probably have a copy of it.

9              MR. DANIEL:  Sorry, S.B., can you --

10             S.B.:  I don't want to -- I don't want

11   to misspeak.  So let me scan through this to see

12   if there is a word in there such as stalking.

13             MR. SCHLEICHER:  Okay.

14             (Pause.)

15             S.B.:  I am not seeing any -- any

16   phrase in --in my emails here that I use the word

17   "stalking."  But if I did, I believe I would have

18   been very correct.

19             MR. DANIEL:  Mr. Schleicher, I

20   apologize.  I didn't mean to interrupt the

21   witness' answer, but would you mind if we had him

22   specify which emails he was looking at, just in

1    terms of the date?

2              BY MR. SCHLEICHER:

3         Q    Yes.  Can you identify the dates of

4    the emails you're looking at?

5         A    Okay.  So the emails I'm looking at

6    are the -- are the two emails that I sent to --

7    to the managers in DCRA.  That's only the -- for

8    the screen.  One was sent to -- one was sent to

9    Mr. Crawford back in 2018 of November.  And the

10   other one was sent to Mr. Bailey on February 2,

11   2017.

12        Q    When Mr. Lawson interviewed you, was

13   that in person or over the phone or by video?

14        A    It was in person.

15        Q    And did you encounter any difficulty

16   in understanding or hearing his questions?

17        A    No, I -- I don't think I did at the

18   time.

19        Q    Did you ever fear that Luchi Lu would

20   physically punch you or otherwise physically

21   overpower you?

22        A    Now that is an interesting question.

1      It's -- in my opinion, I think it -- it was

2      highly likely.  I don't -- I don't know what it

3      is that she has against me, but she is very --

4      she is -- she is relentlessly pursuing me for

5      some reason, not in a good way.

6                   I don't -- I don't know if the word is

7      "fear" or "fearful," but it's -- it's not a very

8      comfortable place to be, for lack of a better

9      word, knowing that she is working down a few

10     cubicles from you.  I -- I really believe that

11     anything can -- could happen.  I'll just leave it

12     at that.  I -- I can't speak to her mental

13     condition, but yeah.

14         Q    Do you have any reason to dispute that

15     in the times you were in the office pre-pandemic

16     with her that she is six inches shorter and about

17     70 pounds lighter than you?

18         A    If there was a dispute, it probably

19     was very short.  I -- I don't think it was a big

20     back and -- long back and forth shouting match or

21     whatever it is.  It's usually -- our encounters

22     are usually very short.

96

1        A     Yes.

2               MR. DANIEL:  Objection.  Foundation.

3        You can answer.

4               S.B.:  I believe this -- this is a

5        similar form that existed back then.

6               BY MR. SCHLEICHER:

7        Q     And on this form, for reason for leave

8        request, you believe you would have indicated

9        "birth of my child" as the reason?

10       A     Correct.

11       Q     Do you remember approximately how many

12       hours or weeks you requested?

13       A     ███ hours.

14       Q     ███?

15       A     That is what is allowed under D.C.

16       provision, eight weeks of paid family leave.

17       Q     Okay.  And how much of that did you

18       end up actually taking?

19       A     I -- I think, based on the records,

20       that -- that exists at DCHR right now, I think it

21       was ███-something, ███ ███, whatever.  I don't -

22       - I don't believe I used all the leave.  Because

1    if you don't use all the leave within a year,

2    then you -- then you lose it.

3             So even during my time when I was on

4    leave, I -- I still made sure that I still helped

5    out at work.  I facilitated work, and that is

6    when I may have been doing some teleworking, even

7    while I'm on paid family leave.  So I -- I tried

8    helping at work as I -- as much as I could during

9    the time.  I didn't take eight weeks straight.

10        Q      Right.  So my question was:  of the

11   eight weeks requested, about how much do you

12   think you actually ended up taking?  Was it like

13   seven weeks?  Five weeks?  Three weeks?  Or do

14   you think you took all eight by the end of the

15   year?

16        A      You can divide ▮ and calculate that

17   into weeks, roughly ▮, ▮, or something like

18   that.

19        Q      So ▮ divided by 40 --

20        A      It's around -- it's around that

21   number.  I did not use all of the ▮0 hours.

22        Q      Okay.  ▮ divided by 40 would be

C E R T I F I C A T E

This is to certify that the foregoing transcript

Deposition of: S.B.

In the matter of: Qing Lu v DC

Before: US District Court

Date: 05-13-21

Place: teleconference

were duly recorded and accurately transcribed under
my direction; further, that said transcript is a
true and accurate record of the proceedings; and
that I am neither counsel for, related to, nor
employed by any of the parties to this action in
which this deposition was taken; and further that I
am not a relative nor an employee of any of the
parties nor counsel employed by the parties, and I
am not financially or otherwise interested in the
outcome of the action.

-------------------------
Court Reporter

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com