UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| QING LU, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 20-cv-00461 (APM) |
| | § | |
| DISTRICT OF COLUMBIA, et al., | § | |
| Defendants. | § | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' ASSERTION OF**
**UNDISPUTED MATERIAL FACTS AND ASSERTION OF HER OWN**

Before responding per LRC 7(h) to Defendants' assertion of undisputed material facts (#1-

90), and then adding her own (#91-240, starting at p. 52), Plaintiff raises these three considerations:

- Defendants say that their asserted facts are submitted pursuant to FRCP "56(b)(2)(A)," but Plaintiff cannot find such under the current Rule 56.

- Plaintiff objects to and asks the Court to strike at least eleven of Defendants' fact paragraphs (¶¶ 7, 9, 16, 25, 31, 37, 39, 50, 57, 66, and 67) because they include quotes that are so lengthy that they violate the Court's Order to include only one factual assertion per paragraph. *Compare* ECF No. 69 Scheduling Order (9/26/2021) (movant's statement of undisputed material facts to be organized in "numbered paragraphs, each containing only one fact assertion"). It is unclear why Defendants did not simply cite in their brief to the documents versus, as below, citing lengthy passages that often add errors and delete context that causes the meaning of the remaining text to mislead the reader. Admissions below are without waiver of the objection/request to strike.

- Plaintiff's own asserted undisputed facts below and her supporting appendix today largely mirror those she offered in support of her own earlier-filed motion for partial summary judgment (ECF No. 77—2/4/2022). But her numbering of them today is updated to comply with the Court's direction that a non-movant's factual assertions be consecutively numbered after those presented by the movant.

## I. PLAINTIFF'S RESPONSE TO DEFENDANTS'
## ASSERTION OF MATERIAL FACTS NOT IN DISPUTE

1.      "In [the District of Columbia Department of Consumer and Regulatory Affairs (DCRA)]

workplace Plaintiff" Qing Lu "is called "Luchi Lu.'"  Ex. 8 at 2.

    RESPONSE: ADMITTED by Plaintiff.

2.      Plaintiff and S.B. were coworkers at DCRA from 2007, reporting directly to Mr. Lester as

Fire Protection Engineers, until the end of 2019.  Ex. 1 at 36, 65; Ex. 12 at 40-41, 51-52.

    RESPONSE: ADMITTED as to Plaintiff and S.B. earlier reporting to Defendant Lester.

    Plaintiff does not know to whom S.B. has been reporting since then.

3.      Plaintiff has never held any other job with the District, is not a human resources officer,

has no legal training, and has never reviewed S.B.'s electronic time sheets, leave requests, or

personnel records.  Ex. 12 at 15, 44, 46-48.

    RESPONSE:   Objection that this violates the Court's Order by encompassing six factual

    assertions, but otherwise ADMITTED Plaintiff is not an HR office and has not been legally

    trained, nor had reviewed S.B.'s personnel records. [But she had seen his erroneous entries

    back when the office was using a shared sign-in time log. Plf. Opp. App. 500 (dec. ¶17).]

4.      Plaintiff "firmly believe[s]" S.B. is a "dishonest" person.  Ex. 12 at 51.

    RESPONSE: ADMITTED, subject to these objections as to relevancy/immateriality:

        (a) The D.C. Whistleblower Protection Act defines what is a

        "protected disclosure" "without restriction" to "motive." D.C. Code

        Ann. § 1-615.52.

(b) As to determining whether speech is protected under the First Amendment as involving a matter of "public concern," a disclosure that involves solely a discloser's own *personal* grievances might end up unprotected, but apart from that analysis, the discloser's motive should not be relevant. Here, that means that whether Plaintiff considers S.B. to generally be dishonest or someone with whom she'd like to socialize is irrelevant/immaterial. Otherwise, public employers could inoculate themselves "from First Amendment retaliation claims simply by arguing that the employee spoke about an issue of public concern for 'personal' reasons." *Garcia v. Hartford Police Dept.,* 706 F.3d 120, 130 (2nd Cir. 2013). *See also LeFande v. D.C.,* 613 F.3d 1155, 1162 (D.C. Cir. 2010) (impact of whistleblowing on the whistleblower's own job a consideration but ultimately not controlling as to protected status of speech where it otherwise involved a matter of public concern; also affirming employees dissatisfied with their workplaces are precisely those who are most likely to notice and object to malfeasance).

5.    Plaintiff does not consider S.B. a friend or see him outside of work.  Ex. 12 at 50-51.

RESPONSE: ADMITTED as to not being a friend, subject to same relevancy objections noted as to 4 above. DENIED to the limited extent there was a May 25, 2016 after-work get together of DCRA staff at a restaurant at Union Station. *See, e.g.,* Plf. Plf. Opp. App. 400 (reference to Plaintiff sharing information with supervisor Sydney Lester when they were at Union Station).

6.      Plaintiff has seen S.B.'s wife with two boys "in the DCRA office, many, many times" and "naturally believed," without "any forensic proof or legal proof," that they were S.B.'s sons because there was nothing about them that "don't add up or from the other info sources that has any suspicion on it."  Ex. 12 at 81-82; see also Ex. 1 at 77.

> RESPONSE: ADMITTED, subject to objection that whether Plaintiff concluded S.B.'s two sons are in fact S.B.'s sons is irrelevant/immaterial: Plaintiff's encountering the two sons at the office does not make it less likely Plaintiff reasonably believed to be true her reports S.B. fraudulently claimed paid parental leave as to a child other than those two sons.

7.      On June 27, 2016, Plaintiff wrote to the Office of the Inspector General (OIG) that she was "sending this email to express my concern about conducts of my coworker [S.B.]." Ex. 1 at 65. Plaintiff continued, in part:

> At the end of April, [S.B.'s] wife stopped by the office.  She voluntarily . . . informed a male employee . . . that she was pregnant.  There was no any noticeable pregnancy on her body.  In the middle of May, [S.B.] announced his wife had given birth to a baby girl.  He showed photos of a baby to coworkers sitting near him. . . .  Between May 19 (Thursday) and June 3rd (Friday), [S.B] was on approved fatherhood leave by using PFL (Paid Family Leave)."

> While [S.B.] was at home on his paternity leave, his wife visited the office alone on June 2nd. WITHOUT carrying the baby, she was sitting in the front desk area, showing photos of a new born to the receptionist and to customers sitting in that area waiting for service, as well as some employees walking by.  In addition to briefing people the baby was doing well generally, she also voluntarily provided . . . some vivid details about 'her pregnancy and labor'  According to her, it was a past due pregnancy and induced labor!  If this were true, that would mean at the end of April she was only about one week from delivery, which a pregnancy can hardly go unnoticed, plus the fact she is almost 6 feet tall, heavy built.  These new details released by her have made the alleged pregnancy and baby birth even more suspicious.

> [S.B.] returned to work and on Monday June 6th.  He was quite responsive to inquiries from coworkers.  He is willing and open to socializing/chatting with

customers about his baby.  He told them his baby cries a lot and does not sleep the whole night so he felt exhausted during the day.
. . . .

On the other hand, some finding from a government's publicly accessible website seemed to have linked [S.B.] to a sever violation.  Please click this link for detailed of the case.  http://casesearch.courts.state.md.us/casesearch/

On March 6th this year, he was caught by Maryland Charles county sheriff for speeding and driving with suspended out-of-state license (DC license).  This is a serious offense and may lead to prison time. . . .  When you scroll down to the bottom, you can find even though the trial was scheduled for June 23rd, a notices was serviced to him on as early as April 8th.
. . . .

Till then, the whole episode of this baby drama – from the timing of the baby announcement to his office attendance and action – have seemed to be so in tune with the legal processing of his trial.  . . . seemed to be in strong consistency with my speculation that the baby set up could be a fraud . . . .

His intent seemed clear.  Some quite plausible yet not proven explanation would be:  As he was uncertain about the verdict from the pending trial, he created the whole thing and attempted to use the paternity leave (PFL) to conceal the possible prison time he may be sentenced to, so he thought nobody would know he's is prison, and at the same time still get paid while in prison, for at least 8 more weeks.

On June 23rd, he did NOT show up at work and the online record shows his case closed by nolle prosequi with a status change from A to C (Active to Closed?).  On June 24th, . . . he returned.

I am one of the people who concern whether or not the baby story is a fiction.  I decided to be the one to bring it to your attention and investigation.  Because we don't know what documents he used to get the HR approval and whether a government issued Birth Certificate was required for paternity leave. . . .

Ex. 1 at 65-68 (emphases in original).

RESPONSE: First, as earlier noted, this is one of the paragraphs that Plaintiff asks the

Court to strike for pointlessly violating the Scheduling Order directive that a MSJ movant's

assertion of undisputed material facts be limited to one fact per paragraph. Also

DISPUTED that this an accurate accounting of the document, particularly in light of the

length of the quote. *Compare* actual text as Defs. Ex. 1 at 65-68. For example:

(a) the ellipses delete the mid-sentence wording in two locations that the information provided to S.B.'s/Plaintiff's coworkers was "without being asked";

(b) the quotes introduce new typos, such as "severe violation" changed to "sever violation" and "people who have concern" to "people who concern"; and

(c) information that would further demonstrate the reasonableness of Plaintiff's belief was deleted in a manner that misdirects the reader, e.g.: (i) the screen shot of the court case information showing a June 23 trial date; (ii) a table setting out a timeline of nine events from late April to late June; and (iii) mention that S.B. told two coworkers on June 22 he would be gone for a long time and the June 23 return was contrary to what he had told them.

8.    On August 11, 2016, Plaintiff wrote to Permit Operations Division Chief Gary Englebert, in part, that "on June 6th[sic.], the schedule was changed" and S.B. started doing Thursday afternoons.  Since then there was been a pattern:  [S.B.]'s wife – who is a permit runner – has always been coming to DCRA for permit particularly on Thursday afternoons. – if you have not observed this yet, you can start making your observations now."  Plaintiff continued, in part:  "I am brining this matter to you for your attention on the possibility of conflict of interest and the extreme self-serving intentions, to make sure we all work together to serve the very best interest of DCRA and there is no hidden self-serving agenda."  Ex. 5 at 9; see Ex. 1 at 65.

RESPONSE: ADMITTED in part and DENIED in part, in light of objections that:

(a) Defendants have added typos, such as "observation now" becoming "observations now" and "I am bringing" becoming "I am brining." *Compare* Defs. Ex. 5 at 9. (Defendants' insertion of "[sic.]" after "June 6th" is grammatically dubious, but is not claimed to rise to the level of being legally objectionable.)

(b) The citation to Ex. 1 at 65 appears to be material other than that quoted by Defendants.

9.     On August 16, 2016, Plaintiff wrote Mr. Englebert again, stating, in part:

. . . .  We don't have any proof to assert that he has assigned his wife jobs . . . to himself, but our questions are:
•        Is the management aware of this?
•        Is there any monitoring policy or control mechanism at all to ensure we all are ethical and play fair fames when we are in business??

To be frank, among us the reviewer, we are not quite surprised by what [S.B.] has been doing, since the dealings with him for a decade has given us more than enough hints of his deep character problems, especially his unhealthy attitude towards money and extreme selfishness. . . .

As mentioned, Wednesday afternoons is my counter time.  However On July 27th (Wednesday) morning Sydeny Lester told me NOT to do it but let [S.B.] to do it 'because he is off the next day.  This is amazing.  If you need a day off you go ahead.  Why do we have to switch for him? . . . .  It does not make any business sense.

Permit runner is an industry with low barrier and everybody can do it.  We do not know – from a strict legal point – whether this should be allowed as the lecturing from the ethics training is still lingering . . . .

Instances described are being seen by everybody.  At the same time there are some hearsays that may indicate some deeper / more grave problems of his conducts. Since these hearsays are not directly from my observations, I cannot provide too much details.  But this is the hint:

1.        Monitor his phone calls at his desk to make sure he is not soliciting or helping [his wife's business] to receive more business!

2.      Watch up his long term plan to make [his wife's business] a third party review company for DCRA.

I know this link provides a complete list of permits that have been issued month by month by DCRA. . . .  But it would be quite time consuming to dig out permits that are issued to [his wife's business] and to her.  The best way for you to control . . . will be more people to watch him for you.

Ex. 5 at 6-7.

RESPONSE: This is another one Plaintiff asks the Court to strike for violating the order to limit each paragraph to one asserted fact. As well, DISPUTED that this is an accurate representation of the document, especially considering the length of the quote. *Compare* Defs. Ex. 5 at 6-7 (original document). The quote is a misleading representation in suggesting Plaintiff merely speculated—for example, Defendants' quote:

(a) deleted Plaintiff's provision of a link to the website for the company run by S.B.'s wife, as well as the persons Plaintiff identified as having knowledge of the timing of the visit's by S.B.'s wife to the permit center; the fact that Defendant Lester put S.B. in the role of assigning projects [i.e., though S.B. is not in management]; and the fact that the manner of S.B. receiving projects had "never happened to the other people in the fire group" and did not "make business sense."

(b) Deleted that Plaintiff proposed to resolve the conflict-of-interest concerns by having S.B. "disclose his association with" his wife "and his relationship with her candidly," also staying away "while she is seeking permit on the 2nd floor." Also leaving out Plaintiff's observation that S.B. chose to do the opposite, sitting by his wife and accompanying her (when she sought permit approvals).

(c) Left out that in asking for "more people to watch S.B.," Plaintiff offered specific suggestions such as asking that "Sharon and fileroom to report to you more often" and to request that Sydney Lester copy the schedule to three named employees.

(d) Introduced additional typos to Plaintiff's message, such as "Sydney Lester" being quoted by Defendants as "Sydeny Lester."

10.    Mr. Englebert forwarded Plaintiff's August 11 and 16 emails to DCRA's Office of the

General Counsel (DCRA OGC).  Ex. 5 at 6, 9.

RESPONSE: ADMITTED.

11.    On August 23, 2016, DCRA OGC referred S.B. to the Board of Ethics and Government

Accountability (BEGA), writing in part, that it was doing so out of an "abundance of caution" after

Mr. Englebert and Mr. Lester "indicated . . . that [Plaintiff] has a long held personal vendetta

against [S.B.] for unknown reasons" and "that they believe this allegation is unlikely to be true"

but "agree[d] that they [could not] confirm whether the allegation is true or not because they are

not on the same floor as the employees when they are at the permit counter, issuing permits."  Ex.

5 at 5.

RESPONSE: ADMITTED.

12.    On August 31, 2016, Mr. Lester wrote Plaintiff, in part:

You have been a member of the Fire Protection Engineering Review team for
several years and during that time you have made several allegation about the
conduct of your co-worker [S.B.].  These allegations became more and more serious
as time progressed.  You have made some recent allegations which have now placed
us at a stage where the allegations have legal implications that cannot be ignored.
We have contacted our legal staff and at this time, after their review, there is no
evidence to conclude any wrong doing.

Since you have made these allegations, if you are in possession of any proof that
backs up your allegations you should present them.  Both Mr. Gary Englebert and
I are available to mee[t] with you to discuss any proof that exists.

Ex. 1 at 60.

RESPONSE: ADMITTED that Mr. Lester wrote this.

13.    "Around that time," Plaintiff says, in part, "Joyce Smith gave Plaintiff a slip of paper with

the tracking number of two applications that were submitted by S.Y.C. and reviewed by S.B. . . .

On September 1, 2016, Plaintiff had a meeting with [Mr. Englebert] and [Mr.] Lester as scheduled." Ex. 9 at 4.

      RESPONSE: ADMITTED.

14.    On September 1, 2016, DCRA OGC forwarded more information from Mr. Englebert to BEGA, writing in part, that the information showed that S.B. had "conduced a fire review of a permit submitted by his wife's company" and indicated that Mr. Englebert "is now reviewing all of [S.B.'s wife's company's] permit applications to determine whether there are any that show [S.B.] acted on these applications." Ex. 5 at 5.

      RESPONSE: ADMITTED.

15.    On September 2 and 8, 2016, DCRA OGC forwarded BEGA spreadsheets showing what permits were connected to both S.B. and his wife.  Exhibit 5 at 3-4.

      RESPONSE: ADMITTED.

16.    On September 29, 2016, Plaintiff wrote to DCRA Human Resources (DCRA HR), in part:
In August, I reported to Gary Englebert my concern of a possible conflict of interest in [S.B.] conducts.  Gary relayed the information to Sydney Lester.  Quickly, I received an email from Sydeny Lester . . .  He stated 'We have contacted our legal staff and at this time, after their review, there is no evidence to conclude any wrong doing.'

I was surprised by his quick assertion since there was no reference to the facts work / investigation he has finished and how he can come to this conclusion.   On September 1st, Gary Englebert, Sydeny Lester and I had a meeting scheduled. . . . [H]e demented me to provide proof and I did.

A few days later, Gary Englebert informed me that IT people conducted a search by then it was found [S.B.] had reviewed seventeen (17) of his wife's jobs in the past few years . . . .  [T]he fact is S█████ B█████ has taken TWO fatherhood leaves for TWO children, one early in 2015, one this year a few months ago. . . .

My understanding was:  A supervisor is expected to monitor and take action to remove issues concerning business operation and to serve the best interest of the agency.  It seems to me that Sydney Lester does not meet the standard.

- He failed to identify and report this problem in the first place, which has been going on for years.
- After he received a report, he still did not take the initiative to locate the problem. . . . My point here is even I were not able to present any proof immediately – due to my position in the organization and limited access to certain information – that still does not mean the problem was not in existence.
- Sydney Lester, as a supervisor should have been the one to search for and locate the problem, in which case the 'allegation' (his word) would have become substantiation a long time ago.

Ex. 1 at 58.

RESPONSE: Request to strike the paragraph as another example of Defendants'

pointless violation of the Court's instruction to limit each paragraph to one asserted

fact. Further, DISPUTED that this is an accurate representation of the document

(*compare* Defs. Ex. 1 at 58), given problems with the purported quote such as:

(a) Defendants introduced errors into the quoted text, such as by changing multiple references by Plaintiff to Sydney Lester to read "Sydeny Lester."

(b) Defendants at times deleted words without use of ellipses. For example, "was very surprised" became "was surprised"; "what work/investigation" lost the "what"; and "meeting as scheduled" lost the "as."

(c) The reference to two fatherhood leaves for two children is taken out of context so that the real reason it was mentioned is lost. That is, Defendants deleted the sentence before that one in which Plaintiff explained that Sydney Lester justified S.B.'s handling the permit applications of S.B.'s wife by contending that S.B. had not yet married her. While Plaintiff mentioned the sons between S.B. and his wife to show they already had a close enough relationship that it was a conflict of interest for S.B. to handle her permits, Defendants' version in the quote above instead leaves the reader thinking the mention of the sons is an irrelevant/unnecessary disclosure of S.B.'s personal life.

17.    On October 31, 2016, Plaintiff wrote BEGA Investigator Ileana Corrales, in part:  "Is there

update you can provide?  As said, I do not know the job number of the 17 jobs referred to.  If you

need, you can provide the numbers and the I can send you the application of those jobs in PDF. . . ."  Ex. 5 at 1.

> RESPONSE: DISPUTED. The ellipsed words make this quote misleading by leaving out that Plaintiff sought the applications so "you [the investigator] can see the name of the applicant is always conspicuous on the [*sic*] each application." (That is, Plaintiff was demonstrating S.B. would have known his wife was the applicant on permits he handled.) Defendants also deleted Plaintiff's note that she was attaching an application as proof of this. *Compare* Defs. Ex. 5 at 1 (original document).

18.    On October 16, 2018, Plaintiff wrote, in part:  "He met her at the counter and started secretly doing her jobs until caught by BEGA.  He did many many jobs and he was fined $1,000 by BEGA in December 2016, for 2 jobs."  Ex. 1 at 139; see also Ex. 7 at 4 (March 5, 2017).

> RESPONSE: ADMITTED to the extent that S.B. violated conflict-of-interest rules by handling her jobs and was fined $1,000—as supported by the second citation (Defs. Ex. 7 at 4), which is to a document in which Plaintiff provided a link to S.B.'s admission of guilt. But DISPUTED this is an accurate quote from Plaintiff, as Defendant changed "secretly helping her with her jobs" to "secretly doing her jobs." As well, the difference between the number of jobs improperly handled and those for which S.B. was fined is obscured by Defendants' deleting Plaintiff's explanation that he escaped responsibility for others based on arguing he was not yet married when handling her applications. *Compare* Defs. Ex. 1 at 139 (original document).

19.    On March 5, 2017, Plaintiff wrote to OIG, in part:

. . . .  Speaking for myself, I NEVER saw her with a baby girl in DCRA's building, not even once.

. . . . [S.B.] took 3 weeks off in December.  My supervisor noticed one of my teammates that [S.B.] has a lot of paternity leave unused.  Since January 2017, he has been taking Monday and Wednesday off to consume his paternity leave."

Ex. 7 at 4.

RESPONSE: ADMITTED.

20.     On May 15, 2017, Plaintiff wrote to OIG, in part:

Let me tell you something Sir:  Even [S.B.] himself did not expect he could 'make it' this well and this far.  He took measured steps.  He used this PFL only for 2 weeks in 2016.  He finished the majority part of it between January and March of 2017 when he felt he was totally safe.  OIG should interview him.  When he is sitting in front of OIG investigation, you will find the answer in his eyes in 2 seconds.  Justice awaited!"

Ex. 7 at 18; see also Ex. 1 at 111-12, 142-43.

RESPONSE: ADMITTED.

21.     Plaintiff testified that she heard "from my communication with my – like with the general public and also from report of my other co-workers, they saw S.B.'s wife have a very big waist, a belly.  I believed that she was wearing some precisely foreign object underneath her clothes to fake pregnancy," and that "[s]he always wears clothes.  I did not see that pillow."  Ex. 12 at 16; see id. at 17-18.

RESPONSE: ADMITTED.

22.     On May 12, 2017, Plaintiff wrote to DCRA HR, in part: "He put a family shot in his cubicle since last November (still there) which the girl is a baby of another woman ([R.B.] who lives in Jamaica?!?!  If he really had a baby of his own, why wouldn't he have his own baby in photo?" Ex. 1 at 73 (emphasis original); see id. at 72.

RESPONSE: ADMITTED.

23.     Plaintiff contacted OIG to see if they had any updated on her original complaint on January 11, 2017.  Ex. 1 at 52-54.

RESPONSE: ADMITTED.

24.     On the afternoon February 1, 2017, OIG sent Plaintiff a D.C. FOIA response indicating

that her complaint had been referred to DCRA as the agency "in the best position to address the

issues raised." Ex. 1 at 56; see id. at 52-56, 62-63.

RESPONSE: ADMITTED.

25.     On February 2, 2017, S.B. wrote to Deputy Chief Building Official (DCBO) Bailey and

Mr. Lester, in part:

> I have remained fairly quite over the years since Ms. Luchi Lubegan her relentless
> pursuit of direct and indirect personal attacks against me at work.  This all started
> in late 2007 towards early 2008 . . . and she still continues to do this for some
> unknown reason . . . .
>
> In recent months, she escalated this behavior . . . .  At that point it became very
> clear to me that her objective is to first damage my reputation here at work, smear
> my name throughout the Agency as someone that cannot be trusted (defamation of
> character), which obviously is designed as an attempt to end my career as a District
> Government employee.  Seeing that this is the case, it is a threat to my livelihood,
> which helps to put food on the family table, therefore threatening my family.
>
> Again, just a week ago during our morning meeting on 1/26/2017, which was held
> on the floor of the Permit Center, she found the time to do a google search on 'fake
> pregnancies' [ ] yes, bizarre!  Knowing that I was the Reviewer assigned to the Fire
> review counter after the meeting ends, she made sure that a printed copy of her
> google 'findings' was left on top of the stamps in the drawer for me to see it.  One
> may ask, what is her motive?  For me it was a direct non-verbal accusation at me
> (us) that my wife's pregnancy last year was faked in order for me to have been
> granted paid family leave (PFL)
> . . . .
>
> I believe this is clear harassment, and her conduct only serves to generate a hostile
> work environment; this need to be addressed as soon as possible and should be
> documented for the record.  This conduct does not belong in our work place!
>
> Ex. 1 at 40; see 9-10, 39.

RESPONSE: Plaintiff requests the Court strike this as violating the Court's order to limit

each factual assertion paragraph to a single fact. As well, DISPUTED that this is an

accurate representation of the original document for reasons such as (*compare* Defs. Ex. 1 at 40, pp. 9-10, 39) that Defendants add typos. For example, "Luchi Lu began" is misquoted as "Luchi Lubegan."  It also is disputed to be an accurate representation of the original document in that Defendants use ellipses in a manner that misdirects the reader as to all that motivated S.B. to complain. E.g., Defendants quote S.B. as follows: "In recent months, she escalated this behavior…" *They delete*: ", by reporting me to the Board of Ethics and Government Accountability office (BEGA) accusing me of misconduct in performing my duties here at work that involves my wife." That is, this overly abbreviated quote hides the fact that S.B. also was upset over Plaintiff's reporting him to BEGA for ethics violations. *Compare* Defs. Ex. 1 at 57-58 (Plaintiff emailing BEGA about ethics issues in late October 26), Plf. Opp. App. 23-26 (December 2016 BEGA negotiated disposition of charges against S.B.), *and* Defs. Ex. 1 at 15 (referencing Plaintiff's communications to BEGA on leave fraud in May 2017). In summary, S.B.'s objection in early February 2017 about Plaintiff's reporting him to BEGA must have been about the 2016 disclosures of conflict-of-interest violations, because Plaintiff did not forward the leave-fraud issue to BEGA until May 2017. By deleting the mention of how S.B. was upset at Plaintiff over her previous whistleblowing and its outcome, Defendants' quote is misleading and so disputed.

26.     DCBO Christopher Bailey provided DCRA HR a witness statement in February 2017 stating:

> Statement
> Location third floor POD office.
> Time during the POD Thursday meeting 9:10am
> On Thursday, February 2nd
>
> Ms. Luchi Lu, voiced a common in the q&a portion of the meeting abruptly changing the subject from office procedure to a personal statement began with a question to management

'how do we handle another employee using their wife with a fake belly to fake a pregnancy and then the father requesting family leave?'

There was not any warning and no reason to bring this information and or comment to an office meeting.  I told Ms. Lu 'I do not understand your question and if it is not beneficial to this discussion she needed to clarify offline?'

Ex. 1 at 37; see 9-10, 39.

RESPONSE: ADMITTED.

27.    Mr. Bailey forwarded S.B.'s email and his own account of the February 2, 2017 meeting to DCRA Human Resources (DCRA HR) Officer Ingrid Jackson in the Office of then Chief Administrative Officer (CAO) Walter Crawford.  Ex. 1 at 39-40, 9-10.

RESPONSE: ADMITTED.

28.    On February 7, 2017, Plaintiff forwarded her OIG D.C. FOIA response to DCRA HR and identified herself as the complainant, stated, in part, that she "originally[ ] thought OIG would be in a better position to probe this case[ ] as . . . a law enforcement entity," and asked "to hear some update from" DCRA HR as to "whether it has been substantiated ([S.B.] did not have a baby in May 2016), or unsubstantiated (he did)."  Ex. 1 at 62.

RESPONSE: ADMITTED, notwithstanding minor variances between the document and Defendants' quote of it, such as with removal of parentheses from around "originally."

29.    On March 5, 2017, Plaintiff wrote to OIG, in part:

On February 10th I went upstairs to Mr. Crawford's office and had a conversation with him.  He advised me that there was no problem, the agency has verified the documents  [S.B.] had submitted for paternity leave approval, he said 'the documents have met the government standard for an approval.'

Ex. 7 at 4; see Ex. 1 at 77.

RESPONSE: DISPUTED to extent relying on the cited pages for the source.

30.     On February 10, 2017, at 1:32 p.m. Plaintiff wrote CAO Crawford and DCRA HR, in part:

Thank you for taking the time to notify me [of] the result of this complaint.  It has been a little bit distraction given the prolonged investigation.  Now it has come to end  makes a good relief.  I respect and take it as our agency's decision.
As stated, I was relying on my observation and comprehension as well as information voluntarily shared with me by several of my coworkers.  I handled my reports and all information professionally and responsibly.  Below is the original / first report I sent to OIG on June 16, 2016.  I just want to be totally candid and open with all you  HR  professional  what I actually did, so as to clear out any misunderstanding, if any.
From now on, there will no more communications from me on this matter.  You have my word.  Thank you all for your time.

Ex. 1 at 64.

RESPONSE: ADMITTED, notwithstanding minor misquoting of the original, such

as in leaving out the "and" in "to end and makes a good relief"

31.     On March 5, 2017, Plaintiff wrote to OIG, in part:

My mentality is:  Regardless whether it is going to be substantiated or not I am not doing anything wrong. . . .  By then, I really wanted to stop. . . . .  However, after DCRA received a letter from OIG on October 28 last year, which they knew there has been a lot suspicions that this may be fraud, DCRA should have taken some NEW actions to investigate by requesting NEW proof, they should not still go by the same/old documents which had been accepted in the first place.  DCRA should verify his medical insurance statement to see if there is a statement for 'induced labor' , and also request him to submit a government issued Birth Certificate.

I've been thinking of it during the weekend.  I don't want to form a negative impression of my agency's HR as if they don't take care of business seriously.  I trust there is something they see I don't see, while I also believe there is something I see they don't see.  So communication is key.  Driven by this kind of mindset, I prepared a report during the weekend of February 18 and 19, please refer to my attachment [V] vs. [L]-DCRA which I sent to my agency . . . on Tuesday February 21st.  I included photos pasted from the **public profile** of [S.B.]'s wife's Facebook . . . .

Ex. 7 at 2; see Ex. 1 at 73; Ex. 7 at 7-13; Ex. 12 at 75-77.

RESPONSE: Objection to violation of the Order to limit each paragraph to one

asserted fact. Additionally DISPUTED IN PART as Defendants again provide a

lengthy quote but delete interior portions that are unhelpful to them, leaving a misleading impression. For example, after the statement about Plaintiff's mentality being that—whether or not her reports are substantiated—she's doing nothing wrong, Defendants use ellipses to delete *the remainder of the sentence, which after a comma said*, "I am honestly and responsibly reporting an issue to my agency as a DC Government employee, which has reflected my professional and open attitude to work with my agency on this issue." *Compare* Defs. Ex. 7 at 2 (original document). While Defendants are free to use ellipses, they cannot do so to cut off half a sentence in order to leave an alternate impression; it appears as if Defendants would find it acceptable—if helpful to their case—to cite Nathan Hale's "I only regret that I have but one life to lose for my country" as "I only regret that I have but one…country."

32.    On September 19, 2017, Plaintiff wrote to the Executive Office of the Mayor (EOM), in part:

> I then sent a report . . . with new evidence to DCRA's HR in February. The contents of this report were not included in my 1st email to OIG. They are 8 months apart and approached from different directions, yet they matched materially to support the same conclusion: My coworker [S.B.] took 8 weeks government paid fatherhood leave WITHOUT having a baby.

Ex. 1 at 93-94.

> RESPONSE: DISPUTED that such wording appears on the cited pages, but ADMITTED that similar wording was sent on that date from Plaintiff to the mayor.

33.    On Tuesday, February 21, Plaintiff wrote to DCRA HR, in part:

> Please see attachment, a fact and common sense based report with new information. Sorry I did not keep my promise, but for a good reason, considering the coincidence of the SAME LAST NAME of baby [L], in case it was overlooked, in the first place

I thought OIG is able to investigate it.  I just realized a lot of information can be verified in his PeopleSoft, under Dependents and Beneficiaries.

Ex. 1 at 74.

RESPONSE: ADMITTED.

34.     On Friday, February 24, 2017, at 2:45 p.m., Plaintiff asked DCRA HR:  "Has this provided some new perspective?" Ex. 1 at 74.

RESPONSE: ADMITTED.

35.     On Friday, February 24, 2017, at 3:13 p.m., DCRA answered:  "This has not provided any new perspective, the agency has confirmed all required documentation needed for an approval." Ex. 1 at 74.

RESPONSE: ADMITTED that DCRA answered with such wording.

36.     On February 24, 2017, at 3:23 p.m., Plaintiff responded to DCRA HR:

Woww.. We are just his coworkers, not law enforcement.  We can sense something wrong even from his eyes and facial expression when someone was asking him about baby.  I figured he may have submitted forged document but I certainly have no proof myself.  See if he would put Thanksgiving (Santa) photo there forever.

Ex. 6 at 1; see Ex. 12 at 89.

RESPONSE: Other than minor misquoting, ADMITTED.

37.     On March 5, 2017, Plaintiff wrote to OIG, in part, about a February 27, 2017, phone call with CAO Crawford:

At this point, I felt very frustrated to pursue any further.  I have sensed very evidence unwillingness of my agency to take any initiative to investigate and to request any new proof.  I decided to talk to Mr. Crawford again.  I called Mr. Crawford from home using my cell phone, the conversation did not go well.  At this point, Mr. Crawford became very impatient.  He pretty much dominated the conversation.  This is what he delivered over the phone to me, not exactly word-for-word quest, but the gist:

Let me tell you there is no issue.  There's no issue with the agency or the government.  We have verified the documents he submitted for approval,

everything is fine and there is no problem with it.  It's time for you to go back to work.  This is an employee's personal life and it's not your business.

You reported to OIG.  OIG dismissed your case.  And now you come back to the agency and you continue to harass an employee's personal life.  I have told you and I'm telling you again:  there is no issue.  The agency has no issue with it.

You don't have complete information as we do.  You don't have the entire information.  I read your report.  You draw your own conclusion.  If you continue to be so stuck on an employee's personal life, you will be dealt with.  You hear me?  Thank you.
. . . .

Because he was too dominate, I was not able to defend myself on the 'harassing his privacy' part. . . .

Ex. 7 at 3; see Ex. 1 at 93-94, 109.

RESPONSE: Request to strike as violating the Order to limit each paragraph to one factual

assertion and DISPUTED in that Defendants misquoted the original, such as in "evident

unwillingness" quoted as "evidence unwillingness." *Compare* Defs. Ex. 7 at 3 (original).

38.    On September 15, 2017, Plaintiff wrote to her union shop steward, in part:

I am sending this email with attachments to ask for your advice on this matter how to deal with HR and those management.  When you read the chains from the very bottom, you can see it has bothered and distracted me for a long time, especially when I called Walter Crawford on 2-27 this year, over the phone he used the word 'harassing' on me, I was very angry. . . .
. . . .
. . . . I am kind of inspired by Mr. Crawford wrong word he used on me.  I want to prove he is wrong!  . . . .

Ex. 1 at 93-94; see id. at 18-19.

RESPONSE: ADMITTED.[1]

---

[1] Plaintiff understands the D.C. Circuit not to be one in which an employee in a case like this could assert a privilege based on confidential union-member communication. She nonetheless trusts that the Court will consider that what she said to the union reflected the lack of self-censoring of someone who believed at the time the communications were confidential (just as a client might say things to their attorney that are more rash than the client feels long-term or in other settings).

39.    On March 5, 2017, Plaintiff wrote OIG:

"If something is real, every detail shall add up automatically.   But there is something wrong about his having a baby, as outlined in my report . . . .   Thought there may be other possibilities, it is highly suspicious especially on the two names of the baby:  [V] and [L]. . . .   Things don't add up at all, there must be reason for it, we don't experience knots for no reason.

. . . .   I am here asking OIG PLEASE DO NOT transfer it to my agency this time . . . .

I would suggest a simple face-to-face interview will get you the most information. DCHR . . . can also help verify the information he entered in his People Soft under Dependents and Beneficiaries.  OIG can check his Aetna, Kaiser statement to see if there is an item for induced labor for May 19th, and request Birth Certification.

If anything here is not clear, if OIG requires clarification or any new information, please let me know.

Ex. 7 at 4.

RESPONSE: ADMITTED.

40.    Plaintiff's Facebook report concluded that S.B.'s wife posted a baby picture of one of their son's as a baby [V] in July 2016, and that they used the daughter [L] of a family friend [R.B.] to create the appearance of a daughter on S.B.'s wife's Facebook and S.B.'s cubicle in November 2016.  See Ex. 1 at 72-73, 77-79, Ex. 7 at 2-4, 7-13; Ex. 12 at 68-69.

RESPONSE: ADMITTED.

41.    On May10, 2017, at 1:46 p.m., OIG emailed Plaintiff:  "This correspondence is in response to your complaint regarding time and attendance and Paid Family Leave fraud.  The Office of Inspector General (OIG) conduced an independent analysis of the documentation provided by the Department of Consumer and Regulatory Affairs (DCRA) and determined that no further action by the OIG is warranted.

Please be advised that the D.C. OIG considers this matter closed. . . .

Ex. 7 at 15; see Ex. 1 at 14.

RESPONSE: ADMITTED that OIG claimed to Plaintiff it reviewed documentation and

found it appropriate to close the case.

42.   On May 11, 2017, Plaintiff responded to OIG:

This case is closed by OIG based on analysis of documentation provided only by
DCRA.  What about the other information including her Facebook provided by me?
. . .  OIG shall not unilaterally rely on one source (DCRA) and totally ignored and
excluded the other (my reports).  This approach itself is not independent and is
unfair to me.
. . . .
Please do advise what will make new and acceptable proof to OIG to reopen this
case.

Ex. 7 at 14.

RESPONSE: DISPUTED in that Defendants again have deleted words within a sentence

in a manner that leaves a mistaken impression when compared with the original quote. For

example, Plaintiff's statement above about OIG "shall not unilaterally rely on one source"

omits the start of that sentence, which was "When evidence from different parties runs in

different directions," *Compare* Defs. Ex. 7 at 14 (original document).

43.   On May 12, 2017, at 12:03 p.m., Plaintiff wrote DCRA HR:

I am sending this email as a follow-up and new inquiry to learn:  if I have NEW
evidence to indicate this is a fraud, now is it good time to talk about it?  You know
my allegation is:  He does NOT have a daughter . . . .  He took 8 weeks government
paid fatherhood leave WITHOUT having a baby.  I still believe that is the truth.  I
know it sounds crazy.  My new evidence includes some changes on her Facebook
and conversations between her and staff on the 2nd floor at permit center.

Ex. 1 at 72; see id. at 73.

RESPONSE: ADMITTED.

44.   On May 12, 2017, at 12:44 p.m., DCRA HR responded:

As it stands, all required documentation has been provided by the employee for
approved Paid Family Leave (PFL).
I refrain from personal opinions when making decisions related to my position and
rely heavily on  facts based on  presentation of  evidence; which in  this case  is

confidential.  I would ask that you respect the required confidentiality of medical documentation and understand we would do the same for you, if the roles were reversed.
I will not address why an individual chooses to represent or not represent a family member in their cubicle.  This is an individual's choice and not a requirement for any position in the agency."

Ex. 1 at 72.

RESPONSE: DISPUTED in excluding (without Defendants' acknowledging the quote as

partial) the HR Specialist's statement thanking Plaintiff for following up and presenting

new information to the agency. Also contains minor misquotes—such as "is confidential"

quoted as "are confidential" and "at the agency" to "in the agency"). But ADMITTED that

DCRA HR here asserted to Plaintiff all required documentation was submitted by S.B.

45.     Plaintiff emailed BEGA about and with her allegations on May 10, 2017, at 3:38 p.m., and

4:34 p.m., and again on May 25, 2017.  Ex. 1 at 70-71, 77-79; see also id. at 80-81.

        RESPONSE: ADMITTED.

46.     On July 24, 2017, BEGA sent Plaintiff a letter via email stating that there was "insufficient

evidence to support a reasonable belief that a violation of the Code of Conduct occurred."  Ex. 1

at 83; see id. at 81-82.

        RESPONSE: ADMITTED that BEGA here asserted there was not enough evidence to

        conclude the Code of Conduct was violated.

47.     On July 25, 2017, Plaintiff responded to BEGA, in part:

        . . . .  In this case, the evidence was totally from her own Facebook not anybody
        else's. . . .  Bega shall not only rely on the paper they provided (and the interview)
        and at the same time totally ignore the co-existence of strong evidence presented
        by her own's Facebook as she is (supposed to be) the mother of the 'baby.'  This is
        a partial opinion.  Without a clearly outlined known definition of sufficiency,
        BEGA cannot conclude whether the evidence I presented is insufficient.  I am the
        complainant of this case, can I appeal?

Yes, this case does involve an employee's spouse, who is so willing to cooperate in a deliberate fraud, but is does not involve a 'child'. . . .

Ex. 1 at 80; see also id. at 81.

RESPONSE: DISPUTED in that Defendants again misquote original text, such as by leaving out "not the subject" as to "I am the complainant of this case, not the subject, being the case can I appeal." The citation of page 80 also is erroneous (but 81 isn't).

48. On August 3, 2017, Plaintiff responded to BEGA's rejection of her request for reconsideration by stating, in part:  "If you have a definition and/or guidelines of sufficient evidence, I will do my best to meet your standard."  Ex. 1 at 84; see see id. at 80, 85.

RESPONSE: DISPUTED in that the quote is not exact (*compare* to original at Defs. Ex. 1 at 84), but ADMITTED as to Plaintiff's making a similar statement in an August 3, 2017 email.

49. On September 11, 2017, DCRA HR Officer Ingrid Jackson wrote Plaintiff:

I apologize for my tardy response.  Based on my review of his records, [S.B.] has met all of the District government requirements in order to be eligible for the Paid Family Leave and has taken the Leave in accordance with the regulations.  Further review reflects that your concerns have been investigated by both the Office of the Inspector General (OIG) and the Board of Ethics and Government Accountability (BEGA).  The OIG and the BEGA informed the agency that they could not find any cause for the agency to take any disciplinary action against [S.B.] and that the case is now closed.

At this point, there is no further action required by representatives of the DC Department of Consumer and Regulatory Affairs (DCRA) or any other District government agency.

Please consider this the final response on behalf of the agency as the matter has been investigated and deemed closed.

Ex. 1 at 90.

RESPONSE: ADMITTED that Ms. Jackson informed Plaintiff that the District concluded all requirements for leave had been met and the matter was now closed.

50.     On September 15, 2017, Plaintiff wrote to her union shop steward, in part:

> I am sending this email with attachments to ask for your advice on this matter how to deal with HR and those management. . . . . We firmly believe this is a fraud, it involves knowingly using and providing a forged document with intent to defraud, it is a felony crime.  He DOES NOT have a baby.  HR deliberately avoid finding the truth by NOT verifying the document he provided.  They are not only negligent but also abused the system.
>
> As stated, it is very easy to prove there exists a human being if there is one and there are many ways to prove it. . . .
>
> . . . .
>
> How to handle this deadlock to reveal the truth and get myself out trouble?  I want to learn how to cope and deal those management on this situation.  I wanted to move on so I can totally concentrate on my work on this end.  Thank you !

Ex. 1 at 93-94.

RESPONSE: ADMITTED, notwithstanding minor misquotes.

51.     On September 19, 2017, at 11:07 a.m., Plaintiff emailed the Executive Office of the Mayor

(EOM) with her allegations, stating in part:  "My coworker [S.B.] took 8 weeks government paid

leave WITHOUT having a baby."  Ex. 1 at 92.

RESPONSE: ADMITTED.

52.     On September 26, 2017, Plaintiff again wrote EOM, in part:

You don't' need to transfer to an agency you knew is irrelevant.  That would be waste of time of you, mine and that party.  Working on this matter with multiple DC government agencies, I have learnt the technique how an agency appeared to be doing something by carefully bypassing the very essential part, don't want to see it more."

Ex. 1 at 97; see id. at 96.

RESPONSE: ADMITTED notwithstanding minor misquoting.

53.     On September 27, 2017, Plaintiff wrote EOM, in part:

Lying about having a baby who is a human being shouldn't be easy.  Yet he made it well and this huge lie has passed three DC government agencies.  At DCRA we are amazed by [S.B.]'s feat, yet

we are more amazed by DCRA's inaction.  We are expecting your office to take legitimate action to render the truth. . . .

Ex. 1 at 99.

RESPONSE: ADMITTED.

54.    On September 27, 2017, EOM wrote Plaintiff, in part:

This matter has been reported to and investigated by your agency, DCRA, the Office of the Inspector General, and the Board of Ethics and Government Accountability.  I have also discussed the report with DCHR.  Your allegations have been investigated by the aforementioned agencies and they have taken appropriate action.  Thank you for brining this to our attention, there will be no further action taken on our end.

Ex. 1 at 98.

RESPONSE: ADMITTED (except for misquoting "bringing" as "brining") that this was

the response of the Executive Office of the Mayor on the date noted.

55.    On November 27, 2017, Plaintiff wrote to the Director of DCHR, in part:

I called you on Wednesday (11-22) and someone helped taking a message.  I am waiting for your response.

Long story short:  My coworker [S.B.] submitted a fake Birth Certificate in May 2016, his wife was wearing a silicone bump underneath her clothes and walking around in DCRA.  He received and took 8 weeks government paid paternity leave with no baby.  This is a fraud involving a forgery crime . . . .

Ex. 1 at 102.

RESPONSE: ADMITTED, to the extent acknowledged to also have included this

statement (*compare* Defs. Ex. 1 at 102), "DCRA and OIG and BEGA closed this case based

on their assumption and opinion that the paper he submitted was not fake[,] without official

verification and confirmation from the issuing authority."

56.    On November 28, 2017, the DCHR Director emailed Plaintiff, in part:  "Please know that

DCHR, OIG[,] and BEGA looked into your allegations and found no merit to your claim.  As

explained to you by members of my staff, this matter is now closed."  Ex. 1 at 101.

RESPONSE: ADMITTED that this was the DCHR Director's response.

57.     On February 20, 2018, Plaintiff sent an email from her personal account to her government

account, addressed to her union representative under the subject heading "Request for a meeting,"

stating, in part:

> I have forwarded you some of my emails about the fake baby before.  [S.B.] claimed
> he had a baby born in May 2016, and he took 8 weeks government paid fatherhood
> leave.  My stand is:  The baby he took 8 weeks government paid fatherhood leave
> for  does NOT physically exist in this world.  In other words There was no baby.  It
> is a fraud. – If it involved using a fake Birth Certificate, then he also committed a
> forgery crime . . . .
> . . . .
>
> Recently (and accidentally) I obtained an email which [S.B.] sent to Chris Bailey
> on 2-2-2017 . . . this is his harassment complaint he filed to DCRA and Mr.
> Crawford call me 'harassing' based on information in this email without verifying
> anything with me from my side.
> . . . .
>
> My main questions are:
> •       Why did he react to a Google Search with nobody's name on it?
> •       Why is his mind there for his wife?
> •       Why did he choose to relate a google search to his wife's pregnancy and
> then deny the connection?
> •       Why did a google search especially bother him?
> •       This sheet of paper is about FAKE pregnancy, if his wife's pregnancy is not
> fake, then that would mean this page has no bearing on his wife at all, why did he
> call it harassment"  Why did he call it harassment TO HIM?
>
> I need to hear from them why a google screen shot constituted harassment to him.
> Why is his mind there?  DCRA did not very anything mentioned in this email with
> me, but just used this harassment word on me.  It is unjust and unfair to me!"

Ex. 1 at 109-10; see id. at 111 D262 (follow up email on meeting with union
representatives); see also id. at 18-19, 116-17.

RESPONSE: Request to strike as violating the Court's Order to limit each paragraph to a

single asserted fact. DISPUTED that this is an accurate representation of the original, for

reasons such as that: (a) the email in fact was not from her home account to her government

account as claimed, but instead the other way around; (b) the quote is misleading in being

quite lengthy yet deleting a list of eight reasons Plaintiff found it reasonable to believe

fraud had occurred; and (c) the lengthy quote deletes Plaintiff's explanation of how S.B.

should not be able to claim her report to BEGA was defamatory given that S.B. went on to

admit fault and pay a $1,000 fine (with Plaintiff's having provided a citation to BEGA's

internet copy of the agreed disposition with S.B.). *Compare* Ex. 1 at 109-110.

58.     On March 8, 2018, Plaintiff wrote to DCRA Program Analyst (and training sexual

harassment officer) Rohan Reid, in part:

He attempted to use a false harassment on me to cover his own fraud" in February and March
2018.
. . . .
I don't want to talk to HR again since they did not put any record on me.  I just felt it's unfair to
me.  I also had talked to my union.  They advised me since HR chose to let it go just let it go.
Otherwise I will become the problem not him.

Ex. 1 at 116-17; see also id. at 109-11, 117-19.

> RESPONSE: DISPUTED to the extent relying on pages 116-117 versus 115-116 and to
>
> the extent deleting the portions of the email that explain Plaintiff was alerting him to the
>
> concern that the subject of whistleblowing may be able to escape responsibility simply by
>
> asserting falsely to be suffering "harassment" even where no sexual harassment was
>
> involved. Likewise the recitation is incomplete without noting Plaintiff ended the contact
>
> by writing that "I will move on and continue to stay positive and let it go. Thank you again."
>
> *Compare* Defs. Exh. 1 at 115-116 (original document).

59.     On April 12, 2019, Plaintiff wrote, in part:

During the process, I gradually realized that I'm overpowered, and in an endangerment that I have
let biased DCRA decide if it is biased.  I started contacting local media outlets, and City Council.
In a hope their leverage can help bring out the truth.  In all initial contacts, I did NOT mention his
name until they clearly expressed interest in the story.

Ex. 3 at 32; see id. at 1.

RESPONSE: ADMITTED.

60.    Plaintiff saw a little girl with S.B.'s wife in the ladies' room at DCRA in October 2018. Ex. 12 at Ex. 12 at 75-77, 81-82.

RESPONSE: ADMITTED.

61.    On October 16, 2018, at 2:27 p.m., Plaintiff sent an email to various D.C. Council email addresses, writing, in part:

> I am sending this email to report an unbelievable fraud and forgery crime committed by one of my colleagues here at DCRA, and the negligence of many DC government agencies including the Mayor's office. . . .
>
> . . . . In May 2016, he submitted a FAKE birth certificate he bought online to DCRA's HR – literally a paper with the 2 words 'birth and 'certificate' on it, with his and his wife's name and a name they made up for the child who does NOT exist. His wife was wearing a silicone bump underneath her clothes and walking around DCRA  He took 8 weeks government paid paternity leave WITHOUT having a baby.  This is a fraud and forgery crime . . . .

Ex. 1 at 135.

RESPONSE: ADMITTED.

62.    On October 16, 2018, at 2:56 p.m., Plaintiff sent an email to various D.C. Council email addresses in response ("Re:") to her earlier email, writing, in part:  "[T]hey allowed him to continually file 'harassment complaint' and use the term 'harassment' to get away with it." Ex. 1 at 138; see id. at 139.

RESPONSE: ADMITTED.

63.    Plaintiff testified that she "always though this [R.B.] was family friend.  It is beyond my wildest imagination this lady is actually his stepmother" until "he told me.  My step mother, [R.B.], that's what he said, word-for-word" in the Third Floor Pantry.  Ex. 12 at 69; see Ex. 7 at 7, 15; Ex. 12 at 68-71.

RESPONSE: DISPUTED in that the assertion strings things together to which Plaintiff did not testify to in those citations (such as the pantry location for the conversation), but ADMITTED generally that Plaintiff has asserted she learned from a conversation in a pantry at work with S.B. that R.B. [who is in some of the photos] is S.B.'s stepmother.

64.     On November 2, 2018, Plaintiff requested an update on one Councilmember's referral of her complaint to OIG. Ex. 1 at 140.

RESPONSE: ADMITTED.

65.     On November 8, 2018, at 11:21 a.m., Plaintiff asked the same Councilmember how OIG's "3rd time to review this same case" was going because "[t]here must be a definite conclusion, with proof." Ex. 1 at 141.

RESPONSE: ADMITTED with the clarification that the "definite conclusion" reference followed reference to there being a baby or not.

66.     On November 26, 2018 wrote the same Councilmember, in part:

We gathered some important information recently just wish to share with you. . . . It is confirmed by his only family member that the girl in the Santa picture . . . is [S.B.]'s paternal half-sister. . . . [S.B.] is nearly 50 years old. Usually it is not common for a 50-year old to have a toddler half-sibling. It will be up to your decision whether to share this with OIG. Hope OIG staff are able to untangle the complicity, just in case [S.B.] brings this girl to OIG's office for an DNA test, since OIG has no knowledge he has a paternal half-sister.

AFTER the fake girl of May 2016, he claimed he had another baby. Last December (2017), 11 months ago . . . . Nobody knows exactly whether this one is also a fake or not. What we know is that he did NOT take paternity leave for this one. It is possible he would negotiate to use the 8 weeks for this one to 'pay back' the fake one of May 2016. If DC government finally gets him. But the existence of this one is also a question mark.

. . . .

Here at DCRA we all say he is so 'lucky' . Because usually even in within the same family, when it comes to something very wrong and very indecent it is usually hard

to get full cooperation from the other half.  His wife is a sad exception. . . .  She has
been so eager and devoted to colluding and conspiring with him on this fraud, from
the very beginning. . . .

Ex. 1 at 142; see id. Ex. 1 at 143-44.

RESPONSE: ADMITTED, subject to objection that D.C. law prohibits interference with

Plaintiff's right to communicate with City Council members. D.C. Code Ann. § 1-

615.53(b) (Except where unlawful, shall not interfere with or deny right of employees "to

furnish information to the Council, a Council committee, or a Councilmember.")

67.    On November 8, 2018, at 11:46 a.m., S.B. wrote CAO Crawford an email titled,

"Workplace Harassment by Fellow Employee," stating, in part:

> The harassment issue with Luchi Lu is on the rise again, or should I say, still
> persists. A few days ago (last week) while I was waiting in the 3rd office pantry to
> warm my lunch, she was also present using the microwave.  Mr. Lester also
> happened to show up while I was waiting.  Surprisingly, Luchi then proceeded to
> question me in her usual sarcastic manner about my daughter, implying that my
> Stepmother ([R.B.]) was actually my daughter's mother; still referencing the
> picture she saw on the Facebook of my Stepmother and my daughter.
> Again today (11/8/2018), about 10:48am in the presence of Ms. Sharon Brown in
> the lobby Suite E340, she again, suggested to Ms. Brown (while I was discussing
> another issue with Ms. Brown), that she will be purchasing pillows to strap to her
> abdomen in order to obtain maternity leave, which <u>again</u>, is a direct accusation that
> my wife faked her pregnancy so that I could get family leave.
>
> . . . .  This is slanderous, and needs to stop.  This has been going on for over ten
> years.  How much longer do I really need to put up with this?  It's becoming
> unbearable!!
>
> I am hereby requesting again, PLEASE do something, because whatever you did
> last time seemed to be having little or no effect on her behavior.  This is causing
> great distraction each time I have to stop, restrain myself and refocus on my work.

Ex. 1 at 36.

RESPONSE: Request to strike as violating the Court's Order to limit factual

assertions to one per paragraph. Also DISPUTED that this is an accurate quote. For

example, the wording of the final sentence of the last paragraph above deletes (without identifying that something was deleted) S.B.'s claim that he suffered a "hostile work environment" due to Plaintiff's implying he had engaged in parental-leave fraud. *Compare* Defs. Ex. 1 at 36. As well, objection that D.C. law prohibits interference with Plaintiff's right to communicate with City Council members and so it would be inappropriate to use such communications against Plaintiff.

68.   On November 28, 2018, DCRA OGC assigned Special Investigator Lawson to investigate S.B.'s November 8, 2018 harassment complaint.  Ex. 1 at 1-2; Ex. 13 at 13-14.

   RESPONSE: ADMITTED.

69.   Special Investigator Lawson produced an "Investigative Report" with exhibits that was subsequently relied on by Mr. Lester and Mr. Whitescarver in issuing Plaintiff's proposed and imposed discipline and is reproduced in full as Exhibit 1 (Bearing Bates Stamp Nos. Lu v. DC et al1-20-cv-00461_00000151-226, 228-301).  See Ex. 2 at 1; Ex. 4 at 142-432; Ex. 14 at 8-9, 14; Ex. 15 at 13.

   RESPONSE: ADMITTED except to the extent this might imply the report accurately reflected the results of the investigation. Examples of the many inaccuracies are addressed under paragraph 71 below and so incorporated here by reference.

70.   Investigator Lawson was aware of a settlement between BEGA and S.B. but did not look into that as part of his investigation.  Ex. 13 at 8-10.

   RESPONSE: DISPUTED, on grounds such as that:

      (a) Mr. Lawson not only knew that Plaintiff had reported S.B. as having engaged in ethics violations, but he also knew that S.B. paid a $1,000 fine. *See* Defs. Ex. 1 at 22 (Investigator Lawson quoting a

Plaintiff email that mentioned the $1,000 BEGA fine of S.B.). Mr. Lawson included the source email for that reference as his Investigative Report Exhibit 39 (*see* Defs. Ex. 1 at 122, cited by Lawson at Defs. Ex. 1 at 22). *See also* Def. Ex. 1 at 135 (Lawson report exhibit #47, an email from Plaintiff to the City Council in which she mentions S.B.'s wife is a permit runner, that S.B. helped her with her jobs, and that he was fined $1,000 by BEGA in December 2016).

(b) Versus merely "not looking into it," Mr. Lawson actively disregarded S.B.'s earlier admission to an ethics violation and paying a $1,000 fine when Mr. Lawson weighed the credibility of S.B. versus Plaintiff. *Compare* Plf. Opp. App. 500 at ¶15 (Plaintiff testimony that during Lawson's interview of her, he had Plaintiff confirm she sent the ethics disclosure emails to BEGA) *with* citations just above noting multiple mentions in the Lawson Investigative Report and exhibits to S.B.'s paying the $1,000 ethics fine to BEGA.

(c) Mr. Lawson was aware Plaintiff had reported S.B.'s ethics violations at an earlier point in time, and even included them in his report, but misrepresented them as being about the parental-leave-fraud issues. *Compare* Defs. Ex. 1 at 12 (Lawson report including as part of the parental-leave-fraud discussion the fact that Plaintiff forwarded a complaint on October 27, 2016 and identifying it as the

Report's Exhibit 11) *with* Defs. Ex. 1 at 57-61 (email chain Plaintiff

sent to Mr. Lawson in September 2016 and on to BEGA on October

27, 2016) *and with id.* at 58-59. The latter pages confirm the emails

were about the ethics issues, not the parental leave fraud claim. So

it was misleading for Mr. Lawson to represent them as part of the

parental leave disclosure issues. Having been one of the recipients

of the original email chain in September 2016 and having included

it as an exhibit to his Investigative Report, presumably Mr. Lawson

read the emails and knew their true content.

In summary, Defendants' assertion is disputed as Investigator Lawson was aware of

Plaintiff's earlier disclosure of ethics violations by S.B., Lawson even included related

documents as exhibits in his Report, and he asked Plaintiff about them when questioning

her as part of his investigation.

71.     The Investigative Report included summaries of interviews taken by Investigator Lawson

in November and December 2018 that corroborated the incidents described in DCBO Bailey's

February 2, 2017 witness statement and S.B.'s February 2, 2017 and November 8, 2018 emails.

Ex. 1 at 4-10.

RESPONSE: DISPUTED—on grounds such as those that follow—that the Investigator

Lawson interview accounts corroborated the reported incidents:

(a) Investigator Lawson three times misled his readers in reporting on his

interview of S.B. as involving discussion of Plaintiff Lu's "stalking."

*Compare* Plf. Opp. App. 57-59 (IR at 4-6) *with* Plf. Opp. App. 89-115

(transcript of interview) (no instances of words "stalk" or "stalking").

(b) Investigator Lawson was deceptive in recounting that S.B. complained to him that Plaintiff had "stalked and harassed him" since May 2016. *Compare* Plf. Opp. App. 57 (IR at 4) *with* Plf. Opp. App. 89-115 (transcript of interview) (no uses of words "stalk" or "stalking").

(c) Investigator Lawson was dishonest in reporting how S.B. told Lawson that S.B. and a management official had discussed Plaintiff's "stalking/harassment" of S.B. *Compare* Plf. Opp. App. 59 (IR at 6) *with* Plf. Opp. App. 89-115 (transcript with no mentions of "stalk" or "stalking" *and with* Plf. Opp. App. 96-97 (transcript at 8:6-12) (S.B. says management official discussed with Plaintiff all the "stuff" Plaintiff was doing and told S.B. to alert him "if any of this starts again"; no reference to discussing "stalking" with management).

(d) Investigator Lawson falsely reported that S.B. explained S.B. had no idea what triggered Plaintiff Lu's "stalking" and harassing him. *Compare* Plf. Opp. App. 59 (IR at 6) *with* Plf. Opp. App. 89-115 (Tr.) (no mention of "trigger" or "triggering," nor of "stalk" or "stalking") *and with* Plf. Opp. App. 105 (Tr. at 17:3-7) (Lawson suggests S.B. has no idea why Ms. Lu is "targeting" S.B.; S.B. responds "All I can say, she's trying to get me to lose my job.").

(e) Investigator Lawson lied in recounting that S.B. told Lawson that S.B. feels "seriously alarmed and disturbed" by Ms. Lu's viewing something on Facebook. *Compare* Plf. Opp. App. 59 (IR at 6) *with* Plf. Opp. App. 89-115 (S.B. transcript with no S.B. use of words "alarmed" or "disturbed"). *Also*

*see* Plf. Opp. App. 481 (Lawson dep. 77:13-19) (Lawson would not be surprised if no mention in S.B. interview transcript of S.B.'s being seriously alarmed and disturbed). The actual source for Investigator Lawson's wording of "seriously alarmed and disturbed" is the D.C. stalking law. *See* Plf. Opp. App. 80 (IR at 27, quoting D.C. Code) *and* Plf. Opp. App. 482-483 (Lawson dep. 79:15 – 80:5) (Lawson admission that not a coincidence his recounting of witness testimony tracks the stalking criminal law elements even though the witnesses did not actually use such terms).

(f) Investigator Lawson misled the readers of his Investigative Report by recounting that S.B. told him of a particular day of the month on which the child at issue purportedly was born. *Compare* Plf. Opp. App. 59 (IR at 6) *with* Plf. Opp. App. 102 (Tr. at 14:1-12) (discussing month and year, but making no mention of the day of the month).

(g) Investigator Lawson lied in describing his interview of Harrison Shelton as being regarding a complaint that Plaintiff Lu "stalked" and harassed S.B. *Compare* Plf. Opp. App. 60 (IR at 7) *with* Plf. Opp. App. 116-120 (Tr.) (no mention of "stalk" or "stalking" during interview).

(h) Investigator Lawson fabricated his claim that Harrison Shelton stated he had "heard about Ms. Lu's stalking of" S.B. "from other co-workers…" *Compare* Plf. Opp. App. 60 (IR at 7) *with* Plf. Opp. App. 116-120 (Tr.) (no mention of "stalk" or "stalking"). *Also see* Plf. Opp. App. 117-118 (Tr. at 2:20 – 3:8) (Mr. Shelton testifying only of hearing second-hand "rumors" that Ms. Lu made "comments" about S.B.; no mention of stalking).

(i) Investigator Lawson fabricated his claim that interviewee Syed Hashmi told Lawson "he has been aware of Ms. Lu's stalking of" S.B. and that "it has been going on a long time." *Compare* Plf. Opp. App. 61 (IR at 8) *with* Plf. Opp. App. 121-129 (Tr.) (no mention of word "stalk" or "stalking") and Plf. Opp. App. 124 (Tr. at 4:11-14) (reference to "long time" is to overall disputes between S.B. and Plaintiff Lu, versus to "stalking").

(j) Investigator Lawson lied when reporting (Plf. Opp. App. 62—IR at 9) that interviewee Samuel Mutia "stated he has been aware of Ms. Lu's stalking of" S.B. regarding use of paid family leave and that "it has been going on for a long time." *Compare* Plf. Opp. App. 232-240 (Tr.) (no use of words "stalk" or "stalking" in interview, nor references to "going on" or "long time").

(k) Investigator Lawson was deceitful when recounting that he and interviewee Chrys Edet discussed Ms. Lu's "stalking" of S.B., with Edet purportedly saying he knew "it has been going on for a long time." *Compare* Plf. Opp. App. 62 (IR at 9) *with* Plf. Opp. App. 241-246 (Tr.) (no mention of "stalk" or "stalking" and no reference to anything going on for a long time).

(l) Investigator Lawson fabricated his claim that he was told by management official Christopher Bailey of a discussion with CAO Crawford that Bailey identified as the "last time he heard about Ms. Lu's stalking of" S.B. *Compare* Plf. Opp. Plf. Opp. App.63 (IR at 10) *with* Plf. Opp. App. 247-

259 (Tr. with sole mention of "stalk" or "stalking" being Investigator

Lawson's at start of interview [Plf. Opp. App. 248 at 2:4-11]).

In summary, Investigator Lawson repeatedly fabricated claims that witnesses told

him of Plaintiff's stalking S.B. and he in deposition did not deny the absence of

actual references to stalking in the transcripts of his witness interviews. Plaintiff

accordingly challenges any effort to rely on Lawson's report for undisputed facts.

72.     Plaintiff testified that on February 5, 2019, she saw the Mayor and Acting DCRA Director

Ernest Chrappah walking through the DCRA Permit Center, "stood up, approached," and told the

Mayor that her coworker "submitted a fake document," his "wife likely was wearing a pillow

underneath her clothes," and that she "hope[d] this time the agency can demonstrate some

integrity." Ex. 12 at 7-8, 24; that "I don't knew either way" whether S.B. had a child born in 2016,

see id. at 12; that S.B.'s wife "always wears clothes" and "I did not see that pillow," see id. at 16;

and that she did not see the documents that S.B. submitted for parental leave prior to February 5

or 6, 2019, see id. at 15, 27-30.

RESPONSE: DISPUTED, with objection that Defendants have strung together multiple

factual assertions in a single numbered paragraph in violation of the Court's Order and did

so in a manner that leaves the erroneous impression that all the quotes are from what

Plaintiff described as her saying to the mayor. The portion she did say to the mayor was

that S.B. submitted a fake document, S.B.'s wife likely was wearing a pillow under her

clothes, and Plaintiff hoped for integrity this time around. The remainder is taken from

testimony elsewhere in her deposition other than recounting the conversation with the

mayor. For example, Plaintiff did say at one point in her deposition (13:6) she did not *know*

[i.e., from first-hand knowledge] if there were a baby born to S.B., going on to explain (at

14:19-22) she nonetheless *believed* fraud occurred based on her observation and reports from coworkers. But ADMITTED that Defendants are correct Plaintiff testified she did not see the actual documents that S.B. submitted in support of his claim for paid leave.

73.   On February 6, 2019, at 10:09 a.m., Plaintiff emailed the Mayor and Acting DCRA Director Ernest Chrappah, writing, in part:

> At DCRA, one male employee submitted a fake paper to the agency's HR in May 2016.  His wife (not a DC government employee) was a wearing a plastic bump / pillow underneath her clothes and walking around in DCRA.  He received 8 weeks government paternity leave with NO baby.  A government employee dragged a pillow-wearing woman to the government's office and knowingly used a fake paper for 8 weeks government paid paternity leave is not only unethical, indecent, it's also a fraud and felony crime. . . .  Attached is a fake paper bought online.  The original copy has an embossed golden stamp on it and 'looks' very real.
>
> Plus don't forget the fact even a man can 'LOOK' pregnant.  https.//www.google. com/search?g=fake+pregnant+belly. . . .
> . . . .
>
> . . . .   What if an employee refused to provide consent to investigating and called it harassment , what happens next?
> . . . .
>
> DCRA, OIG, BEGA[,] and DCHR have worked together to use their government official power to make this crime go away. . . .   They used the each other's negligence to defend their own negligence. . . .  They used the governmental system and their official power to make this crime go away for 3 years.
> . . . .
>
> 'Insufficiency' shall not be conveniently used by DC government to deter whistleblowing activities whenever the outcome doesn't seem to be desirable . . . .  This standard of sufficiency should not be such as to deter any whistleblower . . . .
>
> Madam Mayor and Director Chrapph, I hope in your new tenure, DC government and DCRA can demonstrate some principle and integrity, . . . tell right from wrong and bring the crime to justice. . . .  Hope your attention to this matter can help end the incompetence, negligence and dishonesty of many DC government agencies in handling this matter, and help make DC government a clean and ethical place.  In DC government, harassment is not tolerated.  Forgery is a felony crime, just like murder and rape, it should not be tolerated either.

Nobody is above the law.  Nobody should walk away from the crime he committed without being punished by law. . . .

Please confirm receipt, so I know it is safely received by you both.

Ex. 1 at 147, 149.

RESPONSE: Request the Court strike this as violating its Order that the movant limit each asserted undisputed fact to one per paragraph. DISPUTED this is an accurate representation of the document quoted, for reasons such as that the length of the quote as compared to the many pieces left out of it—even midsentence—makes it an inaccurate recounting of the document. Defendants even add misspellings where Plaintiff did not have them, such as DCRA Director Chrappah's name being erroneously claimed to have been written by Plaintiff as "Chrapph." *Compare* Defs. Ex. 1 at 147-149. There is at least one deletion without the use of ellipses for an unknown reason, as "What if an employee refused to provide consent to investigating the doctor note and called it harassment , what happens next?" lost "the doctor note" wording in Defendants' recounting. Many of the portions left out relate to Plaintiff's explaining that management had not bothered to authenticate the documents submitted and so could not be sure they were what they appeared to be.

74.    On February 6, 2019, at 10:15 a.m., Plaintiff replied to herself, the Mayor, and Director Chrappah with S.B.'s photo, "name[,] and government contact."  Ex, 1 at 146.

RESPONSE: ADMITTED provided this is subject to the clarification that what she provided was S.B.'s "DCRA Directory" listing, versus any private information.

75.    On February 8, 2019, Plaintiff forwarded her February 6, 2019 emails to the Mayor and Acting DCRA Director Chrappah to Investigator Lawson, stating in part:

There is circumstance I think I need to inform you openly for your decision.  A case – using fake document and wearing a pillow for paternity – in currently under

review by Director Chrappah and the Mayor's Office (EOM).  Mayor Bowser visited DCRA on Tuesday (2-5) and I spoke with her about this fraud, Director Chrappah was standing by.  Mayor Bowser asked Director Chrappah to follow through and he is working on it now. . . .  It is being reviewed by OIG too as I informed you yesterday.

. . . .  The nature of this offense is criminal and the review is pending. . . .

Considering the different nature of these 2 complaints, and for my own self-protection purpose, can I meet with you at least AFTER Director Chrappah discovers the truth?  It won't be long now since the request is from the Mayor.  It's your decision I will respect and follow.

Ex. 1 at 145.

RESPONSE: ADMITTED but only subject to the clarification that Defendants deleted the interior portion of the quote in which Plaintiff noted she was providing further below the actual emails with the mayor's office. *Compare* Defs. Ex. 1 at 145.

76.     Investigator Lawson interviewed Plaintiff on February 12, 2019, and issued an Investigative Report on February 23, 2019, finding that Plaintiff "stalked and harassed" S.B. and his wife and repeatedly "misrepresented and falsified information" about them.  Ex. 1 at 1, 10.

RESPONSE: ADMITTED as to Investigator Lawson's *reporting* that as his conclusion. DISPUTED as to accuracy of the conclusion, for reasons such as that Lawson repeatedly fabricated witness testimony, as is revealed by comparing his accounts to the transcripts of the actual witness interviews. For example:

(a) Investigator Lawson three times misled his readers in reporting on his interview of S.B. as involving discussion of Plaintiff Lu's "stalking." *Compare* Plf. Opp. App. 57-59 (IR at 4-6) *with* Plf. Opp. App. 89-115 (transcript of interview) (no uses of words "stalk" or "stalking").

(b) Investigator Lawson was deceptive in recounting that S.B. complained to him that Plaintiff had "stalked and harassed him" since May 2016.

*Compare* Plf. Opp. App. 57 (IR at 4) *with* Plf. Opp. App. 89-115 (transcript of interview) (no uses of words "stalk" or "stalking").

(c) Investigator Lawson was dishonest in reporting how S.B. told Lawson that S.B. and a management official had discussed Plaintiff's "stalking/harassment" of S.B. *Compare* Plf. Opp. App. 59 (IR at 6) *with* Plf. Opp. App. 89-115 (transcript with no mentions of "stalk" or "stalking" *and with* Plf. Opp. App. 96-97 (transcript at 8:6-12) (S.B. says management official discussed with Plaintiff all the "stuff" Plaintiff was doing and told S.B. to alert him "if any of this starts again"; no reference to discussing "stalking" with management).

(d) Investigator Lawson falsely reported that S.B. explained S.B. had no idea what triggered Plaintiff Lu's "stalking" and harassing him. *Compare* Plf. Opp. App. 59 (IR at 6) *with* Plf. Opp. App. 89-115 (Tr.) (no mention of "trigger" or "triggering," nor of "stalk" or "stalking") *and with* Plf. Opp. App. 105 (Tr. at 17:3-7) (Lawson suggests S.B. has no idea why Ms. Lu is "targeting" S.B.; S.B. responds "All I can say, she's trying to get me to lose my job.")

(e) Investigator Lawson lied in recounting that S.B. told Lawson that S.B. feels "seriously alarmed and disturbed" by Ms. Lu's viewing something on Facebook. *Compare* Plf. Opp. App. 59 (IR at 6) *with* Plf. Opp. App. 89-115 (S.B. transcript with no S.B. use of words "alarmed" or "disturbed"). *Also see* Plf. Opp. App. 481 (Lawson dep. 77:13-19) (Lawson would not be surprised if no mention in S.B. interview transcript of S.B.'s being seriously

alarmed and disturbed). The actual source for Investigator Lawson's wording of "seriously alarmed and disturbed" is the D.C. stalking law. *See* Plf. Opp. App. 80 (IR at 27, quoting D.C. Code) *and* Plf. Opp. App. 482-483 (Lawson dep. 79:15 – 80:5) (Lawson admission that not a coincidence his recounting of witness testimony tracks the stalking criminal law elements even though the witnesses did not actually use such terms).

(f) Investigator Lawson misled the readers of his Investigative Report by recounting that S.B. told him of a particular day of the month on which the child at issue purportedly was born. *Compare* Plf. Opp. App. 59 (IR at 6) *with* Plf. Opp. App. 102 (Tr. at 14:1-12) (discussing month and year, but making no mention of the day of the month).

(g) Investigator Lawson lied in describing his interview of Harrison Shelton as being regarding a complaint that Plaintiff Lu "stalked" and harassed S.B. *Compare* Plf. Opp. App. 60 (IR at 7) *with* Plf. Opp. App. 116-120 (Tr.) (no mention of "stalk" or "stalking" during interview).

(h) Investigator Lawson fabricated his claim that Harrison Shelton stated he had "heard about Ms. Lu's stalking of" S.B. "from other co-workers…" *Compare* Plf. Opp. App. 60 (IR at 7) *with* Plf. Opp. App. 116-120 (Tr.) (no mention of "stalk" or "stalking"). *Also see* Plf. Opp. App. 117-118 (Tr. at 2:20 – 3:8) (Mr. Shelton testifying only of hearing second-hand "rumors" that Ms. Lu made "comments" about S.B.; no mention of stalking).

(i) Investigator Lawson fabricated his claim that interviewee Syed Hashmi told Lawson "he has been aware of Ms. Lu's stalking of" S.B. and that "it

has been going on a long time." *Compare* Plf. Opp. App. 61 (IR at 8) *with*

Plf. Opp. App. 121-129 (Tr.) (no mention of word "stalk" or "stalking") and

Plf. Opp. App. 124 (Tr. at 4:11-14) (reference to "long time" is to overall

disputes between S.B. and Plaintiff Lu, versus to "stalking").

(j) Investigator Lawson lied when reporting (Plf. Opp. App. 62—IR at 9)

that interviewee Samuel Mutia "stated he has been aware of Ms. Lu's

stalking of" S.B. regarding use of paid family leave and that "it has been

going on for a long time." *Compare* Plf. Opp. App. 232-240 (Tr.) (no use

of words "stalk" or "stalking" in interview, nor references to "going on" or

"long time").

(k) Investigator Lawson was deceitful when recounting that he and

interviewee Chrys Edet discussed Ms. Lu's "stalking" of S.B., with Edet

purportedly saying he knew "it has been going on for a long time." *Compare*

Plf. Opp. App. 62 (IR at 9) *with* Plf. Opp. App. 241-246 (Tr.) (no mention

of "stalk" or "stalking" and no reference to anything going on for a long

time).

(l) Investigator Lawson fabricated his claim that he was told by management

official Christopher Bailey of a discussion with CAO Crawford that Bailey

identified as the "last time he heard about Ms. Lu's stalking of" S.B.

*Compare* Plf. Opp. Plf. Opp. App.63 (IR at 10) *with* Plf. Opp. App. 247-

259 (Tr. with sole mention of "stalk" or "stalking" being Investigator

Lawson's at start of interview [Plf. Opp. App. 248 at 2:4-11]).

77.     On April 2, 2019, Mr. Lester issued an Advanced Written Notice of Proposed Suspension

of 10 Days.  Ex. 2 at 1.  The Notice of Proposed Suspension states, in part:

> Charge:          DPM 1605.4(b) . . . .
>
> . . . .  This disciplinary action will address only the dishonest statements made by Ms. Lu.
>
> The evidence shows that when Ms. Lu first started filing complaints claiming that [S.B.] had fraudulently stated that he had a new baby girl in 2016 in order to get Paid Family Leave (PFL).  Ms. Lu has persisted with this false claim against a coworker for the past two and a half years.
>
> [Citing and Discussing Exhibits in the Investigative Report]
>
> The final act raised the level of dishonesty/false statements even higher when on February 5, 2019 Ms. Lu confronted Mayor Bowser and her party touring the Permit Center while visiting DCRA, aired her complaint and followed up with an email to the Mayor dated February 6, 2019 with the subject 'Report to Mayor Bowser – Wearing Pillow for paternity leave' . . . .
> . . . .
>
> Ms. Lu grossly violated Part 1, DC Personnel Regulations Chapter 16; Sect 1605.4(b) False Statements, including:  Misrepresentation, falsification, or concealment of material facts or records in connection with an official matter; Knowingly and willingly reporting false or misleading information or purposely omitting material facts to any supervisor.
>
> . . . .  The offenses are serious and do impair operational efficiency and continued up to February 6, 2019. . . .
>
> . . . .
>
> . . . .  It is hoped that the proposed 10 day suspension will impress upon her the need for her to stop engaging in making false statements about her coworkers.
> . . . .
>
> . . . .  In light of the numerous occasions on which Ms. Lu has been advised of the lack of evidence of her claims AND counseled to cease and desist, management believes that it will take at least a 10 day suspension to impress upon her the seriousness of her misconduct and that it must cease once and for all.
>
> Ex. 2 at 1-4.

RESPONSE: Objection that includes multiple factual assertions in a single numbered paragraph in violation of the Court's Order and the narrowing of a six-page document to seven or fewer paragraphs does not accurately represent its contents. Plaintiff does not object to reliance on the original document.

78.     On April 12, 2019, Plaintiff wrote in response to the Investigative Report: "How do I possibly know he has a baby?" Ex. 3 at 5; see id. at 7; that "[S.B.] is the perpetrator of an alleged fraud and white collar crime. He is the SUBJECT, not a VICTIM. [S.B.] and his wife's emotional state (fear, safety disturbance, and distress) should be irrelevant to this official matter and before the law," see id. at 12; that "[t]he law should punish anyone who breaks the law"; that "[t]his is a task that I am not able to finish all by myself."; that "[p]ower and opinion do not substitute for truth. I need to know fact," Exhibit 3 at id. at 13; and that she referred to herself as "a lunatically tenacious and genuinely confused person," id. at 37.

RESPONSE: Request to strike as violating the Court's order to limit each paragraph to a single factual assertion. Plaintiff counts seven or more factual assertions here. As well, DISPUTED that this single paragraph accurately reflects the 37-page document being quoted. For example, this paragraph summary of 37 pages deletes essential context, such as (at 12)—in explaining why any upset by S.B.'s wife should not control the outcome of the review—Plaintiff noted that if there was no fraud then S.B. had no reason to be fearful or distressed as the existence of the child should be easy for him to prove in a multiple of ways. Likewise the "confused person" wording is taken out of context, as (at 37) she actually said she could see from "a third person's point of view" that she might be those things and continued in the same sentence "a Don Quixote fighting the windmills," and in the same paragraph that "we must be honest and have some principles, and personal

decency." The quote as presented by Defendants is inaccurate in making it look like Plaintiff was admitting to being a lunatic, versus admitting someone might think she was tilting at windmills and being "naïve" in her efforts.

79.    On June 27, 2019, Mr. Whitescarver issued a Notice of Final Decision reducing Plaintiff's "proposed suspension from ten (10) business days to eight (8) business days."  Ex. 4 at 1.  The Notice of Final Decision stated, in part:

> This disciplinary action is based on the following Disciplinary Charge:
>
> On February 5, 2019 and February 6, 2019, while on-duty you, knowing and willfully reported false or misleading information or purposefully omitted material facts to a supervisor, in this case the Mayor of the District of Columbia, in violation of DPM, Chapter 16, Section 1605.4(b)(4).
>
> In your April 12, 2019, response to the Proposed Suspension Notice . . . you repeatedly stated that your comments were based upon personal observations, limited as they were, while also repeatedly acknowledge, via email records and statements, having been notified an incident of fraud or leave abuse by the alleged perpetrator, [S.B.].  Your statements and email communications to the Mayor, as cited above, willfully seeks to obfuscate the record of these investigations and interactions. Your responses indicate that you have not fully conceded to the conclusions of the investigation or supervisory direction provided to you in this case.
> . . . .
> . . . .  As stated in the Proposed Suspension Notice. . . .  The offenses are serious and do impair operational efficiency and continued up to February 6, 2019.
> . . . .
> . . . .  As stated in the Proposed Suspension Notice. . . .  It is hoped that the proposed 10 day suspension will impress upon her the need for her to stop engaging in making false statements about her coworkers.
> . . . .
> . . . .  With respect to the respect to the reduction of the proposed suspension from 10 days to the final 8-day suspension, it was taken into consideration that during the intervening period . . .  there have been no reported incidents of you having repeated the performance that necessitated the disciplinary action.  It is with cautious optimism that a reduction in suspension time has been decided.  However, it is also noteworthy that, according to records, your behavioral corrections in this matter in the past are often short-lived, limiting the scope of the suspension reduction to ensure that a lasting behavior correction will ensue.
> . . . .
> You are hereby suspended from July 16, 2019 through July 25, 2019.

Ex. 4 at 1-4.

> RESPONSE: Plaintiff objects that Defendants again assert multiple facts within a single paragraph, in violation of the Court's order. DISPUTED that this accurately quotes the original document—as with other attempts at lengthy quotes, this one also introduces new errors. For example, the charge is recounted as "knowing and willfully reported" as compared to the original (Defs. Exh. 4 at 1) said, "knowingly and willfully reported." Further, Defendants again narrow a lengthy document into a string of quotes that delete any context that is unhelpful to their assertions. For example, the above deleted the fact that the decision threatened that, "Be advised that further misconduct may result in your separation of employment from DCRA." *Id.* at 4.

80.   On June 13, 2019, CAO Tiffany Crowe distributed DCRA's first formal policy to provide employees with the opportunity to telework if they had all the technology they needed to perform their work from home.  Ex. 10 at 1, 3; Ex. 11 at 10; Ex. 16 at 8, 15.

> RESPONSE: ADMITTED.

81.   Ms. Crowe testified that "a key element of the policy" is where it "says, 'Where technologically possible,' and the reason that was actually put in the policy was because we were working to get [virtual private network] access for as many of the staff as we could.  At the time, this was preCovid, so the Office of the Chief Technology Officer was not just like giving out VPN willy-nilly at the time." Ex. 16 at 15; see Ex. 10 at 1; Ex. 16 at 15-18.

> RESPONSE: ADMITTED that this was Ms. Crowe's testimony, but its accuracy is DISPUTED given that Plaintiff had colleagues—such as S.B.—who were allowed to telework without a VPN. *See* Plf. Opp. App. 415-16 (S.B. dep. at 36:22 – 37:6).

82.     Plaintiff did not have access to a VPN.  Ex. 12 at 36-37.

        RESPONSE: ADMITTED.

83.     On August 13, 2019, Plaintiff submitted a telework application to Mr. Lester.  Ex. 10 at 9.

        RESPONSE: ADMITTED.

84.     Mr. Lester approved Plaintiff's telework application.  Ex. 12 at 34; see Ex. 11 at 7-8.

        RESPONSE: ADMITTED.

85.     Ms. Crowe "was not involved" in individual telework applications "[a]nd no other staff

members contacted [her] directly like Ms. Lu" but she "was in a position to actually help Ms. Lu

so [she] tried to do that" when she received her inquiries.  Ex. 11 at 7-8; Ex. 16 at 13, 24-25.

        RESPONSE:  ADMITTED that Ms. Crowe did not get involved in individual telework

        decisions other than as to Plaintiff Lu but DENIED that Ms. Crowe helped Plaintiff.

        *Compare* Plf. Opp. App. 509 at ¶¶ 69-70 (Plf. dec.: Ms. Crowe prevented Plaintiff from

        teleworking on claimed basis of lacking VPN while allowing Plaintiff's colleagues to work

        without a VNP).  *See also* Plf. Opp. App. 415-16 (S.B. dep. at 36:22 – 37:6) (S.B. did not

        require VPN to telework).

86.     On September 30, 2019, CAO Crowe informed Plaintiff that the "screenshot" she had sent

indicated that she did "not have access to Accela at home"—which was "a key requirement of

[her] job"—because she did not have a VPN.  Ex. 11 at 4; see Ex. 16 at 13, 15-16, 19-20, 26-27.

        RESPONSE:  ADMITTED that this was Ms. Crowe's assertion but DENIED as to its

        accuracy.  *See* Plf. Opp. App. 356 (email noting that colleagues were teleworking without

        access to Accela).

87.    As CAO Crowe understood the situation, "there are limited licenses" for VPNs so Plaintiff's request was denied until an "additional inventory of VPNs" was available.  Ex. 11 at 2-4; see Ex. 16 at 26-27.

RESPONSE: ADMITTED this was Ms. Crowe's assertion but its accuracy is DENIED. *See* Plf. Opp. App. 509 at ¶¶ 69-70 (Plf. dec.: Ms. Crowe prevented Plaintiff from teleworking on claimed basis of lacking VPN while allowing Plaintiff's colleagues to work without a VNP). *See also* Plf. Opp. App. 415-16 (S.B. dep. at 36:22 – 37:6) (S.B. did not have to have a VPN to telework).

88.    On October 7, 2019, CAO Crowe explained that she was "not aware of the others exactly situated" and "the policy clearly states that you must be able to do ALL of the functions of your job from home, including access Accela and other network applications."  Ex. 11 at 1; see Ex. 16 at 13-14, 17, 20-22.

RESPONSE: ADMITTED this was Ms. Crowe's claim but DISPUTED the claim is accurate. *See* Plf. Opp. App. 509 at ¶¶ 69-70 (Plf. dec.: Ms. Crowe prevented Plaintiff from teleworking on claimed basis of lacking VPN while allowing Plaintiff's colleagues to work without a VNP). *See also* Plf. Opp. App. 415-16 (S.B. dep. at 36:22 – 37:6) (S.B. did not have to have VPN to telework); Plf. Opp. App. 356 (email of October 9, 2019 noting colleagues were teleworking without having access to Accela).

89.    Ms. Crowe testified that, "as a matter of fact, most of the people on her team didn't have a VPN at the time" and "[s]o most of them were not teleworking"; Ex. 16 at 17; see Ex. 11 at 8-9; that she "asked the HR manager to let [her] know if there were people who were teleworking who based on the policy should not have been and there were no cases of that," Ex. 16 at 19, and asked

for a technology officer to "let [her] know" when DCRA obtained more VPN licenses, Ex. 16 at 27-28.

RESPONSE: ADMITTED this was Ms. Crowe's assertion but its accuracy is DENIED. *See* Plf. Opp. App. 509 at ¶¶ 69-70 (Plf. dec.: Ms. Crowe prevented Plaintiff from teleworking on claimed basis of lacking VPN while allowing Plaintiff's colleagues to work without a VNP). *See also* Plf. Opp. App. 415-16 (S.B. dep. at 36:22 – 37:6) (S.B. did not require a VPN to telework).

90.   On February 18, 2020, Plaintiff filed her Complaint [1].

RESPONSE: ADMITTED.

[Plaintiff's own asserted facts start on next page]

## II. PLAINTIFF'S STATEMENT OF MATERIAL FACTS
## FOR WHICH SHE CONTENDS THERE IS NO GENUINE ISSUE,
## IN SUPPORT OF HER OPPOSITION TO DISMISSAL/SUMMARY JUDGMENT

Per the Local Rules and the Court's MSJ Scheduling Order, Plaintiff Lu identifies the following as relevant facts for which there is no material dispute. After identification of the parties, she addresses the conflict-of-interest/ethics disclosures, then the leave-fraud disclosures, next the Lawson Investigative Report (IR), then the proposed and imposed suspension, and finally telework denial and items not otherwise categorized.

References to "dec. ¶" are to paragraph numbers within Plaintiff's declaration appearing in the Appendix (Plf. Opp. App. 498-510). References to "Tr." are to the court reporter transcription of Lawson's witness interviews during his investigation of Plaintiff. Each asserted fact is underlined to visually distinguish it from the sometimes-lengthy evidentiary citations offered in support of it.

### A. The Parties and Their Roles[2]

91. Plaintiff Qing "Luchi" Lu is a Fire Protection Engineer in the D.C. DCRA. *Compare* Complaint ¶7 *with* Answer ¶7 (admitted); Plf. Opp. App. 498 (dec. ¶1).

92. During Ms. Lu's more than a decade as a Fire Protection Engineer with DCRA, "her performance has continually been that of a highly effective performer." Plf. Opp. App. 30 (Lester's proposal at 4). *Also see* Plf. Opp. App. 52 (Chief Administrative Officer's email to Plaintiff, "I hear that, when not lodging complaints without evidence, you are a valued employee"). *Also see* Plf. Opp. App. 498 (dec. ¶2).

---

[2] What Defendants admitted in their Answer from among what Plaintiff pled in her Complaint is repeatedly cited as evidence, so the Answer appears starting at Plf. Opp. App. 3, and the Complaint at Plf. Opp. App. 375. Both filings are in their latest (first amended) versions.

93. <u>Defendant District of Columbia is a creation of the U.S. Constitution, operating as a municipality.</u> *Compare* Complaint ¶8 *with* Answer ¶8 (admitted). [D.C. is sued only under the D.C. Whistleblower Protection Act (WPA), not the First Amendment.]

94. <u>Defendants C.G. (Clarence Garret) Whitescarver and Sydney Lester are sued in their individual capacities for claims under 42 U.S.C. § 1983 and those raised under the District of Columbia Whistleblower Protection Act.</u> *Compare* Complaint ¶9 *with* Answer ¶9 (admitted, though denying violations).

95. <u>When he proposed a 10-day suspension, Sydney Lester was the Fire Protection Manager, DCRA, Permit Operations Division.</u> *Compare* Complaint ¶10 *with* Answer ¶10 (admitted). *Also see* Plf. Opp. App. 498 (dec. ¶5).

96. <u>When he imposed the eight-day unpaid suspension, C.G. Whitescarver was the DCRA Chief Building Official.</u> *Compare* Complaint ¶10 *with* Answer ¶10 (admitted). *Also see* Plf. Opp. App. 498 (dec. ¶6).

97. <u>Tiffany Crowe was the Chief Administrative Officer (CAO) during the period in which telework was in dispute.</u> Plf. Opp. App. 32 (title in cc: list for proposal at 6); Plf. Opp. App. 356-357 (emails between Crowe and Plaintiff).

98. <u>S.B., the subject of Plaintiff's disclosures, is a fellow DCRA fire engineer.</u> Plf. Opp. App. 54 (IR 1); Plf. Opp. App. 499 (dec. ¶8).

**B. Plaintiff Lu's Ethics Disclosures about S.B. and Their Connection to Lawson's Investigation of Her for Her Fraud Disclosures About S.B.**

99. <u>In August 2016, Plaintiff disclosed to management her belief that coworker S.B. was handling projects submitted by his wife's company, in violation of ethics/conflict-of-interest rules.</u> *See* Plf. Opp. App. 345-348 (emails discussing the disclosures and management's response); Plf. Opp. App. 499 (dec. ¶9).

100.   HR Specialist Mia Brown and Special Investigator Tyrone Lawson were among those to whom Plaintiff Lu disclosed S.B.'s conflicts of interest and what Plaintiff regarded as Defendant Sydney Lester's failure to take adequate corrective action. Plf. Opp. App. 345-346 (Plaintiff email with Mia Brown and Investigator Lawson listed as recipients); Plf. Opp. App. 499 (dec. ¶10).

101.   Defendant Sydney Lester's initial response to Plaintiff Lu's ethics disclosures was that Plaintiff's reports about S.B. had become "more and more serious as time progressed" and that her recent allegations [i.e., the ethics disclosures] "have now placed us at the stage where the allegations have legal implications that cannot be ignored." Plf. Opp. App. 348 (S. Lester email of 8/31/2016). *Also see* Plf. Opp. App. 499 (dec. ¶11).

102.   Defendant Lester also responded to Plaintiff Lu's ethics disclosures about S.B. by asserting that "there is no evidence to conclude any" S.B. wrongdoing occurred. Plf. Opp. App. 348 (email); *see* Plf. Opp. App. 499 (dec. ¶11).

103.   Notwithstanding Defendant Lester's assertion that there was "no evidence" of wrongdoing in relation to Plaintiff's ethics disclosures about S.B., S.B. went on to admit to multiple violations and to agree to pay a $1,000 fine. Plf. Opp. App. 23-26 (Negotiated Disposition). *Also see* Plf. Opp. App. 499 (dec. ¶12) (Plaintiff awareness of outcome).

104.   [Though they later proved true,] Mr. Lester initially had persuaded agency legal counsel that Plaintiff's reports about S.B. conflicts of interest should be disbelieved because of a purported "long held personal vendetta" by Plaintiff against S.B. *See* Plf. Opp. App. 398 (August 23, 2016 email discussion among management officials).

105.   [In contrast to Mr. Lester's negative reaction to Plaintiff's reports about S.B.'s ethics violations,] BEGA told Plaintiff they "greatly appreciate your assistance and cooperation" on

the subject. *See* Plf. Opp. App. 400 (BEGA email of November 1, 2016); Plf. Opp. App. 499 (dec. ¶14).

106.    The portrayal of Plaintiff as having a "vendetta" against S.B. persists among D.C. management even now, after S.B. admitted to ethics violations and paid a fine. *See* Plf. Opp. App. 402-403 (Crowe dep. 23:22 – 24:4) (describing Plaintiff's actions related to examination of the leave-fraud issues to be serving Plaintiff's "vendetta").

107.    S.B. responded to Plaintiff's ethics disclosures with a February 2, 2017 email to management official Christopher Bailey, objecting that Plaintiff reported him to the D.C. Board of Ethics and Government Accountability office (BEGA) for "misconduct in performing my duties here at work that involves my wife." Plf. Opp. App. 342 (2/2/2017 email); Plf. Opp. App. 419-420 (S.B. dep. at 91:22 – 92:9) (acknowledging the email included this reference to the ethics disclosures). *Also see* Plf. Opp. App. 411-412 (S.B. dep. 25:22 – 26:7; 27:4-9) (S.B. identifying the fine he had to pay as "all initiated by Ms. Lu").

108.    S.B.'s complaint to management that Plaintiff was mistreating him by reporting him to BEGA was made even though S.B. had about two months earlier admitted to wrongdoing as to the allegations for which Plaintiff reported him. *Compare* Plf. Opp. App. 342 (S.B.'s email complaining) *with* Plf. Opp. App. 23-26 (Negotiated Disposition signed by S.B. on "12/5/2016").

109.    Investigator Lawson considered Plaintiff's earlier ethics disclosures as to S.B. to be sufficiently relevant to his misconduct investigation of her that—when interviewing her about the fraud disclosures—Lawson had Plaintiff confirm it was she who had reported S.B. and S.B.'s wife for the conflicts of interest [i.e., the earlier ethics disclosures]. Plf. Opp. App. 273

(Tr. at 14:12-20).  *Also see* Plf. Opp. App. 500 (dec. ¶15) (basis for Plaintiff conclusion IR connected to ethics disclosures).

110.   Investigator Lawson considered Plaintiff Lu's earlier ethics disclosures to be sufficiently relevant to his Investigative Report as to her fraud disclosures that he included Plaintiff's earlier email to him about the ethics disclosures in the Report. Plf. Opp. App. 65 (IR at 12, noting Exhibit 11 to IR includes Plaintiff's ethics disclosures to BEGA and to Lawson). *Also see* Plf. Opp. App. 500 (dec. ¶15) (basis for Plaintiff conclusion the IR connected to ethics disclosures).

### C. Plaintiff's Fraud Disclosures About S.B. and the Reasonableness of Her Belief that Serious Wrongdoing of Public Concern Occurred

111.   Even Defendant Sydney Lester—the official who proposed the 10-day suspension for Plaintiff's purportedly knowingly lying in alleging S.B. committed leave fraud—answered that "I would say I'm not certain" when asked post-lawsuit-filing how certain he was that S.B. was innocent of the parental-leave fraud. Plf. Opp. App. 430 (dep. 30:15-19).

112.   Plaintiff Lu was aware that S.B. demonstrated a willingness to engage in work-related misconduct for personal gain involving the same party (his wife), as reflected by his admission to ethics violations and paying a related fine. *See* Plf. Opp. App. 75 (IR at 22-23, recounting Plaintiff's alerting someone that S.B.'s wife was a permit runner and he was fined $1,000 by BEGA, with Plaintiff including a link to the BEGA public webpage for S.B.'s Negotiated Disposition). *Also see* Plf. Opp. App. 499 (dec. ¶12) (awareness of S.B. admission and fine).

113.   A consideration in Plaintiff's concluding that S.B. would be capable of claiming paid parental leave for a nonexistent child was that in prior years she observed S.B. to erroneously report his hours worked and needlessly claim overtime. Plf. Opp. App. 500 (dec. ¶17).

114.   One consideration in Plaintiff's concluding S.B. could have claimed paid parental leave for a nonexistent child was that she observed that fake birth certificates were readily available on the internet. *See, e.g.,* www.superiorfakedegrees.com/fake-birth-certificates/. *Also see* Plf. Opp. App. 500 (dec. ¶18).

115.   One consideration in Plaintiff's concluding S.B. could have claimed paid parental leave for a nonexistent child was that no one confirmed or asserted to her that they had verified the authenticity of the document(s) S.B. submitted. *See, e.g.,* Plf. Opp. App. 464 (BEGA investigator Corrales dep. 31:2-6) (did not authenticate record S.B. relied on). *Also see* Plf. Opp. App. 500-501 (dec. ¶¶19-20) (no one told Plaintiff they had authenticated his supporting documents and she likely would have dropped matter if they had).

116.   A consideration in Plaintiff's concluding that S.B. claimed paid parental leave for a nonexistent child, *despite management's repeated assurances no wrongdoing occurred*, was that the initial reaction to her ethics disclosures about SB [the ones to which he later admitted and for which he paid a fine] also had been management's telling her there was no evidence of wrongdoing by S.B. *See* Plf. Opp. App. 348 (S. Lester email of 8/31/2016); Plf. Opp. App. 499 (dec. ¶13) (their disregard of earlier ethics disclosures as untrue was a factor in Plaintiff's not fully conceding to their position as to leave fraud disclosures).

117.   A consideration in Plaintiff's concluding that S.B. claimed paid parental leave for a nonexistent child was that multiple components of D.C. government pointed to other components as having confirmed there was no wrongdoing, such that it was not clear to Plaintiff that any of them had thoroughly investigated her fraud disclosures. *Compare, e.g.,* Plf. Opp. App. 65 (IR at 12, documenting that OIG closed the complaint and referred it to DCRA) and Plf. Opp. App. 343 (OIG log showing closed 7/14/2018 because "Deemed

insufficient to open an investigation") *with* Plf. Opp. App. 350 (Crowe letter at 1, asserting OIG conducted independent analysis of documentation). *Also see* Plf. Opp. App. 501 (dec. ¶21)

118.    A consideration in Plaintiff's concluding that S.B. claimed paid parental leave for a nonexistent child was that her research on S.B. indicated he was scheduled to appear for a criminal (traffic-related offense) trial in June 2016—the month following the claimed birth. *See* Plf. Opp. App. 349 (Charles County District Court case information relied on by Plaintiff, showing trial set for June 2016); Plf. Opp. App. 501 (dec. ¶23).

119.    A consideration in Plaintiff's concluding that S.B. claimed paid parental leave for a nonexistent child was that Plaintiff understood S.B. to have told coworkers on June 22, 2016 he would be gone a long time, but after the criminal case was closed on June 23, to have returned to work on June 24. Plf. Opp. App. 501 (dec. ¶24).

120.    A consideration in Plaintiff's concluding that S.B. claimed paid parental leave for a nonexistent child was her observation that S.B.'s wife posted publicly about other matters on Facebook on the day of the purported childbirth, while Plaintiff did not see any posts mentioning a birth—something that did not make sense to Plaintiff (who is herself the mother of a child). Plf. Opp. App. 501-502 (dec. ¶25).

121.    A consideration in Plaintiff's concluding that S.B. claimed paid parental leave for a nonexistent child was the timing of when S.B.'s wife told the DCRA staff she was pregnant, as compared to Plaintiff's not then observing her to be noticeably pregnant, and then the child's being reported to have been born past the due date a couple of weeks later. Plf. Opp. App. 502 (dec. ¶26.)

122.    A consideration in Plaintiff's concluding that S.B. claimed paid parental leave for a
nonexistent child was that a female customer told Plaintiff she had seen S.B.'s wife at the office
prior to the birth with what appeared to be a foreign object in a "bizarre triangular shape" under
her clothes (i.e., as if to mimic pregnancy). Plf. Opp. App. 502 (dec. ¶27); *also see* Plf. Opp.
App. 397 (April 2018 email from a customer to Plaintiff making the observation).

123.    A consideration in Plaintiff's concluding that S.B. claimed paid parental leave for a
nonexistent child was that Plaintiff understood a coworker to have told her that a date on which
S.B. had shown pictures of a newborn actually was prior to the date later reported for its birth.
Plf. Opp. App. 502 (dec. ¶28).

124.    A consideration in Plaintiff's concluding that S.B. claimed paid parental leave for a
nonexistent child was that she understood a coworker to have told her (Plaintiff) that when
S.B. was asked about how the baby was doing, S.B. responded that she was doing well and
walking around, which puzzled Plaintiff because this was four or fewer months after the
purported birth, when she understands babies typically don't take their first step until between
nine and 12 months. Plf. Opp. App. 502 (dec. ¶29); *also see* Plf. Opp. App. 467-468 (Alec
Petrillo-Groh dep. 14:11 – 15:21) (surprised by S.B.'s claim that child was walking around,
when the child would have been within four months of the purported birth).

125.    Another consideration in Plaintiff's concluding that S.B. claimed paid parental leave for a
nonexistent child was that it appeared to Plaintiff from the families' *public* Facebook posts that
it was not S.B./his wife who had a newborn and instead was S.B.'s stepmother. Plf. Opp. App.
503 (dec. ¶31).

126.    Even management officials could not agree among themselves how long it was reasonable
for Plaintiff to continue to believe S.B. engaged in leave fraud. *Compare* Plf. Opp. App. 483

(Investigator Lawson saying first six months or year [dep. 80:14-17]); Plf. Opp. App. 14 (Defendant's Answer, Sixth Defense, "never reasonable"); 47 (Int. 20 response—"never reasonable"—sworn to at Plf. Opp. App. 50 by Lester, Whitescarver, and Crowe); Plf. Opp. App. 452-453 (Whitescarver not disputing six months to one-year period as reasonable [dep. 66:17 – 67:12]); and Plf. Opp. App. 430 (Lester testifying that as of his deposition, he was still uncertain whether or not S.B. actually committed leave fraud [dep. 30:15-19]).

127.    A factor in Plaintiff's concluding that a coworker's fraudulently claiming paid leave for a nonexistent child likely would rise to the level of serious wrongdoing (for which her reporting would be protected) was that she understands HR policies to prohibit the making of false statements under oath and intentional misrepresentations. Plf. Opp. App. 503 (dec. ¶32); *also see, e.g.,* DPM, Chapter 16, Section 1605.4(b) (as at edpm.dc.gov/chapter/16/#section-1605) (viewed 2/2/2022).

128.    A factor in Plaintiff's concluding that a coworker's fraudulently claiming paid leave likely would rise to the level of serious wrongdoing (for which her reporting would be protected) was that she understood honesty to be important to the work of persons in positions like S.B.'s and hers. *See* Plf. Opp. App. 503 (dec. ¶33) (understood honesty important as deal with fire safety issues); *also see* Plf. Opp. App. 34 (Whitescarver decision, noting importance of honesty).

129.    A factor in Plaintiff's concluding that a coworker's fraudulently claiming paid leave for a nonexistent child likely would rise to the level of serious wrongdoing (for which her reporting would be protected) was that she understands such conduct could readily rise to the level of a criminal offense. Plf. Opp. App. 503 (dec. ¶34) (could be crime under multiple laws, so rising to level of violation of law/rule/regulation). *Also see, e.g.,* D.C. Code § 22-3221 (crime to engage in conduct intended to defraud or obtain the property of another by means of a false or

fraudulent pretense or representation, where the offender obtains the property of another person or causes another person to lose property) *and* D.C. Code §§ 22-2402, 22-2404, and 22-3242 (crime to commit perjury or to otherwise make false statements under oath or affirmation, and if a public record is involved, penalty can be up to 10 years for fraud).

130.   A factor in Plaintiff's concluding that a coworker's fraudulently claiming paid leave for a nonexistent child likely would rise to the level of serious wrongdoing (for which her reporting would be protected) was that, at least at the time, the form used to obtain the leave historically required a certification and included a false statement warning. *See, e.g.,* dchr.dc.gov/sites/default/files/dc/sites/dchr/page_content/attachments/dc_fml_form_1_application_0.docx (viewed 2/2/2022). *Also see* Plf. Opp. App. 503-504 (dec. ¶35) (form as she saw it was under oath and included false statement warning).

131.   A factor in Plaintiff's concluding that a coworker's fraudulently claiming paid leave for a nonexistent child likely would rise to the level of serious wrongdoing (for which her reporting would be protected) is that she understands wrongdoing by public employees and how tax dollars are spent to be a matter of strong public interest. Plf. Opp. App. 504 (dec. ¶36).

132.   A factor in Plaintiff's concluding that a coworker's fraudulently claiming paid leave for a nonexistent child likely would rise to the level of serious wrongdoing (for which her reporting would be protected) was that she understands the public to be interested in situations in which a government employee misuses position for personal benefit. Plf. Opp. App. 504 (dec. ¶37).

133.   A factor in Plaintiff's concluding that a coworker's fraudulently claiming paid leave for a nonexistent child likely would rise to the level of serious wrongdoing (for which her reporting would be protected) was that BEGA took it very seriously when it came to agree with her that S.B. was misusing his job for the personal benefit of him and his wife. Plf. Opp. App. 504 (dec.

38). *Also see* Plf. Opp. App. 23-26 (BEGA/S.B. agreement imposing $1,000 fine for S.B.'s admitted misuse of his position to handle projects submitted by his wife's company).

134.    A factor in Plaintiff's concluding that a coworker's fraudulently claiming weeks of paid leave would rise to the level of gross misuse/waste of public resources or funds is that the District would be deprived of the employee's services during the period of absence while fraudulently receiving pay. Plf. Opp. App. 504-505 (dec. ¶¶40-41) (paid during absence and rough calculation of over $15,000 as unjustified cost to D.C. based on eight weeks' leave).

135.    A factor in Plaintiff's concluding that a coworker's fraudulently claiming weeks of paid leave would rise to the level of an abuse of authority is that it would involve an employee's using his or her position to obtain a benefit (paid leave) to which they were not entitled. Plf. Opp. App. 505 (dec. ¶42).

136.    Chief Administrative Officer Tiffany Crowe admitted that there was no reason for her conclusion that Plaintiff should have known her disclosures were inaccurate other than that management told Plaintiff they had investigated it and there was nothing to it. Plf. Opp. App. 403-404 (dep. 24:17 – 25:4).

137.    CAO Tiffany Crowe testified that even if the investigation had found that S.B. did engage in leave fraud, Plaintiff still would have been disciplined: it was the way she went about pursuing the disclosures that justified discipline, for "the behavior is the problem, not the belief or disbelief in the outcome." Plf. Opp. App. 404 (dep. 25:12-20).

### D. Tyrone Lawson's Investigation of and Report on Plaintiff

138. Investigator Lawson's report included multiple references to Plaintiff's earlier ethics disclosures about S.B. that culminated in S.B.'s admission of guilt and paying a fine. *See, e.g.,* Plf. Opp. App. 58 (IR at 5, quoting S.B.'s email complaining of Plaintiff's making the conflict-of-interest report to BEGA); Plf. Opp. App. 65 (IR at 12, referencing the Exh. 11 email sent to Lawson in 2016 that was about the ethics disclosure); Plf. Opp. App. 345-346 (IR Exh. 11, the September 2016 email in which Plaintiff discusses her ethics disclosures and management's resistance to exploring the conflict-of-interest assertions Plaintiff lodged).

139. In spite of Investigator Lawson's related references and exhibits and interview questions about Plaintiff's prior ethics disclosures [see paragraph above] about S.B., Lawson's IR failed to anywhere mention in its 35 pages that Plaintiff was right about S.B.'s conflict-of-interest violations and that S.B. admitted to violations and paid a $1,000 fine. *Compare* Plf. Opp. App. 54-88 (Lawson IR) *with* Plf. Opp. App. 23-26 (Negotiated Disposition of BEGA charges against S.B.).

140. The Lawson IR uses assertions that Plaintiff violated criminal law—such as with its claims that multiple witnesses spoke of Plaintiff's "stalking" S.B. and that Plaintiff admitted to the elements of criminal stalking—to disparage her. *See* Plf. Opp. App. 80 (IR at 27, asserting Plaintiff's acknowledgement of guilt as to the criminal violation) *and* Plf. Opp. App. 62 (IR at 9, asserting Mr. Mutia testified awareness of the stalking and that it has been going on for a long time). [The falseness of these accounts by Lawson, with additional examples, are detailed in separate paragraphs below.]

141.    Investigator Lawson three times misled his readers in reporting on his interview of S.B. as involving discussion of Plaintiff Lu's "stalking." *Compare* Plf. Opp. App. 57-59 (IR at 4-6) *with* Plf. Opp. App. 89-115 (transcript of interview) (no uses of words "stalk" or "stalking").

142.    Investigator Lawson also was deceptive in recounting that S.B. complained to him that Plaintiff had "stalked and harassed him" since May 2016. *Compare* Plf. Opp. App. 57 (IR at 4) *with* Plf. Opp. App. 89-115 (transcript of interview) (no uses of words "stalk" or "stalking").

143.    Investigator Lawson was dishonest in reporting how S.B. told Lawson that S.B. and a management official had discussed Plaintiff's "stalking/harassment" of S.B. *Compare* Plf. Opp. App. 59 (IR at 6) *with* Plf. Opp. App. 89-115 (transcript with no mentions of "stalk" or "stalking" *and with* Plf. Opp. App. 96-97 (transcript at 8:6-12) (S.B. says management official discussed with Plaintiff all the "stuff" Plaintiff was doing and told S.B. to alert him "if any of this starts again"; no reference to discussing "stalking" with management).

144.    Investigator Lawson falsely reported that S.B. explained S.B. had no idea what triggered Plaintiff Lu's "stalking" and harassing him. *Compare* Plf. Opp. App. 59 (IR at 6) *with* Plf. Opp. App. 89-115 (Tr.) (no mention of "trigger" or "triggering" nor of "stalk" or "stalking") *and with* Plf. Opp. App. 105 (Tr. at 17:3-7) (Lawson suggests S.B. has no idea why Ms. Lu is "targeting" S.B.; S.B. responds "All I can say, she's trying to get me to lose my job.")

145.    Investigator Lawson lied in recounting that S.B. told Lawson that S.B. feels "seriously alarmed and disturbed" by Ms. Lu's viewing something on Facebook. *Compare* Plf. Opp. App. 59 (IR at 6) *with* (Plf. Opp. App. 89-115) (S.B. transcript with no S.B. use of words "alarmed" or "disturbed"). *Also see* Plf. Opp. App. 481 (Lawson dep. 77:13-19) (Lawson would not be surprised if no mention in S.B. interview transcript of S.B.'s being seriously alarmed and disturbed).

146. <u>The actual source for Investigator Lawson's wording of "seriously alarmed and disturbed"</u> <u>is the D.C. stalking law.</u> *See* Plf. Opp. App. 80 (IR at 27, quoting D.C. Code) *and* Plf. Opp. App. 482-483 (Lawson dep. 79:15 – 80:5) (Lawson admission that not a coincidence his recounting of witness testimony tracks the stalking criminal law elements even though the witnesses did not actually use such terms).

147. <u>Investigator Lawson claimed he is unaware the D.C. stalking law specifically excludes</u> <u>constitutionally protected activity</u> [*compare* Plf. Opp. App. 474 (dep. 32:3-13) *with* D.C. Code § 22-3133(b)] <u>though he read the text of the law "several times" prior to preparing the</u> <u>Investigative Report.</u> Plf. Opp. App. 474 (dep. 32:15-17).

148. Given that he read the stalking law "several times" before preparing his IR (Plf. Opp. App. 474), <u>Investigator Lawson likely was aware that there is a risk of imprisonment for those found</u> <u>guilty under it.</u> *See* D.C. Code 22-3134 (penalties for violation of stalking law).

149. <u>Investigator Lawson misled the readers of his Investigative Report by recounting that S.B.</u> <u>told him a particular day of the month on which the child at issue was born.</u> *Compare* Plf. Opp. App. 59 (IR at 6) *with* Plf. Opp. App. 102 (Tr. at 14:1-12) (discussing month and year, but making no mention of the day of the month).

150. <u>Investigator Lawson lied in describing his interview of Harrison Shelton as being regarding</u> <u>a complaint that Plaintiff Lu "stalked" and harassed S.B.</u> *Compare* Plf. Opp. App. 60 (IR at 7) *with* Plf. Opp. App. 116-120 (Tr.) (no mention of "stalk" or "stalking" during interview).

151. <u>Investigator Lawson fabricated his claim that Harrison Shelton stated he had "heard about</u> <u>Ms. Lu's stalking of" S.B. "from other co-workers…"</u> *Compare* Plf. Opp. App. 60 (IR at 7) *with* Plf. Opp. App. 116-120 (Tr.) (no mention of "stalk" or "stalking"). *Also see* Plf. Opp.

App. 117-118 (Tr. at 2:20 – 3:8) (Mr. Shelton testifying only of hearing second-hand "rumors" Ms. Lu made "comments" about S.B.; no mention of stalking).

152.    Investigator Lawson fabricated his claim that interviewee Syed Hashmi told Lawson "he has been aware of Ms. Lu's stalking of" S.B. and that "it has been going on a long time." *Compare* Plf. Opp. App. 61 (IR at 8) *with* Plf. Opp. App. 121-129 (Tr.) (no mention of word "stalk" or "stalking") and Plf. Opp. App. 124 (Tr. at 4:11-14) (reference to "long time" is to overall disputes between S.B. and Plaintiff Lu, versus to "stalking").

153.    Investigator Lawson lied when reporting (Plf. Opp. App. 62—IR at 9) that interviewee Samuel Mutia "stated he has been aware of Ms. Lu's stalking of" S.B. regarding use of paid family leave and that "it has been going on for a long time." *Compare* Plf. Opp. App. 232-240 (Tr.) (no use of words "stalk" or "stalking" in interview, nor references to "going on" or "long time").

154.    Investigator Lawson was deceitful when recounting that he and interviewee Chrys Edet discussed Ms. Lu's "stalking" of S.B., with Edet purportedly saying he knew "it has been going on for a long time." *Compare* Plf. Opp. App. 62 (IR at 9) *with* Plf. Opp. App. 241-246 (Tr.) (no mention of "stalk" or "stalking" and no reference to anything going on for a long time).

155.    Investigator Lawson poisoned the well in his interview of management official Christopher Bailey by telling Bailey that Lawson was investigating Plaintiff for "persistent stalking and possible sexual harassment," when no allegations of sexual harassment were ever made. *Compare* Plf. Opp. App. 248 (Tr. at 2:4-11) *with* Plf. Opp. App. 54-88 (Lawson's IR, making no reference to any allegations of sexual harassment).

156.    Investigator Lawson fabricated his claim that he was told by management official Christopher Bailey of a discussion with CAO Crawford that Bailey identified as the "last time

he heard about Ms. Lu's stalking of" S.B. *Compare* Plf. Opp. App.63 (IR at 10) *with* Plf. Opp. App. 247-259 (Tr. with sole mention of "stalk" or "stalking" being Investigator Lawson's at start of interview [Plf. Opp. App. 248 at 2:4-11]).

157.    Investigator Lawson demonstrated open hostility toward Plaintiff's engaging in disclosure activity, such as by telling her at least seven times during his interview of her that matters related to whether S.B. engaged in leave fraud were none of her business. *See* Plf. Opp. App. 260-341, at 331 (Tr. 72:6-10) (first and second instances of "none of your business"); 331 (Tr. 72:12) (third); 337 (Tr. 78:8-9) (fourth); 337 (Tr. 78:12) (fifth); 337 (Tr. 78:14-15) (sixth); and 338 (Tr. 79:4) (seventh). *Also see* Plf. Opp. App. 485 (dep. 100:13-19) (Investigator Lawson stipulating that he told Plaintiff eight times during the interview that what had gone on with S.B. was none of her business); Plf. Opp. App. 506 (dec. ¶46).

158.    Yet, as a general proposition, Investigator Lawson agreed that as a general matter one employee's misconduct "is the

159.    47). business of all employees." Plf. Opp. App. 486 (dep. 101:11-17).

160.    During Investigator Lawson's interview of Plaintiff Lu, he questioned why she had contacted the *Washington Post* about the leave-fraud issue when the newspaper is not part of DCRA Human Resources. Plf. Opp. App. 310 (Tr. at 51:16-20). *Also see* Plf. Opp. App. 506 (dec. ¶47).

161.    During Investigator Lawson's interview of Plaintiff, he questioned why she had contacted CNN when it is not part of DCRA Human Resources. Plf. Opp. App. 311 (Tr. at 52:1-8). *Also see* Plf. Opp. App. 506 (dec. ¶47).

162.     During Investigator Lawson's interview of Plaintiff, he questioned why she contacted (news station) WTOP when it is not DCRA Human Resources. Plf. Opp. App. 312 (Tr. at 53:1-4). *Also see* Plf. Opp. App. 506 (dec. ¶

163.     During Investigator Lawson's interview of Plaintiff, he pushed her to admit that she contacted NBC Universal and that it is not part of DCRA Human Resources. Plf. Opp. App. 312-13 (Tr. at 53:21 – 54:7). *Also see* Plf. Opp. App. 506 (dec. ¶47).

164.     The D.C. Department of Human Resources advises staff that they have a right to communicate with members of the D.C. Council. *See, e.g.,* "Whistleblower Protections and Obligations" at www.dchr.dc.gov/page/whistleblower-protections-and-obligations (viewed 2/2/2022); Plf. Opp. App. 506 (dec. ¶48) (she understood management was not permitted to keep employees from communicating with Council).

165.     During Investigator Lawson's interview of Plaintiff, he pushed her to admit that she reported her concerns about leave fraud by S.B. to Councilmember Brianne Nadeau. Plf. Opp. App. 313-14 (Tr. 54:21 – 55:9). *Also see* Plf. Opp. App. 506 (dec. ¶48).

166.     During Investigator Lawson's interview of Plaintiff, he pushed her to admit that she reported her concerns about leave fraud by S.B. to Councilmembers Michele Blackwell and Elissa Silverman. Plf. Opp. App. 314 (Tr. at 55:10-17). *Also see* Plf. Opp. App. 506 (dec. ¶48).

167.     Investigator Lawson acknowledged ("Personally, yes") that he thought it was inappropriate for Plaintiff Lu to interact with these council members. Plf. Opp. App. 484 (dep. 83:10-20).

168.     During Investigator Lawson's interview of Plaintiff Lu, he repeatedly pushed her to acknowledge her report of parental leave fraud by S.B. was weak because Ms. Lu had never seen S.B.'s wife's "nude body while she was wearing a pillow or "fake pregnancy belly." Plf. Opp. App. 64 (IR at 11); Plf. Opp. App. 325 (Tr. at 66:14-20); Plf. Opp. App. 326-27 (Tr. at

67:22 – 68:11) (repeatedly pushing her to admit she had not seen S.B.'s wife in the nude). *Also see* Plf. Opp. App. 506 (dec. ¶50).

169.   During Investigator Lawson's interview of Plaintiff, he rejected her request that he interview her coworker Alec whom she cited as part of the basis for her belief that leave fraud occurred. Plf. Opp. App. 326 (Tr. at 67:7-18) (Lawson: "I don't care what somebody else told you about somebody else" and "I don't need to talk to Alec" as he was not complaining). *Also see* Plf. Opp. App. 487 (dep. 109:3-9) (Lawson agreeing he declined to speak with the witness that Plaintiff requested Lawson interview). *Also see* Plf. Opp. App. 506 (dec. ¶51).

170.   When Plaintiff Lu attempted to tell Investigator Lawson what coworker Alec had said about the matter, Lawson stopped her, saying it would be hearsay [transcribed as "heresy"]. Plf. Opp. App. 216 (Tr. 67:7-9). *Compare* Plf. Opp. App. 250 (Bailey/Lawson Tr. at 4:16-22) (Lawson allowing witness to recount what they had been told Plaintiff was told in a meeting with others for which the witness was not present). *Also see* Plf. Opp. App. 506 (dec. ¶52).

171.   During Investigator Lawson's interview of Plaintiff, he ordered her not to say anything further about the leave-fraud issues to "the press" or "anybody else in DCRA, or anywhere," other than DCRA Human Resources. Plf. Opp. App. 333 (Tr. at 74:4-13). *Also see* Plf. Opp. App. 506 (dec. ¶49).

172.   During his interview of Plaintiff Lu, Investigator Lawson complained that she raised the leave-fraud concerns with members of the "Council," with the "Washington Post, WTOP, City Paper, CNN." Plf. Opp. App. 337 (Tr. at 78:2-5).

173.   Investigator Lawson falsely reported that during his interview of Plaintiff, she "stated her complaint against" S.B. and his wife "is based on speculation and conjure." *Compare* Plf. Opp. App. 65 (IR at 12) *with* Plf. Opp. App. 330-31 (Tr. at 71:16 – 72:3) (Lawson interrupting and

cutting Plaintiff off when she attempts to give a full response to his assertion her reports are based on "conjure and speculation"). *Also see* Plf. Opp. App. 507 (dec. ¶53).

174.   Investigator Lawson's report to management remarked on Plaintiff's having reported her leave fraud assertions to "Councilmembers" and "news media service." Plf. Opp. App. 71 (IR at 18).

175.   Investigator Lawson's report to management included attachments of Plaintiff's emails to media outlets about her reports she believed S.B. had engaged in leave fraud. Plf. Opp. App. 74 (IR at 21, referencing the report's Exhibit 29 consisting of emails with the Washington Post).

176.   Investigator Lawson's report to management included multiple adverse descriptions of Plaintiff's contacts with media outlets. Plf. Opp. App. 75—IR at 22, as to CNN; Plf. Opp. App. 76 (IR at 23, as to WTOP, NBC Universal, and Washington Post); Plf. Opp. App. 77 (IR at 24, as to City Paper).

177.   Investigator Lawson's report to management falsely cited Plaintiff's communications with Councilmembers as misconduct. *Compare* Plf. Opp. App. 77-78 (IR at 24-25) *with* dchr.dc.gov/page/whistleblower-protections-and-obligations (viewed 1/24/2022) (DC DCRA webpage noting employee right to freely communicate with council members) and  D.C. Official Code §1-615.53 (prohibition on supervisor interfering with or denying right of employee to furnish information to the Council or one of its members).

178.   Investigator Lawson lied to management when his report *twice* claimed that "Ms. Lu admitted" to engaging in a course of conduct that aligned with a violation of the criminal stalking law. *Compare* Plf. Opp. App. 80 (IR at 27, claim of Plaintiff admission, also setting out elements of a violation) *and* 85 (IR at 32, repeating Lawson's false representation as to

Plaintiff's admitting guilt) *with* Plf. Opp. App. 260-341 (Tr. of Lawson interview of Plaintiff, containing no admission she knew her conduct would cause S.B. to fear for his safety, feel seriously alarmed/disturbed/frightened, or suffer emotional distress, *nor containing any discussion of such issues* beyond Lawson's speculation (denied by Plaintiff) [Plf. Opp. App. 333-34—IR at 72:17 – 73:2] that S.B. hesitates to bring child to work because of Plaintiff's "haunting" and "stalking" S.B.). *Also compare with* Plf. Opp. App. 339 (IR at 80:7-8, Plaintiff explaining she meant well and did not mean to "hurt anybody or be malicious about something"). *Also see* Plf. Opp. App. 507 (dec. ¶54).

179.   Among the grounds for Investigator Lawson's concluding Plaintiff "grossly violated" rules against falsification as to official matters and in communications with supervisors was that Plaintiff contacted media outlets and members of City Council after being ordered not to communicate with anyone but HR. *See* Plf. Opp. App. 80-81 (IR at 27-28, making at least six references to media outlets and at least two to her communicating with council members).

180.   Among the grounds for Investigator Lawson's concluding Plaintiff "grossly violated" rules against failing to follow instructions were that she contacted media outlets and council members after being ordered to report matters solely to HR. Plf. Opp. App. 81-5 (IR 28-32, referencing communications with CNN, Washington Post, WTOP, and three council members).

181.   While the body of the Lawson Investigative report makes more than 20 uses of the word "stalking" and its variants (Plf. Opp. App. 54-88), Investigator Lawson could not name a single witness who actually used such a word in his interviews of them. *Compare* Plf. Opp. App. 474-475 (dep. 32:18 – 33:4). That is, not even S.B. ever used the term. Plf. Opp. App. 478 (dep. 50:8-11).

182.   The Lawson IR and his interview eventually frightened Plaintiff out of making further disclosures. *See* Plf. Opp. App. 35 (decision at 3, noting no repeating of Plaintiff's conduct at issue between March 27, 2019 and the June 2019 date of the decision). *Also see* Plf. Opp. App. 507 (dec. ¶47) (factors leading her to be less willing to speak out in the future).

183.   In contrast to his extensive investigation of Plaintiff's disclosures/conduct, Investigator Lawson was not assigned to investigate whether her reports that S.B. engaged in fraud were true. *See* Plf. Opp. App. 471 (dep. 22:6-14) (did not know why he was not assigned to investigate accuracy of Plaintiff's fraud disclosures).

184.   Investigator Lawson inaccurately reported that Mr. Lester knew S.B. had a child born during use of FMLA in 2016; instead, this was Lawson's "paraphrase." *See* Plf. Opp. App. 479 (Lawson dep. 70:7 – 71:12) (acknowledgement that may not really be in the transcript).

185.   Investigator Lawson agreed that, if an employee did submit fraudulent documents in support of a claim for paid leave based on a child that did not exist, he would find it to rise to the level of criminal misconduct. Plf. Opp. App. 488-489 (dep. 115:12 – 116:2).

186.   Investigator Lawson agreed that sometimes birth certificates may be forged, in that it is his view that "anything can be forged." Plf. Opp. App. 472-473 (dep. 26:14 – 27:4).

### E. Defendant Lester's Proposed 10-Day Suspension of Plaintiff

187.   Rather than the typical process in which a Letter of Counseling/Reprimand would precede a decision to propose a suspension, as to Plaintiff Lu the Defendants first proposed the discipline and then followed up with a counseling/warning letter. *Compare* Plf. Opp. App. 27 (April 2, 2019) proposed suspension from Lester *with* Plf. Opp. App. 350 (CAO Crowe April 22, 2019 letter detailing the history, asserting the matter is closed, and noting the letter will be put in Plaintiff's "official personnel folder" along with Plf. Opp. App. 52 (cover email to the

Crowe letter, including threat that Ms. Lu needed to "consider this matter closed, as your very job may depend on it"). *Also see* Plf. Opp. App. 507 (dec. ¶57).

188. The District's disciplinary policies (excerpt begins at Plf. Opp. App. 366) identify progressive discipline as involving verbal counseling, then a reprimand, then "corrective action" (suspension of fewer than 10 days), and finally "adverse action" (suspension of 10 or more days). Plf. Opp. App. 368, 371, and 372. [Policy also at edpm.dc.gov/issuances/discipline/.] *Also see* Plf. Opp. App. 507 (dec. ¶57).

189. By starting with a 10-day proposed suspension rather than first trying a reprimand and a less-than-10-day suspension, Defendant Lester skipped two steps of progressive discipline. *See* Plf. Opp. App. 368, 371, and 372 (policy outlining standard steps); Plf. Opp. App. 30 (Douglas factor analysis in proposal, noting no prior reprimands or other prior corrective/adverse actions). *Also see* Plf. Opp. App. 507 (dec. ¶57) (Plaintiff's understanding of the standard process).

190. The disciplinary proposal also violated standard procedures by only giving Ms. Lu six days to respond. *Compare* Plf. Opp. App. 31 (proposal at 5) *with* Plf. Opp. App. 373 (D.C. policy requiring the employee be given 10 days to respond to a proposed suspension of 10 or more days). *Also see* Plf. Opp. App. 508 (dec. ¶59).

191. Defendant Lester summarized the basis for the proposed suspension as being that Plaintiff was told her reports were mistaken and instructed that she should stop making them, but nonetheless she persisted. Plf. Opp. App. 424-425 (dep. 21:20 – 22:6).

192. Tyrone Lawson's Investigative Report was a fundamental basis for Mr. Lester's proposed suspension of Plaintiff. Plf. Opp. App. 29 (proposal at 3, explaining the Lawson "investigation results and conclusions below provide the backdrop for this proposal"). *Also see* Plf. Opp. App.

431-432 (Lester dep. 31:18 – 32:5) (Mr. Lester's primary basis for decision to propose discipline was Lawson IR).

193.   <u>Proposing Official Lester did not seek any information beyond what was presented to him in the Lawson IR.</u> Plf. Opp. App. 434-435 (Lester dep. 35:21 – 36:1).

194.   <u>Defendant Lester testified that if Plaintiff Lu had never reported her belief that S.B. engaged in leave fraud, she never would have been disciplined: he knew of no other reason she would have been suspended.</u> Plf. Opp. App. 429 (dep. 28:4-13).

195.   <u>Defendant Lester in deposition agreed that, if an employee had obtained eight weeks of paid parental leave based on a child that turned out not to exist, it would constitute serious misconduct.</u> Plf. Opp. App. 426 (dep. 24:15-22).

196.   <u>Defendant Lester in deposition agreed that if an employee had submitted a document under oath that they knew to be untrue, it would be serious misconduct.</u> Plf. Opp. App. 426 (dep. 25:1-4).

197.   <u>S.B., a coworker of Plaintiff's, said in deposition he would assume that it would be serious misconduct if a DCRA employee were to claim paid parental leave for a non-existent child.</u> Plf. Opp. App. 410 (dep. 19:10-15).

198.   <u>Proposing Official Lester's more recent testimony at least three times contradicts his assertions in the April 2019 disciplinary proposal as to its basis.</u> *Compare* Plf. Opp. App. 27 (proposal at 1, asserting it addresses "**<u>only</u>** the dishonest statements made by Ms. Lu") (emphasis original) *with* Plf. Opp. App. 40 (Int. 1 response that "Plaintiff's discipline was based on a course of harassing conduct over two and a half years towards her coworker, S.B..."). *Also see* Plf. Opp. App. 41 (repeating the "course of harassing conduct over two and a half years" wording in response to Int. 5) *and* Plf. Opp. App. 47 (response to Int. 20, repeating

this wording). Mr. Lester's declaration under penalty of perjury as to the interrogatory responses appears at Plf. Opp. App. 50.

199.   Asked if it was relevant to his disciplinary proposal that Plaintiff contacted D.C. Council members, Defendant Lester responded that he "wouldn't say it would be irrelevant. It if was in the [Lawson investigative] report it would be relevant." Plf. Opp. App. 438 (dep. 44:8-10).

200.   The disciplinary proposal criticized Plaintiff for her communications with members of the D.C. Council. Plf. Opp. App. 29 (proposal at 3) (asserting she made dishonest statements "over and over and over" to them).

201.   The disciplinary proposal criticized Plaintiff for her communications with the media. Plf. Opp. App. 29 (proposal at 3) (asserting she made dishonest statements "over and over and over" to them).

202.   Proposing Official Lester is unsure if "there are protections under D.C. law for people who report what they believe to be wrongdoing" by employees. Plf. Opp. App. 423 (dep. 13:4-10).

203.   The harm Defendant Lester testified to having been caused by Plaintiff's conduct was "tension in the workplace" and no other harm "that I'm aware of." Plf. Opp. App. 428 (dep. 26:12-18).

204.   Defendant Lester's conclusion that Plaintiff Lu had disrupted the workplace was not based on his observations as the supervisor of Plaintiff and S.B. *See* Plf. Opp. App. 433 (dep. 34:1-5) (Lester conclusion based solely on Lawson IR and what Lawson said to Lester on the subject).

205.   Defendant Lester did not know if Investigator Lawson had looked into whether or not it was actually true that S.B. engaged in leave fraud. Plf. Opp. App. 439 (dep. 53:19-22).

206.   When S.B. complained to Defendant Lester about Plaintiff mistreating him, Mr. Lester did not meet with Plaintiff to hear her side of the story. Plf. Opp. App. 436-437 (dep. 37:21 – 38:1).

**F. Defendant Whitescarver's Imposed Eight-Day Suspension of Plaintiff**

207.   Deciding Official Whitescarver's more recent testimony at least three times contradicts his assertions in the June 2019 disciplinary decision for its basis. *Compare* Plf. Opp. App. 33 (decision at 1, identifying a single charge, related to misleading the mayor on two days in February 2019) *with* Plf. Opp. App. 40 (Int. 1 response that "Plaintiff's discipline was based on a course of harassing conduct over two and a half years towards her coworker, S.B..."). *Also see* Plf. Opp. App. 41 (repeating the "course of harassing conduct over two and a half years" wording in response to Int. 5) *and* Plf. Opp. App. 47 (response to Int. 20, repeating this wording). Mr. Whitescarver's declaration under penalty of perjury as to the interrogatory responses appears at Plf. Opp. App. 50.

208.   Defendant Whitescarver's sworn interrogatory testimony that Plaintiff was disciplined for "a course of harassing conduct over two and a half years towards her coworker, S.B..." (*id.*) contradicts his deposition testimony that the discipline was not for harassment. *Compare* Plf. Opp. App. 451 (dep. 39:1-7) (final charge was misleading the mayor, not insubordination or harassment because that is what was received from proposing official).

209.   Defendant Whitescarver was aware that even an accurate whistleblower disclosure leads to some disruption. Plf. Opp. App. 454 (dep. 69:14-18).

210.   Defendant Whitescarver claims he made his decision to discipline Plaintiff for purportedly lying about S.B. without knowing S.B. had admitted wrongdoing and paid a fine in relation to Plaintiff's earlier ethics disclosures. *See* Plf. Opp. App. 446 (dep. 17:7-11).

211.    Defendant Whitescarver's view of whether or not S.B. committed leave fraud is based entirely on what he heard second-hand from HR and Lawson's Investigation. Plf. Opp. App. 448 (dep. 26:8-13). *Also see* Plf. Opp. App. 449 (dep. 27:9-14) (did not review any documents outside of what was in the Lawson IR).

212.    Defendant Whitescarver disciplined Plaintiff for her reports to the mayor notwithstanding his deposition testimony that an employee is generally allowed to report "to the IG and to anyone else they care to" any matter "they feel is a violation of District law or is a case of fraud or abuse." Plf. Opp. App. 442-443 (dep. 11:17 – 12:3).

213.    Defendant Whitescarver testified that if Plaintiff Lu had never reported her belief that S.B. engaged in leave fraud, she never would have been disciplined: he was unaware of "any other issues that would have caused the suspension." Plf. Opp. App. 447 (dep. 21:9-16).

214.    Defendant Whitescarver in deposition agreed that if an employee had obtained eight weeks of paid parental leave based on a child that turned out not to exist, it would constitute serious misconduct. Plf. Opp. App. 444 (dep. 14:9-18)

215.    Defendant Whitescarver in deposition agreed that if an employee had submitted a document under oath that they knew to be untrue, it would be serious misconduct. Plf. Opp. App. 445 (dep. 15:15-22).

216.    Defendant Whitescarver's decision did not comply with D.C. disciplinary policy in that it was issued 86 days from the proposal (April 2 to June 27, 2019), while policy requires a decision in 45 days. *Compare* Plf. Opp. App. 33 (decision date) *with* Plf. Opp. App. 372 (45-day deadline). [Or 76 days if measuring from receipt of Plaintiff's answer on April 12, 2019.] *Also see* Plf. Opp. App. 508 (dec. ¶62).

217.  <u>Defendant Whitescarver's decision relied on the proposal, which in turn had relied heavily</u> <u>on the Lawson Investigative Report.</u> *See* Plf. Opp. App. 29 (proposal at 3, explaining the Lawson "investigation results and conclusions below provide the backdrop for this proposal") *and* Plf. Opp. App. 33 (decision, citing the proposal and noting Whitescarver's "full review of the supporting documentation") *and* Plf. Opp. App. 34 (decision: "I hereby adopt the evidence, recommendations, rationale, and conclusions of the proposing official").

218.  <u>Part of why Plaintiff was suspended was that she had not surrendered to management's</u> <u>view that there was no wrongdoing by S.B.</u>  *See* Plf. Opp. App. 34 (decision, referencing appearance she had not "fully conceded" to the investigatory conclusions).

219.  <u>The decision acknowledged that Plaintiff had no prior disciplinary record</u>. Plf. Opp. App. 34. *Also see* Plf. Opp. App. 507 (dec. ¶58).

220.  <u>The discipline was issued in part for the purpose of quieting Plaintiff.</u> *See* Plf. Opp. App. 33 at ¶9 (decision: "It is hoped that the proposed 10 day suspension will impress upon her the need for her to stop engaging in making false statements about her coworkers").

### G. Denial of Telework

221.  <u>As compared to the February 2019 disclosures to the mayor cited to discipline Plaintiff and</u> <u>the June 2019 suspension decision (Plf. Opp. App. 33), it was in August 2019 that Plaintiff</u> <u>submitted a request to telework and then was approved for it by her supervisor</u>. *See* Plf. Opp. App. 356 (Plaintiff email from October 2019 noting timeline) *and* 508 (dec. ¶68).

222.  <u>Chief Administrative Officer Tiffany Crowe was the one who had sent Plaintiff the April</u> <u>2019 email warning her that her job could depend on Plaintiff's willingness to drop the claims</u> <u>of fraud</u> (Plf. Opp. App. 52 and Plf. Opp. App. 508 [dec. ¶67]).

223.  It was unusual for CAO Crowe to get involved in decisions about individual employees being approved/disapproved for telework. *See* Plf. Opp. App. 405 (Crowe dep. 59:1-5). *Also see* Plf. Opp. App. 509 (dec. ¶68) (Plaintiff's observation of same).

224.  Ms. Crowe claimed that Plaintiff could not be allowed to telework because she did not have access to a VPN. Plf. Opp. App. 406-407 (Crowe dep. 69:22 – 70:3); Plf. Opp. App. 509 (dec. ¶69).

225.  Plaintiff alerted Ms. Crowe that while she was being barred from teleworking under the claim she could not do so without a VPN, her colleagues [who weren't whistleblowers] were teleworking. Plf. Opp. App. 357 (email); Plf. Opp. App. 509 (dec. ¶¶69-70). *See also* Defs. Ex. 11 at 2 (the 10/7/2019 email from Plaintiff to Crowe about the disparity of treatment).

226.  Among these was Plaintiff's coworker S.B., who testified that he was allowed to telework without a VPN. Plf. Opp. App. 415-416 (dep. 36:16 – 37:6).

227.  Chief Administrative Officer Tiffany Crowe at another point identified the basis for denial [versus elsewhere as absence of VPN] as being inability to access all network applications. Defs. Ex. 11 at 1 (Plaintiff email noting coworkers teleworking without access to Accela app).

228.  Yet Plaintiff's coworkers were allowed to telework without access to all such programs. *Compare* Defs. Ex. 11 at 1 (emails).

229.  The DCRA telework policy requires that a denial by an approving official must be documented in writing in the Telework Application/Agreement and made available to the employee (but no such formal denial has been provided by the Defendants). *Compare* Defs. MSJ Ex. 10 at 5 (policy requirement of formal documentation) with Defs. Ex. 11 at 1-13 (no such formal documentation in the 13 pages of related materials provided by Defendants); *also*

*compare* Ex. 11 at 1 (Plaintiff describing denial of telework being communicated to her verbally, in meeting with Tiffany Crowe).

### H. Other Matters

230.   Neither Plaintiff nor the officials involved in the discipline are aware of any other DCRA employees ever being disciplined for misleading management officials. Plf. Opp. App. 434 (Lester dep. 35:3-6); Plf. Opp. App. 450 (Whitescarver dep. 34:4-16); Plf. Opp. App. 509 (dec. ¶71 as to Plaintiff).

231.   While S.B. did not like Plaintiff reporting him, there were no disruptive confrontations between them, with them instead both continuing to perform at high levels. *See* Plf. Opp. App. 508 (dec. ¶61).

232.   Plaintiff's reports to the mayor that formed the basis for the sole disciplinary charge in the disciplinary decision (Plf. Opp. App. 33) did not disrupt or impede the work of the mayor. *See* Plf. Opp. App. 48 (Defendants' answer to Int. 22 asking for factual basis of any related factual contention, providing no specific answer and instead general statements about disruption of the overall workplace); Plf. Opp. App. 459-460 (DCRA Director Chrappah dep. 22:3 – 23:4) (not unusual or particularly inappropriate for people to excitedly approach mayor when seeing her); Plf. Opp. App. 457 (Director Chrappah dep. 11:6-22) (mayor's office never contacted him about Plaintiff's comments to mayor nor about anything else related to Plaintiff Lu) *and* Plf. Opp. App. 458 (Chrappah dep. 12:15-20) (he expects that if mayor's office did have a concern about a DCRA employee [e.g., Ms. Lu], the mayor's office would have let him know about it). *Also see* Plf. Opp. App. 492-494 (DCRA Deputy Director Shirley Kwan-Hui deposition testimony at 13:15 – 15:08 that she could recall no discussion of Plaintiff with the

Director nor any communications from the mayor's office asserting they considered Plaintiff to have been disruptive).

233.   Apart from the frustration any person might feel at being the subject of a coworker's whistleblowing, S.B.'s work performance was not adversely affected by Plaintiff's disclosures. *See* Plf. Opp. App. 414 (dep. 29:8-17) (he maintained high performance ratings).

234.   Investigator Lawson's experience is that it is typical for a person who is the subject of a whistleblower disclosure to be upset about it. Plf. Opp. App. 476-477 (dep. 39:17 – 40:3).

235.   S.B.'s understanding is that his complaints are what initiated the Lawson investigation of Plaintiff. Plf. Opp. App. 417-418 (dep. 40:17 – 41:2).

236.   Defendant D.C. has acknowledged that it is in the public interest for employees to be "free to report waste, fraud, abuse of authority, violations of law, or threats to public health or safety without fear of retaliation or reprisal." D.C. Code Ann. § 1-615.51.

237.   Defendants Lester and Whitescarver relied on their positions and authority as D.C. government officials to propose and impose the suspension on Plaintiff. *See* Plf. Opp. App. 25-30 (proposal issued by Defendant Lester, on official letterhead and citing his position as "Fire Protection Manager, DCRA, Permit Operations Division") *and* Plf. Opp. App. 31-35 (decision issued by Defendant Whitescarver as Chief Building Officer for the "Department of Consumer and Regulatory Affairs" and on official letterhead).

238.   Plaintiff has become more hesitant to speak out given that DCRA Chief Administrative Officer Tiffany Crowe told Plaintiff by email on April 30, 2019 that, "You need to consider this matter closed, as your very job may depend on it." Plf. Opp. App. 36-37 (email); Plf. Opp. App. 507 (dec. ¶56).

239.    Notwithstanding District HR's proclamation that employees have the right to communicate with Council members, <u>the (now former) Chief Building Officer instructed Plaintiff that she could raise concerns about leave fraud solely to HR from now on.</u> *Compare* [www.dchr.dc.gov/page/whistleblower-protections-and-obligations](www.dchr.dc.gov/page/whistleblower-protections-and-obligations) *and* Plf. Opp. App. 10 (Answer at ¶44, admitting to substance of the conversation asserted in Plaintiff's Complaint at ¶44, n. 8 [Plf. Opp. App. 338]). *Also see* WPS § 1-615-53 (prohibition on reprisal for employee exercising right to furnish information to a Councilmember). *Also see* Plf. Opp. App. 509 (dec. ¶74).

240.    <u>Plaintiff Lu mitigated her damages, such as by trying to take training and enter special programs when offered at work to help improve her resume and make it more likely she can be promoted (even though labelled a stalker); she has tried to continue to perform at a high level in spite of stress; she has sought professional care to try to make the stress and anxiety manageable, such as with counseling and medication; and she has pursued this lawsuit to try to get the discipline off her record as she believes it could easily hold her back from a promotion.</u> Plf. Opp. App. 509-510 (dec. ¶75).

241.    <u>Public employee parental-leave fraud occurs and can be prosecuted criminally.</u> *See, e.g.,* Plf. Opp. App. 513-514 (Georgia Attorney General announcement of state employee pleading guilty to falsely claiming a birth of a child as part of wrongly obtaining paid parental leave).

242.    <u>Another consideration in Plaintiff's concluding it was reasonable to believe that S.B. engaged in leave fraud is that coworker Alec Petrillo-Groh submitted a request for paid parental leave around the same time as S.B. and had told Plaintiff that they did not require verification of the authenticity of what he submitted.</u> *See* Defs. Ex. 3 at 25 (Plaintiff response to proposed disciplinary action, explaining basis for her actions).

243.    Defendant Whitescarver can think of no employee other than Plaintiff who has been disciplined for purportedly lying to management though believing others have done so. Dfs. Ex. 15 at 11 (Whitescarver dep. at 34:4-16).

244.    Defendant Whitescarver generally does not believe that a whistleblower working for the District must believe management when told that what was disclosed is false. Dfs. Ex. 15 at 10-11 (dep. at 33:18 – 34:3).

245.    Defendant Whitescarver does not necessarily expect employees to be certain that what they are reporting is correct before they report it. Dfs. Ex. 15 at 8 (dep. 31:7-17).

246.    Another reason that Plaintiff concluded it was reasonable to believe that S.B. engaged in parental leave fraud was that—as compared to S.B.'s wife in April not looking pregnant to Plaintiff—S.B.'s wife recounted to someone in the office that the [May] birth had been past the due date and so had to be induced. Dfs. Ex. 1 at 65 (Plaintiff email to OIG).

Respectfully Submitted,


SCHLEICHER LAW FIRM, PLLC
1629 K St., NW, Ste. 300
Washington, D.C. 20006
(202) 540-9950
(202) 683-6130 fax


By:  /s/ David R. Schleicher_____
        David R. Schleicher
        DC Bar No. 428001
        david@gov.law