# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

---

| | |
|---|---|
| **QING LU**, | § |
| *Plaintiff*, | § |
| | § |
| v. | § |
| | § Civil Action No. <u>1:20-cv-00461-APM</u> |
| **DISTRICT OF COLUMBIA,** | § |
| **C.G. WHITESCARVER,** | § |
| and | § |
| **SYDNEY LESTER,** | § |
| *Defendants*. | § |

---

## INDEX TO PLAINTIFF'S APPENDIX IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

| Item | Pages |
|---|---|
| Defs.' Answer to Plf.'s Amended Complaint (8/6/2021)…………………………….. | 3-16 |
| Settlement Agreement for Union Grievance (2/14/2020)……………..………….. | 17-22 |
| Negotiated Disposition of S.B. Ethics Violations (12/8/2016)…………………….. | 23-26 |
| Proposed 10-Day Suspension (4/2/2019)…………………………………....……... | 27-32 |
| Decision—Eight-Day Suspension (6/27/2019)…………………………..………... | 33-37 |
| Defs.' 2nd Amended Interrogatory Responses (9/7/2021)……………..…………. | 38-51 |
| T. Crowe email to Plf. (4/30/2019)…………………..……………….…………... | 52-53 |
| T. Lawson Investigative Report (2/23/2019)…………….…..…………………….. | 54-88 |
| S.B. interview by Investigator Lawson (11/30/2018)…..……………………….. | 89-115 |
| H. Shelton interview by Investigator Lawson (11/30/2018)…..……………….….. | 116-120 |
| S. Hashmi interview by Investigator Lawson (12/3/2018)……………………….... | 121-231 |
| S. Mutia interview by Investigator Lawson (12/3/2018)……………………….….. | 232-240 |
| C. Edet interview by Investigator Lawson (12/10/2018)………………………….. | 241-246 |
| C. Bailey interview by Investigator Lawson (10/10/2018)……………………….. | 247-259 |
| Qing Lu interview by Investigator Lawson (2/12/2019)………………………….. | 260-341 |

| | |
|---|---|
| S.B. email to management complaining of Plf. (2/2/2017)…………………………… | 342 |
| OIG case report showing no investigation opened (1/24/2017)………………………... | 343-344 |
| Emails re: Plf.'s ethics disclosures to BEGA (2016)…………………………………… | 345-348 |
| S.B. court setting relied on by Plf. (4/8/2016)………………………………………… | 349 |
| CAO T. Crowe letter to Plf. (4/22/2019)……………………………………………… | 350-355 |
| Email traffic re: denied telework (late 2019)………………………………………… | 356-365 |
| DC HR polices, excerpt on discipline………………………………………............ | 366-374 |
| Plf.'s First Amended Complaint (ECF No. 58)………………………………………… | 375-396 |
| Customer observation of odd shape (4/3/2018)………………………………………… | 397 |
| Email: "long held personnel vendetta" (8/23/2016)…………………………………… | 398-399 |
| BEGA email: greatly appreciate assistance (11/1/2016)……………………………… | 400 |
| Tiffany Crowe deposition (2/11/2021)………………………………………………… | 401-408 |
| S.B. deposition (5/13/2021)…………………………………………………………… | 409-421 |
| Sydney Lester deposition (2/11/2021)………………………………………………… | 422-440 |
| Clarence Whitescarver deposition (2/11/2021)………………………………………… | 441-455 |
| Ernest Chrappah deposition (3/31/2021)……………………………………………… | 456-462 |
| Ileana Corrales deposition (11/9/2021)……………………………………………… | 463-465 |
| Alec Petrillo-Groh deposition (3/10/2021)…………………………………………… | 466-469 |
| Tyrone Lawson deposition (4/14/2021)………………………………………………… | 470-490 |
| Shirley Kwan-Hui deposition (3/29/2021)…………………………………………….. | 491-497 |
| Plf. Declaration in Support of Partial MSJ (2/3/2022)………………………………… | 498-510 |
| Declaration as to Authenticity of Records (4/15/2022)………………………………… | 511-512 |
| Georgia Attorney General Press Release (4/4/2022) About Official Pleading Guilty to False Claim of Childbirth to Wrongfully Get Paid Parental Leave………….. | 513-514 |
| Excerpts from AFGE Grievance (6/30/2019)…………………………………………... | 515-516 |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| QING LU,<br><br>　　　　　　*Plaintiff,*<br><br>　　v.<br><br>DISTRICT OF COLUMBIA, *et al.*,<br><br>　　　　　　*Defendants.* | Civil Action No. 1:20-cv-00461-APM |

## DEFENDANTS DISTRICT OF COLUMBIA, CLARENCE G. WHITESCARVER, AND SYDNEY LESTER'S AMENDED ANSWER TO PLAINTIFF'S AMENDED COMPLAINT

Defendants District of Columbia (the District), Clarence G. Whitescarver, and Sydney Lester (collectively Defendants), through counsel, herein answer Plaintiff's Amended Complaint as follows:

### First Defense

Plaintiff's Amended Complaint fails to state a claim upon which relief can be granted.

### Second Defense

As to each of the numbered paragraphs in Plaintiff's Amended Complaint, Defendants respond as follows:

### PLAINTIFF'S FIRST AMENDED COMPLAINT[1]

Defendants admit that Plaintiff is suing under the First Amendment and the D.C. Whistleblower Protection Act, claiming that she has repeatedly made statements about S.B., and that S.B. entered into a negotiated disposition with the Board of Ethics and Government

---

[1]　For convenience and ease of reference only, Defendants utilize the headings appearing in Plaintiff's Amended Complaint in responding to the paragraphs contained therein.

Accountability (BEGA) that resulted in a $1,000 fine. Defendants deny the remaining allegations in the first paragraph of Plaintiff's Amended Complaint.

Defendants admit that Defendant Sydney Lester proposed a 10-day unpaid suspension for Plaintiff and that Defendant C.G. Whitescarver imposed an 8-day unpaid suspension for her. Defendants deny the remaining allegations in the second paragraph of Plaintiff's Amended Complaint.

## II.  JURISDICTION

1.      Defendants acknowledge the existence of the statute cited by Plaintiff but deny that the Court's jurisdiction is necessarily derived therefrom.

2.      Defendants acknowledge the existence of the statute cited by Plaintiff but deny that the Court's jurisdiction is necessarily derived therefrom.

3.      Defendants deny the violations of law which Plaintiff alleges and deny that this Court necessarily has jurisdiction over them. Defendants acknowledge the existence of the DCWPA and the fact that it authorizes naming individuals as defendants.

## III.  ADMINISTRATIVE EXHAUSTION OF REMEDIES

4.      Denied.

5.      Defendants admit that the union initially invoked arbitration in Plaintiff's behalf as to the eight-day suspension, but deny the remaining allegations in this paragraph.

## IV.  PARTIES AND SERVICE

6.      Defendants admit that Plaintiff may be contacted by way of her attorney, David R. Schleicher, Esq. Defendants lack sufficient information or knowledge to admit or deny the remaining allegations in Paragraph 6.

7.      Admitted.

8.     Admitted.

9.     Defendants admit that Plaintiff is suing Defendants Whitescarver and Lester in their individual capacities for claims under 42 U.S.C. § 1983 and those raised under DCWPA. Defendants admit the existence of those statutes but deny any violation of them by any defendant.  Defendants admit that Defendants Whitescarver and Lester were served and answered Plaintiff's original Complaint.

10.    Admitted.

## V.  FIRST AMENDMENT CLAIMS

### *A.  Legal Background*

11.    Admitted.

12.    Defendants generally admit the existence of this legal standard, but deny that this standard is properly applied to Plaintiff's actions or Defendants' responses to her actions.

13.    Admitted.

14.    Admitted.

15.    Admitted.

### *B.  Relevant Factual Claims*

16.    Denied.

    16.1.    Denied.

    16.2.    Defendants admit that these statutes exist but deny Plaintiff's general allegations that S.B. violated them.

    16.3.    Defendants admit that, in 2017, the position held by S.B. (and Plaintiff) was classified by D.C. as a "safety sensitive" position.  Defendants lack sufficient

information or knowledge to admit or deny the remaining allegations in Paragraph

16.3

16.4.    Defendants lack sufficient information or knowledge to admit or deny

the statements made in Paragraph 16.4.

17.    Denied.

17.1.    Denied.

17.2.    Denied.

18.    Denied.

18.1.    Admitted.

18.2.    Defendants deny that the discipline imposed on Plaintiff was based on

Plaintiff's exercise of her free speech rights.  Defendants deny the allegation in

footnote 4.  Defendants also deny that Plaintiff had any reasonable or good faith

belief in these complaints.  Defendants admit that Plaintiff's proposed discipline

detailed her reports.

18.3.    Defendants admit there was an eight-day suspension imposed by the

June 27, 2019 decision by Defendant Whitescarver.  Defendants deny the

remaining allegations in Paragraph 18.3.

18.3.1.    Admitted.

18.3.2.    Denied.

19.    Denied.

20.    Defendants deny any "violations" and the allegation that Plaintiff was speaking

"on matters [of] public concern," but generally admit the existence of this legal standard.

21.    Denied.

22.     Defendants lack sufficient information or knowledge to admit or deny the allegations in Paragraph 22.

23.     Defendants admit to the substance of the May 29, 2019 face-to-face meeting between Plaintiff and Defendant Whitescarver and to the substance of the email from Tiffany Crow to Plaintiff on April 30, 2019.  Defendants deny the remaining allegations and specifically the allegation that these actions are relevant to any claimed "chilling effect."

## VI.  D.C. WHISTLEBLOWER PROTECTION ACT

### A.  Legal Background

24.     Admitted.

25.     Admitted.

26.     Admitted.

27.     Admitted.

### B.  Relevant Factual Claims

28.     Admitted.

29.     Admitted.

30.     Defendants admit that the Mayor has authority to effectively recommend or take action to address violations and the misuse of government resources.  Defendants deny the remaining allegations in Paragraph 30.

31.     Denied.

32.     Denied.

33.     Denied.

34.     Denied.

35.     Defendants admit that the laws and regulations referenced in this paragraph and its sub-paragraphs exist.

    35.1.     Defendants admit that DPM, Chapter 16, Section 1605.4(b), exists.

        35.1.1.     Defendants admit that this legal standard exists.

        35.1.2.     Defendants admit that this legal standard exists.

        35.1.3.     Defendants admit that this legal standard exists.

    35.2.     Defendants admit that D.C. Code § 22-3221 exists, but denies that it is applicable to this matter.

    35.3.     Defendants admit that D.C. Code § 22-3242 exists, but denies that it is applicable to this matter.

    35.4.     Defendants admit that D.C. Code §§ 22-2402 and 22-2404 exist, but denies that they are applicable to this matter.

    35.5.     Admitted.

36.     Denied.

37.     Denied.

    37.1.     Defendants deny that Plaintiff observed erroneous time reporting and improper overtime claims.

    37.2.     Defendants deny that Plaintiff's belief was reasonable, but admit the factual allegations in Paragraph 37.2.

        37.2.1.     Defendants deny that fraud was committed, and lack sufficient information or knowledge to admit or deny the general allegations about "fake" documents made in this subparagraph and footnote 6.

37.3.     Defendants admit that Plaintiff refused to accept the conclusion reached by multiple investigations that there was no merit to her allegations about S.B.'s use of parental leave and subsequently made demands for additional information that she was not given by those investigators, but deny the remaining allegations in Paragraph 37.3.

37.4.     Denied.

37.5.     Defendants lack sufficient information or knowledge to admit or deny the allegations in Paragraph 37.5.

37.6.     Defendants admit that Plaintiff's testimony is that she visited the Facebook pages of S.B.'s family members, but deny the remaining allegations in Paragraph 37.6.

    37.6.1.     Defendants lack sufficient information or knowledge to admit or deny the allegations in Paragraph 37.6.1.

    37.6.2.     Defendants lack sufficient information or knowledge to admit or deny the allegations in Paragraph 37.6.2.

37.7   Denied.

38.     Defendants lack sufficient information or knowledge to admit or deny the allegations in Paragraph 38.

39.     Denied.

39.1.     Defendants admit that Plaintiff claims to have had such a conversation, but deny the conclusions reached in Paragraph 39.1.

39.2.     Defendants admit that Plaintiff claims to have had such a conversation, but deny the conclusions reached in Paragraph 39.2.

39.3.    Defendants admit that Plaintiff claims to have had such a conversation, but deny the conclusions reached in Paragraph 39.3.

40.    Admitted.

41.    Defendants admit that Plaintiff made allegations about S.B. to the Office of the Inspector General (OIG) and that OIG is a public body, but deny the remaining allegations in Paragraph 41.

41.1.    Defendants admit that Plaintiff sent a communicated to OIG on June 27, 2016, but deny the conclusions reached in Paragraph 41.1.

42.    Defendants admit that Plaintiff asked OIG to investigate S.B. on multiple occasions and that OIG referred her allegations to DCRA on one of those occasions, but deny the remaining allegations in Paragraph 42.

43.    Defendants lack sufficient information or knowledge to admit or deny the allegations in Paragraph 43.

44.    Defendants lack sufficient information or knowledge to admit or deny the allegations in Paragraph 44.  Regarding footnote 8, Defendants admit that Plaintiff met with Lynn Underwood and Chris Bailey on August 15, 2017, and admit to the substance of their conversation.  Defendants acknowledge the existence D.C. Code § 1-615.53, but deny that the Defendants, Lynn Underwood, and/or Chris Bailey violated it.

45.    Admitted.

46.    Denied.

46.1.    Denied.

47.    Denied.

48.    Denied.

49.     Denied.

50.     Defendants admit that Plaintiff had contact with BEGA and that BEGA conducted investigations of S.B., but deny the conclusions Plaintiff reaches in Paragraph 50.

51.     Denied.

52.     Denied.

## VII.  HARM SUFFERED

53.     Defendants admit that a 10-day suspension of Plaintiff was initially proposed and that she served an 8-day suspension.  Defendants further admit that the suspension caused Plaintiff to lose pay.  Defendants lack sufficient information or knowledge to admit or deny the remaining allegations in Paragraph 53.

53.1.     Denied.

54.     Defendants admit that Plaintiff was investigated for harassing S.B. and his wife S.C.B. as alleged in this paragraph and footnote 9, but deny that this investigation and discipline constituted retaliation, ill will, or improper motive in violation of the DCWPA.  Defendants lack sufficient information or knowledge to admit or deny the remaining allegations in Paragraph 54 and footnote 9.

55.     Defendants admit to the existence of the DCWPA prohibition against retaliation for protected disclosures, but deny that the decision to deny Plaintiff telework was in retaliation for any protected disclosure.

55.1.     Admitted.

55.2.     Defendants admit that Plaintiff's application for permission to telework was approved by her managers.

55.3.     Defendants admit that Plaintiff was unable to begin teleworking immediately, but deny the remaining allegations in Paragraph 55.3.

55.4.     Defendants admit that Plaintiff was unable to start teleworking immediately because she did not have a virtual private network (VPN) allowing her to access the Accela software necessary for her job.  Defendants deny the remaining allegations in Paragraph 55.4.

56.     Defendants admit that Plaintiff has hired an attorney but deny that Defendants have violated Plaintiff's rights or that it was necessary for Plaintiff to hire an attorney to mitigate her damages.

## VIII.  SUPPLEMENTAL CLAIM

57.     Defendants admit that Plaintiff is claiming that "her August-November 2016" allegations about S.B. (and S.C.B.) are "protected activity under the First Amendment and D.C. Whistleblower Protection Act," but deny that they qualify as protected activity or entitle Plaintiff to any relief.  Defendants deny the remaining allegations in Paragraph 57.

58.     Denied.

58.1.     Defendants admit that Sydney Lester emailed Plaintiff on August 31, 2016, but currently lack sufficient information or knowledge to admit or deny Plaintiff's characterization of that meeting.

58.2.     Defendants admit the Sydney Lester and Gary Englebert agreed to meet with Plaintiff to hear some of her allegations about S.B. on September 1, 2016, but currently lack sufficient information or knowledge to admit or deny Plaintiff's characterization of that meeting.

58.3.    Defendants admit that Plaintiff sent an email to Mia Brown and Tyrone Lawson on September 29, 2016, but deny Plaintiff's characterization in Paragraph 58.3.

58.4    Admitted.

58.4.1.    Defendants admit that BEGA entered into a negotiated disposition with S.B. on December 8, 2016 (BEGA No. Case No. 1548-001), but deny Plaintiff's characterization of that agreement in Paragraph 58.4.1.

58.5.    Defendants admit that the emails referenced in Paragraphs 58.1 to 58.4 were included as Exhibit 11 in the Investigative Report at issue in this case, , but deny the remaining allegations and characterizations in Paragraph 58.5.

## IX.  RELIEF SOUGHT

59 to 59.9.    Defendants deny that Plaintiff is entitled to any of the relief requested herein.

## X.  JURY TRIAL REQUESTED

60.    Defendants admit that Plaintiff is demanding a jury trial.

**FURTHER ANSWERING**, Defendants deny all allegations of wrongdoing not specifically admitted or otherwise answered.

### Third Defense

Defendants' exercise of proper management and control over the government workplace are not prohibited by the First Amendment.

### Fourth Defense

Defendants did not violate the D.C. Whistleblower Protection Act.

**Fifth Defense**

The conflict of interest that Plaintiff claims she was reporting was not the reason why she was disciplined.

**Sixth Defense**

The parental leave fraud that Plaintiff claims she was reporting is not "[g]ross" under D.C. Code § 1-615.52(a)(6), and, in any event, her beliefs that such fraud had been committed and not properly investigation were never reasonable.

**Seventh Defense**

If Plaintiff was injured or otherwise damaged as alleged in the Complaint, said damages resulted from Plaintiff's intentional, or otherwise wrongful, conduct.

**Eighth Defense**

Plaintiff failed to mitigate her damages.

**Ninth Defense**

If an impermissible factor was used in taking an employment action against Plaintiff, Defendants would have taken the same employment action as was taken against Plaintiff in the absence of the use of the alleged impermissible factor.

**Tenth Defense**

If Plaintiff was damaged as alleged in the Complaint, said damages were not proximately caused by the District or its employees, agents or servants acting within the scope of their employment.

**Eleventh Defense**

Defendants had a legitimate, non-retaliatory and/or non-discriminatory reason for any alleged action taken against Plaintiff.

**Twelfth Defense**

Plaintiff's claim may be barred by the applicable statute of limitations.

**Set-off**

Defendant District of Columbia asserts a set-off against any judgment rendered against it for all funds and services provided to or on behalf of Plaintiff, by Medicaid, Medicare, or any other form of public assistance.

**Jury Demand**

Defendants hereby demand a trial by jury.

Defendants reserve the right to amend their answer to Plaintiff's Amended Complaint and to raise any additional defenses, which the evidence in discovery may reveal.

Date:  February 4, 2022                    Respectfully Submitted,

                                           KARL A. RACINE
                                           Attorney General for the District of Columbia

                                           CHAD COPELAND
                                           Deputy Attorney General
                                           Civil Litigation Division

                                           */s/ Matthew R. Blecher*
                                           MATTHEW R. BLECHER [1012957]
                                           Acting Chief, Civil Litigation Division, Section III

                                           */s/ Adam P. Daniel*
                                           ADAM P. DANIEL [1048359]
                                           RYAN MARTINI [888241893]
                                           Assistant Attorneys General
                                           Civil Litigation Division
                                           400 6th Street NW
                                           Washington, D.C. 20001
                                           Phone:  (202) 442-7272; (202) 724-7322
                                           Fax:  (202) 400-2675; (202) 741-0555
                                           Email:  adam.daniel@dc.gov; ryan.martini@dc.gov

*Counsel for Defendants District of Columbia,*
*Clarence G. Whitescarver, and Sydney Lester*

## FEDERAL MEDIATION AND CONCILIATION SERVICE

| | | |
|---|---|---|
| American Federation of Government<br>Employees, Local 2725 | )<br>)<br>) | |
| v. | )<br>)<br>) | (Lu Grievance)<br>Arbitrator David Paul Clark |
| District of Columbia,<br>Department of Consumer and Regulatory,<br>Affairs. | )<br>)<br>) | FMCS Case No. 190821-101215 |

### SETTLEMENT AGREEMENT

1. **PARTIES.** This Settlement Agreement (Agreement) is entered into between the American Federation of Government Employees (AFGE), Local 2725, the District of Columbia and its Department of Consumer and Regulatory Affairs Services (collectively "Agency") through its representative, the District of Columbia Office of Labor Relations and Collective Bargaining (OLRCB), (collectively "the Parties"), and Ms. Qing (Luchi) Lu for the purpose of resolving all issues related to the above captioned grievance and arbitration.

2. **TERMS.** The parties agree to the following terms:

   a. The parties agree that the invocation of arbitration in this matter is rescinded by mutual agreement and that the hearing scheduled for January 28, 2019, is cancelled.

   b. The parties further agree that the mutual recession of the arbitration will be considered a "final determination" of the negotiated grievance process in this matter.

   c. The parties further agree that the mutual recession of the arbitration will not affect the discipline imposed by the Agency on June 27, 2019.

   d. The Agency agrees that it will not assert that the grievance in this matter is pending or in anyway precludes Ms. Lu from initiating any lawsuit against the Agency in any court of law.

   e. The parties further agree that if a court, in determining jurisdiction over any civil lawsuit filed by Ms. Lu, rules that the Ms. Lu did not adequately exhaust her administrative remedies, the union will be permitted to refile for arbitration in this matter without prejudice as to timeliness from the current mutual rescission of arbitration, so long as the refiling for arbitration is done within 120 days of that decision by the court (and the conclusion of any related court appeal that might be initiated by employee).

3. **NON-PRECEDENTIAL.** The Parties agree that this Agreement is completely void of any precedential value whatsoever. The Parties also agree that this Agreement was entered into based upon the particular facts and circumstances of this case only. Neither the Agreement nor the terms herein shall be construed as a basis, by any person or persons, to justify or repudiate similar terms in any subsequent matter. This Agreement shall not be quoted, construed, cited or relied upon by any Party in any manner in connection with any other judicial or administrative procedure, except to the extent necessary to enforce this Agreement or as required by law.

4. **TOTALITY OF AGREEMENT.** This Agreement constitutes a full, fair, and final resolution of all aspects of these matters and represents the sum total of all terms and conditions of the Agreement between the Parties. Parole evidence shall not be admissible to modify the terms of this Agreement in any judicial or administrative proceeding. No other conditions or assurances, expressed or implied, are included but for those included within the four corners of the instant written document.

5. **JOINT PRODUCT.** This Agreement is a joint work product and shall not be construed against any Party on the grounds of sole authorship.

6. **NO THIRD-PARTY BENEFICIARY.** No rights inure to the benefit of any individuals or entities that are not parties to this Agreement. There are no third-party beneficiary rights for any purpose under this Settlement

**FOR THE AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, LOCAL 2725:**

_____        12/17/19
Rushab Sanghvi                          Date
Associate General Counsel
AFGE

**FOR QING LU:**

_____        Dec 17, 2019
Qing Lu (Dec 17, 2019)                  Date
Qing Lu
Grievant

_____        16 Dec 2019
David R. Schleicher                     Date
SCHLEICHER LAW FIRM, PLLC

**FOR THE D.C. DEPARTMENT ON CONSUMER AND REGULATORY AFFAIRS:**

_Ernest Chrappah_        2-14-2020

Ernest Chrappah              Date
Director, DCRA

                               2/14/2020

Michael Kentoff            Date
Attorney Advisor, OLRCB

       MCK FOR MDL             2/14/2020

Michael D. Levy            Date
Director, OLRCB

         SUPERVISING ATTY ADVISOR

**From:** "Kentoff, Michael (EOM)" <Michael.Kentoff@dc.gov>
**Date:** Friday, February 14, 2020 at 10:58 AM
**To:** David Schleicher <david@gov.law>
**Cc:** Rushab Sanghvi <Sanghr@afge.org>
**Subject:** Re: Qing Lu Agreement Delay

David:

I can confirm that the 2019 date is a typo. I can make the change in red pen and initial or you can, if necessary, refer to this correspondence.

Michael

Michael Kentoff
Attorney Advisor
District of Columbia Office of Labor Relations and Collective Bargaining
202-724-4955

---

**From:** David Schleicher <david@gov.law>
**Sent:** Friday, February 14, 2020 11:55:32 AM
**To:** Kentoff, Michael (EOM) <Michael.Kentoff@dc.gov>
**Cc:** Rushab Sanghvi <Sanghr@afge.org>
**Subject:** Re: Qing Lu Agreement Delay

**CAUTION:** This email originated from outside of the DC Government. Do not click on links or open attachments unless you recognize the sender and know that the content is safe. If you believe that this email is suspicious, please forward to phishing@dc.gov for additional analysis by OCTO Security Operations Center (SOC).

Gentlemen—

Just noticed the signed version was the initial one where date of arbitration in 2(a) was misidentified as January 2019 rather than the actual 2020.  Rather than get all six signatures again, can you both just confirm by email in response that the 2019 reference was a typo and is meant to read 2020? Since it does not change anything substantive, I am okay with this approach if you/your offices are.

Thank you.

--David R. Schleicher
SCHLEICHER LAW FIRM, PLLC
(m) 202-607-7921
www.gov.law   www.smallbiz.law
        www.talentcounsel.law
w aco – DC – h ouston – Seattle
THE FIRM FOR FEDS – THE FIRM FOR BIz ™

*This message may contain privileged or otherwise confidential information. Interception prohibited by law. If you are not the named recipient, please notify sender and then delete the message. Thank you.*

**Plf. Opp.**
**App. 20**

**From:** "Kentoff, Michael (EOM)" <Michael.Kentoff@dc.gov>

**Date:** Friday, February 14, 2020 at 9:39 AM
**To:** David Schleicher <david@gov.law>
**Cc:** Rushab Sanghvi <Sanghr@afge.org>
**Subject:** RE: Qing Lu Agreement Delay

Happy to, David. See attached. Apologies for the time-lag.
Michael

Michael Kentoff | DC Office of Labor Relations and Collective Bargaining
(202) 724-4955



**From:** David Schleicher <david@gov.law>
**Sent:** Friday, February 14, 2020 10:37 AM
**To:** Kentoff, Michael (EOM) <Michael.Kentoff@dc.gov>
**Cc:** Rushab Sanghvi <Sanghr@afge.org>
**Subject:** Re: Qing Lu Agreement Delay

> **CAUTION:** This email originated from outside of the DC Government. Do not click on links or open attachments unless you recognize the sender and know that the content is safe. If you believe that this email is suspicious, please forward to phishing@dc.gov for additional analysis by OCTO Security Operations Center (SOC).

That will be a nice way to end the week. I appreciate your work in staying on this.

--David R. Schleicher
SCHLEICHER LAW FIRM, PLLC
(m) 202-607-7921
www.gov.law   www.smallbiz.law
    www.talentcounsel.law
w aco – DC – h ouston – Seattle
THE FIRM FOR FEDS – THE FIRM FOR BIZ ™

*This message may contain privileged or otherwise confidential information.
Interception prohibited by law. If you are not the named recipient, please
notify sender and then delete the message. Thank you.*

> **From:** "Kentoff, Michael (EOM)" <Michael.Kentoff@dc.gov>
> **Date:** Friday, February 14, 2020 at 9:35 AM
> **To:** David Schleicher <david@gov.law>, Rushab Sanghvi <Sanghr@afge.org>
> **Subject:** RE: Qing Lu Agreement Delay

**From:** Rushab Sanghvi <Sanghr@afge.org>
**Date:** Tuesday, February 18, 2020 at 4:03 PM
**To:** David Schleicher <david@gov.law>
**Subject:** Re: Qing Lu AFGE Case

Confirmed. The Agency was supposed to have signed the revised copy but apparently never did. However, with Michael's confirmation that it was a typo, you should be fine,

Best,

Rushab


Rushab Sanghvi
Associate General Counsel
AFGE, Office of the General Counsel
Tel. 202-639-6424
Fax. 202-379-2928

This message may contain confidential attorney-client privileged information and/or confidential attorney work-product.  Only an intended recipient of this message is authorized to view, retain, or otherwise use its content, including any attachments and/or metadata.  If you are not an intended recipient, please so notify the sender immediately by clicking "reply," and delete this message without reading, printing or otherwise preserving or disseminating its contents.


**From:** David Schleicher <david@gov.law>
**Date:** Tuesday, February 18, 2020 at 11:02 PM
**To:** Rushab Sanghvi <Sanghr@afge.org>
**Subject:** Qing Lu AFGE Case

Rushab,

Please confirm by email in response that the 2019 arbitration referenced in the agreement among AFGE, the DC government, and my client Qing Lu was a typo and should read 2020.

I will then retain send out a copy of the agreement to you and the DC attorney with confirmations from both of you attached for your records.

[from https://bega.dc.gov/publication/1548-001-s-b█████-negotiated-disposition]

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**BOARD OF ETHICS AND GOVERNMENT ACCOUNTABILITY**

☆ ☆ ☆



**Office of Government Ethics**

In Re: S███ B███
Case No.: 1548-001

## PUBLIC NEGOTIATED DISPOSITION

Pursuant to section 221 (a)(4)(A)[1] of the Board of Ethics and Government Accountability Establishment and Comprehensive Ethics Reform Amendment Act of 2011, effective April 27, 2012, D.C. Law 19-124, D.C. Code § 1-1162.21(a)(4)(A) ("Ethics Act"), the Office of Government Ethics (the "Office" or "OGE") hereby enters into this public negotiated settlement agreement with the Respondent, S. B███. Respondent agrees that the resulting disposition is a settlement of the above-titled action, detailed as follows:

## I. FINDINGS OF FACT

Respondent is a Fire Protection Engineer in the Permitting Operations / Fire Protection Division at the Department of Consumer and Regulatory Affairs ("DCRA") and has held that position since 2007. Respondent's duties and responsibilities include reviewing permit applications for code compliance and providing guidance to applicants to help them bring their applications into compliance. Respondent's job duties also require that he process walk-in permit applications at the DCRA fire review desk.

An architect or builder may submit a permit application to DCRA by one of two processes. The online process requires that an applicant submit the application online through ProjectDox. Once the application is uploaded into the online system, a DCRA manager assigns reviewers (*e.g.*, fire, structural, electrical) to review the permit. In some cases, such as an application to build a fence, permits are not assigned to a fire reviewer. In other, more complex jobs, such as commercial building permit applications, fire reviewers are assigned to review the application. All assigned reviewers must approve the permit application before it is issued. Applicants can access ProjectDox to see whether a reviewer has approved or made comments regarding their application. Applicants may also submit their permit applications through an in-person process. In those cases, applicants may go to DCRA's main office, submit their permit application to intake, and then take the permit to each assigned division for permit review and approval. If each division approves the permit, the permit is issued that same day.

---

[1] Section 221(a)(4)(A) of the Ethics Act provides, "[i]n addition to any civil penalty imposed under this title, a violation of the Code of Conduct may result in the following: ... [a] negotiated disposition of a matter offered by the Director of Government Ethics, and accepted by the respondent, subject to approval by the Ethics Board."

On November 5, 2014, Respondent entered into a domestic partnership with the owner of an architect consulting firm that often appears before DCRA with permit applications for its projects based in Washington, D.C. In mid-August 2015, Respondent married the owner of the company. An investigation revealed that, on two separate occasions, Respondent took official action on permit applications submitted by his spouse, on behalf her company, in violation of the conflicts of interest provisions in the Ethics Act.[2]

First, on August 3, 2015, Respondent reviewed Permit Number B1509401, an "addition alteration repair permit," which was submitted by his spouse. The permit pertained to a residential property and was assigned to Respondent for fire review. According to Respondent's supervisor, in early 2015, DCRA changed its internal policies so that fire reviewers, such as Respondent, were no longer required to review residential permits. Instead, the new policy required residential reviewers to perform fire reviews for residential permit applications. If a fire reviewer were assigned to a residential property, they were instructed to select "N/A," so that the permit could be reviewed by a residential reviewer. Upon learning that her residential permit application had been assigned to fire review despite this new policy, Respondent's spouse contacted him for assistance. Respondent admitted during his interview with OGE that he went into Acela, DCRA's internal permit review system, and selected "N/A" (not applicable) for the fire review portion of this permit application. Because he did not view selecting "N/A" as an official action, Respondent did not inform his supervisor that the permit application was submitted by his spouse and he did not recuse himself from working on this permit. This permit was ultimately approved by DCRA after it was reviewed and approved by several disciplines, including, but not limited to the following departments: zoning, energy, green, structural, mechanical and water.

Second, on February 12, 2016, Respondent's spouse brought an "alteration and repair permit," Permit Number B1604648, for window and door replacements to DCRA for in-person processing. The DCRA intake officer assigned the fire review desk, which on this date was staffed by Respondent, to review this walk-in application. Respondent admitted during his interview with OGE that he performed and approved the fire review section of this permit application. In subsequent correspondence with OGE, Respondent admitted that he should have recused himself from conducting this review. This permit was ultimately approved by DCRA.

Respondent and his spouse cooperated fully with OGE's investigation by submitting to interviews and providing this Office with documents upon request. In addition, Respondent swiftly accepted responsibility and expressed remorse for his conduct.

---

[2] *See* D.C. Official Code § 1-1162.23.

## II. NATURE OF MISCONDUCT

Respondent violated the following provisions of the Code of Conduct, as set forth below:

- **Count One:** Conflict of Interest

    On August 3, 2015, Respondent violated D.C. Official Code §1-1162.23(a)[3] when he entered "N/A" on a permit application (B1509401) that his spouse had submitted for approval to DCRA. By selecting "N/A" on the permit application, Respondent helped move her permit application through the DCRA review process. Respondent's spouse was a "person closely affiliated"[4] with him at the time he took this action, given that they had previously entered a domestic partnership on November 5, 2014.

- **Count Two:** Conflict of Interest

    On February 12, 2016, Respondent violated D.C. Official Code §1-1162.23(a) when he approved a permit (B1604648) that his spouse brought to DCRA for in-person review. His spouse was a "person closely affiliated" with Respondent at the time he took this action, given that they were married in mid-August 2015.

## III. TERMS OF THE NEGOTIATED SETTLEMENT

Respondent acknowledges that his conduct was in violation of the District Code of Conduct in that he violated the conflict of interest provisions set forth in the Ethics Act. Respondent agrees to pay a $1,000 fine and attend ethics training provided by OGE within six months of the full execution of this Negotiated Disposition Agreement. Respondent also promises not to engage in such conduct in the future. The fine shall be paid by having $50.00 per pay period automatically deducted from Respondent's bi-weekly paycheck from the District government commencing immediately and continuing until such time as the fine amount is fully satisfied. By this agreement, Respondent expressly authorizes the Office of Pay and Retirement Services (OPRS) to make these deductions and to transfer such funds to the Board of Ethics and Government Accountability. In the event that Respondent's employment with the District government ceases prior to complete satisfaction of the fine amount, Respondent agrees that any outstanding fine

---

[3] D.C. Official Code §1-1162.23(a) provides, "No employee shall use his or her official position or title, or personally and substantially participate, through decision, approval, disapproval, recommendation, the rendering of advice, investigation, or otherwise, in a judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, or other particular matter, or attempt to influence the outcome of a particular matter, in a manner that the employee knows is likely to have a direct and predictable effect on the employee's financial interests or the financial interests of a person closely affiliated with the employee."

[4] A "person closely affiliated" with a District employee is defined as a "spouse, dependent child, general partner, a member of the employee's household, or an affiliated organization." D.C. Official Code §1-1161.01(43).

3

amount will be satisfied by the Respondent from the District government for unused annual leave. Respondent acknowledges that, whether or not OPRS completes this deduction as described herein, Respondent is nonetheless solely responsible for satisfying the fine amount.

Respondent also understands that if he fails to pay the $1,000 fine in the manner and within the time limit provided above, pursuant to section 221 (a)(5)(a) of the Ethics Act (D.C. Official Code §1-1162.21 (a)(5)(A)), the Ethics Board may file a petition in the Superior Court of the District of Columbia for enforcement of this settlement and the accompanying Board Order assessing the fine. Respondent agrees that this Negotiated Disposition is not just an admission of wrongdoing, but constitutes various factual admissions by him that may be used in any subsequent enforcement or judicial proceeding that may result from his failure to comply with this agreement.

Respondent further understands that if he fails to adhere to this agreement, the Office may instead, at its sole option, recommend that the Ethics Board nullify this settlement and hold an open and adversarial hearing on this matter, after which the Board may impose sanctions up to the full statutory amount ($5,000 per violation) as provided in the Ethics Act for each violation. Because the Office is, at this time, foregoing that the Ethics Board hold an open and adversarial hearing on this matter, Respondent agrees to waive any statute of limitation defenses should the Board decide to proceed in that matter as a result of Respondent's breach of this agreement.

The mutual promises outlined herein constitute the entire agreement in this case. By our signatures, we agree to the terms outlined herein.

Respondent

12/5/2016
Date

Darrin P. Sobin
Director of Government Ethics

12/5/2016
Date

This agreement shall not be deemed effective unless and until it is approved by the Board of Ethics and Government Accountability, as demonstrated by the signature of the Chairman below.

APPROVED:

Robert J. Spagnoletti
Chairman, Board of Ethics and Government Accountability

12/8/16
Date

4



Government of the District of Columbia
Department of Consumer and Regulatory Affairs

# POD/Fire Protection Unit

Date April 2, 2019

Employee: Luchi Lu
Title: Fire Protection Engineer
Unit/Agency: Technical Review Branch, Permit Operations Division/DCRA

**RE: Advance Written Notice of Proposed Suspension of 10 Days**

**Dear Ms. Lu**

This is a **15 calendar day** advanced written notice of a proposal to suspend you
without pay for 10 **business days(s)** from your position of Fire Protection Engineer
with the <u>Department of Consumer and Regulatory Affairs, Permit Operations
Division/ Fire Protection Unit.</u> This action is proposed in accordance with the
provisions of **§1605.4(b)** of the District Personnel Manual (DPM). This proposed
action is based on the charge of False Statement. The details to support this action
are stated below:

Charge:    DPM 1605.4(b) In this case the charge is False Statements –
Knowingly and willfully reporting false or misleading information or
purposefully omitting facts, to any supervisor.

**Specification**:
Special Investigator Tyrone Quintin Lawson was tasked with investigating Case Number
018-SP-0034 – a complaint that Qing (Luchi) Lu, Fire Protection Engineer, knowingly
stalked and harassed Fire Protection Engineer S██ B███ and his wife N███ B███
while on duty. His report stated that her actions occurred over the period June 27, 2016 to
February 5, 2019. During that time Ms. Lu failed to comply with rules and proper
supervisory instructions. Mr. Lawson also stated that Ms. Lu also knowingly and willfully
provided false or misleading information in connection with the investigation. This
disciplinary action will address **only** the dishonest statements made by Ms. Lu.

The evidence shows that when Ms. Lu first started filing complaints claiming that **Mr.
B███ had fraudulently stated that he had a new born baby ███ in ███ in order to
get Paid Family Leave (PFL). Ms. Lu has persisted with this false claim against a
coworker for the past two and a half years.**



On Tuesday **February 7, 2017** Ms. Lu forwarded an email entitled "FOIA Response" to then HR Officer Mia Brown and HR Manager Ingrid Jackson which was a five (5) page email thread. Eventually Ms. B█████ emailed Ms. Lu and told her that Mr. B████ met all of the qualifications for approval of his PFL. This is documented in Ms. Brown's email to Ms. Lu dated **May 12, 2017** where she was advised that "As it stands, all required documentation has been provided by the employee for approved Paid family Leave (PFL)" – Exhibit 15 in the Investigative Report (IR).

In addition, over time, then CAO Walter Crawford and then HR Manager Ingrid Jackson told Ms. Lu that the matter was closed because Mr. B████ met all the required qualifications for his PFL. This is documented in Ms. Lu's email of **February 10, 2017**, to Mr. Crawford acknowledging the end of the investigation and that per her final paragraph, "From now on, there will be no more communications from me on this matter. You have my word. Thank you all for your time". - Exhibit 13 in the IR. Ms. Jackson's email of **September 11, 2017** advised Ms. Lu that her concerns were investigated by both the Office of the Inspector General and the Board of Ethics and Government (BEGA) and that the OIG and BEGA has informed the agency that they could not find any cause for the agency to take any disciplinary action against Mr. B████ and that the case is now closed. Finally Ms. Jackson closed the email by stating "Please consider this the final response on behalf of the agency as the matter has been investigated and deemed closed". – Exhibit 22A in the IR.

OIG informed then DCRA Director Bolling by email from IG Daniel Lucas, dated **October 28, 2016**, that the complaint was referred to DCRA and they considered the matter a DCRA matter. - Exhibit 10 in the IR; On **May 10, 2017** OIG Hotline sent an email to Ms. Lu informing her that the OIG conducted an independent analysis and determined that no further action by the OIG is warranted. That email also advised that the D.C. OIG considers this matter closed. The OIG response was in response to Ms. Lu's Complaint Number 2016-1103 which she submitted alleging false claims or statements, a case of fraud, opened June 27, 2016 and closed December 1, 2016. – Exhibit 9 in the IR.

BEGA also responded to Ms. Lu's complaint as shown in her emails of **July 25, 2017** to BEGA Investigator Corrales, where she insisted that there is cause to reopen their investigation. BEGA indicated to Ms. Lu that that they considered the matter closed and refused to investigate because there was no foundation to her complaint. This is documented in both BEGA Investigator Corrales email of **July 25, 2017** to Ms. Lu where she was advised that the matter was closed and Ms. Lu's email - Exhibit 18 of the IR.

Then DCHR Director Ventris Gibson told Ms. Lu that the matter regarding her complaint was closed because all of the qualifications for PFL were met by Mr. B████ This is documented in his email of **November 28, 2017**, to her, where she concluded that "Since this matter is closed, we are unable to assist you further".

In addition, DCHR Program Analysis Ledesma Smith-Mathis, in an email to Ms. Lu dated **November 29, 2017** with the subject "RE: DCHR Response – Follow up with the Director", informing her that "after speaking with Director Gibson, she has informed me that DCHR, OIG and BEGA looked into your allegation and found no merit to your



claim". The email concluded with the statement "Since the matter is closed, we are unable to assist you further". – Exhibit 44 of the IR.

Finally, then DCRA Director Melinda Bolling told Ms. Lu that her complaint was investigated and found to have no merit and so DCRA is done with the complaint. This was documented in Ms. Lu's email to Mr. Slade of **April 23, 2018** informing him of the outcome of her meeting with the Director. – Exhibit 40 of the IR.

Yet in spite of all these clear instructions, Ms. Lu made deliberate effort to continue making dishonest statements in filing complaints over and over and over to the same D.C. Government Agencies, D.C. Councilmembers, entities outside D.C. Government including private companies, private citizens and various news media services as provided in the examples below.

    On Friday, **September 22, 2017** Ms. Lu sent an email with her complaint against S█████ B█████ entitled "Report forgery crime to EOM" to Mayor Bowser, with copies to Mark Tuohey (EOM), John Falcicchio (EOM) and Beverly Perry (EOM). See pages 29 and 30 of the attached investigative report.

    On Monday, **April 9, 2018** Ms. Lu sent emails regarding her complaint against S█████ B█████ entitled "Epidemic Paternity leave fraud by male DC government employee" to CNN's Heather Brown, Lauren Cone, Community@CNN and CNN.Feedback. See page 30 of the attached investigative report.

    On Thursday, **April 12, 2018** Ms. Lu sent BEGA investigation information to a private citizen Tanya Hill of Permit Xperts. See page 30 of the investigative report.

    Between Wednesday, **May 23,** 2018 and Wednesday, **May 30, 2018** Ms. Lu exchanged emails about her complaint against S█████ B█████ entitled "Paternity leave fraud - using pillows for fake pregnancy" to Michelle Basch of WTOP. See page 31 of the attached investigative report.

Several additional false charges were made by Ms. Lu, in her complaint against S█████ B█████ see pages 29, 30 and 31 of the IR.

The final act raised the level of dishonesty/false statements even higher when on **February 5, 2019** Ms. Lu confronted Mayor Bowser and her party touring the Permit Center while visiting DCRA, aired her complaint and followed up with an email to the Mayor dated **February 6, 2019** with the subject "Report to Mayor Bowser – Wearing Pillow for paternity leave" – Exhibit 55 of the IR

Special Investigator Lawson's comprehensive investigation report documents the evidence that Ms. Lu's conduct has been dishonest and prejudicial to Mr. B████ and the District Government. His investigation results and conclusions below provide the backdrop for this proposal.

Ms. Lu grossly violated Part 1, DC Personal Regulations Chapter 16; Sect 1605.4(b) False Statements, including: Misrepresentation, falsification, or concealment of material facts or records in connection with an official matter; Knowingly and willingly reporting false or misleading information or purposely omitting material facts to any supervisor.



**This proposed disciplinary action has taken into account the Douglas factors to include:**

1. **The nature and seriousness of the conduct.** The offenses are serious and do impair operational efficiency and continued up to February 6, 2019.

2. **The employee's job level and employment type.** Employee interacts with the public on a daily basis and is expected to uphold the mission and integrity of her position. Core functions require interaction with professionals in the construction industry where accuracy and honesty are essential in the Agency's ability to enforce compliance if not done with integrity.

3. **Past Corrective or Adverse Actions (including reprimands). None**

4. **Employee's past work record.** Ms. Lu has been a Fire Protection Engineer with DCRA for over eleven (11) years. During that time her performance has continually been that of a highly effective performer.

5. **Confidence in Employee.** Management's confidence in the employee's ability to refrain from continuing the dishonest allegation about Mr. B███ is very low based on her record.

6. **Consistency of the penalty with Table of Illustrative Actions.** This proposed discipline is in line with the table of penalties. Any subsequent lapse should be ground for more serious action including termination.

7. **Impact on Agency Reputation/Notoriety.** None

8. **Clarity of Notice to Employee of Unacceptable Conduct.** Emails from OIG, BEGA, DCHR Director and staff and DCRA Management all informed her that the claim was deemed false and should be discontinued.

9. **The potential for the employee's rehabilitation.** Up to February 6, 2019, Ms. Lu continued her dishonest conduct. It is hoped that the proposed 10 day suspension will impress upon her the need for her to stop engaging in making false statements about her coworkers.

10. **Mitigating circumstances.** The employee has admitted to knowingly engage in a course of conduct directed at Mr. B███ that she should have known was false

11. **Adequacy of Alternative Actions.** In light of the numerous occasions on which Ms. Lu has been advised of the lack of evidence of her claims AND counseled to cease and desist, management believes that it will take at least a 10 day suspension to impress upon her the seriousness of her misconduct and that it must cease once and for all.



You have the right to review any material upon which this proposed action is based and to prepare a written response to the notice, including affidavits and other documentation, within six (6) days of receipt of this notice. You have the right to union representation.

Your response, should you prepare one, may raise every defense, fact or supporting matter in extenuation, exculpation, or mitigation of which you have knowledge or reasonably should have knowledge, or which is relevant to the reasons in support of the proposed action, specification(s), or proposed penalty.

Any response you prepare should be presented to Mr. Clarence Whitescarver, Deciding Official, who will review this written notice and your response, if there is one, and issue a notice of final decision. Mr. Whitescarver is located at DCRA, 1100 4th Street SW, Washington, DC, 20024, and may be reached at (202) 481 3536.

The material upon which the proposed action is based may be reviewed in the DCRA main office, located at 1100 4th Street SW, Washington, DC, 20024. You may arrange to review the material by contacting Mr. Donald Tatum   Human Resources Officer, (202-442-8928), however please note that copies of all supporting documents were given to you at the same time you received the Proposed Notice.

The final action being proposed (if implemented by the Deciding Official) may be appealed at the Office of Employee Appeals as provided in §1625.1(c) of the DPM or through the negotiated grievance procedure set forth in your collective bargaining agreement (if you belong to a union), but not both. [DPM §1625.2] You have the right to union representation if you are a member of a union that has a collective bargaining agreement with the District of Columbia. Whether or not you are a member of a union you have the right to be represented by an attorney or other representative.

You may elect to file an appeal of any future Final Decision for removals or suspensions of 10 or more days with the D.C. Office of Employee Appeals (OEA) located at 955 L'Enfant Plaza, SW, Suite 2500, Washington, DC 20024 Phone: (202) 727-0004. That appeal must be filed within thirty (30) calendar days of the effective date of any implemented suspension. For additional information on filing an appeal, you can contact the OEA at (202) 727-0004. In addition, this information is available at http://oea.dc.gov/oea/site/default.asp.

Please be advised that you will remain in an active duty status during the period of advance notice.

Sincerely,

Sydney Lester
Fire Protection Manager, DCRA, Permit Operations Division



Director or Designee

cc:   Tiffany Crowe, Chief Administrative Officer
      Clarence Whitescarver, Deciding Official
      Don Tatum, Labor Relations Liaison
      LaKeitha Johnson, AFGE Union Representative.

### ACKNOWLEDGEMENT OF RECEIPT

Qing Lauhin`Lu     Date 4-2-2019
Employee's Signature

                   Date 4/2/19
Witness

## Government of the District of Columbia
## Department of Consumer and Regulatory Affairs



June 27, 2019

Luchi Lu
Fire Protection Engineer
Technical Review Branch, Permit Operations Division

### RE:  <u>Notice of Final Decision: Advanced Written Notice of Proposed 10 day Suspension</u>

Dear Ms. Lu:

This is the notice of final decision regarding the proposal to suspend you without pay for ten (10) days from your position of Fire Protection Engineer in the Permits Operation Administration with the Department of Consumer and Regulatory Affairs.

The charge was set forth in the proposed written notice dated **March 27, 2019**. Following a full review of the supporting documentation and your associated written response dated 4/12/2019, in addition to the meeting conducted with you and a AFGE Union representatives on or about 4/19/2019, I conclude that the proposed suspension is the appropriate action for this matter, with a reduction of the proposed suspension from ten (10) business days to eight (8) business days. Accordingly, you will be suspended for eight business days from **July 16, 2019** through **July 25, 2019**. This period of suspension covers two pay periods.

This action is being taken based upon the following violation of the District Personnel Manual (DPM) as incorporated by Article 9, Section A, of the Collective Bargaining Agreement between the Department of Consumer and Regulatory Affairs (DCRA) and AFGE Local 2725.

This disciplinary action is based on the following **Disciplinary Charge**:

On February 5, 2019 and February 6, 2019, while on-duty you, knowingly and willfully reported false or misleading information or purposely omitted material facts to a supervisor, in this case the Mayor of the District of Columbia, in violation of DPM, Chapter 16, Section 1605.4(b)(4).

**Government of the District of Columbia**
**Department of Consumer and Regulatory Affairs**



In your April 12, 2019, response to the Proposed Suspension Notice of March 27, 2019, you repeatedly stated that your comments were based upon personal observations, limited as they were, while also repeatedly acknowledge, via email records and statements, having been notified by a variety of District agencies, officials, supervisors, and investigator(s) that the matter had been investigated and closed without having identified an incident of fraud or leave abuse by the alleged perpetrator, Mr. S███ ████  Your statements and email communications to the Mayor, as cited above, willfully seeks to obfuscate the record of these investigations and interactions.  Your responses also indicate that you have not fully conceded to the conclusions of the investigations or supervisory direction provided to you in this case.

**Douglas Factors**.  I hereby adopt the evidence, recommendations, rationale, and conclusions of the proposing official.  The Proposed Suspension Notice, along with attachment, is incorporated into this final action, including specific Douglas Factor analyses below:

1.  **As stated in the Proposed Suspension Notice.**  The nature and seriousness of the conduct.  The offenses are serious and do impair operational efficiency and continued up to February 6, 2019.

2.  **As stated in the Proposed Suspension Notice.**  The employee's job level and employment type.  Employee interacts with the public on a daily basis and is expected to uphold the mission and integrity of her position.  Core functions require interaction with professionals in the construction industry where accuracy and honesty are essential in the Agency's ability to enforce compliance if not done with integrity.

3.  **As stated in the Proposed Suspension Notice**.  Past Corrective or Adverse Actions (including reprimands).  None.

4.  **As stated in the Proposed Suspension Notice. Employee past work record.** It should be noted that according to the record you used work time to draft and/or transmit these allegations of leave fraud and abuse, even after being advised of the case being closed. This lack of a due sense of accountability for one's work time and the apparent disregard to the adverse effect in the workplace for your actions is an aggravating factor.

**Government of the District of Columbia
Department of Consumer and Regulatory Affairs**



5. **Confidence in Employee**. Your apparent behavioral adjustment during the intervening weeks since being served with the Proposed Suspension Notice has been considered as a mitigating factor in my decision to reduce the suspension time period.

6. **As stated in the Proposed Suspension Notice. Consistency of the penalty with Table of Illustrative Actions.** This proposed discipline is in line with the table of penalties. Any subsequent lapse should be ground for more serious action including termination.

7. **Impact on Agency Reputation/Notoriety**. Contrary to the finding in the Proposed Suspension, persistent, unsubstantiated allegations of impropriety on the part of an agency employee, together with an assertion that the investigatory process is flawed due to findings that do not support your allegations does have an unacceptable impact toward degrading public confidence in the conduct of the District governmental and its processes. Wanton disregard for personal actions that adversely impact public confidence is not in keeping with acceptable District employee behavior.

8. **As stated in the Proposed Suspension Notice.** Emails from OIG, BEGA, DCHR Director and staff and DCRA Management all informed her that the claim was deemed false and should be discontinued.

9. **As stated in the Proposed Suspension Notice**. Up to February 6, 2019, Ms. Lu continued her dishonest conduct. It is hoped that the proposed 10 day suspension will impress upon her the need for her to stop engaging in making false statements about her coworkers.

10. **The potential for the employee's rehabilitation**. As stated in #5 and in the paragraph labeled "Mitigating Factor," above. It is hoped that you will be rehabilitated after serving this suspension and will cease and desist this form of misconduct.

11. **Mitigating circumstances**. With respect to the reduction of the proposed suspension from 10 days to the final 8-day suspension, it was taken into consideration that during the intervening period from March 27, 2019, to the present, there have been no reported incidents of you having repeated the performance that necessitated this disciplinary action. It is with cautious optimism that a reduction in suspension time has been decided. However, it is also noteworthy that, according to records, your behavioral corrections in



**Government of the District of Columbia**
**Department of Consumer and Regulatory Affairs**

this matter in the past are often short-lived, limiting the scope of the suspension reduction to ensure that a lasting behavioral correction will ensue.

As a government employee, you hold a position of the public trust. Statements made and actions taken as a government employee either reflect well on the public trust, or degrade it. You have the responsibility to consider the impact of your actions on the public trust, the cohesiveness of the workplace environment, and the wellbeing of your fellow employees. Be advised that further misconduct may result in your separation of employment from DCRA.

You are hereby suspended from **July 16, 2019** through **July 25, 2019**; you are to return to work on July 26, 2019. If you have any questions about the suspension dates please contact Don Tatum (Labor Relations Liaison) at 202-442-8928.

This action may be grieved as provided in §**1625-1634** of the DPM or through the negotiated grievance procedure set forth in your collective bargaining agreement (if you belong to a union), but not both. [DPM §**1625.2**] Employees belonging to AFGE 2725 may only grieve reprimands and suspensions of nine days or less through their collective bargaining agreement. You have the right to union representation if you are a member of a union that has a collective bargaining agreement with the District of Columbia.

Sincerely,

C. G. Whitescarver, Chief Building Official (CBO)
Department of Consumer and Regulatory Affairs

cc: Sydney Lester, Fire Protection Manager, DCRA, Permit Operations Division
    Don Tatum, Labor Relations Liaison
    Personnel Folder
    DCRA Office of General Counsel
    AFGE Local 2725

**Government of the District of Columbia**
**Department of Consumer and Regulatory Affairs**



*Qing Lui*                                            6-27-2019
_____            _____
Signature of Employee acknowledging receipt          Date

*[signature]*                                          6-27-2019
_____            _____
Signature of Administrator acknowledging that he/she    Date
delivered letter to employee

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

QING LU,

　　　　　*Plaintiff,*

　　v.

DISTRICT OF COLUMBIA, *et al.*,

　　　　　*Defendants.*

Civil Action No. 1:20-cv-00461-APM

## DEFENDANTS' SECOND AMENDED RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Pursuant to Federal Rule of Civil Procedure 33 and 26, Defendants District of Columbia (the District), Clarence G. Whitescarver, and Sydney Lester provide the following objections and responses to Plaintiff's First Set of Interrogatories.

1.　　　The information supplied in these answers is not based solely on the knowledge of the executing party, but includes knowledge of the District, its agents, representatives, and attorneys, unless privileged.

2.　　　The provision of any information in connection with these discovery responses does not constitute an admission that such information, or any part of such information, is either material or relevant to any issue in this case or is admissible in any proceeding, including trial, in this action.

3.　　　Defendants reserve the right to amend, revise, or supplement their answers to these Interrogatories if and when new or different information becomes available.

4.　　　For any additional responsive information made available through deposition testimony, Defendants incorporate such information for purposes of giving Plaintiff notice that

such information exists but do not adopt such testimony as accurate and complete.

5.     Defendants, in accordance with Federal Rule of Civil Procedure 33, may refer Plaintiff to documents to answer these interrogatories when such answer "may be derived or ascertained" from the document[s] and "the burden of deriving or ascertaining the answer is substantially the same" for both parties.

## GENERAL OBJECTIONS

1.     Defendants object to the instructions propounded by Plaintiff where those instructions seek to impose obligations in excess of those required by the Federal Rules of Civil Procedure.

2.     Defendants object to the extent that Plaintiff's discovery is intended to seek communications or documents that are protected by the attorney-client privilege or protected by the work product doctrine and object to Plaintiff's discovery insofar as they could be read to seek such protected information.

3.     Defendants object to these requests to the extent that they are unduly burdensome, overly broad, and not calculated to lead to the discovery of admissible evidence and not proportional to the needs of this case.

4.     Defendants object to Plaintiff's requests to the extent they seek information subject to the deliberative process privilege, law enforcement privilege, confidential informant privilege, or any other applicable privilege or similar protection.

5.     Defendants preserve any and all objections to the materiality, admissibility, and/or relevance of the material provided.

6.     Defendants represent that the discovery provided is accurate to the best of their knowledge as of the date of this production.

7.     Defendants object to Plaintiff's counsel, their employees or agents using the documents herein produced for any other purpose other than the instant litigation.

8.     Defendants object to the extent the term "you" includes attorneys or their agents, as impermissibly seeking information protected by the attorney-client privilege and attorney work product doctrine.

9.     Each and every response herein is made subject to the foregoing general objections, regardless of whether a general objection or specific objection is stated in the response. The explicit reference to a general objection or the making of a specific objection in response to a particular discovery response is not intended to constitute a waiver of general objections that are not specifically referred to in that response.

## SECOND AMENDED RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

1.     Identify (by at least date, method of communication, recipient, and a brief summary of the communication) each communication/disclosure by Plaintiff that you believe justified Plaintiff being suspended for eight days without pay.

**FIRST AMENDED RESPONSE: Defendants object to this interrogatory as vague and ambiguous. Subject to and without waiving these objections, Plaintiff's discipline was based on a course of harassing conduct over two and a half years towards her coworker, S.B., regarding the birth of his** ████ **in** ████ **2016 and his related parental leave, as documented in the February 23, 2019 Investigative Report by Tyrone Q. Lawson (Investigative Report), produced at Bates Nos. 00000150 - 00000301.**

2.     Identify (by at least date, method of communication, recipient, and a brief summary of the communication) each communication/disclosure by Plaintiff that you

believe justified Plaintiff being proposed for a ten-day suspension.

    **FIRST AMENDED RESPONSE:  Defendants object to this interrogatory as vague and ambiguous.  Subject to and without waiving these objections, see the First Amended Answer to Interrogatory No. 1.**

    5.  Briefly summarize the factual basis for any contention on your part that Plaintiff's work performance suffered as a result of her making disclosures regarding S███ B███.

    **SECOND AMENDED RESPONSE:  Defendants object to this interrogatory as vague and ambiguous.  Defendants further object as the request seeks information that is irrelevant and not proportional to the needs of this case.  Subject to and without waiving these objections, Plaintiff's discipline was based on a course of harassing conduct over two and a half years towards S.B. regarding the birth of his ███████ 2016 and his related parental leave, as documented in the Investigative Report.  By Plaintiff's own admission, she invested extensive amounts of on-the-job time to her course of conduct related to S.B., which was not part of her official duties.  The Investigative Report discusses Plaintiff's activities, as previously produced at Bates Nos. 00000151 – 00000185, with supporting materials exhibited at Bates Nos. Nos. 00000186 – 00000301. Additional discussion of Plaintiff's activities is found in the April 22, 2020 Letter sent to Plaintiff by Tiffany Crowe, as previously produced at Bates Nos. 00000459 – 00000464, with supporting attachments produced at Bates Nos. 00000303 – 00000390.**

    6.  Briefly summarize the factual basis for any contention on your part that Plaintiff's disclosures regarding S███ B███ caused disruption in the workplace

beyond any upset feelings that may have been experienced by Mr. B████/his wife.

**SECOND AMENDED RESPONSE:  Defendant's object to this interrogatory as vague and ambiguous because it assumes that she made "disclosure" about matters in which she was not involved and mischaracterizes the severity of her conduct towards S.B. and his wife regarding the birth of their** ██████████ **and his related parental leave.  Subject to and without waiving this objection, Plaintiff engaged in a persistent course of harassing conduct that included spreading information about S.B., his family, and parental leave that was, upon the best investigation of DCRA, inaccurate.** *See generally* **Investigative Report previously produced at Bates Nos. 00000150 – 00000301.  Plaintiff's persistent course of harassing conduct, although directed towards S.B. and his wife, involved her sending dozens of emails.  Plaintiff was instructed on multiple occasions to confine her communications about S.B.'s** ████ **r and use of parental leave ─what is essentially a human resources issue─to Human Resources (HR).  Instead, she continued to email multiple high-ranking non-HR personnel long after she was informed that all investigations of her complaints about S.B.'s** ███████ **and parental leave had concluded, causing additional disruption and loss of District time and resources.  In addition, disruptions from Plaintiff's conduct specific to the Fire Protection Division of DCRA, include:  (1) reports in the workplace of S.B. discovering documents containing Plaintiff's insinuations about him, his wife, their** ██████ **r, and his parental leave; (2) investigation of S.B.'s harassment complaint to DCRA HR regarding that harassment; and (3) one or more staff meetings in which Plaintiff made public statements unrelated to work and related to her insinuations about S.B., his wife, their** ███████ **r, and his parental leave.  The Investigative Report**

provides a complete summary of the facts, as previously produced at Bates Nos. 00000151 – 00000185, with supporting materials exhibited at Bates Nos. 00000186 – 00000301.  Additional summary of Plaintiff's activities is found in the April 22, 2020 Letter sent to Plaintiff by Tiffany Crowe, as previously produced at Bates Nos. 00000459 – 00000464, with supporting attachments produced at Bates Nos. 00000303 – 00000390.

7.  Identify what most likely would have been the discipline imposed on Plaintiff if Plaintiff had not disclosed to the Mayor (February 5-6, 2019) Plaintiff's belief about wrongdoing by Mr. S███ /his wife.  (For example, do you contend she would have been suspended for the same eight days, or instead for five days, three days, or not at all?)

SECOND AMENDED RESPONSE: Defendants object to this interrogatory as vague and ambiguous because it assumes that Plaintiff made a "disclosure" and calls for speculation.  Subject to and without waiving these objections, Plaintiff is likely to have received the same or similar discipline because her communication to the Mayor on February 5-6, 2019, was merely one incident that occurred at the end of a two-month investigation into similar or identical conduct over the course of two and a half years. The Investigative Report provides a complete summary of the harassing conduct towards S.B., regarding the birth of his ██████████ 2016 and his related parental leave, for which Plaintiff was disciplined as previously produced at Bates Nos. 00000151 – 00000185, with supporting materials exhibited at Bates Nos. 00000186 – 00000301.

10.  Identify the factual basis for any contention on your part that Plaintiff knowingly or deliberately reported inaccurate information to others about S███ / B███ ,

versus such disclosures being the result of a reasonable belief on her part.

**SECOND AMENDED RESPONSE: Defendants object to this interrogatory as vague and ambiguous because it assumes that Plaintiff's belief was reasonable. Subject to and without waiving these objections, see the full explanation of the charge against Plaintiff for her harassing conduct towards S.B. regarding the birth of his ███████ in ████ 2016 and his related parental leave provided in the Investigative Report previously produced at Bates Nos. 00000151 – 00000185, with supporting materials exhibited at Bates Nos. 00000186 – 00000301. An additional summary of the facts related to Plaintiff's conduct is found in the April 22, 2020 Letter sent to Plaintiff by Tiffany Crowe, previously produced at Bates Nos. 00000459 – 00000464, with supporting attachments produced at Bates Nos. 00000303 – 00000390.**

11. Identify the date on which you contend Plaintiff first should have conceded that the District's investigation(s) of S███ B███h legitimately found no wrongdoing on Mr. B███s part.

**SECOND AMENDED RESPONSE: Defendants object to this interrogatory as vague and ambiguous because it assumes that Plaintiff's unfounded belief was reasonable before she was first instructed to accept the outcome of the District's investigations. Subject to and without waiving these objections, Plaintiff stated that she assented to the result of the District's investigation of S.B.'s use of parental leave in an email to Walter Crawford and Ingrid Jackson at 1:32 p.m. on February 10, 2017. Additionally, Plaintiff admitted that she did not have evidence to support her allegations about S.B.'s parental leave in an email to Ms. Mia Brown at 3:23 p.m. on February 24, 2017. These and similar communications about S.B.'s ████r and parental leave are more fully described in the**

Investigative Report previously produced at Bates Nos. 00000151 – 00000185, with supporting materials exhibited at Bates Nos. 00000186 – 00000301; and the April 22, 2020 Letter sent to Plaintiff by Tiffany Crowe previously produced at Bates Nos. 00000459 – 00000464, with supporting attachments produced at Bates Nos. 00000303 – 00000390. Plaintiff should have acknowledged the ultimate conclusion of any and all investigations—that there was no wrongdoing by S.B. with regard to his use of parental leave—from the very beginning.

12. Briefly summarize any factual basis for a contention on your part that disclosing parental leave fraud by a coworker was a typical part of the job duties specific to Plaintiff's position.

SECOND AMENDED RESPONSE: Defendants object to this interrogatory as vague and ambiguous because it assumes that Plaintiff's made "disclosure" about parental leave fraud without ever having proper foundation for her beliefs. Subject to and without waiving these objections, Defendants do not contend that Plaintiff's duties included approving or investigating parental leave fraud or the private personnel matters of any District employee. Instead, Plaintiff engaged in a persistent course of harassing conduct that included spreading information about S.B., his family, and parental leave that was, upon the best investigation of DCRA, inaccurate. Plaintiff's conduct towards S.B., regarding his ▮▮▮▮▮ and use of parental leave, and DCRA's responses to it are more fully described in the Investigative Report previously produced at Bates Nos. 00000151 – 00000185, with supporting materials exhibited at Bates Nos. 00000186 – 00000301; and the April 22, 2020 Letter sent to Plaintiff by Tiffany Crowe previously produced at Bates Nos. 00000459 – 00000464, with supporting

**attachments produced at Bates Nos. 00000303 – 00000390.**

13. Briefly summarize any factual basis for any contention on your part that Plaintiff

would have been subjected to the disciplinary proceedings even if she had not reported

information to the Mayor on February 5 and 6, 2019.

**SECOND AMENDED RESPONSE:  Defendants object to this interrogatory as**

**vague, ambiguous, and calls for speculation.  Subject to and without waiving these**

**objections, Plaintiff would have received the same or similar discipline because her**

**communication with the Mayor in February 2019, was merely one more incident**

**capping a two-month investigation into identical conduct towards S.B., regarding his**

**the birth of his** ▮▮▮ **in** ▮▮▮ **and use of parental leave, over the course of two**

**and a half years as summarized in the Investigative Report previously produced at**

**Bates Nos. 00000151 – 00000185, with supporting materials exhibited at Bates Nos.**

**00000186 – 00000301.**

15. Briefly explain the manner in which—per Defendant Whitescarver's warning to

Plaintiff in a meeting of around May 29, 2019—Plaintiff's continued pursuit of disclosures about

Mr. B▮▮▮ could have resulted in her being terminated.

**FIRST AMENDED RESPONSE:  Defendants object to this interrogatory as**

**vague, ambiguous, and calls for speculation.  Subject to and without waiving those**

**objections, Plaintiff was disciplined based on a course of harassing conduct towards**

**S.B., regarding his the birth of his** ▮▮▮ **in** ▮▮▮ **and use of parental leave,**

**over two and a half years, as documented in the Investigative Report, produced at**

**Bates Nos. 00000150 – 00000301.  Employees of the District of Columbia may be**

**subject to progressive discipline under D.C. Mun. Reg. 6-B 1600.**

16. Explain the manner in which—per DCRA Chief Administrative Officer Tiffany Crow's cautionary email of around April 30, 2019—Plaintiff's job could depend on Plaintiff's willingness to treat matters involving Mr. B████t █s closed.

**FIRST AMENDED RESPONSE: Defendants object to this interrogatory as vague, ambiguous, and calls for speculation. Subject to and without waiving those objections, Plaintiff was disciplined based on a course of harassing conduct towards S.B., regarding the birth of his ████████ in ████ ████ and use of parental leave, over two and a half years, as documented in the Investigative Report, produced at Bates Nos. 00000150 - 00000301. Employees of the District of Columbia may be subject to progressive discipline under D.C. Mun. Reg. 6-B 1600.**

20. Identify (by at least a brief summary of the disclosure, the date of it, to whom it was communicated, and the method of communication) each report/disclosure by Plaintiff about Mr. B████ s obtaining paid family leave in 2016-2017 that you contend was intentionally false or misleading, as opposed to being the result of a reasonable belief on Plaintiff's part.

**SECOND AMENDED RESPONSE: Defendants object to this interrogatory as vague and ambiguous because it assumes that Plaintiff's beliefs about S.B. obtaining family leave were reasonable and that she made a "disclosure." Subject to and without waiving these objections, Plaintiff's belief was never reasonable because her communications in 2016 and 2017 were not based on actual knowledge of S.B.'s private personnel matter. Plaintiff's discipline was based on a course of harassing conduct over two and a half years towards S.B., regarding the birth of his ████████ in ████ ████ and use of parental leave, discussed in the Investigative Report previously produced at Bates Nos. 00000151 – 00000185, with supporting materials exhibited**

at Bates Nos. 00000186 – 00000301.  An additional discussion of these
communications is provided in the April 22, 2020 Letter sent to Plaintiff by Tiffany
Crowe previously produced at Bates Nos. 00000459 – 00000464, with supporting
attachments produced at Bates Nos. 00000303 – 00000390.

22. Briefly summarize any factual basis for any contention on your part that the work of
the Mayor was disrupted or impeded by Plaintiff's February 5-6, 2019 disclosures to the Mayor.

SECOND AMENDED RESPONSE:  Defendants object to this interrogatory as
vague and ambiguous.  Subject to and without waiving this objection, Plaintiff's conduct
on February 5-6, 2019, was the last of the many instances in which Plaintiff engaged in
an course of generally disruptive and inappropriate conduct towards S.B., regarding
his the birth of his ███████████████ and use of parental leave, as more fully
described in the Investigative Report previously produced at Bates Nos. 00000151 –
00000185, with supporting materials exhibited at Bates Nos. Nos. 00000186 –
00000301.  An additional account of Plaintiff's conduct is provided in the April 22,
2020 Letter sent to Plaintiff by Tiffany Crowe previously produced at Bates Nos.
00000459 – 00000464, with supporting attachments produced at Bates Nos.
00000303 – 00000390.

24. Identify each District employee (by at least name, title, and date of doing so) who
collected evidence as to whether or not Mr. B███ i fraudulently obtained paid parental benefits
that as of the time of its collection was not already known to those who earlier reviewed the
situation.

SECOND AMENDED RESPONSE:  Defendants object to this interrogatory as
vague and ambiguous.  Defendants further object as the request seeks information that is

<mark>irrelevant and not proportional to the needs of this case.</mark>  Defendants further object as this information is protected by D.C. Code § 1-631.01, § 1-631.03, § 5-113.01, § 5-113.06, and D.C. Mun. Reg. 6-B 3105, 3112, and 3113.6 of the District Personnel Manual.  Subject to and without waiving these objections, generally speaking, Mr. B▉▉▉ submitted documentation to DCRA sufficient to establish eligibility under DCHR I-2020-17 (https://edpm.dc.gov/issuances/family-and-medical-leave/), or the version in effect during the applicable period.  Subject to and without waiving these objections, the responses that Plaintiff received after presenting allegations about Mr. B▉▉▉, his ▉▉▉▉▉, and parental leave, are summarized in the Investigative Report previously produced at Bates Nos. 00000151 – 00000185, with supporting materials exhibited at Bates Nos. 00000186 – 00000301; and April 22, 2020 Letter sent to Plaintiff by Tiffany Crowe at Bates Nos. 00000459 – 00000464, with supporting attachments previously produced at Bates Nos. 00000303 – 00000390.

25. Identify each person with whom DCRA management communicated as part of determining that Plaintiff knew or should have known her reports about S▉▉ B▉▉▉ were false or misleading (identifying each by at least date, name, method, and summary of communication).

**FIRST AMENDED RESPONSE:  Defendants object to this interrogatory as vague and ambiguous.  Defendants further object as the request seeks information that is** <mark>**irrelevant and not proportional to the needs of this case.**</mark>  **Subject to and without waiving these objections, see the Investigative Report, produced at Bates Nos. 00000150 – 00000301, for a summary of communications related to Plaintiff's conduct towards S.B., regarding the birth of his ▉▉▉▉▉ in ▉▉▉▉ and his related parental leave.**

Under 28 U.S.C. § 1746, I declare under the penalty of perjury that these foregoing Answers to Plaintiff's First Set of Interrogatories are true to the best of my knowledge, information, and belief.

Executed on: _9/7/21_

**Tiffany Crowe**
Chief Operating Officer
Department of Consumer and Regulatory Affairs

Executed on: _9/8/21_

**Clarence G. Whitescarver**
Chief Building Official
Department of Consumer and Regulatory Affairs

Executed on: _9/3/2021_

**Sydney Lester**
Fire Protection & Elevator Eng. Manger
Permit Operations Division
Department of Consumer and Regulatory Affairs

Objections by Counsel:

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

ALICIA M. CULLEN
Chief, Civil Litigation Division, Section III

_/s/ Adam P. Daniel_
MATTHEW R. BLECHER [1012957]
ADAM P. DANIEL [1048359]
Assistant Attorneys General
Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
Phone: (202) 442-9774; (202) 442-7272
Fax: (202) 730-0586; (202) 400-2675

Email:  matthew.blecher@dc.gov;
adam.daniel@dc.gov
*Counsel for Defendants District of Columbia,*
*Sydney Lester, and C.G. Whitescarver*

### **CERTIFICATE OF SERVICE**

I certify that on Septebmer 7, 2021, I served a copy of Defendants' Second Amended

Responses to Plaintiff's First Set of Interrogatories via email to:

David R. Schleicher, Esq.
Schleicher Law Firm, PLLC
1629 K Street, NW
Suite 300
Washington, D.C. 20006
david@gov.law
*Counsel for Plaintiff*

*/s/ Adam P. Daniel*
ADAM P. DANIEL
Assistant Attorney General

Message

| From: | Lu, Luchi (DCRA) [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=3D6E7A327C8F4B14B720AFE6A177B08S-LLU] |
|---|---|
| Sent: | 4/30/2019 4:12:42 PM |
| To: | Crowe, Tiffany (DCRA) [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=4ff225553a8b4ddaa788d02236e5b619-Tiffany.Cro] |
| CC: | Tatum, Donald (DCRA) [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=6e92b777998e4cf6a0fe7d3adf001f9d-dtatum]; McGraw, Esther (DCRA) [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=18f3bccbf52a45349d8205316b724263-Esther.McGr]; Lester, Sydney (DCRA) [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=2921ad568dd64c74b3a3ae43761f700d-Slester] |
| Subject: | RE: Matter closed |

Go back to WORK ! MANY THANKS !!

Best Regards,

**Luchi Lu, MBA, PE, PMP, CPIM** | Fire Protection Engineer | Permit Operations Division
Department of Consumer & Regulatory Affaires

luchi.lu@dc.gov | 1100 4th St SW, DC 20024
Main: 202.442.4400 | Desk: 202.442.9474
dcra.dc.gov



**From:** Crowe, Tiffany (DCRA)
**Sent:** Tuesday, April 30, 2019 12:03 PM
**To:** Lu, Luchi (DCRA)
**Cc:** Tatum, Donald (DCRA); McGraw, Esther (DCRA); Lester, Sydney (DCRA)
**Subject:** Matter closed

Ms. Lu,

The attached letter from me is DCRA's response to your latest (Feb. 5, 2019) complaint about Mr. B▓▓▓▓. DC government has investigated your complaint and found it without merit. You need to consider this matter closed, as your very job may depend on it. I hear that, when not lodging complaints without evidence, you are a valued employee. Please devote your energy to your job, do it well, and cease this activity – I hear you. Will do! Again, please consider this matter closed.

Best,

Tiffany

**Tiffany Crowe | Chief Administrative Officer**
Department of Consumer and Regulatory Affairs
tiffany.crowe@dc.gov | **1100 4th St SW, DC 20024** | Office 5103

**App. 52**

**office: 202.442.4509 | mobile: 202.271.4388 |** dcra.dc.gov



DCRA actively uses feedback to improve our delivery and services. Please take a minute to share your feedback on how we performed in our last engagement. Also, subscribe to receive DCRA news and updates.
DCRA actively uses feedback to improve our delivery and services. Please take a minute to share your feedback on how we performed in our last engagement. Also, subscribe to receive DCRA news and updates.

**Plf. Opp.**
**App. 53**

Department of Consumer and Regulatory Affairs
Office of the Director

## INVESTIGATIVE REPORT

## CONFIDENTIAL

| | | |
|---|---|---|
| **CASE NUMBER** | : | 018-SP-0034 |
| **CASE ASSIGNMENT DATE** | : | November 28, 2018 |
| **SPECIAL INVESTIGATOR** | : | Tyrone Quintin Lawson |
| **DATE** | : | February 23, 2019 |

**COMPLAINANT**

| | | |
|---|---|---|
| **NAME** | : | Office of the General Counsel |
| **AGENCY** | : | Department of Consumer and Regulatory Affairs |
| **BUSINESS ADDRESS** | : | 1100 4th Street, S.W., Suite 5266 |
| | : | Washington, D.C. 20024 |

**RESPONDENT**

| | | |
|---|---|---|
| **NAME** | : | Qing (Luchi) Lu, Fire Protection Engineer |
| **AGENCY** | : | Department of Consumer and Regulatory Affairs Technical Review Branch, Permit Operations Division |
| **BUSINESS ADDRESS** | : | 1100 4th Street, S.W., 3th Floor |
| | : | Washington, D.C. 20024 |

## INVESTIGATION SUMMARY

Department of Consumer and Regulatory Affairs (DCRA) Interim Deputy General Counsel (DGC) Patricia Donkor assigned Special Investigator Tyrone Q. Lawson to investigate a complaint that Qing (Luchi) Lu, Fire Protection Engineer within the DCRA Technical Review Branch of the Permit Operations Division, knowingly and willfully stalked and harassed Fire Protection Engineer S  B  and his wife   from June 27, 2016 until February 5, 2019 while on official duty; that Ms. Lu misrepresented and falsified information in her official complaints against Mr. and Mrs. B  ; that Ms. Lu deliberately made false statements to her superiors on numerous occasions between February 2, 2017 and February 5, 2019; that Ms. Lu deliberately failed to comply with rules and proper supervisory instructions; and that Ms. Lu knowingly and willfully provided false or misleading information in connection with this investigation.

Contained herein is evidence that Fire Protection Engineer Lu's conduct has been prejudicial to the District of Columbia Government and/or that Fire Protection Engineer Lu's conduct violated D.C. laws and/or regulations.

**Plf. Opp.
App. 54**

This investigation substantiates the following:

    (1) Fire Protection Engineer Lu engaged in activities that would be in violation of D.C. laws and statutes in violation of Part 1, D.C. Personnel Regulations Chapter 16;

    (2) Fire Protection Engineer Lu has routinely misrepresented and falsified material facts in connection with official complaints against Mr. and Mrs. B███.

    (3) Fire Protection Engineer Lu has been insubordinate on numerous occasions between February 2, 2017 and February 5, 2019.

    (4) Fire Protection Engineer Lu knowingly and willfully reported false or misleading information to her superiors on several occasions; and,

    (5) Fire Protection Engineer Lu made false and untruthful statements during her audio recorded investigatory interviews in connection with this investigation.

## INVESTIGATION DETAILS – Monday, July 30, 2018

On Wednesday, November 28, 2018, DCRA Interim DGC Patricia Donkor and Assistant General Counsel Adrianne Lord-Sorensen met with Special Investigator Lawson regarding the request for a special investigation into an allegation of employee misconduct wherein it was alleged that Fire Protection Engineer Qing (Luchi) Lu, knowingly and willfully stalked and harassed her co-worker Fire Protection Engineer S███ B███ since June 27, 2016; that Ms. Lu reported false and fictitious information in connection with her complaints against Mr. B███; that on several occasions Ms. Lu knowingly and willfully made false statements to her superiors; and that Ms. Lu deliberately failed to comply with rules and proper supervisory instructions on numerous occasions.

Ms. Donkor provided an email complaint from Mr. B███ to former Chief Administrative Officer (CAO) Walter Crawford dated November 8, 2018 (Exhibit #1). Mr. B███ copied his immediate supervisor Sydney Lester and Deputy Chief Building Official (DCBO) Christopher Bailey on his email. Mr. Lester's email states:

> Good Morning Mr. Crawford,
>
> This harassment issue with Luchi Lu is on the rise again, or should I just say, still persist. A few days ago (last week), while I was waiting in the 3rd office pantry to warm my lunch, she was also present using the microwave. Mr. Lester also happened to show up while I was waiting. Surprisingly, Luchi then proceeded to question me in her usual sarcastic manner about my ███, implying that my Stepmother (██) was actually my ███ mother; still referencing the picture she saw on the Facebook posting of my Stepmother and my ███.
>
> Again today (11/8/2018), about 10:48am in the presence of Ms. Sharon Brown in the lobby Suite E340, she again, suggested to Ms. Brown (while I was discussing another issue with Ms. Brown), that she will be purchasing pillows to strap to her abdomen in order to obtain maternity

Confidential Subject to Protective Order     Lu v. DC et al 1-20-cv-00461_00000152

leave, which <u>again</u>, is a direct accusation that my wife faked her
pregnancy so that I could get family leave.
Walter, you informed that when this occurs again I should let you know.
This is slanderous, and needs to stop. This has been going on for over ten
years. How much longer do I really need to put up with this? It's
becoming unbearable!!

I am hereby requesting again, PLEASE do something, because whatever
you did the last time seem to be having little or no effect on her behavior.
This has created a hostile work environment, causes great distraction each
time I have to stop, restrain myself and refocus on my work.

As you can see, I've copied my Superiors on this email for the record.
And each time I've complained, I have gotten nothing back in writing, so
this time please, I'm kindly requesting a formal response how this issue
will be addressed.

Thanks for attention to this matter.

Regards,

S⬛ B⬛

### First Interview of Sydney Lester - Wednesday, November 28, 2018

On Wednesday, November 28, 2018, Special Investigator Lawson conducted an audio recorded
investigatory interview with DCRA Fire Protection Supervisory Engineer, Sydney Lester,
regarding a complaint that Qing (Luchi) Lu has stalked and harassed DCRA Fire Protection
Engineer S⬛ B⬛ since May 19, 2016; and that on numerous occasions Ms. Lu knowingly
and willfully reported false or misleading material information to her superiors.

Mr. Lester stated that on or about Thursday, November 1, 2018 he was in the third floor pantry
talking with Mr. B⬛ as they warmed their lunch in a microwave oven. Mr. Lester stated that
Ms. Lu entered the pantry and immediately began questioning Mr. B⬛ about a photograph
that Mr. B⬛n had on his desk. Mr. Lester stated that he observed that initially Mr. B⬛n
appeared confused about Ms. Lu's questions about the photograph. Mr. Lester stated that Mr.
B⬛ stated that Mr. B⬛ figured out that Ms. Lu was asking about a photograph of his
Stepmother holding his three-year old⬛ that was posted on N⬛ B⬛ 's Facebook
page and a photo of Mr. B⬛ and his family that is posted on Mr. B⬛ 's workstation. Mr.
Lester stated that it became obvious to him that Ms. Lu's questioned Mr. B⬛ about the
photograph because she insisted that the toddler in the photograph was not Mr. B⬛ 's⬛
but that it was somebody else's⬛ Mr. Lester stated that Mr. B⬛ insisted to Ms. Lu
that the infant in the photograph is his⬛

Mr. Lester stated that he has seen the photograph on Mr. B⬛ 's desk that Ms. Lu was
questioning Mr. B⬛ about. Mr. Lester stated that the child in Mr. B⬛ 's photograph is the
⬛ that was born which Ms. Lu has repeatedly questioned Mr. B⬛ 's use of Paid Family
Leave (PFL) under Family Medical Leave Act (FMLA) during and after the child's birth. Mr.
Lester stated that he has not met the child in person but he knows that Mr. B⬛ has a toddler
⬛ who was born during Mr. B⬛ 's use of FMLA in⬛

Plf.⬛Opp.
App. 56

Special Investigator Lawson presented the statement entitled "Time during the POD Thursday meeting 9:10am" dated Thursday, February 2nd that DCBO Bailey sent to HRO Ingrid Jackson in February of the year 2017 (Exhibit #1A). The statement states:

> Ms. Luchi Lu, voiced a comment in the q&a portion of the meeting abruptly changing the subject from office procedure to a personal statement. This statement began with a question to management "how do we handle another employee using their wife with a fake belly to fake a pregnancy and the father requesting family leave?"

> There was not any warning and no reason to bring this information and or comment to an office meeting. I told Ms. Lu "I do not understand your question and if it is not beneficial to this discussion she needed to clarify offline?"

Mr. Lester stated that he did not recall the meeting. Mr. B████ stated that he may have been on leave on Thursday, February 2, 2017.

### Interview of S███ B███ - Friday, November 30, 2018

On Friday, November 30, 2018, Special Investigator Lawson conducted an audio recorded investigatory interview with DCRA Fire Protection Engineer, S███ B███ regarding his complaint that Qing (Luchi) Lu has stalked and harassed him since May 19, 2016; and that on numerous occasions Ms. Lu knowingly and willfully reported false or misleading material information to her superiors.

Special Investigator Lawson presented Mr. B████'s email complaint entitled "Workplace Harassment by Fellow Employee" to former CAO Walter Crawford, dated November 8, 2018 (See Exhibit #1), for his review. Mr. B████ confirmed that he did prepare and send the email to Mr. Crawford. Mr. B██ n stated that on Thursday, November 8, 2018, he was in the third floor reception lounge engaged in a conversation with Contact Representative and Third Floor Receptionist Sharon Brown. Mr. B████ stated that Ms. Lu entered the reception lounge going towards the secured door to the offices. Mr. B████ stated that Ms. Lu interrupted his conversation with Ms. Brown stating, "Oh I need to get some pillows strapped to my abdomen blah, blah, blah…so I can get some maternity leave." Mr. B████ stated that Ms. Brown was puzzled why Ms. Lu made the statement. Mr. B████ state that he knew exactly what Ms. Lu meant because Ms. Lu has done it in the past.

Mr. B████ stated that Ms. Lu has left internet search pages about women faking pregnancy in the shared Fire Protection Review customer service desk drawer in the Permit Operations Center (POC) on the second floor. Mr. B████ stated that Ms. Lu knew when Mr. B████'s customer service desk shift in the POC was scheduled. Mr. B████ stated that approximately a year ago the Fire Protection and Mechanical Review staff had a training meeting in the POC. Mr. B████ stated that Ms. Lu sat at the Fire Review customer service desk in the POC during the meeting. Mr. B████ stated that after the meeting he manned the Fire Protection Review customer service desk in the POC. Mr. B████ stated that he found the 'fake pregnant belly' Google internet search page in the drawers of the Fire Protection Review customer service desk after Ms. Lu left. Mr. B████ stated that the 'fake pregnant belly' Google search document was time-stamped to reflect that they were printed during the time of the meeting (Exhibit #2). Mr. B████ stated that it was easy for Ms. Lu to look on the schedule to see when he would be scheduled a tour of duty

on the Fire Protection Review desk in the permit center because Fire Protection staff took turns manning the customer service desk.

Mr. B___ stated that at that time Deputy Chief Building Official (DCBO) Christopher Bailey was their division supervisor under the Chief Building Official. Mr. B___n stated that he took the 'fake pregnant belly' Google search webpage to DCBO Bailey and reported it as harassment. Mr. B___ stated that he sent DCBO Bailey an email about it on February 2, 2017 (Exhibit #3) and Mr. Bailey forwarded his email to DCRA Human Resource Officer Ingrid Jackson on February 2, 2017. Mr. B___'s email states:

> Good afternoon Mr. Bailey,
>
> Re: Harassment Complaint.
>
> I have remained fairly quiet over the years since Ms. Luchi Lu began her relentless pursuit of direct and indirect personal attacks against me at work. This all started in late 2007 towards early 2008 when DCRA was located at 941 North Capitol St, NE, and she still continues to do this for some unknown reason; and apparently, I've been the lone focus of her behavior.
>
> In the recent months, she escalated this behavior, by reporting me to the Board of Ethics and Government Accountability office (BEGA) accusing me of misconduct in performing my duties here at work that involves my wife. At that point it became very clear to me that her objective is to first damage my reputation here at work, smear my name throughout the Agency as someone that cannot be trusted (defamation of character), which obviously is designed as an attempt to end my career as a District Government employee. Seeing that this is the case, it is a threat to my livelihood, which helps to put food on the family table, therefore threatening my family.
>
> Again, just a week ago during our morning meeting on 1/26/2017, which was held on the floor of the Permit Center, she found the time to do a google search on 'fake pregnancies'... yes, bizarre! Knowing that I was the Reviewer assigned to the Fire review counter after the meeting ends, she made sure that a printed copy of her google 'findings' was left on top of the stamps in the drawer for me to see it. One may ask, what is her motive? For me it was very clear, it was a direct non-verbal accusation at me (us) that my wife's pregnancy last year was faked in order for me to have been granted paid family leave (PFL).
>
> Among all the other things that she has done in the past, she has even gone as far as to implicate Mr. Lester in fixing the Permit Center roster, so that I can approve plans that my wife submits on Thursdays.
>
> I believe this is clear harassment, and her conduct only serves to generate a hostile work environment; this need to be addressed as soon as possible

Confidential Subject to Protective Order     Lu v. DC et al1-20-cv-00461_00000155

and should be documented for the record. This conduct does not belong in our work place!

Thanks for your time in this matter.



Mr. B███ stated that CAO Crawford met with him later about his email complaint and told him that he (Crawford) had met with Ms. Lu and 'dealt' with her about all of the things Ms. Lu was doing against him (B███). Mr. B███ stated that CAO Crawford informed him to let him (Crawford) know directly if anything else came up regarding Ms. Lu and her stalking/harassment of him (B███).

Special Investigator Lawson presented the statement entitled "Time during the POD Thursday meeting 9:10am" dated Thursday, February 2nd that DCBO Bailey sent to HRO Ingrid Jackson in February of the year 2017 (See Exhibit #1A).

Mr. B███ stated that he did recall attending the meeting on Thursday, February 2, 2017. Mr. B███ stated that he was embarrassed because he knew Ms. Lu was harassing him in front of his co-workers.

Mr. B███ stated that he has no idea what he has done to Ms. Lu to trigger Ms. Lu stalking and harassing him. Mr. B███ stated that Ms. Lu has demonstrated that she has animosity towards him since the year 2008. Mr. B███ stated that he does not know of anything that he did to trigger Ms. Lu's attitude towards him in the history of their employment with DCRA. Mr. B███ stated that Ms. Lu's attitude towards him at first did not have anything to do with FMLA.

Mr. B███ stated that he had a ███ r born on ███, ███ and a son born in ███. Mr. B███ stated that his father and his stepmother, R███ B███, visited him from Jamaica. Mr. B███ stated that while they were visiting, they went on a tour of the White House. Mr. B███ stated that during the visit to the Whiter House his stepmother was photograph holding his ███ (Exhibit #3A). Mr. B███ stated that the photograph was posted on his wife's Facebook page. Mr. B███ stated that Ms. Lu went on his stepmother's Facebook page and sent a message congratulating his stepmother on her new baby. Mr. B███ stated that he feels seriously alarmed and disturbed that Ms. Lu went as far as to find his wife and his stepmother

Mr. B███ stated that he believes that Ms. Lu has some obsessed dislike for him personally. Mr. B███ stated that he believes that Ms. Lu is obsessed with trying to get him fired from his job. Mr. B███ stated that he is in fear of Ms. Lu's obsession towards making him loose his job and that he feels emotionally distressed from Ms. Lu's conduct and action towards him.

## Interview of Sharon Brown - Friday, November 30, 2018

On Friday, November 30, 2018, Special Investigator Lawson conducted an audio recorded investigatory interview with DCRA Contact Representative and Receptionist Engineer, Sharon Brown, regarding a complaint that Qing (Luchi) Lu has stalked and harassed DCRA Fire Protection Engineer S██ ly ███ since May 19, 2016.

Ms. Brown stated that on Thursday, November 8, 2018 she was sitting at her workstation in the third floor reception lounge, room E340, having a brief social conversation with Mr. B▮▮▮▮. Ms. Brown stated that Ms. Lu entered the reception lounge from the lobby. Ms. Brown stated that as Ms. Lu walked past them towards the security door to the office suite, she stopped and stated, "Imma (sic) buy two pillows and put them under my blouse so I can have time off and have some leave like some people." Ms. Brown stated that she heard what Ms. Lu said but she asked Ms. Lu what she said. Ms. Brown stated that Ms. Lu said, "Imma (sic) go out buy me two pillows so I can pretend like I am having a baby so I can have time off leave so I can ahhh (sic), ahhhh (sic), ahhh (sic)...have a baby.

Ms. Brown stated that she asked Mr. B▮▮▮▮, "S▮▮▮▮ who is she talking about?" Ms. Brown stated that Mr. B▮▮▮▮ said, "She's referring to me because she has been picking at me about my children and me having a baby." Ms. Brown stated that she replied, "Wow there's some strange stuff going on down here." Ms. Brown stated that approximately three years ago when she first moved to the third floor receptionist, Ms. Lu emailed her a document related to Mr. B▮▮▮▮'s Board of Ethics and Accountability (BEGA) complaint that Ms. Lu filed. The BEGA complaint was that Mr. B▮▮▮▮ was reviewing and approving plans that had been submitted to DCRA by his wife. Ms. Brown stated that Ms. Lu sent the email to several staff members. Ms. Brown stated that Ms. Lu's email stated once you read it delete it. Ms. Brown stated that she did not read the document, she deleted it. Ms. Brown stated that she thought it was very unusual for an employee to dig into the personal life of a co-worker. Ms. Brown stated that she believes that it is a very dangerous situation for an employee to be so seriously involved in a co-worker's life. Ms. Brown stated that every time Mr. B▮▮▮▮ comes around Ms. Lu always has something negative to say to or about Mr. B▮▮▮▮.

### Interview of Harrison Shelton - Friday, November 30, 2018

On Friday, November 30, 2018, Special Investigator Lawson conducted an audio recorded investigatory interview with DCRA Mechanical Engineer, Harrison Shelton, regarding a complaint that Qing (Luchi) Lu has stalked and harassed DCRA Fire Protection Engineer S▮▮▮▮ B▮▮▮▮ since May 19, 2016.

Special Investigator Lawson presented the statement entitled "Time during the POD Thursday meeting 9:10am" dated Thursday, February 2nd that DCBO Bailey sent to HRO Ingrid Jackson in February of the year 2017 (See Exhibit #1A). Mr. Shelton stated that he did not recall attending a meeting in February of 2018 wherein Ms. Lu asked management, "How do we handle another employee using their wife with a fake belly to take a pregnancy and then the father requesting family leave?" Mr. Shelton stated that he has heard about Ms. Lu's stalking of Mr. B▮▮▮▮ from other co-workers within the Fire Protection and Mechanical Review staff. Mr. Shelton stated that Ms. Lu has never said anything directly to him about her complaints against Mr. B▮▮▮▮.

### Interview of Kandace Taylor - Friday, November 30, 2018

On Friday, November 30, 2018, Special Investigator Lawson conducted an audio recorded investigatory interview with former DCRA Executive Assistant to Director Melinda Bolling, Kandace Taylor, regarding a complaint that Qing (Luchi) Lu has stalked and harassed DCRA Fire Protection Engineer S▮▮▮▮ B▮▮▮▮ since May 19, 2016.

Special Investigator Lawson provided Ms. Taylor with a plastic notebook insert that has a 'Post it' note that says, "Ms. Kandace Taylor. From Luchi" (Exhibit #4). The notebook insert was left in Ms. Taylor's chair and contained a fake birth certificate (Exhibit #5). Special Investigator

Lawson also provided Ms. Taylor with the fake birth certificate that was prepared by Ms. Lu. Ms. Taylor stated that Ms. Lu stated that she created the document to show what a fake birth certificate might look like. Ms. Taylor stated that Ms. Lu left the notebook insert containing the fake birth certificate in her chair at a time when Ms. Lu was attempting to get an appointment to meet with Director Bolling about her complaint against Mr. B   . Ms. Taylor stated that Ms. Lu complained that Mr. B   's wife faked a pregnancy so Mr. B    could fraudulently use leave under FMLA.

## Interview of Keith Slade - Friday, November 30, 2018

On Friday, November 30, 2018, Special Investigator Lawson conducted an audio recorded investigatory interview with DCRA Emergency Manager, Keith Slade, regarding a complaint that Qing (Luchi) Lu has stalked and harassed DCRA Fire Protection Engineer S    B    since May 19, 2016.

Special Investigator Lawson provided Mr. Slade with a printout of an email Ms. Lu sent to Mr. Slade's personal email account. Mr. Slade stated that Ms. Lu asked him to provide her with his personal email address. Mr. Slade stated that he gave Ms. Lu his Gmail address. Mr. Slade stated that he was unaware why Ms. Lu wanted his personal email address until Ms. Lu sent him emails of her complaint about Mr. B   . Mr. Slade stated that he was aware that there were ongoing disputes between Ms. Lu and Mr. B   . Mr. Slade stated that in his opinion Ms. Lu did not like Mr. B   . Mr. Slade stated that Ms. Lu mentioned to him that she believed that Mr. B    did not have a baby [in 2016]. That Mr. B   's wife had fabricated a pregnancy. Mr. Slade stated that he was blind-sided by Ms. Lu's email conversation but he read the complaint that Ms. Lu filed with BEGA and the same complaint which she filed with former DCRA Director Melinda Bolling.

Mr. Slade stated that he is aware of the allegation but he does not know if the allegation is true or not. Mr. Slade stated that Ms. Lu sent emails to his D.C. government email account informing him to check his Gmail account. Mr. Slade stated that when he checked his Gmail account there was a request for him to make a statement about what he knew about Mr. B    and the fraudulent pregnancy. Mr. Slade stated that he does not know anything about Ms. Lu's complaint against Mr. B    other than she has complained to numerous D.C. government agencies about her allegations.

## Interview of Syed Hashmi - Monday, December 3, 2018

On Monday, December 3, 2018, Special Investigator Lawson conducted an audio recorded investigatory interview with Mechanical Engineer Syed Hashmi regarding a complaint that Qing (Luchi) Lu has stalked and harassed DCRA Fire Protection Engineer S    B    since May 19, 2016.

Special Investigator Lawson presented the statement entitled "Time during the POD Thursday meeting 9:10am" dated Thursday, February 2nd that DCBO Bailey sent to HRO Ingrid Jackson in February of the year 2017 (See Exhibit #1A). Mr. Hashmi stated that he recalled attending a meeting in February of 2017 wherein Ms. Lu asked management, "How do we handle another employee using their wife with a fake belly to take a pregnancy and then the father requesting family leave?" Mr. Hashmi stated that he has been aware of Ms. Lu's stalking of Mr. B    regarding Mr. B   's use of PFL and that he knows that it has been going on for a long time. Mr. Hashmi stated that he does not get personally involved if some co-worker does not like another co-worker. Mr. Hashmi stated that he has a working relationship with Mr. B    and

Confidential Subject to Protective Order    Lu v. DC et al 1-20-cv-00461_00000158

Ms. Lu so he prefers not to be involved in the investigation because he does not mix business with personal stuff. Mr. Hashmi stated that he believes that if personal issues interfere with work then the personal issues are a problem.

## Interview of Samuel Mutia - Monday, December 3, 2018

On Monday, December 3, 2018, Special Investigator Lawson conducted an audio recorded investigatory interview with Fire Protection Engineer Samuel Mutia regarding a complaint that Qing (Luchi) Lu has stalked and harassed DCRA Fire Protection Engineer S███ B███ since May 19, 2016.

Special Investigator Lawson presented the statement entitled "Time during the POD Thursday meeting 9:10am" dated Thursday, February 2nd that DCBO Bailey sent to HRO Ingrid Jackson in February of the year 2017 (See Exhibit #1A). Mr. Mutia stated that he recalled attending a meeting in February of 2017 wherein Ms. Lu asked management, "How do we handle another employee using their wife with a fake belly to take a pregnancy and then the father requesting family leave?" Mr. Mutia stated that because Ms. Lu spoke with a Chinese language accent, he did not understand the question at the time Ms. Lu asked it. Mr. Mutia stated that after the meeting a few of his co-workers informed him of Ms. Lu's question. Mr. Mutia stated that he remembers discussing Ms. Lu's question with several co-workers after the meeting. Mr. Mutia stated that he recalls co-workers asking him, "Did you hear Luchi talking about fake pregnancy?" Mr. Mutia stated that he has been aware of Ms. Lu's stalking of Mr. B███ regarding Mr. B███'s use of PFL and that he knows that it has been going on for a long time.

Mr. Mutia stated that two other occasions Ms. Lu spoke to him about her allegation that Mr. B███ committed PFL fraud and that his wife faked her pregnancy which their was born on ███████. Mr. Mutia stated that he recalled Ms. Lu said something to him about a fake belly walking around on the second floor. Mr. Mutia stated that Ms. Lu also sent him an email about it. Mr. Mutia stated that he deleted the email because he did not want to get involved in Ms. Lu's hearsay.

## Interview of Chrys Edet - Monday, December 10, 2018

On Monday, December 10, 2018, Special Investigator Lawson conducted an audio recorded investigatory interview with Mechanical Engineer Chrys Edet regarding a complaint that Qing (Luchi) Lu has stalked and harassed DCRA Fire Protection Engineer S███ B███ since May 12, 2016.

Special Investigator Lawson presented the statement entitled "Time during the POD Thursday meeting 9:10am" dated Thursday, February 2nd that DCBO Bailey sent to HRO Ingrid Jackson in February of the year 2017 (See Exhibit #1A). Mr. Edet stated that he did not recall attending a meeting in February of 2017 wherein Ms. Lu asked management, "How do we handle another employee using their wife with a fake belly to take a pregnancy and then the father requesting family leave?" Mr. Edet stated that he has not been aware of Ms. Lu's stalking of Mr. B███ regarding Mr. B███'s use of PFL and that he knows that it has been going on for a long time.

## Interview of Christopher Bailey - Monday, December 10, 2018

On Monday, December 10, 2018, Special Investigator Lawson conducted an audio recorded investigatory interview with DCBO Christopher Bailey regarding a complaint that Qing (Luchi) Lu has stalked and harassed DCRA Fire Protection Engineer S███ B███ since May 19, 2016; and that Ms. Lu deliberately refused to comply with rules, regulations, written procedures or

Plf. Opp.
App. 62

proper supervisory instructions and that she continued this course of conduct on until Tuesday, February 5, 2019.

Mr. Bailey stated that on or about January of 2016 his office was located on the third floor when he was the Structural Review Manager and acting DCBO. Mr. Bailey stated that Mr. B▓ brought him a printout of a Google search page showing fake pregnancy bellies that was left in the desk drawer of the Fire Protection Review customer service desk in the Permit Operations Center (POC). Mr. Bailey stated that Mr. B▓ told him that Ms. Lu printed the Google search page during a Fire Protection/Mechanical Reviewer meeting and had placed the search page printout in the desk drawer knowing that Mr. B▓ was scheduled to man the customer service desk after the meeting.

Mr. Bailey stated that approximately one week later Ms. Lu met with him and proceeded to tell him that Mr. B▓'s wife faked pregnancy and ▓▓▓ birth of a child to enable Mr. B▓ to fraudulently obtain PFL. Mr. B▓ stated that shortly after his meeting with Ms. Lu, Mr. B▓n came to him highly aggravated and complained that during a Permit Operations Division meeting Ms. Lu stated, "People using fake pregnancy situations to get more leave, more paid leave, should be investigated." Mr. Bailey stated that Mr. B▓ was furious because he took exception to Ms. Lu's statement during the meeting. Mr. Bailey stated that he forwarded Mr. B▓'s complaint to DCRA HR Officer, Ingrid Jackson in his email dated February 3, 2017. Mr. Bailey stated that he also sent the statement entitled "Time during the POD Thursday meeting 9:10am" dated Thursday, February 2nd to HRO Ingrid Jackson in February of the year 2017 (See Exhibit #1A).

Mr. Bailey stated, "HR then told me that there had been other, this is not the first time that that specific allegation of S▓ B▓n's wife having faked a pregnancy to allow him to have time off was brought up to them (HR). I was not the only person who brought this to their attention." Mr. Bailey stated that he was told that Ms. Jackson and CAO Walter Crawford planned to meet with Ms. Lu and tell her what her parameters were; what she is supposed to do at work; that she has to come to work; that she has to do her job and that she is not to engage in any type of correspondence or any type interaction with Mr. B▓.

Mr. Bailey stated that on November 18, 2018, Mr. B▓ sent an email complaint entitled "Workplace Harassment by Fellow Employee" to CAO Crawford and copied him and Sydney Lester on the email (See Exhibit #1). Mr. Bailey stated that on day in November of 2018 Mr. B▓ stopped him in a hallway one day and told him "She's [Lu] starting back up with this same mess." Mr. Bailey stated that he shared Mr. B▓'s complaint with CAO Crawford. Mr. B▓ stated that CAO Crawford appeared to be aware of Mr. B▓'s newest complaint against Ms. Lu. Mr. Bailey stated that CAO Crawford told him that they were going to escalate taking action against Ms. Lu to another level. Mr. Bailey stated that his discussion with CAO Crawford was the last time he heard about Ms. Lu's stalking of Mr. B▓.

## Interview of Qing (Luchi) Lu - Tuesday, February 12, 2019

On Tuesday, February 12, 2019, Special Investigator Lawson conducted an audio recorded investigatory interview with Fire Protection Engineer Qing (Luchi) Lu regarding a complaint that Ms. Lu has stalked and harassed DCRA Fire Protection Engineer S▓ B▓ since May 19, 2016; and that Ms. Lu deliberately refused to comply with rules, regulations, written procedures or proper supervisory instructions and that she continued this course of conduct on until

Tuesday, February 5, 2019. American Federation of Government Employees (AFGE), Local 2725 Shop Steward William Harris attended the interview.

Special Investigator Lawson provided Ms. Lu with a Garrity Rights notification form. Ms. Lu signed and dated the form February 12, 2019 acknowledging that she understood her Garrity Rights (Exhibit #6).

Ms. Lu stated that she has been employed with DCRA as a Fire Protection Engineer for eleven (11) years, four (4) months. Ms. Lu stated that as a Fire Protection Engineer she reviews construction plans and drawings for fire safety and building egress. Special Investigator Lawson provided Ms. Lu with a copy of the Position Description (PD) Form for Fire Protection Engineer (Exhibit #7). Ms. Lu reviewed the official PD and agreed that it accurately describes her official duties and responsibilities.

Ms. Lu was asked to describe those positions in her chain-of command. Ms. Lu stated that Sydney Lester has been her immediate supervisor since she was hired. Ms. Lu stated that DCBO Christopher Bailey is Mr. Lester's Supervisor and the Chief Building Official (CBO) is DCBO Bailey's supervisor followed by the Director of DCRA who supervises the CBO.

Ms. Lu stated that all of her complaints regarding S███ B███ and his wife, N███, asserted that Mrs. B███ faked her pregnancy by wearing a pillow or 'fake pregnancy belly.' Ms. Lu stated that she had 'reasonable proof' that Mrs. B███ faked the pregnancy of their who was born on███ During the interview Special Investigator Lawson asked Ms. Lu on several occasions if Ms. Lu had ever seen S███ B███'s wife's nude body while she was wearing a pillow or 'fake pregnancy belly.' Ms. Lu stated that she has never seen Ms. B███ wearing a pillow or 'fake pregnancy belly' made of plastic, silicone, foam or any other material. Ms. Lu stated that whenever she saw Mrs. B███ during her███ pregnancy Mrs. B███ was wearing clothing.

Ms. Lu stated that at the end of███, S███ B███'s wife███, visited DCRA's third floor. Ms. Lu stated that Mrs. B███ offered to tell former DCRA Contact Representative Anthony Jones that she was pregnant. Ms. Lu stated:

> There was no sign [of pregnancy] on her body that day. On that day I saw her myself too…on the second floor. She did not look that way. But a couple days later she came back again. At that moment everybody clearly recall an impressively big bump, big bump on her body. And at a later time after the baby was born she offered to tell us…not us just a lot of people it was a past due pregnancy with induced labor. And also I have customers emailing me in writing clearly state that was an oddly shaped and probably while she's straining, she's not comfortable, she moves to the side, she put it back right away or something like that.

Ms. Lu stated:

> Do you know Alex, Alex (last name unknown) the original Mechanical Engineer who was there? Alex has a real baby at the same time. If not on the same day, within the very same month. At about September after four (4) months the baby was born the two (2) new fathers had a conversation.

Alex asked S█████ B█████, 'Hey S█████ How's your baby doing?' That's four months. Do you know what S█████ Br███ say? She's doing well, she's walking around. Whose baby is walking around like four months old?

Special Investigator Lawson asked Ms. Lu how she learned of the conversation between Alex and Mr. B█████, Ms. Lu stated, "Alex told me."

Special Investigator Lawson again asked Ms. Lu if she had ever seen N█████ B█████ in the nude wearing a pillow or a "fake pregnancy belly." Ms. Lu stated "No."

Ms. Lu stated that she has never met S█████ B█████s wife, N█████, his stepmother, R██ B██ or any of his children.

Ms. Lu stated that her complaint against S█████ █████and his wife N████ is based on speculation and conjure.

Ms. Lu stated that on June 27, 2016, she filed a complaint with the D.C. Office of the Inspector General (OIG) stating that Mr. B████'s wife had faked the pregnancy of their █████ who was born on █████████ so that Mr. B████ could fraudulently obtained PFL for the fake pregnancy. Ms. Lu acknowledged that the OIG sent her a memorandum stating that they referred her complaint to DCRA and that the OIG case was closed. Ms. Lu was provided copies of her February 1, 2017 Freedom of Information Act request of the OIG which includes a copy of the memorandum to DCRA Director Melinda Bolling (Exhibit 8); a case activity log showing the different stages of Ms. Lu's complaint (Exhibit #9), the activity log list the complaint as a false complaint; and the OIG memorandum to Ms. Lu explaining that the complaint was referred to DCRA (Exhibit #10).

On Thursday, September 29, 2016, Ms. Lu sent an email of her complaint against Mr. B████ to Mia Brown and Special Investigator Lawson. On Thursday, October 27, 2016 Ms. Lu forwarded her complaint to Board of Ethics and Government Accountability (BEGA) Investigator Ileana Corrales (Exhibit #11). Ms. Lu was presented with the email printout for her review and confirmed that she prepared and sent the emails.

Ms. Lu admitted that she printed the 'fake pregnancy belly' Google search on January 30, 2016 while she sat at the Fire Protection Review desk during a POD meeting. Ms. Lu admitted that she left the 'fake pregnancy belly' Google search webpage (See Exhibit #2) in the desk drawer of the Fire Protection Review desk. Ms. Lu stated that she printed the 'fake pregnancy belly' Google search webpage for a friend of hers who resided in China at that time.

On Tuesday February 7, 2017, Ms. Lu forwarded an email entitled "FOIA Response" to Mia Brown and a superior Ingrid Jackson. Ms. Lu's email is on page five (5) of email thread dated Friday, May 12, 2017 to Mia Brown (Exhibit #12) states:

Hi

Please see attachments for FOIA Response – OIG Case 2016-1103 – I received from OIG on Wednesday February 1st, 2017. I am the

"Complainant" referred to in the letter. I reported it to OIG on June 27th, 2016 using my personal email. I identified myself completely with OIG in my first / initial report. I requested Confidentiality. My allegation was: S███ B███ did NOT have a baby in ███████ My concern was: He may have committed a fraud. My allegation and concern were based on my own observations and information shared with me by my coworkers.

S███ B███ was on fatherhood leave between ███ and ███████, S███ B███ showed photos of a baby to coworkers sitting near him and claimed that was his ███████. Sidney Lester walked around and helped make announcement of arrival of a ███████.

The reason I sent my reports to OIG in the first place was because I (originally) thought OIG would be in a better position to probe this case, as it is a law enforcement entity which has more authority to demand access to some highly classified / personal information when dealing with institutions (hospitals) and companies (healthcare providers and medical insurance companies, like Aetna, Kaiser and/or United), while performing this task. It was also out of confidentiality concerns. I am still requesting confidentiality. Yet the letter (dated October 28th, 2016) from OIG, which I received on February 1st, has indicated that DCRA would be in the best position to address this issue as they believe this is an HR issue. This is why I am sending this email to you. For my own sake, I chose not to copy this email to my supervisor Sydney Lester, nor share it with other management of my floor.

With all my respect, I wish – if I may – to hear some updates from you whether it has been substantiated (he did not have a baby in ███████), or unsubstantiated (he did). In case of the latter, I would admit I made an honest mistake. I understood most OIG investigations will generate 3 outcomes: substantiated, unsubstantiated, and inconclusive (not found). For this particular case, "inconclusive" is especially inapplicable We cannot say "He is somewhat having a baby and somewhat not". It must be a 100% Yes or 100% No. I reported this issue to OIG in an upright and candid manner. Now I wish – if I may – to get straightforward answer from DCRA HR.

I understand, respect and will follow the DC Codes referenced in OIG's letter. I will also strictly follow all the disciplines and rules of our own agency in relation to this matter. I will also obey and follow all of your direction and instructions.

Thank you.
Luchi

Ms. Lu was presented with the Tuesday, February 7, 2017 email printout for her review and confirmed that she prepared and sent the emails.

Ms. Lu stated that on Friday, February 10, 2017, she met with Walter Crawford and Ingrid Jackson to discuss her continuously sending her complaint against Mr. ▮▮ to various internal and external D.C. government entities. On Friday, February 10, 2017, Ms. Lu sent the following email to Walter Crawford and copying Ingrid Jackson and Mia Brown (Exhibit #13):

> Mr. Crawford,
>
> Thank you for taking your time to notify me the result of this complaint. It has been a little bit distracting given the prolonged investigation. Now it has come to an end and makes a good relief. I respect and take it as our agency's decision.
>
> As stated, I was relying on my observation and comprehension as well as information voluntarily shared with me by several of my coworkers. I handled my reports and all information professionally band responsibly. Below is the original / initial / first report I sent to OIG on June 27, 2016. I just want to be totally candid and open with all you HR professionals what I actually did, so as to clear out any misunderstanding, if any.
>
> From now on, there will be no more communications from me on this matter. You have my word. Thank you all for your time.

Special Investigator Lawson presented the Friday, February 10, 2017 email to Ms. Lu to review. Ms. Lu read her email aloud and then stated, "I broke my promise." Ms. Lu agreed that she directed her email to a superior, Mr. Crawford, and that she 'broke her promise.'

On Wednesday, May 10, 2017 OIG Hotline sent the following email to Ms. Lu:

> Dear Qing Lu:
>
> This correspondence is in response to your complaint regarding time and attendance and Paid Family Leave fraud. The Office of Inspector General (OIG) conducted an independent analysis of the documentation provided by the Department of Consumer and Regulatory Affairs (DCRA) and determined that no further action by the OIG is warranted.
>
> Please be advised that the D.C. OIG considers this matter closed. If we can assist you in matters involving fraud, waste and abuse within the District of Columbia government, please contact the OIG Hotline at (202) 724-TIPS (8477), or by email at hotline.oig@dc.gov.
>
> Sincerely,
>
> OIG Hotline

Ms. Lu was presented with the Wednesday, May 10, 2017 OIG email printout for her review and confirmed that she received the email.

On Wednesday, May 10, 2017 Ms. Lu emailed her complaint against S███ B███ entitled "Ethical / fraud report – initiative communication" to BEGA's Tameka Collier (Exhibit #14). Ms. Lu was presented with the Wednesday, May 10, 2017 BEGA email printout for her review and confirmed that she prepared and sent the email to Ms. Collier.

On Friday, May 12, 2017 Mia Brown sent Ms. Lu a reply to an extensive email Ms. Lu wrote to Ms. Brown on the same day (Exhibit #15). Ms. Lu claimed to have "NEW evidence" to indicate Ms. B███ committed fraud to obtain PFL approval. Ms. Lu relied on a photograph posted on Facebook showing Mr. B███'s stepmother holding his ███. Ms. Lu claimed Mr. B███'s stepmother was the mother of Mr. B███'s ███. Ms. Lu also stated that staff members had conversations with Mr. B███'s wife when she visited the POC. Ms. Lu also refers to the meeting she had with CAO Crawford on February 10, 2017 in her email.

Mia Brown's email reply to Ms. Lu states, "All required documentation has been provided by the employee for approved Paid Family Leave (PFL)." Mia Brown's email also recommended that Ms. Lu seek the assistance of INOVA in coping with the 'spiritual pain' that Ms. Lu claims she was suffering as a result of her complaint against Mr. B███.

Ms. Lu was presented with the Friday, May 12, 2017 email printout for her review and confirmed that she prepared and sent the emails.

On Wednesday, May 17, 2017, Ms. Lu forwarded her email thread with Mia Brown to BEGA Investigator Ileana Corrales (Exhibit #16).

On Thursday, May 25, 2017, Ms. Lu sent an extensive email to BEGA Investigator Ileana Corrales stating that S███ B███'s wife did not show physical signs of pregnancy (Exhibit #17). Ms. Lu claimed that Mr. B███'s wife faked her pregnancy so that Mr. B███ could fraudulently obtain PFL so that Mr. B███ could cover the 'possible prison time' that he may have been sentenced to as a result of a June 23, 2016 trial for driving on a suspended license. The Charles County State's Attorney's Office entered a Nolle Prosequi for the driving on a suspended license charge.

Ms. Lu was presented with the Thursday, May 25, 2017 email printout for her review and confirmed that she prepared and sent the emails.

On Tuesday, July 25, 2017, Ms. Lu sent another email to BEGA Investigator Ileana Corrales wherein Ms. Lu expressed her displeasure that BEGA sent Ms. Lu a letter from the Interim Director and General Counsel stating that BEGA was no going to investigate Ms. Lu's complaint against Mr. B███ (Exhibit 18). Ms. Lu was presented with the Tuesday, July 25, 2017 email printout for her review and confirmed that she prepared and sent the emails. Interim Director Flowers' July 24, 2017 memorandum (Exhibit #18A) states:

Dear Ms. Lu:

This letter responds to your complaint to the Board of Ethics and Government Accountability ("BEGA") dated May 16, 2017, and subsequent conversations with BEGA staff, in which you provided to us

details about your co-worker, ▮▮ B▮▮ . In your complaint you allege that Mr. B▮▮ abused his Paid Family Leave by purchasing, or forgoing, a document to deceive the government about the birth of his ▮▮ .

We analyzed the details of your complaint in light of the Board of Ethics and Government Accountability Establishment and Comprehensive Ethics Reform Amendment Act of 2011 ('Ethics Act"), effective April 27, 2012 (D.C. Law 19-124; D.C. Official Code § 1-1161.01, *et seq.*). After an interview with Mr. B▮▮ , and a review of relevant documents obtained by BEGA investigators, there is insufficient evidence to support a reasonable belief that a violation of the Code of Conduct occurred.

We appreciate your taking the time to forward this matter to our Office. If you have any questions please feel free to contact Investigator Ileana Corrales at 202-741-2130.

Sincerely,

Brian K. Flowers.

On Wednesday, August 2, 2017 Ms. Lu sent an extensive email to BEGA's Interim Director Brian K. Flowers (Page 2, Exhibit #19) regarding her complaint against S▮▮ B▮▮ and his wife BEGA case 1625-001. Ms. Lu's email states that on June 24, 2017, Ileana Corrales notified her that her complaint was 'closed because of insufficient evidence and privacy.' Ms. Lu's email states, "I have clearly responded "this case does involve an employee's spouse, who is so willing to cooperate in a deliberate fraud, but is does not involve a "child". The close of this case is NOT supported by official verification with the state record of Maryland government."

Ms. Lu was presented with the Wednesday, August 2, 2017 email printout for her review and confirmed that she prepared and sent the emails.

On Thursday, August 3, 2017, Ms. Lu sent the following email to DCBO Christopher Bailey:

Hi Chris . (sic) Thank you for taking time from your busy schedule meeting with me. You asked for a "date" of some communication. Now I am forwarding to you for your information. As said, I was seeking advice. I do NOT need you to discuss with anybody. If I choose to do it later, I will do it myself and take all the consequence responsibilities myself. Thank you again. Any further advice (sic), please let me know.

Thank you again,
Luchi

DCBO Bailey forwarded this email to CAO Walter Crawford on Thursday, August 3, 2017 (Exhibit #20). Ms. Lu was presented with the Thursday, August 3, 2017 email printout for her review and confirmed that she prepared and sent the emails.

Ms. Lu stated that on August 15, 2017 CBO Lynn Underwood had Ms. Lu come to his office on the fourth floor to meet with him and DCBO Christopher Bailey. Ms. Lu stated that CBO Underwood instructed her not to send anymore emails to Director Melinda Bolling or Executive Assistant Kandace Taylor. Ms. Lu stated that CBO Underwood instructed her to only pursue her complaint against S██ B██ with DCRA HR. Ms. Lu stated, "I strictly followed his (Underwood's) instructions." Ms. Lu stated that after her meeting with CBO Underwood and DCBO Bailey she took her complaint to DCRA HR only.

On Tuesday, August 15, 2017 CBO Lynn Underwood sent an email entitled "Luchi Lu" to HRO Ingrid Jackson. CBO Underwood copied his email to DCBO Christopher Bailey, Deputy Director Lori Parris, Director Melinda Bolling and Executive Assistant to the Director Kandace Taylor (Exhibit #21). CBO Underwood's email states:

> Chris and I just had a meeting with Luchi Lu regarding the issue with
> S██ B██. We told her not to have contact with anyone in DCRA
> except Human Relations about this issue. She acknowledged our direction
> and left the meeting with an understanding of our explicit direction.

Ms. Lu was presented with the Tuesday, August 15, 2017 email printout for her review and confirmed that she received CBO Underwood's instructions during the Tuesday, August 15, 2017 meeting that she had with CBO Underwood and DCBO Bailey.

On Monday, August 21, 2017 Luchi Lu sent an email to CBO Lynn Underwood and DCBO Christopher Bailey (See email Thread Exhibit #22) stating:

> Sir,
>
> Do you think this time HR is going to request his authorization to verify
> his document with DVR Maryland, or still just take it as true with no
> verification? Thank you.
>
> Luchi

Ms. Lu was presented with the Monday, August 21, 2017 email printout for her review and confirmed that she prepared and sent the emails.

On Tuesday, August 22, 2017, CBO Underwood sent a reply email to Ms. Lu copying Ingrid Jackson and DCBO Christopher Bailey (Exhibit #22) stating:

> Luchi,
> Please remember that I instructed you to take this issue ONLY to HR from
> now on. Please do not send these questions or any like them to anyone
> other than HR. Thank you

Lynn Underwood

Ms. Lu was presented with the Tuesday, August 22, 2017 email printout for her review and confirmed that she received the email and that she was aware of CBO Underwood's verbal and written instructions of Tuesday, August 22, 2017.

Despite CBO Underwood's supervisory instruction of Tuesday, August 22, 2017 Ms. Lu continued to send her complaint against S███ B███:

On Monday, September 11, 2017, Ms. Lu sent an email to HRO Ingrid Jackson asking for a response to Ms. Lu's emails entitled "Report to Director" that Ms. Lu sent on August 23, 2017 and August 25, 2017 (Exhibit #22A). Ms. Jackson sent Ms. Lu a reply on Monday September 11, 2017 which states:

> Good afternoon Ms. Lu,
>
> I apologize for my tardy response. Based on my review of his records, Mr. B███ has met all of the District government requirements in order to be eligible for Paid Family Leave and has taken the Leave in accordance with regulations. Further review reflects that your concerns have been investigated by both the Office of the Inspector General (OIG and the Board of Ethics and Government Accountability (BEGA). The OIG and BEGA informed the agency that they could not find any cause for the agency to take any disciplinary action against Mr. B███ and that the case is now closed.
>
> At this point, there is no further action required by representatives of the DC Department of Consumer and Regulatory Affairs (DCRA or any other District government agency.
>
> Please consider this the final response on behalf of the agency as the matter has been investigated and deemed closed.

Despite of HRO Jackson's email reply of Monday, September 11, 2017, Ms. Lu continued sending her complaint against Mr. B███ to D.C. government agencies, Councilmembers, news media service, private individuals and co-workers from September 11, 2017 until February 5, 2019.

On Tuesday, September 19, 2017, Ms. Lu emailed the complaint entitled "Report forgery crime to EOM" to Mayor Bowser, Bowser, Muriel (Executive Office of the Mayor [EOM]), ATD EOM3, and Bowser, Muriel (TRANSITION). Ms. Lu sent copies to Mark Tuohey (EOM), John Falcicchio (EOM and Beverly Perry (EOM) (Exhibit #23). Ms. Lu was presented with the Tuesday, September 19, 2017 email printout for her review and confirmed that she sent the email and that she was aware of CBO Underwood's verbal and written instructions of Tuesday, August 22, 2017. Ms. Lu acknowledged that none of the above listed individuals are part of DCRA HR.

On Tuesday, September 19, 2017, Ms. Lu sent an email that included her full complaint against S███ B███ entitled "Report to Director" to AFGE Chief Shop Steward and Housing Code Inspector Lakeitha Johnson (Exhibit #24). Ms. Lu was presented with the Tuesday, September

19, 2017 email printout for her review and confirmed that she sent the email and that she was aware of CBO Underwood's verbal and written instructions of Tuesday, August 22, 2017. Ms. Lu acknowledged that Ms. Johnson is not part of DCRA HR.

On Friday, September 22, 2017, Ms. Lu sent another email with her complaint against S█ B█ entitled "Report forgery crime to EOM" to Mayor Bowser, Bowser, Muriel (Executive Office of the Mayor [EOM]), ATD EOM3, and Bowser, Muriel (TRANSITION). Ms. Lu sent copies to Mark Tuohey (EOM), John Falcicchio (EOM and Beverly Perry (EOM) (Exhibit #25). Ms. Lu was presented with the Friday, September 22, 2017 email printout for her review and confirmed that she sent the email and that she was aware of CBO Underwood's verbal and written instructions of Tuesday, August 22, 2017. Ms. Lu acknowledged that none of the above listed individuals are part of DCRA HR.

On Monday, September 25, 2017 and Tuesday, September 26, 2017, Ms. Lu exchanged emails regarding her complaint against S█ B█ entitled "Report forgery crime to EOM" with Jim Slattery of EOM and copied Joseph Wright of EOM (Exhibit #26). Ms. Lu was presented with the Monday, September 25, 2017 and the Tuesday, September 26, 2017 email printout for her review and confirmed that she prepared, sent and received the emails and that she was aware of CBO Underwood's verbal and written instructions of Tuesday, August 22, 2017. Ms. Lu acknowledged that none of the above listed individuals are part of DCRA HR.

On Wednesday, September 27, 2017 Ms. Lu exchanged emails regarding her complaint against S█ B█ entitled "Report forgery crime to EOM" with Karuna Seshasai of EOM (Exhibit #27). Ms. Lu was presented with the Wednesday, September 27, 2017 email printout for her review and confirmed that she prepared, sent and received the emails and that she was aware of CBO Underwood's verbal and written instructions of Tuesday, August 22, 2017. Ms. Lu acknowledged that Ms. Seshasai is not part of DCRA HR.
Ms. Seshasai's email states:

> Good afternoon Ms. Lu,
>
> I did receive your email last Friday, September 22, and your voicemail. The Mayor's Office has also received your request for follow-up on the report you sent on September 19. This matter has been reported to and investigated by your agency, DCRA, the Office of the Inspector General, and the Board of Ethics and Government Accountability. I have also discussed the report with DCHR. Your allegations have been investigated by the aforementioned agencies and they have taken appropriate action. Thank you for bringing this to our attention, there will be no further action taken on our end.
>
> Best,
>
> Karuna

On Wednesday, September 27, 2017 Ms. Lu exchanged emails regarding her complaint against S█ B█ entitled "Report forgery crime to EOM" with Karuna Seshasai of EOM (Exhibit #27). Ms. Lu was presented with the Wednesday, September 27, 2017 email printout for her review and confirmed that she prepared, sent and received the emails and that she was aware of

Confidential Subject to Protective Order      Lu v. DC et al 1-20-cv-00461_00000169

CBO Underwood's verbal and written instructions of Tuesday, August 22, 2017. Ms. Lu's email to Ms. Seshasai states:

# How do you know he is not a liar ?

Special Investigator Lawson presented Ms. Lu with an email DCRA, Inspections and Compliance Administration Combination Code Inspector, Ronald Fones sent to Mia Brown on Wednesday, October 4, 2017 (Exhibit 27A). Inspector Fones' email states:

> Mia
>
> On September 4th around 9:30 am, I was approached by Luchi Lu, (4th floor elevator lobby) she was asking me if I heard about one of the plan reviews' getting PFML because his wife was wearing a false pregnancy belt. I told her I did not know who she was talking about.
>
> Lyn Underwood told me to report it to you.
>
> Inspector Fones

Ms. Lu stated that she trust Inspector Fones and if he wrote the email she must have spoken to him about her complaint against S▮▮▮ B▮▮▮ on September 4, 2017 as Inspector Fones stated in his email.

Between October 12, 2017 and November 30, 2017 Ms. Lu exchanged approximately twenty-eight (28) emails with approximately six (6) DCHR staff members, including DCHR Director Ventris Gibson, Ellen Brennan, Ledsema Smith-Mathis, Lissette Ortiz, Gia Stancell and Justin Zimmerman regarding her complaint against S▮▮▮ B▮▮▮. Ms. Lu stated that she was aware of CBO Underwood's verbal and written instructions of Tuesday, August 22, 2017. Ms. Lu acknowledged that none of the above listed individuals are part of DCRA HR. On Tuesday, November 28, 2017 Director Gibson sent the following email to Ms. Lu (Exhibit #28):

> Good Morning Ms. Lu:
>
> Thank you for your email. You requested that DCHR look into the allegation you made regarding a co-worker. Please know that DCHR, OIG and BEGA looked into your allegation and found no merit to your claim. As explained to you by members of my staff, this matter is now closed.
>
> Since this matter is closed, we are unable to assist you further.

Ms. Lu continued to send emails to DCHR after Ms. Gibson's November 28, 2017 email above. Ms. Lu sent eight more emails to various DCHR staff members insisting on a meeting with Director Gibson. Ms. Lu stated that she was aware of CBO Underwood's verbal and written instructions of Tuesday, August 22, 2017. Ms. Lu acknowledged that none of the above listed DCHR staff individuals are part of DCRA HR.

On Wednesday, January 31, 2018 Ms. Lu sent emails regarding her complaint against S▮ B▮ entitled "Paternity leave fraud at DC government –Wearing a pillow" to Fenit Nirappil of The Washington Post (Exhibit #29). Ms. Lu attached a photocopy of her D.C. government employee credentials to the email. Ms. Lu was presented with the Wednesday, April 25, 2018 email printout for her review and confirmed that she prepared, sent and received the emails and that she was aware of CBO Underwood's verbal and written instructions of Tuesday, August 22, 2017. Ms. Lu acknowledged that Mr. Nirappil is not part of DCRA HR.

On Tuesday, February 20, 2018 Ms. Lu again sent emails regarding her complaint against S▮ B▮ entitled "DCHR Response" to DCHR staff members Ellen Brennan, Ledsema Smith-Mathis, Lissette Ortiz, Gia Stancell and Justin Zimmerman regarding her complaint against S▮ B▮ (Exhibit #30). Ms. Lu claimed to have new information. Ms. Lu stated that she was aware of CBO Underwood's verbal and written instructions of Tuesday, August 22, 2017. Ms. Lu acknowledged that none of the above listed individuals are part of DCRA HR.

On Tuesday, February 20, 2018 Ms. Lu sent her complaint against S▮ B▮ and a complaint against Walter Crawford to Nolo Network, an employment law search website (Exhibit #31). Ms. Lu stated that she was aware of CBO Underwood's verbal and written instructions of Tuesday, August 22, 2017. Ms. Lu acknowledged that the above listed website is not part of DCRA HR. Ms. Lu wrote:

> One of my coworkers, s DC government employee submitted a fake birth certificate to HR and his wife was wearing a silicone bump around her belly underneath her clothes. This person took 8 weeks government paid fatherhood leave WITHOUT a baby!! I reported this fraud to HR with rock solid evidence obtained from me and from other employees. When I was calling to follow up, The agency's chief staff=HR manager called it harassment. He used "harassment" to threaten me. He said "if you continue you'll be dealt with". He knew revealing the truth will reveal his own incompetence and negligence.

On Tuesday, February 20, 2018 Ms. Lu again sent another email regarding her complaint against S▮ B▮ entitled "Request for a meeting" to Lakeitha Johnson (Exhibit #32). Ms. Lu stated that she was aware of CBO Underwood's verbal and written instructions of Tuesday, August 22, 2017. Ms. Lu again acknowledged that Ms. Johnson is not part of DCRA HR.

On Thursday, February 22, 2018 Ms. Lu again sent another email regarding her complaint against S▮ B▮ entitled "THANK YOU" to Lakeitha Johnson and AFGE Shop Steward and Housing Code Inspector William Harris (Exhibit #33). Ms. Lu stated that she was aware of CBO Underwood's verbal and written instructions of Tuesday, August 22, 2017. Ms. Lu again acknowledged that Ms. Johnson is not part of DCRA HR. Ms. Lu's email states:

> Mr. Harris,
>
> Thank you for taking time from your busy schedule to meet with me. I really appreciate it. Thank you for your advice.

Below is the email I sent to Ms. Mia Brown on 12-1-2017 after talking with her in the lobby in this building, which was the very last email about this matter. I will learn to work on myself to change my mindset. Thank you again!

On Friday, February 23, 2018 Ms. Lu again sent another email regarding her complaint against S██ B██ entitled "OIG Control #2016-1103" to Hotline Inspector General (Exhibit #34). Ms. Lu stated that she was aware of CBO Underwood's verbal and written instructions of Tuesday, August 22, 2017. Ms. Lu acknowledged that Hotline Inspector General is not part of DCRA HR.

On Friday, March 9, 2018 Ms. Lu sent emails regarding her complaint against S██ B██ entitled "Confidential Meeting Request" to DCRA EEO Counselor Rohan Reid (Exhibit #35). Ms. Lu stated that she was aware of CBO Underwood's verbal and written instructions of Tuesday, August 22, 2017. Ms. Lu again acknowledged that Mr. Reid is not part of DCRA HR.

On Thursday, April 5, 2018 Ms. Lu again sent an email regarding her complaint against S██ B██ entitled "follow up" to former DCRA Director Melinda Bolling (Exhibit #36). Ms. Lu stated that she was aware of CBO Underwood's verbal and written instructions of Tuesday, August 22, 2017. Ms. Lu acknowledged that Director Bolling is not part of DCRA HR. CBO Underwood explicitly instructed Ms. Lu not to communicate her complaint to Director Bolling after August 15, 2017. Despite this Ms. Lu sent emails requested a meeting with Director Bolling about her complaint against S██ y B██.

On Monday, April 9, 2018 Ms. Lu sent emails regarding her complaint against S██ B██ entitled "Epidemic Paternity leave fraud by male DC government employees" to CNN's Heather Brown, Lauren Cone, Community@Cnn and CNN.Feedback (Exhibit #37). Ms. Lu attached a photocopy of her D.C. government employee credentials to the email. Ms. Lu was presented with the Wednesday, April 25, 2018 email printout for her review and confirmed that she prepared, sent and received the emails and that she was aware of CBO Underwood's verbal and written instructions of Tuesday, August 22, 2017. Ms. Lu again acknowledged that none of the above listed individuals are part of DCRA HR.

On Tuesday, April 10, 2018 Ms. Lu again sent another email regarding her complaint against S██ B██ entitled "follow up" to former DCRA Director Melinda Bolling (Exhibit #38). Ms. Lu stated that she was aware of CBO Underwood's verbal and written instructions of Tuesday, August 22, 2017. CBO Underwood explicitly instructed Ms. Lu not to communicate her complaint to Director Bolling after August 15, 2017. Despite this Ms. Lu continued sending emails requesting a meeting with Director Bolling about her complaint against S██ y B██.

On Thursday, April 12, 2018 Ms. Lu sent BEGA investigation information to a private citizen Tanya Hill of Permit Xperts (Exhibit #39). Ms. Lu's email to Ms. Hill states:

Probably he wants to have total control as a manager, but it's not right. But did you know his wife is a permit runner and he's fined $1,000 by BEGA.

Check this out!

https://bega.dc.gov/sites/bega/files/publication/attachments/1548-001_-
_S._B█████ - Negotiated_Disposition.pdf

(see attachment)

On Monday, April 23, 2018 and Friday, April 27, 2018 Ms. Lu sent emails regarding her
complaint against S███ B█ entitled "THANK YOU" to Keith Slade and Andrea Sumner
(Exhibit #40). Ms. Lu stated that she was aware of CBO Underwood's verbal and written
instructions of Tuesday, August 22, 2017. Ms. Lu acknowledged that none of the above listed
individuals are part of DCRA HR. Ms. Lu email to Ms. Sumner had Mr. B████ s negotiated
disposition with BEGA attached and states:

Update – Mr. and Mrs. Pillow – FYI

Have a good weekend…

Ms. Lu stated that her use of the words Mr. and Mrs. Pillow was intended to describe Mr. B████ h
and his wife. Ms. Lu admitted that she was intending to be disrespectful towards Mr. and Mrs.
B█

On Wednesday, April 25, 2018 Ms. Lu sent emails regarding her complaint against S███ B█████
entitled "Paternity leave fraud at DC government –Wearing a pillow" to Fenit Nirappil, J
Capehart, Michelle Boorstein, and Paul Farhi of The Washington Post (Exhibit #41). Ms. Lu
attached a photocopy of her D.C. government employee credentials to the email. Ms. Lu was
presented with the Wednesday, April 25, 2018 email printout for her review and confirmed that
she prepared, sent and received the emails and that she was aware of CBO Underwood's verbal
and written instructions of Tuesday, August 22, 2017. Ms. Lu acknowledged that none of the
above listed individuals are part of DCRA HR.

Between Wednesday, May 23, 2018 and Wednesday, May 30, 2018 Ms. Lu exchanged emails
regarding her complaint against S███ B████ entitled "Paternity leave fraud – using pillows for
fake pregnancy" to Michelle Basch of WTOP (Exhibit #42). Ms. Lu was presented with the
Wednesday, April 25, 2018 email printout for her review and confirmed that she prepared, sent
and received the emails and that she was aware of CBO Underwood's verbal and written
instructions of Tuesday, August 22, 2017. Ms. Lu acknowledged that Ms. Basch is not part of
DCRA HR.

On Friday, June 1, 2018 Ms. Lu exchanged emails regarding her complaint against Silroy Brown
entitled "DC gov worker's wife faked pregnancy, worker took paternity leave" to Rick
Yarborough of NBC Universal (Exhibit #43). Ms. Lu attached a photocopy of her D.C.
government employee credentials to the email. Ms. Lu was presented with the Wednesday, April
25, 2018 email printout for her review and confirmed that she prepared, sent and received the
emails and that she was aware of CBO Underwood's verbal and written instructions of Tuesday,
August 22, 2017. Ms. Lu acknowledged that Mr. Yarborough is not part of DCRA HR.

On Wednesday, August 15, 2018 Ms. Lu sent another email regarding her complaint against S___ B___ h entitled "DCHR Response – Follow up with the Director" to Rick Yarborough of NBC Universal (Exhibit #44). Ms. Lu was presented with the Wednesday, April 25, 2018 email printout for her review and confirmed that she prepared, sent and received the emails and that she was aware of CBO Underwood's verbal and written instructions of Tuesday, August 22, 2017. Ms. Lu acknowledged that Mr. Yarborough is not part of DCRA HR.

Between Tuesday, September 28, 2018 and Wednesday, November 7, 2018 Ms. Lu exchanged numerous emails regarding her complaint against S___ B___ entitled "wearing pillow for 8 weeks paternity leave" to City Paper reporters Caroline Jones and Morgan Baskin (Exhibits #45 and #46). Ms. Lu was presented with the Wednesday, April 25, 2018 email printout for her review and confirmed that she prepared, sent and received the emails and that she was aware of CBO Underwood's verbal and written instructions of Tuesday, August 22, 2017. Ms. Lu acknowledged that neither Ms. Jones nor Ms. Baskin Mr. Yarborough is part of DCRA HR.

Between Wednesday, October 16, 2018 and Monday, November 12, 2018 Ms. Lu exchanged numerous emails regarding her complaint against S___ B___ entitled "Report to council members of District of Columbia – a crime committed by a DCRA employee at work" to Councilmembers Anita Bonds, Elissa Silverman, Brianne K. Nadeau and several council staff members including I. Kang, D. Meadows, M. Blackwell, C. Royster, T. Jackson and T. Fazzni (Exhibit #47). Ms. Lu was presented with the Wednesday, April 25, 2018 email printout for her review and confirmed that she prepared, sent and received the emails and that she was aware of CBO Underwood's verbal and written instructions of Tuesday, August 22, 2017. Ms. Lu acknowledged that none of the above listed individuals are part of DCRA HR.

On Wednesday, October 16, 2018 Ms. Lu sent an email regarding her complaint against S___ y B___ entitled "Report to council members of District of Columbia – a crime committed by a DCRA employee at work" to Councilmember Brianne K Nadeau and Chief of Staff Michelle Loggins (Exhibit #48). Ms. Lu attached a screenshot of S___ y B___ 's DCRA telephone directory contact page showing his photo (Exhibit #49). Ms. Lu was presented with the Wednesday, April 25, 2018 email printout for her review and confirmed that she prepared, sent and received the emails and that she was aware of CBO Underwood's verbal and written instructions of Tuesday, August 22, 2017. Ms. Lu acknowledged that none of the above listed individuals are part of DCRA HR.

On Wednesday, October 17, 2018 Ms. Lu sent an email regarding her complaint against S___ B___ entitled "Report to council members of District of Columbia – a crime committed by a DCRA employee at work" to Councilmember Elissa Silverman and Chief of Staff Michele Blackwell (Exhibit #50). Ms. Lu was presented with the Wednesday, April 25, 2018 email printout for her review and confirmed that she prepared, sent and received the emails and that she was aware of CBO Underwood's verbal and written instructions of Tuesday, August 22, 2017. Ms. Lu acknowledged that none of the above listed individuals are part of DCRA HR.

On Friday, November 2, 2018 Ms. Lu sent an email regarding her complaint against S___ B___ entitled "Report to council members of District of Columbia – a crime committed by a DCRA employee at work" to Councilmember Brianne K Nadeau (Exhibit #51) asking for an update. Ms. Lu was presented with the Wednesday, April 25, 2018 email printout for her review and confirmed that she prepared, sent and received the emails and that she was aware of CBO

Confidential Subject to Protective Order      Lu v. DC et al1-20-cv-00461_00000174

Underwood's verbal and written instructions of Tuesday, August 22, 2017. Ms. Lu acknowledged that none of the above listed individuals are part of DCRA HR.

On Monday, November 12, 2018 Ms. Lu sent an email regarding her complaint against S B entitled "Report to council members of District of Columbia – a crime committed by a DCRA employee at work" to Councilmember Brianne K Nadeau (Exhibit #52) again asking for an update. Ms. Lu was presented with the Wednesday, April 25, 2018 email printout for her review and confirmed that she prepared, sent and received the emails and that she was aware of CBO Underwood's verbal and written instructions of Tuesday, August 22, 2017. Ms. Lu acknowledged that none of the above listed individuals are part of DCRA HR.

On Monday, November 26, 2018 Ms. Lu sent an email regarding her complaint against S y B entitled "Important info to share" to Councilmember Brianne K Nadeau (Exhibit #53). Ms. Lu attached screenshots of N B 's Facebook photographs (Exhibit #54. In the email Ms. Lu alleges that photograph #2 is of S y B 's paternal half-sister. The woman in photograph #2 is Mr. B 's stepmother. Ms. Lu was presented with the Wednesday, April 25, 2018 email printout for her review and confirmed that she prepared, sent and received the emails and that she was aware of CBO Underwood's verbal and written instructions of Tuesday, August 22, 2017. Ms. Lu acknowledged that none of the above listed individuals are part of DCRA HR.

Despite the fact that CBO Lynn Underwood issued verbal and written direct supervisory instructions to Ms. Lu on August 15, 2017 and on August 22, 2017, on Tuesday, February 5, 2019 Mayor Muriel Bowser and DCRA Director Ernest Chrappah were touring DCRA Permit Operations Center when Ms. Lu approached Mayor Bowser and informed her of her complaint against S B while Director Chrappah listened.

Despite the fact that CBO Lynn Underwood issued verbal and written direct supervisory instructions to Ms. Lu on August 15, 2017 and on August 22, 2017, on Wednesday, February 6, 2019 Ms. Lu sent an email entitled "Report to Mayor Bowser – Wearing pillow for paternity leave" to Director Chrappah and Mayor Bowser (Exhibit #55).

During the audio recorded investigatory interview Ms. Lu stated, "My allegation is the baby that does not exist." Special Investigator Lawson informed Ms. Lu that a baby does exist and was born from Mrs. B 's pregnancy on                     Ms. Lu also stated:

I was hired and I am hired as a well-paid professional engineer. When you showed me all this stuff I did not realize I wrote this much you know it's really a lot [of] time. I don't know when since I become a DA that's not my job it's presumptuous. If at some point I ahh (sic) made a mistake, that's an honest mistake. I just tried to do the right thing. The current HR policy whenever you give them a piece of paper they don't verify. Paternity leave is very easy to do compared (sic) to maternity leave especially when the spouse is not working for DCRA. You know you can just say 'I got a girlfriend who's pregnant; you got a paper they don't verify. You know I just try to make this point to help DCHR realize currently there's some problem in it. But if at any point I cross the line; cause some pressure or some bad feelings on Mr. and Mrs. B , I apologize. That was not my intention. I never meant anything bad…

And now you know my email has been tightly monitored you know I'm not going to pursue any further [on this]...I apologize.

Special Investigator Lawson reminded Ms. Lu that when she first started filing complaints, Mia Brown emailed her and told her that Mr. B███ met all of the qualifications for approval of his PFL; that CAO Walter Crawford told her that the matter was closed because Mr. B███ met all of the required qualifications for his PFL; that OIG informed her that her complaint was referred to DCRA and they considered the matter closed; that BEGA also responded to her complaint stating that they considered the matter closed and refused to investigate because there was no foundation to her complaint; then DCHR Director Ventris Gibson told her that the matter regarding her complaint was closed because all of the qualifications for PFL were met by Mr. B███; finally DCRA Director Melinda Bolling told her that her complaint has not merit and was without any foundation.

Yet despite of all this, she continued filing complaints over and over and over to the same D.C. government agencies, D.C. Councilmembers, entities outside of the D.C. government including private companies and various news media services.

Ms. Lu stated;

> I just want to pointed out currently there is some problem with the DCHR policy. They don't verify...can you explain why [S███ B███ told Alex (last name unknown] his ███████ is walking around like 4 month old.

> Thank you for your time. I didn't know I have, this so much time. I did not realize you know I have spent so much time on this which is really out of my specified responsibility but I meant well. I did not meant (sic) to hurt anybody or be malicious or something. I just made the judgment based on some reasonable self and combined with the input from a co-worker...

Special Investigator Lawson informed Ms. Lu that the first six (6) months of her complaining or even the first year of her complaining might have been reasonable but she has continued her complaining for two and a half years. Ms. Lu responded, "That long...my bad, I'm sorry."

## Investigative Conclusions and Results

This investigation, determined that there is sufficient evidence to sustain findings that Qing (Luchi) Lu, Fire Protection Engineer with DCRA's Technical Review Branch of the Permit Operations Division, violated the D.C. Personal Regulations Chapter 16, Corrective and Adverse Actions and Chapter 18, Employee Conduct:

**Ms. Lu grossly violated Part 1, D.C. Personal Regulations Chapter 16; §1605.4(a) Conduct prejudicial to the District of Columbia Government, including:**

(3) Conduct that an employee should have reasonably known is a violation of law or regulation;

To wit:
On Tuesday, February 12, 2019, Special Investigator Lawson conducted an audio recorded interview with Fire Protection Engineer Qing (Luchi) Lu regarding Ms. Lu's complaint allegation that Fire Protection Engineer S███ B███ fraudulently obtained approved Paid Family Leave (PFL) because Mr. B███ 's wife, N███ B███ faked a pregnancy and birth of ███████ born ██████.

During the interview Ms. Lu admitted that between June of the year 2016 and February of the year 2019, she engaged in a course of conduct directed at Mr. and Mrs. B███ that Ms. Lu should have known would cause a reasonable person in the individual's circumstances to:

    (A) Fear for his or her safety or to the safety of another person;
    (B) Feel seriously alarmed, disturbed, or frightened; or
    (C) Suffer emotional distress.

In making this admission Ms. Lu knew or reasonably should have known that she was violating D.C. Official Code (Criminal) § 22-3133. Stalking.

**Mr. Lu grossly violated Part 1, D.C. Personal Regulations Chapter 16; §1605.4(b) False Statements, including:**

    (2) Misrepresentation, falsification, or concealment of material facts or records in connection with an official matter;

    (4) Knowingly and willfully reporting false or misleading information or purposely omitting material facts to any supervisor.

To wit:
Between May 19, 2016 and February 5, 2019 Ms. Lu repeatedly filed false and fictitious complaints against Mr. and Mrs. B███ with OIG (twice), BEGA (twice), DCHR (twice), DCRA Director (twice), DCRAHR (twice), three DC Councilmembers (Bonds, Nadeau and Silverman), Mayor Bowser (Three times), Executive Office of the Mayor (three times), CNN, WTOP, NBC Universal, The Washington Post, The City Paper. Ms. Lu's complaint asserted that Mr. B███ submitted fake documents to DCRA HR for approval of his PFL. Mr. B███ submitted authentic documentation that satisfied the PFL requirements. Ms. Lu's complaint asserted that during Mrs. B███ 's pregnancy with their ██████, Ms. B███ wore a pillow or a 'fake pregnancy belly.' Ms. Lu admitted that she has no proof that Ms. B███ ever wore a pillow or a 'fake pregnancy belly' and Ms. Lu has never observed Ms. B███ in the nude or her nude abdomen wearing a pillow or 'fake pregnancy belly.'

On June 27, 2016 Ms. Lu filed a complaint with the Office of the Inspector General. The Office of the Inspector General's Hotline described Ms. Lu's complaint as "False claims or statements." On July 14, 2016 Deputy Inspector General RAFP closed Ms. Lu's complaint as deemed it insufficient to open an investigation. On July 18 2016 and August 1, 2016, Ms. Lu contacted OIG for a status check of her complaint against Mr. and Mrs.

B█████. OIG reopened the case on August 23, 2016. Case was closed by OIG on October 17, 2016 stating, "Based on an assessment of the information provided by the complainant, this matter does not warrant an investigation by Investigations Unit (IU). It is recommended that this matter be referred to DCRCA with no response requested as both allegations are HR issues." (See Exhibit #9).

On Friday, February 10, 2017 Ms. Lu met with CAO Walter Crawford and HRO Ingrid Jackson regarding her complaint against Mr. and Mrs. B█████. After the meeting Ms. Lu sent an email to Mr. Crawford and copied Ms. Jackson, both were Ms. Lu's superiors:

> Mr. Crawford,
>
> Thank you for taking the time to notify me the result of this complaint. It has been a little bit distracting given the prolonged investigation. Now it has come to an end and makes a good relief. I respect and take it as our agency's decision...
>
> From now on, there will be no more communications from me on the matter. You have my word. Thank you all for your time.

Ms. Lu continued to communicating her complaint to various D.C. government agencies, D.C. Councilmembers, media services, Mayor Bowser and Director Chrappah from February 10, 2017 until February 5, 2019.

During her audio recorded investigatory interview Ms. Lu stated that she printed out a Google search webpage of a 'fake pregnancy belly' (See Exhibit #2) for a friend who lives China as a joke. Ms. Lu sent the same fake pregnancy belly to Director Bolling to show how Ms. B█████ could have used a fake pregnancy belly to fake the pregnancy of their █████ who was born █████.

**On numerous occasions between August 15, 2017 and February 5, 2019 Ms. Lu grossly violated Part 1, D.C. Personal Regulations Chapter 16; §1605.4(d) Failure/Refusal to Follow Instructions, including §1607.2(d) Failure/Refusal to Follow Instructions:**

(1) Negligence, including the careless failure to comply with rules, regulation, written procedures, or proper supervision.

On Tuesday, August 15, 2017, CBO Lynn Underwood and DCBO Christopher Bailey met with Ms. Lu and gave her explicit verbal instruction to not have any contact with anyone in DCRA except Human Relations about her complaint against Mr. and Mrs. B█████. CBO Underwood followed up his instruction to Ms. Lu in writing by sending the following email to HRO Jackson, DCBO Bailey, Director Melinda Bolling, Deputy Director Lori Parris and Executive Assistant Kandace Taylor:

> Chris and I just had a meeting with Luchi Lu regarding the issue with S█████ B█████. We told her not to have contact with anyone in DCRA except Human Relations about this issue. She acknowledged our direction and left the meeting with an understanding of our explicit direction.

Despite being given explicit verbal and written instructions by her superiors CBO Underwood and DCBO Bailey, Ms. Lu continued sending emails to AFGE Chief Shop Steward Lakeitha Johnson on Tuesday September 19, 2017, Rohan Reid on Friday March 9, 2018 and Director Bolling from Tuesday, April 10, 2018 and continued sending about ten (10) emails to Director Bolling until November of 2018.

On Tuesday, August 22, 2017, CBO Underwood sent Ms. Lu an email affirming the following written instructions:

Luchi,
Please remember that I instructed you to take this issue only to HR from now on. Please do not send these questions or anything like them to anyone other than HR. Thank you.

Lynn Underwood

On Monday, September 11, 2017 HRO Jackson sent Ms. Lu an email stating on Monday September 11, 2017 which states:

Good afternoon Ms. Lu,

I apologize for my tardy response. Based on my review of his records, Mr. B▇ has met all of the District government requirements in order to be eligible for Paid Family Leave and has taken the Leave in accordance with regulations. Further review reflects that your concerns have been investigated by both the Office of the Inspector General (OIG and the Board of Ethics and Government Accountability (BEGA). The OIG and BEGA informed the agency that they could not find any cause for the agency to take any disciplinary action against Mr. B▇ and that the case is now closed.

At this point, there is no further action required by representatives of the DC Department of Consumer and Regulatory Affairs (DCRA or any other District government agency.

Please consider this the final response on behalf of the agency as the matter has been investigated and deemed closed.

Despite being given explicit verbal and written instructions by her superior CBO Underwood, and despite HRO Jackson's assertion that there was no cause for Ms. Lu to file any additional complaints against Mr. B▇, Ms. Lu continued sending emails to Rohan Reid on Friday March 9, 2018 and Director Bolling from Tuesday, April 10, 2018 and continued sending emails to:

- On Friday, September 22, 2017, Ms. Lu sent another email with her complaint against S▇ B▇ entitled "Report forgery crime to EOM" to Mayor Bowser, Bowser, Muriel (Executive Office of the

Mayor [EOM]), ATD EOM3, and Bowser, Muriel (TRANSITION). Ms. Lu sent copies to Mark Tuohey (EOM), John Falcicchio (EOM and Beverly Perry (EOM).

- On Monday, September 25, 2017 and Tuesday, September 26, 2017, Ms. Lu exchanged emails regarding her complaint against S█████ B█████ entitled "Report forgery crime to EOM" with Jim Slattery of EOM and copied Joseph Wright of EOM.

- On Wednesday, September 27, 2017 Ms. Lu exchanged emails regarding her complaint against S████ B████ entitled "Report forgery crime to EOM" with Karuna Seshasai of EOM.

- Between October 12, 2017 and November 30, 2017 Ms. Lu exchanged approximately twenty-eight (28) emails with approximately six (6) DCHR staff members, including DCHR Director Ventris Gibson, Ellen Brennan, Ledsema Smith-Mathis, Lissette Ortiz, Gia Stancell and Justin Zimmerman regarding her complaint against █████ B████.

- Ms. Lu continued to send emails to DCHR after Ms. Gibson's November 28, 2017 email. Ms. Lu sent eight more emails to various DCHR staff members insisting on a meeting with Director Gibson.

- On Thursday, April 5, 2018 Ms. Lu again sent an email regarding her complaint against S████ B████ entitled "follow up" to former DCRA Director Melinda Bolling.

- On Monday, April 9, 2018 Ms. Lu sent emails regarding her complaint against S███ y B████ entitled "Epidemic Paternity leave fraud by male DC government employees" to CNN's Heather Brown, Lauren Cone, Community@Cnn and CNN.Feedback (Exhibit #XX). Ms. Lu attached a photocopy of her D.C. government employee credentials to the email.

- On Tuesday, April 10, 2018 Ms. Lu again sent another email regarding her complaint against S████ B████ entitled "follow up" to former DCRA Director Melinda Bolling. Ms. Lu continued sending emails requesting a meeting with Director Bolling about her complaint against S███ y B████.

- On Thursday, April 12, 2018 Ms. Lu sent BEGA investigation information to a private citizen Tanya Hill of Permit Xperts.

- On Monday, April 23, 2018 and Friday, April 27, 2018 Ms. Lu sent emails regarding her complaint against S███ y B████ entitled

Confidential Subject to Protective Order     Lu v. DC et al1-20-cv-00461_00000180

"THANK YOU" to DCRA employees Keith Slade and Andrea Sumner;

- On Wednesday, April 25, 2018 Ms. Lu sent emails regarding her complaint against S█████B████ entitled "Paternity leave fraud at DC government – Wearing a pillow" to Fenit Nirappil, J Capehart, Michelle Boorstein, and Paul Farhi of The Washington Post.

- Between Wednesday, May 23, 2018 and Wednesday, May 30, 2018 Ms. Lu exchanged emails regarding her complaint against S█████B████ entitled "Paternity leave fraud – using pillows for fake pregnancy" to Michelle Basch of WTOP.

- On Friday, June 1, 2018 Ms. Lu exchanged emails regarding her complaint against S█████B████ entitled "DC gov worker's wife faked pregnancy, worker took paternity leave" to Rick Yarborough of NBC Universal.

- On Wednesday, August 15, 2018 Ms. Lu sent another email regarding her complaint against S█████B████ entitled "DCHR Response – Follow up with the Director" to Rick Yarborough of NBC Universal.

- Between Tuesday, September 28, 2018 and Wednesday, November 7, 2018 Ms. Lu exchanged numerous emails regarding her complaint against S█████B████ entitled "wearing pillow for 8 weeks paternity leave" to City Paper reporters Caroline Jones and Morgan Baskin.

- Between Wednesday, October 16, 2018 and Monday, November 12, 2018 Ms. Lu exchanged numerous emails regarding her complaint against S█████B████ entitled "Report to council members of District of Columbia – a crime committed by a DCRA employee at work" to Councilmembers Anita Bonds, Elissa Silverman, Brianne K. Nadeau and several council staff members including I. Kang, D. Meadows, M. Blackwell, C. Royster, T. Jackson and T. Fazzni.

- On Wednesday, October 17, 2018 Ms. Lu sent an email regarding her complaint against S█████B████ entitled "Report to council members of District of Columbia – a crime committed by a DCRA employee at work" to Councilmembers Brianne K Nadeau, Elissa Silverman and Michelle Loggins .

- Between Tuesday, September 28, 2018 and Wednesday, November 7, 2018 Ms. Lu exchanged emails regarding her complaint against S█████B████ entitled "wearing pillow for 8 weeks paternity leave" to City Paper reporters Caroline Jones and Morgan Baskin.

Confidential Subject to Protective Order     Lu v. DC et al1-20-cv-00461_00000181

Despite the fact that CBO Lynn Underwood issued verbal and written direct supervisory instructions to Ms. Lu on August 15, 2017 and on August 22, 2017, on Tuesday, February 5, 2019 Mayor Muriel Bowser and DCRA Director Ernest Chrappah were touring DCRA Permit Operations Center when Ms. Lu approached Mayor Bowser and informed her of her complaint against S█ B███ while Director Chrappah listened.

Despite the fact that CBO Lynn Underwood issued verbal and written direct supervisory instructions to Ms. Lu on August 15, 2017 and on August 22, 2017, on Wednesday, February 6, 2019 Ms. Lu sent an email entitled "Report to Mayor Bowser – Wearing pillow for paternity leave" to Director Chrappah and Mayor Bowser.

**Ms. Lu grossly violated Part 1, D.C. Personal Regulations Chapter 18; §1800.3(n) Employees shall not take actions creating the appearance that they are violating the law or ethical standards set forth in this chapter. Whether particular circumstances create an appearance that the law or these standards have been violated shall determine from the perspective of a reasonable person with knowledge of the relevant facts:**

To wit:
On Tuesday, February 12, 2019, Special Investigator Lawson conducted an audio recorded interview with Fire Protection Engineer Qing (Luchi) Lu regarding Ms. Lu's complaint allegation that Fire Protection Engineer S██ B███ fraudulently obtained approved Paid Family Leave (PFL) because Mr. B███ 's wife, ███████, faked a pregnancy and birth of ██████ born ████

During the interview Ms. Lu admitted that between June of the year 2016 and February of the year 2019, she engaged in a course of conduct directed at Mr. and Mrs. B███ that Ms. Lu should have known would cause a reasonable person in the individual's circumstances to:

(D) Fear for his or her safety or to the safety of another person;
(E) Feel seriously alarmed, disturbed, or frightened; or
(F) Suffer emotional distress.

In making this admission Ms. Lu knew or reasonably should have known that she was violating D.C. Official Code (Criminal) § 22-3133. Stalking.

Byron Q. Lawson, Investigator          Date 2/23/2019

**EXHIBITS**
**Since Ms. Lu's email threads are lengthy and most contain the same information only the first one or two relevant pages will be used as exhibits.**
Exhibit #1 – Mr. B███ 's email to CAO Crawford entitled "Workplace Harassment by Fellow Employee" dated November 8, 2018.

Plf. Opp.
App. 85

Exhibit #1A – Copy of the statement entitled "Time during the POD Thursday meeting 9:10am" dated Thursday, February 2nd that DCBO Bailey sent to HRO Ingrid Jackson in February of 2017.

Exhibit #2 – Copy of the fake pregnant belly' Google search webpage that Mr. B____ found in the Fire Protection Review customer service desk on 1/26/2017.

Exhibit #3 – Printout of email thread DCBO Bailey sent to HRO Jackson with Mr. B____'s complaint and DCBO Bailey's statement, dated 2/2/2017 and 2/1/2017.

Exhibit #3A – Photo of Mr. B____'s stepmother holding his____ when they toured the White House. Child's face was intentionally blacked out.

Exhibit #4 – Copy of Ms. Lu's Post It note written to Ms. Taylor.

Exhibit #5 – Copy of a fake birth certificate Ms. Lu sent to Ms. Taylor to show Director Bolling that a fake birth certificate can be prepared.

Exhibit #6 – Garrity Rights Notification Form signed by Ms. Lu on 2/12/2019.

Exhibit #7 – Printout of the official Position Description for Fire Protection Engineer.

Exhibit #8 – Copy of OIG FOIA request letter to Ms. Lu, dated 2/1/2017.

Exhibit #9 – Copy of OIG complaint tracking "Update Complaint Memorandum Form" for complaint # 2016-1103 showing Ms. Lu's complaint as 'false claims or statement', dated 6/27/2016.

Exhibit #10 – Copy of OIG complaint referral letter to Director Bolling for complaint #2016-1103, dated 10/28/2016.

Exhibit #11 – Printout of Ms. Lu's email to BEGA's Ms. Corrales and Ms. Foster entitled "His Supervision" , sent 10/27/2016

Exhibit #12 – Printout of Ms. Ms. Lu's email forwarded to Mia Brown entitled "FOIA Response", dated 2/7/2017.

Exhibit #13 – Printout of Ms. Lu's email to CAO Crawford, HRO Jackson, and Mia Brown entitled "Thank you." The email thread includes Ms. Lu's complaint against Mr. B____, dated 22/10/2017.

Exhibit #14 – Printout of Ms. Lu's email to BEGA's Ms. Collier dated 5/10/2017.

Exhibit #15 – Printout of Mia Brown's email reply to Ms. Lu entitled "seeking advice" dated 5/12/2017.

Exhibit #16 – Printout of Ms. Lu forwarded email thread entitled "seeking advice" with Mia Brown to BEGA Investigator Ileana Corrales, dated 5/17/2017

Exhibit #17 – Printout of Ms. Lu's email to BEGA Investigator Corrales entitled "Reports – OIG 2012-1103", dated 5/25/2017.

Exhibit #18 – Printout of Ms. Lu's email to BEGA Investigator Corrales entitled "Board of Ethics & Government Accountability", dated 7/25/2017.

Exhibit #18A – Copy of BEGA's Interim Director Flowers' memorandum to Ms. Lu closing the complaint she filed against Mr. B____ with BEGA, dated 7/24/2017.

Exhibit #19 – Printout of Ms. Lu's email to BEGA Interim Director Flowers entitled "BEGA case 1625-001", dated 8/3/2017.

Exhibit #20 – Printout of Ms. Lu's email to DCBO Bailey entitled "Thank you", dated 8/3/2017.

Exhibit #21 – Printout of Mr. Underwood's email entitled "Luchi Lu" to HRO Jackson, DCBO Bailey, Director Bolling Deputy Director Parris and Ms. Taylor stating that Ms. Lu was instructed not to discuss her complaint against Mr. B____ outside DCRA HR, dated 8/15/2017.

Exhibit #22 – Printout of Ms. Lu's email to CBO Underwood and DCBO Bailey entitled "Report to Director" and CBO Underwood's reply with written supervisory instruction, dated 8/21/2017 and 8/22/2017.

Plf. Opp.
33
App. 86

Exhibit #22A – Printout of HRO Jackson's email reply to Ms. Lu entitled "Report
   to Director" wherein Ms. Jackson informed Ms. Lu that that complaint was
   closed by all D.C. government agencies, dated 9/11/2017.

Exhibit #23 – Printout of Ms. Lu's email complaint entitled "Report forgery crime to EOM" to
   Mayor Bowser, Bowser, Muriel (Executive Office of the Mayor [EOM]), ATD
   EOM3, and Bowser, Muriel (TRANSITION). Ms. Lu sent copies to Mark Tuohey
   (EOM), John Falcicchio (EOM and Beverly Perry (EOM), dated 9/19/2017.

Exhibit #24 – Printout of Ms. Lu's email to Ms. Johnson entitled "Report to Director", dated
   9/19/2017.

Exhibit #25 – Printout of Ms. Lu's email complaint against S██ B██ entitled "Report
   forgery crime to EOM" to Mayor Bowser, Bowser, Muriel (Executive Office of
   the Mayor [EOM]), ATD EOM3, and Bowser, Muriel (TRANSITION). Ms. Lu
   sent copies to Mark Tuohey (EOM), John Falcicchio (EOM and Beverly Perry
   (EOM), dated 9/22/2017.

Exhibit #26 – Printout of Ms. Lu email exchanged regarding her complaint against S██ B██
   entitled "Report forgery crime to EOM" with Mr. Slattery of EOM and copied
   Mr. Wright of EOM, dated 9/26/2017

Exhibit #27 – Printout of Ms. Lu's email exchanged regarding her complaint against
   B██ entitled "Report forgery crime to EOM" with Ms. Seshasai of EOM,
   dated 9/27/2017.

Exhibit #27A – Printout of Inspector Fones' email to Mia Brown regarding his contact with Ms.
   Lu complaining about a DCRA employee faking a pregnancy to get PFL, dated
   10/4/2017.

Exhibit #28 – Printout of DCHR's Director Gibson's email to Ms. Lu entitled "DCHR
   Response" dated 11/28/2017.

Exhibit #29 – Printout of Ms. Lu's email exchange with Mr. Nirappil of The Washington Post ,
   dated 1/30/2018 and 1/31/2018.

Exhibit #30 – Printout of Ms. Lu's email regarding her complaint against Mr. B██
   entitled "DCHR Response" to DCHR staff members Ms. Brennan, Ms. Smith-
   Mathis, Ms. Ortiz, Ms. Stancell and Mr. Zimmerman regarding her complaint
   against S██ B██, dated 2/20/2018

Exhibit #31 – Printout of Ms. Lu's email submission with Nolo Network entitled "Case Review
   #599-9C6-447F from employmentlawfirms.com, dated 2/20/2018.

Exhibit #32 – Printout of Ms. Lu's email to Housing Inspector Johnson entitled "Request for a
   meeting" dated 2/20/2018.

Exhibit #33 – Printout of Ms. Lu's email to Housing Inspectors Johnson and Harris, dated
   2/22/2018.

Exhibit #34 – Printout of Ms. Lu's email to Hotline Inspector General (OIG) entitled "OIG
   Control #2016-1103", dated 2/23/2018.

Exhibit #35 – Printout of Ms. Lu's email exchange with Mr. Reid, dated 3/9/2018.

Exhibit #36 – Printout of Ms. Lu's email to Director Bolling entitled "follow up", dated
   4/5/2018.

Exhibit #37 – Printout of Ms. Lu's email entitled "Epidemic Paternity leave fraud by male DC
   government employees" to Ms. Brown, Ms. Cone, Community and
   CNN.Feedback of CNN, with Ms. Lu's D.C. government employee ID attached,
   dated 4/9/2018.

Exhibit #38 – Printout of Ms. Lu's email entitled "follow up" , dated 4/10/2018.

Exhibit #39 – Printout of Ms. Lu's email exchange entitled "Distribution of EA, ER and EA
   jobs" with Ms. Hill of PermitXperts , dated 4/12/2018.

Confidential Subject to Protective Order      Lu v. DC et al1-20-cv-00461_00000184

Exhibit #40 – Printout of Ms. Lu's email entitled "THANK YOU !" to Ms. Sumner dated 4/27/2018.

Exhibit #41 – Printout of Ms. Lu's email entitled "Paternity leave fraud at DC government – Wearing a pillow" to Mr. Nirappil of The Washington Post. Ms. Lu attached a copy of her D.C. government photo ID, dated 4/25/2018.

Exhibit #42 – Printout of Ms. Lu's email entitled "Paternity leave fraud – using pillows for fake pregnancy" to Ms. Basch of WTOP , dated 5/30/2018.

Exhibit #43 – Printout of Ms. Lu's email entitled "DC gov worker's wife faked pregnancy, worker took paternity leave?!" sent to Mr. Yarborough, Mr. Glassman, Ms. Weston NBCUNI DC, dcnews and NBC Uni WRC Desk, Ms. Lu attached a photocopy of her D.C. government employee ID, dated 6/1/2018.

Exhibit #44 – Printout of Ms. Lu's email exchange entitled "DC gov worker's wife faked pregnancy, worker took paternity leave?!" with to Mr. Yarborough of NBC Universal, dated 8/15/2018.

Exhibit #45 – Printout of Ms. Lu's email entitled "wearing pillow for 8 weeks paternity leave" to Ms. Jones of the Washington City Paper, dated 9/28/2018.

Exhibit #46 – Printout of Ms. Lu's email entitled "THANK YOU !" sent to Ms. Baskin of the Washington City Paper, dated 11/7/2018.

Exhibit #47 – Printout of Ms. Lu's email entitled "Report to council members of District o f Columbia –a crime committed by DCTA employee at work" to Councilmembers Anita Bonds, Elissa Silverman, Brianne K. Nadeau and several council staff members including I. Kang, D. Meadows, M. Blackwell, C. Royster, T. Jackson and T. Fazzni, dated 10/16/2018

Exhibit #48 – Printout of Ms. Lu's email entitled "Report to council members of District o f Columbia –a crime committed by DCTA employee at work" to Councilmember Brianne K Nadeau and Chief of Staff Michelle Loggins, dated 10/16/2018.

Exhibit #49 – Printout of screenshots of Mr. B███ 's DCRA telephone directory page and screenshot of Facebook posted photo of Mr. B███ and his family with Santa Clause Ms. Lu sent to Councilmember Nadeau and Ms. Loggins attached to her email dated 10/16/2018.

Exhibit #50 – Printout of Ms. Lu's email entitled "Report to council members of District o f Columbia –a crime committed by DCTA employee at work" to Councilmember Elissa Silverman and Chief of Staff Michele Blackwell, dated 10/17/2018.

Exhibit #51 – Printout of Ms. Lu's email entitled "Report to council members of District o f Columbia –a crime committed by DCTA employee at work" to Councilmember Brianne K Nadeau, dated 11/2/2018.

Exhibit #52 – Printout of Ms. Lu's email entitled "Report to council members of District o f Columbia –a crime committed by DCTA employee at work" to Councilmember Brianne K Nadeau, dated 11/12/2018.

Exhibit #53 – Printout of Ms. Lu's email entitled "Important info to share" to Councilmember Brianne K Nadeau, dated 11/26/2018.

Exhibit #54 – Printout of 7 screenshots of Facebook posted photo of Mr. B██ n and his family Ms. Lu sent to Councilmember Nadeau attached to her email dated 11/26/2018.

Exhibit #52 – Printout of Ms. Lu's email entitled "Report to Mayor Bowser –Wearing pillow for paternity leave" to Mayor Bowser and Director Chrappah, dated 2/6/2019.

Confidential Subject to Protective Order          Lu v. DC et al1-20-cv-00461 00000185

1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF COLUMBIA

3      _____

4    QING LU,                    )

5              Plaintiff,        )

6    vs.                         )   Civil Action No.

7    DISTRICT OF COLUMBIA,       )   1:20-CV-00461 APM

8              Defendant.        )

9    _____)

10

11

12

13

14           TRANSCRIPTION OF AUDIO FILE

15      TYRONE LAWSON INTERVIEW OF  *** S.B. ***

16              NOVEMBER 30, 2018

17

18

19

20

21

22

*** S.B. ***    - November 30, 2018

```
1              TYRONE LAWSON:  Mr. *** S.B. ***

2                  *** S.B. ***    Yes, sir.  Good morning.

3              TYRONE LAWSON:  How are you?  So I want

4      -- so let me first present you with this email

5      from you to Walter Crawford dated Thursday,

6      November 8, 2018, when you copied Sydney Lester,

7      your supervisor, and Mr. Bailey.  You remember

8      that?

9                  *** S.B. ***    (No audible response)

10             TYRONE LAWSON:  Look that over and tell

11     me -- did you prepare that?

12                 *** S.B. ***    Yes, I did.

13             TYRONE LAWSON:  Okay.  You sent that to

14     Mr. Crawford?

15                 *** S.B. ***    (No audible response)

16             TYRONE LAWSON:  Okay.

17             (Pause)

18             Okay.  All right.  So tell me in your own

19     words what happened for those two incidents.

20                 *** S.B. ***    Two incidents on --

21             TYRONE LAWSON:  So let me ask you this --

22                 *** S.B. ***    I think I captured it
```

1     right here.

2              TYRONE LAWSON:  Yeah.  I want you to tell

3     me in your own words what happened.  I want you to

4     explain to me what happened.  You wrote it.  I

5     want you to explain to me.

6              *** S.B.***    Okay.  This -- this goes

7     way back.

8              TYRONE LAWSON:  Uh-huh (affirmative).

9              *** S.B. ***    This didn't start on -- in

10    November.

11             TYRONE LAWSON:  I know what.  I just want

12    you to tell me regarding these -- this email what

13    happened.

14             *** S.B. ***    Okay.  This email -- okay.

15    So on 11 -- I was -- I was in the vestibule

16    downstairs --

17             TYRONE LAWSON:  Uh-huh (affirmative).

18             *** S.B. ***    -- the reception area

19    downstairs.

20             TYRONE LAWSON:  Uh-huh (affirmative).

21             *** S.B. ***    E-340.

22             TYRONE LAWSON:  Uh-huh (affirmative).

*** S.B. ***    - November 30, 2018

Page 4

1              *** S.B. ***    And Ms. Brown and I were

2     engaged in another discussion.

3              TYRONE LAWSON:  Uh-huh (affirmative).

4              *** S.B. ***    And then Lu Qing passed

5     by.

6              TYRONE LAWSON:  So you were talking to

7     Ms. Brown about something else?

8              *** S.B. ***    Sharon Brown.

9              TYRONE LAWSON:  Okay.  Yeah.   Sharon

10    Brown.

11             *** S.B. ***    Yes.

12             TYRONE LAWSON:  You were having a

13    conversation with her?

14             *** S.B. ***    Yeah.

15             TYRONE LAWSON:  Okay.

16             *** S.B. ***    I mean, this is -- and

17    then Lu Qing came on by.  I think she was coming

18    -- she was going inside, so coming from out --

19             TYRONE LAWSON:  Uh-huh (affirmative).

20             *** S.B. ***    -- the elevator lobby --

21             TYRONE LAWSON:  Uh-huh (affirmative).

22             *** S.B. ***    -- going inside the

Plf. Opp.
App. 92

```
 1    office.

 2                TYRONE LAWSON:  Uh-huh (affirmative).

 3                *** S.B.***    And then she all of a

 4    sudden interjected in the conversation, directing

 5    her comment to Ms. Brown about, "Oh, I need to get

 6    some pillow strapped to my abdomen," blah, blah,

 7    blah, "so I can get some leave."

 8                TYRONE LAWSON:  Some what kind of leave?

 9                *** S.B. ***    Yes.

10                TYRONE LAWSON:  Did she say what kind of

11    leave?

12                *** S.B. ***    I mean, you know --

13                TYRONE LAWSON:  Did she say FMLA?

14                *** S.B. ***    Maternity leave.

15                TYRONE LAWSON:  Okay.  She said maternity

16    leave?

17                *** S.B. ***    I -- whatever her term

18    was.

19                TYRONE LAWSON:  All right.

20                *** S.B. ***    So then Ms. Brown, she was

21    puzzled --

22                TYRONE LAWSON:  Uh-huh (affirmative).
```

1          *** S.B. ***    -- because she doesn't

2    understand why that comment was made.  But I knew

3    exactly what -- what that meant.

4          TYRONE LAWSON:  Uh-huh (affirmative).

5          *** S.B. ***    Because she had done it in

6    the past.

7          TYRONE LAWSON:  Uh-huh (affirmative).

8          *** S.B. ***    She has left note or --

9    what you call it -- internet search page about

10   women faking pregnancy in the drawer in the permit

11   center.  That was months ago, probably last year,

12   probably --

13         TYRONE LAWSON:  Okay.

14         *** S.B. ***    And Chris Bailey was POD

15   manager then.

16         TYRONE LAWSON:  Uh-huh (affirmative).

17         *** S.B. ***    Okay.  Knowing that I was

18   going to take coverage of the permit center that

19   --

20         TYRONE LAWSON:  Okay.  That was my next

21   question.  So you all share that desk when you on

22   --

Plf. Opp.
App. 94

*** S.B. ***    - November 30, 2018

1              *** S.B. ***    At the permit center.

2              TYRONE LAWSON:  -- when you're at the

3       permit center?

4              *** S.B. ***    Yes.

5              TYRONE LAWSON:  Okay.

6              *** S.B. ***    And so she knows it was

7       going to be in the morning, but we had a meeting,

8       a coordinating meeting with everybody in POD in

9       the permit center that morning.

10             TYRONE LAWSON:  Uh-huh (affirmative).

11             *** S.B. ***    So while the meeting was

12      going on, that's what she was doing.

13             TYRONE LAWSON:  Okay.

14             *** S.B. ***    And she left that fake

15      pregnancy search page in the drawer right up top,

16      so that when I pull up my drawer to get my stamps

17      out, I see it.  I took it to Chris Bailey at the

18      time, and I tell him, you know, this is -- this is

19      harassment, man.

20             TYRONE LAWSON:  Okay.

21             *** S.B. ***    I think I prepared an

22      email of some sort to him then, and then he

1     forward it to Walter or whoever it was at the

2     time.

3              TYRONE LAWSON:  Okay.

4              *** S.B. ***    So there was an email back

5     then concerning that.  And so, no, this is raising

6     its ugly head again.  So Walter had told me that

7     he had dealt with her or met with her discussing

8     all these stuff that she had been doing.

9              TYRONE LAWSON:  Uh-huh (affirmative).

10             *** S.B. ***    And said directly to me,

11    if any of this starts again, then you let me know

12    directly.  And that's what I did.

13             TYRONE LAWSON:  Okay.  So Mr. Crawford

14    told you that he met with Ms. Lu?

15             *** S.B. ***    Yes, sir.

16             TYRONE LAWSON:  And told her about, you

17    know --

18             *** S.B. ***    Whatever the discussion

19    was.

20             TYRONE LAWSON:  Okay.

21             *** S.B. ***    He didn't tell me in

22    detail or provided any detail as to what was done

Plf. Opp.
App. 96

```
1    with her in that meeting, or if she was

2    reprimanded for --

3             TYRONE LAWSON:  Right.  He's not -- he

4    can't tell you that.

5             *** S.B. ***     (Indiscernible)

6             (Cross talk)

7             TYRONE LAWSON:  He can tell you he met

8    with her.  Right.  But he can't tell you what --

9             *** S.B. ***     Exactly.

10            TYRONE LAWSON:  Right.

11            *** S.B. ***     So I don't know what was

12   done.

13            TYRONE LAWSON:  Okay.

14            *** S.B. ***     So I said -- so I said in

15   my line here, I don't know what you did when you

16   met with her last time, but it seemed to have

17   little or no effect on her behavior --

18            TYRONE LAWSON:  Okay.

19            *** S.B. ***     -- because she's doing

20   this all over again.

21            TYRONE LAWSON:  Okay.

22            *** S.B. ***     This has been going on for
```

1      a long time, man.

2              TYRONE LAWSON:  Okay.  All right.  Yeah.

3      So do you recall the date that you and Mr. Lester

4      was in the pantry?  Do you recall what date that

5      was?  Was it --

6              *** S.B. ***    It was probably the week

7      before -- did I say the week before?  Oh,

8      goodness.

9              TYRONE LAWSON:  This was -- you said that

10     happened on the 8th of --

11             *** S.B. ***    Right.  This was November.

12             TYRONE LAWSON:  Don't --

13             *** S.B. ***    Sorry, sorry.  This was

14     November 8th.

15             TYRONE LAWSON:  Uh-huh (affirmative).

16             *** S.B. ***    And this was the week

17     before November 8th.

18             TYRONE LAWSON:  Okay.

19             *** S.B. ***    So it was at least week --

20     it was a week before.

21             TYRONE LAWSON:  About a week before, the

22     previous week?

*** S.B. ***   - November 30, 2018

1                    *** S.B. ***    I'm not going to give a

2        specific date.  I do not remember.

3                    TYRONE LAWSON:  No, no.  I understand.

4        But it was -- it was within that week that was

5        before this --

6                    *** S.B. ***    Yes.

7                    TYRONE LAWSON:  -- is what -- that's

8        fine.  Okay.  So -- all right.  So tell me what's

9        going on, man, with you and -- with you and Ms.

10       Lu.

11                   *** S.B. ***    She need to come clean as

12       to what I have for her -- what I have done to her.

13                   TYRONE LAWSON:  Uh-huh (affirmative).

14                   *** S.B. ***    I don't know what I've

15       done to this woman.

16                   TYRONE LAWSON:  Uh-huh (affirmative).

17                   *** S.B. ***    But she's been in my back

18       since -- I could probably go back to -- early --

19       early 2008.  It's been going on, man --

20                   TYRONE LAWSON:  When did you go --

21                   *** S.B. ***    -- for a long --

22                   TYRONE LAWSON:  When did you go on leave

Plf. Opp.
App. 99

*** S.B. ***    - November 30, 2018

1      for your -- it was a ████████, right?

2              *** S.B. ***    I had a son -- yeah.   My

3      ████████ was born in ████.

4              TYRONE LAWSON:   ██████?

5              *** S.B. ***    Yes.

6              TYRONE LAWSON:   Is that when you went on

7      FMLA -- is that what she's talking about?

8              *** S.B. ***    Maybe that's what she's

9      talking about.   I think that's -- that's the

10     instance she's talking -- but I also had a son

11     last December.

12             TYRONE LAWSON:   Okay.

13             *** S.B. ***    So --

14             TYRONE LAWSON:   No.   This would have been

15     before because this has been going on for a while.

16             *** S.B. ***    This has been --

17             TYRONE LAWSON:   I already know.   I

18     already know, okay.

19             *** S.B. ***    It had nothing to do with

20     family leave.   Back then it was something else.   I

21     don't know what it was.   She need to come clean

22     and tell you exactly what it is.

*** S.B. ***    - November 30, 2018

1            TYRONE LAWSON:  What do you mean?  What

2     do you mean it was something else?

3              *** S.B. ***    She has this -- she just

4     obsessed -- that something that she dislike about

5     me personally that she's not coming clean about or

6     what I've done to her.

7            TYRONE LAWSON:  Uh-huh (affirmative).

8              *** S.B. ***    She need to disclose that.

9     I can't get into her head.

10           TYRONE LAWSON:  Okay.  I can't either.

11    But what I can do is collect facts, and what I

12    need to know from you is when this first started,

13    right -- because I know -- because she -- because

14    I know she's been going on and on alleging that

15    you fraudulently got FMLA, family medical leave --

16             *** S.B. ***    Family leave.

17           TYRONE LAWSON:  -- for the birth of one

18    -- one of -- one of your children.

19             *** S.B. ***    Uh-huh (affirmative).

20           TYRONE LAWSON:  So I need to know from

21    you: do you remember which -- it couldn't have

22    been the one --

*** S.B. ***    - November 30, 2018

1           *** S.B. ***    My █████████

2           TYRONE LAWSON:  It couldn't have been

3    your ██████ that was born last --

4           *** S.B. ***    No.  My █████████

5           TYRONE LAWSON:  So you ██████████ is how

6    old?

7           *** S.B. ***    ████████ was born in ███████.

8           TYRONE LAWSON:  █████?

9           *** S.B. ***    ██████.

10           TYRONE LAWSON:  █████████? So █████████

11           *** S.B. ***    ████████████████

12           TYRONE LAWSON:  Going on ███ years old.

13           *** S.B. ***    Uh-huh (affirmative).

14           TYRONE LAWSON:  Okay.  All right.  And

15    you took FMLA for that birth?

16           *** S.B. ***    Yes.

17           TYRONE LAWSON:  Okay.  All right.  Let me

18    ask you this.  And you don't have to.  I'm just

19    asking you this to help me solidify my case, if

20    you don't mind.  Would you have a problem

21    providing me with a copy of her birth certificate

22    or whatever you provided --

*** S.B. ***   – November 30, 2018

1          *** S.B. ***    That as provided when I

2    applied for my leave.

3          TYRONE LAWSON:  Okay.  That was my next

4    question.

5          *** S.B. ***    That would not be -- they

6    would not be able to approve it until I provided

7    proof of birth.

8          TYRONE LAWSON:  Right.  Okay.  That was

9    going to be my next question.  So -- okay.  All

10   right.  If you did provide it.  I don't -- I don't

11   know that you did because some -- some things they

12   did --

13         *** S.B. ***    You can go to Mia.  Mia

14   can give you --

15         TYRONE LAWSON:  Right.  I understand.  So

16   now that I know that, I can get it from her.  I

17   didn't know because sometimes they can't ask

18   certain questions --

19         *** S.B. ***    Yeah.

20         TYRONE LAWSON:  -- under FMLA.

21         *** S.B. ***    It's a requirement.  You

22   have to satisfy --

*** S.B. ***   - November 30, 2018

1              TYRONE LAWSON:  Well, they -- no.  What

2    they can do is they can have you have your doctor

3    provide something to them.  They can't necessary

4    specifically go into what the medical issue was,

5    you understand.

6              *** S.B. ***    No, no, no.  It's not a

7    medical issue.

8              TYRONE LAWSON:  No, I understand.

9              *** S.B. ***    Like the -- for instance,

10   the birth certificate is not ready the same day

11   the child is born.

12             TYRONE LAWSON:  Right, exactly.

13             *** S.B. ***    It's weeks after.

14             TYRONE LAWSON:  Right.

15             *** S.B. ***    So what you get is like a

16   hospital release or --

17             TYRONE LAWSON:  Right.

18             *** S.B. ***    -- record of birth.

19             TYRONE LAWSON:  Right, right.

20             *** S.B. ***    Okay.  From the hospital.

21             TYRONE LAWSON:  Right, okay.  All right.

22   As long as I know they got that.

*** S.B. ***    – November 30, 2018

1           *** S.B. ***    For the documentation,

2      that was all provided.

3           TYRONE LAWSON:  Okay.  I can get it from

4      them.  So you don't have any idea why she's doing

5      what she's doing to you or targeting you?

6           *** S.B. ***    All I can say, she's

7      trying to get me to lose my job.

8           TYRONE LAWSON:  Okay.

9           *** S.B. ***    To me that's the bottom

10     line.

11          TYRONE LAWSON:  And you don't have any

12     idea why, what brought this on or anything?

13          *** S.B. ***    She need to explain to me

14     why she's doing it.

15          TYRONE LAWSON:  Okay.

16          *** S.B. ***    She need to explain to my

17     supervisor why she's doing it.  She need to

18     explain to Walter or whoever now is in charge.

19          TYRONE LAWSON:  All right.  Okay.  Okay.

20     All right.

21          *** S.B. ***    And she's now coming up

22     now saying I'm committing fraud or whatever it is,

*** S.B. ***   - November 30, 2018

1       this -- this is harassment, man.  And it need --

2       why is she getting into my business?

3               TYRONE LAWSON:  Okay.

4               *** S.B. ***    Why is it business of hers

5       whether my time has been approved by DC HR?

6               TYRONE LAWSON:  Mr. *** S.B. *** I got that.

7       Okay.  I understand that.

8               *** S.B. ***    I need it to stop.

9               TYRONE LAWSON:  I know.  But all -- I

10      know.  I know what you need, and I know what you

11      want.  But I can't -- I can't really deal with

12      what --

13              *** S.B. ***    What the discipline is

14      going to be.

15              TYRONE LAWSON:  -- what you're saying you

16      want right now, okay.  You understand what I'm

17      saying?  My position, my job is to --

18              *** S.B. ***    Get the information.

19              TYRONE LAWSON:  -- get the information,

20      get the facts, and put it in a nice neat package.

21      You understand?  So I understand what you feel,

22      and I understand you're upset and all that.  But

*** S.B. ***   - November 30, 2018

Page 19

```
1      that's not giving me facts, okay.  I will say,

2      yes, Mr. Lester is upset.  He feels it's

3      harassment and stuff like that.  But what I need

4      to know is, you know, specifics --

5                *** S.B. ***    Uh-huh (affirmative).

6           TYRONE LAWSON:  -- and you provided me

7      with the specifics with the emails.  You said

8      there was one incident that she put -- or -- now,

9      did you see her put it in there?  Do you remember?

10               *** S.B. ***    Okay.  What was that

11     again?  My mind --

12          TYRONE LAWSON:  You said she did a

13     search, online search about faking pregnancy or

14     something?

15               *** S.B. ***    Yes.  She did that.

16          TYRONE LAWSON:  Right.  But did you see

17     her?

18               *** S.B. ***    Whatever internet search

19     and put it in my -- in the desk drawer downstairs.

20          TYRONE LAWSON:  Uh-huh (affirmative).

21               *** S.B. ***    And when I was -- when I

22     opened that drawer, that's the first thing I saw.
```

*** S.B. ***   - November 30, 2018

1        TYRONE LAWSON:  But did you see her put

2    it in there is my question?  I know you know.

3            *** S.B. ***    I got a copy of the

4    printout.  I saw the time stamp on the internet

5    search.

6        TYRONE LAWSON:  Okay.  The time stamp --

7    okay, good.  Listen -- what did the time stamp

8    show?

9            *** S.B. ***    Where the what?

10        TYRONE LAWSON:  What did the time stamp

11   show?  Do you still have a copy of that -- that

12   document?

13           *** S.B. ***    I can find it.

14        TYRONE LAWSON:  All right.  See if you

15   can find it for me.

16           *** S.B. ***    I'm going to find it.  And

17   I'm also going to show you this.

18        TYRONE LAWSON:  Now, let me ask you this:

19   before you show me that --

20           *** S.B. ***    Hold on a second.

21        TYRONE LAWSON:  -- back to the document.

22   Listen to me, man.  I got to stay focused.

*** S.B. ***   - November 30, 2018

1                    *** S.B. ***    Okay.

2            TYRONE LAWSON:  All right.  So the search

3     document, right, the time stamp.  What did the

4     time stamp reflect?

5                    *** S.B. ***    It was the time -- during

6     the time the meeting was going on.

7            TYRONE LAWSON:  That she was at that

8     desk?

9                    *** S.B. ***    Yes.

10            TYRONE LAWSON:  That's what I need you to

11     say.

12                    *** S.B. ***    She was at the desk.

13            TYRONE LAWSON:  That's what I need you to

14     say.  All right.

15                    *** S.B. ***    Pull up the tapes.  We

16     have tapes, man.  Everything is recorded nowadays.

17            TYRONE LAWSON:  No.  It's not.

18                    *** S.B. ***    It's digitally recorded.

19            TYRONE LAWSON:  No, it's not.

20                    *** S.B. ***    On video.

21            TYRONE LAWSON:  No.  Everything not --

22     everything down here is not recorded.  Just

*** S.B. ***   - November 30, 2018

1    because there's cameras there, don't mean they

2    work, okay.

3              *** S.B. ***    I'll get Keith to -- I'll

4    get Keith to give me information on that.

5              TYRONE LAWSON:  They don't --

6              *** S.B. ***    Keith --

7              TYRONE LAWSON:  I already know, okay.  I

8    know.  I know which cameras work and which cameras

9    don't work in the permit center.

10             *** S.B. ***    Okay.

11             TYRONE LAWSON:  Because some of the

12   cameras belong to PSD.  Some of the cameras --

13   DCRA had installed a long time ago, but they don't

14   work.

15             *** S.B. ***    All right.

16             TYRONE LAWSON:  All right.

17             *** S.B. ***    All right.  Okay.  It is

18   what it is.

19             TYRONE LAWSON:  Now show me what you got.

20             *** S.B. ***    Just let me -- we went to

21   the White house with my ██████ and my -- my

22   stepmother.

*** S.B. ***   – November 30, 2018

Page 23

1          TYRONE LAWSON:  Uh-huh (affirmative).

2              *** S.B. ***    My father's wife because

3     my mother died.  He remarried.

4          TYRONE LAWSON:  Uh-huh (affirmative).

5              *** S.B. ***    She she's now my

6     stepmother.

7          TYRONE LAWSON:  Uh-huh (affirmative).

8              *** S.B. ***    █████, my stepmother, was

9     -- we all attended the White House, and she came

10    with us.  Lauren was with us at the time.  She

11    took a picture with Lauren.  It was pasted on

12    Facebook.

13         TYRONE LAWSON:  Right.

14             *** S.B. ***    Then she dug up Facebook,

15    went into my records or my wife's records and was

16    asking R███, "Congratulations on your new baby."

17         TYRONE LAWSON:  Uh-huh (affirmative).

18             *** S.B. ***    So she's going that far to

19    imply that my stepmother is the mother of my

20    child.

21         TYRONE LAWSON:  Okay.

22             *** S.B. ***    I'm going to show you the

```
1      posting, and I'm going to get my wife also to

2      provide information --

3             TYRONE LAWSON:  Okay.

4             *** S.B. ***    -- if you need that

5      information.

6             TYRONE LAWSON:  All right.  So let me ask

7      you this: so you can't do it on your phone.  All

8      right.  Listen to me.  I need you to get that

9      posting and print it out for me.  Can you do that?

10            *** S.B. ***    All right.  I can do that.

11            TYRONE LAWSON:  All right.  That's what I

12     need, all right.  Showing me on the phone is not

13     going to do a whole lot for me right now.  I just

14     need you to get that posting, print it out for me.

15            *** S.B. ***    That's the picture of my

16     stepmother --

17            TYRONE LAWSON:  I got you.  So print that

18     out.

19            *** S.B. ***    -- and my ████████.

20            TYRONE LAWSON:  So print it out.  And she

21     sent -- she sent a post?

22            *** S.B. ***    This was -- this picture
```

*** S.B. ***   - November 30, 2018

1       is what was pasted on Facebook --

2                   TYRONE LAWSON:  Okay.

3                       *** S.B. ***   -- when we went to the

4       White House.

5                   TYRONE LAWSON:  Okay.  All right.  Okay.

6       So what I need for you to do is to print that

7       picture out, print that posting out.

8                       *** S.B. ***   I'm going to try and get

9       the Facebook posting.

10                  TYRONE LAWSON:  And try to get the --

11                      *** S.B. ***   It's not my Facebook page.

12      It's my wife's Facebook page.

13                  TYRONE LAWSON:  Okay.  Well, try to get

14      your -- ask your wife to do it for you, you know.

15      Tell her why, you know, you need it.  And then try

16      to -- try to see if you can find that email search

17      page and get it to me, okay.

18                      *** S.B. ***    Okay.

19                  TYRONE LAWSON:  All right.

20                      *** S.B. ***   I will find it.

21                  TYRONE LAWSON:  All right.  I don't have

22      any -- any questions at this --

*** S.B. ***   - November 30, 2018

Page 26

```
 1              (END OF AUDIO FILE)

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22
```

ISB – November 30, 2018

```
 1              CERTIFICATE OF TRANSCRIPTIONIST

 2              I certify that the foregoing is a true

 3      and accurate transcript of the digital recording

 4      provided to me in this matter.

 5              I do further certify that I am neither a

 6      relative, nor employee, nor attorney of any of the

 7      parties to this action, and that I am not

 8      financially interested in the action.

 9

10

11                      _____

12                      _____

13                      Julie Thompson, CET-1036

14

15

16

17

18

19

20

21

22
```

```
1                 IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF COLUMBIA

3       _____

4     QING LU,                    )

5              Plaintiff,         )

6     vs.                         )   Civil Action No.

7     DISTRICT OF COLUMBIA,       )   1:20-CV-00461 APM

8              Defendant.         )

9       _____    )

10

11

12

13

14              TRANSCRIPTION OF AUDIO FILE

15      TYRONE LAWSON INTERVIEW OF HARRISON SHELTON

16                 NOVEMBER 30, 2018

17

18

19

20

21

22
```

Plf. Opp.
App. 116

Harrison Shelton – November 30, 2018

```
1              TYRONE LAWSON:  All right.  Mr. Shelton.

2              HARRISON SHELTON:  That's me.

3              TYRONE LAWSON:  I want to speak with you

4     regarding an investigation I'm conducting into an

5     allegation of employee misconduct, and you have

6     been identified as a witness.

7              HARRISON SHELTON:  Okay.

8              TYRONE LAWSON:  I want to ask you if you

9     recall February this year at a time during one of

10    you all's meetings.

11             HARRISON SHELTON:  Uh-huh (affirmative).

12             TYRONE LAWSON:  Read that statement.  You

13    ever seen that before?

14             HARRISON SHELTON:  (Reading)  I have --

15    I've heard.

16             TYRONE LAWSON:  Huh?

17             HARRISON SHELTON:  I haven't -- I didn't

18    see this.  I don't remember this actual instance.

19             TYRONE LAWSON:  Uh-huh (affirmative).

20             HARRISON SHELTON:  But I have heard

21    comments, rumors of, statements like that.

22             TYRONE LAWSON:  Comments from who?  You
```

Harrison Shelton - November 30, 2018

Page 3

1     remember?

2             HARRISON SHELTON:  Various people.

3             TYRONE LAWSON:  Huh?

4             HARRISON SHELTON:  Various people.

5             TYRONE LAWSON:  Okay.  Not from her --

6             HARRISON SHELTON:  Not from her.

7             TYRONE LAWSON:  -- from Ms. Lu?

8             HARRISON SHELTON:  Never from her.

9             TYRONE LAWSON:  But you don't recall a

10    meeting that you all had back in February where

11    Ms. Lu made this statement?

12            HARRISON SHELTON:  I've never heard her

13    verbalize any statement like that.

14            TYRONE LAWSON:  Okay.  Do you ever

15    receive any emails from her?

16            HARRISON SHELTON:  No, I don't.

17            TYRONE LAWSON:  I'm talking -- huh?

18            HARRISON SHELTON:  The only -- only time

19    I have interaction with Lu Qing --

20            TYRONE LAWSON:  Uh-huh (affirmative).

21            HARRISON SHELTON:  -- is when she has

22    questions regarding relationship between the fire

Harrison Shelton - November 30, 2018

1       --

2               TYRONE LAWSON:  The fire and your --

3               HARRISON SHELTON:  -- mechanical.

4               TYRONE LAWSON:  -- mechanical?

5               HARRISON SHELTON:  Yes.

6               TYRONE LAWSON:  Okay.  But you've never

7       received like an email that she copied a bunch of

8       people on?

9               HARRISON SHELTON:  No.  I have not.

10              TYRONE LAWSON:  Okay.  All right.  Okay.

11      Thank you very much.  That's all I have.  I

12      appreciate it.

13              (END OF AUDIO FILE)

14

15

16

17

18

19

20

21

22

Harrison Shelton - November 30, 2018

Page 5

1              CERTIFICATE OF TRANSCRIPTIONIST

2              I certify that the foregoing is a true

3      and accurate transcript of the digital recording

4      provided to me in this matter.

5              I do further certify that I am neither a

6      relative, nor employee, nor attorney of any of the

7      parties to this action, and that I am not

8      financially interested in the action.

9

10

11      _____

12

13              Julie Thompson, CET-1036

14

15

16

17

18

19

20

21

22

Plf. Opp.
App. 120

Syed Hashmi - December 3, 2018

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF COLUMBIA

 3     _____

 4     QING LU,                    )

 5              Plaintiff,         )

 6     vs.                         )   Civil Action No.

 7     DISTRICT OF COLUMBIA,       )   1:20-CV-00461 APM

 8              Defendant.         )

 9     _____)

10

11

12

13

14              TRANSCRIPTION OF AUDIO FILE

15        TYRONE LAWSON INTERVIEW OF SYED HASHMI

16                  DECEMBER 3, 2018

17

18

19

20

21

22
```

Syed Hashmi - December 3, 2018

1          TYRONE LAWSON:  Okay.  Mr. Hashmi, I

2     wanted to speak with you regarding an

3     investigation I'm conducting.  You are not the

4     reason for the investigation, but you may be a

5     witness to some things that happened.

6          Do you recall -- I'm going to let you

7     read this and see if you recall anything like that

8     happening back in February of 2018.

9          SYED HASHMI:  (Reading)

10          TYRONE LAWSON:  That might -- that might

11     be because this is -- this says February 2nd.

12          SYED HASHMI:  No.  This is the POD staff

13     meeting.

14          TYRONE LAWSON:  Okay.

15          SYED HASHMI:  Okay.  So you have 8 --

16     team meeting (indiscernible) should be 2/8.  So

17     this is 8, so it should (indiscernible).  So I

18     don't have it there.

19          TYRONE LAWSON:  Okay.

20          SYED HASHMI:  So if they have -- I think

21     I miss meeting (indiscernible).  Sometimes they

22     say two, three weeks.

Syed Hashmi — December 3, 2018

```
1              TYRONE LAWSON:  Okay.

2              SYED HASHMI:  I don't have that meeting.

3    I don't know.

4              TYRONE LAWSON:  So you think you -- you

5    wasn't -- you wasn't attend --

6              SYED HASHMI:  Well, what did she say?

7    Let me see.

8              (Reading)

9              This on fraudulent retribution (phonetic)

10   here.  It think this going on for long time.

11             TYRONE LAWSON:  So you know about it?

12             SYED HASHMI:  I know little about it, but

13   it's something I don't want to get involved with

14   anybody.

15             TYRONE LAWSON:  Uh-huh (affirmative).

16             SYED HASHMI:  If something -- somebody

17   doing something -- personally, I don't care what

18   they do out -- it wasn't my problem.

19             TYRONE LAWSON:  Uh-huh (affirmative).

20             SYED HASHMI:  This problem for management

21   or somebody else have to do.  It's not my problem.

22             TYRONE LAWSON:  Uh-huh (affirmative).
```

Syed Hashmi - December 3, 2018

1          SYED HASHMI:  I don't want to get

2    involved with somebody fighting for personal

3    reasons.

4          TYRONE LAWSON:  Uh-huh (affirmative).

5          SYED HASHMI:  If some job issues,

6    something, then I would definitely get involved.

7    But personally if somebody doesn't like anybody, I

8    don't care if they don't like.  I cannot be

9    mediator.  I cannot do anything.

10          TYRONE LAWSON:  Right, I understand.

11          SYED HASHMI:  That happens.  Yeah.  This

12    happens, and this is going on for a long time.  So

13    I don't know.  I have no issue.  I am good friend

14    with both parties.

15          TYRONE LAWSON:  Uh-huh (affirmative).

16          SYED HASHMI:  So I don't want to get

17    involved in this because they are different

18    people, and you cannot convince any of those.  And

19    the only thing, you don't mix business with

20    personal stuff --

21          TYRONE LAWSON:  Uh-huh (affirmative).

22          SYED HASHMI:  -- what somebody is doing

Syed Hashmi - December 3, 2018

1    at their house -- I don't know.  You are

2    (indiscernible) somebody.  So you don't go like

3    personal levels.

4              TYRONE LAWSON:  Uh-huh (affirmative).

5              SYED HASHMI:  If you are doing something

6    wrong with the work and hurting your job or

7    something, that is different.

8              TYRONE LAWSON:  Right.

9              SYED HASHMI:  But not personal issues.

10   So I won't get involved in these kind of things.

11             TYRONE LAWSON:  Okay.  Okay.

12             SYED HASHMI:  Unfortunately, this --

13   these things happen.

14             TYRONE LAWSON:  Uh-huh (affirmative).

15             SYED HASHMI:  And somebody has to do --

16             TYRONE LAWSON:  I just -- I mean, but you

17   -- you're aware this has been going on, right?

18             SYED HASHMI:  Yeah, yeah.  I am aware.

19             TYRONE LAWSON:  Has anything been said to

20   you specifically?

21             SYED HASHMI:  No, no.

22             TYRONE LAWSON:  Has Ms. Lu said anything

Syed Hashmi - December 3, 2018

1    to you or, you know, about it?

2              SYED HASHMI:  No, no.  Just I think -- I

3    think I was in this meeting.

4              TYRONE LAWSON:  Uh-huh (affirmative).

5              SYED HASHMI:  She started talking about

6    this personal stuff.

7              TYRONE LAWSON:  You remember?

8              SYED HASHMI:  Yeah, yeah.  This -- it's

9    going on for a long time.

10             TYRONE LAWSON:  Okay.

11             SYED HASHMI:  Before I started working

12   here, this has been before that.  So I don't know.

13             TYRONE LAWSON:  Okay.

14             SYED HASHMI:  I don't know.  Both parties

15   -- I don't want to get involved in this.

16             TYRONE LAWSON:  Okay.

17             SYED HASHMI:  Are we good?

18             TYRONE LAWSON:  Well, no.

19             SYED HASHMI:  (Indiscernible)

20             TYRONE LAWSON:  Let me just say this --

21   let me say this -- let me say this, okay.

22             SYED HASHMI:  Yeah.

Syed Hashmi - December 3, 2018

1          TYRONE LAWSON:  Okay.  It's not that you

2     involved.  It's just that -- I mean, by virtue of

3     the fact that you was at the meeting --

4          SYED HASHMI:  Yeah.

5          TYRONE LAWSON:  -- and you heard this go

6     on --

7          SYED HASHMI:  Yeah.

8          TYRONE LAWSON:  -- you know, makes you a

9     witness.

10          SYED HASHMI:  Yeah.

11          TYRONE LAWSON:  So I mean, I can't just

12     ignore that fact.

13          SYED HASHMI:  Yeah.

14          TYRONE LAWSON:  Because everybody that

15     was at the meeting, I'm talking to.

16          SYED HASHMI:  Yeah.

17          TYRONE LAWSON:  You understand?  So I

18     mean, and I'm just trying to get people to

19     corroborate whether they actually heard this

20     happen, you know, in a meeting is what I'm trying

21     to do, okay.

22          SYED HASHMI:  Yeah.

Syed Hashmi - December 3, 2018

1          TYRONE LAWSON:  So I understand you don't

2     want to get understand, and I understand you

3     trying to keep it --

4          SYED HASHMI:  (Indiscernible)

5          TYRONE LAWSON:  -- you know, neutral and

6     stuff.

7          SYED HASHMI:  Parties I've known, and

8     they're both really good people here.  They are

9     both very hard --

10          TYRONE LAWSON:  Uh-huh (affirmative).

11          SYED HASHMI:  They are hardworking

12     people.  But then personally, this is nothing

13     professional.  This is personal.

14          TYRONE LAWSON:  Okay.

15          SYED HASHMI:  I don't know what to do

16     with this.

17          TYRONE LAWSON:  Okay.  All right.  I

18     don't have any more questions necessarily.

19          SYED HASHMI:  Yeah.

20          (END OF AUDIO FILE)

21

22

Syed Hashmi - December 3, 2018

Page 9

1            CERTIFICATE OF TRANSCRIPTIONIST

2              I certify that the foregoing is a true

3    and accurate transcript of the digital recording

4    provided to me in this matter.

5              I do further certify that I am neither a

6    relative, nor employee, nor attorney of any of the

7    parties to this action, and that I am not

8    financially interested in the action.

9

10

11

12    _____

13              Julie Thompson, CET-1036

14

15

16

17

18

19

20

21

22

Sydney Lester - November 28, 2018

1                IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF COLUMBIA

3     _____

4     QING LU,                    )

5              Plaintiff,         )

6     vs.                         )    Civil Action No.

7     DISTRICT OF COLUMBIA,       )    1:20-CV-00461 APM

8              Defendant.         )

9     _____)

10

11

12

13

14              TRANSCRIPTION OF AUDIO FILE

15     TYRONE LAWSON INTERVIEW OF SYDNEY LESTER

16

17

18

19

20

21

22

Sydney Lester - November 28, 2018

Page 2

1           TYRONE LAWSON:  Yeah, man.  I just had a

2       few follow-up questions to ask you before I speak

3       to her next Tuesday.

4           SYDNEY LESTER:  Uh-huh (affirmative).

5           TYRONE LAWSON:  So how long you been with

6       DCRA?

7           SYDNEY LESTER:  It was '85.

8           TYRONE LAWSON:  So you've been here -- so

9       you was here when both of them arrived?

10          SYDNEY LESTER:  Yeah.  I hired both of

11      them.

12          TYRONE LAWSON:  Huh?  Oh, you hired both

13      of them?

14          SYDNEY LESTER:  I hired both of them.

15          TYRONE LAWSON:  Okay.  Do you recall --

16      was there stuff going on between her and *** S.B. ***

17      back in -- at 941?

18          SYDNEY LESTER:  I racked my brain just to

19      try and figure out what could it have been.

20          TYRONE LAWSON:  Uh-huh (affirmative).

21          SYDNEY LESTER:  And I can't think of

22      anything.  I know that they used to sit opposite

Sydney Lester - November 28, 2018

Page 3

1    each other.

2              TYRONE LAWSON:  Uh-huh (affirmative).

3              SYDNEY LESTER:  They were in the

4    corridor.  He was on one side.  She was on the

5    other side.

6              TYRONE LAWSON:  Uh-huh (affirmative).

7              SYDNEY LESTER:  That's all.  I don't know

8    what --

9              TYRONE LAWSON:  You can't figure out why

10   she's doing what she do?

11             SYDNEY LESTER:  No, no.  I can't figure

12   out -- I can't figure it out.

13             TYRONE LAWSON:  So this new -- this new

14   thing with the baby thing.

15             SYDNEY LESTER:  Uh-huh (affirmative).

16             TYRONE LAWSON:  When did you find out

17   about that?

18             SYDNEY LESTER:  She has been doing -- she

19   has been talking about this now for years.

20             TYRONE LAWSON:  For years she's been

21   talking about it?

22             SYDNEY LESTER:  Yeah.

Sydney Lester - November 28, 2018

1           TYRONE LAWSON:  Did ˮˮˮ S.B. ˮˮˮ ever complain

2   to you about it?

3           SYDNEY LESTER:  Complained to me.  He

4   complained to -- to the HR.

5           TYRONE LAWSON:  He complained to you and

6   HR?

7           SYDNEY LESTER:  Yeah.

8           TYRONE LAWSON:  Who he complain to in HR?

9   Do you know?

10          SYDNEY LESTER:  Well, I guess it would be

11  Walter or --

12          TYRONE LAWSON:  Okay.  So -- so that was

13  kind of recent though.  That was like in the last

14  year.

15          SYDNEY LESTER:  Yeah.  But -- but there

16  was another complaint before that also --

17          TYRONE LAWSON:  Really?

18          SYDNEY LESTER:  -- also made to HR.

19          TYRONE LAWSON:  Complaint about what?

20          SYDNEY LESTER:  About -- about the same,

21  about the same -- the same -- the same incident or

22  the same situation or the same --

Sydney Lester - November 28, 2018

1           TYRONE LAWSON:  About the pregnancy

2      thing?

3           SYDNEY LESTER:  Yes.  About -- about the

4      fact that she is saying that -- about the baby --

5      baby bump using pillows.

6           TYRONE LAWSON:  Right, right, right.

7           SYDNEY LESTER:  About that.  So you know,

8      this last time was -- *** S.B. *** found this item that

9      -- there was no response before, and the response

10     was not -- did not result in any action.

11          TYRONE LAWSON:  What do you mean, there

12     was no response?  You mean HR didn't respond?

13          SYDNEY LESTER:  Right.  HR did not --

14     everything that they were responding to, whatever

15     it is that he had submitted to them.

16          TYRONE LAWSON:  Uh-huh (affirmative).

17          SYDNEY LESTER:  So from Ms. Jackson --

18          TYRONE LAWSON:  Uh-huh (affirmative).

19          SYDNEY LESTER:  -- he had send some

20     documentation or some complaint to them.

21          TYRONE LAWSON:  Uh-huh (affirmative).

22          SYDNEY LESTER:  And --

Sydney Lester - November 28, 2018

Page 6

```
 1              TYRONE LAWSON:  You said Ms. Ingrid

 2    Jackson?

 3              SYDNEY LESTER:  Yes.

 4              TYRONE LAWSON:  Okay.

 5              SYDNEY LESTER:  So -- so basically what

 6    you are -- what you see here now is not the first

 7    time that he has submitted some form of a

 8    complaint.

 9              TYRONE LAWSON:  Okay.

10              SYDNEY LESTER:  So maybe --

11              TYRONE LAWSON:  Did he submit any kind of

12    written complaint to you?  Any kind of written

13    complaint to you?

14              SYDNEY LESTER:  No.

15              TYRONE LAWSON:  He hasn't?

16              SYDNEY LESTER:  Well -- well, maybe he

17    could have submitted it to HR and cc'd me, but to

18    say that he had written something directly to me,

19    I -- thinking back, no.  I can't -- I can't

20    remember --

21              TYRONE LAWSON:  Okay.

22              SYDNEY LESTER:  -- nothing that --
```

Sydney Lester - November 28, 2018

1          TYRONE LAWSON:  All right.  Did you ever

2     -- did you ever do anything?  Did you ever talk to

3     Ms. Lu or, you know, email her anything about it?

4     Do you remember?

5          SYDNEY LESTER:  No.  I don't remember.

6          TYRONE LAWSON:  So you was just -- you

7     was just -- you was just relying on -- or I guess

8     you was just -- well --

9          SYDNEY LESTER:  Relying on the -- on HR

10    --

11         TYRONE LAWSON:  HR.

12         SYDNEY LESTER:  -- to follow whatever

13    procedure --

14         TYRONE LAWSON:  To -- to investigate

15    whatever.

16         SYDNEY LESTER:  And follow whatever

17    procedure that there was to deal with it.

18         TYRONE LAWSON:  Okay.

19         SYDNEY LESTER:  Because -- I mean, the

20    thing that she was doing --

21         TYRONE LAWSON:  Uh-huh (affirmative).

22         SYDNEY LESTER:  -- because I mean, she

Sydney Lester - November 28, 2018

Page 8

1      has even, I guess -- because she was making these

2      complaints, and she did not see that any action

3      was --

4                  TYRONE LAWSON:  Uh-huh (affirmative).

5                  SYDNEY LESTER:  -- taking place that

6      would satisfy here --

7                  TYRONE LAWSON:  Uh-huh (affirmative).

8                  SYDNEY LESTER:  -- that it was being

9      addressed, she more or less thought that I was on

10     his side.  Or she even submitted a complaint

11     against me.

12                 TYRONE LAWSON:  To who?

13                 SYDNEY LESTER:  To -- I guess to HR.

14                 TYRONE LAWSON:  Okay.

15                 SYDNEY LESTER:  And --

16                 TYRONE LAWSON:  A complaint?  Was it a

17     complaint or a grievance or --

18                 SYDNEY LESTER:  No, a complaint.  Just to

19     say -- just to --

20                 TYRONE LAWSON:  What was the complaint?

21     What did she say?  You remember?

22                 SYDNEY LESTER:  What was that complaint

Sydney Lester - November 28, 2018

1    now?  No.  I have to think about it.

2                TYRONE LAWSON:  All right.

3                SYDNEY LESTER:  Because --

4                TYRONE LAWSON:  Did they send it to you?

5    Did they talk to you?

6                SYDNEY LESTER:  They sent it --

7                TYRONE LAWSON:  What happened?

8                SYDNEY LESTER:  They sent it to me, and

9    OAG, the OAG person that deals at Baker

10   (phonetic), she may have some document with

11   respect to that.

12               TYRONE LAWSON:  The OAG -- oh, you mean

13   the lady who used to be here?  Ranoko (phonetic)?

14               SYDNEY LESTER:  Yeah.  She's the one that

15   called me and spoke to me, and I ended up having

16   to go up to -- is it 441?

17               TYRONE LAWSON:  441 to Baker?

18               SYDNEY LESTER:  Yeah.

19               TYRONE LAWSON:  You had to go to Baker

20   and talk to them?

21               SYDNEY LESTER:  Uh-huh (affirmative).

22   Because of whatever it is that she was -- she had

Plf. Opp.
App. 138

Sydney Lester - November 28, 2018

1    complained about, whatever.

2              TYRONE LAWSON:  Okay.  All right.  Do me

3    a favor — would you —

4              SYDNEY LESTER:  What?

5              TYRONE LAWSON:  Can you see if you can

6    find something in your email —

7              SYDNEY LESTER:  That has?

8              TYRONE LAWSON:  — from her complaining

9    about you?

10             SYDNEY LESTER:  Okay.

11             TYRONE LAWSON:  Before Tuesday so I can

12   see — so I can see if it's — if there's anything

13   there —

14             SYDNEY LESTER:  Uh-huh (affirmative).

15             TYRONE LAWSON:  — that I need to address

16   with her when I talk to her Tuesday, you know.

17   Because we're trying to make sure that when I talk

18   to her, I got all my — everything I want to ask

19   her about all the, you know —

20             SYDNEY LESTER:  Ducks in a row.

21             TYRONE LAWSON:  Yeah.

22             SYDNEY LESTER:  Yeah.

Sydney Lester — November 28, 2018

1              TYRONE LAWSON:  So can you do that for

2      me?

3              SYDNEY LESTER:  Okay.  I will.

4              TYRONE LAWSON:  Thank you very much.

5      That's all I got.

6              SYDNEY LESTER:  Okay.

7              TYRONE LAWSON:  Appreciate it.

8              SYDNEY LESTER:  No problem.

9              (END OF AUDIO FILE)

10

11

12

13

14

15

16

17

18

19

20

21

22

Sydney Lester - November 28, 2018

1                CERTIFICATE OF TRANSCRIPTIONIST

2              I certify that the foregoing is a true

3     and accurate transcript of the digital recording

4     provided to me in this matter.

5              I do further certify that I am neither a

6     relative, nor employee, nor attorney of any of the

7     parties to this action, and that I am not

8     financially interested in the action.

9

10

11

12     _____

13              Julie Thompson, CET-1036

14

15

16

17

18

19

20

21

22

Plf. Opp.
App. 141

```
 1              IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF COLUMBIA

 3        _____

 4    QING LU,                    )

 5              Plaintiff,        )

 6    vs.                         )   Civil Action No.

 7    DISTRICT OF COLUMBIA,       )   1:20-CV-00461 APM

 8              Defendant.        )

 9        _____)

10

11

12

13

14             TRANSCRIPTION OF AUDIO FILE

15       TYRONE LAWSON INTERVIEW OF SYDNEY LESTER

16                 NOVEMBER 28, 2018

17

18

19

20

21

22
```

Sydney Lester - November 28, 2018

1              TYRONE LAWSON:  ...file a claim against

2      an employee's conduct.  And you may be a witness

3      to something that happened.  It doesn't say when,

4      but I'm assuming it was early in November that you

5      may have been in the lunchroom on the third floor

6      in the pantry.

7              SYDNEY LESTER:  Okay.

8              TYRONE LAWSON:  And you and Mr. *** S.B. ***

9      *** S.B. *** was in there.  And Ms. Lu came in there and

10     may have made a comment to Mr. *** S.B. ***

11             SYDNEY LESTER:  Right.

12             TYRONE LAWSON:  You recall that?

13             SYDNEY LESTER:  Yeah, yeah.

14             TYRONE LAWSON:  Can you tell me what

15     happened?

16             SYDNEY LESTER:  Okay.  So we were in

17     there.  She came in, and then she asked *** S.B. *** ab

18     out a picture that he has on his -- on the wall.

19             TYRONE LAWSON:  Uh-huh (affirmative).

20             SYDNEY LESTER:  In this --

21             TYRONE LAWSON:  In his office, in his

22     cubicle?

Sydney Lester – November 28, 2018

Page 3

| | |
|---|---|
| 1 | SYDNEY LESTER:  In his cubicle. |
| 2 | TYRONE LAWSON:  Uh-huh (affirmative). |
| 3 | SYDNEY LESTER:  Right.  And was asking if |
| 4 | that's the picture of his ███████. |
| 5 | TYRONE LAWSON:  Okay. |
| 6 | SYDNEY LESTER:  So at *** S.B. *** was a little |
| 7 | confused.  So he didn't understand what the |
| 8 | question was.  So he –– he wasn't really sure what |
| 9 | picture she was talking about. |
| 10 | TYRONE LAWSON:  Uh-huh (affirmative). |
| 11 | SYDNEY LESTER:  So then after a while, he |
| 12 | figured it out and said, "Oh, you mean the picture |
| 13 | of –– "yeah, yeah.  That's my –– that's my |
| 14 | ███████." And he explained what it was.  And |
| 15 | essentially the gist I got was that she was |
| 16 | questioning whether that was really his ███████ |
| 17 | or somebody else's ███████. |
| 18 | TYRONE LAWSON:  In the picture? |
| 19 | SYDNEY LESTER:  In the picture.  Yes. |
| 20 | TYRONE LAWSON:  Do you recall –– do you |
| 21 | know –– have you seen the picture?  Do you know |
| 22 | about the picture he's talking about? |

Sydney Lester - November 28, 2018

1          SYDNEY LESTER:  Yes.  I -- yes.  He has a

2     couple pictures on the wall.  Yes.

3          TYRONE LAWSON:  Okay.  So -- and that

4     picture, is it -- is it an infant, or is it a --

5          SYDNEY LESTER:  Infant meaning baby --

6          TYRONE LAWSON:  A baby, yeah.

7          SYDNEY LESTER:  -- in the arm?

8          TYRONE LAWSON:  Yeah.

9          SYDNEY LESTER:  No.  It was not baby in

10    the arm.  It was --

11         TYRONE LAWSON:  Older?

12         SYDNEY LESTER:  Yeah.

13         TYRONE LAWSON:  ███████?  About?

14         SYDNEY LESTER:  It would be difficult for

15    me to guess, but --

16         TYRONE LAWSON:  Roughly.  Teens?

17         SYDNEY LESTER:  No, no, no, no, no.

18    Under -- under five.

19         TYRONE LAWSON:  Under five?

20         SYDNEY LESTER:  Yeah, yeah.

21         TYRONE LAWSON:  Okay.  Okay.  All right.

22    So she was questioning whether or not that was his

Sydney Lester - November 28, 2018

1          █████████?

2                    SYDNEY LESTER:  Uh-huh (affirmative).

3     Essentially.

4                    TYRONE LAWSON:  Essentially.  And his

5     response was that is his ████████?

6                    SYDNEY LESTER:  Yes.

7                    TYRONE LAWSON:  Okay.  So do you know if

8     that -- because you've been here for a while.

9                    SYDNEY LESTER:  Right.

10                    TYRONE LAWSON:  Do you know if that was

11    the ██████████ -- because I don't think it's been

12    █████ years.  But he -- he went on FMLA one time.

13                    SYDNEY LESTER:  Uh-huh (affirmative).

14                    TYRONE LAWSON:  Is that the child that --

15                    SYDNEY LESTER:  I think that was the

16    child -- that was for that child.

17                    TYRONE LAWSON:  Okay.

18                    SYDNEY LESTER:  I -- yeah.

19                    TYRONE LAWSON:  Okay.  All right.

20                    SYDNEY LESTER:  So I know that he has a

21    ████████.

22                    TYRONE LAWSON:  Uh-huh (affirmative).

Sydney Lester - November 28, 2018

1              SYDNEY LESTER:  I have never met the

2      child.

3              TYRONE LAWSON:  Uh-huh (affirmative).

4              SYDNEY LESTER:  But that much I know.

5              TYRONE LAWSON:  Okay.  All right.

6      Anything else you remember about that?

7              SYDNEY LESTER:  No.  That --

8              TYRONE LAWSON:  Did she say anything else

9      after he said that or --

10              SYDNEY LESTER:  No.  But the -- the long

11      -- the long and short of everything was that, you

12      know, she was skeptical.

13              TYRONE LAWSON:  She was skeptical?

14              SYDNEY LESTER:  Right.

15              TYRONE LAWSON:  She was -- she didn't

16      believe that was his ███████ is what you're

17      saying?

18              SYDNEY LESTER:  Essentially.

19              TYRONE LAWSON:  Okay.

20              SYDNEY LESTER:  Yes.

21              TYRONE LAWSON:  Okay.  All right.  Okay.

22      That's all I need to know.  But you don't remember

Sydney Lester - November 28, 2018

1     what day that was particularly?

2               SYDNEY LESTER:  No.  Because, I mean --

3     no.

4               TYRONE LAWSON:  Okay.  Do you know if it

5     was -- it was -- it was November or October, or

6     you couldn't say?

7               SYDNEY LESTER:  I wouldn't specifically

8     say a date, but I know that we were all in the

9     pantry.

10              TYRONE LAWSON:  Okay.

11              SYDNEY LESTER:  Because, you know, at

12    lunchtime we go there for lunches.

13              TYRONE LAWSON:  Okay.

14              SYDNEY LESTER:  And --

15              TYRONE LAWSON:  Okay.  That's all I have,

16    sir.

17              SYDNEY LESTER:  Okay.

18              TYRONE LAWSON:  Thank you very much.  I

19    appreciate it.

20              SYDNEY LESTER:  No problem.

21              (END OF AUDIO FILE)

22

Sydney Lester - November 28, 2018

Page 8

1                    CERTIFICATE OF TRANSCRIPTIONIST

2              I certify that the foregoing is a true

3      and accurate transcript of the digital recording

4      provided to me in this matter.

5              I do further certify that I am neither a

6      relative, nor employee, nor attorney of any of the

7      parties to this action, and that I am not

8      financially interested in the action.

9

10

11

12      _____

13              Julie Thompson, CET-1036

14

15

16

17

18

19

20

21

22

1                    INTERVIEW

2                       OF

3                QING (LUCHI) LU

4         Conducted by Tyrone Lawson

5         Tuesday, February 12, 2019

6

7

8

9

10

11

12

13

14

15   JOB No.:      4514218

16

17

18

19

20

21

22

                                    Page 1

```
 1                  R E C O R D I N G

 2           MS. QING LU:  McGraw.  McGraw.

 3           MR. LAWSON:  What about her?

 4           MS. QING LU:  Oh, I don't know.  You -- you

 5   copied this image so --

 6           MR. LAWSON:  She is General Counsel.

 7           MS. QING LU:  Oh, okay.

 8           MR. LAWSON:  Ms. Bocock is the Senior Policy

 9   Advisor to the director.

10           MS. QING LU:  Yes.

11           MR. LAWSON:  Which she is -- she is actually

12   my immediate boss.

13           MS. QING LU:  Okay.

14           MR. LAWSON:  All right, Ms. Lu.  So, first

15   thing I want to do is, I want to advise you.  I always

16   do this to everybody.  That is -- that I'm

17   interviewing, with regards to complaint.  Is to give

18   them -- to make sure that they understand what their

19   Garrity Warning -- Garrity Rights are.  And this form

20   right here explains what the Garrity Rights are.

21   Could you read that over?

22           MS. QING LU:  You are being asked to provide
```

                                                   Page 2

```
 1   information as part of an internal and/or

 2   administrative occupation.  You do not have to answer

 3   questions if your answers will implicate you in a

 4   crime.  No action will be taken against you solely for

 5   refusing to answer the questions.  However, the

 6   evidence and value of your silence will be considered

 7   in the facts surrounding your case.  Any statements

 8   you truthfully provide may be used as evidence and

 9   will be treated and/or criminal proceedings.  Do you

10   understand these rights?  Yes.  I'm scared.

11           MR. LAWSON:  Okay.  Do you understand?

12           MS. QING LU:  Yes, I do.

13           MR. LAWSON:  All right, check it.  And sign

14   it for me please.  Print your name, date it.

15           MS. QING LU:  Put my name where?

16           MR. LAWSON:  Sign it, print it, and date it.

17           MS. QING LU:  Oh, okay.

18           MR. LAWSON:  Okay, thank you.  So, just so --

19   just so I'm -- you are clear.  What this is saying is

20   -- and you still have to answer questions, but if you

21   think it is going to --

22           MS. QING LU:  Put me in trouble?
```

Page 3

```
 1                    MR. LAWSON:  If you think -- if you think it

 2      is going to implicate you in a crime, then you don't

 3      have to answer.  But you do have to answer questions

 4      as it relates to this investigation.

 5                    MS. QING LU:  Okay.

 6                    MR. LAWSON:  You understand?

 7                    MS. QING LU:  Yes, I do, sir.

 8                    MR. LAWSON:  All right, Ms. Lu.  Which -- how

 9      long have you been working with DCRA?

10                    MS. QING LU:  11 years and past four months,

11      sir.

12                    MR. LAWSON:  11 years, four months?

13                    MS. QING LU:  Uh-huh.

14                    MR. LAWSON:  Okay.  What is your position

15      with the agency?

16                    MS. QING LU:  Fire Protection Engineer and

17      Reviewer.

18                    MR. LAWSON:  And what do you do as a Fire

19      Protection Engineer?

20                    MS. QING LU:  As a Fire Protection Engineer,

21      I review plans concerning fire safety.  Buildings,

22      egress.  And also, I do customer service on the second
```

Page 4

```
 1    floor at the counter.  Serving customers face to face.
 2              MR. LAWSON:  All right.  If you could read
 3    this over -- if you could read this over to page two.
 4    Just to make sure that that's the Fire Protection
 5    Engineer's position description.  And then --
 6              MS. QING LU:  From where?  From here to here?
 7              MR. LAWSON:  Yes.  Well, just read -- just
 8    read duties and then -- and then read specifically
 9    (inaudible).
10              MS. QING LU:  Okay.  So, I read from here --
11              MR. LAWSON:  You don't have to read out loud,
12    just read -- you know, just read it over and see that
13    that's your duties and -- you know that is what you
14    do.
15              MS. QING LU:  Sure.  From here to here.
16              MR. LAWSON:  Yes, yes.
17              MS. QING LU:  Luchi served as Fire Protection
18    Engineer in the fire protection and engineering
19    section, technical reviewer branch.  Permit
20    authorization division, construction, and regulation
21    administration department of consumer and regulatory
22    affairs.  Performs technical and holds compliance
```

Page 5

1    review of design and layout of access and exits for

2    fire protection systems.  Including but not limited to

3    fire detection systems, automatic and manual fire

4    extinguishing systems, fire alarm systems, smoke meter

5    systems, emergency power, and emergency light, fire-

6    resistant construction, opening protection amendment

7    of egress and exits.  Technical review work involves

8    in the preliminary design for construction activities

9    and their construction by owners' design professionals

10   engaging in the D.C. construction codes, development

11   process.  Engaging in technical research for fire

12   protection questions while presenting and planning

13   review work.  And review work involves detailed

14   examination of fire protection in nonstructural plans.

15   Riser diagrams, schedules, and specifications while

16   applying technical knowledge of the generally accepted

17   standards and engineering practices used in the design

18   construction of fire protection systems.  For

19   buildings and other structure, which require building

20   permit approval.  Prepares or validates compliance

21   reports of each project.  Reviewed documents include

22   the design plans specification and shop plans for the

Page  6

1    installation of systems in place.  Commercial and

2    residential buildings as well as government buildings

3    such as schools, hospitals, office buildings, penal

4    institutions, and similar structures.  Project

5    assigned include additions and renovations to existing

6    structures and new construction.  Equipment has come

7    with design and the code reviewer has responsibility

8    for medium size to very large and complex projects.

9    Specifically, equipment shall be reviewed.  Architects

10   and engineers design development as required through

11   the preliminary design review process.  And review

12   construction drawings submitted in these permit

13   applications.  Review contractors and engineer system

14   shop drawings for compliance with applicable codes and

15   standards.  And accuracy for the intended purpose.

16   Reviews/perform calculations to verified sizing of

17   equipment and systems.  Taking into consideration the

18   facility's needs.  The code and requirements

19   standards, criteria, and engineering practices.

20   Reviewing systems specifications for consistency with

21   submitted architectural and engineering plans, and the

22   provisions of the D.C. construction codes.  Visit

Page  7

1    construction sites to gather firsthand information and

2    the condition of the facilities, type of construction,

3    availability, and the location of fire and electrical

4    services.  System layout and other field conditions

5    related to the discharge of the principal duties where

6    required.  Provide information and assistance to

7    applicants and general populace regarding to inquiries

8    on code compliance.  Screen applicants, summation

9    package for companies.  And make determination on

10   required reviews in accordance with established

11   departmental criteria and policies.  Serves as counter

12   relief person to serve the general public and the

13   permit counter.  Fire permit center, fire counter.  To

14   ordinate with other engineers and inspectors on staff

15   to avoid interference between different systems and

16   its plans.  And to reassure and inform of the

17   enforcement of code requirements and the proper

18   integrations of system operation.  Performs other

19   related duties as assigned.

20          MR. LAWSON:  Okay.  So, would you -- would

21   you say this is an accurate description of your job?

22          MS. QING LU:  Yes.

Page 8

```
 1                MR. LAWSON:  Your duties and

 2   responsibilities?

 3                MS. QING LU:  Yes.

 4                MR. LAWSON:  Okay.

 5                MS. QING LU:  Pretty much.

 6                MR. LAWSON:  All right.  Who is your

 7   supervisor?  Your immediate supervisor.

 8                MS. QING LU:  Mr. Sydney Lester.

 9                MR. LAWSON:  All right.  And who is Mr.

10   Lester's supervisor?  Do you know?

11                MS. QING LU:  Mr. Chris Bailey.

12                MR. LAWSON:  Chris Bailey?

13                MS. QING LU:  Yes.

14                MR. LAWSON:  All right.  And who is Chris

15   Bailey's supervisor?

16                MS. QING LU:  Ariel Weisbard.

17                MR. LAWSON:  Yes.

18                MS. QING LU:  Yes.

19                MR. LAWSON:  So basically, your division is

20   primary operations under the Chief Government

21   Official?

22                MS. QING LU:  Yes, pretty much.
```

Page 9

```
 1              MR. LAWSON:  Okay.

 2              MS. QING LU:  Uh-huh.

 3              MR. LAWSON:  And Chris Bailey is the Deputy

 4    Chief Building Official?  Who your immediate

 5    supervisor, Sydney Lester, reports to, right?

 6              MS. QING LU:  Yes.  I believe so.  Uh-huh.

 7              MR. LAWSON:  All right.  So, in June --

 8    specifically, on June --

 9              MS. QING LU:  27th, '16.

10              MR. LAWSON:  -- 27th --

11              MS. QING LU:  No. 27th, '16.

12              MR. LAWSON:  June 27, 2016.

13              MS. QING LU:  Yes, uh-huh.

14              MR. LAWSON:  You filed a complaint with the

15    Office Inspector General.

16              MS. QING LU:  Yes.

17              MR. LAWSON:  Okay.  And then you filed a FOIA

18    request --

19              MS. QING LU:  Yes.

20              MR. LAWSON:  -- February 1, 2017, correct?

21              MS. QING LU:  Correct, yes.

22              MR. LAWSON:  All right.  So, Don't -- I'm
```

Page 10

1   sure you recognize these documents.

2           MS. QING LU:  Yes, I do.  Uh-huh.

3           MR. LAWSON:  So, this is the OIG for your

4   response -- for your request response?

5           MS. QING LU:  Yes.

6           MR. LAWSON:  Correct?

7           MS. QING LU:  Yes.

8           MR. LAWSON:  This is the OIG, what you got

9   from the OIG --

10          MS. QING LU:  On February 1st --

11          MR. LAWSON:  On February 1st.

12          MS. QING LU:  2017.

13          MR. LAWSON:  That the OIG sent to Director

14  Bolen.

15          MS. QING LU:  No.  OIG sent the letter to

16  Director Bolen on October 2016.

17          MR. LAWSON:  I understand.

18          MS. QING LU:  Yes.

19          MR. LAWSON:  But this the letter.  This is

20  what I'm saying.  I'm not saying when.  I'm just

21  saying this is the letter.

22          MS. QING LU:  Yes.

Page 11

1           MR. LAWSON:  It is dated October 28th.

2           MS. QING LU:  Yes.

3           MR. LAWSON:  So, they sent that to Director

4   Bolen, right?

5           MS. QING LU:  Uh-huh.

6           MR. LAWSON:  This is a -- I guess a case

7   tracking?

8           MS. QING LU:  Yes.  It is just activities.

9           MR. LAWSON:  For the case -- for the

10  complaint.  It is for the case.  This is a tracking

11  form for the complaint.  One that they received from

12  you.

13          MS. QING LU:  Uh-huh.

14          MR. LAWSON:  It says the date they received

15  it, the date it was assigned, --

16          MS. QING LU:  Yes.  And some activities.

17          MR. LAWSON:  Right.

18          MS. QING LU:  Yes, sir.

19          MR. LAWSON:  That is part of the FOIA stuff,

20  that OIG gave you, right?

21          MS. QING LU:  Yes.

22          MR. LAWSON:  Okay.  So, then on Thursday --

Page 12

```
 1   well, not necessarily Thursday, October 27, 2016.  But
 2   you sent an email to Mia Brown.
 3             MS. QING LU:  Yes.  Okay.  Yes.
 4             MR. LAWSON:  You recall that?
 5             MS. QING LU:  Sure.  Uh-huh.
 6             MR. LAWSON:  You actually sent it to -- you
 7   sent it to Ms. Brown, then Mia.  You recall that?
 8             MS. QING LU:  Mia -- I don't remember the
 9   name.  Yes.  This is from (inaudible).  Yes.
10             MR. LAWSON:  Right.  But I'm talking about
11   this part right here.  I'm talking about down there.
12             MS. QING LU:  Oh okay.  Yes.  Mia Brown.
13   Yes, uh-huh.
14             MR. LAWSON:  Okay.
15             MS. QING LU:  Yes.
16             MR. LAWSON:  And I understand this part --
17   top part right here is BEGA's Ileana Corrales.  At
18   BEGA.
19             MS. QING LU:  Okay.
20             MR. LAWSON:  Okay.  So, this was the gist of
21   your complaint.
22             MS. QING LU:  Sir, it is not a complaint.
```

Veritext Legal Solutions
800-336-4000

1  There is no baby.

2          MR. LAWSON:  Okay.  You are not going to

3  questions, okay?

4          MS. QING LU:  Okay, sir.

5          MR. LAWSON:  I'm doing the questions.

6          MS. QING LU:  Okay, sir.

7          MR. LAWSON:  All right?

8          MS. QING LU:  Okay.

9          MR. LAWSON:  So, let's get that straight.

10  Let's get that established right now.

11          MS. QING LU:  Yes, sir.

12          MR. LAWSON:  So, you have a complaint.  You -

13  - you -- it is a complaint.  That in all this you

14  reported something to Gary Englebert, about a possible

15  conflict with    *** S.B. ***    conduct.  And I guess

16  with Mr. *** S.B. *** approving it, his wife was a permit

17  runner?

18          MS. QING LU:  Yes.

19          MR. LAWSON:  You complained about that.

20          MS. QING LU:  Uh-huh.

21          MR. LAWSON:  And then you complained that Mr.

22  *** S.B. *** fathered two children.  And you question whether

                                            Page 14

```
 1   or not he fathered a third child, his ███████.

 2              MS. QING LU:  Well, I have reasonable --

 3              MR. LAWSON:  Yes, I know.

 4              MS. QING LU:  -- proof.

 5              MR. LAWSON:  Yes, I know.

 6              MS. QING LU:  Yes, sir.

 7              MR. LAWSON:  All right.  Then you filed a

 8   complaint, where you sent the email of a complaint to

 9   the Board of Ethics and Government Accountability,

10   BEGA.

11              MS. QING LU:  BEGA, yes.

12              MR. LAWSON:  Investigator Ileana Corrales.

13              MS. QING LU:  Uh-huh.

14              MR. LAWSON:  Well, you sent the same

15   complaint that you filed with OIG, to the Board of

16   Ethics and Government Accountability, correct?

17              MS. QING LU:  Yes, sir.

18              MR. LAWSON:  All right.  On Tuesday, November

19   28, 2017 --

20              MS. QING LU:  Okay.

21              MR. LAWSON:  -- you received an email from

22   the Director of D.C. Human Resources.
```

Page 15

1          MS. QING LU:  Okay.  Giberson(sic), something

2     like that.

3          MR. LAWSON:  Ventris Gibson.

4          MS. QING LU:  Yes, okay.  Uh-huh.

5          MR. LAWSON:  All right.  So, Ms. Gibson -- if

6     you could look over this email?

7          MS. QING LU:  From where?  From here?

8          MR. LAWSON:  Yes.  Well, just -- I mean, yes.

9     From the date.

10         MS. QING LU:  Okay.  From --

11         MR. LAWSON:  Don't read it, just look it

12    over.  Is that the email that Ms. Gibson sent to you?

13         MS. QING LU:  Yes.  I received it, yes.

14         MR. LAWSON:  Okay.  All right.  Now, what

15    does it say?

16         MS. QING LU:  It says good morning, Ms. Lu.

17    Thank you for your email.  You have requested that BCH

18    look into the allegations you made regarding a co-

19    worker.  Please know -- please note that BCHR, OIG,

20    and BEGA looked into your allegations, and find no

21    merit to your claim.  As explained to you by members

22    of my staff.  This matter is now closed.  Since this

                                        Page 16

```
 1   matter is closed, we are unable to assist you any

 2   further.

 3            MR. LAWSON:  Okay.  So, that is the Director

 4   of Human Resources --

 5            MS. QING LU:  Yes.

 6            MR. LAWSON:   -- of the D.C. government

 7   saying that your claim has no merit.

 8            MS. QING LU:  Yes, sir.

 9            MR. LAWSON:  Okay.  I want you to look at

10   this email over and see if you recall on September 4,

11   2017 -- do you recall speaking with Ronald Holmes, in

12   an elevator?

13            MS. QING LU:  No.

14            MR. LAWSON:  Okay.  Read that email.

15            MS. QING LU:  Here on September 4th around

16   9:30 a.m., I was approached by Luchi Lu.  First floor,

17   elevator lobby.  She was asking if I have heard about

18   we were investigating PFML.  Because his wife was

19   wearing a false pregnancy belt.  I told her I did not

20   know what she was talking about.  Lynn Underwood

21   helped me to report her to you.

22            MR. LAWSON:  Do you recall having that
```

Page 17

```
 1   conversation with Ronald Holmes?
 2           MS. QING LU:  I don't know.  But I trust --
 3   He is honest.  If he -- if he wrote that, I must have
 4   talked to him.
 5           MR. LAWSON:  Okay.
 6           MS. QING LU:  But I don't recall.  Honestly.
 7           MR. LAWSON:  So, do you recall in February
 8   2017, that you met with former Chief Administrator
 9   Officer, Walter Crawford?
10           MS. QING LU:  Oh, yes.  Uh-huh.
11           MR. LAWSON:  And as a result, you sent this
12   email right here?
13           MS. QING LU:  Yes.
14           MR. LAWSON:  Can you read that?
15           MS. QING LU:  Mr. Crawford, thank you for
16   taking your time to notify me the result of this
17   complaint.  It has been a little bit distracting.
18   Even the prolonged investigation.  Now it has come to
19   an end and makes a good relief.  I respect and take it
20   our agency's position.  I stated I was relaying my
21   information and comprehension.  As well as information
22   voluntarily shared with me by several of my co-
```

Veritext Legal Solutions
800-336-4000

```
 1    workers.  I handled my report and all information
 2    professionally and responsibly.  Below is the
 3    original, initial first report I sent to OIG, on June
 4    27, 2016.  I just want to be totally candid and open
 5    with all your HR professionals, what I actually did.
 6    So, as to clear up any misunderstanding, if any.  From
 7    now on there will be no communication from me on this
 8    matter.  You have my word.  Thank you all for your
 9    time.  And I broke my promise.
10              MR. LAWSON:  Okay.
11              MS. QING LU:  Yes.
12              MR. LAWSON:  Because you specifically say,
13    and you are speaking to Mr. Crawford, who is a
14    superior.  From now on there will be no more
15    communication from me in this matter --
16              MS. QING LU:  Yes, I wrote --
17              MR. LAWSON:  You have my word.  Thank you --
18              MS. QING LU:  Yes, I wrote --
19              MR. LAWSON:  -- for all of your time.
20              MS. QING LU:  I wrote a promise, yes.
21              MR. LAWSON:  Right?
22              MS. QING LU:  Yes.
```

Page 19

```
 1              MR. LAWSON:  Okay.  All right.  So, this was
 2    February 10th, right?
 3              MS. QING LU:  Yes.
 4              MR. LAWSON:  So, this is February 24, 2017.
 5    Where you sent another email to Ms. Brown.
 6              MS. QING LU:  Okay.  Read it?
 7              MR. LAWSON:  Yes, you can read it.
 8              MS. QING LU:  This one or this one?
 9              MR. LAWSON:  This one.
10              MS. QING LU:  Okay.  This is from me to Ms.
11    Mia Brown.  I wrote wow, we are just his co-workers.
12    Not law enforcement.  We can't sense something wrong
13    even from his eyes and facial expressions.  When
14    someone was asking him about the baby.  I figured he
15    may have (inaudible), but I certainly have no proof
16    myself.  See if he would put (inaudible) forever.  And
17    yes, he did.  Thank you letting me know.  You know the
18    girl in the picture is his paternal (inaudible) --
19              MR. LAWSON:  Ms. Lu.  So, this is dated May
20    12, 2017.  Where you exchanged emails with Mia Brown
21    about the same subject.
22              MS. QING LU:  Okay.  From this here, right?
```

                                                    Page 20

```
 1                MR. LAWSON:  That is the -- that is the
 2      response.  This is your email to Ms. Brown.  That is
 3      Ms. Brown's response.
 4                MS. QING LU:  Okay.
 5                MR. LAWSON:  Correct?
 6                MS. QING LU:  Yes.
 7                MR. LAWSON:  I just need -- I just need you
 8      to look it over to see --
 9                MS. QING LU:  Yes.  It is correct, sir.
10                MR. LAWSON:  All right.  You don't need to
11      read it.
12                MS. QING LU:  Oh.
13                MR. LAWSON:  All right.  So, this is dated
14      May 15th.  Where you were sending an email to Tameka
15      Collier and Wade Sharomi(sic) at BEGA.  Is that
16      correct?
17                MS. QING LU:  Oh, yes.  This lady has some
18      law background.  So, she knows there are two types of
19      allegations.  You claimed something existing --
20                MR. LAWSON:  Ms. Lu, is this correct that you
21      sent this email to --
22                MS. QING LU:  Yes, sir.
```

Page 21

1               MR. LAWSON:  All right.  And then on May 17,

2     2017, you sent another email to Ileana Corrales,

3     correct?

4               MS. QING LU:  Yes, yes.  All this are true

5     information.

6               MR. LAWSON:  Okay.  All right.  Okay.  All

7     right.  Then Ms. Corrales sent you an email on

8     Tuesday, July 25th.  In which you responded July 25th.

9               MS. QING LU:  Okay, sir --

10              MR. LAWSON:  You recognize that?

11              MS. QING LU:  Yes, sir.

12              MR. LAWSON:  Okay.  Okay.  Then on June --

13    I'm sorry.  July 26, 2017, you sent another email to

14    Ileana Corrales at the Board of Ethics and Government

15    Accountability, regarding two previous emails that you

16    sent to her.  You recognize that?

17              MS. QING LU:  Yes.

18              MR. LAWSON:  All right.  Then on July 27,

19    2017, you sent an email to -- where you directed it to

20    Interim Director of Government Ethics and General

21    Counsel, Brian K. Flowers.  You recognize that?

22              MS. QING LU:  Yes, sir.

                                           Page 22

1            MR. LAWSON:  Okay.  So, at some point, Mia

2    Brown sent you a link to this document, correct?

3            MS. QING LU:  Yes.

4            MR. LAWSON:  And this is the email that --

5    with the link in there, correct?

6            MS. QING LU:  Yes.

7            MR. LAWSON:  Okay.  So, this is the District

8    of Columbia Personnel Bulletin for Paid Family Leave,

9    correct?

10            MS. QING LU:  Uh-huh.

11            MR. LAWSON:  All right.  Okay.  On August 2,

12    2017, you received an email from Brian Flowers of the

13    Board of Ethics and Government Accountability.  Can

14    you read what Mr. Flowers wrote to you on --

15            MS. QING LU:  Sure. Mr. Flowers to Luchi Lu.

16    Ms. Lu, this will acknowledge receipt of your request

17    that we will review.  All materials and request

18    authorization from    *** S.B. ***    To submit it into

19    the Vital Record Department of Maryland government.

20    To determine whether it matches the state birth

21    record.  As you know, the Board of Ethics and

22    Government of Accountability's jurisdiction over the

                                             Page 23

```
 1    conduct of District of Columbia is set forth in the
 2    Board of Ethics and the Government Accountabilities
 3    establishment and comprehensive acts reform, Act of
 4    2011.  Effective April 27, 2012.  D.C. law 19-124,
 5    D.C. Official Code 10161.01, and is limited to the
 6    statutes that -- and rules contained in the
 7    (inaudible).  See Official Code 1-1161-017.  The final
 8    statutes and rules that comprise the Code of Conduct.
 9    Allegations related to paternity leave and FMLA abuse,
10    are not within our primary jurisdiction.  I do not see
11    anything materiality in your submission from the one
12    that we responded to on July 24th.  We do not have the
13    internal process to appeal an accusation by the
14    Director to decline the -- to decline to investigate a
15    company.  If you have new evidence and supports -- If
16    you have any new evidence that supports a reasonable
17    belief that the violation Code of Conduct has
18    occurred, we will consider your request at that time.
19    Sincerely, Mr. Flowers.
20             MR. LAWSON:  Okay.  August 4, 2017, you
21    reviewed -- you were forwarded an email from William
22    Smith, who forwarded you an email from Gail Tucker
```

Page 24

```
 1    with Department of Health.  And I'm assuming Maryland

 2    Department of Health and Mental Hygiene's Division of

 3    Vital Records.  Do you recall that?

 4              MS. QING LU:  Yes.  Vaguely.  Sort-of.  Yes.

 5    Yes, uh-huh.

 6              MR. LAWSON:  Okay.  So, what that basically

 7    says the Maryland Department of Vital Records does not

 8    release vital records unless the --

 9              MS. QING LU:  Received from the authority, or

10    official source.

11              MR. LAWSON:  Right.

12              MS. QING LU:  Not by individual.

13              MR. LAWSON:  Right.

14              MS. QING LU:  Uh-huh.

15              MR. LAWSON:  Okay.

16              MS. QING LU:  Yes.

17              MR. LAWSON:  All right.  On August 3, 2017,

18    you sent an email to Deputy Chief Building Official,

19    Christopher Bailey.  Right there.  Can you read that?

20              MS. QING LU:  Hi, Chris.  Thank you for

21    taking time from your busy schedule meeting with me.

22    You asked for a date of some communication.  Now I'm
```

Page 25

```
 1   forwarding to you, for your information, as said.  I
 2   was seeking advice.  I do not need you to discuss with
 3   anybody.  If I choose to do it later, I will do it
 4   myself, and take all consequences and responsibilities
 5   myself.  Thank you again.  Any further advice, please
 6   let me know.  Thank you again, Luchi.
 7              MR. LAWSON:  Okay.  On August 7, 2017, you
 8   sent this email to Director Bolen.  You remember that?
 9              MS. QING LU:  Yes, yes.  Which he did not
10   respond.
11              MR. LAWSON:  Okay.  This essentially is your
12   complaint --
13              MS. QING LU:  Well --
14              MR. LAWSON:  -- against    *** S.B. ***    and --
15              MS. QING LU:  Mr. Walter Crawford.
16              MR. LAWSON:  Huh?
17              MS. QING LU:  I don't know.
18              MR. LAWSON:  What do you mean you don't know?
19              MS. QING LU:  This is -- you know, I sent to
20   her and she did not respond.
21              MR. LAWSON:  Right.  So, you did -- you sent
22   another email on August 14, 2017.  Where you said --
```

                                              Page 26

```
 1  where you were saying that you sent her an email the

 2  previous week --

 3           MS. QING LU:  Yes, yes.

 4           MR. LAWSON:  Right?

 5           MS. QING LU:  Yes.  Because she did not

 6  confirm receipt.  So, I followed up with her.

 7           MR. LAWSON:  Okay.

 8           MS. QING LU:  Okay.

 9           MR. LAWSON:  Okay.  On August 14, 2017, you

10  sent an email to Candace Taylor.  You recall that?

11  For the same thing from the Director.

12           MS. QING LU:  Oh, she was the Director's

13  Assistant, right?

14           MR. LAWSON:  Yes.

15           MS. QING LU:  Yes, uh-huh.

16           MR. LAWSON:  You recall that?  Sending that?

17           MS. QING LU:  It is in black and white here.

18  It is true.  True document.  Yes, sir.

19           MR. LAWSON:  All right.  Then on August 15th,

20  the next day, you sent that email to Ms. Taylor?

21           MS. QING LU:  Yes, uh-huh.

22           MR. LAWSON:  You recall that?
```

Page 27

```
 1                 MS. QING LU:  I don't recall anything.  But
 2    once I see it, I trust that this is a true document,
 3    sir.  Yes.  I don't recall every --
 4                 MR. LAWSON:  Okay.  Well, just look it over
 5    and see if you remember, you know --
 6                 MS. QING LU:  I don't remember sending, but I
 7    trust it was sent by me to her because my name is
 8    here.
 9                 MR. LAWSON:  Okay.  Well, it was sent from
10    your email account.
11                 MS. QING LU:  Okay.
12                 MR. LAWSON:  On August 15, 2017, you had a
13    meeting with Mr. Underwood?
14                 MS. QING LU:  No, it is not -- well, the
15    situation is, they called me.  Asked me to come
16    upstairs to meet with them.
17                 MR. LAWSON:  Uh-huh.
18                 MS. QING LU:  Yes.  So, then I went upstairs.
19    And then Mr. Lynn instructed me do not write to
20    Director again.  Do not write to Director's Assistant
21    again.  If you want to pursue, only take it to Human
22    Resources.  Then I strictly followed his instruction.
```

Veritext Legal Solutions
800-336-4000

```
 1              MR. LAWSON:  You strictly followed his

 2   instruction?

 3              MS. QING LU:  Yes.  I take -- then after

 4   this, I take it only to --

 5              MR. LAWSON:  Okay so --

 6              MS. QING LU:  -- resource --

 7              MR. LAWSON:  All right.  Wait a minute.  So,

 8   August 15, 2017.  The email says, Chris and I just had

 9   a meeting with Luchi Lu, regarding the issue with

10      *** S.B. ***

11              MS. QING LU:  Uh-huh.

12              MR. LAWSON:  We told her not to have contact

13   with anyone in DCRA except Human Relations --

14              MS. QING LU:  Yes.

15              MR. LAWSON:  -- about his issue.  She

16   acknowledged our receipt and left the meeting with an

17   understanding of our explicit direction.

18              MS. QING LU:  Yes.

19              MR. LAWSON:  Right?

20              MS. QING LU:  Yes.

21              MR. LAWSON:  All right.  So, on August 22,

22   2017 --
```

Veritext Legal Solutions
Page 178
800-336-4000

```
 1            MS. QING LU:  Human Resources.

 2            MR. LAWSON:  -- you sent the -- you sent an

 3   email to Mr. Underwood and Mr. Bailey, right here.

 4            MS. QING LU:  Uh-huh, uh-huh.

 5            MR. LAWSON:  Right?

 6            MS. QING LU:  Yes.

 7            MR. LAWSON:  And then Mr. Underwood responded

 8   -- how did Mr. Underwood respond to you?

 9            MS. QING LU:  Luchi, please remember that I

10   instructed you to take this issue only to H.R. from

11   now on.  Please do not send these questions, or any

12   like them, to anyone other than H.R.  Thank you, Mr.

13   Lynn Underwood.

14            MR. LAWSON:  Okay.  So, Mr. Underwood has

15   given you a directive.  He is reminding you of his

16   previous directive.  Telling you that you only need to

17   take this issue up with H.R.

18            MS. QING LU:  With H.R., yes.

19            MR. LAWSON:  Right?

20            MS. QING LU:  Uh-huh.

21            MR. LAWSON:  Okay.  So, on August 23, 2017,

22   you did take it up with H.R. and Ms. --
```

                                                    Page 30

1          MS. QING LU:  Yes, yes.

2          MR. LAWSON:  -- Jackson.  Ms. --

3          MS. QING LU:  Ingrid.

4          MR. LAWSON:   -- Ingrid Jackson, right?

5          MS. QING LU:  Uh-huh.

6          MR. LAWSON:  Okay.  Okay.  On Friday,

7   September 15, 2017, you sent an email to Lakeitha

8   Johnson?

9          MS. QING LU:  Yes.  She is my Union Steward.

10          MR. LAWSON:  Is she -- is she Human

11   Resources?

12          MS. QING LU:  No.  No, she is not.  She is

13   my, you know, whenever have issue --

14          MR. LAWSON:  No.  Hold on.  Don't even -- you

15   can talk to your union people about your issues.

16          MS. QING LU:  Oh.

17          MR. LAWSON:  You understand?

18          MS. QING LU:  No, I don't.  I --

19          MR. LAWSON:  But still -- but still.  Is she

20   part of Human Resources?

21          MS. QING LU:  No, she is not.

22          MR. LAWSON:  Okay.

Page 31

1          MS. QING LU:  Okay.

2          MR. LAWSON:  Or Human Relations?

3          MS. QING LU:  No, she is not.

4          MR. LAWSON:  All right.

5          MS. QING LU:  She is my Union Steward.

6          MR. LAWSON:  Okay.  All right.  Then on --

7    okay.  Tuesday, September 19, 2017.  You sent an email

8    to the Mayor's Executive Office Management --

9          MS. QING LU:  (Inaudible).  Something like

10   that.

11         MR. LAWSON:  Muriel Bowser.  To -- and you

12   copied John Falicicchio, Beverly Perry, Mark

13   Tornath(ph).

14         MS. QING LU:  Uh-huh.

15         MR. LAWSON:  You recall that --

16         MS. QING LU:  Yes.

17         MR. LAWSON:  -- email?

18         MS. QING LU:  Yes.  When I see it, I

19   recognize it.  This is the true email I sent.

20         MR. LAWSON:  Okay.  Is that -- is any of

21   these people part of DCRA Human Resources?

22         MS. QING LU:  Oh, okay.  No, sir.

Veritext Legal Solutions
800-336-4000

```
 1                   MR. LAWSON:  Okay.  All right.  Then on
 2     September 22, 2017, you followed up with an email --
 3                   MS. QING LU:  Yes, uh-huh.
 4                   MR. LAWSON:  -- to the Executive Office of
 5     the Mayor.
 6                   MS. QING LU:  Yes.
 7                   MR. LAWSON:  Asking them for the status of
 8     their -- your email --
 9                   MS. QING LU:  Yes, sir.
10                   MR. LAWSON:  -- complaint.  Correct?
11                   MS. QING LU:  Yes, sir.
12                   MR. LAWSON:  All right.  Then, let me see.
13     May 10, 2017, you sent -- you sent -- I'm assuming you
14     filed another complaint with the Office of the
15     Inspector General.  Because they responded to you in
16     this email, right here.
17                   MS. QING LU:  Okay, uh-huh.
18                   MR. LAWSON:  Do you recall that?
19                   MS. QING LU:  Yes, I remember the one.  I
20     tried to file the case, the second time to OIG.  I
21     asked them for the old case, with new proof.  Can I
22     refile?  I received their response within one hour.
```

Page 33

```
1    They said please go ahead.  To add any additional or

2    new information here.  Yes, you can refile.

3              MR. LAWSON:  Okay.  But that was -- this was

4    after your FOIA request.  Because this is in May.

5    Your FOIA request was in February.

6              MS. QING LU:  Correct.

7              MR. LAWSON:  2017, correct?

8              MS. QING LU:  Yes.  The FOIA goes first.  And

9    this was after it.

10             MR. LAWSON:  All right.  Okay.  On Monday,

11   September 25, 2017, you sent another email to a Jim

12   Slattery, in the Executive Office of the Mayor.

13             MS. QING LU:  Yes.  This person is the

14   Communication Officer or something like that.  I did

15   not send it to him.  I remember this case was somehow

16   passed to him, and then he responded.

17             MR. LAWSON:  Okay.  Well, you sent the email

18   that he got.  So, --

19             MS. QING LU:  Oh, okay.

20             MR. LAWSON:  -- if you sent an email to the

21   Executive Office of the Mayor.  And whoever that is

22   assigned it, gets it.
```

Page 34

```
 1              MS. QING LU:  Right, right.

 2              MR. LAWSON:  That is who gets it.

 3              MS. QING LU:  Yes.  Right, right.

 4              MR. LAWSON:  You understand?

 5              MS. QING LU:  Okay, yes.  It was assigned by

 6   the Mayor's office to him, right?

 7              MR. LAWSON:  Right.

 8              MS. QING LU:  Okay.

 9              MR. LAWSON:  So, Mr. Slattery then responded

10   to you, that you should probably check with D.C.

11   Deputy Mayor for Planning and Economic Development.

12              MS. QING LU:  Yes, right.

13              MR. LAWSON:  You recall that?

14              MS. QING LU:  Yes.  I was confused.  Yes.

15              MR. LAWSON:  Okay.  On Wednesday, September

16   27, 2017, you sent an email to Corona Shashashi(ph).

17   I'm assuming I'm pronouncing it wrong.  But this is

18   your email, right?  Correct?

19              MS. QING LU:  Yes.

20              MR. LAWSON:  Where you said how do you know

21   he is not a liar.

22              MS. QING LU:  Yes.
```

Page 35

1          MR. LAWSON:  Okay.  Is she part of DCRA Human

2    Resources?

3          MS. QING LU:  Oh.  No, sir.

4          MR. LAWSON:  All right.  Okay.  Then you sent

5    on November 29, 2017, you sent an email to Ledesma

6    Smith-Mathis, right here.

7          MS. QING LU:  DCHR, right?

8          MR. LAWSON:  DCHR.

9          MS. QING LU:  Yes.

10          MR. LAWSON:  Right.

11          MS. QING LU:  Uh-huh.  Thank you for your

12    clarification.

13          MR. LAWSON:  Is DCHR part of DCRA Human

14    Resources?

15          MS. QING LU:  Oh.  No, sir.  I'm sorry.

16          MR. LAWSON:  On February 20, 2018, you sent

17    an email to Ellen Brennan, Ledesma Smith-Mathis,

18    Lissette Ortiz, Gia Stancell, and Justin Zimmerman.

19    All at DCHR.  You recall that?

20          MS. QING LU:  Yes, sir.

21          MR. LAWSON:  All right.  Now, on February 20,

22    2018, you contacted, I guess some kind of employment

```
 1   law firm?  Or you attempted to contact some kind of
 2   employment law firm?  Do you recall that?
 3              MS. QING LU:  I don't remember.
 4              MR. LAWSON:  Okay.  Essentially, -- okay.
 5   This is what you told them.
 6              MS. QING LU:  Oh, okay.  Yes.
 7              MR. LAWSON:  I'm assuming it is a form that
 8   you fill out on their website.
 9              MS. QING LU:  Uh-huh, uh-huh.  Yes, I believe
10   so.  Yes, Uh-huh.
11              MR. LAWSON:  Okay.  Is this law form part of
12   DCHR?  I'm sorry, DCRA H.R.?
13              MS. QING LU:  No, sir.
14              MR. LAWSON:  All right.  Then you use your
15   government address to contact these people?
16              MS. QING LU:  Uh-huh.  Actually, I wanted to
17   have some advice from them.  You know, how to get rid
18   of the pressure.  That is a part of the reason they
19   advised me.  I just feel so pressured, at the moment.
20              MR. LAWSON:  Okay.  All right.  Then on --
21   I'm assuming in February 2017.  You sent an email to -
22   - I'm sorry.  February 2018.  Last year.  You sent an
```

Page 37

```
 1    email to Lakeitha Johnson, requesting a meeting?

 2              MS. QING LU:  Yes.  It must be.  Uh-huh.

 3    Okay.

 4              MR. LAWSON:  Okay.  So again, is Lakeitha

 5    Johnson part of DCRA Human Resources or Human

 6    Relations?

 7              MS. QING LU:  Sir, I know she --

 8              MR. LAWSON:  Is she part of Human Resources

 9    or Human Relations?

10              MS. QING LU:  No, sir.  She is not.  I

11    thought we could always talk to you about any issues

12    related to the workplace.  I don't know --

13              MR. LAWSON:  Your issues.

14              MS. QING LU:   Oh, I didn't know that.  I

15    apologize.

16              MR. LAWSON:  Okay?  All right.  On February

17    23, 2018, you sent an email to the Inspector General -

18    - the office of the Inspector General hotline,

19    requesting confidential consultation with the OIG.

20    With the Inspector General.  You remember that?

21              MS. QING LU:  I don't remember that.  But

22    this is the true email I sent to them.  Let me see.
```

Page 38

```
 1    Oh, yes.  I especially remember this sheet, this

 2    thing.  You know I overheard from my coworkers, that

 3    he claimed he saw an Amazon sheet or a Google sheet.

 4    And then he brought that sheet to Walter Crawford, and

 5    someone else.  This is accusations that my wife's

 6    pregnancy is fake.  To me, that was like a confession.

 7    If it was not fake, why would you relay back to this?

 8              MR. LAWSON:  Okay.  You sent this email to

 9    OIG, correct?

10              MS. QING LU:  Yes, uh-huh.

11              MR. LAWSON:  Is OIG part of DCRA Human

12    Resources?  Yes or no.

13              MS. QING LU:  No, sir.  I apologize.

14              MR. LAWSON:  This is an email you sent to --

15    oh, I'm sorry.  I meant to acknowledge that Mr.

16    William Harris is in attendance.  And you invoked your

17    (inaudible) rights.  And Mr. William Harris is

18    representing you from AFGE American Federation of

19    Government Employees, Local 2725.  So, Mr. Harris --

20    you sent the email to Mr. Harris.  And you copied

21    Lakeitha Johnson on it, in February 2018.  Last year.

22    You recall that?
```

Page 39

```
 1              MR. LAWSON:  Yes, yes.  Sorry, I don't know
 2    the procedure, sir.  I never had issue.  I can always
 3    consult my Union Steward.  I just didn't know there
 4    are some specifications.
 5              MR. LAWSON:  Well, -- okay, let me -- okay.
 6    All right.  Okay.  So, this is September 20 --
 7    September 19, 2019.  Where you did email exchanges
 8    between you and Ms. Johnson, Lakeitha Johnson.
 9              MS. QING LU:  Oh, okay.
10              MR. LAWSON:  Correct?  All right.  So, you
11    ask, and you sent her the entire packet of your
12    complaint that you sent to Ingrid Jackson, entitled
13    report to the director, that has email chain.  Also
14    has Mr. Underwood's email to you, the reminder to you
15    that you are only supposed to take this issue up with
16    Human Resources from then on.  And then your email
17    describing your complaint about    *** S.B. ***      And
18    questioning whether or not he had a baby.  And you
19    asked Ms. Johnson any thoughts, wisdom, advice that
20    she could share.  Correct?
21              MS. QING LU:  Yes, uh-huh.
22              MR. LAWSON:  What did she say?
```

```
 1                MS. QING LU:  No.

 2                MR. LAWSON:  Right.

 3                MS. QING LU:  Uh-huh.

 4                MR. LAWSON:  So, Lakeitha Johnson is the

 5   Chief Steward for AFGE Local 2725.

 6                MS. QING LU:  Oh, okay.

 7                MR. LAWSON:  So, almost -- almost nine months

 8   before you sent this email to Mr. Smith.  Ms. Johnson

 9   is telling you, no.  She can't.  She is not willing to

10   provide you with any advice, right?  This email that

11   you sent to Mr. Harris, that you said that you was

12   confused about whether or not you can question

13   somebody else's issues with your union.

14                MS. QING LU:  I don't know, probably.

15                MR. LAWSON:  You just said that.  You just

16   said you were confused about whether or not you could

17   go to your union about a problem you want to complain

18   about somebody else, right?

19                MS. QING LU:  Yes, uh-huh.

20                MR. LAWSON:  But nine months earlier Ms.

21   Johnson told you that she -- that there was no advice

22   that they could give you, correct?
```

Page 41

```
 1              MS. QING LU:  Yes, right.  Uh-huh.

 2              MR. LAWSON:  All right.  So, February 23,

 3   2018, the Office of Inspector General responded to

 4   your new attempt to file a complaint and referred you

 5   to the Office of Human Rights for harassment

 6   complaints.  Because you -- you were complaining that

 7   you thought there was harassment.  That Mr. *** S.B. ***

 8   complained about you.

 9              MS. QING LU:  This I don't remember.

10              MR. LAWSON:  Okay.  Your initial complaint to

11   OIG was that you -- you thought    *** S.B. ***    was

12   harassing you because he filed a complaint about the -

13   -

14              MS. QING LU:  No, what?

15              MR. LAWSON:   -- the fake stomach.  Okay.

16              MS. QING LU:  Where does it say that?  I just

17   --

18              MR. LAWSON:  All right.  Have you ever seen

19   this before?

20              MS. QING LU:  Oh, yes.  I remember this that

21   I --

22              MR. LAWSON:  Did you print that out?
```

Page 42

1          MS. QING LU:  I would remember.  It is

2     possible.  You know why?  This -- I remember that is

3     earlier in the year.  Usually, Chinese New Year is the

4     last week --

5          MR. LAWSON:  Okay.  This was printed out --

6          MS. QING LU:  January.

7          MR. LAWSON:  -- January 26, 2017.

8          MS. QING LU:  It is possible.  It is

9     possible.  You know --

10          MR. LAWSON:  You printed that out?

11          MS. QING LU:  You know what?  At that time,

12     we do some goofy stuff.  You know have some girls'

13     party.

14          MR. LAWSON:  Okay.  Do you recall printing

15     that out?

16          MS. QING LU:  Not exactly.

17          MR. LAWSON:  Okay.

18          MS. QING LU:  I don't deny it because the

19     time was right.  Usually, around the Chinese New Year

20     time, we did some goofy stuff.

21          MR. LAWSON:  okay.  So, during that -- when

22     that was printed, it was a meeting being held on the

```
 1    permit operation center with the Fire Protection staff

 2    and the mechanical staff.

 3             MS. QING LU:  I don't recall that.

 4             MR. LAWSON:  You don't remember?

 5             MS. QING LU:  No.

 6             MR. LAWSON:  So, if you would have printed

 7    that out, do you recall if you printed it out in the

 8    permit center?

 9             MS. QING LU:  I don't recall.  I just say

10    around Chinese New Year time.  Usually the last week

11    of January, first week of February.  You know we did

12    some goofy stuff here and there.  They go to the

13    parties.  In China, they cannot.  There is no way.

14    They can't purchase this kind of product.  They are

15    sort of interested.  And I did a Google search for

16    them.

17             MR. LAWSON:  For who?

18             MS. QING LU:  Just like friends, you know.

19    Something like that.

20             MR. LAWSON:  So, you are saying you did a

21    Google search for a fake pregnancy belly --

22             MS. QING LU:  Product.
```

Page 44

```
 1              MR. LAWSON:  -- products.

 2              MS. QING LU:  Yes.

 3              MR. LAWSON:  For some friends?

 4              MS. QING LU:  Well, I did it for my own.

 5   Just doing search for fun.  Just something like this.

 6              MR. LAWSON:  For fun?  So, you are saying you

 7   did this Google search for fun?  That is why you did

 8   it.

 9              MS. QING LU:  Something like that.

10              MR. LAWSON:  Fake pregnant belly.  That is

11   why you did it.  For fun?  Is that what you are

12   asserting?

13              MS. QING LU:  Oh, yes.

14              MR. LAWSON:  Okay.  All right.  On September

15   27, 2017, you sent another email to Corona Shashashi,

16   stating a paper is not a baby.  None of these agencies

17   verified the paperwork he submitted with the Maryland

18   government.  How does D.C. government know the

19   paperwork submitted was fake?  Can you advise what

20   fact is conclusion based upon and supported by?

21              MS. QING LU:  Yes.

22              MR. LAWSON:  You recall that?
```

Page 45

1                    MS. QING LU:  Yes.

2                    MR. LAWSON:  Okay.  Again, is she part of

3    DCRA Human Resources or Human Relations?

4                    MS. QING LU:  No, sir.  But I still have this

5    question.

6                    MR. LAWSON:  Okay.  On April 5, 2018, you

7    sent an email -- another email to Director Bolen

8    requesting a meeting -- a 30-minute meeting.

9                    MS. QING LU:  Yes.

10                   MR. LAWSON:  You recall that?

11                   MS. QING LU:  Yes.  The meeting was granted.

12                   MR. LAWSON:  You met with her?

13                   MS. QING LU:  Yes.  I met her on April 20th,

14   Friday.

15                   MR. LAWSON:  Uh-huh.

16                   MS. QING LU:  With Mr. Walter Crawford.

17                   MR. LAWSON:  You met --

18                   MS. QING LU:  And also, a lady.  Very short,

19   very thin, Asian look.  She joined us halfway.

20                   MR. LAWSON:  Okay.  So, what happened as a

21   result of that meeting?

22                   MS. QING LU:  During the meeting, I presented

Page 46

1    some proof to Director Bolen.  I got some email

2    directly from a female customer.  They said his wife's

3    body was very oddly shaped.  That was very expressive.

4    We figured probably that was because the way she was

5    trained for DCRA for business --

6            MR. LAWSON:  I want to know what happened in

7    the meeting.

8            MS. QING LU:  Okay.

9            MR. LAWSON:  Okay.

10           MS. QING LU:  Director Bolen told me, Luchi,

11   even if you were right, it is not going to be

12   validated.

13           MR. LAWSON:  And that is what Director Bolen

14   told you?

15           MS. QING LU:  Yes.

16           MR. LAWSON:  Okay.

17           MS. QING LU:  I was shocked.  I said she is a

18   Director of us, she is a lawyer, she knows nobody is

19   above the law.  She told me even if you were right, it

20   is not going to be validated.

21           MR. LAWSON:  All right.  April 12, 2018, you

22   sent an email to a Tanya Hill.  Tanya Hill works for

```
 1    permit experts.  Which I guess is a permit expediting

 2    firm?

 3             MS. QING LU:  Yes.

 4             MR. LAWSON:  You recall that?

 5             MS. QING LU:  Uh-huh, uh-huh.

 6             MR. LAWSON:  Is Tanya Hill part of DCRA Human

 7    Resources?

 8             MS. QING LU:  No, sir.

 9             MR. LAWSON:  Okay, thank you.  Okay.  On

10    April 27, 2017, you sent an email to Andrea Saunder,

11    where you just made a statement.  Which in a previous

12    email you sent to Keith Slade, regarding your meeting

13    that you had with the Director and the result of that

14    meeting.  But your meeting to -- your email to Andrea

15    Saunder says what?

16             MS. QING LU:  Update.  Mr. and Mrs. Pillow.

17             MR. LAWSON:  Uh-huh.

18             MS. QING LU:  Yes, that is disrespectful.  I

19    apologize.

20             MR. LAWSON:  Okay.  Disrespectful to who?

21    Who did you mean that to?

22             MS. QING LU:  Well, to be honest, if I do not
```

Page 48

```
 1   candy-coat my answer, I certainly meant Mr. *** S.B. *** and

 2   his wife.

 3           MR. LAWSON:  Okay.  Then in March 2018, you

 4   sent a confidential meeting request to Rohan Reid.

 5   You recall that?

 6           MS. QING LU:  Yes, uh-huh.  Yes.

 7           MR. LAWSON:  So, why did you send this to

 8   Rohan Reid?

 9           MS. QING LU:  I just want to get a new

10   approach probably.  He can help eventually with this.

11   And I know at some point,     *** S.B. ***    has used the

12   word harassment, harassment.  I never meant to harass

13   her or harass him.  I just want to know of the truth.

14   Based on our honest observation, we have good reason

15   to believe this is a pillow, a fraud.

16           MR. LAWSON:  Okay.  All right.  Why did you

17   have -- why did you send this Rohan Reid?

18           MS. QING LU:  I don't know why.  I just

19   wanted to talk to --

20           MR. LAWSON:  Why did you request a

21   confidential meeting with Rohan Reid?

22           MS. QING LU:  I just want to get more advice,
```

Page 49

```
 1   you know?

 2             MR. LAWSON:  But why Rohan Reid?

 3             MS. QING LU:  I just want to know that --

 4             MR. LAWSON:  Okay.  Is Rohan Reid part of

 5   DCRA Human Resources?

 6             MS. QING LU:  No, sir.  I just --

 7             MR. LAWSON:  That is all right.

 8             MS. QING LU:  I just want to confirm --

 9             MR. LAWSON:  All right.

10             MS. QING LU:  -- there is no bad record in my

11   performance note.  Because --

12             MR. LAWSON:  On --

13             MS. QING LU:  -- he used the word harassment

14   first.

15             MR. LAWSON:  Okay.  Do you recall  March 7,

16   2017, you conducted a background report for *** S.B. ***

17   *** S.B. ***  Or you attempted to request it?

18             MS. QING LU:  From where?

19             MR. LAWSON:  From this website.

20             MS. QING LU:  I have no idea.  Using my DCRA

21   email?

22             MR. LAWSON:  Yes.
```

Page 50

```
 1                  MS. QING LU:  I don't remember.

 2                  MR. LAWSON:  Okay.  All right.  So, on

 3     Wednesday, April 25, 2017, you sent an email to Fenit

 4     Nirappil, of the Washing Post.

 5                  MS. QING LU:  Yes.

 6                  MR. LAWSON:  Do you remember that?

 7                  MS. QING LU:  I remember that.  Several of

 8     us, you know, we got information.  We tried different

 9     sources.  Actually, the media are sort of reluctant to

10     cover this.  You know, --

11                  MR. LAWSON:  Did you send this, yes or no?

12                  MS. QING LU:  Yes, I did, sir.

13                  MR. LAWSON:  Was that part of DCRA Human

14     Resources?

15                  MS. QING LU:  I'm not sure.  I --

16                  MR. LAWSON:  Is the Washington Post part of

17     DCRA Resources, Human Resources?

18                  MS. QING LU:  No, sir.  I am allowed to get

19     more --

20                  MR. LAWSON:  Ms. -- Ms. Lu.  All right.

21                  MS. QING LU:  No, sir.

22                  MR. LAWSON:  On Monday, April 9, 2018, you
```

Veritext Legal Solutions
PLF Opp
App. 200
800-336-4000

```
 1    sent an email to -- I'm sorry.  April 9, 2017, you

 2    sent an email to CNN.

 3               MS. QING LU:  That must be right, yes.

 4               MR. LAWSON:  Okay.

 5               MS. QING LU:  Several of us in a way are

 6    taking --

 7               MR. LAWSON:  Is CNN part of DCRA Human

 8    Resources?  Or Human Relations?

 9               MS. QING LU:  No, it is not.  It -- it --

10               MR. LAWSON:  Okay.  All right.  On May 11th,

11    you followed up with an email to Fenit Nirappil of the

12    Washington Post.

13               MS. QING LU:  Yes.

14               MR. LAWSON:  Right?

15               MS. QING LU:  I know my writing is very

16    professional.  I used a professional envelope.

17               MR. LAWSON:  Okay.

18               MS. QING LU:  I really do want to --

19               MR. LAWSON:  All right.

20               MS. QING LU:  -- get some exposure to find

21    out the truth, quicker.

22               MR. LAWSON:  Okay.  On Thursday, May 24,
```

Page 52

```
1    2018, you sent an email to Michelle Bosch of WTOP.

2              MS. QING LU:  I believe so.

3              MR. LAWSON:  Is WTOP part DCRA Human

4    Resources or Human Relations?

5              MS. QING LU:  Do I need an amendment of

6    (inaudible) do anything like this of this nature?

7              MR. LAWSON:  Okay.  Then on May 30, 2018, you

8    sent another email to Michele Bosch, requesting about

9    an update.

10             MS. QING LU:  I believe so.  These are all

11   true documents.

12             MR. LAWSON:  Okay.  On June 1, 2018, you sent

13   an email to Rick Yarborough, at NBC Universal.

14             MS. QING LU:  Yes.

15             MR. LAWSON:  You recall that?

16             MS. QING LU:  Yes.

17             MR. LAWSON:  And in part -- in that email,

18   you sent an attachment with your government I.D.,

19   correct?

20             MS. QING LU:  Uh-huh, uh-huh.

21             MR. LAWSON:  On August 15, 2018, you sent the

22   follow-up to Rick Yarborough, with NBC Universal.
```

Veritext Legal Solutions
800-336-4000

```
 1              MS. QING LU:  I believe so.

 2              MR. LAWSON:  All right

 3              MS. QING LU:  Yes.  At first, he was

 4    interested.  And then I told him (crosstalk).

 5              MR. LAWSON:  Okay.  Rick Yarborough is not

 6    part of DCRA Human Resources, is he?

 7              MS. QING LU:  No, sir.

 8              MR. LAWSON:  All right.  On October 17, 2018,

 9    you sent an email to Councilmember Elissa Silverman

10    and Michelle Loggins.  Do you recall that?

11              MS. QING LU:  Yes.

12              MR. LAWSON:  Okay.  On October 23, 2018, you

13    sent emails to Morgan Baskin of the City Paper.

14              MS. QING LU:  Uh-huh.

15              MR. LAWSON:  Where you scheduled a meeting

16    with her.  Or was attempting to schedule a meeting

17    with her.

18              MS. QING LU:  No.  Phone call.

19              MR. LAWSON:  Phone call?

20              MS. QING LU:  Yes.

21              MR. LAWSON:  Okay.  On November 2, 2018, you

22    sent an email to Councilmember Brianne K. Nadeau, with
```

Page 54

1    your complaint.

2             MS. QING LU:  Yes.

3             MR. LAWSON:  You recall that?

4             MS. QING LU:  Yes, uh-huh.

5             MR. LAWSON:  And Councilmember -- excuse me.

6    Councilmember Nadeau's office responded to you on

7    November 12, 2017.  Basically, saying they were going

8    to submit the request to OIG, on your behalf.

9             MS. QING LU:  Uh-huh, uh-huh.

10            MR. LAWSON:  Okay.  On February 8, 2019 --

11   I'm sorry, wait a minute.  On April 5, 2018, -- let me

12   show you the request.  Okay.  On October 17, 2017, you

13   sent an email to Michele Blackwell, Councilmember

14   Michele Blackwell, and you copied Councilmember Elissa

15   Silverman.  Do you recall that?  With your complaint.

16            MS. QING LU:  Yes.  This is true documents,

17   sir.

18            MR. LAWSON:  Okay.  Okay.  On -- did you ever

19   meet with Morgan Baskin in person?

20            MS. QING LU:  No.  We called each other.  I

21   talked to her over the phone.

22            MR. LAWSON:  You talked to her on the phone?

Page 55

```
 1              MS. QING LU:  Yes, uh-huh.

 2              MR. LAWSON:  Where did you talk to her over

 3   the phone?  At your desk?

 4              MS. QING LU:  No.  Downstairs.  At the --

 5              MR. LAWSON:  At the permit center?

 6              MS. QING LU:  No.  On the first floor, sir.

 7              MR. LAWSON:  Oh.  On your cell phone or

 8   something?

 9              MS. QING LU:  Yes, sir.

10              MR. LAWSON:  How long did you talk to her?

11              MS. QING LU:  Maximum seven, ten minutes.

12              MR. LAWSON:  Okay.

13              MS. QING LU:  Yes.

14              MR. LAWSON:  On October 30, 2017, you sent

15   another email to Council Nadeau, and you copied

16   Michelle Loggins again, with your OIG FOIA responses

17   in 2016, OIG responses of 2017, and your complaint.

18   Do you recall that?

19              MS. QING LU:  This is true documents, sir.

20              MR. LAWSON:  All right.  Okay.  As part of

21   your August 2017 complaint to BEGA, what you sent to

22   Mr. Flowers.  And Mr. Flowers acknowledged receiving
```

Page 56

```
 1   your -- your request.  And in an email response to

 2   you, he states I do not see anything materially

 3   different in your submission from the one that we

 4   responded to on July 24th, attached.  We do not have

 5   internal process appealing decisions by Director, to

 6   decline to investigate the complaint.  If you have new

 7   evidence that supports reasonable belief that a

 8   violation of code of conduct has occurred, we will

 9   consider your request.  You read that earlier,

10   correct?

11           MS. QING LU:  Yes, I believe so.

12           MR. LAWSON:  Okay.  And November 29, 2018, --

13   I'm sorry.  November 28, 2018, you requested a meeting

14   with Director Gibson.

15           MS. QING LU:  Human Resources?

16           MR. LAWSON:  Yes.

17           MS. QING LU:  D.C.H.R.?

18           MR. LAWSON:  Yes.

19           MS. QING LU:  No, I did not request a

20   meeting.  Their policy advisor wants to meet with me -

21   -

22           MR. LAWSON:  No, no, no, no.
```

Page 57

1          MS. QING LU:  -- at a later time --

2          MR. LAWSON:  You requested the meeting with

3  Ms. Gibson.

4          MS. QING LU:  I don't remember that.

5          MR. LAWSON:  They referred you to the Policy

6  Advisor, Mr. Zimmerman.

7          MS. QING LU:  Oh, okay.  Yes.

8          MR. LAWSON:  Because here is your email

9  directly to Ms. Gibson --

10          MS. QING LU:  That was canceled, yes.

11          MR. LAWSON:  -- requesting a meeting.

12          MS. QING LU:  You want me to read it?

13          MR. LAWSON:  No, I don't want you to read it.

14          MS. QING LU:  Oh.

15          MR. LAWSON:  I just want you to acknowledge

16  that.  And instead of Ms. Gibson, you were referred to

17  Mr. Zimmerman, correct?

18          MS. QING LU:  Yes.  He wanted to meet with

19  me.  Then it was canceled.

20          MR. LAWSON:  Okay.  Then you sent the request

21  to meet with Mayor Bowser on November --

22          MS. QING LU:  (Crosstalk).

Page 58

1              MR. LAWSON:  Huh?

2              MS. QING LU:  Yes.  The Mayor's office.

3              MR. LAWSON:  Yes.  This was in September

4   2017.  Okay.

5              MS. QING LU:  Sir, is there a baby or not?

6              MR. LAWSON:  All right.  Ms. Lu, so do you

7   recall this note?

8              MS. QING LU:  Yes.  This is my handwriting,

9   yes.

10             MR. LAWSON:  Okay.  You left this in Candace

11  Taylor's chair?

12             MS. QING LU:  No.  To the receptionist.  I

13  don't know where she sat.

14             MR. LAWSON:  All right.  Did it contain this,

15  I'm assuming fake birth certificate?

16             MS. QING LU:  Yes.  I just tried to use this

17  as an illustration that a fake birth certificate can

18  be obtained very easy.

19             MR. LAWSON:  Okay.

20             MS. QING LU:  That was my point.  That is why

21  I make a note.

22             MR. LAWSON:  Okay.  And I'm going to ask you

Page 59

1   again.  Because you said you printed this out for

2   friends.  This fake -- fake belly.

3           MS. QING LU:  For fun.  Just for later

4   (inaudible) you know.

5           MR. LAWSON:  And you don't remember if you

6   left it in the desk on the permit center?

7           MS. QING LU:  Yes.  It was there in the

8   permit center.  Before there was a meeting there.

9           MR. LAWSON:  Right.

10          MS. QING LU:  Just a meeting, yes.

11          MR. LAWSON:  So, you left it in the desk

12   drawer?

13          MS. QING LU:  I don't remember where I left

14   it.  It must be at my station 15.

15          MR. LAWSON:  Right.  Did you -- did you sit

16   that -- after the meeting did you -- did you -- were

17   you scheduled to sit at that desk?

18          MS. QING LU:  After meeting?  I don't

19   remember.

20          MR. LAWSON:  You don't?  Or was   *** S.B. ***

21   scheduled to meet that desk, to sit that desk?

22          MS. QING LU:  It must be him.  That is why he

Page 60

1    complained, yes.  Probably I was there earlier, or

2    this was done on the day before.  I don't recall.

3    This must be why he (inaudible).

4              MR. LAWSON:  Okay.  All right.  So,

5    throughout your entire complaint, you repeatedly

6    asserted that    *** S.B. ***    wife faked her pregnancy,

7    correct?

8              MS. QING LU:  Yes.  Based on --

9              MR. LAWSON:  And that you --

10             MS. QING LU:  -- reasonable proof.

11             MR. LAWSON:  Okay.  What reasonable proof you

12    have?

13             MS. QING LU:  Oh, okay.

14             MR. LAWSON:  Let me ask you this.  First of

15    all, are you an investigator?

16             MS. QING LU:  No, sir.

17             MR. LAWSON:  Because we already went over

18    your position description.  So, does your position

19    description have any investigative -- investigation

20    tasks, duties, or anything like that?

21             MS. QING LU:  No, sir.  I was paid as a Fire

22    Protection Engineer as (inaudible), yes.

Page 61

```
 1              MR. LAWSON:  Okay.

 2              MS. QING LU:  I'm sorry.

 3              MR. LAWSON:  So, what reasonable proof do you

 4   have?  Let me ask you this before you say anything.

 5              MS. QING LU:  Okay.  Okay.

 6              MR. LAWSON:  Have you ever seen *** S.B. ***

 7   *** S.B. *** wife wearing any fake pregnancy pillow,

 8   anything like that, in the nude?

 9              MS. QING LU:  Of course.  She --

10              MR. LAWSON:  Have you ever seen her in the

11   nude?

12              MS. QING LU:  No, sir.

13              MR. LAWSON:  Wearing that?

14              MS. QING LU:  No, sir.

15              MR. LAWSON:  Okay.  So, any time you have

16   seen her, she is wearing clothes?

17              MS. QING LU:  Yes.

18              MR. LAWSON:  All right.  So, how can you

19   prove that she is wearing fake pregnancy belt?

20              MS. QING LU:  Okay.  Now I can talk.  So, can

21   I?

22              MR. LAWSON:  Yes.
```

Page 62

PLf. Opp.
App. 211

```
 1               MS. QING LU:  Okay.  You know by the end of
 2    April 2016,     *** S.B. ***     wife came to DCRA on the
 3    third floor.  There are only Asme and his wife, the
 4    two of them.  She offered to tell Asme, hey you know
 5    what?  I am pregnant.  There was no sign on her body,
 6    on that day.  That day I saw her myself too.  On the
 7    second floor.  She did not look that way.  But a
 8    couple days later, she came back again.  At that
 9    moment everybody clearly recalls a progressively big
10    bump -- big bump on her body.  And at a later time,
11    after the baby was born, she offered to tell us -- not
12    us, just a lot of people.  It was a past-due
13    pregnancy, to induce the labor.  And also, I have
14    customers in email writing.  Clearly states that was
15    oddly shaped.  And probably because why she is
16    training it is not comfortable, she moved to the side.
17    She put it back the right way or something like that.
18    We had --
19               MR. LAWSON:  All of this is in your
20    complaint.  All what you are telling me now, is in
21    your written complaint.
22               MS. QING LU:  I don't remember.  You know the
```

Page 63

```
 1   -- the --

 2           MR. LAWSON:  You -- you wrote this complaint.

 3   You sent this complaint to 30 people, at least.

 4           MS. QING LU:  No, sir.  You know what?

 5           MR. LAWSON:  But all what you are telling me

 6   right now is the same thing that is written in your

 7   complaint.

 8           MS. QING LU:  No.

 9           MR. LAWSON:  Yes.  Yes, it is.

10           MS. QING LU:  I am not -- do you know Alec?

11   The original mechanical engineer was there.  Alec has

12   a real baby at exactly the same time.  If not on the

13   same day, that in very same month.

14           MR. LAWSON:  What is your point?

15           MS. QING LU:  Okay.  I'm going there.  At

16   about September.  After four months, the baby was born

17   the two new fathers had a conversation.  Alec asked

18   *** S.B. *** about it.  Hey *** S.B. *** how is your baby doing

19   last four months?  Do you know what    *** S.B. ***    say?

20   She is doing well.  She is walking around.

21           MR. LAWSON:  What is your point?

22           MS. QING LU:  Whose baby is walking around at
```

Page 64

```
 1   four-month-old, sir?  Do you have children?
 2             MR. LAWSON:  I have -- yes, I do have
 3   children.
 4             MS. QING LU:  Walking around at four months
 5   old?
 6             MR. LAWSON:  All right.  So, how did you find
 7   out about that conversation?
 8             MS. QING LU:  Oh, Alec told me.  Alec --
 9             MR. LAWSON:  So, you -- so, somebody else
10   told you about a conversation they had with somebody
11   else?
12             MS. QING LU:  Yes.
13             MR. LAWSON:  And you are basing a complaint
14   on what somebody else told you.
15             MS. QING LU:  Yes.  Not all the information
16   are firsthand.
17             MR. LAWSON:  Okay.
18             MS. QING LU:  Also, --
19             MR. LAWSON:  What -- I want to know what
20   firsthand knowledge you have regarding --
21             MS. QING LU:  I did not see her --
22             MR. LAWSON:  -- this fake pregnancy.
```

Page 65

```
 1              MS. QING LU:  I did not see her on the -- the

 2   very end of April, she is coming.  But he told people

 3   she was pregnant.  There is no sign.  Couple days

 4   later, there is a huge sign.  Scientifically, it is

 5   not possible.  Economically it is not possible.

 6              MR. LAWSON:  You don't know that.  You don't

 7   know how different -- you don't know how people have

 8   their pregnancies.

 9              MS. QING LU:  I'm a mother.  I'm a woman.  I

10   have --

11              MR. LAWSON:  You a woman.  Then -- then --

12   then --

13              MS. QING LU:  I have seen others --

14              MR. LAWSON:  Okay.  Then -- then -- then --

15   you being a woman and a mother.  My question to you

16   is, how is it that you are making allegations that

17   somebody is faking their pregnancy if you don't have

18   substantial proof.  And like I said, you didn't see

19   her in the nude, with a pillow wrapped around her.  Or

20   with a fake belly on her stomach.

21              MS. QING LU:  It is collaborative.  It is not

22   like it must be naked, you know.  If on this day you
```

Page 66

```
 1    don't have anything, on the other day.  Oh my god, it
 2    is like a pillow.  It must be something wrong,
 3    logically.
 4            MR. LAWSON:  I don't know.  Because
 5    basically, you are expecting people to go on your word
 6    that this happened.
 7            MS. QING LU:  Can I also tell you something
 8    else Alec told me?  Alec told me --
 9            MR. LAWSON:  No.  Because that is heresy.
10            MS. QING LU:  Oh, okay.  So, you can't hear -
11    -
12            MR. LAWSON:  So, I don't care -- I don't care
13    what somebody else told you about somebody else.
14            MS. QING LU:  Okay.  So, you can talk to Alec
15    yourself.
16            MR. LAWSON:  I don't need to talk to Alec.
17    Because Alec is not complaining about    *** S.B. ***
18    wife faking a pregnancy.
19            MS. QING LU:  No.  No, but he --
20            MR. LAWSON:  Luchi Lu is.
21            MS. QING LU:  Yes, uh-huh.
22            MR. LAWSON:  So, again.  Have you ever seen
```

Page 67

1      *** S.B. ***      wife --

2                  MS. QING LU:  Naked.

3                  MR. LAWSON:  -- N██████, in the nude, wearing

4      a pillow or a fake pregnancy stomach, similar to the

5      ones that are in this web research?

6                  MS. QING LU:  No, sir.

7                  MR. LAWSON:  Have you ever personally seen

8      that?

9                  MS. QING LU:  Have what?

10                 MR. LAWSON:  Have you ever personally seen --

11                 MS. QING LU:  No, sir.

12                 MR. LAWSON:  -- N██████  B██████ wearing

13     something like that?

14                 MS. QING LU:  Not even once, no.

15                 MR. LAWSON:  Okay.  All right.  Have you ever

16     met    *** S.B. ***      stepmother, █████ B█████?

17                 MS. QING LU:  No.  We knew that is her

18     stepmother.  The recent lady.

19                 MR. LAWSON:  All right.  Have you ever met

20     her?

21                 MS. QING LU:  Of course not.

22                 MR. LAWSON:  Have you ever met any of *** S.B. ***

                                                 Page 68

1   *** S.B. *** family?

2              MS. QING LU:  Yes.

3              MR. LAWSON:  Other than his wife?

4              MS. QING LU:  I saw his wife and his two

5   sons.

6              MR. LAWSON:  Okay.

7              MS. QING LU:  Yes.

8              MR. LAWSON:  Have you met them?  That is my

9   question.

10              MS. QING LU:  What do you mean met them?

11  They are --

12              MR. LAWSON:  Have you been introduced to

13  them?  Have they said --

14              MS. QING LU:  No, sir.

15              MR. LAWSON:  -- Luchi Lu, my name is N█████,

16  my son's name is ████, my other son's name is █████?

17              MS. QING LU:  Of course not.

18              MR. LAWSON:  Okay.  So, you -- you don't have

19  any kind of relationship with them?  You never had any

20  kind of relationship with them?

21              MS. QING LU:  No.

22              MR. LAWSON:  All right.  Did you go to the

Veritext Legal Solutions
800-336-4000

```
 1   Mayor and the Director on Tuesday, last week?
 2           MS. QING LU:  Tuesday, last week?
 3           MR. LAWSON:  Wait a minute.
 4           MS. QING LU:  Go where?
 5           MR. LAWSON:  I'm sorry.
 6           MS. QING LU:  No.
 7           MR. LAWSON:  Okay.  This -- you sent me this
 8   email on Friday, February 8, 2017, correct?
 9           MS. QING LU:  Yes, uh-huh.
10           MR. LAWSON:  All right.  In that email you
11   state specifically, there is a circumstance I need to
12   inform openly for your decision.  A case using fake
13   document and wearing a pillow for paternity is
14   currently under review by Director Sherpa and the
15   Mayor's office, EOM.  Mayor Bowser visited DCRA on
16   Tuesday, 2/5.  And I spoke with her about this fraud.
17   Director Sherpa was standing by.  Mayor Bowser asked
18   Director Sherpa to follow-up.  And he is working on it
19   now.
20           MS. QING LU:  Yes.
21           MR. LAWSON:  That is what you said?
22           MS. QING LU:  Yes, uh-huh.
```

Page 70

```
 1                    MR. LAWSON:  So, again.  Have you ever seen
 2     N█████ B█████, in the nude, wearing a pillow --
 3                    MS. QING LU:  No, sir.
 4                    MR. LAWSON:  -- or a fake pregnancy belly.
 5                    MS. QING LU:  No.  That was collaborating.
 6     You know.  Just --
 7                    MR. LAWSON:  Have you ever seen her wearing
 8     it?
 9                    MS. QING LU:  No, not myself.
10                    MR. LAWSON:  Okay.  So, how are you saying
11     that she wore it?
12                    MS. QING LU:  Well --
13                    MR. LAWSON:  Have you ever seen her wear it,
14     Ms. Lu?
15                    MS. QING LU:  No, sir.
16                    MR. LAWSON:  So, you speculating?
17                    MS. QING LU:  Pretty much.  I'm --
18                    MR. LAWSON:  Okay.  So, all of your complaint
19     is speculation.  All of your complaint is based on
20     conjure and speculation.  Because you have no proof.
21                    MS. QING LU:  Well, --
22                    MR. LAWSON:  You have no proof.  If you did
```

```
 1    not see it personally, you have no proof.

 2              MS. QING LU:  Well, my allegation is the baby

 3    that is non-existent.  How can I prove --

 4              MR. LAWSON:  There is a baby that exists.

 5              MS. QING LU:  Okay, okay.

 6              MR. LAWSON:  And I'm going to tell you, you

 7    know, because it is none of your business, really.

 8    And that is why nobody had you know, wanted to tell

 9    you.  But it is really none of your business about him

10    or his family.

11              MS. QING LU:  Uh-huh.

12              MR. LAWSON:  It is none of your business. He

13    does have a baby, and he has a ███████.  That was

14    born ███████████.

15              MS. QING LU:  Okay.  Then why didn't he tell

16    me?

17              MR. LAWSON:  He ain't got to tell you

18    nothing.  The reason why he probably don't want to

19    bring his ███████ down here is because he don't want

20    to expose████ to you.  After you have been haunting

21    him --

22              MS. QING LU:  No.  He --
```

Page 72

```
 1                    MR. LAWSON:  -- and stalking him, for the
 2     last two years.
 3                    MS. QING LU:  You know what?  Alec told me,
 4     he heard --
 5                    MR. LAWSON:  I don't want -- I don't care
 6     what Alec says.  I don't care what Alec heard.
 7                    MS. QING LU:  He --
 8                    MR. LAWSON:  It doesn't matter, Ms. Lu.
 9                    MS. QING LU:  Uh-huh.  Oh, okay.
10                    MR. LAWSON:  Is it proof?
11                    MS. QING LU:  Yes.  It is.
12                    MR. LAWSON:  Alec could tell you anything.  I
13     could you anything right now.
14                    MS. QING LU:  Alec is a professional
15     engineer.
16                    MR. LAWSON:  There are so -- what does that
17     have to do with -- what -- with what he is telling
18     you?
19                    MS. QING LU:  He is telling the truth.
20                    MR. LAWSON:  How do you know that Ms. Lu?
21                    MS. QING LU:  I --
22                    MR. LAWSON:  How do you know that *** S.B. ***
```

Veritext Legal Solutions
App. 222
800-336-4000

1    *** S.B. *** ain't telling you the truth?

2              MS. QING LU:  There are many, many proofs and

3    it don't add up.

4              MR. LAWSON:  Okay.  All right.  I'm telling

5    you right now.  Do not say anything else to anybody

6    else in DCRA, or anywhere, about this complaint.  Do

7    you understand?

8              MS. QING LU:  I understand.

9              MR. LAWSON:  That means the press.  That

10   means anybody.  Do not go any -- anywhere outside DCRA

11   about your complaint, except Human Resources.  Like

12   you were instructed by your superior in August of

13   2017.  Do you understand?

14             MS. QING LU:  I understand.  I won't take it

15   to anybody, you know, I'm hired as a professional

16   (crosstalk) --

17             MR. LAWSON:  But you said that -- you said

18   that -- numerous times in emails, that I read -- that

19   we already went through.

20             MS. QING LU:  Uh-huh, yes.

21             MR. LAWSON:  You told -- you even told your

22   superior, Walter Crawford that --

Page 74

1              MS. QING LU:  Yes.  We stop here.

2       (Crosstalk).

3              MR. LAWSON:  Right.  Right.

4              MS. QING LU:  Yes.

5              MR. LAWSON:   Right.  Okay?  So, I don't

6       have any additional questions.

7              MS. QING LU:  Well, it is my turn.  You know,

8       as said I was hired, and I am hired as a well-paid

9       protection engineer.  Well, you show me all of this

10      stuff.  I can now realize it was really a lot of time.

11      I don't know since when I became a DA, it is not my

12      job.  It is presumptuous.  Even at some point, I made

13      a mistake, that is honest mistake.  I just try to do

14      the right thing.  According to H.R. policy that

15      whenever you give them a paper, they don't verify.

16      Paternity leave is very easy to do, comparing to

17      maternity leave.  Especially when the spouse is not

18      working for DCRA.  You know?  You can just say I got a

19      girlfriend who is pregnant.  You got a paper, that

20      don't verify.  You know?  I just try to make this

21      point to help D.C.H.R. to realize currently, there is

22      some problem in there.  But if at any point I crossed

```
 1    the line, and caused some pressure, or some bad

 2    feelings on Mr. and Mrs. B▓▓▓, I apologize.  That was

 3    not my intention.  I never meant anything bad.  You

 4    know, you don't want to listen to it.  But I suggest

 5    you talk to Alec.  But that is your call, your

 6    decision, sir.

 7              MR. LAWSON:  No.  I don't need to talk to

 8    Alec.

 9              MS. QING LU:  Okay.  And now you know my

10    email has been tightly monitored.  You know my -- my -

11    - you know I'm going to pursue any further --

12    (crosstalk).

13              MR. LAWSON:  Well, Ms. Lu, I'm going to say

14    this -- I'm going to say this -- I'm going to say this

15    to you.

16              MS. QING LU:  Uh-huh.

17              MR. LAWSON:  Because -- you have no -- you

18    have -- you can't fall back on anything about you

19    didn't know.  Because Mia Brown told you, when you

20    first complained, Mia Brown responded to you.  And

21    told you that Mr.    *** S.B. ***    has met all of the

22    qualifications --
```

```
 1              MS. QING LU:  Yes.

 2              MR. LAWSON:  -- for his paid family leave.

 3   We read that email, correct?

 4              MS. QING LU:  Yes.

 5              MR. LAWSON:  Then -- hold on.  Then the

 6   Office of the Inspector General told you that they

 7   referred the matter to DCRA, correct?

 8              MS. QING LU:  By the way --

 9              MR. LAWSON:  And they told you they

10   considered the matter closed, correct?

11              MS. QING LU:  Yes, sir.

12              MR. LAWSON:  And BEGA also responded to you

13   and told you that they considered the matter closed

14   because there wasn't any foundation to your complaint.

15              MS. QING LU:  But what --

16              MR. LAWSON:  Hold on.  Then the Director of

17   DCRA Government Human Resources, Ventris Gibson, told

18   you that the matter was closed because all of the

19   qualifications have been met, correct?

20              MS. QING LU:  Yes, sir.

21              MR. LAWSON:  But yet you still continued

22   going on and on and on --
```

Page 77

Plt. Opp.
App. 226

```
 1              MS. QING LU:  I just --

 2              MR. LAWSON:  Everybody, anybody in the

 3    District of Columbia government including Council,

 4    outside of D.C. government, including Washington Post,

 5    WTOP, City Paper, CNN.

 6              MS. QING LU:  But why didn't he just answer

 7    the question that I asked them?

 8              MR. LAWSON:  Because it is none of your

 9    business, Ms. Lu.

10              MS. QING LU:  I asked them why did the --

11    okay.

12              MR. LAWSON:  It is none of your business.

13              MS. QING LU:  But do you think --

14              MR. LAWSON:  William having -- William's wife

15    having a child, is none of your business.

16              MS. QING LU:  I just want to point it out --

17              MR. LAWSON:  Unless he make -- unless he

18    wants to make it your business.

19              MS. QING LU:  I just want to point it out

20    currently, there is some problem with the D.C.H.R.

21    policy --

22              MR. LAWSON:  No.  there is no problem with
```

Page 78

```
 1   D.C. H.R. policy.
 2            MS. QING LU:  But they do verify.  There is -
 3   -
 4            MR. LAWSON:  It is none of your business.
 5            MS. QING LU:  Oh, okay.  Yes.  I take that.
 6   It is not.
 7            MR. LAWSON:  They don't need to verify with
 8   you.  All they need to verify is that his or whoever's
 9   documents are in order, to get their family leave or
10   whatever.  To approve their leave.
11            MS. QING LU:  But can you --
12            MR. LAWSON:  But they have to get approved
13   before they go on family -- paid family leave.
14            MS. QING LU:  But can you explain why he said
15   his ██████ is walking around at four months old?
16            MR. LAWSON:  What -- I don't care.  It
17   doesn't matter.
18            MS. QING LU:  Okay.  Yes.  Thank you for your
19   time.  I didn't know I had --
20            MR. LAWSON:  Okay.
21            MS. QING LU:  This is so much.
22            MR. LAWSON:  Well, I don't have any different
```

```
1    questions.  Do you have anything else to say?

2            MS. QING LU:  Thank you for your time.  I

3    didn't realize you know, that I spent so much time on

4    this.  Which is really out of my specified

5    responsibility.

6            MR. LAWSON:  Right.

7            MS. QING LU:  But I meant well.  I did not

8    mean to hurt anybody or be malicious about something.

9    I just made the judgment based on my limited belief

10   with some reasonable solves.  And combined with an

11   input from my coworkers --

12           MR. LAWSON:  All right.

13           MS. QING LU:  -- and the female customers.

14           MR. LAWSON:  Ms. Lu, the first year might

15   have been reasonable.  The first six months might have

16   reasonable.  This has gone on for two and a half

17   years.

18           MS. QING LU:  That long?  I knew --

19           MR. LAWSON:  2016?

20           MS. QING LU:  Uh-huh.

21           MR. LAWSON:  You first filed a complaint with

22   OIG, we already said in June of 2016.  That is two and
```

Page 80

```
 1    a half years ago.

 2              MS. QING LU:  Yes.  That is something.  It

 3    take that long to get a response --

 4              MR. LAWSON:  No,  they responded to you quite

 5    quickly.  Because they checked.  Because they sent the

 6    email.  Well, they sent the memo to Melinda Bolen.

 7    Telling them about the complaint.  And Melinda Bolen

 8    responded and provided the documents that supported.

 9    So, --

10              MS. QING LU:  My bad.  I'm sorry.

11              MR. LAWSON:  Yes.  Your bad.  All right.  We

12    will end this -- we will end this interview at this

13    time.  Thank you very much for coming.  Thank you very

14    much --

15              (Recording ends.)

16

17

18

19

20

21

22
```

Page 81

PLt.Opp
App. 230

```
 1                 CERTIFICATE OF TRANSCRIBER

 2              I, ANGELA WILSON, do hereby certify that this

 3      transcript was prepared from the digital audio

 4      recording of the foregoing proceeding, that said

 5      transcript is a true and accurate record of the

 6      proceedings to the best of my knowledge, skills, and

 7      ability; that I am neither counsel for, related to,

 8      nor employed by any of the parties to the action in

 9      which this was taken; and, further, that I am not a

10      relative or employee of any counsel or attorney

11      employed by the parties hereto, nor financially or

12      otherwise interested in the outcome of this action.

13

14

15                                         ANGELA WILSON

16

17

18

19

20

21

22
```

Page 82

Samuel Mutia - December 3, 2018

```
 1            IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLUMBIA

 3    _____

 4   QING LU,                    )

 5            Plaintiff,          )

 6   vs.                         )    Civil Action No.

 7   DISTRICT OF COLUMBIA,        )    1:20-CV-00461 APM

 8            Defendant.          )

 9   _____)

10

11

12

13

14            TRANSCRIPTION OF AUDIO FILE

15       TYRONE LAWSON INTERVIEW OF SAMUEL MUTIA

16                DECEMBER 3, 2018

17

18

19

20

21

22
```

Plf. Opp.
App. 232

Samuel Mutia - December 3, 2018

```
1              TYRONE LAWSON:  ...employee misconduct.

2              SAMUEL MUTIA:  Okay.

3              TYRONE LAWSON:  So I wanted to ask you,

4      Mr. Mutia, do you recall -- I want to give you

5      this --

6              SAMUEL MUTIA:  Uh-huh (affirmative).

7              TYRONE LAWSON:  -- to look over.  It is

8      regarding a meeting, one of your POD meetings that

9      occurred earlier this year.  Can you read that and

10     see if it refreshes, brings back any memories.

11             SAMUEL MUTIA:  This past February?

12             TYRONE LAWSON:  Yeah.

13             (Pause)

14             SAMUEL MUTIA:  I was in the meeting.

15             TYRONE LAWSON:  You were in the meeting?

16             SAMUEL MUTIA:  Yeah.

17             TYRONE LAWSON:  You recall that meeting?

18             SAMUEL MUTIA:  I recall this meeting, but

19     I did not hear her because she spoke with an

20     accent.

21             TYRONE LAWSON:  Uh-huh (affirmative).

22             SAMUEL MUTIA:  I did not understand or
```

Samuel Mutia - December 3, 2018

1    catch this part.

2              TYRONE LAWSON:  Okay.

3              SAMUEL MUTIA:  But my colleagues later on

4    told me.

5              TYRONE LAWSON:  What she said?

6              SAMUEL MUTIA:  What she said because I

7    didn't catch it.

8              TYRONE LAWSON:  Okay.

9              SAMUEL MUTIA:  Yeah.  Because I remember

10   us, you know, discussing this.

11             TYRONE LAWSON:  Uh-huh (affirmative).

12             SAMUEL MUTIA:  Yeah.  I don't know who --

13   I don't know the second paragraph.

14             TYRONE LAWSON:  Huh?

15             SAMUEL MUTIA:  I don't know who -- who

16   say this in the second paragraph.  "I told Ms.

17   Lu."  I don't know who this is.

18             TYRONE LAWSON:  Oh.  No, I understand.  I

19   just need to know if you recall the meeting, and

20   if you recall -- you said -- you said you heard

21   her say something, but you didn't understand

22   because she spoke with an accent.

Samuel Mutia - December 3, 2018

```
1              SAMUEL MUTIA:  Correct.

2              TYRONE LAWSON:  But later on that day

3      your colleagues told you what she said?

4              SAMUEL MUTIA:  Right.

5              TYRONE LAWSON:  Okay.

6              SAMUEL MUTIA:  They came back and say,

7      "Did you hear Lu Qing mention this?"

8              TYRONE LAWSON:  What was this?

9              SAMUEL MUTIA:  Something about a fake --

10             TYRONE LAWSON:  A fake pregnancy?

11             SAMUEL MUTIA:  Yes, sir.

12             TYRONE LAWSON:  Okay.

13             SAMUEL MUTIA:  And I said, "I did not

14     catch that," so I left it at that.

15             TYRONE LAWSON:  Okay.

16             SAMUEL MUTIA:  Yeah.

17             TYRONE LAWSON:  And have you heard

18     anything else about that same --

19             SAMUEL MUTIA:  The fake belly and

20     pregnancy?

21             TYRONE LAWSON:  Uh-huh (affirmative).

22             SAMUEL MUTIA:  I've heard it twice.
```

Samuel Mutia - December 3, 2018

```
 1              TYRONE LAWSON:  Okay.

 2              SAMUEL MUTIA:  She's brought it, you

 3     know, to me.

 4              TYRONE LAWSON:  She brought it to you?

 5              SAMUEL MUTIA:  Yeah.  She brought it to

 6     me, and I just -- because I -- there's no proof or

 7     anything, I just dismissed it.

 8              TYRONE LAWSON:  Uh-huh (affirmative).

 9     Okay.  So when she brought it to you, how did --

10     do you recall how she brought it to you?

11              SAMUEL MUTIA:  Verbal.  And one time she

12     send me an email about, you know, something that

13     has been typed up --

14              TYRONE LAWSON:  Uh-huh (affirmative).

15              SAMUEL MUTIA:  -- by probably her.

16              TYRONE LAWSON:  Do you know if you still

17     have that email?

18              SAMUEL MUTIA:  I deleted that stuff.

19              TYRONE LAWSON:  You deleted it?

20              SAMUEL MUTIA:  Yeah.  Because I didn't

21     want to get involved in hearsay.

22              TYRONE LAWSON:  Okay.
```

Plf. Opp.
App. 236

Samuel Mutia - December 3, 2018

1              SAMUEL MUTIA:  Yeah.  We -- you know, we

2      work in the same --

3              TYRONE LAWSON:  Yeah.  I know.  I know.

4              SAMUEL MUTIA:  -- same --

5              TYRONE LAWSON:  Do you recall what she

6      said to you when it was verbal?

7              SAMUEL MUTIA:  Something about a fake --

8      having a fake belly.

9              TYRONE LAWSON:  Okay.

10             SAMUEL MUTIA:  Walking around on the

11     second floor.

12             TYRONE LAWSON:  Okay.

13             SAMUEL MUTIA:  And this caught me off

14     guard, so I didn't -- I didn't pay attention to

15     it.

16             TYRONE LAWSON:  Okay.  Let me ask you: so

17     this was -- she -- she contacted you, or she spoke

18     to you about the fake pregnancy, fake belly thing

19     twice after this meeting; do you recall?  Was it

20     after or before; do you recall?

21             SAMUEL MUTIA:  That's a good question.

22     Maybe -- maybe it was before.

Samuel Mutia - December 3, 2018

1               TYRONE LAWSON:  Before?

2               SAMUEL MUTIA:  Yeah.

3               TYRONE LAWSON:  Okay.  But it was two

4       times and outside of this meeting, so --

5               SAMUEL MUTIA:  Yes.

6               TYRONE LAWSON:  Okay.

7               SAMUEL MUTIA:  Yes.  Because we both work

8       in fire.

9               TYRONE LAWSON:  Uh-huh (affirmative).

10              SAMUEL MUTIA:  So we do interact.  We

11      change shifts.  So that's why she has a chance to

12      catch me --

13              TYRONE LAWSON:  Uh-huh (affirmative).

14              SAMUEL MUTIA:  -- you know.

15              TYRONE LAWSON:  Okay.

16              SAMUEL MUTIA:  But that was it.

17              TYRONE LAWSON:  Okay.

18              SAMUEL MUTIA:  Yeah.

19              TYRONE LAWSON:  All right.  That's all

20      the questions I have.

21              SAMUEL MUTIA:  Okay.

22              TYRONE LAWSON:  Would you do me a favor,

Samuel Mutia - December 3, 2018

Page 8

1      just to be sure, and go back and check your email

2      and see if it's there or not?  I mean -- you said

3      you deleted it, but I don't know maybe it's -- I

4      don't know.

5              SAMUEL MUTIA:  Maybe it's somewhere.

6              TYRONE LAWSON:  Maybe it's still there.

7              SAMUEL MUTIA:  All right.

8              TYRONE LAWSON:  Maybe not.  I don't know,

9      but if you could check for me.

10             (END OF AUDIO FILE)

11

12

13

14

15

16

17

18

19             CERTIFICATE OF TRANSCRIPTIONIST

20             I certify that the foregoing is a true

21      and accurate transcript of the digital recording

22      provided to me in this matter.

Samuel Mutia - December 3, 2018

1                I do further certify that I am neither a

2        relative, nor employee, nor attorney of any of the

3        parties to this action, and that I am not

4        financially interested in the action.

5

6

7

8        _____

9             Julie Thompson, CET-1036

10

11

12

13

14

15

16

17

18

19

20

21

22

Chrys Edet - December 10, 2018

```
1                 IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF COLUMBIA

3       _____

4    QING LU,                   )

5              Plaintiff,       )

6    vs.                        )   Civil Action No.

7    DISTRICT OF COLUMBIA,      )   1:20-CV-00461 APM

8              Defendant.       )

9       _____)

10

11

12

13

14                 TRANSCRIPTION OF AUDIO FILE

15          TYRONE LAWSON INTERVIEW OF CHRYS EDET

16                   DECEMBER 10, 2018

17

18

19

20

21

22
```

Chrys Edet - December 10, 2018

1          TYRONE LAWSON:  Hi.  Mr. -- how do you

2      pronounce it, Edet?

3          CHRYS EDET:  Edet.

4          TYRONE LAWSON:  Edet?

5          CHRYS EDET:  That's right.  Yes.

6          TYRONE LAWSON:  Okay.  Mr. Edet, so,

7      again, my name is Tyrone Lawson.

8          CHRYS EDET:  Yes.

9          TYRONE LAWSON:  And I'm a special

10      investigator for the agency.  I do a lot of

11      employee misconduct kind of investigations.  I

12      also do investigations of allegations of fraud,

13      abuse, misuse, that kind of thing with some

14      licensees and some customers in the -- you know,

15      with coming to DCRA kind of a thing.

16          CHRYS EDET:  Yeah.

17          TYRONE LAWSON:  But at this point I'm

18      conducting an investigation into an allegation of

19      employee misconduct.  You may be -- you may or may

20      not be a witness to this conduct.  That's why I

21      wanted to speak to you because your name came up

22      as maybe witnessing.

Chrys Edet - December 10, 2018

1              And I wanted to let you read this

2      statement right here to see if it jogs any

3      memories.

4              CHRYS EDET:  (Reading)

5              TYRONE LAWSON:  Do you have any

6      recollection -- recollection of that happening in

7      one of you all meetings?

8              CHRYS EDET:  Not at all.  This is the

9      first time --

10             TYRONE LAWSON:  You don't remember?

11             CHRYS EDET:  First time I've seen this.

12     Yeah.

13             TYRONE LAWSON:  First time you seen that?

14             CHRYS EDET:  Yeah.

15             TYRONE LAWSON:  Okay.  Okay.  So have you

16     -- are you aware of Mr. Lu allegations against

17     Mr. *** S.B. ***

18             CHRYS EDET:  No.

19             TYRONE LAWSON:  No?  You're not aware of

20     it.

21             CHRYS EDET:  Not at all.

22             TYRONE LAWSON:  You haven't heard

Chrys Edet - December 10, 2018

Page 4

1    anything from him or her or anybody else about

2    this conduct that's going on?

3           CHRYS EDET:  They didn't discuss those

4    things with me at all.

5           TYRONE LAWSON:  Okay.

6           CHRYS EDET:  Yeah.  I know ⁛S.B.⁛ has been

7    married to one Spanish lady --

8           TYRONE LAWSON:  Uh-huh (affirmative).

9           CHRYS EDET:  -- having a hard time.

10   Then, of course, the whole thing with the lady

11   involved in an accident.

12          TYRONE LAWSON:  Okay.

13          CHRYS EDET:  And now ⁛S.B.⁛ is married to

14   somebody else now.

15          TYRONE LAWSON:  Okay.

16          CHRYS EDET:  That's as much I know.

17          TYRONE LAWSON:  Okay.

18          CHRYS EDET:  Yeah.

19          TYRONE LAWSON:  All right.  That's it?

20          CHRYS EDET:  That's it.

21          TYRONE LAWSON:  Okay.  That's all I have.

22   Thank you very much.  I really appreciate it.

Chrys Edet — December 10, 2018

Page 5

1              (END OF AUDIO FILE)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Chrys Edet - December 10, 2018

1          CERTIFICATE OF TRANSCRIPTIONIST

2          I certify that the foregoing is a true

3     and accurate transcript of the digital recording

4     provided to me in this matter.

5          I do further certify that I am neither a

6     relative, nor employee, nor attorney of any of the

7     parties to this action, and that I am not

8     financially interested in the action.

9

10

11

12     _____

14          Julie Thompson, CET-1036

15

16

17

18

19

20

21

22

Christopher Bailey - December 10, 2018

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF COLUMBIA

 3        _____

 4   QING LU,                    )

 5             Plaintiff,        )

 6   vs.                         )    Civil Action No.

 7   DISTRICT OF COLUMBIA,       )    1:20-CV-00461 APM

 8             Defendant.        )

 9        _____)

10

11

12

13

14              TRANSCRIPTION OF AUDIO FILE

15      TYRONE LAWSON INTERVIEW OF CHRISTOPHER BAILEY

16                  DECEMBER 10, 2018

17

18

19

20

21

22
```

Christopher Bailey - December 10, 2018

Page 2

1          TYRONE LAWSON:  All right, Mr. Bailey.

2          CHRISTOPHER BAILEY:  Uh-huh

3     (affirmative).

4          TYRONE LAWSON:  I want to speak with you

5     regarding this employee misconduct allegation that

6     I'm investigating --

7          CHRISTOPHER BAILEY:  Uh-huh

8     (affirmative).

9          TYRONE LAWSON:  -- involving Lu Qing Lu

10    and Ms. Lu's persistent stalking and possible

11    sexual harassment of   *** S.B. ***

12         CHRISTOPHER BAILEY:  Uh-huh

13    (affirmative).

14         TYRONE LAWSON:  Can you tell me anything

15    you know -- any knowledge you might have regarding

16    this complaint?

17         CHRISTOPHER BAILEY:  I can.  Starting

18    back as far as -- I would probably say a year ago,

19    if not more.  I was on the third floor as acting

20    deputy billing chief.  I was the structural

21    certification -- the structural plans review

22    manager, but I was acting as the deputy chief.

Christopher Bailey - December 10, 2018

1        And in -- during that time, Mr. ***S.B.*** came to me

2        with a photocopy of a breast and stomach weight

3        vest, I guess, and said that he had found this on

4        his chair.

5                    TYRONE LAWSON:  Uh-huh (affirmative).

6                    CHRISTOPHER BAILEY:  And was the first

7        incidence of this being brought to my attention.

8        He had mentioned that it was Lu Qing Lu, but that

9        was his -- that was his story coming to me.

10                   Literally, probably within maybe a week,

11       Lu Qing came to me and specifically had a meeting

12       with me to talk about how   ***S.B.***   was using

13       his -- his wife as a means to get to family

14       medical leave inappropriately by faking -- her

15       perception is that his wife was faking the present

16       pregnancy to allow ***S.B.*** to have time off.

17                   TYRONE LAWSON:  Okay.

18                   CHRISTOPHER BAILEY:  I would say fast-

19       forward a couple of months.  ***S.B.*** came highly

20       aggravated.  Lu Qing had brought up in a meeting

21       with POD, a group of people that --

22                   TYRONE LAWSON:  Uh-huh (affirmative).

Christopher Bailey - December 10, 2018

Page 4

```
 1          CHRISTOPHER BAILEY:  She had brought up,
 2    and not naming him by name, but saying that people
 3    using fake situations to get family -- to get more
 4    leave, more paid leave should be investigated,
 5    directing and inferring that to be Mr. *** S.B. ***
 6    Mr. *** S.B. *** was furious because he took offense to
 7    that.
 8          And then moving forward, I brought this
 9    issue to HR.  HR then told me that there had been
10    other -- this is not the first time that specific
11    allegation of    *** S.B. ***    wife having a fake
12    pregnancy to allow him to time off was brought up
13    to them.  So this was -- I was not the only person
14    bringing this up to their attention.
15          TYRONE LAWSON:  Uh-huh (affirmative).
16          CHRISTOPHER BAILEY:  They had a -- I
17    believe it was Andrew Jackson and Walter Crawford
18    had had meetings.  I don't know if they had
19    separate meetings or a joint meeting, but they had
20    a sit-down meeting with her and told her, her
21    parameters or her -- what she's supposed to do at
22    work.  She is to come to work.  She is to do her
```

Christopher Bailey - December 10, 2018

1      job.  She is not to engage in any correspondence

2      or any type of outside interaction with Mr. *** S.B. ***

3      They are here to do work only.  That was kind of

4      like a -- this is you're here to do work.

5              TYRONE LAWSON:  Uh-huh (affirmative).

6              CHRISTOPHER BAILEY:  I do not know the --

7      what happened at that meeting, but that was the

8      gist of it prior to the meeting happening since I

9      had brought this up.  They were going to have --

10     HR was going to sit down specifically with Ms. Lu

11     Qing and tell her that this is inappropriate.

12             TYRONE LAWSON:  Okay.

13             CHRISTOPHER BAILEY:  Fast-forward to --

14     this is 2018.  Where *** S.B. *** brought up a complaint

15     directly to HR without my knowledge.  He had went

16     -- went above me or just brought it directly to

17     HR.  And -- what do you call it -- I had an issue

18     with -- what was the issue with?  I don't know if

19     *** S.B. *** gave me a piece of paper.  I should have --

20     I should have looked at this before the meeting,

21     but -- one second.

22             He had written or emailed me a complaint,

Christopher Bailey - December 10, 2018

1      a written complaint about Lu Qing, and I want to

2      say I printed it out and put it in my file here.

3      But I'm going to check my emails to see if I have

4      it also there.

5                   TYRONE LAWSON:  I think I might have --

6      is this the one you're talking about the email

7      where he says he was in the pantry with --

8                   CHRISTOPHER BAILEY:  No.  This was the --

9      this was the email he had -- he had got me from

10     fake Bill (phonetic).  Hold on.  Let me check my

11     email.

12                  TYRONE LAWSON:  He copied you on one

13     about --

14                  CHRISTOPHER BAILEY:  Yes, he did.  I'll

15     check here.

16                  (Pause)

17                  Here it is.  Workplace harassment.  That

18     was on 11/8/18.

19                  TYRONE LAWSON:  Yeah.  That was the one

20     he sent to Ms. Crawford?

21                  CHRISTOPHER BAILEY:  Yes.

22                  TYRONE LAWSON:  And copied you on?

Christopher Bailey - December 10, 2018

Page 7

```
1              CHRISTOPHER BAILEY:  That's correct.

2              TYRONE LAWSON:  Yeah.  I got that.

3              CHRISTOPHER BAILEY:  Okay.  I have

4      another one.  I may be wrong.

5              TYRONE LAWSON:  So is this the thing you

6      said he found in his seat?

7              CHRISTOPHER BAILEY:  That's correct.

8              TYRONE LAWSON:  Okay.

9              CHRISTOPHER BAILEY:  I'm going back in

10     time here.  Hold on.  I'm trying to see if I can

11     find some more emails because he's emailed me --

12              (Pause)

13              So on 2/3/17 -- want me to forward these

14     to you?

15              TYRONE LAWSON:  Yeah.

16              CHRISTOPHER BAILEY:  All right.

17              TYRONE LAWSON:  If you don't mind.  Is

18     this -- is that regarding a meeting?

19              CHRISTOPHER BAILEY:  This is another one.

20     I can print it out for you to read it.

21              TYRONE LAWSON:  Yeah.

22              CHRISTOPHER BAILEY:  It's pretty long.
```

Christopher Bailey - December 10, 2018

1    I'm forwarding it to you.  Can I forward these

2    thing?

3              TYRONE LAWSON:  Yeah.

4              CHRISTOPHER BAILEY:  I have --

5              TYRONE LAWSON:  Forward it to me.  What

6    is that -- is that from Mr. *** S.B. ***

7              CHRISTOPHER BAILEY:  Yeah.  This is

8    directly from Mr. *** S.B. ***  Remember I told you he

9    had contacted me last year --

10             TYRONE LAWSON:  Uh-huh (affirmative).

11             CHRISTOPHER BAILEY:  -- about this

12   incident.  This is the email from that.  That was

13   on 2 -- 2/2/17.  All right.

14             So then I want to say recently --

15   recently this came up, and I can't remember if it

16   came up via HR.  But I remember -- no.  What had

17   happened was *** S.B. *** came to me again, this time in

18   the hallway.

19             TYRONE LAWSON:  (Indiscernible)

20             CHRISTOPHER BAILEY:  Yeah, yeah, yeah.

21   Came to me again and said that she -- she's

22   starting back up with this -- with the same mess.

Christopher Bailey - December 10, 2018

```
 1            TYRONE LAWSON:  Uh-huh (affirmative).

 2            CHRISTOPHER BAILEY:  I brought that to

 3     Walter's attention.  Walter seemed to know about

 4     it.

 5            TYRONE LAWSON:  Uh-huh (affirmative).

 6            CHRISTOPHER BAILEY:  And he was, you

 7     know, we are about -- I think now we need to

 8     escalate this, and that's as far as I've known the

 9     incident to go.

10            TYRONE LAWSON:  Uh-huh (affirmative).

11            CHRISTOPHER BAILEY:  That's it.

12            TYRONE LAWSON:  Have you had any -- any

13     other conversations with Ms. Lu?

14            CHRISTOPHER BAILEY:  No.  I have not, not

15     since 2017, like last year.

16            TYRONE LAWSON:  Since he reported it to

17     you?

18            CHRISTOPHER BAILEY:  Correct.  Not -- not

19     since last year.

20            TYRONE LAWSON:  All right.  You indicated

21     -- let me show you this -- first of all, let me

22     show you this.  It looks like a statement --
```

Christopher Bailey - December 10, 2018

1          CHRISTOPHER BAILEY:  Uh-huh

2      (affirmative).

3          TYRONE LAWSON:  -- undated.  Can you look

4      that over?

5          (Pause)

6          CHRISTOPHER BAILEY:  Yeah.  This was --

7      this is -- this is when I said she spoke up during

8      an actual PD meeting.

9          TYRONE LAWSON:  Is that the PD meeting

10     that Mr. """S.B.""" is referring to in the email to you

11     in 2017?  Do you know?  Do you recall?

12         CHRISTOPHER BAILEY:  I've got to recall.

13     I have it right here.  Yes.  The dates -- the

14     dates match.

15         TYRONE LAWSON:  Okay.

16         CHRISTOPHER BAILEY:  February 2nd --

17     February 2, 2017.

18         TYRONE LAWSON:  Okay.

19         CHRISTOPHER BAILEY:  The one I have is

20     much more in depth.

21         TYRONE LAWSON:  Okay.

22         CHRISTOPHER BAILEY:  And so -- it's five

Christopher Bailey - December 10, 2018

1    paragraphs.

2            TYRONE LAWSON:  All right.  And you

3    stated that you spoke to -- I guess -- did you

4    speak to Mr. Crawford and Ms. Jackson together in

5    a meeting about this matter?

6            CHRISTOPHER BAILEY:  Possibly.  I know

7    Ms. Jackson was head of HR at the time.

8            TYRONE LAWSON:  Uh-huh (affirmative).

9            CHRISTOPHER BAILEY:  And then Walter was

10   the --

11           TYRONE LAWSON:  Okay.  And you recall

12   that -- during that meeting they specifically told

13   you that they had a meeting with Ms. Lu, and that

14   they told her specifically what her duties and

15   responsibilities were?

16           CHRISTOPHER BAILEY:  Not had had, were

17   going to.

18           TYRONE LAWSON:  Okay.  So they hadn't had

19   it when you left?  Okay.  Okay.

20           CHRISTOPHER BAILEY:  The -- up until

21   recently, I was under the impression and was -- I

22   don't want to say lead to believe -- but I

Christopher Bailey - December 10, 2018

1    understood that Walter Crawford had had that

2    meeting because he had mentioned he was going to

3    escalate to another level.  So that would assume

4    that he had the first --

5              TYRONE LAWSON:  Uh-huh (affirmative).

6              CHRISTOPHER BAILEY:  -- in order to then

7    go to that next -- that next level.

8              TYRONE LAWSON:  Okay.  All right.  That's

9    good.  I don't have any further questions.

10             CHRISTOPHER BAILEY:  Cool.

11             TYRONE LAWSON:  Thank you very much.

12             (END OF AUDIO FILE)

13

14

15

16

17

18

19

20

21

22

1                    CERTIFICATE OF TRANSCRIPTIONIST

2              I certify that the foregoing is a true

3       and accurate transcript of the digital recording

4       provided to me in this matter.

5              I do further certify that I am neither a

6       relative, nor employee, nor attorney of any of the

7       parties to this action, and that I am not

8       financially interested in the action.

9

10

11

12       _____

13              Julie Thompson, CET-1036

14

15

16

17

18

19

20

21

22

Plf. Opp.
App. 259

1                            INTERVIEW

2                              OF

3                       QING (LUCHI) LU

4                  Conducted by Tyrone Lawson

5                 Tuesday, February 12, 2019

6

7

8

9

10

11

12

13

14

15    JOB No.:        4514218

16

17

18

19

20

21

22

                                        Page 1

PX Opp
App 260

```
 1                     R E C O R D I N G
 2              MS. QING LU:  McGraw.  McGraw.
 3              MR. LAWSON:  What about her?
 4              MS. QING LU:  Oh, I don't know.  You -- you
 5    copied this image so --
 6              MR. LAWSON:  She is General Counsel.
 7              MS. QING LU:  Oh, okay.
 8              MR. LAWSON:  Ms. Bocock is the Senior Policy
 9    Advisor to the director.
10              MS. QING LU:  Yes.
11              MR. LAWSON:  Which she is -- she is actually
12    my immediate boss.
13              MS. QING LU:  Okay.
14              MR. LAWSON:  All right, Ms. Lu.  So, first
15    thing I want to do is, I want to advise you.  I always
16    do this to everybody.  That is -- that I'm
17    interviewing, with regards to complaint.  Is to give
18    them -- to make sure that they understand what their
19    Garrity Warning -- Garrity Rights are.  And this form
20    right here explains what the Garrity Rights are.
21    Could you read that over?
22              MS. QING LU:  You are being asked to provide
```

Page 2

```
 1    information as part of an internal and/or

 2    administrative occupation.  You do not have to answer

 3    questions if your answers will implicate you in a

 4    crime.  No action will be taken against you solely for

 5    refusing to answer the questions.  However, the

 6    evidence and value of your silence will be considered

 7    in the facts surrounding your case.  Any statements

 8    you truthfully provide may be used as evidence and

 9    will be treated and/or criminal proceedings.  Do you

10    understand these rights?  Yes.  I'm scared.

11            MR. LAWSON:  Okay.  Do you understand?

12            MS. QING LU:  Yes, I do.

13            MR. LAWSON:  All right, check it.  And sign

14    it for me please.  Print your name, date it.

15            MS. QING LU:  Put my name where?

16            MR. LAWSON:  Sign it, print it, and date it.

17            MS. QING LU:  Oh, okay.

18            MR. LAWSON:  Okay, thank you.  So, just so --

19    just so I'm -- you are clear.  What this is saying is

20    -- and you still have to answer questions, but if you

21    think it is going to --

22            MS. QING LU:  Put me in trouble?
```

Page 3

```
 1              MR. LAWSON:  If you think -- if you think it
 2     is going to implicate you in a crime, then you don't
 3     have to answer.  But you do have to answer questions
 4     as it relates to this investigation.
 5              MS. QING LU:  Okay.
 6              MR. LAWSON:  You understand?
 7              MS. QING LU:  Yes, I do, sir.
 8              MR. LAWSON:  All right, Ms. Lu.  Which -- how
 9     long have you been working with DCRA?
10              MS. QING LU:  11 years and past four months,
11     sir.
12              MR. LAWSON:  11 years, four months?
13              MS. QING LU:  Uh-huh.
14              MR. LAWSON:  Okay.  What is your position
15     with the agency?
16              MS. QING LU:  Fire Protection Engineer and
17     Reviewer.
18              MR. LAWSON:  And what do you do as a Fire
19     Protection Engineer?
20              MS. QING LU:  As a Fire Protection Engineer,
21     I review plans concerning fire safety.  Buildings,
22     egress.  And also, I do customer service on the second
```

Page  4

```
1    floor at the counter.  Serving customers face to face.
2            MR. LAWSON:  All right.  If you could read
3    this over -- if you could read this over to page two.
4    Just to make sure that that's the Fire Protection
5    Engineer's position description.  And then --
6            MS. QING LU:  From where?  From here to here?
7            MR. LAWSON:  Yes.  Well, just read -- just
8    read duties and then -- and then read specifically
9    (inaudible).
10           MS. QING LU:  Okay.  So, I read from here --
11           MR. LAWSON:  You don't have to read out loud,
12   just read -- you know, just read it over and see that
13   that's your duties and -- you know that is what you
14   do.
15           MS. QING LU:  Sure.  From here to here.
16           MR. LAWSON:  Yes, yes.
17           MS. QING LU:  Luchi served as Fire Protection
18   Engineer in the fire protection and engineering
19   section, technical reviewer branch.  Permit
20   authorization division, construction, and regulation
21   administration department of consumer and regulatory
22   affairs.  Performs technical and holds compliance
```

Page 5

1   review of design and layout of access and exits for

2   fire protection systems.  Including but not limited to

3   fire detection systems, automatic and manual fire

4   extinguishing systems, fire alarm systems, smoke meter

5   systems, emergency power, and emergency light, fire-

6   resistant construction, opening protection amendment

7   of egress and exits.  Technical review work involves

8   in the preliminary design for construction activities

9   and their construction by owners' design professionals

10  engaging in the D.C. construction codes, development

11  process.  Engaging in technical research for fire

12  protection questions while presenting and planning

13  review work.  And review work involves detailed

14  examination of fire protection in nonstructural plans.

15  Riser diagrams, schedules, and specifications while

16  applying technical knowledge of the generally accepted

17  standards and engineering practices used in the design

18  construction of fire protection systems.  For

19  buildings and other structure, which require building

20  permit approval.  Prepares or validates compliance

21  reports of each project.  Reviewed documents include

22  the design plans specification and shop plans for the

Page  6

```
 1    installation of systems in place.  Commercial and
 2    residential buildings as well as government buildings
 3    such as schools, hospitals, office buildings, penal
 4    institutions, and similar structures.  Project
 5    assigned include additions and renovations to existing
 6    structures and new construction.  Equipment has come
 7    with design and the code reviewer has responsibility
 8    for medium size to very large and complex projects.
 9    Specifically, equipment shall be reviewed.  Architects
10    and engineers design development as required through
11    the preliminary design review process.  And review
12    construction drawings submitted in these permit
13    applications.  Review contractors and engineer system
14    shop drawings for compliance with applicable codes and
15    standards.  And accuracy for the intended purpose.
16    Reviews/perform calculations to verified sizing of
17    equipment and systems.  Taking into consideration the
18    facility's needs.  The code and requirements
19    standards, criteria, and engineering practices.
20    Reviewing systems specifications for consistency with
21    submitted architectural and engineering plans, and the
22    provisions of the D.C. construction codes.  Visit
```

Page  7

1    construction sites to gather firsthand information and

2    the condition of the facilities, type of construction,

3    availability, and the location of fire and electrical

4    services.  System layout and other field conditions

5    related to the discharge of the principal duties where

6    required.  Provide information and assistance to

7    applicants and general populace regarding to inquiries

8    on code compliance.  Screen applicants, summation

9    package for companies.  And make determination on

10   required reviews in accordance with established

11   departmental criteria and policies.  Serves as counter

12   relief person to serve the general public and the

13   permit counter.  Fire permit center, fire counter.  To

14   ordinate with other engineers and inspectors on staff

15   to avoid interference between different systems and

16   its plans.  And to reassure and inform of the

17   enforcement of code requirements and the proper

18   integrations of system operation.  Performs other

19   related duties as assigned.

20          MR. LAWSON:  Okay.  So, would you -- would

21   you say this is an accurate description of your job?

22          MS. QING LU:  Yes.

Page  8

```
 1                  MR. LAWSON:  Your duties and

 2    responsibilities?

 3                  MS. QING LU:  Yes.

 4                  MR. LAWSON:  Okay.

 5                  MS. QING LU:  Pretty much.

 6                  MR. LAWSON:  All right.  Who is your

 7    supervisor?  Your immediate supervisor.

 8                  MS. QING LU:  Mr. Sydney Lester.

 9                  MR. LAWSON:  All right.  And who is Mr.

10    Lester's supervisor?  Do you know?

11                  MS. QING LU:  Mr. Chris Bailey.

12                  MR. LAWSON:  Chris Bailey?

13                  MS. QING LU:  Yes.

14                  MR. LAWSON:  All right.  And who is Chris

15    Bailey's supervisor?

16                  MS. QING LU:  Ariel Weisbard.

17                  MR. LAWSON:  Yes.

18                  MS. QING LU:  Yes.

19                  MR. LAWSON:  So basically, your division is

20    primary operations under the Chief Government

21    Official?

22                  MS. QING LU:  Yes, pretty much.
```

Page 9

1            MR. LAWSON:  Okay.

2            MS. QING LU:  Uh-huh.

3            MR. LAWSON:  And Chris Bailey is the Deputy

4    Chief Building Official?  Who your immediate

5    supervisor, Sydney Lester, reports to, right?

6            MS. QING LU:  Yes.  I believe so.  Uh-huh.

7            MR. LAWSON:  All right.  So, in June --

8    specifically, on June --

9            MS. QING LU:  27th, '16.

10           MR. LAWSON:  -- 27th --

11           MS. QING LU:  No. 27th, '16.

12           MR. LAWSON:  June 27, 2016.

13           MS. QING LU:  Yes, uh-huh.

14           MR. LAWSON:  You filed a complaint with the

15    Office Inspector General.

16           MS. QING LU:  Yes.

17           MR. LAWSON:  Okay.  And then you filed a FOIA

18    request --

19           MS. QING LU:  Yes.

20           MR. LAWSON:  -- February 1, 2017, correct?

21           MS. QING LU:  Correct, yes.

22           MR. LAWSON:  All right.  So, Don't -- I'm

                                              Page 10

1    sure you recognize these documents.

2              MS. QING LU:  Yes, I do.  Uh-huh.

3              MR. LAWSON:  So, this is the OIG for your

4    response -- for your request response?

5              MS. QING LU:  Yes.

6              MR. LAWSON:  Correct?

7              MS. QING LU:  Yes.

8              MR. LAWSON:  This is the OIG, what you got

9    from the OIG --

10             MS. QING LU:  On February 1st --

11             MR. LAWSON:  On February 1st.

12             MS. QING LU:  2017.

13             MR. LAWSON:  That the OIG sent to Director

14   Bolen.

15             MS. QING LU:  No.  OIG sent the letter to

16   Director Bolen on October 2016.

17             MR. LAWSON:  I understand.

18             MS. QING LU:  Yes.

19             MR. LAWSON:  But this the letter.  This is

20   what I'm saying.  I'm not saying when.  I'm just

21   saying this is the letter.

22             MS. QING LU:  Yes.

1          MR. LAWSON:  It is dated October 28th.

2          MS. QING LU:  Yes.

3          MR. LAWSON:  So, they sent that to Director

4   Bolen, right?

5          MS. QING LU:  Uh-huh.

6          MR. LAWSON:  This is a -- I guess a case

7   tracking?

8          MS. QING LU:  Yes.  It is just activities.

9          MR. LAWSON:  For the case -- for the

10  complaint.  It is for the case.  This is a tracking

11  form for the complaint.  One that they received from

12  you.

13         MS. QING LU:  Uh-huh.

14         MR. LAWSON:  It says the date they received

15  it, the date it was assigned, --

16         MS. QING LU:  Yes.  And some activities.

17         MR. LAWSON:  Right.

18         MS. QING LU:  Yes, sir.

19         MR. LAWSON:  That is part of the FOIA stuff,

20  that OIG gave you, right?

21         MS. QING LU:  Yes.

22         MR. LAWSON:  Okay.  So, then on Thursday --

Page 12

```
 1   well, not necessarily Thursday, October 27, 2016.  But

 2   you sent an email to Mia Brown.

 3             MS. QING LU:  Yes.  Okay.  Yes.

 4             MR. LAWSON:  You recall that?

 5             MS. QING LU:  Sure.  Uh-huh.

 6             MR. LAWSON:  You actually sent it to -- you

 7   sent it to Ms. B████, then Mia.  You recall that?

 8             MS. QING LU:  Mia -- I don't remember the

 9   name.  Yes.  This is from (inaudible).  Yes.

10             MR. LAWSON:  Right.  But I'm talking about

11   this part right here.  I'm talking about down there.

12             MS. QING LU:  Oh okay.  Yes.  Mia Brown.

13   Yes, uh-huh.

14             MR. LAWSON:  Okay.

15             MS. QING LU:  Yes.

16             MR. LAWSON:  And I understand this part --

17   top part right here is BEGA's Ileana Corrales.  At

18   BEGA.

19             MS. QING LU:  Okay.

20             MR. LAWSON:  Okay.  So, this was the gist of

21   your complaint.

22             MS. QING LU:  Sir, it is not a complaint.
```

Page 13

```
 1    There is no baby.

 2              MR. LAWSON:  Okay.  You are not going to

 3    questions, okay?

 4              MS. QING LU:  Okay, sir.

 5              MR. LAWSON:  I'm doing the questions.

 6              MS. QING LU:  Okay, sir.

 7              MR. LAWSON:  All right?

 8              MS. QING LU:  Okay.

 9              MR. LAWSON:  So, let's get that straight.

10    Let's get that established right now.

11              MS. QING LU:  Yes, sir.

12              MR. LAWSON:  So, you have a complaint.  You -

13    - you -- it is a complaint.  That in all this you

14    reported something to Gary Englebert, about a possible

15    conflict with     *** S.B. ***     conduct.  And I guess

16    with Mr. *** S.B. *** approving it, his wife was a permit

17    runner?

18              MS. QING LU:  Yes.

19              MR. LAWSON:  You complained about that.

20              MS. QING LU:  Uh-huh.

21              MR. LAWSON:  And then you complained that Mr.

22    *** S.B. *** fathered two children.  And you question whether
```

```
 1    or not he fathered a third child, his ███████.

 2                MS. QING LU:  Well, I have reasonable --

 3                MR. LAWSON:  Yes, I know.

 4                MS. QING LU:  -- proof.

 5                MR. LAWSON:  Yes, I know.

 6                MS. QING LU:  Yes, sir.

 7                MR. LAWSON:  All right.  Then you filed a

 8    complaint, where you sent the email of a complaint to

 9    the Board of Ethics and Government Accountability,

10    BEGA.

11                MS. QING LU:  BEGA, yes.

12                MR. LAWSON:  Investigator Ileana Corrales.

13                MS. QING LU:  Uh-huh.

14                MR. LAWSON:  Well, you sent the same

15    complaint that you filed with OIG, to the Board of

16    Ethics and Government Accountability, correct?

17                MS. QING LU:  Yes, sir.

18                MR. LAWSON:  All right.  On Tuesday, November

19    28, 2017 --

20                MS. QING LU:  Okay.

21                MR. LAWSON:  -- you received an email from

22    the Director of D.C. Human Resources.
```

Page 15

```
 1              MS. QING LU:  Okay.  Giberson(sic), something

 2     like that.

 3              MR. LAWSON:  Ventris Gibson.

 4              MS. QING LU:  Yes, okay.  Uh-huh.

 5              MR. LAWSON:  All right.  So, Ms. Gibson -- if

 6     you could look over this email?

 7              MS. QING LU:  From where?  From here?

 8              MR. LAWSON:  Yes.  Well, just -- I mean, yes.

 9     From the date.

10              MS. QING LU:  Okay.  From --

11              MR. LAWSON:  Don't read it, just look it

12     over.  Is that the email that Ms. Gibson sent to you?

13              MS. QING LU:  Yes.  I received it, yes.

14              MR. LAWSON:  Okay.  All right.  Now, what

15     does it say?

16              MS. QING LU:  It says good morning, Ms. Lu.

17     Thank you for your email.  You have requested that BCH

18     look into the allegations you made regarding a co-

19     worker.  Please know -- please note that BCHR, OIG,

20     and BEGA looked into your allegations, and find no

21     merit to your claim.  As explained to you by members

22     of my staff.  This matter is now closed.  Since this
```

                                                    Page 16

```
 1   matter is closed, we are unable to assist you any
 2   further.
 3           MR. LAWSON:  Okay.  So, that is the Director
 4   of Human Resources --
 5           MS. QING LU:  Yes.
 6           MR. LAWSON:   -- of the D.C. government
 7   saying that your claim has no merit.
 8           MS. QING LU:  Yes, sir.
 9           MR. LAWSON:  Okay.  I want you to look at
10   this email over and see if you recall on September 4,
11   2017 -- do you recall speaking with Ronald Holmes, in
12   an elevator?
13           MS. QING LU:  No.
14           MR. LAWSON:  Okay.  Read that email.
15           MS. QING LU:  Here on September 4th around
16   9:30 a.m., I was approached by Luchi Lu.  First floor,
17   elevator lobby.  She was asking if I have heard about
18   we were investigating PFML.  Because his wife was
19   wearing a false pregnancy belt.  I told her I did not
20   know what she was talking about.  Lynn Underwood
21   helped me to report her to you.
22           MR. LAWSON:  Do you recall having that
```

Page 17

```
 1   conversation with Ronald Holmes?

 2             MS. QING LU:  I don't know.  But I trust --

 3   He is honest.  If he -- if he wrote that, I must have

 4   talked to him.

 5             MR. LAWSON:  Okay.

 6             MS. QING LU:  But I don't recall.  Honestly.

 7             MR. LAWSON:  So, do you recall in February

 8   2017, that you met with former Chief Administrator

 9   Officer, Walter Crawford?

10             MS. QING LU:  Oh, yes.  Uh-huh.

11             MR. LAWSON:  And as a result, you sent this

12   email right here?

13             MS. QING LU:  Yes.

14             MR. LAWSON:  Can you read that?

15             MS. QING LU:  Mr. Crawford, thank you for

16   taking your time to notify me the result of this

17   complaint.  It has been a little bit distracting.

18   Even the prolonged investigation.  Now it has come to

19   an end and makes a good relief.  I respect and take it

20   our agency's position.  I stated I was relaying my

21   information and comprehension.  As well as information

22   voluntarily shared with me by several of my co-
```

Page 18

```
 1   workers.  I handled my report and all information
 2   professionally and responsibly.  Below is the
 3   original, initial first report I sent to OIG, on June
 4   27, 2016.  I just want to be totally candid and open
 5   with all your HR professionals, what I actually did.
 6   So, as to clear up any misunderstanding, if any.  From
 7   now on there will be no communication from me on this
 8   matter.  You have my word.  Thank you all for your
 9   time.  And I broke my promise.
10             MR. LAWSON:  Okay.
11             MS. QING LU:  Yes.
12             MR. LAWSON:  Because you specifically say,
13   and you are speaking to Mr. Crawford, who is a
14   superior.  From now on there will be no more
15   communication from me in this matter --
16             MS. QING LU:  Yes, I wrote --
17             MR. LAWSON:  You have my word.  Thank you --
18             MS. QING LU:  Yes, I wrote --
19             MR. LAWSON:  -- for all of your time.
20             MS. QING LU:  I wrote a promise, yes.
21             MR. LAWSON:  Right?
22             MS. QING LU:  Yes.
```

Page 19

```
 1              MR. LAWSON:  Okay.  All right.  So, this was
 2    February 10th, right?
 3              MS. QING LU:  Yes.
 4              MR. LAWSON:  So, this is February 24, 2017.
 5    Where you sent another email to Ms. Brown.
 6              MS. QING LU:  Okay.  Read it?
 7              MR. LAWSON:  Yes, you can read it.
 8              MS. QING LU:  This one or this one?
 9              MR. LAWSON:  This one.
10              MS. QING LU:  Okay.  This is from me to Ms.
11    Mia Brown.  I wrote wow, we are just his co-workers.
12    Not law enforcement.  We can't sense something wrong
13    even from his eyes and facial expressions.  When
14    someone was asking him about the baby.  I figured he
15    may have (inaudible), but I certainly have no proof
16    myself.  See if he would put (inaudible) forever.  And
17    yes, he did.  Thank you letting me know.  You know the
18    girl in the picture is his paternal (inaudible) --
19              MR. LAWSON:  Ms. Lu.  So, this is dated May
20    12, 2017.  Where you exchanged emails with Mia Brown
21    about the same subject.
22              MS. QING LU:  Okay.  From this here, right?
```

Page 20

```
 1                MR. LAWSON:  That is the -- that is the
 2     response.  This is your email to Ms. Brown.  That is
 3     Ms. Brown's response.
 4                MS. QING LU:  Okay.
 5                MR. LAWSON:  Correct?
 6                MS. QING LU:  Yes.
 7                MR. LAWSON:  I just need -- I just need you
 8     to look it over to see --
 9                MS. QING LU:  Yes.  It is correct, sir.
10                MR. LAWSON:  All right.  You don't need to
11     read it.
12                MS. QING LU:  Oh.
13                MR. LAWSON:  All right.  So, this is dated
14     May 15th.  Where you were sending an email to Tameka
15     Collier and Wade Sharomi(sic) at BEGA.  Is that
16     correct?
17                MS. QING LU:  Oh, yes.  This lady has some
18     law background.  So, she knows there are two types of
19     allegations.  You claimed something existing --
20                MR. LAWSON:  Ms. Lu, is this correct that you
21     sent this email to --
22                MS. QING LU:  Yes, sir.
```

```
1              MR. LAWSON:  All right.  And then on May 17,

2     2017, you sent another email to Ileana Corrales,

3     correct?

4              MS. QING LU:  Yes, yes.  All this are true

5     information.

6              MR. LAWSON:  Okay.  All right.  Okay.  All

7     right.  Then Ms. Corrales sent you an email on

8     Tuesday, July 25th.  In which you responded July 25th.

9              MS. QING LU:  Okay, sir --

10             MR. LAWSON:  You recognize that?

11             MS. QING LU:  Yes, sir.

12             MR. LAWSON:  Okay.  Okay.  Then on June --

13    I'm sorry.  July 26, 2017, you sent another email to

14    Ileana Corrales at the Board of Ethics and Government

15    Accountability, regarding two previous emails that you

16    sent to her.  You recognize that?

17             MS. QING LU:  Yes.

18             MR. LAWSON:  All right.  Then on July 27,

19    2017, you sent an email to -- where you directed it to

20    Interim Director of Government Ethics and General

21    Counsel, Brian K. Flowers.  You recognize that?

22             MS. QING LU:  Yes, sir.
```

Page 22

App. 281

1          MR. LAWSON:  Okay.  So, at some point, Mia

2     Brown sent you a link to this document, correct?

3          MS. QING LU:  Yes.

4          MR. LAWSON:  And this is the email that --

5     with the link in there, correct?

6          MS. QING LU:  Yes.

7          MR. LAWSON:  Okay.  So, this is the District

8     of Columbia Personnel Bulletin for Paid Family Leave,

9     correct?

10         MS. QING LU:  Uh-huh.

11         MR. LAWSON:  All right.  Okay.  On August 2,

12    2017, you received an email from Brian Flowers of the

13    Board of Ethics and Government Accountability.  Can

14    you read what Mr. Flowers wrote to you on --

15         MS. QING LU:  Sure. Mr. Flowers to Luchi Lu.

16    Ms. Lu, this will acknowledge receipt of your request

17    that we will review.  All materials and request

18    authorization from     *** S.B. ***     To submit it into

19    the Vital Record Department of Maryland government.

20    To determine whether it matches the state birth

21    record.  As you know, the Board of Ethics and

22    Government of Accountability's jurisdiction over the

                                        Page 23

```
 1    conduct of District of Columbia is set forth in the
 2    Board of Ethics and the Government Accountabilities
 3    establishment and comprehensive acts reform, Act of
 4    2011.  Effective April 27, 2012.  D.C. law 19-124,
 5    D.C. Official Code 10161.01, and is limited to the
 6    statutes that -- and rules contained in the
 7    (inaudible).  See Official Code 1-1161-017.  The final
 8    statutes and rules that comprise the Code of Conduct.
 9    Allegations related to paternity leave and FMLA abuse,
10    are not within our primary jurisdiction.  I do not see
11    anything materiality in your submission from the one
12    that we responded to on July 24th.  We do not have the
13    internal process to appeal an accusation by the
14    Director to decline the -- to decline to investigate a
15    company.  If you have new evidence and supports -- If
16    you have any new evidence that supports a reasonable
17    belief that the violation Code of Conduct has
18    occurred, we will consider your request at that time.
19    Sincerely, Mr. Flowers.
20              MR. LAWSON:  Okay.  August 4, 2017, you
21    reviewed -- you were forwarded an email from William
22    Smith, who forwarded you an email from Gail Tucker
```

Page 24

```
 1   with Department of Health.  And I'm assuming Maryland
 2   Department of Health and Mental Hygiene's Division of
 3   Vital Records.  Do you recall that?
 4            MS. QING LU:  Yes.  Vaguely.  Sort-of.  Yes.
 5   Yes, uh-huh.
 6            MR. LAWSON:  Okay.  So, what that basically
 7   says the Maryland Department of Vital Records does not
 8   release vital records unless the --
 9            MS. QING LU:  Received from the authority, or
10   official source.
11            MR. LAWSON:  Right.
12            MS. QING LU:  Not by individual.
13            MR. LAWSON:  Right.
14            MS. QING LU:  Uh-huh.
15            MR. LAWSON:  Okay.
16            MS. QING LU:  Yes.
17            MR. LAWSON:  All right.  On August 3, 2017,
18   you sent an email to Deputy Chief Building Official,
19   Christopher Bailey.  Right there.  Can you read that?
20            MS. QING LU:  Hi, Chris.  Thank you for
21   taking time from your busy schedule meeting with me.
22   You asked for a date of some communication.  Now I'm
```

Page 25

```
 1   forwarding to you, for your information, as said.  I
 2   was seeking advice.  I do not need you to discuss with
 3   anybody.  If I choose to do it later, I will do it
 4   myself, and take all consequences and responsibilities
 5   myself.  Thank you again.  Any further advice, please
 6   let me know.  Thank you again, Luchi.
 7             MR. LAWSON:  Okay.  On August 7, 2017, you
 8   sent this email to Director Bolen.  You remember that?
 9             MS. QING LU:  Yes, yes.  Which he did not
10   respond.
11             MR. LAWSON:  Okay.  This essentially is your
12   complaint --
13             MS. QING LU:  Well --
14             MR. LAWSON:  -- against   *** S.B. ***   and --
15             MS. QING LU:  Mr. Walter Crawford.
16             MR. LAWSON:  Huh?
17             MS. QING LU:  I don't know.
18             MR. LAWSON:  What do you mean you don't know?
19             MS. QING LU:  This is -- you know, I sent to
20   her and she did not respond.
21             MR. LAWSON:  Right.  So, you did -- you sent
22   another email on August 14, 2017.  Where you said --
```

Page 26

```
 1   where you were saying that you sent her an email the

 2   previous week --

 3              MS. QING LU:  Yes, yes.

 4              MR. LAWSON:  Right?

 5              MS. QING LU:  Yes.  Because she did not

 6   confirm receipt.  So, I followed up with her.

 7              MR. LAWSON:  Okay.

 8              MS. QING LU:  Okay.

 9              MR. LAWSON:  Okay.  On August 14, 2017, you

10   sent an email to Candace Taylor.  You recall that?

11   For the same thing from the Director.

12              MS. QING LU:  Oh, she was the Director's

13   Assistant, right?

14              MR. LAWSON:  Yes.

15              MS. QING LU:  Yes, uh-huh.

16              MR. LAWSON:  You recall that?  Sending that?

17              MS. QING LU:  It is in black and white here.

18   It is true.  True document.  Yes, sir.

19              MR. LAWSON:  All right.  Then on August 15th,

20   the next day, you sent that email to Ms. Taylor?

21              MS. QING LU:  Yes, uh-huh.

22              MR. LAWSON:  You recall that?
```

Page 27

```
 1              MS. QING LU:  I don't recall anything.  But
 2    once I see it, I trust that this is a true document,
 3    sir.  Yes.  I don't recall every --
 4              MR. LAWSON:  Okay.  Well, just look it over
 5    and see if you remember, you know --
 6              MS. QING LU:  I don't remember sending, but I
 7    trust it was sent by me to her because my name is
 8    here.
 9              MR. LAWSON:  Okay.  Well, it was sent from
10    your email account.
11              MS. QING LU:  Okay.
12              MR. LAWSON:  On August 15, 2017, you had a
13    meeting with Mr. Underwood?
14              MS. QING LU:  No, it is not -- well, the
15    situation is, they called me.  Asked me to come
16    upstairs to meet with them.
17              MR. LAWSON:  Uh-huh.
18              MS. QING LU:  Yes.  So, then I went upstairs.
19    And then Mr. Lynn instructed me do not write to
20    Director again.  Do not write to Director's Assistant
21    again.  If you want to pursue, only take it to Human
22    Resources.  Then I strictly followed his instruction.
```

Page 28

1          MR. LAWSON:  You strictly followed his

2   instruction?

3          MS. QING LU:  Yes.  I take -- then after

4   this, I take it only to --

5          MR. LAWSON:  Okay so --

6          MS. QING LU:  -- resource --

7          MR. LAWSON:  All right.  Wait a minute.  So,

8   August 15, 2017.  The email says, Chris and I just had

9   a meeting with Luchi Lu, regarding the issue with

10      *** S.B. ***

11         MS. QING LU:  Uh-huh.

12         MR. LAWSON:  We told her not to have contact

13  with anyone in DCRA except Human Relations --

14         MS. QING LU:  Yes.

15         MR. LAWSON:  -- about his issue.  She

16  acknowledged our receipt and left the meeting with an

17  understanding of our explicit direction.

18         MS. QING LU:  Yes.

19         MR. LAWSON:  Right?

20         MS. QING LU:  Yes.

21         MR. LAWSON:  All right.  So, on August 22,

22  2017 --

```
 1                MS. QING LU:  Human Resources.

 2                MR. LAWSON:  -- you sent the -- you sent an

 3    email to Mr. Underwood and Mr. Bailey, right here.

 4                MS. QING LU:  Uh-huh, uh-huh.

 5                MR. LAWSON:  Right?

 6                MS. QING LU:  Yes.

 7                MR. LAWSON:  And then Mr. Underwood responded

 8    -- how did Mr. Underwood respond to you?

 9                MS. QING LU:  Luchi, please remember that I

10    instructed you to take this issue only to H.R. from

11    now on.  Please do not send these questions, or any

12    like them, to anyone other than H.R.  Thank you, Mr.

13    Lynn Underwood.

14                MR. LAWSON:  Okay.  So, Mr. Underwood has

15    given you a directive.  He is reminding you of his

16    previous directive.  Telling you that you only need to

17    take this issue up with H.R.

18                MS. QING LU:  With H.R., yes.

19                MR. LAWSON:  Right?

20                MS. QING LU:  Uh-huh.

21                MR. LAWSON:  Okay.  So, on August 23, 2017,

22    you did take it up with H.R. and Ms. --
```

Page 30

```
 1                MS. QING LU:  Yes, yes.

 2                MR. LAWSON:  -- Jackson.  Ms. --

 3                MS. QING LU:  Ingrid.

 4                MR. LAWSON:   -- Ingrid Jackson, right?

 5                MS. QING LU:  Uh-huh.

 6                MR. LAWSON:  Okay.  Okay.  On Friday,

 7   September 15, 2017, you sent an email to Lakeitha

 8   Johnson?

 9                MS. QING LU:  Yes.  She is my Union Steward.

10                MR. LAWSON:  Is she -- is she Human

11   Resources?

12                MS. QING LU:  No.  No, she is not.  She is

13   my, you know, whenever have issue --

14                MR. LAWSON:  No.  Hold on.  Don't even -- you

15   can talk to your union people about your issues.

16                MS. QING LU:  Oh.

17                MR. LAWSON:  You understand?

18                MS. QING LU:  No, I don't.  I --

19                MR. LAWSON:  But still -- but still.  Is she

20   part of Human Resources?

21                MS. QING LU:  No, she is not.

22                MR. LAWSON:  Okay.
```

Page 31

```
 1              MS. QING LU:  Okay.

 2              MR. LAWSON:  Or Human Relations?

 3              MS. QING LU:  No, she is not.

 4              MR. LAWSON:  All right.

 5              MS. QING LU:  She is my Union Steward.

 6              MR. LAWSON:  Okay.  All right.  Then on --

 7   okay.  Tuesday, September 19, 2017.  You sent an email

 8   to the Mayor's Executive Office Management --

 9              MS. QING LU:  (Inaudible).  Something like

10   that.

11              MR. LAWSON:  Muriel Bowser.  To -- and you

12   copied John Falicicchio, Beverly Perry, Mark

13   Tornath(ph).

14              MS. QING LU:  Uh-huh.

15              MR. LAWSON:  You recall that --

16              MS. QING LU:  Yes.

17              MR. LAWSON:  -- email?

18              MS. QING LU:  Yes.  When I see it, I

19   recognize it.  This is the true email I sent.

20              MR. LAWSON:  Okay.  Is that -- is any of

21   these people part of DCRA Human Resources?

22              MS. QING LU:  Oh, okay.  No, sir.
```

```
1              MR. LAWSON:  Okay.  All right.  Then on

2     September 22, 2017, you followed up with an email --

3              MS. QING LU:  Yes, uh-huh.

4              MR. LAWSON:  -- to the Executive Office of

5     the Mayor.

6              MS. QING LU:  Yes.

7              MR. LAWSON:  Asking them for the status of

8     their -- your email --

9              MS. QING LU:  Yes, sir.

10              MR. LAWSON:  -- complaint.  Correct?

11              MS. QING LU:  Yes, sir.

12              MR. LAWSON:  All right.  Then, let me see.

13     May 10, 2017, you sent -- you sent -- I'm assuming you

14     filed another complaint with the Office of the

15     Inspector General.  Because they responded to you in

16     this email, right here.

17              MS. QING LU:  Okay, uh-huh.

18              MR. LAWSON:  Do you recall that?

19              MS. QING LU:  Yes, I remember the one.  I

20     tried to file the case, the second time to OIG.  I

21     asked them for the old case, with new proof.  Can I

22     refile?  I received their response within one hour.
```

Page 33

```
 1    They said please go ahead.  To add any additional or
 2    new information here.  Yes, you can refile.
 3              MR. LAWSON:  Okay.  But that was -- this was
 4    after your FOIA request.  Because this is in May.
 5    Your FOIA request was in February.
 6              MS. QING LU:  Correct.
 7              MR. LAWSON:  2017, correct?
 8              MS. QING LU:  Yes.  The FOIA goes first.  And
 9    this was after it.
10              MR. LAWSON:  All right.  Okay.  On Monday,
11    September 25, 2017, you sent another email to a Jim
12    Slattery, in the Executive Office of the Mayor.
13              MS. QING LU:  Yes.  This person is the
14    Communication Officer or something like that.  I did
15    not send it to him.  I remember this case was somehow
16    passed to him, and then he responded.
17              MR. LAWSON:  Okay.  Well, you sent the email
18    that he got.  So, --
19              MS. QING LU:  Oh, okay.
20              MR. LAWSON:  -- if you sent an email to the
21    Executive Office of the Mayor.  And whoever that is
22    assigned it, gets it.
```

Page 34

1              MS. QING LU:  Right, right.

2              MR. LAWSON:  That is who gets it.

3              MS. QING LU:  Yes.  Right, right.

4              MR. LAWSON:  You understand?

5              MS. QING LU:  Okay, yes.  It was assigned by

6    the Mayor's office to him, right?

7              MR. LAWSON:  Right.

8              MS. QING LU:  Okay.

9              MR. LAWSON:  So, Mr. Slattery then responded

10   to you, that you should probably check with D.C.

11   Deputy Mayor for Planning and Economic Development.

12             MS. QING LU:  Yes, right.

13             MR. LAWSON:  You recall that?

14             MS. QING LU:  Yes.  I was confused.  Yes.

15             MR. LAWSON:  Okay.  On Wednesday, September

16   27, 2017, you sent an email to Corona Shashashi(ph).

17   I'm assuming I'm pronouncing it wrong.  But this is

18   your email, right?  Correct?

19             MS. QING LU:  Yes.

20             MR. LAWSON:  Where you said how do you know

21   he is not a liar.

22             MS. QING LU:  Yes.

Page 35

```
 1               MR. LAWSON:  Okay.  Is she part of DCRA Human
 2     Resources?
 3               MS. QING LU:  Oh.  No, sir.
 4               MR. LAWSON:  All right.  Okay.  Then you sent
 5     on November 29, 2017, you sent an email to Ledesma
 6     Smith-Mathis, right here.
 7               MS. QING LU:  DCHR, right?
 8               MR. LAWSON:  DCHR.
 9               MS. QING LU:  Yes.
10               MR. LAWSON:  Right.
11               MS. QING LU:  Uh-huh.  Thank you for your
12     clarification.
13               MR. LAWSON:  Is DCHR part of DCRA Human
14     Resources?
15               MS. QING LU:  Oh.  No, sir.  I'm sorry.
16               MR. LAWSON:  On February 20, 2018, you sent
17     an email to Ellen Brennan, Ledesma Smith-Mathis,
18     Lissette Ortiz, Gia Stancell, and Justin Zimmerman.
19     All at DCHR.  You recall that?
20               MS. QING LU:  Yes, sir.
21               MR. LAWSON:  All right.  Now, on February 20,
22     2018, you contacted, I guess some kind of employment
```

Page 36

```
 1   law firm?  Or you attempted to contact some kind of
 2   employment law firm?  Do you recall that?
 3            MS. QING LU:  I don't remember.
 4            MR. LAWSON:  Okay.  Essentially, -- okay.
 5   This is what you told them.
 6            MS. QING LU:  Oh, okay.  Yes.
 7            MR. LAWSON:  I'm assuming it is a form that
 8   you fill out on their website.
 9            MS. QING LU:  Uh-huh, uh-huh.  Yes, I believe
10   so.  Yes, Uh-huh.
11            MR. LAWSON:  Okay.  Is this law form part of
12   DCHR?  I'm sorry, DCRA H.R.?
13            MS. QING LU:  No, sir.
14            MR. LAWSON:  All right.  Then you use your
15   government address to contact these people?
16            MS. QING LU:  Uh-huh.  Actually, I wanted to
17   have some advice from them.  You know, how to get rid
18   of the pressure.  That is a part of the reason they
19   advised me.  I just feel so pressured, at the moment.
20            MR. LAWSON:  Okay.  All right.  Then on --
21   I'm assuming in February 2017.  You sent an email to -
22   - I'm sorry.  February 2018.  Last year.  You sent an
```

Page 37

 1   email to Lakeitha Johnson, requesting a meeting?

 2           MS. QING LU:  Yes.  It must be.  Uh-huh.

 3   Okay.

 4           MR. LAWSON:  Okay.  So again, is Lakeitha

 5   Johnson part of DCRA Human Resources or Human

 6   Relations?

 7           MS. QING LU:  Sir, I know she --

 8           MR. LAWSON:  Is she part of Human Resources

 9   or Human Relations?

10           MS. QING LU:  No, sir.  She is not.  I

11   thought we could always talk to you about any issues

12   related to the workplace.  I don't know --

13           MR. LAWSON:  Your issues.

14           MS. QING LU:   Oh, I didn't know that.  I

15   apologize.

16           MR. LAWSON:  Okay?  All right.  On February

17   23, 2018, you sent an email to the Inspector General -

18   - the office of the Inspector General hotline,

19   requesting confidential consultation with the OIG.

20   With the Inspector General.  You remember that?

21           MS. QING LU:  I don't remember that.  But

22   this is the true email I sent to them.  Let me see.

```
 1   Oh, yes.  I especially remember this sheet, this
 2   thing.  You know I overheard from my coworkers, that
 3   he claimed he saw an Amazon sheet or a Google sheet.
 4   And then he brought that sheet to Walter Crawford, and
 5   someone else.  This is accusations that my wife's
 6   pregnancy is fake.  To me, that was like a confession.
 7   If it was not fake, why would you relay back to this?
 8            MR. LAWSON:  Okay.  You sent this email to
 9   OIG, correct?
10            MS. QING LU:  Yes, uh-huh.
11            MR. LAWSON:  Is OIG part of DCRA Human
12   Resources?  Yes or no.
13            MS. QING LU:  No, sir.  I apologize.
14            MR. LAWSON:  This is an email you sent to --
15   oh, I'm sorry.  I meant to acknowledge that Mr.
16   William Harris is in attendance.  And you invoked your
17   (inaudible) rights.  And Mr. William Harris is
18   representing you from AFGE American Federation of
19   Government Employees, Local 2725.  So, Mr. Harris --
20   you sent the email to Mr. Harris.  And you copied
21   Lakeitha Johnson on it, in February 2018.  Last year.
22   You recall that?
```

Page 39

```
 1              MR. LAWSON:  Yes, yes.  Sorry, I don't know
 2      the procedure, sir.  I never had issue.  I can always
 3      consult my Union Steward.  I just didn't know there
 4      are some specifications.
 5              MR. LAWSON:  Well, -- okay, let me -- okay.
 6      All right.  Okay.  So, this is September 20 --
 7      September 19, 2019.  Where you did email exchanges
 8      between you and Ms. Johnson, Lakeitha Johnson.
 9              MS. QING LU:  Oh, okay.
10              MR. LAWSON:  Correct?  All right.  So, you
11      ask, and you sent her the entire packet of your
12      complaint that you sent to Ingrid Jackson, entitled
13      report to the director, that has email chain.  Also
14      has Mr. Underwood's email to you, the reminder to you
15      that you are only supposed to take this issue up with
16      Human Resources from then on.  And then your email
17      describing your complaint about    *** S.B. ***     And
18      questioning whether or not he had a baby.  And you
19      asked Ms. Johnson any thoughts, wisdom, advice that
20      she could share.  Correct?
21              MS. QING LU:  Yes, uh-huh.
22              MR. LAWSON:  What did she say?
```

Page 40

```
 1              MS. QING LU:  No.

 2              MR. LAWSON:  Right.

 3              MS. QING LU:  Uh-huh.

 4              MR. LAWSON:  So, Lakeitha Johnson is the

 5   Chief Steward for AFGE Local 2725.

 6              MS. QING LU:  Oh, okay.

 7              MR. LAWSON:  So, almost -- almost nine months

 8   before you sent this email to Mr. Smith.  Ms. Johnson

 9   is telling you, no.  She can't.  She is not willing to

10   provide you with any advice, right?  This email that

11   you sent to Mr. Harris, that you said that you was

12   confused about whether or not you can question

13   somebody else's issues with your union.

14              MS. QING LU:  I don't know, probably.

15              MR. LAWSON:  You just said that.  You just

16   said you were confused about whether or not you could

17   go to your union about a problem you want to complain

18   about somebody else, right?

19              MS. QING LU:  Yes, uh-huh.

20              MR. LAWSON:  But nine months earlier Ms.

21   Johnson told you that she -- that there was no advice

22   that they could give you, correct?
```

Page 41

```
 1              MS. QING LU:  Yes, right.  Uh-huh.

 2              MR. LAWSON:  All right.  So, February 23,

 3    2018, the Office of Inspector General responded to

 4    your new attempt to file a complaint and referred you

 5    to the Office of Human Rights for harassment

 6    complaints.  Because you -- you were complaining that

 7    you thought there was harassment.  That Mr. *** S.B. ***

 8    complained about you.

 9              MS. QING LU:  This I don't remember.

10              MR. LAWSON:  Okay.  Your initial complaint to

11    OIG was that you -- you thought    *** S.B. ***    was

12    harassing you because he filed a complaint about the -

13    -

14              MS. QING LU:  No, what?

15              MR. LAWSON:   -- the fake stomach.  Okay.

16              MS. QING LU:  Where does it say that?  I just

17    --

18              MR. LAWSON:  All right.  Have you ever seen

19    this before?

20              MS. QING LU:  Oh, yes.  I remember this that

21    I --

22              MR. LAWSON:  Did you print that out?
```

                                              Page 42

1              MS. QING LU:  I would remember.  It is

2     possible.  You know why?  This -- I remember that is

3     earlier in the year.  Usually, Chinese New Year is the

4     last week --

5              MR. LAWSON:  Okay.  This was printed out --

6              MS. QING LU:  January.

7              MR. LAWSON:  -- January 26, 2017.

8              MS. QING LU:  It is possible.  It is

9     possible.  You know --

10              MR. LAWSON:  You printed that out?

11              MS. QING LU:  You know what?  At that time,

12     we do some goofy stuff.  You know have some girls'

13     party.

14              MR. LAWSON:  Okay.  Do you recall printing

15     that out?

16              MS. QING LU:  Not exactly.

17              MR. LAWSON:  Okay.

18              MS. QING LU:  I don't deny it because the

19     time was right.  Usually, around the Chinese New Year

20     time, we did some goofy stuff.

21              MR. LAWSON:  okay.  So, during that -- when

22     that was printed, it was a meeting being held on the

```
1   permit operation center with the Fire Protection staff
2   and the mechanical staff.
3           MS. QING LU:  I don't recall that.
4           MR. LAWSON:  You don't remember?
5           MS. QING LU:  No.
6           MR. LAWSON:  So, if you would have printed
7   that out, do you recall if you printed it out in the
8   permit center?
9           MS. QING LU:  I don't recall.  I just say
10  around Chinese New Year time.  Usually the last week
11  of January, first week of February.  You know we did
12  some goofy stuff here and there.  They go to the
13  parties.  In China, they cannot.  There is no way.
14  They can't purchase this kind of product.  They are
15  sort of interested.  And I did a Google search for
16  them.
17          MR. LAWSON:  For who?
18          MS. QING LU:  Just like friends, you know.
19  Something like that.
20          MR. LAWSON:  So, you are saying you did a
21  Google search for a fake pregnancy belly --
22          MS. QING LU:  Product.
```

Page 44

```
 1                MR. LAWSON:  -- products.

 2                MS. QING LU:  Yes.

 3                MR. LAWSON:  For some friends?

 4                MS. QING LU:  Well, I did it for my own.

 5   Just doing search for fun.  Just something like this.

 6                MR. LAWSON:  For fun?  So, you are saying you

 7   did this Google search for fun?  That is why you did

 8   it.

 9                MS. QING LU:  Something like that.

10                MR. LAWSON:  Fake pregnant belly.  That is

11   why you did it.  For fun?  Is that what you are

12   asserting?

13                MS. QING LU:  Oh, yes.

14                MR. LAWSON:  Okay.  All right.  On September

15   27, 2017, you sent another email to Corona Shashashi,

16   stating a paper is not a baby.  None of these agencies

17   verified the paperwork he submitted with the Maryland

18   government.  How does D.C. government know the

19   paperwork submitted was fake?  Can you advise what

20   fact is conclusion based upon and supported by?

21                MS. QING LU:  Yes.

22                MR. LAWSON:  You recall that?
```

Page 45

1            MS. QING LU:  Yes.

2            MR. LAWSON:  Okay.  Again, is she part of

3    DCRA Human Resources or Human Relations?

4            MS. QING LU:  No, sir.  But I still have this

5    question.

6            MR. LAWSON:  Okay.  On April 5, 2018, you

7    sent an email -- another email to Director Bolen

8    requesting a meeting -- a 30-minute meeting.

9            MS. QING LU:  Yes.

10           MR. LAWSON:  You recall that?

11           MS. QING LU:  Yes.  The meeting was granted.

12           MR. LAWSON:  You met with her?

13           MS. QING LU:  Yes.  I met her on April 20th,

14    Friday.

15           MR. LAWSON:  Uh-huh.

16           MS. QING LU:  With Mr. Walter Crawford.

17           MR. LAWSON:  You met --

18           MS. QING LU:  And also, a lady.  Very short,

19    very thin, Asian look.  She joined us halfway.

20           MR. LAWSON:  Okay.  So, what happened as a

21    result of that meeting?

22           MS. QING LU:  During the meeting, I presented

Page 46

```
1     some proof to Director Bolen.  I got some email
2     directly from a female customer.  They said his wife's
3     body was very oddly shaped.  That was very expressive.
4     We figured probably that was because the way she was
5     trained for DCRA for business --
6              MR. LAWSON:  I want to know what happened in
7     the meeting.
8              MS. QING LU:  Okay.
9              MR. LAWSON:  Okay.
10             MS. QING LU:  Director Bolen told me, Luchi,
11    even if you were right, it is not going to be
12    validated.
13             MR. LAWSON:  And that is what Director Bolen
14    told you?
15             MS. QING LU:  Yes.
16             MR. LAWSON:  Okay.
17             MS. QING LU:  I was shocked.  I said she is a
18    Director of us, she is a lawyer, she knows nobody is
19    above the law.  She told me even if you were right, it
20    is not going to be validated.
21             MR. LAWSON:  All right.  April 12, 2018, you
22    sent an email to a Tanya Hill.  Tanya Hill works for
```

Page 47

```
 1   permit experts.  Which I guess is a permit expediting

 2   firm?

 3              MS. QING LU:  Yes.

 4              MR. LAWSON:  You recall that?

 5              MS. QING LU:  Uh-huh, uh-huh.

 6              MR. LAWSON:  Is Tanya Hill part of DCRA Human

 7   Resources?

 8              MS. QING LU:  No, sir.

 9              MR. LAWSON:  Okay, thank you.  Okay.  On

10   April 27, 2017, you sent an email to Andrea Saunder,

11   where you just made a statement.  Which in a previous

12   email you sent to Keith Slade, regarding your meeting

13   that you had with the Director and the result of that

14   meeting.  But your meeting to -- your email to Andrea

15   Saunder says what?

16              MS. QING LU:  Update.  Mr. and Mrs. Pillow.

17              MR. LAWSON:  Uh-huh.

18              MS. QING LU:  Yes, that is disrespectful.  I

19   apologize.

20              MR. LAWSON:  Okay.  Disrespectful to who?

21   Who did you mean that to?

22              MS. QING LU:  Well, to be honest, if I do not
```

Page 48

1 candy-coat my answer, I certainly meant Mr. *** S.B. *** and

2 his wife.

3          MR. LAWSON:  Okay.  Then in March 2018, you

4 sent a confidential meeting request to Rohan Reid.

5 You recall that?

6          MS. QING LU:  Yes, uh-huh.  Yes.

7          MR. LAWSON:  So, why did you send this to

8 Rohan Reid?

9          MS. QING LU:  I just want to get a new

10 approach probably.  He can help eventually with this.

11 And I know at some point,    *** S.B. ***   has used the

12 word harassment, harassment.  I never meant to harass

13 her or harass him.  I just want to know of the truth.

14 Based on our honest observation, we have good reason

15 to believe this is a pillow, a fraud.

16          MR. LAWSON:  Okay.  All right.  Why did you

17 have -- why did you send this Rohan Reid?

18          MS. QING LU:  I don't know why.  I just

19 wanted to talk to --

20          MR. LAWSON:  Why did you request a

21 confidential meeting with Rohan Reid?

22          MS. QING LU:  I just want to get more advice,

```
 1   you know?

 2             MR. LAWSON:  But why Rohan Reid?

 3             MS. QING LU:  I just want to know that --

 4             MR. LAWSON:  Okay.  Is Rohan Reid part of

 5   DCRA Human Resources?

 6             MS. QING LU:  No, sir.  I just --

 7             MR. LAWSON:  That is all right.

 8             MS. QING LU:  I just want to confirm --

 9             MR. LAWSON:  All right.

10             MS. QING LU:  -- there is no bad record in my

11   performance note.  Because --

12             MR. LAWSON:  On --

13             MS. QING LU:  -- he used the word harassment

14   first.

15             MR. LAWSON:  Okay.  Do you recall  March 7,

16   2017, you conducted a background report for *** S.B. ***

17   *** S.B. ***  Or you attempted to request it?

18             MS. QING LU:  From where?

19             MR. LAWSON:  From this website.

20             MS. QING LU:  I have no idea.  Using my DCRA

21   email?

22             MR. LAWSON:  Yes.
```

 1              MS. QING LU:  I don't remember.

 2              MR. LAWSON:  Okay.  All right.  So, on

 3   Wednesday, April 25, 2017, you sent an email to Fenit

 4   Nirappil, of the Washing Post.

 5              MS. QING LU:  Yes.

 6              MR. LAWSON:  Do you remember that?

 7              MS. QING LU:  I remember that.  Several of

 8   us, you know, we got information.  We tried different

 9   sources.  Actually, the media are sort of reluctant to

10   cover this.  You know, --

11              MR. LAWSON:  Did you send this, yes or no?

12              MS. QING LU:  Yes, I did, sir.

13              MR. LAWSON:  Was that part of DCRA Human

14   Resources?

15              MS. QING LU:  I'm not sure.  I --

16              MR. LAWSON:  Is the Washington Post part of

17   DCRA Resources, Human Resources?

18              MS. QING LU:  No, sir.  I am allowed to get

19   more --

20              MR. LAWSON:  Ms. -- Ms. Lu.  All right.

21              MS. QING LU:  No, sir.

22              MR. LAWSON:  On Monday, April 9, 2018, you

                                        Page 51

```
 1    sent an email to -- I'm sorry.  April 9, 2017, you

 2    sent an email to CNN.

 3              MS. QING LU:  That must be right, yes.

 4              MR. LAWSON:  Okay.

 5              MS. QING LU:  Several of us in a way are

 6    taking --

 7              MR. LAWSON:  Is CNN part of DCRA Human

 8    Resources?  Or Human Relations?

 9              MS. QING LU:  No, it is not.  It -- it --

10              MR. LAWSON:  Okay.  All right.  On May 11th,

11    you followed up with an email to Fenit Nirappil of the

12    Washington Post.

13              MS. QING LU:  Yes.

14              MR. LAWSON:  Right?

15              MS. QING LU:  I know my writing is very

16    professional.  I used a professional envelope.

17              MR. LAWSON:  Okay.

18              MS. QING LU:  I really do want to --

19              MR. LAWSON:  All right.

20              MS. QING LU:  -- get some exposure to find

21    out the truth, quicker.

22              MR. LAWSON:  Okay.  On Thursday, May 24,
```

Page 52

```
 1    2018, you sent an email to Michelle Bosch of WTOP.

 2              MS. QING LU:  I believe so.

 3              MR. LAWSON:  Is WTOP part DCRA Human

 4    Resources or Human Relations?

 5              MS. QING LU:  Do I need an amendment of

 6    (inaudible) do anything like this of this nature?

 7              MR. LAWSON:  Okay.  Then on May 30, 2018, you

 8    sent another email to Michele Bosch, requesting about

 9    an update.

10              MS. QING LU:  I believe so.  These are all

11    true documents.

12              MR. LAWSON:  Okay.  On June 1, 2018, you sent

13    an email to Rick Yarborough, at NBC Universal.

14              MS. QING LU:  Yes.

15              MR. LAWSON:  You recall that?

16              MS. QING LU:  Yes.

17              MR. LAWSON:  And in part -- in that email,

18    you sent an attachment with your government I.D.,

19    correct?

20              MS. QING LU:  Uh-huh, uh-huh.

21              MR. LAWSON:  On August 15, 2018, you sent the

22    follow-up to Rick Yarborough, with NBC Universal.
```

Page 53

1              MS. QING LU:  I believe so.

2              MR. LAWSON:  All right

3              MS. QING LU:  Yes.  At first, he was

4    interested.  And then I told him (crosstalk).

5              MR. LAWSON:  Okay.  Rick Yarborough is not

6    part of DCRA Human Resources, is he?

7              MS. QING LU:  No, sir.

8              MR. LAWSON:  All right.  On October 17, 2018,

9    you sent an email to Councilmember Elissa Silverman

10   and Michelle Loggins.  Do you recall that?

11             MS. QING LU:  Yes.

12             MR. LAWSON:  Okay.  On October 23, 2018, you

13   sent emails to Morgan Baskin of the City Paper.

14             MS. QING LU:  Uh-huh.

15             MR. LAWSON:  Where you scheduled a meeting

16   with her.  Or was attempting to schedule a meeting

17   with her.

18             MS. QING LU:  No.  Phone call.

19             MR. LAWSON:  Phone call?

20             MS. QING LU:  Yes.

21             MR. LAWSON:  Okay.  On November 2, 2018, you

22   sent an email to Councilmember Brianne K. Nadeau, with

                                              Page 54

```
 1   your complaint.

 2            MS. QING LU:  Yes.

 3            MR. LAWSON:  You recall that?

 4            MS. QING LU:  Yes, uh-huh.

 5            MR. LAWSON:  And Councilmember -- excuse me.

 6   Councilmember Nadeau's office responded to you on

 7   November 12, 2017.  Basically, saying they were going

 8   to submit the request to OIG, on your behalf.

 9            MS. QING LU:  Uh-huh, uh-huh.

10            MR. LAWSON:  Okay.  On February 8, 2019 --

11   I'm sorry, wait a minute.  On April 5, 2018, -- let me

12   show you the request.  Okay.  On October 17, 2017, you

13   sent an email to Michele Blackwell, Councilmember

14   Michele Blackwell, and you copied Councilmember Elissa

15   Silverman.  Do you recall that?  With your complaint.

16            MS. QING LU:  Yes.  This is true documents,

17   sir.

18            MR. LAWSON:  Okay.  Okay.  On -- did you ever

19   meet with Morgan Baskin in person?

20            MS. QING LU:  No.  We called each other.  I

21   talked to her over the phone.

22            MR. LAWSON:  You talked to her on the phone?
```

Page 55

1          MS. QING LU:  Yes, uh-huh.

2          MR. LAWSON:  Where did you talk to her over

3  the phone?  At your desk?

4          MS. QING LU:  No.  Downstairs.  At the --

5          MR. LAWSON:  At the permit center?

6          MS. QING LU:  No.  On the first floor, sir.

7          MR. LAWSON:  Oh.  On your cell phone or

8  something?

9          MS. QING LU:  Yes, sir.

10          MR. LAWSON:  How long did you talk to her?

11          MS. QING LU:  Maximum seven, ten minutes.

12          MR. LAWSON:  Okay.

13          MS. QING LU:  Yes.

14          MR. LAWSON:  On October 30, 2017, you sent

15  another email to Council Nadeau, and you copied

16  Michelle Loggins again, with your OIG FOIA responses

17  in 2016, OIG responses of 2017, and your complaint.

18  Do you recall that?

19          MS. QING LU:  This is true documents, sir.

20          MR. LAWSON:  All right.  Okay.  As part of

21  your August 2017 complaint to BEGA, what you sent to

22  Mr. Flowers.  And Mr. Flowers acknowledged receiving

Page 56

```
 1   your -- your request.  And in an email response to

 2   you, he states I do not see anything materially

 3   different in your submission from the one that we

 4   responded to on July 24th, attached.  We do not have

 5   internal process appealing decisions by Director, to

 6   decline to investigate the complaint.  If you have new

 7   evidence that supports reasonable belief that a

 8   violation of code of conduct has occurred, we will

 9   consider your request.  You read that earlier,

10   correct?

11           MS. QING LU:  Yes, I believe so.

12           MR. LAWSON:  Okay.  And November 29, 2018, --

13   I'm sorry.  November 28, 2018, you requested a meeting

14   with Director Gibson.

15           MS. QING LU:  Human Resources?

16           MR. LAWSON:  Yes.

17           MS. QING LU:  D.C.H.R.?

18           MR. LAWSON:  Yes.

19           MS. QING LU:  No, I did not request a

20   meeting.  Their policy advisor wants to meet with me -

21   -

22           MR. LAWSON:  No, no, no, no.
```

Page 57

Pl. Opp.
App. 316

```
1              MS. QING LU:  -- at a later time --

2              MR. LAWSON:  You requested the meeting with

3    Ms. Gibson.

4              MS. QING LU:  I don't remember that.

5              MR. LAWSON:  They referred you to the Policy

6    Advisor, Mr. Zimmerman.

7              MS. QING LU:  Oh, okay.  Yes.

8              MR. LAWSON:  Because here is your email

9    directly to Ms. Gibson --

10             MS. QING LU:  That was canceled, yes.

11             MR. LAWSON:  -- requesting a meeting.

12             MS. QING LU:  You want me to read it?

13             MR. LAWSON:  No, I don't want you to read it.

14             MS. QING LU:  Oh.

15             MR. LAWSON:  I just want you to acknowledge

16   that.  And instead of Ms. Gibson, you were referred to

17   Mr. Zimmerman, correct?

18             MS. QING LU:  Yes.  He wanted to meet with

19   me.  Then it was canceled.

20             MR. LAWSON:  Okay.  Then you sent the request

21   to meet with Mayor Bowser on November --

22             MS. QING LU:  (Crosstalk).
```

Page 58

1          MR. LAWSON:  Huh?

2          MS. QING LU:  Yes.  The Mayor's office.

3          MR. LAWSON:  Yes.  This was in September

4   2017.  Okay.

5          MS. QING LU:  Sir, is there a baby or not?

6          MR. LAWSON:  All right.  Ms. Lu, so do you

7   recall this note?

8          MS. QING LU:  Yes.  This is my handwriting,

9   yes.

10          MR. LAWSON:  Okay.  You left this in Candace

11   Taylor's chair?

12          MS. QING LU:  No.  To the receptionist.  I

13   don't know where she sat.

14          MR. LAWSON:  All right.  Did it contain this,

15   I'm assuming fake birth certificate?

16          MS. QING LU:  Yes.  I just tried to use this

17   as an illustration that a fake birth certificate can

18   be obtained very easy.

19          MR. LAWSON:  Okay.

20          MS. QING LU:  That was my point.  That is why

21   I make a note.

22          MR. LAWSON:  Okay.  And I'm going to ask you

Page 59

```
 1   again.  Because you said you printed this out for

 2   friends.  This fake -- fake belly.

 3            MS. QING LU:  For fun.  Just for later

 4   (inaudible) you know.

 5            MR. LAWSON:  And you don't remember if you

 6   left it in the desk on the permit center?

 7            MS. QING LU:  Yes.  It was there in the

 8   permit center.  Before there was a meeting there.

 9            MR. LAWSON:  Right.

10            MS. QING LU:  Just a meeting, yes.

11            MR. LAWSON:  So, you left it in the desk

12   drawer?

13            MS. QING LU:  I don't remember where I left

14   it.  It must be at my station 15.

15            MR. LAWSON:  Right.  Did you -- did you sit

16   that -- after the meeting did you -- did you -- were

17   you scheduled to sit at that desk?

18            MS. QING LU:  After meeting?  I don't

19   remember.

20            MR. LAWSON:  You don't?  Or was    *** S.B. ***

21   scheduled to meet that desk, to sit that desk?

22            MS. QING LU:  It must be him.  That is why he
```

Page 60

```
 1   complained, yes.  Probably I was there earlier, or
 2   this was done on the day before.  I don't recall.
 3   This must be why he (inaudible).
 4            MR. LAWSON:  Okay.  All right.  So,
 5   throughout your entire complaint, you repeatedly
 6   asserted that     *** S.B. ***     wife faked her pregnancy,
 7   correct?
 8            MS. QING LU:  Yes.  Based on --
 9            MR. LAWSON:  And that you --
10            MS. QING LU:  -- reasonable proof.
11            MR. LAWSON:  Okay.  What reasonable proof you
12   have?
13            MS. QING LU:  Oh, okay.
14            MR. LAWSON:  Let me ask you this.  First of
15   all, are you an investigator?
16            MS. QING LU:  No, sir.
17            MR. LAWSON:  Because we already went over
18   your position description.  So, does your position
19   description have any investigative -- investigation
20   tasks, duties, or anything like that?
21            MS. QING LU:  No, sir.  I was paid as a Fire
22   Protection Engineer as (inaudible), yes.
```

Page 61

1              MR. LAWSON:  Okay.

2              MS. QING LU:  I'm sorry.

3              MR. LAWSON:  So, what reasonable proof do you

4    have?  Let me ask you this before you say anything.

5              MS. QING LU:  Okay.  Okay.

6              MR. LAWSON:  Have you ever seen *** S.B. ***

7    *** S.B. *** wife wearing any fake pregnancy pillow,

8    anything like that, in the nude?

9              MS. QING LU:  Of course.  She --

10             MR. LAWSON:  Have you ever seen her in the

11   nude?

12             MS. QING LU:  No, sir.

13             MR. LAWSON:  Wearing that?

14             MS. QING LU:  No, sir.

15             MR. LAWSON:  Okay.  So, any time you have

16   seen her, she is wearing clothes?

17             MS. QING LU:  Yes.

18             MR. LAWSON:  All right.  So, how can you

19   prove that she is wearing fake pregnancy belt?

20             MS. QING LU:  Okay.  Now I can talk.  So, can

21   I?

22             MR. LAWSON:  Yes.

Page 62

```
 1              MS. QING LU:  Okay.  You know by the end of
 2    April 2016,     *** S.B. ***     wife came to DCRA on the
 3    third floor.  There are only Asme and his wife, the
 4    two of them.  She offered to tell Asme, hey you know
 5    what?  I am pregnant.  There was no sign on her body,
 6    on that day.  That day I saw her myself too.  On the
 7    second floor.  She did not look that way.  But a
 8    couple days later, she came back again.  At that
 9    moment everybody clearly recalls a progressively big
10    bump -- big bump on her body.  And at a later time,
11    after the baby was born, she offered to tell us -- not
12    us, just a lot of people.  It was a past-due
13    pregnancy, to induce the labor.  And also, I have
14    customers in email writing.  Clearly states that was
15    oddly shaped.  And probably because why she is
16    training it is not comfortable, she moved to the side.
17    She put it back the right way or something like that.
18    We had --
19              MR. LAWSON:  All of this is in your
20    complaint.  All what you are telling me now, is in
21    your written complaint.
22              MS. QING LU:  I don't remember.  You know the
```

Page 63

```
 1   -- the --
 2            MR. LAWSON:  You -- you wrote this complaint.
 3   You sent this complaint to 30 people, at least.
 4            MS. QING LU:  No, sir.  You know what?
 5            MR. LAWSON:  But all what you are telling me
 6   right now is the same thing that is written in your
 7   complaint.
 8            MS. QING LU:  No.
 9            MR. LAWSON:  Yes.  Yes, it is.
10            MS. QING LU:  I am not -- do you know Alec?
11   The original mechanical engineer was there.  Alec has
12   a real baby at exactly the same time.  If not on the
13   same day, that in very same month.
14            MR. LAWSON:  What is your point?
15            MS. QING LU:  Okay.  I'm going there.  At
16   about September.  After four months, the baby was born
17   the two new fathers had a conversation.  Alec asked
18   *** S.B. *** about it.  Hey *** S.B. *** how is your baby doing
19   last four months?  Do you know what    *** S.B. ***    say?
20   She is doing well.  She is walking around.
21            MR. LAWSON:  What is your point?
22            MS. QING LU:  Whose baby is walking around at
```

Page 64

```
 1    four-month-old, sir?  Do you have children?

 2              MR. LAWSON:  I have -- yes, I do have

 3    children.

 4              MS. QING LU:  Walking around at four months

 5    old?

 6              MR. LAWSON:  All right.  So, how did you find

 7    out about that conversation?

 8              MS. QING LU:  Oh, Alec told me.  Alec --

 9              MR. LAWSON:  So, you -- so, somebody else

10    told you about a conversation they had with somebody

11    else?

12              MS. QING LU:  Yes.

13              MR. LAWSON:  And you are basing a complaint

14    on what somebody else told you.

15              MS. QING LU:  Yes.  Not all the information

16    are firsthand.

17              MR. LAWSON:  Okay.

18              MS. QING LU:  Also, --

19              MR. LAWSON:  What -- I want to know what

20    firsthand knowledge you have regarding --

21              MS. QING LU:  I did not see her --

22              MR. LAWSON:  -- this fake pregnancy.
```

Page 65

1            MS. QING LU:  I did not see her on the -- the

2      very end of April, she is coming.  But he told people

3      she was pregnant.  There is no sign.  Couple days

4      later, there is a huge sign.  Scientifically, it is

5      not possible.  Economically it is not possible.

6            MR. LAWSON:  You don't know that.  You don't

7      know how different -- you don't know how people have

8      their pregnancies.

9            MS. QING LU:  I'm a mother.  I'm a woman.  I

10     have --

11           MR. LAWSON:  You a woman.  Then -- then --

12     then --

13           MS. QING LU:  I have seen others --

14           MR. LAWSON:  Okay.  Then -- then -- then --

15     you being a woman and a mother.  My question to you

16     is, how is it that you are making allegations that

17     somebody is faking their pregnancy if you don't have

18     substantial proof.  And like I said, you didn't see

19     her in the nude, with a pillow wrapped around her.  Or

20     with a fake belly on her stomach.

21           MS. QING LU:  It is collaborative.  It is not

22     like it must be naked, you know.  If on this day you

Veritext Legal Solutions
800-336-4000

```
1    don't have anything, on the other day.  Oh my god, it

2    is like a pillow.  It must be something wrong,

3    logically.

4              MR. LAWSON:  I don't know.  Because

5    basically, you are expecting people to go on your word

6    that this happened.

7              MS. QING LU:  Can I also tell you something

8    else Alec told me?  Alec told me --

9              MR. LAWSON:  No.  Because that is heresy.

10             MS. QING LU:  Oh, okay.  So, you can't hear -

11   -

12             MR. LAWSON:  So, I don't care -- I don't care

13   what somebody else told you about somebody else.

14             MS. QING LU:  Okay.  So, you can talk to Alec

15   yourself.

16             MR. LAWSON:  I don't need to talk to Alec.

17   Because Alec is not complaining about    *** S.B. ***

18   wife faking a pregnancy.

19             MS. QING LU:  No.  No, but he --

20             MR. LAWSON:  Luchi Lu is.

21             MS. QING LU:  Yes, uh-huh.

22             MR. LAWSON:  So, again.  Have you ever seen
```

Page 67

```
 1      *** S.B. ***       wife --

 2              MS. QING LU:  Naked.

 3              MR. LAWSON:  -- N█████, in the nude, wearing

 4   a pillow or a fake pregnancy stomach, similar to the

 5   ones that are in this web research?

 6              MS. QING LU:  No, sir.

 7              MR. LAWSON:  Have you ever personally seen

 8   that?

 9              MS. QING LU:  Have what?

10              MR. LAWSON:  Have you ever personally seen --

11              MS. QING LU:  No, sir.

12              MR. LAWSON:  -- N█████ B█████ wearing

13   something like that?

14              MS. QING LU:  Not even once, no.

15              MR. LAWSON:  Okay.  All right.  Have you ever

16   met    *** S.B. ***      stepmother, █████ B█████?

17              MS. QING LU:  No.  We knew that is her

18   stepmother.  The recent lady.

19              MR. LAWSON:  All right.  Have you ever met

20   her?

21              MS. QING LU:  Of course not.

22              MR. LAWSON:  Have you ever met any of *** S.B. ***
```

Page 68

1    *** S.B. *** family?

2              MS. QING LU:  Yes.

3              MR. LAWSON:  Other than his wife?

4              MS. QING LU:  I saw his wife and his two

5    sons.

6              MR. LAWSON:  Okay.

7              MS. QING LU:  Yes.

8              MR. LAWSON:  Have you met them?  That is my

9    question.

10             MS. QING LU:  What do you mean met them?

11   They are --

12             MR. LAWSON:  Have you been introduced to

13   them?  Have they said --

14             MS. QING LU:  No, sir.

15             MR. LAWSON:  -- Luchi Lu, my name is N███,

16   my son's name is Joe, my other son's name is Jeff?

17             MS. QING LU:  Of course not.

18             MR. LAWSON:  Okay.  So, you -- you don't have

19   any kind of relationship with them?  You never had any

20   kind of relationship with them?

21             MS. QING LU:  No.

22             MR. LAWSON:  All right.  Did you go to the

                                              Page 69

```
 1   Mayor and the Director on Tuesday, last week?

 2              MS. QING LU:  Tuesday, last week?

 3              MR. LAWSON:  Wait a minute.

 4              MS. QING LU:  Go where?

 5              MR. LAWSON:  I'm sorry.

 6              MS. QING LU:  No.

 7              MR. LAWSON:  Okay.  This -- you sent me this

 8   email on Friday, February 8, 2017, correct?

 9              MS. QING LU:  Yes, uh-huh.

10              MR. LAWSON:  All right.  In that email you

11   state specifically, there is a circumstance I need to

12   inform openly for your decision.  A case using fake

13   document and wearing a pillow for paternity is

14   currently under review by Director Sherpa and the

15   Mayor's office, EOM.  Mayor Bowser visited DCRA on

16   Tuesday, 2/5.  And I spoke with her about this fraud.

17   Director Sherpa was standing by.  Mayor Bowser asked

18   Director Sherpa to follow-up.  And he is working on it

19   now.

20              MS. QING LU:  Yes.

21              MR. LAWSON:  That is what you said?

22              MS. QING LU:  Yes, uh-huh.
```

Veritext Legal Solutions
800-336-4000

```
 1                    MR. LAWSON:  So, again.  Have you ever seen
 2   N████  B████, in the nude, wearing a pillow --
 3                    MS. QING LU:  No, sir.
 4                    MR. LAWSON:  -- or a fake pregnancy belly.
 5                    MS. QING LU:  No.  That was collaborating.
 6   You know.  Just --
 7                    MR. LAWSON:  Have you ever seen her wearing
 8   it?
 9                    MS. QING LU:  No, not myself.
10                    MR. LAWSON:  Okay.  So, how are you saying
11   that she wore it?
12                    MS. QING LU:  Well --
13                    MR. LAWSON:  Have you ever seen her wear it,
14   Ms. Lu?
15                    MS. QING LU:  No, sir.
16                    MR. LAWSON:  So, you speculating?
17                    MS. QING LU:  Pretty much.  I'm --
18                    MR. LAWSON:  Okay.  So, all of your complaint
19   is speculation.  All of your complaint is based on
20   conjure and speculation.  Because you have no proof.
21                    MS. QING LU:  Well, --
22                    MR. LAWSON:  You have no proof.  If you did
```

Page 71

```
 1   not see it personally, you have no proof.

 2             MS. QING LU:  Well, my allegation is the baby

 3   that is non-existent.  How can I prove --

 4             MR. LAWSON:  There is a baby that exists.

 5             MS. QING LU:  Okay, okay.

 6             MR. LAWSON:  And I'm going to tell you, you

 7   know, because it is none of your business, really.

 8   And that is why nobody had you know, wanted to tell

 9   you.  But it is really none of your business about him

10   or his family.

11             MS. QING LU:  Uh-huh.

12             MR. LAWSON:  It is none of your business.  He

13   does have a baby, and he has ███████████.  That was

14   born ███████████.

15             MS. QING LU:  Okay.  Then why didn't he tell

16   me?

17             MR. LAWSON:  He ain't got to tell you

18   nothing.  The reason why he probably don't want to

19   bring his ███████ down here is because he don't want

20   to expose her to you.  After you have been haunting

21   him --

22             MS. QING LU:  No.  He --
```

Page 72

```
 1                  MR. LAWSON:  -- and stalking him, for the

 2     last two years.

 3                  MS. QING LU:  You know what?  Alec told me,

 4     he heard --

 5                  MR. LAWSON:  I don't want -- I don't care

 6     what Alec says.  I don't care what Alec heard.

 7                  MS. QING LU:  He --

 8                  MR. LAWSON:  It doesn't matter, Ms. Lu.

 9                  MS. QING LU:  Uh-huh.  Oh, okay.

10                  MR. LAWSON:  Is it proof?

11                  MS. QING LU:  Yes.  It is.

12                  MR. LAWSON:  Alec could tell you anything.  I

13     could you anything right now.

14                  MS. QING LU:  Alec is a professional

15     engineer.

16                  MR. LAWSON:  There are so -- what does that

17     have to do with -- what -- with what he is telling

18     you?

19                  MS. QING LU:  He is telling the truth.

20                  MR. LAWSON:  How do you know that Ms. Lu?

21                  MS. QING LU:  I --

22                  MR. LAWSON:  How do you know that *** S.B. ***
```

Veritext Legal Solutions
800-336-4000

1    *** S.B. *** ain't telling you the truth?

2              MS. QING LU:  There are many, many proofs and

3    it don't add up.

4              MR. LAWSON:  Okay.  All right.  I'm telling

5    you right now.  Do not say anything else to anybody

6    else in DCRA, or anywhere, about this complaint.  Do

7    you understand?

8              MS. QING LU:  I understand.

9              MR. LAWSON:  That means the press.  That

10   means anybody.  Do not go any -- anywhere outside DCRA

11   about your complaint, except Human Resources.  Like

12   you were instructed by your superior in August of

13   2017.  Do you understand?

14             MS. QING LU:  I understand.  I won't take it

15   to anybody, you know, I'm hired as a professional

16   (crosstalk) --

17             MR. LAWSON:  But you said that -- you said

18   that -- numerous times in emails, that I read -- that

19   we already went through.

20             MS. QING LU:  Uh-huh, yes.

21             MR. LAWSON:  You told -- you even told your

22   superior, Walter Crawford that --

Page 74

```
 1              MS. QING LU:  Yes.  We stop here.
 2   (Crosstalk).
 3              MR. LAWSON:  Right.  Right.
 4              MS. QING LU:  Yes.
 5              MR. LAWSON:   Right.  Okay?  So, I don't
 6   have any additional questions.
 7              MS. QING LU:  Well, it is my turn.  You know,
 8   as said I was hired, and I am hired as a well-paid
 9   protection engineer.  Well, you show me all of this
10   stuff.  I can now realize it was really a lot of time.
11   I don't know since when I became a DA, it is not my
12   job.  It is presumptuous.  Even at some point, I made
13   a mistake, that is honest mistake.  I just try to do
14   the right thing.  According to H.R. policy that
15   whenever you give them a paper, they don't verify.
16   Paternity leave is very easy to do, comparing to
17   maternity leave.  Especially when the spouse is not
18   working for DCRA.  You know?  You can just say I got a
19   girlfriend who is pregnant.  You got a paper, that
20   don't verify.  You know?  I just try to make this
21   point to help D.C.H.R. to realize currently, there is
22   some problem in there.  But if at any point I crossed
```

Page 75

```
 1    the line, and caused some pressure, or some bad
 2    feelings on Mr. and Mrs. B███, I apologize.  That was
 3    not my intention.  I never meant anything bad.  You
 4    know, you don't want to listen to it.  But I suggest
 5    you talk to Alec.  But that is your call, your
 6    decision, sir.
 7              MR. LAWSON:  No.  I don't need to talk to
 8    Alec.
 9              MS. QING LU:  Okay.  And now you know my
10    email has been tightly monitored.  You know my -- my -
11    - you know I'm going to pursue any further --
12    (crosstalk).
13              MR. LAWSON:  Well, Ms. Lu, I'm going to say
14    this -- I'm going to say this -- I'm going to say this
15    to you.
16              MS. QING LU:  Uh-huh.
17              MR. LAWSON:  Because -- you have no -- you
18    have -- you can't fall back on anything about you
19    didn't know.  Because Mia Brown told you, when you
20    first complained, Mia Brown responded to you.  And
21    told you that Mr.    *** S.B. ***    has met all of the
22    qualifications --
```

```
 1              MS. QING LU:  Yes.

 2              MR. LAWSON:  -- for his paid family leave.

 3   We read that email, correct?

 4              MS. QING LU:  Yes.

 5              MR. LAWSON:  Then -- hold on.  Then the

 6   Office of the Inspector General told you that they

 7   referred the matter to DCRA, correct?

 8              MS. QING LU:  By the way --

 9              MR. LAWSON:  And they told you they

10   considered the matter closed, correct?

11              MS. QING LU:  Yes, sir.

12              MR. LAWSON:  And BEGA also responded to you

13   and told you that they considered the matter closed

14   because there wasn't any foundation to your complaint.

15              MS. QING LU:  But what --

16              MR. LAWSON:  Hold on.  Then the Director of

17   DCRA Government Human Resources, Ventris Gibson, told

18   you that the matter was closed because all of the

19   qualifications have been met, correct?

20              MS. QING LU:  Yes, sir.

21              MR. LAWSON:  But yet you still continued

22   going on and on and on --
```

Page 77

Plf. Opp
App. 336

```
 1              MS. QING LU:  I just --

 2              MR. LAWSON:  Everybody, anybody in the

 3   District of Columbia government including Council,

 4   outside of D.C. government, including Washington Post,

 5   WTOP, City Paper, CNN.

 6              MS. QING LU:  But why didn't he just answer

 7   the question that I asked them?

 8              MR. LAWSON:  Because it is none of your

 9   business, Ms. Lu.

10              MS. QING LU:  I asked them why did the --

11   okay.

12              MR. LAWSON:  It is none of your business.

13              MS. QING LU:  But do you think --

14              MR. LAWSON:  William having -- William's wife

15   having a child, is none of your business.

16              MS. QING LU:  I just want to point it out --

17              MR. LAWSON:  Unless he make -- unless he

18   wants to make it your business.

19              MS. QING LU:  I just want to point it out

20   currently, there is some problem with the D.C.H.R.

21   policy --

22              MR. LAWSON:  No.  there is no problem with
```

Page 78

```
 1   D.C. H.R. policy.
 2           MS. QING LU:  But they do verify.  There is -
 3   -
 4           MR. LAWSON:  It is none of your business.
 5           MS. QING LU:  Oh, okay.  Yes.  I take that.
 6   It is not.
 7           MR. LAWSON:  They don't need to verify with
 8   you.  All they need to verify is that his or whoever's
 9   documents are in order, to get their family leave or
10   whatever.  To approve their leave.
11           MS. QING LU:  But can you --
12           MR. LAWSON:  But they have to get approved
13   before they go on family -- paid family leave.
14           MS. QING LU:  But can you explain why he said
15   his ██████ is walking around at four months old?
16           MR. LAWSON:  What -- I don't care.  It
17   doesn't matter.
18           MS. QING LU:  Okay.  Yes.  Thank you for your
19   time.  I didn't know I had --
20           MR. LAWSON:  Okay.
21           MS. QING LU:  This is so much.
22           MR. LAWSON:  Well, I don't have any different
```

Page 79

```
 1    questions.  Do you have anything else to say?
 2              MS. QING LU:  Thank you for your time.  I
 3    didn't realize you know, that I spent so much time on
 4    this.  Which is really out of my specified
 5    responsibility.
 6              MR. LAWSON:  Right.
 7              MS. QING LU:  But I meant well.  I did not
 8    mean to hurt anybody or be malicious about something.
 9    I just made the judgment based on my limited belief
10    with some reasonable solves.  And combined with an
11    input from my coworkers --
12              MR. LAWSON:  All right.
13              MS. QING LU:  -- and the female customers.
14              MR. LAWSON:  Ms. Lu, the first year might
15    have been reasonable.  The first six months might have
16    reasonable.  This has gone on for two and a half
17    years.
18              MS. QING LU:  That long?  I knew --
19              MR. LAWSON:  2016?
20              MS. QING LU:  Uh-huh.
21              MR. LAWSON:  You first filed a complaint with
22    OIG, we already said in June of 2016.  That is two and
```

Page 80

```
 1   a half years ago.

 2           MS. QING LU:  Yes.  That is something.  It

 3   take that long to get a response --

 4           MR. LAWSON:  No, they responded to you quite

 5   quickly.  Because they checked.  Because they sent the

 6   email.  Well, they sent the memo to Melinda Bolen.

 7   Telling them about the complaint.  And Melinda Bolen

 8   responded and provided the documents that supported.

 9   So, --

10           MS. QING LU:  My bad.  I'm sorry.

11           MR. LAWSON:  Yes.  Your bad.  All right.  We

12   will end this -- we will end this interview at this

13   time.  Thank you very much for coming.  Thank you very

14   much --

15           (Recording ends.)

16

17

18

19

20

21

22
```

Page 81

```
 1                  CERTIFICATE OF TRANSCRIBER

 2           I, ANGELA WILSON, do hereby certify that this

 3    transcript was prepared from the digital audio

 4    recording of the foregoing proceeding, that said

 5    transcript is a true and accurate record of the

 6    proceedings to the best of my knowledge, skills, and

 7    ability; that I am neither counsel for, related to,

 8    nor employed by any of the parties to the action in

 9    which this was taken; and, further, that I am not a

10    relative or employee of any counsel or attorney

11    employed by the parties hereto, nor financially or

12    otherwise interested in the outcome of this action.

13

14

15                                        ANGELA WILSON

16

17

18

19

20

21

22
```

Page 82

**From:** B___ S___ (DCRA)
**Sent:** Thursday, February 02, 2017 2:00 PM
**To:** Bailey, Christopher (DCRA)
**Cc:** Lester, Sydney (DCRA)
**Subject:** Harassment Complaint

Good afternoon Mr. Bailey,

Re: Harassment Complaint.

I have remained fairly quiet over the years since Ms. Luchi Lu began her relentless pursuit of direct and indirect personal attacks against me at work. This all started in late 2007 towards early 2008 when DCRA was located at 941 North Capitol St, NE, and she still continues to do this for some unknown reason; and apparently, I've been the lone focus of her behavior.

In the recent months, she escalated this behavior, by reporting me to the Board of Ethics and Government Accountability office (BEGA) accusing me of misconduct in performing my duties here at work that involves my wife. At that point it became very clear to me that her objective is to first damage my reputation here at work, smear my name throughout the Agency as someone that cannot be trusted (defamation of character), which obviously is designed as an attempt to end my career as a District Government employee. Seeing that this is the case, it is a threat to my livelihood, which helps to put food on the family table, therefore threatening my family.

Again, just a week ago during our morning meeting on 1/26/2017, which was held on the floor of the Permit Center, she found the time to do a google search on 'fake pregnancies'... yes, bizarre! Knowing that I was the Reviewer assigned to the Fire review counter after the meeting ends, she made sure that a printed copy of her google 'findings' was left on top of the stamps in the drawer for me to see it. One may ask, what is her motive? For me it was very clear, it was a direct non-verbal accusation at me (us) that my wife's pregnancy last year was faked in order for me to have been granted paid family leave (PFL).

Among all the other things that she has done in the past, she has even gone as far as to implicate Mr. Lester in fixing the Permit Center roster, so that I can approve plans that my wife submits on Thursdays.

I believe this is clear harassment, and her conduct only serves to generate a hostile work environment; this need to be addressed as soon as possible and should be documented for the record. This conduct does not belong in our work place!

Thanks for your time in this matter.



Fire Protection Engineer/ Permit Operations Division
Department of Consumer and Regulatory Affairs
1100 4th Street, SW, Suite E340
Washington DC 20024.
202.442.4697(O), 202.442.4863 (F)
Email: s___ b___ @dc.gov
Website: www.dcra.dc.gov

PUBLIC SAFETY SURVEY: Let us know about your experiences and opinions regarding public safety in Washington, DC. Take the 10-minute survey Here. #SaferStrongerDC
PUBLIC SAFETY SURVEY: Let us know about your experiences and opinions regarding public safety in Washington, DC. Take the 10-minute survey Here. #SaferStrongerDC

Exhibit #9

# UPDATE COMPLAINT MEMORANDUM FORM

| | | | | | |
|---|---|---|---|---|---|
| **Complaint Number** | 2016-1103 | | **Received_by** | E-Mail | |
| **How Notified** | E-Mail | | **Notified** | 6/27/2016 **Time** | |
| **HotlineDescription** | False claims or statements | | | | |
| **Case Character :** | Fraud | | **TYPE** | Other | |
| **Department** | Consumer & Regulatory Affairs, Department of (CR) | | **STATUS** | Closed | |
| **Office** | NONE | | **Opened** | | 6/27/2016 |
| **Referred** | | | **Closed** | | 12/1/2016 |
| **Responded** | | | **Group** | SQ0 | |
| **Suspense** | | | **Suspense Action** | | |
| **Agent's Name :** | | | **Supervisor Name :** | | |
| **Date Assigned:** | 6/28/2016 | | **Date Reassigned to Agent** | | |
| | | | **Grand Jury** | ☐ | |

| **Complainant** | **Address1** | **Address2** | **City/State** | **Phone Numbe** | **Protect Identity** |
|---|---|---|---|---|---|
| | | | | | ☐ |

| **Title/Subjects** | **Title** | **Department Name** | **Office Name** | **Phone #** |
|---|---|---|---|---|
| | | | | |

**Narrative** The DIG received a complaint from ▮▮▮▮ ▮▮▮▮ with an allegation of employee misconduct committed by ▮▮▮▮ Permit Operations Division, Fire Protection Engineer, DCRA. The complainant alleges that ▮▮▮ was caught by Maryland Charles county Sheriff for speeding and driving with a suspended out-of-state license (DC license).

Additionally, the complainant alleges that ▮▮▮ may be committing time and attendance fraud. The complainant alleges that ▮▮▮ was on approved fatherhood leave between May 19, 2016 and June 3, 2016, by using PFL (Paid Family Leave). The complainant alleges that ▮▮▮ wife stopped by the office at the end of April and she showed no signs of being pregnant. However, in the middle of May ▮▮▮ announced his wife had given birth to a baby▮▮▮

**Comments** On 6/28/16, Analyst saved email to the appropriate folder and forward complaint # to PM to assign.

6/28/2016 This case is assigned to Analyst▮▮▮ of the Hotline
6/29/16, Analyst▮▮▮ sent email to complainant for identity request and complainant responded to be confidential.
6/29/16, complaint analysis form submitted to RAFP prog mgr for review and approval
6/29/16, Resubmitted Complainant Analysis form with DCHR as Refer Letter - Response to RAFP Prog Mgr for review and approval
6/29/2016 CA submitted to DIG RAFP for approval
6/29/2016 Approved CA form returned to analyst
6/29/16, Refer Letter - Response to DCHR submitted to RAFP Prog Mgr for review and approval
6/29/16, Refer Letter -Response returned to Analyst▮▮▮ for revisions
6/29/16, Refer Letter - Response resubmitted to RAFP Prog Mgr for review and approval of edits
7/5/2016 Resubmitted referral letter to RAFP PM
7/5/2016 Referral letter with response sent to DIG RAFP for approval
7/14/2016 Closed by DIG RAFP. Deemed insufficient to open an investigation.

# UPDATE COMPLAINT MEMORANDUM FORM

7/18/16 at 4:10 P.M., Complainant called to get the status/results of the investigation. ▇▇▇ asked for the timeframe in her message.
8/1/2016 Complainant emailed to get status/results of the investigation. Contact information for FOIA provided via email
8/23/2016 Case reopened and transferred to IU
9/7/2016 Status check sent to IU regarding assignment to IU
10/3/2016 Reminder email sent to IU about assignment.

On 10/17/2016, Received a FOIA request from complainant, Analyst forward to ▇▇▇▇▇▇

10/17/16 - DAIGI ▇▇▇ based on an assessment of information provided by the complainant, this matter does not warrant an investigation by IU. It is recommended that this matter be referred to DCRA with no response requested as both allegations are HR issues.
10/19/2016 Refer with response to DCRA as per IU
10/20/16, Refer Letter - Response to DCRA submitted to RAFP PM for review and approval
10/20/2016 Refer letter sent to DIG RAFP
10/24/2016 Letter sent to the front office by DIG RAFP.
11/17/2016, Received additional information from complainant. Complainant sent a FOIA request to the EOM and it was forward to the OIG.
12/1/2016 Referral letter no response mailed to agency and case closed

1/11/17 ▇▇▇ sent an email to the OIG Hotline on Tuesday, January 10, 2017 requesting the following:
HI,

I am sending this email to request a report / update of the subject case, which I reported to OIG in June 2016.

Thank you.



**Plf. Opp.
App. 344**

Confidential Subject to Protective Order      Lu v. DC et al 1-20-cv-00461_00000205

*Exhibit # 11*

**Lawson, Tyrone (DCRA)**

| | |
|---|---|
| **From:** | Lu, Luchi (DCRA) </O=DC GOVERNMENT/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=LLU> |
| **Sent:** | Thursday, October 27, 2016 6:58 PM |
| **To:** | Corrales, Ileana (BEGA) |
| **Cc:** | Foster, Janet (BEGA) |
| **Subject:** | FW: His Supervision |

**From:** Lawson, Tyrone (DCRA)
**Sent:** Thursday, September 29, 2016 2:48 PM
**To:** Lu, Luchi (DCRA)
**Cc:** Brown, Mia (DCRA)
**Subject:** RE: His Supervision

Confirmed also.

Best Regards

Tyrone Quintin Lawson
Special Investigator
The Department of Consumer and Regulatory Affairs
Office of the Director
(202) 442-4386 (desk)
(202) 442-9447 (fax)
tyrone.lawson@dc.gov

**From:** Brown, Mia (DCRA)
**Sent:** Thursday, September 29, 2016 1:02 PM
**To:** Lu, Luchi (DCRA)
**Cc:** Lawson, Tyrone (DCRA)
**Subject:** RE: His Supervision

Receipt confirmed.

Mia Brown
Human Resource Specialist
Department of Consumer and Regulatory Affairs
1100 4th Street, SW, Suite E500
Washington, DC 20024
Phone: (202) 442-4352

**From:** Lu, Luchi (DCRA)
**Sent:** Thursday, September 29, 2016 10:35 AM
**To:** Brown, Mia (DCRA)

**Plf. Opp.
App. 345**
1

**Cc:** Lawson, Tyrone (DCRA)
**Subject:** His Supervision

Hi All,

In August, I reported to Gary Englebert my concern of possible conflict of interest in S█████ B█████'s conducts. Gary relayed the information to Sydney Lester. Quickly, I received an email from Sydney Lester (Please scroll down to the bottom to read his email). He stated "We have contacted our legal staff and at this time, after their review, there is no evidence to conclude any wrong doing."

I was very surprised by his quick assertion since there was no reference to the facts what work / investigation he has finished and how he came to this conclusion. On September 1st, Gary Englebert, Sydney Lester and I had a meeting as scheduled. At the meeting, I asked Sydney Lester "What did you do, what have done, what information have you provided to draw that conclusion that there was no any wrong doing?" This was his response "I asked S███ B█████ 'To your best memory have you done any your wife's job?' " I went on: "You receive work log from S████ B█████ every week. Have you gone through his list to verify whether / how many his wife's jobs he has done?" He did not want to answer the question. Rather, he demented me to provide proof and I did.

A few days later, Gary Englebert informed me that IT people conducted a search by then it was found S█████ B█████ had reviewed seventeen (17) of his wife's jobs in the past few years, and Sydney Lester denied some of them by claiming S████ B█████ was not married yet at the time when he was doing some of those jobs. However, the fact is S████ B█████ has taken **TWO fatherhood leaves for TWO children,** one early in 2015, one this year a few month ago. How should relationship be measured? Does the fact of two fatherhood leave for two children together justify it?

My understanding was: A supervisor is expected to monitor and take action to remove issues concerning business operation and to serve the best interest of the agency. It seems to me that Sydney Lester does not meet the standard.

- He failed to identify and report this problem in the first place, which has been going on for years.
- After he received a report, he still did not take the initiative to locate the problem. To its contrary, he has been very defensive. My point here is even I were not able to present any proof immediatelly – due to my position in the organization and limited access to certain information -- that still does not mean the problem was not in existence.
- Sydney Lester, as a supervisor should have been the one to search for and locate the problem, in which case the "allegation" (his word) would have become substantiation a long time ago.

Please kindly confirm receipt of this email.

Thank you,

Best Regards,

Luchi Lu
Fire Protection Engineer
Department of Consumer and Regulatory Affairs
1100 4th Street SW, E340. Washington, DC 20024

**Plf. Opp.
App. 346**

Office: 202-442-9474
Email: luchi.lu@dc.gov
Website: www.dcra.dc.gov

---

**From:** Lu, Luchi (DCRA)
**Sent:** Wednesday, August 31, 2016 4:01 PM
**To:** Lester, Sydney (DCRA)
**Cc:** Englebert, Gary (DCRA)
**Subject:** Re: Our Workplace

Confirmed.

On Aug 31, 2016, at 3:58 PM, Lester, Sydney (DCRA) <sydney.lester@dc.gov> wrote:

> We will meet tomorrow morning at 10:00 AM in the community conference room adjacent to our
> reception area.
>
> Thanks.
>
> Sydney Lester
> Fire Protection Manager/ Permit Operations Division
> Department of Consumer and Regulatory Affairs
> 1100 4th Street SW, 3rd Floor
> Washington DC 20024.
> 202.442.4551 (O), 202.442.4863 (F)
> sydney.lester@dc.gov
> www.dcra.dc.gov
>
> ---
>
> **From:** Lu, Luchi (DCRA)
> **Sent:** Wednesday, August 31, 2016 3:27 PM
> **To:** Lester, Sydney (DCRA)
> **Cc:** Englebert, Gary (DCRA)
> **Subject:** RE: Our Workplace
>
> When:    I am immediately available, if you get someone to cover the counter.
> Where:    You pick.
>
> ---
>
> **From:** Lester, Sydney (DCRA)
> **Sent:** Wednesday, August 31, 2016 3:09 PM
> **To:** Lu, Luchi (DCRA)
> **Cc:** Englebert, Gary (DCRA)
> **Subject:** RE: Our Workplace
>
> Thanks for your response. Let's coordinate the place and time for you to present the proof that you have
> for the allegations that you have made.
>
> Regards.

**Plf. Opp.
App. 347**

Sydney Lester
Fire Protection Manager/ Permit Operations Division
Department of Consumer and Regulatory Affairs
1100 4th Street SW, 3rd Floor
Washington DC 20024.
202.442.4551 (O), 202.442.4863 (F)
sydney.lester@dc.gov
www.dcra.dc.gov

**From:** Lu, Luchi (DCRA)
**Sent:** Wednesday, August 31, 2016 3:03 PM
**To:** Lester, Sydney (DCRA)
**Cc:** Englebert, Gary (DCRA)
**Subject:** RE: Our Workplace

I acknowledge receipt of this email. Will certainly provide proof for issues concerning public trust.

**From:** Lester, Sydney (DCRA)
**Sent:** Wednesday, August 31, 2016 2:38 PM
**To:** Lu, Luchi (DCRA)
**Cc:** Englebert, Gary (DCRA)
**Subject:** Our Workplace

Luchi,

You have been a member of the Fire Protection Engineering Review team for several years and during that time you have made several allegation about the conduct of your co-worker S▮▮▮ B▮▮▮. These allegations became more and more serious as time progressed. You have made some recent allegations which have now placed us at the stage where the allegations have legal implications that cannot be ignored. We have contacted our legal staff and at this time, after their review, there is no evidence to conclude any wrong doing.

Since you have made the allegations, if you are in possession of any proof that backs up your allegations you should present them. Both Mr. Gary Englebert and I are available to meet with you to discuss any proof that exists.

Regards.

Sydney Lester
Fire Protection Manager/ Permit Operations Division
Department of Consumer and Regulatory Affairs
1100 4th Street SW, 3rd Floor
Washington DC 20024.
202.442.4551 (O), 202.442.4863 (F)

**Plf. Opp.**
**App. 348**

## DISTRICT COURT OF MARYLAND

Case Information
Go Back Now

**Court System:**  **DISTRICT COURT FOR CHARLES COUNTY (LAPLATA) - TRAFFIC SYSTEM**
Citation Number: **00000001B0K66**  Case Status: **ACTIVE CASE**
Violation Date:  **03/06/2016**              Violation Time: **10:08 AM**
Violation County: **CHARLES COUNTY (LAPLATA)**
District Code:  **04**                       Location Code: **02**

AgencyName: **CHARLES COUNTY SHERIFF'S DEPT**
Officer Name: **SELKIRK, K**
Officer ID: **0320**

**Defendant Information**

Defendant Name: █
Address: █          █ █
City: █          State: **MD**  Zip Code: █
Race: **BLACK,AFRICAN AMERICAN**
Sex: **M**  Height: **510**  Weight: **195**
DO█   2/█

**Schedule Information**

Trial Date: █     16  Trial Time: **10:30 AM**  Room: **01**
Trial Location: **CHARLES COUNTY (LAPLATA)**
Reason:    **CaseTrial**

## Charge Information

Charge:    Article: **TA**  Sec: **16**  Sub-Sec: **303**  Para: **F**  Code:
Description: **PERSON DRIVING MOTOR VEHICLE ON HIGHWAY OR PUBLIC USE PROPERTY ON SUSPENDED OUT-OF-STATE LICENSE**

Location Stopped: **MIDDLETOWN RD/ROCKY RD**
Contributed to Accident?: **NO**  Personal Injury?: **NO**

Fine: **0**  Related Citation Number: **00190K66**
Vehicle Tag: █     State: **DC**  Vehicle Description: **13LEXU02**

**Event History Information**

| Event | Date | Comment |
|-------|------|---------|
| ESCH | 2016-04-08 | 20160623;1030A;01 |

**Plf. Opp.
App. 349**



April 22, 2019

Via Hand Delivery and Electronic Mail

Luchi Lu
Fire Protection Engineer
DCRA
1100 4th St. SW, Suite E340
Washington, DC 20024
(202) 442-9474
luchi.lu@dc.gov

Re: Your Allegations of Paid Family Leave Fraud by S███ B███

Dear Ms. Lu:

From June 2016 through February 2019, you made numerous complaints concerning S███ B███ s use of paid family leave from May 19, 2016 through June 3, 2016, to the D.C. Office of the Inspector General, the D.C. Department of Consumer and Regulatory Affairs, the D.C. Board of Ethics and Government Accountability, the D.C. Department of Human Resources, the Executive Office of the Mayor, and others.

This letter documents those complaints and the responses you received from each District agency and is in response to your February 5 and 6, 2019 verbal and written complaints to the Mayor and DCRA of the same allegation. To reiterate, this matter has been fully investigated by numerous agencies and is closed. No further action will be taken on your complaint.

Your Complaint to OIG

On June 27, 2016, you submitted a fraud complaint to the D.C. Office of the Inspector General (OIG) alleging that your colleague S███ B███ engaged in time and attendance fraud and abuse when he applied for and received paid family leave. (**Attachment 1**.) On October 28, 2016, OIG forwarded the complaint in a letter to DCRA, stating "your office would be in the best position to address the issues raised." (**Attachment 2**.) On February 1, 2017, you obtained a copy of this letter from filing a request under the D.C. Freedom of Information Act (FOIA) with OIG. (Id.)

On May 10, 2017, OIG responded to your complaint of time and attendance and Paid Family Leave fraud, stating that it "conducted an independent analysis of the documentation provided by the [DCRA] and determined that no further action by the OIG is warranted." (**Attachment 3**.) OIG also stated, "[p]lease be advised that the D.C. OIG considers this matter closed." (Id.)

**Plf. Opp.**
**App. 350**



Page 2 of 6

## Your Complaint to DCRA

On February 7, 2017, given OIG's statement that DCRA "would be in the best position to address the issues raised," you forwarded by email the documents you received under FOIA to Ingrid Jackson, DCRA Human Resources Manager, and Mia Brown, DCRA Human Resources Specialist. (**Attachment 2**.) You stated that you wanted "to get a straightforward answer from DCRA HR" concerning your allegations. (*Id.*) You also stated that you would "strictly follow all the disciplines and rules of our own agency in relation to this matter" and "obey and follow all your direction and instructions." (*Id.*)

## Investigation and Response by DCRA

On February 10, 2017, DCRA's Chief Administrative Officer, Walter Crawford, asked you to come to his office where he informed you verbally that DCRA had investigated your allegations concerning ▮▮ B▮▮ and had concluded that the allegations were unfounded and that Mr. B▮▮'s use of paid family leave was not fraudulent. (**Attachments 1, 4**.)

Later that same day, you thanked Mr. Crawford by email for "taking the time to notify me [of] the result of this complaint." (**Attachment 1**.) You also stated that you "respect and take it as our agency's decision" and that "[f]rom now on, there will be no more communications from me on this matter." (*Id.*) You concluded with "[y]ou have my word." (*Id.*)

## Your Second Complaint to DCRA of the Same Allegation

On February 21, 2017, you emailed Mr. Crawford and the DCRA Human Resources staff to pursue the same complaint with allegedly "new info." stating "[s]orry I did not keep my promise." (**Attachment 4**.) Attached to your email, you included photographs and information that you copied from the Facebook page of S▮ B▮▮'s wife and other pages linked to her account. (*Id.*)

On February 24, 2017, Mia Brown responded to your "new info" email, stating: "This has not provided any new perspective, the agency has confirmed all required documentation needed for an approval." (**Attachment 5**.) You responded on that same date with "Thank you for letting me know!!" (*Id.*)



Page 3 of 6

Your Third Complaint to DCRA of the Same Allegation

On May 12, 2017, you emailed Mia Brown "seeking advice." **(Attachment 6.)** You stated:

> I am sending this email as a follow-up and new inquiry to learn: if I have NEW evidence to indicate this is a fraud, now is it [a] good time to talk about it? You know my allegation is: He does NOT have a ▮▮▮▮▮▮ born on ▮▮▮ ▮▮▮▮▮▮. He took 8 weeks government paid fatherhood leave WITHOUT having a baby. I still believe this is the truth. I know it sounds crazy.

(*Id.*)

Later the same day, Mia Brown responded that "all required documentation has been provided by the employee for approved Paid Family Leave (PFL)." (*Id.*) She asked that you "respect the required confidentiality of medical documentation and understand we would do the same for you, if the roles were reversed." (*Id.*) She also encouraged you to "reach out to Inova ... for assistance in coping" and included the web address for the Employee Assistance Program (EAP). (*Id.*)

Within the hour, you inquired again:

> May I know, if—in case—someone of us asked his [son] "How's your sister doing" or "What's your sister's name," and the boy responded "I do not have a sister"—in that case shall we report to HR?

(*Id.*) After Mia Brown responded "[n]o need to report the response of a child to HR," you emailed in response that you "disagree [with] the practice of accepting medical documentation as ultimate proof of a child birth." (*Id.*)

Your Complaint to BEGA of the Same Allegation

On May 10, 2017, two hours after receiving the OIG's conclusion and response, you immediately filed a complaint with the D.C. Board of Ethics and Government Accountability (BEGA) making the same allegation of time and attendance and Paid Family Leave fraud by ▮▮▮▮▮▮▮. **(Attachment 7.)**

On July 24, 2017, Interim BEGA Director Brian Flowers sent a response to your complaint stating that, after interviewing S▮▮, B▮▮ and reviewing relevant documents, "there is insufficient evidence to support a reasonable belief that a violation of the Code of Conduct occurred." **(Attachment 8.)**



Page 4 of 6

Despite BEGA's response, you continued to press the allegation. (**Attachment 9.**)

Your Further Complaints to DCRA of the Same Allegation

Despite DCRA's investigation and response to your first three complaints of fraud against ▮▮, ▮▮▮▮, you continued to pursue the same allegation:

- On August 3, 2017, you emailed Deputy Chief Building Official (DCBO) Christopher Bailey about it. (**Attachment 10.**) On August 15, 2017, you met with Chief Building Official (CBO) Lynn Underwood who instructed you, going forward, to only talk to DCRA Human Resources about your allegation against ▮▮▮ B▮▮▮ (**Attachment 11.**)
- On August 21, 2017, you emailed CBO Underwood and DCBO Bailey about it again. (**Attachment 12.**) CBO Underwood reminded you to "take this issue ONLY to HR from now on." (*Id.*)
- On August 23, 2017, you sent an email to DCRA HR Manager Ingrid Jackson about it. (**Attachment 13.**)
- On August 25, 2017, you sent another email to Ingrid Jackson about it. (*Id.*)
- On September 11, 2017, you sent another email to Ingrid Jackson asking for a response. (*Id.*)

On September 11, 2017, DCRA HR Manager Ingrid Jackson responded:

Based on my review of his records, Mr. [S▮▮] ▮▮▮▮ has met all of the District government requirements in order to be eligible for Paid Family Leave and has taken the Leave in accordance with regulations. Further review reflects that your concerns have been investigated by both the Office of the Inspector General (OIG) and the Board of Ethics and Government Accountability (BEGA). The OIG and BEGA informed the agency that they could not find any cause for the agency to take any disciplinary action against Mr. B▮▮▮ and that the case is now closed.

At this point, there is no further action required by representatives of the [DCRA] or any other District government agency.

Please consider this the final response on behalf of the agency as the matter has been investigated and deemed closed.

(**Attachment 13.**)

1100 4th Street SW, Washington, ▮▮▮▮▮4 | 202.442.4400 | dcra.dc.gov



Page 5 of 6

### Your Complaints to the Mayor of the Same Allegation

From September 19 through 27, 2017, you sent emails with the same allegation against S██████B█████ to Mayor Bowser and members of the Executive Office of the Mayor (EOM). (**Attachments 14, 15, 16, 17.**)

On September 27, 2017, Karuna Seshasai of EOM emailed you the following response:

> This matter has been reported to and investigated by your agency, DCRA, the Office of the Inspector General, and the Board of Ethics and Government Accountability. I have also discussed the report with DCHR. Your allegations have been investigated by the aforementioned agencies and they have taken appropriate action. Thank you for bringing this to our attention, there will be no further action taken on our end.

(**Attachment 17.**)

You responded to Ms. Seshasai asking, "How do you know he is not a liar?" (Id.)

### Your Complaints to the DCHR of the Same Allegation

In October and November 2017, you continued to make the same allegation against S██████B█████ to other District agencies—this time to the D.C. Department of Human Resources (DCHR).

On November 28, 2017, DCHR Director Ventris Gibson emailed you the following response:

> You requested that DCHR look into the allegation you made regarding a co-worker. Please know that DCHR, OIG and BEGA looked into your allegation and found no merit to your claim. As explained to you by members of my staff, this matter is now closed.
>
> Since this matter is now closed, we are unable to assist you further.

(**Attachment 18.**)

Confidential Subject to Protective Order     Lu v. DC et al1-20-cv-00461_00000463



Page 6 of 6

**Your Complaints to District Agencies, Councilmembers, News Organizations, Private Individuals, and Co-Workers of the Same Allegation**

From January 2018 through February 2019, you continued to send emails repeatedly making the same allegation against S███ B███ to District agencies, Councilmembers, news organizations, private individuals, and co-workers.

**Your Second Complaint to the Mayor of the Same Allegation**

On February 5, 2019, you made the same complaint to Mayor Bowser during her tour of DCRA and followed it up the next day with an email. (**Attachment 19.**)

**Summary and Conclusion**

As communicated to you numerous times previously by DCRA, OIG, BEGA, DCHR, and EOM, this matter has been fully investigated by numerous agencies and is closed. No further action will be taken on your complaint.

A copy of this letter will be placed in your official personnel folder.

Sincerely,

Tiffany Crowe
Chief Administrative Officer

cc:
Donald Tatum, DCRA Labor Liaison
Personnel file
Miranda Gillis, President, AFGE Local 2725
LaKeitha Johnson, Chief Steward, AFGE Local 2725

Message

| From: | Lu, Luchi (DCRA) [luchi.lu@dc.gov] |
|-------|-------------------------------------|
| Sent: | 10/9/2019 12:48:06 PM |
| To: | Ricks, Tanya (DCRA) [tanya.ricks1@dc.gov] |
| CC: | Lester, Sydney (DCRA) [sydney.lester@dc.gov] |
| Subject: | FW: Telework application |

Ms. Ricks,

I submitted my application for telework on August 13 and my supervisor approved it. On September 13 Ms. Crowe called me for a meeting in her office. On October 2 she informed me that my request was denied. On October 7 she explained that reason for denial was for VPN (Accela) access from home as the resource is scarce.

I want to know: For other employees did it take this long to process? To my best knowledge some got their application approved within 2 weeks after their supervisor forwarded their applications to HR. They do NOT have home access to Accela either and have been teleworking for months.

I need to get an update from you to know how soon I can start mine. Thanks.

Best Regards,

**Luchi Lu, MBA, PE, PMP** |Fire Protection Engineer | Permit Operations Division
Department of Consumer & Regulatory Affairs

luchi.lu@dc.gov | 1100 4th St SW, DC 20024
Main: 202.442.4400 | Desk: 202.442.9474
dcra.dc.gov



**From:** Crowe, Tiffany (DCRA)
**Sent:** Monday, October 07, 2019 11:21 AM
**To:** Lu, Luchi (DCRA)
**Cc:** Bailey, Christopher (DCRA); Lester, Sydney (DCRA); Hager, William (DCRA); Ricks, Tanya (DCRA)
**Subject:** RE: Telework application

Ms. Lu,

I am not aware of the others exactly situated, but I've copied the HR Manager on this email to do an audit of all current teleworkers. Your supervisor contacted me about your application, which is why I'm involved. I can't speak to the other individuals, but the policy clearly states that you must be able to do ALL of the functions of your job from home, including access Accela and other network applications. If supervisors attested on the form that this was true, and submitted the application with incorrect information, that will be addressed.

Thank you for your interest in this program. The HR team will follow-up with you and your supervisor.

Best,

**Plf. Opp.**
**App. 356**

**Tiffany Crowe | Chief Administrative Officer**
Department of Consumer and Regulatory Affairs
tiffany.crowe@dc.gov | 1100 4th St SW, DC 20024 | Office 5103
office: 202.442.4509 | mobile: 202.271.4388 | dcra.dc.gov

 

**From:** Lu, Luchi (DCRA)
**Sent:** Monday, October 7, 2019 11:15 AM
**To:** Crowe, Tiffany (DCRA) <Tiffany.Crowe@dc.gov>
**Cc:** Bailey, Christopher (DCRA) <christopher.bailey@dc.gov>; Lester, Sydney (DCRA) <sydney.lester@dc.gov>; Hager, William (DCRA) <william.Hager2@dc.gov>
**Subject:** RE: Telework application

Ms. **Crowe,**

You've seemed to be very involved in my telework application.

There are other teleworking employees who do NOT have home access to VPN. Their requests have been approved by HR after their supervisor submitted their applications. They have been doing it for months. I am exactly situated. What triggered the deviation?

- Is home access to VPN required for EVERY telework applicant / employee?
- Can you explain why I am required while other employees are not?

Best Regards,

**Luchi Lu, MBA, PE, PMP** | Fire Protection Engineer | Permit Operations Division
Department of Consumer & Regulatory Affairs

luchi.lu@dc.gov | 1100 4th St SW, DC 20024
Main: 202.442.4400 | Desk: 202.442.9474
dcra.dc.gov



**From:** Crowe, Tiffany (DCRA)
**Sent:** Monday, October 07, 2019 9:47 AM
**To:** Lu, Luchi (DCRA)
**Cc:** Bailey, Christopher (DCRA); Lester, Sydney (DCRA); Hager, William (DCRA)
**Subject:** RE: Telework application

Ms. Lu. I have your form. I haven't had a chance to scan it. Once we have additional inventory of VPNs, your request will be reconsidered.

**Tiffany Crowe | Chief Administrative Officer**
Department of Consumer and Regulatory Affairs
tiffany.crowe@dc.gov | 1100 4th St SW, DC 20024 | Office 5103

**App. 357**

**office: 202.442.4509 | mobile: 202.271.4388 | dcra.dc.gov**



**From:** Lu, Luchi (DCRA)
**Sent:** Thursday, October 3, 2019 8:55 AM
**To:** Crowe, Tiffany (DCRA) <Tiffany.Crowe@dc.gov>
**Subject:** RE: Telework application

I am looking forward to receiving it to learn why my request was denied.

Best Regards,

**Luchi Lu, MBA, PE, PMP** | Fire Protection Engineer | Permit Operations Division
Department of Consumer & Regulatory Affairs

luchi.lu@dc.gov | 1100 4th St SW, DC 20024
Main: 202.442.4400 | Desk: 202.442.9474
dcra.dc.gov



**From:** Crowe, Tiffany (DCRA)
**Sent:** Wednesday, October 02, 2019 3:03 PM
**To:** Lu, Luchi (DCRA); Bailey, Christopher (DCRA); Hager, William (DCRA)
**Cc:** Lester, Sydney (DCRA); Agosto, Pedro (DCRA); Whitescarver, Clarence (DCRA)
**Subject:** RE: Telework application

Hi Luchi – As I understand it, there are limited licenses. Additionally, please remember that telework is a privilege not a right, so it would not be necessary for me to provide you with false information. Your request for telework has been denied. I'll forward the form to you later today.

Best,

Tiffany

**From:** Lu, Luchi (DCRA)
**Sent:** Wednesday, October 2, 2019 2:32 PM
**To:** Crowe, Tiffany (DCRA) <Tiffany.Crowe@dc.gov>
**Cc:** Lester, Sydney (DCRA) <sydney.lester@dc.gov>
**Subject:** RE: Telework application

Ms. Crowe,

I discussed this with an expert in DCRA's IT department. What you said is not true. According to him, an employee who needs to access Accela from home shall submit a request. Upon approval of this request, the IT department will issue and set up his/her home access to VPN/Accela. In other words, no employee can have access to Accela until he/she is approved.

**Plf. Opp.**
**App. 358**

**Let me know from now who I should follow up with on my telework application.**

Best Regards,

**Luchi Lu, MBA, PE, PMP** | Fire Protection Engineer | Permit Operations Division
Department of Consumer & Regulatory Affairs

luchi.lu@dc.gov | 1100 4th St SW, DC 20024
Main: 202.442.4400 | Desk: 202.442.9474
dcra.dc.gov



**From:** Crowe, Tiffany (DCRA)
**Sent:** Monday, September 30, 2019 9:30 AM
**To:** Lu, Luchi (DCRA)
**Cc:** Chrappah, Ernest (DCRA); Whitescarver, Clarence (DCRA); Lester, Sydney (DCRA)
**Subject:** RE: Telework application

Hi Ms. Lu. I apologize for the delay. The primary issue is technical. When you sent a screenshot of your test, it looks like you do not have access to Accela at home. This is a key requirement of your job. OIS was not to issue special laptops or VPN access in order to allow people to telework, rather, if someone met the requirements, and had the appropriate equipment, they could be granted telework. I was not involved in every other telework request, so I can't speak to the process. I believe you reached out to me regarding your application.

Best,

Tiffany

**From:** Lu, Luchi (DCRA)
**Sent:** Monday, September 30, 2019 9:13 AM
**To:** Crowe, Tiffany (DCRA) <Tiffany.Crowe@dc.gov>
**Cc:** Chrappah, Ernest (DCRA) <Ernest.Chrappah@dc.gov>; Whitescarver, Clarence (DCRA) <clarence.whitescarver@dc.gov>
**Subject:** RE: Telework application

Ms. Crowe,

This is the 5th email I'm following up with you on my telework application that I submitted on August 13th, almost 7 weeks ago. You asked a meeting with me and we met in your office on September 13. Do you meet with every single applicant in your office or just me? I'd like to know how long it takes other applicants to receive an approval. I read the Guideline you sent in June I meet all the requirements. Your timely approval on my application will be appreciated. If there is an issue let's talk about it.

Best Regards,

**Luchi Lu, MBA, PE, PMP** | Fire Protection Engineer | Permit Operations Division
Department of Consumer & Regulatory Affairs

luchi.lu@dc.gov | 1100 4th St SW, DC 20024
Main: 202.442.4400 | Desk: 202.442.9474
dcra.dc.gov

**Plf. Opp.**
**App. 359**



**From:** Lu, Luchi (DCRA)
**Sent:** Thursday, September 26, 2019 10:01 AM
**To:** Crowe, Tiffany (DCRA)
**Cc:** Ricks, Tanya (DCRA)
**Subject:** RE: Telework application

Do you know how soon I can receive the approval? I submitted my application on August 13, 6 weeks ago.

Best Regards,

**Luchi Lu, MBA, PE, PMP** |Fire Protection Engineer | Permit Operations Division
Department of Consumer & Regulatory Affairs

luchi.lu@dc.gov | 1100 4th St SW, DC 20024
Main: 202.442.4400 | Desk: 202.442.9474
dcra.dc.gov



**From:** Crowe, Tiffany (DCRA)
**Sent:** Friday, September 20, 2019 5:35 AM
**To:** Lu, Luchi (DCRA)
**Cc:** Lester, Sydney (DCRA); Ricks, Tanya (DCRA)
**Subject:** RE: Telework application

Hi Luchi. Did we get back to you yet? @Tanya – have you received an application for Ms. Lu? I went through my emails and I do not see the actual application.

Can someone send?

**From:** Lu, Luchi (DCRA)
**Sent:** Wednesday, September 11, 2019 12:44 PM
**To:** Crowe, Tiffany (DCRA) <Tiffany.Crowe@dc.gov>
**Cc:** Lester, Sydney (DCRA) <sydney.lester@dc.gov>; Ricks, Tanya (DCRA) <tanya.ricks1@dc.gov>
**Subject:** RE: Telework application

I am free on Friday. Any time in your convenience.

Best Regards,

**Luchi Lu, MBA, PE, PMP** |Fire Protection Engineer | Permit Operations Division
Department of Consumer & Regulatory Affairs

luchi.lu@dc.gov | 1100 4th St SW, DC 20024
Main: 202.442.4400 | Desk: 202.442.9474
dcra.dc.gov

**Plf. Opp.
App. 360**



**From:** Crowe, Tiffany (DCRA)
**Sent:** Wednesday, September 11, 2019 12:41 PM
**To:** Lu, Luchi (DCRA)
**Cc:** Lester, Sydney (DCRA); Ricks, Tanya (DCRA)
**Subject:** Re: Telework application

Please look at outlook and find a time tomorrow or Friday.

**Tiffany Crowe |** Chief Administrative Officer
Department of Consumer and Regulatory Affairs
tiffany.crowe@dc.gov | 1100 4th SW, DC 20024 | Office 5103
office: 202.442.4509 | mobile: 202.271.4388 | dcra.dc.gov

On Sep 11, 2019, at 12:39 PM, Lu, Luchi (DCRA) <luchi.lu@dc.gov> wrote:

> I am free the whole afternoon. Thanks.
>
> Best Regards,
>
> **Luchi Lu, MBA, PE, PMP** | Fire Protection Engineer | Permit Operations Division
> Department of Consumer & Regulatory Affairs
>
> luchi.lu@dc.gov | 1100 4th St SW, DC 20024
> Main: 202.442.4400 | Desk: 202.442.9474
> dcra.dc.gov
>
> <image001.png>   <image002.jpg> <image003.jpg>
> <image004.jpg> <image005.jpg>
>
>
> **From:** Crowe, Tiffany (DCRA)
> **Sent:** Wednesday, September 11, 2019 12:36 PM
> **To:** Lu, Luchi (DCRA)
> **Cc:** Ricks, Tanya (DCRA)
> **Subject:** Re: Telework application
>
> Hi Ms. Lu. Please schedule a meeting with me, your supervisor, and Ms. Ricks to discuss.
>
> Thank you.
>
>
> **Tiffany Crowe |** Chief Administrative Officer
> Department of Consumer and Regulatory Affairs
> tiffany.crowe@dc.gov | 1100 4th St SW, DC 20024 | Office 5103
> office: 202.442.4509 | mobile: 202.271.4388 | dcra.dc.gov
>
> On Sep 11, 2019, at 12:19 PM, Lu, Luchi (DCRA) Plf. Opp. @dc.gov> wrote:

**App. 361**

Good afternoon Ms. Crowe,

This is 3rd email to inquire about the status of my telework application. I applied on August 13. It's more than 4 weeks now. Can you please tell me usually how long it take to process. If you require additional information please let me know. Thank you.

Best Regards,

**Luchi Lu, MBA, PE, PMP** |Fire Protection Engineer | Permit Operations Division
Department of Consumer & Regulatory Affairs

luchi.lu@dc.gov | 1100 4th St SW, DC 20024
Main: 202.442.4400 | Desk: 202.442.9474
dcra.dc.gov

<image001.png> <image002.jpg> <image003.jpg>
<image004.jpg> <image005.jpg>


**From:** Lu, Luchi (DCRA)
**Sent:** Monday, September 09, 2019 8:16 AM
**To:** Crowe, Tiffany (DCRA)
**Subject:** FW: Telework application

Ms. Crowe,

Mr. Lester sent you an email last Wednesday. I submitted my telework application on August 13, about 4 weeks ago. I'd like to know how soon I can receive an approval. Thanks.

Best Regards,

**Luchi Lu, MBA, PE, PMP** |Fire Protection Engineer | Permit Operations Division
Department of Consumer & Regulatory Affairs

luchi.lu@dc.gov | 1100 4th St SW, DC 20024
Main: 202.442.4400 | Desk: 202.442.9474
dcra.dc.gov

<image001.png> <image002.jpg> <image003.jpg>
<image004.jpg> <image005.jpg>


**From:** Lester, Sydney (DCRA)
**Sent:** Wednesday, September 04, 2019 3:34 PM
**To:** Crowe, Tiffany (DCRA)
**Cc:** Lu, Luchi (DCRA); Turner-Christian, Latrease (DCRA)cr
**Subject:** FW: Telework application

Good afternoon Ms. Crowe,

**Plf. Opp.
App. 362**

Do you have a response for Ms. Lu?

Regards.

**Sydney Lester** | *Fire Protection & Elevator Eng. Manager, Permit Operations Division*
**Department of Consumer and Regulatory Affairs**

**Sydney.Lester@dc.gov** | **1100 4th St SW, DC 20024**
**main: 202.442.4400 | desk: 202.442.4551**
**dcra.dc.gov**

**From:** Lu, Luchi (DCRA)
**Sent:** Wednesday, September 4, 2019 3:16 PM
**To:** Lester, Sydney (DCRA) <sydney.lester@dc.gov>
**Subject:** RE: Telework application

I signed the form and submitted my application for telework on August 13, about 3 weeks ago. I have not heard anything back. Can you ask HR usually how it takes to receive an approval? How long did it take other employee to receive the approval as I knew some have been on it for a while. You can forward my email to the HR contact and copy me. Thank you.

Best Regards,

**Luchi Lu, MBA, PE, PMP** | Fire Protection Engineer | Permit Operations Division
Department of Consumer & Regulatory Affairs

luchi.lu@dc.gov | 1100 4th St SW, DC 20024
Main: 202.442.4400 | Desk: 202.442.9474
dcra.dc.gov

<image001.png>  <image002.jpg> <image003.jpg>
<image004.jpg> <image005.jpg>

**From:** Lester, Sydney (DCRA)
**Sent:** Thursday, August 22, 2019 9:20 AM
**To:** Lu, Luchi (DCRA)
**Subject:** RE: Telework application

There is no time frame. They are submitted and HR deals with it after. There are some that were submitted weeks ago and they are still waiting.

Will let you know as soon as I get the response. They may even contact you directly, I am not sure since I have no one else, other than Saima, applying. I have not gotten a response for her application.

**Sydney Lester** | *Fire Protection & Elevator Eng. Manager, Permit Operations Division*
**Department of Consumer and Regulatory Affairs**

**Plf. Opp.**
**App. 363**

Sydney.Lester@dc.gov | 1100 4th St SW, DC 20024
main: 202.442.4400| desk: 202.442.4551
dcra.dc.gov

**From:** Lu, Luchi (DCRA)
**Sent:** Thursday, August 22, 2019 9:12 AM
**To:** Lester, Sydney (DCRA) <sydney.lester@dc.gov>
**Subject:** RE: Telework application

Usually how long does it take to receive an approval for telework application?
How long was it for others? Thanks.

Best Regards,

**Luchi Lu, MBA, PE, PMP** |Fire Protection Engineer | Permit Operations Division
Department of Consumer & Regulatory Affairs

luchi.lu@dc.gov | 1100 4th St SW, DC 20024
Main: 202.442.4400 | Desk: 202.442.9474
dcra.dc.gov

<image001.png>  <image002.jpg> <image003.jpg>
<image004.jpg> <image005.jpg>

**From:** Lester, Sydney (DCRA)
**Sent:** Tuesday, August 13, 2019 9:18 AM
**To:** Lu, Luchi (DCRA)
**Subject:** RE: Telework application

Please prepare and sign a hard copy. Leave it on my desk if I am not in the office.
Thanks.

**Sydney Lester | *Fire Protection & Elevator Eng. Manager, Permit Operations
Division***
**Department of Consumer and Regulatory Affairs**

Sydney.Lester@dc.gov | 1100 4th St SW, DC 20024
main: 202.442.4400| desk: 202.442.4551
dcra.dc.gov

**From:** Lu, Luchi (DCRA)
**Sent:** Tuesday, August 13, 2019 8:23 AM
**To:** Lester, Sydney (DCRA) <sydney.lester@dc.gov>
**Subject:** Telework application

Please see attachment for my telework application.

Best Regards,

**Luchi Lu, MBA, PE, PMP** |Fire Protection Engineer | Permit Operations Division
Department of Consumer & Regulatory Affairs

**Pl. Opp.**
**App. 364**

luchi.lu@dc.gov | 1100 4th St SW, DC 20024
Main: 202.442.4400 | Desk: 202.442.9474
dcra.dc.gov

<image001.png> <image002.jpg> <image003.jpg>
<image004.jpg> <image005.jpg>

**From:** Crowe, Tiffany (DCRA)
**Sent:** Friday, June 14, 2019 6:23 PM
**To:** dcrahrdivision(DCRA); Crowe, Tiffany (DCRA)
**Subject:** Telework Policy launch

Good Afternoon.

Attached, please find the newly launched Telework Policy. Supplemental materials and
Lessonly Training to follow. Telework applications are processed on a rolling basis and
subject to eligibility guidelines.

Please do not "reply all." If you have questions about the policy or application, please
email dcrahrdivision@dc.gov.

Thank you.

Have a great weekend.

**Tiffany Crowe | Chief Administrative Officer**
**Department of Consumer and Regulatory Affairs**
tiffany.crowe@dc.gov | **1100 4th St SW, DC 20024 | Office 5103**
**office: 202.442.4509 | mobile: 202.271.4388 |** dcra.dc.gov

<image006.png> <image007.jpg> <image008.jpg> <im
age009.jpg> <image010.jpg>

DCRA actively uses feedback to improve our delivery and services. Please take a
minute to share your feedback on how we performed in our last engagement.
Also, subscribe to receive DCRA news and updates.

**Join Mayor Bowser at DC DHCD's Housing Expo, June 15, 10-3 at the
Convention Center. Home-buying & rental housing programs, remodeling
tips, get free credit reports & counseling & a $4,800 living room furniture
giveaway, all in one place. Register today! #JuneHousingBloom**

DCRA actively uses feedback to improve our delivery and services. Please take a
minute to share your feedback on how we performed in our last engagement.
Also, subscribe to receive DCRA news and updates.

**Plf. Opp.**
**App. 365**

# Discipline

I-16-18

| Effective Date: | Expiration Date: | Chapters: |
|---|---|---|
| June 22, 2016 | When Superseded | 16 |

Contents »

# Overview

*NOTE: This instruction supersedes E-DPM Instruction No.16-13, same subject, dated February 23, 2016. The purpose of this instruction is to add a standalone copy of the table of illustrative actions and new sample final decision templates for reprimands and suspensions.*

The District of Columbia takes a positive approach toward employee management to achieve organizational effectiveness by using a progressive system to address performance and conduct issues. Managers must reliably establish and communicate reasonable performance and conduct standards that serve the public trust. Each employee has a responsibility to perform his or her duties to the best of his or her ability and to those standards established by management. When an employee fails or refuses to meet applicable standards, management has an obligation to take appropriate action, to ensure governmental integrity.

This instruction outlines general procedures for progressively addressing employees who fall short of performance and conduct standards.

# Reasonable, Fair, and Consistent

As with any organization, the District government operates with required standards of behavior, conduct and performance. While many standards are written, such as the D.C. personnel regulations and agency-level policies, there are general standards of behavior that are implied in any employer/employee relationship.

It is important that the disciplinary process is viewed as a means by which employees are helped and encouraged to achieve and maintain the required standards of conduct and behavior. Chapter 16 of the D.C. personnel regulations, Corrective and Adverse Actions; Enforced Leave; and Grievances, and this instruction help ensure – for the benefit of both the District government as an employer and its employees – that any shortfalls in an employee's conduct are dealt with effectively and in a reasonable, fair, and consistent manner.

In summary, "reasonable" and "fair" mean:

- Managers should raise and deal with issues promptly and should not unreasonably delay meetings, decisions, or confirmation of those decisions;
- Managers should act consistently;
- Managers should carry out any necessary investigations to establish the facts of the case before any decisions are made;
- Managers should inform employees of the basis of the problem and give them an opportunity to offer an explanation and to put the employee's version of the facts forward before any decisions are made;
- Managers should allow employees to be accompanied at any formal disciplinary meeting by a union representative or other representative of their choice; and
- Managers should allow an employee to appeal any formal disciplinary decision made under the proper disciplinary procedures.

# Employee and Employer Responsibilities

## Supervisor and Managers

The District government, as the employer, must ensure that employees are aware of applicable standards of conduct and behavior and provide those employees with a reasonable opportunity to fulfill and understand the consequences of not meeting those requirements. These obligations are typically met through documents issued by the personnel authority (typically the D.C. Department of Human Resources (DCHR)), the employing agency, and applicable labor agreements, which advise employees about District and agency rules, procedures and standards, and through managers advising and reminding employees of these rules, procedures and standards.

In particular, managers should:

- Ensure that employees are aware of any rules, procedures and standards applicable to their role and function, and understand what is required of them;
- When necessary, provide guidance and training to employees to enable them to meet these standards; and
- Ensure that employees are aware of the consequences of not complying with these rules, procedures and standards.

## Employees

There are general standards of conduct which are implicit in any employment contract and, therefore, form contractual expectations which the District government can expect of its employees. In particular, employees are expected to:

- Act in a manner congruent with the interests and standards of the District of Columbia government, both at work and outside of work;
- Devote their full attention while at work to the duties of their position;
- Act with responsibility, judgment and good faith when exercising the duties of their position;
- Carry out any reasonable instruction given by a District officer, manager or supervisor relating to those duties; and
- Never, under any circumstances, divulge to any unauthorized person, or make personal use of, confidential information connected with the District of Columbia, its employees, residents, businesses or visitors.

In addition to the above implied rules, all employees are expected to comply with published District policies, procedures and standards, including, but not limited to, the D.C. Municipal Regulations, District Personnel Manual, the Ethical Code of Conduct, Mayor's Orders, and policies published by the employing agency.

# Gathering the Facts

Before a supervisor can take any action, he or she must obtain all the relevant facts. A "fact" is an actual event or circumstance.

## Evidence

For each fact supporting an allegation of misconduct, the supervisor must have corresponding evidence proving that fact. Sources of fact include:

- Documents (both physical and electronic);
- Tangible objects; or
- Witness statements.

> *Witness Statements: Whenever your "facts" are proven by the statements of others, it is strongly advisable to secure a witness statement. This could be in the form a written witness statement, an e-mail, or affidavit. Employees have multiple avenues of appeal, particularly in actions involving lengthy suspensions or removal. Often, witnesses become unavailable at later stages of litigation, and written statements are indispensable.*

## Employment History

In addition to evidence that may support a specific allegation of misconduct, supervisors must also gather evidence that supports the appropriate corrective response. This evidence includes, but is not limited to:

- Employment and work history (i.e., official personnel folder, performance evaluations);
- Agency personnel file (including notifications of policies and procedures);
- Position description;
- Disciplinary record; and/or
- Past discipline imposed by the agency for similar conduct.

# Progressive Discipline

**Plf. Opp.
App. 367**

Once all the facts are known, the employee's supervisor is in a position to ascertain the most appropriate corrective response. For minor concerns, an informal and collaborative approach may be the best response (see the next section, *Informal Resolution*).

When an employee's conduct fails to meet expectations and informal resolution is not appropriate, management must turn to the progressive disciplinary system, which includes the following steps:

1. Verbal counseling;
2. Reprimand;
3. Corrective action; and
4. Adverse action.

*While the District employs a progressive disciplinary process, strict adherence to the progressive steps will not always be appropriate. The resulting agency action will be dictated by applying the factors outlined in § 1606.2 of the regulations, which may produce an action that skips one or more of the progressive discipline steps.*

*For example, if an employee gets into a physical fight with a customer and, without justification, seriously injuries the customer, corrective or adverse action might be the appropriate first response, even if the employee has no disciplinary history.*

## Using the Proposing Official's Rationale Worksheet

In order to choose the appropriate action, agencies must apply the factors outlined in § 1606.2. These factors include, but are not limited to, an employee's work history, the impact of the behavior on the agency, and the potential of the employee to be rehabilitated. Consideration of these factors should be made by utilizing the Proposing Official's Rational Worksheet (Attachment 5). The worksheet asks a series of questions related to the factors that includes an analysis of the facts gathered during the initial investigation and should help the agency decide what type of action should be taken based on the egregiousness of the behavior in juxtaposition to the factors. Upon completion of the worksheet, the agency should prepare the notice of proposed action.

# Informal Resolution

Many potential disciplinary issues can be resolved by the manager or supervisor intervening at an early stage as part of their normal day-to-day responsibilities. In many instances, good management should prevent recourse to formal procedures. The probation process is particularly important for communicating standards of conduct and performance.

In cases of minor breaches of discipline (e.g. lateness for work, careless mistakes, lack of attention to detail/instructions/procedures), the immediate supervisor should discuss these concerns with the employee to ensure that the employee is:

- Aware of the concerns;
- Knows what is required to meet expected standards of conduct;
- Made aware of the timescale over which an improvement is required; and
- Made aware of the consequences of not achieving the required standard.

This is not a stage in the formal progressive disciplinary process. It is part of the standard day-to-day relationship between managers and the people they manage. However, in certain circumstances, it will be necessary for the discussion and outcome to be confirmed in writing as it may become necessary to pursue the issue through the formal process if there is a reoccurrence or a failure to improve to the required standard.

## Preparation

Before speaking to the employee, the manager should consider the following points:

- What are the facts, what is the evidence?'
- What are the standards expected? Are these standards clear?
- Are there any factors you are aware of which may be relevant (e.g., health, domestic difficulties, lack of training or supervision)?
- How can the issue be corrected, what should be done differently in the future?
- Remember that the objective is to improve conduct to the required standard.

## Outcome

Ideally, the manager should aim to reach an agreement with the employee on the following points. However, where it is not possible to reach a consensus, the manager should make clear:

- The standards expected;
- Where the employee is currently falling short of these standards (i.e. the gap between current conduct and the standards required);

Plf. Opp.
App. 368

- The action required to close that gap – what the employee is going to do, what you are going to do, the timescale for improvement (e.g., what support, training or other advice and guidance will be provided, who is responsible for organizing and providing it and what are the timescales for these interventions);
- Follow up and review;
- Summarize what you have agreed to avoid a misunderstanding; and
- Make a record if necessary – this will be helpful if the employee's conduct does not improve to the standard required.

## Next steps

After speaking to the employee, the manager should:

- Continue to monitor the employee's conduct over the agreed upon timescale and provide regular reviews and give feedback;
- Make sure he or she delivers on the agreed-upon action (e.g., training, additional support);
- If the employee's conduct does improve to the standard required, then make a point of telling the employee and encourage the employee to continue to improve his or her conduct;
- If the employee's conduct does not improve to the standard required – i.e., if there is no improvement, or what improvement there has been still falls short of the standard required – then it will be necessary to speak to the employee again; and
- Take advice from DCHR's employee relations team as to whether it is necessary to move forward to the formal disciplinary procedure.

# Verbal Counseling

As noted previously, management should initially attempt to correct minor lapses in conduct and performance through informal means. However, when such corrective steps are not successful, or for more serious conduct concerns, the first step in the formal disciplinary process is verbal counseling.

> **Performance Issues.** *Performance concerns are addressed through Chapter 14 of the District Personnel Manual. This instruction focuses primarily on misconduct issues.*

## Preparation

When counseling the employee is deemed appropriate to the circumstances, the manager should first:

- Gather and assess the relevant facts;
- Schedule an uninterrupted period of time with the employee and his or her union representative (if any); and
- Review and be aware of the relevant facts, conduct standards, and plan for improving the employee's behavior.

## Counseling Session

At the counseling session, the manager must:

1. Articulate the relevant conduct standard(s);
2. Explain how the employee has failed to meet those standards;
3. Explain management's conduct expectations; and
4. Explain the potential consequences if those expectations are not met prospectively.

## Follow-up

Within 5 days after the counseling session, the manager must memorialize the conversation in writing. This may be done through a letter or e-mail. The correspondence shall establish the date, time, and content of all verbal counseling. Managers shall retain a copy of the correspondence for a period of no less than two years, but it shall not be made a part of employee's Official Personnel Folder (OPF). (See Attachment 1, Sample Verbal Counseling Follow-up.)

| VERBAL COUNSELING AT A GLANCE |
| --- |
| Fully investigate the facts of the situation |
| Schedule an uninterrupted time with the employee and his/her representative |
| Discuss what happened, the standards, expectations, and potential consequences |
| Within 5 days follow-up and restate the verbal counseling in writing |

**VERBAL COUNSELING AT A GLANCE**

Maintain a copy of the written correspondence for two years (not in OPF)

# Formal Actions

Formal disciplinary actions include corrective and adverse actions. A corrective action is a reprimand, reassignment, or suspension of less than 10 workdays. An adverse action is a reduction in grade, suspension of 10 or more workdays, or removal.

## Proposing Official

Formal actions are initiated by a "proposing official." A proposing official can be any management official superior to the employee. A proposing official can also be any management official designated by DCHR (if an agency needs a proposing official to be designated by DCHR, the agency should contact DCHR's employee relations team).

## Deciding Official

Formal actions are completed by a "deciding official," who reviews the proposed action, a response from the employee and any recommendations from an administrative review officer, and then issues a final decision. The deciding official is the agency head or a management official designated by the agency head, who did not already serve as the proposing official.

> *Proposing and Deciding Officials in small agencies. In most cases, the proposing and deciding official cannot be the same person. However, in some agencies, with small staffs, the overlap may be unavoidable and is technically permitted. However, in those cases, it is advisable to include another entity in the final decision (such as a Deputy Mayor, the City Administrator or the Director of DCHR.)*

# Reprimands

A reprimand is a corrective action in the form of a written document issued by an employee's supervisor that identifies a specific conduct fault by an employee. A reprimand should be considered when counseling has failed, or when verbal counseling is an inadequate disciplinary response to address the conduct.

## The Written Reprimand

The proposing official should gather all the supporting evidence and draft the reprimand against the employee. The reprimand should include:

1. A short narrative concerning the factual circumstances warranting the reprimand;
2. A description of the conduct standards at issue and how these standards were not met;
3. A brief narrative on how the employee should conduct himself or herself prospectively to alleviate the conduct fault;
4. The potential consequences if the conduct requirements are not met;
5. A notice informing the employee that he or she may submit a written response to the reprimand; and
6. Notification to the employee of his or her right to grieve the final decision pursuant to Chapter 16 of the regulations.

As a best practice, the reprimand should be reviewed by agency counsel and approved by the agency head (or his or her designee). A sample reprimand appears at Attachment 2.

## Service

The reprimand must be served on the employee. This is best achieved in person as follows:

1. Schedule a meeting time during an uninterrupted period of time with the employee and his or her representative (if any).
2. At the meeting, discuss the conduct standards expected, how they were not met, what is expected in the future, and the potential consequences for failing to meet expectations.
3. Explain the need to issue a formal reprimand, what a reprimand is, and the employee's right to submit a response, and, if he or she chooses, a right to file a grievance.
4. Serve the reprimand on the employee.

## Employee Response

The employee who is served the reprimand has a right to submit a written response within 10 days of service. The response must be delivered to the supervisor issuing the reprimand.

**Plf. Opp.**
**App. 370**

Based on the written response, the supervisor may sustain, modify, or rescind the reprimand. (Note: if the supervisor takes no action, the reprimand is automatically sustained.) In the event the supervisor modifies the reprimand, the revised reprimand must be served on the employee and he or she will have a new 10 days to submit a revised response.

## Record Keeping

A reprimand becomes final upon the filing of the employee's response or the expiration of the time for the employee to file a response. A copy of the final reprimand must be filed in the Official Personnel Folder (OPF) and may be considered in future disciplinary matters for up to 3 years.

| REPRIMANDS AT A GLANCE |
| --- |
| Fully investigate the facts of the situation |
| Draft the written reprimand |
| Schedule an uninterrupted time with the employee and his/her representative |
| Discuss what happened, the standards, expectations, and potential consequences |
| Explain the reprimand process to the employee and serve the reprimand |
| The employee has 10 days to file a written response; consider any response and, if appropriate, modify or rescind the reprimand |
| File a sustained reprimand and any response in the OPF for up to three years |

# Suspensions (Less than 10 Days)

Corrective action also includes suspensions of less than 10 workdays. Suspensions are appropriate when counseling and reprimands have failed to correct breaches of conduct standards, and as otherwise indicated by application of the factors set forth at § 1606.2 of the regulations.

When a suspension of less than 10 days is to be imposed, the process includes:

1. Notice of the proposed corrective action being served on the employee;
2. Affording the employee an opportunity to respond to the proposed action;
3. Final notice of the corrective action being imposed; and
4. Notifying the employee of his or her opportunity to grieve the final action.

## Notice of Proposed Action

The proposing official should gather all the supporting evidence and draft the proposed suspension against the employee. (See Attachment 3, Sample Notice of Proposed Suspension.) The notice should be a relatively short document (2-3 pages in length) that includes:

1. A concise statement of the action being taken (a suspension of less than 10 work days), the general reason for the action, and the proposed effective date of the suspension;
2. Enumerated independent cause(s) for which the suspensions are being proposed;
3. For each independent cause, a specific proposed action (supported by a factors analysis worksheet, See Attachment 5.)
4. An explanation of the employee's rights, including the right to review supporting materials, submit a written response, be represented, and the name and contact information of the deciding official.

> **Notice of Proposed Action.** *As a best practice, a notice of proposed action should be reviewed by agency counsel.*

## Service

The proposed action must be served on the employee. This is best achieved in person as follows:

1. Schedule a meeting time during an uninterrupted period of time with the employee and his or her representative (if any).
2. At the meeting, discuss the conduct standards expected, how they were not met, what is expected in the future, and the potential consequences for failing to meet expectations.
3. Explain the need to take corrective action, the suspension being proposed, and the employee's rights.
4. Serve the proposed action on the employee.

**Plf. Opp.**<br>**App. 371**

## Employee Response

The employee who is served a proposed corrective action has a right to submit a written response within 5 days of service. The response must be delivered to the proposing official.

## Final Decision

Within 45 days of the employee's written response (or the expiration of the employee's time to respond), the deciding official must serve a final decision on the proposed suspension. Service of the final decision must be done in person or by courier to the employee's address of record (with delivery confirmation.)

The final decision must be based on the proposed action and the employee's written response (if any.) (See Attachment 6, Sample Final Decision – Suspension [of less than 10 workdays.) The final decision must:

1. Provide a concise summary of the action(s) being taken and the effective date of the action(s);
2. Succinctly enumerate each independent cause for which the corrective action is being taken; specifications shall not be used in any final written decision;
3. Provide for an independent suspension (or other corrective action) for each enumerated cause;
4. Demonstrate reasoned consideration of the relevant factors set forth in 6B DCMR § 1606.2 for each independent action; and
5. Articulate the employee's grievance rights.

> *Final Decisions. Final decisions should be fairly similar to the proposed action and may rely upon the factor analysis worksheets used at the proposing phase.*

## Record Keeping

A suspension of less than 10 workdays becomes final upon service of the final decision on the employee. The service date of the final decision is the date the document is sent to the employee's address of record. A copy of the final decision, including any attachments and the proposed suspension (if incorporated), must be filed in the OPF and may be considered in future disciplinary matters for up to three years.

| SUSPENSIONS (LESS THAN 10 DAYS) AT A GLANCE |
| --- |
| Fully investigate the facts of the situation |
| Draft the written proposed suspension notice |
| Schedule an uninterrupted time with the employee and his/her representative |
| Discuss what happened, the standards, expectations, and potential consequences |
| Explain the suspension process to the employee and serve the proposed action |
| The employee has 5 days to file a written response; consider any response and, if appropriate, modify or rescind the proposed suspension |
| File a final suspension along with any referenced documents in the OPF for up to 3 years |

# Adverse Actions

An adverse action is a suspension of ten (10) or more workdays, a reduction in grade, or removal. Whenever a corrective action fails to improve a conduct problem, a performance improvement plan has failed to improve performance, when an employee cannot carry out an essential duty of his or her employment, or if the employee has engaged in conduct that cannot be remediated by any other means, adverse action may be warranted.

When an adverse action is to be taken, the process includes:

1. Notice of the proposed adverse action being served on the employee;
2. For proposed removal actions, providing for an independent review by a hearing officer;
3. Affording the employee an opportunity to respond to the proposed action;
4. Final notice of the adverse action being imposed; and
5. Notifying the employee of his or her opportunity to grieve or appeal the final action.

**Plf. Opp.**
**App. 372**

## Notice of Proposed Action

The proposing official should gather all the supporting evidence and draft the proposed adverse action against the employee. (See Attachment 6, Sample Notice of Proposed [Adverse Action].) The notice should be a relatively short document (2-3 pages in length) that includes:

1. A concise statement of the action being taken (a suspension of 10 work days or more, a reduction in grade, or removal), the general reason for the action and the proposed effective date of the action;

2. Enumerated independent cause(s) for which the action(s) is being proposed;

3. For each independent cause, a specific proposed action (supported by a factors analysis worksheet, See Attachment 5.); and

4. An explanation of the employee's rights, including the right to review supporting materials, submit a written response to a deciding official (or to a hearing officer in the case of a removal), be represented, and the name and contact information of the deciding official (or, in the case of a removal, the hearing officer).

> *Notice of Adverse Action. As a best practice, a notice of adverse action should be reviewed by agency counsel.*

## Service

The proposed adverse action must be served on the employee no less than 15 days prior to the effective date of the proposed action. This is best achieved in person as follows:

1. Schedule a meeting time during an uninterrupted period of time with the employee and his or her representative (if any).

2. At the meeting, discuss the conduct standards expected, how they were not met, and, except in the case of removal, what is expected in the future and the potential consequences for failing to meet expectations.

3. Explain the need to take the adverse action, the action being proposed, and the employee's rights.

4. If the employee will be placed on administrative leave, explain the administrative leave process and collect any government property in his or her possession.

5. Serve the proposed action on the employee.

## Assignment of Hearing Officers

When an agency proposes removal, the District must provide for an impartial review by a hearing officer.

### Selecting the Hearing Officer

The agency should assign the individual who will serve as the hearing officer. However, if needed, an agency may contact DCHR's employee relations team for assistance in identifying a suitable officer. Hearing Officers must meet the following criteria:

1. Be at grade CS-13 or above, or its equivalent;

2. Be a licensed attorney, if available;

3. Not be in the supervisory chain of command between the proposing and deciding official; and

4. Have no direct knowledge of the matter under consideration.

### Notifying the Hearing Officer

Once a Hearing Officer has been selected, a complete record along with a cover memo should be submitted to the individual for his or her consideration. The complete record includes the entirety of the notice of proposed adverse action, along with any referenced documents or evidence, and proof of service of the proposed notice on the employee.

## Employee Response

The employee who is served a proposed adverse action has a right to submit a written response within 10 days of service. For proposed removals, the written response must be provided to the assigned Hearing Officer. Otherwise, the written response must be served on the deciding official.

## Final Decision

Within 45 days of the employee's written response (or the expiration of the employee's time to respond), or, in the case of removal, receipt of the Hearing Officer's report, the deciding official must issue a final decision on the proposed adverse action. Service of the final decision must be done in person or by courier to the employee's address of record (with delivery confirmation.)

The final decision must be based on the proposed action and the employee's written response (if any.) (See Attachment 7, Sample Final Decision – [Adverse Action].) The final decision must:

1. Provide a concise summary of the action(s) being taken and the effective date of the action(s);

2. Succinctly enumerate each independent cause for which the adverse action is being taken; specifications shall not be used in any final written decision;

3. Provide for an independent suspension (or other adverse action) for each enumerated cause;

**Plf. Opp.
App. 373**

4. Demonstrate reasoned consideration of the relevant factors set forth in § 1606.2 of the regulations for each independent action; and

5. Articulate the employee's appeal and grievance rights.

> *Final Decisions.* Final decisions should be fairly similar to the proposed action and may rely upon the factor analysis worksheets used at the proposing phase.

## Record Keeping

An adverse action becomes final upon service of the final decision on the employee. The service date of the final decision is the date the document is sent to the employee's address of record. A copy of the final decision, including any attachments and the proposed action (if incorporated), must be filed in the OPF and may be considered in future disciplinary matters for up to three years.

| ADVERSE ACTIONS AT A GLANCE |
|---|
| Fully investigate the facts of the situation |
| Identify a suitable Hearing Officer (for removal cases) |
| Draft the written proposed adverse action notice |
| Schedule an uninterrupted time with the employee and his/her representative |
| Discuss what happened, the standards, and, if appropriate, future expectations and potential consequences |
| Explain the adverse action to the employee and serve the proposed action |
| The employee has 10 days to file a written response |
| Consider any response and Hearing Officer report (if applicable) and, if appropriate, sustain, modify or rescind the proposed adverse action |
| Serve the final decision on the employee |
| File the final decision along with any referenced documents in the OPF for up to 3 years |

# Legal

## Authorities

The information provided in this instruction is pursuant to D.C. Official Code § 1-616.51 (2014 Repl.) and Chapter 16 of the D.C. personnel regulations, Corrective and Adverse Actions; Enforced Leave; and Grievances.

## Applicability

The information in this instruction is not applicable to employees serving in a probationary period or temporary appointment in the Career Service; employees organized under the Office of the Chief Financial Officer; Attorneys in the Legal or Senior Executive Attorney Services; employees in the Executive Service; employees of the Board of Trustees of the University of the District of Columbia, or employees in the Management Supervisory Service, except as provided in § 1600.3 of the regulations.

# Additional Information

For additional information concerning this instruction, please contact DCHR's Policy and Compliance Administration, by calling (202) 442-9700 or by sending an e-mail to dchr.policy@dc.gov.

# Attachments

1. I-16-18

**Plf. Opp.
App. 374**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| QING LU, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 20-cv-00461 (APM) |
| | § | |
| DISTRICT OF COLUMBIA, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

*Qing Lu sues under the 1ˢᵗ Amendment and D.C. Whistleblower Protection Act. A District employee of over 13 years, management has described her as a "highly effective performer" of her Fire Protection Engineer duties. She reported her belief that coworker "S.B." engaged in improper conflicts of interest as to his (now) wife, resulting in S.B.'s admitting to violation of ethics rules and paying a $1,000 fine. She further repeatedly reported her conclusion that S.B. fraudulently claimed eight weeks' paid parental leave.*

*Defendant Lester (Fire Protection Manager) proposed a 10-day unpaid suspension of her and Defendant Whitescarver (Chief Building Official) imposed an eight-day suspension. Charging her with providing misleading information, they implied a citizen loses whistleblower / free-speech rights by making further reports once government management instructs her to trust them that no wrongdoing occurred.*

## II. JURISDICTION[1]

1.      This Court has federal question (28 U.S.C. § 1331) jurisdiction because the suit arises under the First Amendment of the United States Constitution, as enforced under 42 U.S.C. § 1983 (deprivation of rights under color of D.C. law).

2.      Per 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the D.C. Whistleblower Protection Act (DCWPA) claims, arising from the same events.

3.      Defendants Whitescarver and Lester are subject to this Court's jurisdiction as persons who knowingly acted in the District of Columbia under color of law against Plaintiff, in violation of her rights under federal and D.C. law. As well, the DCWPA authorizes naming individual city managers as defendants.

## III. ADMINISTRATIVE EXHAUSTION OF REMEDIES

4.      No administrative exhaustion is required as to the federal claims.

5.      Plaintiff's union initially invoked arbitration on her behalf as to the imposed eight-day suspension. But by later agreement with the District, the scheduled arbitration was cancelled and this outcome agreed to be a "final determination" of the issues that were to be raised in the anticipated arbitration. That is, the parties agreed no relief would be granted in arbitration, with the result that Plaintiff now only may obtain whatever relief is available from this Court, versus the range of relief often available from a negotiated grievance process.[2]

---

[1] Assertions in this pleading are made in addition and in the alternative to each other and apply to both causes of action.

[2] *See generally* D.C. Code § 1-615.56 (barring concurrent arbitration and court actions over the same claim of violation of the DCWPA).

## IV. PARTIES AND SERVICE

6.  Plaintiff is an individual, residing in Gaithersburg, Maryland, who may be contacted by way of the undersigned attorney.

7.  She is a Fire Protection Engineer in the D.C. Department of Consumer and Regulatory Affairs (DCRA).

8.  Defendant District of Columbia is a creation of the U.S. Constitution, operating as a municipality, and has been served and answered.

9.  Defendants C.G. (Clarence Garret) Whitescarver and Sydney Lester are sued in their individual capacities for claims under 42 U.S.C. § 1983 and those raised under the DCWPA.[3] They were served and have answered.

10. When he imposed the eight-day unpaid suspension, C.G. Whitescarver was the DCRA Chief Building Official. When he proposed 10 days' suspension, Sydney Lester was the Fire Protection Manager, DCRA, Permit Operations Division.

## V. FIRST AMENDMENT CLAIMS

### A. *Legal Background*

11. Plaintiff's claims of violation of her First Amendment rights are raised against Defendants Lester and Whitescarver in their individual capacities. (No federal free-speech claim is raised against the District as a municipality as a whole.)

12. A public employee raising a claim of First Amendment retaliation generally must prove: (1) she spoke as a citizen on a matter of public concern; (2) her

---

[3] In contrast with federal employee whistleblower law, the D.C. equivalent allows (at § 1-615.54) suit against "…in his or her personal capacity, any District employee, supervisor, or official having personal involvement in the prohibited" action at issue.

interest in speaking out on the matter outweighed the government's interest in promoting the efficiency of public services; (3) the employee's speech was a substantial or motivating factor in prompting the retaliatory act; and (4) if the government asserts it would have taken the same action even in the absence of the employee's speech, that this is untrue.

13. Deprivations of federal free-speech rights may be raised under 42 U.S.C. § 1983 against government officials in their individual capacities where their challenged actions were taken under color of law of the District of Columbia, e.g., where their actions were taken in their capacities as government officials.

14. While government officials often are deemed immune from liability for discretionary acts, this does not extend to their violation of clearly established rights, often such as ones of free speech.

15. The First Amendment does not protect merely against government conduct that silences free speech: it reaches even actions that have a deterrent or chilling effect on the exercise of such rights.

*B. Relevant Factual Claims*

16. Plaintiff's reporting of her belief that S.B. (and his wife S.C.B.) in 2016 engaged in benefit fraud against the District was a matter of public concern.

   16.1. For example, it would be a significant waste of government resources if an employee were absent for some eight weeks and yet was paid, when the basis cited for the paid leave turned out to have been false.

16.2. As well, D.C. law makes it a crime to commit fraud (Code at § 22-3221), forge a public record (§ 22-3242(a)(3)), commit perjury (§ 22-2402), or make false statements under oath or affirmation (§ 22-2404) [e.g., in S.B. declaring the leave application form he submitted was accurate].

16.3. The position held by S.B. (and Plaintiff) of Fire Protection Engineer is classified by D.C. as a "safety sensitive" position, subjecting incumbents to criminal background checks, possibly traffic-record checks, and drug and alcohol screening. The City understands that a person holding a fire engineer position who cannot be trusted can cause harm to the public.

16.4. As well, any fraud would appear to have been aided by S.B.'s wife S.C.B. Given that she earlier was a contractor of another D.C. agency, her trustworthiness or lack thereof also is a matter of public concern.

17. Plaintiff's interest in making one or more of her reports outweighed any counter-interest of the government in promoting efficiency in public services.

17.1. Here the disclosures related to believed inefficiencies and fraud in public services being provided, so the public and government had an aligned interest with Plaintiff in protecting her ability to make such reports.

17.2. For example, had her disclosures been taken seriously, they might have prevented future fraud, such as by D.C. implementing a system of verifying the authenticity of materials submitted for such paid leave, rather than assuming what an employee initially submits is reliable.

18.    Plaintiff's reports were a substantial or motivating factor in the actions she challenges. In fact, those reports were cited as a basis for disciplining her.

    18.1.    As to the proposed 10-day suspension without pay issued in April 2019 by Defendant Lester, it recommends punishing Plaintiff for "knowingly and willfully reporting false or misleading information or purposefully omitting facts, to any supervisor." It goes on to claim Plaintiff "grossly violated" the rule against employees misleading supervisors.

    18.2.    Consistent with the discipline's being based on Plaintiff's exercise of her free-speech rights, the proposal detailed Plaintiff's reports—of her belief that S.B. committed benefit fraud—to: (a) HR management; (b) the D.C. Office of Inspector General; (c) the Board of Ethics and Government; (d) the Department of Regulatory and Consumer Affairs (DCRA) Director; (e) the Mayor; and (f) members of the media.[4]

    18.3.    As to the eight-day suspension imposed by the decision of June 27, 2019 issued by Defendant Whitescarver, the discipline was described as being based on Plaintiff's reporting information specifically to the Mayor, on February 5 and 6, 2019.

        18.3.1.    These reports were said to willfully seek to "obfuscate the record of the [related] investigations and interactions."

---

[4] Since the disciplinary charge was making misleading statements to a supervisor, the decision to reference Plaintiff's disclosures to the media was irrelevant to proving misconduct. The fact of their inclusion confirms a motive to silence Plaintiff's speech.

      18.3.2.   Plaintiff also was asserted to have failed to fully concede to the conclusions of the investigations. That is, the severity of the punishment was in part because of the fact she continued to exercise her free speech rights to make reports rather than blindly trusting that government management was truthfully reporting well-founded and accurate conclusions to her.

19.    The defendants would not have taken the same action absent Plaintiff's protected speech, given that her disclosures were cited to justify the discipline.

20.    At the time of Defendants' violations, the right of government employees to speak out on matters on public concern was clearly established, at least when such reporting was outside the scope of an employee's ordinary job duties.

21.    Defendants Lester and Whitescarver took the proposed and imposed suspensions under the color of law in that they issued them in their roles as management officials of the District of Columbia government, on official letterhead. As a result, D.C. deprived Plaintiff of over a week of pay.

22.    An official proposal to deny an employee 10 days (i.e., two weeks) of pay for her exercise of her free-speech rights can objectively be expected to have a chilling effect on her willingness to speak out in the future. Here, had the proposal not been issued, the later eight-day suspension could not have been imposed, so Plaintiff suffered actual economic harm as a result of the proposal.

23.    Also relevant to the chilling effect, in a face-to-face meeting around May 29, 2019, Defendant Whitescarver warned Plaintiff that her continued pursuit of

her disclosure of S.B.'s actions could result in termination. DCRA Chief Administrative Officer Tiffany Crow had told Plaintiff by email on April 30 that Plaintiff's job may depend on her willingness to treat the matter as closed.

## VI. D.C. WHISTLEBLOWER PROTECTION ACT

### A. Legal Background

24. Under the DCWPA (D.C. Code § 1-615.53), a "supervisor" may not take or threaten to take a prohibited personnel action, or otherwise retaliate, against an employee for making a "protected disclosure."

25. Among matters included in protected disclosures are ones made to a supervisor or public body of what the employee "reasonably believes" to evidence a gross misuse or waste of public resources or funds; an abuse of authority connected to administration of a public program; or violation of a federal, state, or local law, rule, or regulation. D.C. Code § 1-615.52(a)(6).

26. Once an employee demonstrates it is more likely than not that her disclosures were a contributing factor in the challenged personnel action, the burden shifts to the District to show by clear and convincing evidence it would have taken the same action for "legitimate, independent reasons" even if the employee made not made the protected disclosure.

27. A claim under the DCWPA may be brought against the District, individual supervisors responsible for the challenged actions, or—as here—both.

## B. Relevant Factual Claims

28. As persons with the authority to effectively recommend or take remedial or corrective action for misconduct, Defendants Whitescarver and Lester were "supervisors."

29. As a law enforcement body, the D.C. Office of Inspector General is a "public body" for purposes of disclosures to it being protected.

30. The Mayor is a "supervisor" to whom Plaintiff made protected disclosures, as the Mayor has authority to effectively recommend or take action to address violations and the misuse of government resources.

31. One or more of Plaintiff's disclosures were protected in that they were based on her reasonable belief that S.B. fraudulently claimed paid parental leave and that this constituted one or more categories of wrongdoing under the DCWPA.

32. There appears to have been a gross misuse/waste of public resources or funds, given the payment of some eight weeks of leave by the D.C. government (and related loss of services from S.B. during that period) for a childbirth that does not appear to have occurred (or at least that Plaintiff believed had not).

33. There appears to have been an abuse of authority, in S.B.'s using his position as a District employee to obtain a benefit (extended paid leave) to which he does not appear to have been entitled.

34. There was a violation of a federal, state, or local law—if correct that no child was born as claimed—given that one or more of the submitted documents

(application; birth certificate; and/or medical certification) would have been fraudulent and undeserved benefits obtained by way of deception.

35. Among the laws/rules/regulations that fraudulently obtaining paid parental leave likely would violate is one or more of these…

    35.1. DPM, Chapter 16, Section 1605.4(b) prohibits employees of the District from making false statements, such as:

        35.1.1. Misrepresenting or falsifying or concealing material facts related to an official matter.

        35.1.2. Knowingly and willfully making an incorrect entry on an official record.

        35.1.3. Knowingly and willfully reporting false or misleading information or purposefully omitting material facts to a supervisor.

    35.2. D.C. Code § 22-3221 makes it a criminal offense to engage in conduct intended to defraud or obtain the property of another by means of a false or fraudulent pretense or representation, where the offender obtains the property of another person or causes another person to lose property.

    35.3. Under § 22-3242, the penalty for forgery is set as up to 10 years for fraud involving certain documents such as financial instruments and a "public record, or instrument filed in public office or with a public servant."

    35.4. As well, D.C. law makes it a crime to commit perjury (§ 22-2402), or to make false statements under oath or affirmation (§ 22-2404).

35.5. An employee applying for paid leave for the birth of a child must certify that the information provided is accurate and that the employee is eligible for the requested leave, also acknowledging an understanding that making of a false statement on the application is a violation of law subject to criminal penalties.[5]

36. As to one or more of her disclosures/reports, Plaintiff reasonably believed that the information that she provided evidenced one or more of the above-identified categories of wrongdoing (e.g., gross waste of funds, violation of law).

37. Among reasons it was reasonable for Plaintiff to believe this are those such as one or more of the following:

37.1. Her observations in prior years of what looked to her to be S.B.'s erroneous reporting of hours and needless claiming of overtime.

37.2. In December 2016, S.B. was documented to have agreed to pay a $1,000 fine and receive ethics training for violating the District Code of Conduct conflict-of-interest rules as to a matter S.B. handled at work involving S.B.'s domestic partner (later, spouse), S.C.B. (She is the same person involved in his claiming of paid parental leave for birth of a child.)

37.2.1. The fact that S.B. may have submitted a birth certificate or a medical certification of the anticipated birth does not rule out

---

[5] *See, e.g.,* dchr.dc.gov/sites/default/files/dc/sites/dchr/page_content/attachments/dc_fml_form_1_application_0.docx

fraud, as fake ones are readily and inexpensively available on the internet.[6]

37.3. When Plaintiff sought confirmation that management authenticated the documents submitted by S.B. to justify paid leave, management repeatedly refused to answer directly, instead insisting she accept their general assurance that they found no wrongdoing and that S.B. and his wife S.C.B. testified they did nothing wrong.

37.4. Plaintiff was aware of S.B.'s having a pending trial for a serious traffic violation, such that he might want to hide the reason for his absence from his employer.

37.5. On June 22, 2016, he told coworkers he would be away for a long time. On June 23 the court case was closed. On June 24th he returned to work.

37.6. Plaintiff's observations of the public Facebook postings of S.B. and his family caused her to doubt that the claimed child had been born.

37.6.1. For example, on the day the birth was said to have occurred, S.C.B. made a handful of Facebook postings, but none mentioned her labor or the childbirth.

37.6.2. Her posts from the day before and day of the purported delivery were later taken down from Facebook, while other postings remained up.

---

[6] *See, e.g.,* www.superiorfakedegrees.com/fake-birth-certificates/.

37.7.  As well, the child thereafter pictured with S.B. and S.C.B. appeared to be one elsewhere identified as the child of an out-of-country relative.

38.  The conduct of S.B. and S.C.B. at the office also caused Plaintiff to be dubious of the claimed birth. For example, S.C.B. volunteered to the staff at the end of ███████ that she was pregnant. At the time, she was not noticeably pregnant, but she was later said to have given birth in ███████, this being described as past the expected due date.

39.  Reports Plaintiff received from third-parties also caused her to doubt the legitimacy of S.B.'s receipt of paid parental leave benefits. For example:

39.1.  One permit expeditor told Plaintiff she had seen S.C.B. at the office prior to the birth with what appeared to be a foreign object in an odd triangle shape under her clothes, as if to mimic pregnancy.

39.2.  A coworker told Plaintiff that a date S.B. had shown pictures of a newborn actually was prior to the date later reported for its birth.

39.3.  A coworker told Plaintiff that when S.B. was asked about how the baby was doing, he responded that she was doing well and walking around. But this was at just four months after the purported birth, when babies typically don't take their first step until between nine and 12 months.

40.  At all times relevant to her claims, the District of Columbia and its DCRA department were an employer under terms of the DCWPA.

41.  Some of Plaintiff's disclosures were to the D.C. Office of Inspector General, which constitutes a DCWPA "public body" as a law enforcement agency.

41.1. For example, around June 27, 2016 she made an initial report of her concerns to the OIG hotline, referencing the lack of indications of pregnancy as compared to the pending court matter that could have given S.B. a reason to seek leave to avoid disclosing.

42. Plaintiff understood that OIG would or was conducting some sort of investigation but later discovered OIG had referred the issue to DCRA, treating it not as criminal or fraudulent, but as a run-of-the-mill HR matter.[7]

43. Among recipients of Plaintiff's disclosures were one or more persons who are considered "supervisors" under the WBPA, that is, persons who had the authority to take or effectively recommend discipline, direction of staff, or evaluate their performance, exercising authority with independent judgment.

44. For example, her reports reached DCRA management such as then-Director Melinda Bolling, then-Chief Administrative Officer Walter Crawford, then-Chief Building Officer Lynn Underwood, and by hand-off from Director Bolling, Deputy Chief Building Officer Chris Bailey.[8]

---

[7] As noted elsewhere today, Plaintiff herself eventually was made the subject of an investigation, following S.B. filing a formal harassment complaint against her.

[8] Lynn Underwood and Chris Bailey met with Plaintiff on August 15, 2017 and (per Underwood's email to Ingrid Jackson of that date) instructed Plaintiff not to contact anyone further about the matter other than HR staff. This appears to have been an illegal order not to contact persons including members of Council. *Compare* D.C. Code § 1-615.53 (prohibition on supervisor interfering with or denying right of employee to furnish information to the Council or one of its members). Thus, to the extent discipline is shown to have been based on non-compliance with that order, it was a violation of the DCWPA for being based on refusal to comply with an illegal order. To the extent the Mayor may be regarded as a member of the council, suspending Plaintiff for providing information to the Mayor also violated that prohibition.

45. Plaintiff also sought to work through DCHR staff, such as Lissette Ortiz and Ellen Brennan, and was denied meetings with Director Ventris Gibson and Associate Director for Policy and Compliance Justin Zimmerman.

46. It was after Plaintiff failed to get a full response from working at lower levels that she reported the matter to the City Council and Mayor/Executive Office of the Mayor.

   46.1. An in-person report to the Mayor (whom Plaintiff encountered in the Permit Center) and a follow-up email to her were cited as the basis for the eight-day suspension. As earlier, the Mayor is a "supervisor," having authority to correct violations and misuses of government resources.

47. The overall pattern was one in which Plaintiff's disclosures were not adequately investigated and then each subsequent entity would take the earlier inadequate investigations into account in joining in assuming no wrongdoing occurred and so the matter should be closed.

48. For example, it appears the initial report to OIG was handed off to DCRA without OIG's conducting its own fact-finding, resulting in Plaintiff's reporting being "deemed insufficient to open an investigation."

49. DCRA then appears to have accepted S.B.'s claims of entitlement to leave at face value, without attempting to authenticate the materials S.B. submitted.

50. The Board of Ethics and Government Accountability (BEGA) relied on its earlier ethics-related investigation for which it interviewed S.B. and S.C.B. under oath, but then decided it lacked jurisdiction, with its investigator

speculating to Plaintiff that the baby had been adopted [though that would have been inconsistent with S.B.'s and S.C.B.'s accounts].

51.     HR likewise assumed that DCRA and BEGA handled the matter properly.

52.     Finally, the Mayor's office assumed that the matter had been reviewed adequately by the other offices, such that nothing further should be done.

## VII. HARM SUFFERED

53.     As above, Plaintiff was subjected to a proposed 10-day suspension and from that an eight-day suspension was imposed. These caused her to suffer lost pay and benefits, as well as to endure significant emotional distress, humiliation and embarrassment, and loss to her personal and professional reputations, and served to reduce her willingness to exercise her free-speech rights in the future.

53.1.   What has happened to Plaintiff as a result of her disclosures also can be expected to have chilled the willingness of other employees to speak out on such matters of public concern, knowing they too could lose pay.

54.     As noted above, Plaintiff also was subjected to an investigation (apparently initiated by OGC staff and/or due to S.B. filing a complaint against her) of whether she stalked and harassed S.B. This investigation fell within the DCWPA definition of "retaliating" ("conducting or causing to be conducted an investigation of an employee…because of a protected disclosure…"). This in turn caused further emotional distress and reputational damage for her.[9]

---

[9] The proposed 10-day suspension said it addressed "**only**" (emphasis original) the "dishonest statements made by Ms. Lu," but it did so just after referencing that she

55. Under the DCWPA prohibition against "or retaliating in any other manner" because of an employee's protected disclosure, Plaintiff additionally asserts that she has been denied telework based on more stringent standards than those applied to employees who have not made protected disclosures.

    55.1. As compared to the June 27, 2019 suspension decision, DCRA began a telework program that same month.

    55.2. Plaintiff twice was made to apply and both times was informed her application was approved.

    55.3. Yet the Department still has not let her actually start it, while allowing similarly-situated employees who are not whistleblowers do so.

    55.4. Explanations have been pretextual, such as relying on her lack of access at home to Accela software, when other non-managers appear to be unable to access it from home either and yet are allowed to telework.

56. Among further harms, Plaintiff has had to pay to hire an attorney to protect her rights in these matters.

## VIII. SUPPLEMENTAL CLAIM

57. Plaintiff also raises as protected activity under the First Amendment and D.C. Whistleblower Protection Act her August-November 2016 disclosures that S.B. improperly was reviewing projects of someone close to him, i.e., S.C.B.

had been investigated for having had "stalked and harassed" S.B. and his wife S.C.B., thus managing to smear her reputation with those claims without charging them.

58.     This claim is consistent with documents produced by Defendants (their Bates numbers 207-211) that confirm that:

58.1.   Sydney Lester emailed Plaintiff that her allegations of S.B. wrongdoing had grown more and more serious over time, but lacked evidence.

58.2.   Plaintiff then met with Mr. Lester and his fellow management official Gary Englebert to set out the evidence she had of conflict-of-interest violations by S.B.

58.3.   On September 29, 2016, Plaintiff emailed Human Resources Specialist Mia Brown and DCRA Special Investigator Tyrone Lawson to complain her reports of conflicts of interest by S.B. were unnecessarily disregarded by Sydney Lester.

58.4.   On October 27, 2016, Plaintiff forwarded the above email chain on to BEGA investigator Ileana Corrales and another BEGA staff member.

58.4.1.   (As noted earlier, BEGA went on to require that S.B. admit to an ethics violation and pay a $1,000 fine.)

58.5.   The emails referenced above later became Exhibit 11 in DCRA Investigator Lawson's report of investigation—the one alleging misconduct by Plaintiff that was relied on to propose a 10-day suspension and impose an eight-day suspension on her.

## IX. RELIEF SOUGHT

59.    Plaintiff thus seeks relief such as the following against Defendants:

59.1.    A declaration that one or more Defendants violated Plaintiff's rights under the D.C. whistleblower law and/or First Amendment, such that the proposed suspension and imposed suspension should be deemed void and all related adverse references in her files removed.

59.2.    An award of back pay and benefits as a result of voiding the suspension.

59.3.    To the extent the denial of telework is shown to have been based on Plaintiff's protected disclosures, an order that the denial cease.

59.4.    To the extent that the investigation of Plaintiff violated the DCWPA, an order that it be sealed and retained solely in counsel's litigation files, not to be disclosed to any other D.C. employee/official or third party.

59.5.    An order that Defendants submit reports to the Court outlining efforts to prevent future violations of such rights by them.

59.6.    An award of compensatory damages.

59.7.    An award of attorney fees, expenses, and costs of court.

59.8.    To the extent judgment is entered against multiple Defendants based on the same cause of action, an order that they are jointly and severally liable for payment of related damages.

59.9.    Such other and further relief in law and equity as may be appropriate.

## X. JURY TRIAL REQUESTED

60.    Plaintiff seeks a jury trial as to all disputed issues of fact.

**PRAYER**

FOR SUCH REASONS, Plaintiff requests that judgment be entered in her favor and that Defendants be denied relief of any kind.

Respectfully Submitted,

SCHLEICHER LAW FIRM, PLLC

By: /s/ David R. Schleicher
  David R. Schleicher
  DC Bar No. 428001
  david@gov.law

  1629 K St., NW, Ste. 300
  Washington, D.C. 20006
  (202) 540-9950
  (202) 683-6130 fax

ATTORNEYS FOR PLAINTIFF LU

**Substantive Changes Reflected in Plaintiff's 1st Amended Complaint
in *Qing Lu v. District of Columbia, et al.*, Case No. 20-cv-00461 (APM)**

| Page | ¶ | Change | Explanation |
|---|---|---|---|
| 1 | Summary | "…employee of over 12 years" to "over 13 years" | Passage of time. |
| 1 | Summary | "She repeatedly reported her belief that coworker 'S.B.'—who earlier admitted to ethics violations—fraudulently claimed eight weeks' paid parental leave"<br><br>*to*<br><br>"She reported her belief that coworker 'S.B.' engaged in improper conflicts of interest as to his (now) wife, resulting in S.B.'s admitting to violation of ethics rules and paying a $1,000 fine. She further repeatedly reported her conclusion that S.B. fraudulently claimed eight weeks' paid parental leave." | Added further detail on her disclosure of conflict-of-interest violations. |
| 2 | JURIS-DICTION | Deleted the portion of footnote 1 that read, "They are based on the limited information available pre-discovery and so subject to correction/clarification as the case develops." | Updated in light of it now being post-discovery. |
| 5 | 16.4 | Changed from "is a full-time contractor…"<br><br>*to*<br><br>"earlier was a contractor…" | Corrected due to information obtained since. |
| 9 | 30 | Deleted footnote 5 referencing potential deposition of the Mayor. | Resolved during discovery. |
| 15 - 16 | 50 | Changed, "The Board of Ethics and Government Accountability (BEGA) jointly interviewed S.B. and S.C.B. under oath and then decided it lacked jurisdiction, with its investigator speculating to Plaintiff that the baby had been adopted [though that would have been inconsistent with S.B.'s and S.C.B.'s accounts]"<br><br>*to* (note the underlined added text)<br><br>"The Board of Ethics and Government Accountability (BEGA) <u>relied on its earlier ethics-related investigation for which it</u> interviewed S.B. and S.C.B. under oath, but then decided it lacked jurisdiction, with its investigator speculating to Plaintiff that the baby had been adopted [though that would have been inconsistent with S.B.'s and S.C.B.'s accounts]." | Corrected to reflect there was not after all a new investigation as to S.B. paid parental leave fraud issue; instead BEGA simply relied on materials from first investigation. This is per statements of Defendants' counsel in July 20, 2021 court conference. |

| 17 | 57 (new) | Added under new, "VIII. SUPPLEMENTAL CLAIM" section:<br><br>"57. Plaintiff also raises as protected activity under the First Amendment and D.C. Whistleblower Protection Act her August-November 2016 disclosures that S.B. improperly was reviewing projects of someone close to him, i.e., S.C.B." | This is text of the Court-approved amendment. (Note S.B.'s wife S.C.B. is also known as S.Y.C.) |
|---|---|---|---|
| 18 | 58 (new) and its five sub-paragraphs | Added:<br><br>"58. This claim is consistent with documents produced by Defendants (their Bates numbers 207-211) that confirm that:<br><br>58.1 Sydney Lester emailed Plaintiff that her allegations of S.B. wrongdoing had grown more and more serious over time, but lacked evidence.<br><br>58.2 Plaintiff then met with Mr. Lester and his fellow management official Gary Englebert to set out the evidence she had of conflict-of-interest violations by S.B.<br><br>58.3 On September 29, 2016, Plaintiff emailed Human Resources Specialist Mia Brown and DCRA Special Investigator Tyrone Lawson to complain her reports of conflicts of interest by S.B. were unnecessarily disregarded by Sydney Lester.<br><br>58.4 On October 27, 2016, Plaintiff forwarded the above email chain on to BEGA investigator Ileana Corrales and another BEGA staff member.<br><br>58.4.1 (As noted earlier, BEGA went on to require that S.B. admit to an ethics violation and pay a $1,000 fine.)<br><br>58.5 The emails referenced above later became Exhibit 11 in DCRA Investigator Lawson's report of investigation—the one alleging misconduct by Plaintiff that was relied on to propose a 10-day suspension and impose an eight-day suspension on her." | Per Defendants' request for additional detail on the new claim, this information has been added, citing documents Defendants produced in discovery. |
| 19 | 60 | Added: "Plaintiff seeks a jury trial as to all disputed issues of fact." | Added (Defs. have already requested). |

**From:** S Major <​████████████████​>
**Sent:** Tuesday, April 3, 2018 6:02 PM
**To:** Luchi Lu Hotmail <​████████████████​>
**Subject:** Re: Mr. and Ms. Bump -- Epidemic paternity leave fraud DCRA

Luchi,
This story keeps getting worse. I almost have no words!!! Just corrupt, defiant and disturbing. He gave me such a hard time when I had a residential elevator project. He wouldn't approve it for nothing. This was a residential elevator and he put requirements on it like it was a commercial elevator. Here he is putting me through all of this unnecessary drama knowing that he's doing all of these corrupt and illegal things with his wife. Disgusting!!! Yes, it was a bizarre triangular shape that's why I noticed it. I thought to myself that something may be wrong with the baby but I never imagined that it wasn't a baby. Wait a minute the guy that just left and got another job was Antonio. Wow!!! I thought you were talking about Keith not Antonio. Antonio told me that he was getting married and having a baby WITH HIS FIANCE!!! I agree with Mr. Chendi, I don't know how these people sleep either. You have a job with benefits. That's better than most people can say. Why do you need to lie, cheat and deceive to get more than what's allotted to you. I don't understand it at all.

Sheba
(240)██████

---

**Message**

---

**From:**       Allsopp, Runako (DCRA) [/O=DC GOVERNMENT/OU=EXCHANGE ADMINISTRATIVE GROUP
               (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=RUNAKO.ALLSOPP]
**Sent:**       8/23/2016 5:46:12 PM
**To:**         Flowers, Brian (BEGA) [/O=DC GOVERNMENT/OU=EXCHANGE ADMINISTRATIVE GROUP
               (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=BRIAN.FLOWERS]
**CC:**         Sobin, Darrin (BEGA) [/O=DC GOVERNMENT/OU=EXCHANGE ADMINISTRATIVE GROUP
               (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=DARRIN.SOBIN]
**Subject:**    Permit Issuances/ Financial Conflicts of Interest
**Attachments:** FW: counter schedule; FW: Thursday afternoons; Permit Center Fire Counter Schedule - 5-24-16 to ----.docx

Brian/Darrin:

████████████████████g ████████████████. I received a complaint regarding DCRA Fire Protection
Engineer, S██ B███. S██'s wife is an expeditor and has her own company. ████████████████
████████████████████████████), ████████████████████████
████████████████.  ██████,  ████████████████████████n
████████████████. I have spoken to S██ and Luchi's immediate supervisor, Sydney Lester and also Sydney Lester's
supervisor, Gary Englebert.  Both have indicated that they believe this allegation is unlikely to be true and that Luchi has
a long held personal vendetta against Mr. B███ for unknown reasons; ████████████████████
████████████████████.  ████████████████████████,
████████████████████████

Please let me know if you have any further questions or need additional information. Thanks.

Runako Kumbula Allsopp
Assistant General Counsel
Office of the General Counsel for the
Department of Consumer and Regulatory Affairs
1100 4th Street, SW, Suite 5266
Washington, D.C. 20024
Phone:  202-442-8199  Fax:  202-442-9447
Email:  Runako.Allsopp@dc.gov

Fwd: Application in PDF

Qing Lu <luchi_100@hotmail.com>

Tue 2020-08-04 12:17 AM

**To:** Qing Lu <luchi_100@hotmail.com>

Regards,
Luchi

Begin forwarded message:

> **From:** "Lu, Luchi (DCRA)" <luchi.lu@dc.gov>
> **Date:** November 2, 2016 at 8:37:59 AM EDT
> **To:** Qing Lu <luchi_100@hotmail.com>
> **Subject: FW:  Application in PDF**

---

**From:** Lu, Luchi (DCRA)
**Sent:** Wednesday, November 02, 2016 8:31 AM
**To:** Foster, Janet (BEGA)
**Cc:** Corrales, Ileana (BEGA)
**Subject:** RE: Application in PDF

Ms. Foster,

Thank you for your email. As a matter of fact, I just wish to provide some additional background to the questions I was asked at the meeting.

When Investigator Corrales asked me "Does Sydney Lester know she is his wife", I was not able to recall and recap all the relevant information. Now I am providing additional information to substantiate it. I believe the answer is Yes.

On October 27th, 2014, S████ B████'s lawful wife was killed by a car in Maryland.
http://pgpolice.blogspot.com/2014/10/pgpd-investigates-fatal-pedestrian_27.html
http://washington.cbslocal.com/2014/10/27/woman-killed-after-being-hit-by-car-in-maryland/
Prince George county sheriff called S████ B████ at work to notify him of his wife's death. S████ B████ answered the phone and then informed Sydney Lester what happened. He left the office in a rush on that day. He was on bereavement leave for about 2 weeks taking care of the tragedy. Sydney Lester was the one who approved his bereavement leave. Sydney Lester asked one of my coworkers whether he wanted to attend the funeral.

S████ B████ took his first paternity lea█ ██ █ebruary 2015. Before that, he introduced Ms. ████ ████ who was pregnant to Sydney Lester and other coworkers in the office to show the relationship. There are also many other occasions when she is

attempting to lead people to believe he had THREE/FOUR jobs to do. He masters all the techniques of acting dramatically busy particularly after 4:30 for over-time earning purpose. To substantiate, you can check PeopleSoft or his W2 to verify how many overtime he earned particularly during those years of economic down turn. I reported this to Sydney Lester when we were in Union Station.

About 2 or 3 years ago, at the annual "Ethics Training", when the instructor was talking about "time thefting", I raised my hand and stood up. I asked my question in front of almost 100 employees of DCRA: "When we address the time thefting issue, shall we take into consideration of the cultural difference and country origin?" People laughed, they thought I was sarcastic but I was NOT. I was deeply confused whether in certain culture / country being sly and cunning is highly regarded as "smart" and "resourceful".

In recent years after we use one sheet for the whole week, S███ B███ adjusted his strategy/technique accordingly. Sometimes when he is late in the morning and / or leaves early in the afternoon, i.e. when he is not doing 8 hours, he leaves the time of that day in BLANK so he can still claim 8 hours in PeopleSoft and it won't be traceable or verifiable. I reported that to Gary Englebert with some other privileged treatments S███ B███ has been receiving (attendance, training, promotion promise, exclusive entitlement to overtime). In January this year (2016), Gary called Sydney Lester and me to his office and the three of us had a meeting. I brought a copy of his times where he used this new technique. In addition, I also mentioned ███'s splitting one job to three to earn overtime to Gary. I told both both of them S███ B███ has deep character problem he is dishonest with an ingrained nature of taking advantage. I also pointed out to Sydney Lester what he is doing is not management, it is conspiracy!!

I know the timesheet manipulation and overtime issues may not be directly related to the conflict of interest allegation, but hopefully it can provide some insight on your investigation. At the same time, I, myself, will strictly follow the confidentiality rules. I will not disclose any information before BEGA reaches its final conclusion.

Please confirm receipt of this email.

Thank you,
Luchi


Best Regards,

Luchi Lu
Fire Protection Engineer
Department of Consumer and Regulatory Affairs
1100 4th Street SW, E340. Washington, DC 20024
Office: 202-442-9474
Email:  luchi.lu@dc.gov
Website:  www.dcra.dc.gov

**From:** Foster, Janet (BEGA)
**Sent:** Tuesday, November 01, 2016 10:19 AM
**To:** Lu, Luchi (DCRA); Corrales, Ileana (BEGA)
**Subject:** RE: Application in PDF

Ms. Lu –
Thank you for meeting with Ms. Corrales last week. Please note that our investigations are *confidential*, so we cannot provide ~~details~~ while our investigations are ongoing. We do, however, greatly appreciate your assistance and cooperation. Should we have any

**Plf. Opp.**
**App. 400**

Tiffany Crowe - February 11, 2021

Page 1

```
 1            UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF COLUMBIA

 3

 4    _____
                                    )
 5    QING LU,                      )
                                    )
 6              Plaintiff,          )
                                    )
 7       vs.                        )    Civil Action No.
                                    )    1:20-cv-00461-APM
 8    DISTRICT OF COLUMBIA, et al.  )
                                    )
 9              Defendants.         )
                                    )
10    _____)

11

12

13

14        VIRTUAL DEPOSITION OF TIFFANY CROWE

15           Thursday, February 11, 2021

16                  12:18 p.m.

17

18

19

20

21

22    Reported by:  Cappy Hallock, RPR, CRR
```

Tiffany Crowe - February 11, 2021

```
1          A      I apologize.  I will mute my phone.

2          Q      You talk about comments regarding SB's

3    wife's appearance.  Are you talking about Ms. Lu

4    reporting that Ms. SB did not appear to be

5    pregnant shortly before the time when the child

6    was said to have been born?

7          A      Absolutely.  Like, that is a very -- I

8    started to say I don't know if you have ever been

9    pregnant.  You haven't been but, you know, those

10   types of things are absolutely inappropriate.

11         Q      And are you talking about her, things

12   that Ms. Lu observed on the public Facebook

13   postings from Ms. SB?

14         A      I mean, while the District does not

15   have standard code of conduct when it comes to

16   viewing and screenshotting your colleague's social

17   media posts, that is also an intrusion.  Even if

18   they have posted it publicly for their friends and

19   family to see you also don't know how -- you don't

20   know the inner workings of anyone's family or

21   personal situation.

22                 So to go looking for information about
```

Tiffany Crowe - February 11, 2021

Page 24

1      someone's personal life to serve a vendetta seems

2      a little scary to me, particularly when she did

3      what she could do in that circumstance which is

4      report it.

5                An entire investigation was held,

6      which is absolutely what the Agency should have

7      done, but in general when someone reports

8      something the reporter of that thing does not also

9      continue their own investigation into the matter.

10     They don't continue to search for and harass the

11     subject of that investigation.  They allow the

12     process to take place.  And I can say that from my

13     experience participating in other investigations.

14     So this is the only incident in which the person

15     who filed the complaint continued in this matter,

16     in this manner.

17          Q    Apart from Ms. Lu being told by

18     District management or officials that her report

19     had been investigated and there was nothing to it,

20     do you know of any other reason that leads you to

21     conclude she should have known what she was

22     reporting was false?

Tiffany Crowe - February 11, 2021

Page 25

1          MR. DANIEL:  Objection.

2          You can answer.  I'm sorry.

3          THE WITNESS:  Okay.

4      A    No.  I mean, you report something

5  because you have a concern about it.  Right?  And

6  so the investigation concluded, the facts were

7  shared with her.  And at that point, you know, you

8  can believe the facts or not believe the facts but

9  I don't want to speculate about what she knew and

10  when she knew it.  Nor do I -- like --

11      Q    I'm sorry, go ahead.

12      A    Even if -- like, no matter how the

13  investigation turned out, let's say that it turns

14  out that SB had -- the investigation was done, the

15  results were different.  If during the course of

16  that investigation the behavior of the complainant

17  was the same, we would still have the same

18  disciplinary challenge at the Agency if the

19  behavior is the problem, not the belief or

20  disbelief in the outcome.

21      Q    Okay.  So your view was that her

22  harassing of SB, that was the more serious aspect,

Plf. Opp.
App. 404

Tiffany Crowe - February 11, 2021

Page 59

1    that was news to me.  Now, these applications were

2    approved at the manager level unless there was,

3    like, a formal -- a formal appeal or some reason

4    it had been escalated to me, so all of the

5    approvals were done at the managerial level.  So

6    when she said there were several people similarly

7    situated to her I asked who those people were.  I

8    didn't get any names so that's when I asked the HR

9    manager to let me know if there were people who

10   were teleworking who based on the policy should

11   not have been and there were no cases of that.

12          Q     And is it correct that Ms. Lu had been

13   approved by the supervisory chain to telework?

14          A     I don't know about that.  I know based

15   on Ms. Lu's e-mails and her admission she said

16   that she had submitted it to her supervisor and

17   her supervisor said that he had given it to HR.

18   So I took her at her word that her supervisor said

19   it was fine for her to telework but they thought

20   there were some questions so they escalated it to

21   me.

22          Q     And so what did you understand to be,

Plf. Opp.
App. 405

Tiffany Crowe - February 11, 2021

1    had approved it in August and Christopher Bailey

2    in November.  Is it possible that Ms. Lu initiated

3    on her own, contacted you rather than the

4    supervisor advising her to contact you?

5         A    I don't --

6              THE WITNESS:  Sorry, go ahead.

7              MR. DANIEL:  Calls for speculation.

8              But go ahead and answer.

9         A    I guess it's possible.  I assumed --

10   in her e-mail she said my supervisor said that

11   they sent my application to you.  And so I -- it

12   does call for a lot of speculation about how that

13   conversation went or how Ms. Lu came to believe

14   that I was the person to contact about this.

15        Q    Okay.

16             And are you the one that indicated

17   that you needed to have a meeting in person with

18   Ms. Lu to figure out what was going on?

19        A    Yes.  There were a lot of e-mails,

20   like I said.  I was a little confused about why I

21   was being involved in this, if it was already

22   approved, you know.  And so it was only through

Tiffany Crowe - February 11, 2021

Page 70

1    these conversations that I came to understand that

2    she didn't actually have a VPN, which her

3    supervisor said she needed to do her work.

4            So they, knowing the policy and

5    knowing that's what is required for her job and

6    knowing she didn't have a VPN, I was just a little

7    confused about the situation and wanted to see how

8    I could help.  So I told Ms. Lu rather than going

9    back and forth with e-mail that we should have a

10   conversation.

11       Q    Okay, and what would have been

12   Mr. Lester's role in dealing with telework as to

13   Ms. Lu?

14       A    Was he her supervisor at the time?

15       Q    Well, he has indicated that he has

16   been her supervisor at least at some point.

17       A    I guess I would have to know whether

18   or not he was her supervisor to know what his role

19   is.

20       Q    Okay.

21            MR. SCHLEICHER:  That's all that we

22   have.  Mr. Daniel, do you have any questions?

Tiffany Crowe - February 11, 2021

Page 82

```
1      UNITED STATES OF AMERICA )

2      STATE OF MARYLAND        )

3

4           I, CAPPY HALLOCK, the reporter before

5      whom the foregoing deposition was taken, do hereby

6      certify that the witness whose testimony appears

7      in the foregoing deposition was sworn by me; that

8      said deposition is a true record of the testimony

9      given by said witness.

10          I further certify that I am neither

11     counsel for, related to, nor employed by any of

12     the parties to the action in which this deposition

13     was taken; and further that I am not a relative or

14     employee of any attorney or counsel employed by

15     the parties hereto, or financially or otherwise

16     interested in the outcome of this action.

17

18

19

20                        Cappy Hallock, RPR, CRR

21

22     My Commission expires January 19, 2025
```

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

+ + + + +

```
                              :
IN THE MATTER OF:             :
                              :
QING LU,                      :
                              :
     Plaintiff,               :   Civil Action No.
                              :   1:20-cv-00461-APM
v.                            :
                              :
DISTRICT OF COLUMBIA,         :
et. al.,                      :
                              :
     Defendants.              :
                              :
```

Thursday,
May 13, 2021

DEPOSITION OF:

S.B.

called for examination by Counsel for the
Plaintiffs, pursuant to Notice of Deposition, via
videoteleconference, when were present on behalf
of the respective parties:

1    answer?

2              MR. DANIEL:  Not instructing him not

3    to answer, but let's tighten this up a little

4    bit.

5              BY MR. SCHLEICHER:

6         Q    Did you get the question, S.B.?

7         A    Okay.  So you're asking me if someone

8    fraudulent, commit a crime or something, I --

9    what is -- what is the question again?

10        Q    I'm asking about whether -- what your

11   view is that if a DCRA employee claims paid

12   parental leave for a child that does not exist,

13   whether that would be, in your view, serious

14   misconduct?

15        A    I would assume.

16        Q    And --

17        A    What -- what would be the basis?  What

18   -- what would be the basis for someone can always

19   submit something, but it doesn't mean that it's -

20   - it's going to be approved.  It has to be

21   reviewed, and the information that they provide

22   has to be assessed.  And a decision has to be

1      of -- or the penalty in this matter.  I didn't.

2      I wasn't even aware that she was suspended, even

3      though the harassment was towards me.  Nobody

4      came back to me and said she was suspended from

5      work or wasn't paid and sent home.  I did not

6      know that.  I only knew when all of this came to

7      me that there was going to be a hearing.  That's

8      when I knew that she was suspended.

9             So that's that.  I cannot say whether

10     or not the penalty was too severe or too light.

11     They determined that that's the penalty that they

12     were going to hand out.  I had nothing to do with

13     it, but I'm glad something was done.

14             BY MR. SCHLEICHER:

15     Q     Okay.  Have you ever been subjected to

16     a disciplinary suspension for your conduct as a

17     DCRA employee?

18     A     Have you ever been subjected to this

19     kind of conduct for your work?

20     Q     Subjected to an unpaid suspension.

21     A     Not that -- not to my knowledge.

22     Q     We discussed earlier that you had paid

1      a $1,000 fine; is that right?

2            A      That was outside of DCRA.  Again, this

3      was all initiated by Ms. Lu.  So there were --

4      there were -- I mean, I think you probably have a

5      copy of the BEGA reports that would likely

6      describe what the issue was.  So there you have

7      it.

8            Q      Okay.  In what way was the BEGA --

9      B-E-G-A -- fine a result of what Luchi Lu had

10     done?

11           A      What Luchi Lu had done?

12           Q      You said it involved her, that matter

13     also involved her?

14           A      The matter was raised by her.  I -- so

15     there was -- well, the long and short of it is

16     there were two incidents of conflict of interest.

17     So that -- that was that, and, therefore, need to

18     I guess -- I cannot -- I don't think that Lu's

19     level of misconduct was -- there's two matters of

20     conflict of interest and they said okay.

21                 Let's define.  I tried to appeal it.

22     They said we considered it, but at the time I --

1    it would have probably caused additional legal

2    expense, so whatever.  I just agreed to whatever

3    it is, whatever it was.

4         Q    And what I'm trying to figure out is,

5    do you believe that Luchi Lu was behind that

6    matter also, behind you ending up having to pay a

7    $1,000 fine?

8         A    Yes.  The matter was reported by her.

9    The original claim was originated by her.

10        Q    Do people in jobs like the one that

11   you and Luchi Lu have make around $100,000 a year

12   very roughly?

13        A    Yes, sir.

14        Q    Okay.  I had divided that by 52 weeks,

15   and then by five days a week, and I get about

16   $384.  And then multiply that by an eight-day

17   suspension, over $3,000.  Do you believe it was

18   appropriate for Luchi Lu to suffer about $3,000

19   loss in pay versus you paying a $1,000 loss?  Or

20   do you think those two situations are completely

21   different?

22        A    They are completely different.  Are

1    who come to DCRA to do business, that my wife is

2    faking pregnancy.  And she is bold enough to

3    discuss that with other employees in the office

4    and say that we are committing fraud.

5              And you are asking me if $3,000 is too

6    severe?  If it was in some cases, she would be

7    fired.

8        Q    Okay.  Have you managed to maintain

9    high performance ratings in spite of what has

10   been going on between you and Luchi Lu?

11       A    I try to do my job despite all this

12   distraction.  I try to stay focused.

13       Q    And so have you managed to maintain

14   high performance ratings in spite of that stress?

15       A    Well, I guess -- I guess my -- my job

16   appraisal speaks for itself.  I -- I think the

17   answer would be yes.

18       Q    Did the stress of Luchi Lu's reports

19   about you ever become so unbearable that you had

20   to seek professional counseling or be prescribed

21   something like an anti-depressant or anti-anxiety

22   drug?

1              S.B.:  I -- I am reading what the

2     closed caption is saying in order to -- to catch

3     up on the question.  That's the reason for the

4     delay.

5              MR. BLECHER:  I understand.  But don't

6     read it out loud.  Read it in your head, if --

7              S.B.:  Oh, okay.  Okay.

8              MR. BLECHER:  Got it?

9              S.B.:  I get what you're saying.

10    Okay.

11             BY MR. SCHLEICHER:

12        Q    Let me ask it this way.  Did your wife

13    fake the pregnancy that was the basis for the

14    paid family leave request in 2016?

15        A    No, she did not fake her pregnancy.

16        Q    All right.  Prior to the pandemic,

17    were you allowed to telework at all?

18             MR. DANIEL:  Objection.  Foundation.

19    You can answer.

20             S.B.:  Yes, I was allowed to telework.

21             BY MR. SCHLEICHER:

22        Q    And do you remember whether or not you

1    were required to have a VPN, virtual private

2    network, set up in order to telework prior to the

3    pandemic?

4              MR. DANIEL:  Objection.  Foundation.

5    You can answer.

6              S.B.:  I did not need a VPN to work.

7              BY MR. SCHLEICHER:

8        Q    Okay.  When do you understand Luchi Lu

9    to have first started making reports claiming

10   wrongdoing by you?

11       A    I don't know.  I don't keep track of

12   what Luchi Lu does.

13       Q    Are there any matters other than the

14   claim of the parental leave fraud and the

15   conflict of interest, other than those two

16   matters, are there any that you're aware of her

17   reporting about you?

18       A    Okay.  What -- sorry.  Could you

19   report the two matters again?  Could you -- could

20   you mention those --

21       Q    Yes.

22       A    -- two matters again?

1      You can answer.

2                  S.B.:  I hope it was because of my

3      complaint.  If it was not because of my

4      complaint, then there would be no reason for him

5      to be asking about my family and pictures that

6      were posted in my -- in my cubicle at work.  So

7      my guess it was related to that same incident.

8                  So it's not isolated.  I -- I think I

9      am -- I think I am correct to say that it's all

10     related to the same issue.

11                 BY MR. SCHLEICHER:

12         Q     How many times did you have to

13     complain to management to get -- before the

14     investigation of Luchi Lu started?

15                 MR. DANIEL:  Objection.  Foundation.

16     You can answer.

17                 S.B.:  If I -- I can recall that I

18     made two -- I sent two emails.  Other than that,

19     I have been complaining verbally until I wrote

20     those two emails.  So I guess --

21                 BY MR. SCHLEICHER:

22         Q     Have you got --

41

1       A       -- that is what initiated the -- the

2    investigation.

3       Q       Have you had the chance to talk with

4    Sydney Lester about Luchi Lu's conduct in

5    reporting you?

6       A       Oh, do you mean in this -- for this

7    case?

8       Q       Well --

9       A       Reporting me about what?

10      Q       Yes.  About the parental leave issue.

11              MR. DANIEL:  Objection.  Can you --

12    objection.  Can you specify as to when and to

13    what case you're asking him he discussed with Mr.

14    Lester?  It's a little unclear.  There's a long

15    time span we're talking about here.

16              BY MR. SCHLEICHER:

17      Q       Okay.  So I'm talking about Luchi Lu's

18    claim that you engaged in parental leave fraud,

19    and I'm wondering when the most recent time was

20    that you discussed that matter with Sydney

21    Lester, if at all?

22      A       Okay.  I'm going to go back and -- to

1    occurred on more than one location, up to the

2    point where Lester would either walk her with a

3    new timesheet and just throw away the old

4    timesheets and have the timesheets redone,

5    because, I mean, it was just not -- not proper.

6              Who are you -- I mean, who is she to

7    tell me what -- what my attendance record should

8    be or is?  Why are you questioning my time?  You

9    don't approve my timesheet.

10        Q     And in the --

11        A     So everything that has been going on

12   in the past where she -- she is doing all of

13   these conniving things.  And I verbally

14   complained to Lester over the years.  Lester

15   knew.  And so hence this letter.  I think I had

16   gotten tired of what was happening.

17             So, and then it just came up to this

18   point where now it escalated to -- to her

19   attacking my wife or me personally about whether

20   my wife is pregnant or -- or all of these -- it

21   just keeps growing into some other issue, man.

22        Q     In the second paragraph, you start by

1      saying, "In the recent months, she escalated this

2      behavior, by reporting me to the Board of Ethics

3      and Government Accountability Office (BEGA),

4      accusing me of misconduct in performing my duties

5      here at work that involves my wife."

6                  Is that a reference to her allegations

7      about the conflict of interest matters?

8          A      The conflict -- the conflict of

9      interest, yeah.

10         Q      And then down at the bottom, do you

11     see where I have highlighted you say, "Among all

12     the other things that she has done in the past,

13     she has even gone as far as to implicate

14     Mr. Lester in fixing the permit center roster so

15     that I can approve plans that my wife submits on

16     Thursdays."  Can you explain what you are

17     referring to there?

18         A      Okay.  Let me -- let me tell you what

19     that line is all about.  Before -- before Garrett

20     Englebert left, he was in Mr. Bailey's position

21     as head of the PO -- the POD section, or -- or

22     Deputy CBO.

131

### C E R T I F I C A T E

This is to certify that the foregoing transcript

Deposition of: S.B.

In the matter of: Qing Lu v DC

Before: US District Court

Date: 05-13-21

Place: teleconference


were duly recorded and accurately transcribed under

my direction; further, that said transcript is a

true and accurate record of the proceedings; and

that I am neither counsel for, related to, nor

employed by any of the parties to this action in

which this deposition was taken; and further that I

am not a relative nor an employee of any of the

parties nor counsel employed by the parties, and I

am not financially or otherwise interested in the

outcome of the action.



------------------------
Court Reporter

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C. 20005-3701        www.nealrgross.com

Sydney Lester - February 11, 2021

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLUMBIA

 3

 4     _____
                                     )
 5     QING LU,                      )
                                     )
 6              Plaintiff,           )
                                     )
 7        vs.                        )    Civil Action No.
                                     )    1:20-cv-00461-APM
 8     DISTRICT OF COLUMBIA, et al.  )
                                     )
 9              Defendants.          )
                                     )
10     _____)

11

12

13

14         VIRTUAL DEPOSITION OF SYDNEY LESTER

15            Thursday, February 11, 2021

16                  2:02 p.m.

17

18

19

20

21

22     Reported by:  Cappy Hallock, RPR, CRR
```

Sydney Lester - February 11, 2021

1       reporter, can you hear him all right?

2               THE REPORTER:  He is a little muffled

3       but it may be just the way that he talks.

4           Q     Without giving a legal opinion but

5       just your own understanding, can you summarize

6       what your understanding is as to whether or not

7       there are protections under D.C. law for people

8       who report what they believe to be wrongdoing

9       employees?

10          A     I'm not sure.

11          Q     Okay.  And again, not a legal opinion

12      but your personal understanding, what is your

13      understanding of whether or not employees of the

14      D.C. government generally have first amendment

15      rights as to matters they speak out about at work?

16              Let me change that question.  I'm

17      wondering about your personal understanding, not a

18      legal opinion, about whether or not D.C. employees

19      have a right under the first amendment to report

20      what they consider to be serious wrongdoing?

21          A     (garbled)

22              THE REPORTER:  There was all kinds of

Sydney Lester – February 11, 2021

1       Q      Do you know if Mr. Lawson has

2    socialized outside of work with SB?

3       A      No.

4       Q      What do you consider to be the most

5    serious single incident of misconduct that Ms. Lu

6    has engaged in?

7       A      Well, I didn't -- I didn't -- it was

8    just a combination of all the events, all the

9    activities.

10      Q      Of all the activities, which one do

11   you think was the most serious example of

12   misconduct?

13      A      I didn't categorize them.  I think

14   they were all serious.

15      Q      There is not any of them that stand

16   out to you as particularly outrageous or egregious

17   or offensive?

18      A      No.  I still think that -- no, there

19   is none.

20      Q      And in your own words can you

21   summarize what you believe her to have done wrong

22   that justified suspending her for ten days?

Sydney Lester - February 11, 2021

1      A    The continuing the conduct even though

2   she had been told that her complaints have been

3   looked into and that, the result was that there

4   was nothing to it.  So after being told that over

5   and over, for it to be continuing I think that,

6   you know, led to action against her.

7      Q    And when you say continuing her

8   conduct, what conduct are you referring to?

9      A    Conduct of not accepting that the

10  issue that she has raised has been investigated by

11  the appropriate bodies and they have come back to

12  say that there is nothing there.

13     Q    And who came up with the number of ten

14  days versus, say, a reprimand or a counseling or

15  five days?

16     A    I think maybe the guideline that has

17  been.

18     Q    Do you mean, like the table of

19  penalties or schedule of penalties in the

20  disciplinary manual -- I'm sorry, the HR manual

21  dealing with discipline?

22     A    Something like that.

Sydney Lester - February 11, 2021

Page 24

```
 1        A     Not that I remember.

 2        Q     If it turned out that SB had, in fact,

 3   obtained eight weeks of paid parental leave for a

 4   child that wasn't born, would you agree that would

 5   be serious misconduct on his part?

 6              MR. DANIEL:  Objection, calls for

 7   speculation.

 8              You can answer.

 9              You can answer.

10              THE WITNESS:  How is that?

11              MR. DANIEL:  Did you hear the

12   question?

13              THE WITNESS:  Can you repeat it?

14              MR. SCHLEICHER:  Sure.

15        Q     If there was an employee that turned

16   out to have fraudulently obtained eight weeks of

17   paid parental leave would you agree that that

18   would be serious misconduct?

19        A     Yes, that would -- that would be.

20        Q     How about an employee who asserted

21   something is true under oath that they knew to be

22   untrue, would that also be serious?
```

Sydney Lester - February 11, 2021

Page 25

```
 1          A      If someone did what?

 2          Q      Swore to something under oath that

 3    they knew was not true.

 4          A      That would be serious.

 5          Q      Do you consider Ms. Lu's conduct to

 6    have been more serious wrongdoing than SB's

 7    admitted ethics violation?

 8                 MR. DANIEL:  Objection, form.

 9                 You can answer.

10                 You can answer.

11          A      I'm not sure of what SB, the situation

12    was in terms of what -- are you saying that he

13    swore something under oath that was not true?

14          Q      No.  I'm sorry.  I was referring to

15    his admitted ethics violation for reviewing plans

16    of his domestic partner without disclosing that to

17    management, how you weighed that in seriousness

18    versus what Ms. Lu did.

19          A      I don't know what you admit that.

20          Q      I'm sorry, what?

21          A      I don't know how you would compare

22    that.
```

Sydney Lester - February 11, 2021

```
 1          Q     What harm did Ms. Lu's actions cause

 2   to the District of Columbia government in your

 3   observation?

 4                MR. DANIEL:  Objection, foundation.

 5          Q     Let me ask this then.

 6                Do you believe that Ms. Lu's actions

 7   caused harm to the District of Columbia

 8   government?

 9          A     In general.  Is that in general?

10          Q     In any way.

11          A     I don't know.

12          Q     Do you believe that Ms. Lu's actions

13   caused harm to DCRA?

14          A     Well, it caused tension in the

15   workplace, if that's what you're talking about.

16          Q     Okay.  Any other harm other than

17   tension in the workplace?

18          A     Not that I'm aware of.

19          Q     And when you say tension in the

20   workplace are you referring to the relationship

21   between SB and Ms. Lu?

22          A     Yes.
```

Sydney Lester - February 11, 2021

```
 1                  You can answer.

 2                  You can answer.

 3         A    Can you repeat the question?

 4         Q    I'm asking are you aware of any reason

 5   to believe that Ms. Lu would have ended up

 6   suspended if she had never reported her belief

 7   that SB engaged in leave fraud.

 8         A    I can't say.

 9         Q    Well, does that mean that you're not

10   aware of any reason to believe that?

11         A    I'm not aware.

12         Q    I'm sorry, what was that?

13         A    I am not aware.

14         Q    Oh, okay.

15                  Did you form an opinion about whether

16   or not Ms. Lu intentionally lied about SB versus,

17   say, she was simply mistaken?

18         A    I can't say what her intent was but

19   she continued even after she was told that what

20   she was saying was not so.

21         Q    Okay.

22                  Do you know if she was ever shown any
```

Sydney Lester — February 11, 2021

1    absolutely certain and 1 being you have no idea,

2    how certain are you that SB, his obtaining

3    parental leave was honest and accurate?

4         A    Is 100 that I am sure?

5         Q    Yes.

6         A    So you're asking me to guess, right?

7         Q    No, I'm asking.  If you don't know

8    whether or not it's accurate you can certainly say

9    that, but I'm asking you if you have an opinion

10   about whether or not he committed fraud, and I

11   want to find out how certain you are about that.

12              MR. DANIEL:  I've lost track of the

13   question, David.  Can you put it to him again.

14              MR. SCHLEICHER:  Sure.

15        Q    On a scale of zero to 100, with 100

16   being absolutely certain and zero meaning that you

17   have no idea, how certain are you that SB did not

18   fraudulently obtain paid parental leave benefits?

19        A    I would say I'm not certain.

20        Q    Okay.

21              What is the single most convincing

22   piece of evidence for you that he did make an

Plf. Opp.
App. 430

Sydney Lester - February 11, 2021

1    honest and accurate request for paid parental

2    leave?

3         A    When he got the approval by the HR

4    folks that has to deal with that kind of issue.

5         Q    Okay.

6              And do you know if HR did anything to

7    verify whether or not the documents SB submitted

8    were authentic?

9         A    I don't know how they operate.

10        Q    When do you think was the last, most

11   recent discussion that you had with SB about

12   Ms. Lu?

13        A    The last discussion?  I would say a

14   couple years ago.

15        Q    So since you proposed discipline has

16   SB complained at all about Ms. Lu?

17        A    I don't think so.

18        Q    Did you have a chance to read

19   Mr. Lawson's investigation of SB's complaints

20   about Ms. Lu?

21        A    You mean his investigation report?

22        Q    Yes.

Sydney Lester - February 11, 2021

Page 32

 1          A     Yes, I did.

 2          Q     And was that the primary basis for

 3     your decision to propose discipline, that it was

 4     appropriate to propose discipline against Ms. Lu?

 5          A     Yes, it was.

 6          Q     Did you get a chance to meet with

 7     Mr. Lawson also after he had prepared the Report

 8     of Investigation for him to answer any questions

 9     that you had about it?

10          A     I don't remember.  I don't think so.

11          Q     Who do you remember being the highest

12     ranking elected or management official who has

13     communicated to you about Ms. Lu's reporting about

14     SB?

15          A     I guess it would be the mayor.

16          Q     Okay, and what do you remember the

17     mayor communicating about Ms. Lu?

18          A     What do I remember what?

19          Q     What do you remember about the mayor

20     communicating about Ms. Lu?

21          A     I don't remember the -- what she

22     communicated.  I'm just -- your question was what.

Sydney Lester – February 11, 2021

1          Q      Your conclusion that Ms. Lu had

2     disrupted the workplace, was that based on

3     anything other than Mr. Lawson's report and what

4     SB said to you about it?

5          A      No.  Based on what I –– no.

6          Q      Who do you remember to be the first

7     person that suggested that Ms. Lu's conduct might

8     justify disciplining her?

9          A      Who was the first person that

10    suggested that her action –– I can't say that I

11    remember the first person.

12         Q      Well, let me ask it this way.  Are you

13    the one that brought up the idea that it would be

14    appropriate to discipline her or did someone bring

15    that idea up with you?

16         A      Well, I would say working together

17    with the labor relations officer.

18         Q      Was that Mr. Tatum?

19         A      Yes.

20         Q      Are you aware of any other DCRA

21    employees who had been disciplined for misleading

22    management or supervisors?

Sydney Lester - February 11, 2021

```
 1          A      Would you repeat that question?  I
 2     didn't hear all of it.
 3          Q      Are you aware of any other employees
 4     at DCRA who were disciplined for misleading
 5     management or supervisors?
 6          A      No.
 7          Q      Did SB ever mention to you that he
 8     might be absent from work related to a trial over
 9     a traffic ticket?
10          A      I can't recall.
11          Q      Who is it that prepared the first
12     draft of your disciplinary proposal?  Was it you
13     or did someone provide the first draft to you?
14          A      I did the first draft.
15          Q      Do you remember about how many drafts
16     there were back and forth?
17          A      No.
18          Q      And as you were is there any the --
19                 THE REPORTER:  Ask the question again,
20     please.
21          Q      Yes.  When you were preparing the
22     disciplinary proposal was there any information
```

Plf. Opp.
App. 434

Sydney Lester - February 11, 2021

1       that you asked someone for beyond what was in the

2       Lawson investigation?

3            A     No.   That's whatever was in the

4       investigation.   Just what was in the

5       investigation.

6            Q     Okay.

7                  THE WITNESS:  You're breaking up now.

8            Q     What do you consider to be the

9       greatest danger that is posed by conduct like --

10                 MR. DANIEL:  Can you start the

11      question again?  He didn't hear the question.

12                 MR. SCHLEICHER:  Sure.

13                 THE WITNESS:  Your internet connection

14      is bad.

15           Q     What do you consider to be the

16      greatest danger --

17                 MR. SCHLEICHER:  Let me see if I'm

18      getting a better one over here.  Hang on.

19                 Can you hear me all right now?

20                 THE WITNESS:  Yes.

21                 MR. SCHLEICHER:  I may switch to this

22      other.

Sydney Lester - February 11, 2021

1              Okay.  Can you hear me all right?  Can

2     you hear me all right?

3              Can you hear me now?

4              THE WITNESS:  Yes.

5     BY MR. SCHLEICHER:

6          Q    Okay.  I'm sorry.

7              So my question was what do you

8     consider to be the greatest danger posed by

9     conduct like that that Ms. Lu engaged in?

10              MR. DANIEL:  Objection as to vague.

11              But you can answer.

12          A    Danger?  Just harassment,

13     unpleasantness in the workplace.

14          Q    Harassment and bitterness in the

15     workplace?

16          A    I'm not sure, that's my guess.

17          Q    Okay.

18              Do you know if Melinda Bolling played

19     any role in Ms. Lu being investigated?

20          A    No, I don't know.

21          Q    When SB complained to you that Ms. Lu

22     was harassing him, did you have a chance to meet

Sydney Lester - February 11, 2021

1    with Ms. Lu to get her side of the story?

2         A    No, I did not meet with her.

3         Q    I'm sorry, what was that?

4         A    I did not meet with her.

5         Q    Okay.

6         A    I don't remember meeting with her.

7         Q    And is there a reason you didn't meet

8    with her on that subject?

9         A    Because -- no, she thought that she

10   should bring it up with HR.

11        Q    And was there a point at which you

12   tried a verbal counseling followed up with a

13   letter documenting that with Ms. Lu to address

14   what SB was complaining about?

15        A    No.  I did not go through that

16   process.  I told him to go to HR to have HR deal

17   with it.

18        Q    And do you know was there an office

19   that you would typically send someone to?  Is

20   there an Office of Human Rights that would

21   typically handle a harassment complaint in your

22   experience?

Sydney Lester - February 11, 2021

1       A       Like I say, I didn't rely on -- I

2   relied on the entire report and what the report

3   said.

4       Q       Okay.  Let's look at it this way.

5               Did you include things in this

6   proposal that you considered irrelevant to your

7   decisionmaking?

8       A       I wouldn't say that it would be

9   irrelevant.  If it was in the report it would be

10  relevant.

11      Q       Okay, and I see there is mention of

12  her contacting CNN and WTOP.  What was it about

13  her contacting those media outlets that you found

14  to be concerning?

15      A       It was in the report.

16      Q       And I saw in Mr. Lawson's

17  investigation there seemed to be a gap between the

18  last witness being interviewed in December and

19  then when he interviewed Ms. Lu in February.  I'm

20  wondering, if she had not gone to the mayor would

21  you still have proposed discipline against her or

22  would the matter have dropped?

Sydney Lester – February 11, 2021

1    had occurred like the, her noticing that Ms. B█████

2    had made several other posts the same day on

3    Facebook but made no mention of the child being

4    born, did you find that persuasive at all?

5         A    Are you asking me to opine on

6    something that I didn't make?

7         Q    And why is it you don't think you can

8    opine on that?

9         A    Because I don't have the information

10   to make a decision.

11        Q    Are you someone that uses Facebook?

12        A    No.

13        Q    What message did you hope to send to

14   Ms. Lu with your proposed ten-day suspension?

15        A    That her complaints were, they were

16   investigated and that everybody came back saying

17   that there was nothing, and that we need to move

18   on.

19        Q    Do you know if Mr. Lawson conducted an

20   investigation of whether or not SB fraudulently

21   obtained leave?

22        A    I don't know.

Sydney Lester - February 11, 2021

Page 59

```
1    UNITED STATES OF AMERICA )

2    STATE OF MARYLAND        )

3

4             I, CAPPY HALLOCK, the reporter before

5    whom the foregoing deposition was taken, do hereby

6    certify that the witness whose testimony appears

7    in the foregoing deposition was sworn by me; that

8    said deposition is a true record of the testimony

9    given by said witness.

10             I further certify that I am neither

11   counsel for, related to, nor employed by any of

12   the parties to the action in which this deposition

13   was taken; and further that I am not a relative or

14   employee of any attorney or counsel employed by

15   the parties hereto, or financially or otherwise

16   interested in the outcome of this action.

17

18

19

20             Cappy Hallock, RPR, CRR

21

22   My Commission expires January 19, 2025
```

Clarence Garret Whitescarver - February 11, 2021

```
 1                UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF COLUMBIA

 3

 4      _____
                                     )
 5      QING LU,                     )
                                     )
 6                  Plaintiff,       )
                                     )
 7          vs.                      )    Civil Action No.
                                     )    1:20-cv-00461-APM
 8      DISTRICT OF COLUMBIA, et al. )
                                     )
 9                  Defendants.      )
                                     )
10      _____)

11

12

13

14      VIRTUAL DEPOSITION OF CLARENCE GARRET WHITESCARVER

15                  Thursday, February 11, 2021

16                        9:22 a.m.

17

18

19

20

21

22      Reported by:  Cappy Hallock, RPR, CRR
```

Clarence Garret Whitescarver - February 11, 2021

Page 11

1    else they care to, any item that they feel is a

2    violation of District law or is a case of fraud or

3    abuse.

4         Q     Okay.

5               And a similar question, again not

6    asking you for a legal opinion, but what is your

7    understanding of whether DCRA employees may have

8    some protection under the federal first amendment

9    about making reports of what they believe to be

10   wrongdoing?

11              MR. DANIEL:  Objection, calls for a

12   legal conclusion.

13              You can answer.

14        A     I would assume there are some

15   protections, yes.

16        Q     What is your current position with the

17   District?

18        A     I'm the chief building official.

19        Q     How long have you held that job?

20        A     Since October 2018.

21        Q     Is it unusual for you to have a role

22   in employee disciplinary matters?

Clarence Garret Whitescarver - February 11, 2021

Page 12

1        A      No.

2        Q      And is that typically as the deciding

3   official, proposing official or either one of

4   those?

5        A      Either one.

6        Q      And is it typical for you to have a

7   role in initiating investigations of employees for

8   potential misconduct?

9        A      Yes.

10       Q      Do you have a very general idea of

11  about how many employee misconduct investigations

12  or matters you have been involved in either as a

13  proposing or deciding official?  More like 20, 50,

14  100?

15       A      I would say less than six.

16       Q      Okay.

17              And of the ones you have been involved

18  in, how many have involved a charge of

19  intentionally misleading someone in management?

20       A      None that I recall.

21       Q      And other than the present one, how

22  many have involved a charge of misleading the

Clarence Garret Whitescarver - February 11, 2021

Page 14

```
1          Q     And in your own words can you

2   summarize what you believe her to have done wrong

3   that justified her being suspended for eight days?

4          A     Essentially the proffering of false or

5   misleading information to a supervisor.

6          Q     And by supervisor are you referring to

7   the mayor?

8          A     Yes.

9          Q     And apart from the specifics of this

10  case, if you concluded it was that a DCRA employee

11  obtained eight weeks of paid parental leave based

12  on the birth of a child that turned out not to

13  have taken place would you agree that would be

14  serious misconduct?

15               MR. DANIEL:  Objection, calls for a

16  legal conclusion.

17               You can answer.

18          A     Yes.

19          Q     In that same scenario, asking for your

20  personal view, not a legal conclusion, would you

21  agree that obtaining paid parental leave for a

22  child that wasn't born would constitute a misuse
```

Clarence Garret Whitescarver - February 11, 2021

Page 15

1      of the employee's position to obtain something to

2      which they were not entitled?

3                MR. DANIEL:  Objection, relevance.

4      Calls for a legal conclusion.

5                You can answer.

6           A    Yes.

7           Q    And I'm not asking for a legal

8      conclusion, but your own personal view.  If

9      someone did that would you agree that it would

10     likely violate some law, rule or regulation?

11               MR. DANIEL:  Objection, relevance.

12     Calls for a legal conclusion.

13               You can answer.

14          A    Yes.

15          Q    And would you agree it would be

16     serious misconduct for a DCRA employee to assert

17     something related to their job under oath that

18     they knew to be untrue?

19               MR. DANIEL:  Objection.  Speculation,

20     relevance.  Calls for a legal conclusion.

21               You can answer.

22          A    Yes.

Clarence Garret Whitescarver - February 11, 2021

```
 1          A      Yes.

 2          Q      And how long have you known him or who

 3     he is?

 4          A      I don't recall exactly when he came on

 5     board or when I became aware of him as an employee

 6     but probably on the order of five or six years.

 7          Q      Were you aware that in December 2016

 8     he paid a $1,000 fine and agreed to take training

 9     based on an admitted violation of ethics rule?

10          A      I am now.  I was not at the time of

11     this corrective action.

12          Q      Okay.

13                 And what is your understanding of what

14     he did wrong?

15                 MR. DANIEL:  Objection, relevance.

16          A      The Board of Ethics and Government

17     Accountability essentially fined him for being

18     involved with approving plans or reviewing plans,

19     I should say, that were provided to the District

20     government by his wife.

21          Q      And how common is it for a DCRA

22     employee to have admitted to an ethics violation
```

Plf. Opp.
App. 446

Clarence Garret Whitescarver - February 11, 2021

Page 21

```
1    about SB's, the allegations she had against SB.

2         Q    And do I understand you correctly to

3    be saying there were other employees who were

4    mentioned in Mr. Lawson's investigation who

5    complained about Ms. Lu's conduct?

6         A    I don't know that I would characterize

7    it as a complaint but it was essentially a concern

8    that they forwarded to their supervisors, yes.

9         Q    Do you have any reason Ms. Lu would

10   have ended up being suspended if she had never

11   reported her belief that SB fraudulently obtained

12   paid parental leave?

13             MR. DANIEL:  Objection to form.

14             You can answer.

15        A    I'm not aware of any other issues that

16   would have caused the suspension.

17        Q    And do you have a basis for concluding

18   that Ms. Lu intentionally lied about SB rather

19   than simply saying she was mistaken?

20             MR. DANIEL:  Form.

21             You can answer.

22        A    Yes.
```

Clarence Garret Whitescarver - February 11, 2021

Page 26

1        Q       Did you have a chance to review the

2    BEGA, B-E-G-A, investigation of whether or not SB

3    fraudulently obtained paid parental leave?

4        A       Just the results of the investigation.

5    No, not the actual report.

6        Q       I'm sorry, did I ask you, had you met

7    the ███████ at issue?

8        A       No.

9        Q       And, I'm sorry, are you answering --

10   let me just ask it again.  Have you met the

11   ███████ that was the subject of the paid parental

12   leave request?

13       A       No.

14       Q       Have you had a chance to discuss these

15   events with SB directly?

16       A       No.

17       Q       Did you at some point tell SB that he

18   should put these issues to bed?

19               MR. DANIEL:  Objection as to form.

20               Can you rephrase to be more specific?

21       Q       In a meeting with SB did you tell him

22   to put these issues to bed, or something similar

Clarence Garret Whitescarver - February 11, 2021

Page 27

1     about he should let these issues go and move on?

2                MR. DANIEL:  Objection as to form.

3                What are you referring to?

4                MR. SCHLEICHER:  I'm asking whether

5     Mr. Whitescarver at some point directly told SB

6     to, in essence, move on from these matters.

7          A     I have no recollection of making that

8     statement to him.

9          Q     Apart from what is in the Lawson

10    report, have you reviewed any documents that

11    helped persuade you that SB's claim was honest and

12    accurate, things like a birth certificate or other

13    official documents?

14         A     No.

15         Q     And what is your understanding of what

16    was done to ensure that any documents he submitted

17    in relation to the paid parental leave claim were

18    authentic rather than fake?

19         A     Like I say, I relied on the HR's

20    determination of the legitimacy of the documents.

21         Q     Have there been any elected or

22    management officials who communicated to you that

Clarence Garret Whitescarver - February 11, 2021

Page 34

1      legal conclusion and speculation.

2              You can answer.

3      A      No.

4      Q      Do you think Ms. Lu is the only DCRA

5      employee to have ever misled management about

6      something?

7              MR. DANIEL:  Objection, calls for

8      speculation.

9              You can answer.

10     A      No.

11     Q      Can you think of examples of any other

12     employees who were disciplined for misleading

13     management?

14             MR. DANIEL:  Objection, form.

15             You can answer.

16     A      It has been answered, but no.

17     Q      As a general matter would you consider

18     it proper for an employee to use time for which

19     they were receiving paid parental leave to attend

20     a trial?

21             MR. DANIEL:  Objection, form.  Calls

22     for speculation.

Clarence Garret Whitescarver - February 11, 2021

Page 39

```
1          Q      What is your understanding of why the

2     final charge against Ms. Lu in your decision was

3     essentially misleading the mayor rather than

4     something like insubordination or harassment?

5          A      Because that was essentially the

6     charge that was in the proposal from the

7     supervisor.

8          Q      Did you have a chance to read the

9     proposal from Mr. Lester?

10         A      Yes.

11         Q      I saw that it said that the

12    disciplinary action would address, and then it was

13    bold underlined the word only, and then the

14    dishonest statements by Ms. Lu.  So reading the

15    disciplinary action will address only the

16    dishonest statements by Ms. Lu, I wondered if you

17    knew why Mr. Lester had chosen to emphasize that

18    it was only addressing the dishonest statements by

19    Ms. Lu?

20         A      I don't recall having had a discussion

21    with Lester to find out why he limited it to that.

22         Q      I was wondering what you meant in your
```

Clarence Garret Whitescarver - February 11, 2021

Page 66

1        A      It is reported, first reports,

2    typically it would go to our HR department within

3    DCRA.  And then DCHR, D.C. human resources is also

4    a means of communicating workplace harassment.

5        Q      And do you know why the decision was

6    made to have Mr. Lawson investigate these matters

7    rather than someone else or some other entity?

8        A      No, I was not involved in triggering

9    that or being involved in any discussions leading

10   up to triggering that investigation.

11              (Plaintiff Deposition Exhibit No. 7

12   was marked for identification.)

13   BY MR. SCHLEICHER:

14       Q      Looking at this Exhibit 7, do these

15   appear to be excerpts from the Lawson report?

16       A      Yes.

17       Q      And then what is marked as Page 26

18   from his report and marked for our purposes as

19   Page 48 of the overall exhibits, I see a statement

20   in the report that, "Special Investigator Lawson

21   informed Ms. Lu that the first six months of her

22   complaining or even the first year of her

Clarence Garret Whitescarver - February 11, 2021

Page 67

1    complaining might have been reasonable but she has

2    continued her complaining for two and a half

3    years."

4              I'm wondering if you agree with this

5    statement, that the first six months of Ms. Lu's

6    reporting or even the first year of her reporting

7    about SB might have been reasonable?

8              MR. DANIEL:  Objection to form.

9    Vagueness.

10             You can answer.

11       A    I don't particularly disagree with

12   that statement.

13       Q    And what caused Ms. Lu's reporting to

14   be unreasonable?  Did you consider it to be the

15   number of reports, the span of time or something

16   else, or some combination?

17       A    The workplace disruption, workplace

18   harassment continuing unabated is the, by far I

19   would think one of the more triggering aspects to

20   having to take additional action.  It's just to

21   correct the workplace environment.  Had the

22   reports continued outside the Agency and didn't

Clarence Garret Whitescarver - February 11, 2021

Page 69

1          MR. DANIEL:  Objection, calls for

2     speculation.

3          You can answer.

4     A     Yes.  I would think so.

5     Q     Okay.

6          For example, if Ms. Lu reports SB for

7     an ethics violation, like he admitted to earlier,

8     isn't it to be expected that SB is going to be

9     upset that she has made that report?

10         MR. DANIEL:  Objection, calls for

11    speculation.

12         You can answer.

13    A     I would expect that, yes.

14    Q     So even if the report turns out to be

15    true there is going to be some disruption caused

16    by the report having been made.  Is that your

17    experience?

18    A     I would say so, some disruption.

19    Q     I see on the last page of the, before

20    the listing of exhibits in Mr. Lawson's report,

21    Exhibit 7, Mr. Lawson asserts that Ms. Lu knew or

22    reasonably should have known that she was

Clarence Garret Whitescarver - February 11, 2021

Page 89

```
1    UNITED STATES OF AMERICA )

2    STATE OF MARYLAND        )

3

4           I, CAPPY HALLOCK, the reporter before

5    whom the foregoing deposition was taken, do hereby

6    certify that the witness whose testimony appears

7    in the foregoing deposition was sworn by me; that

8    said deposition is a true record of the testimony

9    given by said witness.

10          I further certify that I am neither

11   counsel for, related to, nor employed by any of

12   the parties to the action in which this deposition

13   was taken; and further that I am not a relative or

14   employee of any attorney or counsel employed by

15   the parties hereto, or financially or otherwise

16   interested in the outcome of this action.

17

18

19

20                  Cappy Hallock, RPR, CRR

21   My Commission expires January 19, 2025

22
```

Ernest Chrappah — March 31, 2021

1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLUMBIA

3

4       _____
                                     )
5       QING LU,                     )
                                     )
6                   Plaintiff,       )
                                     )
7           vs.                      )    Civil Action No.
                                     )    1:20-cv-00461-APM
8       DISTRICT OF COLUMBIA, et al. )
                                     )
9                   Defendants.      )
                                     )
10      _____)

11

12

13

14          VIRTUAL DEPOSITION OF ERNEST CHRAPPAH

15              Wednesday, March 31, 2021

16                   2:38 p.m.

17

18

19

20

21

22      REPORTED BY: Lohna Burns

Ernest Chrappah - March 31, 2021

1             You can answer.

2             THE WITNESS:  Some allegations of improper

3    conduct relating to pregnancy or maternity leave or

4    something like that.

5    BY MR. SCHLEICHER:

6        Q.   Okay.  Are you aware of any reason to

7    believe that the proposed or actual suspension of

8    Luchi Lu was in any way the result of the mayor or

9    someone from her office contending that Luchi Lu had

10   misled them?

11           MR. DANIEL:  Objection.  Form.

12           You can answer.

13           THE WITNESS:  No.  The mayor's office has

14   never said anything to me.

15   BY MR. SCHLEICHER:

16       Q.   Okay.  And I can save -- we can eliminate

17   some questions, let me -- by letting me make sure I

18   understand what you're saying there.

19           Is it true that the mayor's office,

20   neither the mayor nor her staff, have ever contacted

21   you about Luchi Lu?

22       A.   That's correct, never.

Ernest Chrappah - March 31, 2021

1          Q.    Okay.  And if the mayor or staff did

2    believe that Luchi Lu had misled the mayor, would

3    you think it likely that you would be among the

4    people that would -- they would communicate that to

5    you since are the head of DCRA?

6               MR. DANIEL:  Objection.  Form.

7               You can answer.

8               THE WITNESS:  Can you repeat the question

9    again?

10   BY MR. SCHLEICHER:

11         Q.    Yes.  Sure.  Let me ask it differently.

12              Now, Luchi Lu, she works for DCRA; is that

13   right?

14         A.    Yes.

15         Q.    Okay.  So if the mayor or her staff have a

16   problem with an employee that works for DCRA, would

17   you expect they might communicate that through you?

18              MR. DANIEL:  Objection.  Form.

19              You can answer.

20              THE WITNESS:  Yes.

21   BY MR. SCHLEICHER:

22         Q.    What is your personal understanding of the

Ernest Chrappah – March 31, 2021

```
 1              You can answer.

 2              THE WITNESS:  No.  I mean, at the end of

 3      the day, the mayor is at the agency.  Everybody

 4      wants to see the mayor.  So you can chalk it up as,

 5      you know, people getting super excited and want to

 6      get in a word.

 7      BY MR. SCHLEICHER:

 8         Q.   Okay.  And was there anything about Luchi

 9      Lu's interactions with the mayor that you consider

10      to be inappropriate?

11              MR. DANIEL:  Objection.  Form.

12              You can answer.

13              THE WITNESS:  No.  She bum rushed the

14      mayor.  I'm not judging whether it was appropriate

15      or inappropriate.  I'm more interested in the

16      welfare of our employees than what they have to say.

17      BY MR. SCHLEICHER:

18         Q.   And have you seen other employees approach

19      the mayor in an excited manner?

20              MR. DANIEL:  Objection.  Form.

21              You can answer.

22              THE WITNESS:  Yes, I mean, it was "Madam
```

Ernest Chrappah - March 31, 2021

```
 1    Mayor," Madam Mayor." It was a public event or
 2    something.  And some will wait their turn, and some,
 3    you can tell, are anxious to see the mayor.  I mean,
 4    it's exciting when the mayor comes around.
 5    BY MR. SCHLEICHER:
 6         Q.   Did the mayor say anything to you about
 7    the interaction?
 8              MR. DANIEL:  Objection.  Form.
 9              THE WITNESS:  No.
10    BY MR. SCHLEICHER:
11         Q.   And what did you -- as I heard you, you
12    said you told the mayor that you would look into the
13    matter; is that right?
14         A.   Yes.
15         Q.   And what did you do to look into the
16    matter?
17         A.   I forwarded the concern to HR for them to
18    look into it.  It's standard protocol when there are
19    issues, have HR look into it so they can figure out
20    what is actually there.
21         Q.   And who did you communicate with in HR; if
22    you remember?
```

1    CERTIFICATE OF STENOTYPE REPORTER – NOTARY PUBLIC

2

3         I, Lohna Burns, Court Reporter, the

4    officer before whom the foregoing proceeding was

5    taken, do hereby certify that the foregoing

6    transcript is a true, correct, and complete record

7    of the proceeding; that said proceeding was taken by

8    me stenographically and thereafter reduced to

9    typewriting by me; and that I am neither counsel

10   for, related to, nor employed by any of the parties

11   to this litigation and have no interest, financial

12   or otherwise, in its outcome.

13        IN WITNESS WHEREOF, I have hereunto set

14   my hand and affixed my notarial seal this 31st day

15   of March 2021.

16

17                    _____

18                    LOHNA BURNS

19                    Notary Public in and for

20                    District of Columbia

21   My commission expires:

22   January 31, 2023

Ernest Chrappah — March 31, 2021

1                          ERRATA SHEET

2

3        PAGE — LINE — CORRECTION/REASON

4        Page 8 line 11 – should be nothing specific  instead of not in
         specific

5        Page 15 line 14 should be DCHR instead of DCRA

6        Page 17 line 3 should be "with a sense of our duty" instead of
         "in sense of our duties"

7        Page 17 line 17  should be "no, I don't manage her in the
         organization"

8        Page 19 line 12  should be "mayor coming to the agency gets
         everybody to be"  'is' should be deleted

9        Page 19 line 14 replace "permanent process" with "permit
         process"

10

11       Page 19 line 16  "the" is missing before the word "second"

         Page 21 line 3  "permanent improvement" should be "permit
12       or process improvement"

13       _____    _____    _____

14       _____    _____    _____

15       _____    _____    _____

16       _____    _____    _____

17       _____    _____    _____

18       _____    _____    _____

19       _____    _____    _____

20       _____    _____    _____

21       _____    _____    _____

22       _____    _____    _____

         _____

Ileana Carmen Corrales - November 9, 2021

```
 1              UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLUMBIA

 3

 4       _____
                                       )
 5       QING LU,                      )
                                       )
 6                    Plaintiff,       )
                                       )
 7           vs.                       )    Civil Action No.
                                       )    1:20-cv-00461-APM
 8       DISTRICT OF COLUMBIA, et al.  )
                                       )
 9                    Defendants.      )
                                       )
10       _____)

11

12

13              VIRTUAL DEPOSITION OF
                ILEANA CARMEN CORRALES
14            Tuesday, November 9th, 2021

15

16           The virtual deposition, via Webex, of

17       ILEANA CARMEN CORRALES was held on Tuesday, November

18       9th, 2021, commencing at 10:00 a.m., before R. Dwayne

19       Harrison, a Notary Public.

20

21       REPORTED BY: R. Dwayne Harrison
```

Ileana Carmen Corrales - November 9, 2021

1      memory of the actual interview.

2           Q      Okay.  You mentioned something about a

3      letter from a hospital you saw in the file.

4                  Did you have a chance to authenticate that

5      with the hospital?

6           A      No.

7           Q      Did SB, in his -- in your interview of SB,

8      did he mention anything about a child that was recently

9      born?

10          A      Yes.

11          Q      And what do you remember him saying about

12     that?

13          A      Well, when we were trying to establish the

14     relationship between him and his wife, he told us that

15     he had two children with her.

16          Q      He had what?

17          A      That he had two children with her.

18          Q      Oh, okay.

19                 MR. SCHLEICHER:  All right.  I pass the

20     witness.

21                 MR. DANIEL:  Before we do that, do we have

Plf. Opp.
App. 464

Ileana Carmen Corrales - November 9, 2021

Page 35

```
1       C E R T I F I C A T E

2       State of Maryland

3       City of Baltimore, to wit:

4              I, R. Dwayne Harrison, a Notary Public of

5       the State of Maryland, Baltimore City, do hereby

6       certify that the within-named witness personally

7       appeared before me at the time and place herein set

8       out, and after having been duly sworn by me, according

9       to law, was examined by counsel.

10             I further certify that the examination was

11      recorded stenographically by me and this transcript is

12      a true record of the proceedings.

13             I further certify that I am not of counsel

14      to any of the parties, nor in any way interested in the

15      outcome of this action.

16             As witness my hand and notarial seal this

17      15th day of November 2021.

18                          R. Dwayne Harrison
                            Notary Public
19

20      My Commission Expires:

21      September 15th, 2025
```

Alec Petrillo-Groh - March 10, 2021

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLUMBIA

 3

 4    _____
                                    )
 5    QING LU,                      )
                                    )
 6              Plaintiff,          )
                                    )
 7        vs.                       )    Civil Action No.
                                    )    1:20-cv-00461-APM
 8    DISTRICT OF COLUMBIA, et al.  )
                                    )
 9              Defendants.         )
                                    )
10    _____)

11

12

13

14          Deposition of Alec Petrillo-Groh

15               Conducted Virtually

16          Wednesday, March 10, 2021

17

18

19

20

21

22    Reported by:  Susan E. Alldridge, RPR
```

Alec Petrillo-Groh - March 10, 2021

1        ███████ with him about whether he had children

2    or how many children he had?

3        A    With him specifically at the permit

4    center counter, after he returned, we would discuss

5    and commiserate about having both what I assumed to

6    be children of the same -- same age, same gender.  I

7    figured there was, you know, plenty to talk about.

8    So we did talk small talk about our children and

9    developments and whether we were getting enough

10   sleep, et cetera.

11       Q    Did -- do you remember if SB mentioned to

12   you something around August or September 2016 in the

13   permit center that -- about his child doing well and

14   walking around?

15       A    Yes.  There was one conversation that at

16   the time I'd be scratching my head, but I didn't --

17   you know, I didn't think much of it given that, you

18   know, we both had new kids.  And, you know, the

19   permit center is a little busy; so I didn't read too

20   much into it.

21            But there was discussion on, you know,

22   our children's development.  And I had heard

Alec Petrillo-Groh - March 10, 2021

Page 15

1    something to the nature of a child acting in a

2    manner that wasn't consistent with the assumed age

3    of this child and the development.

4         Q     Are you talking about the child walking

5    at a younger age than would be expected or something

6    else?

7         A     I -- I believe that was the nature of the

8    comment that -- that I was confused about at the

9    time, yes.

10        Q     Okay.  And if Ms. Lu's testimony was that

11   what she had heard was that SB had said something

12   about the baby was walking but this was only about

13   four months after it was born, is that consistent

14   with what you remember being said, or do you

15   remember something else?

16        A     That sounds like it.  I don't have a

17   concrete recollection there, but I think that time

18   frame sounds about right.  It was -- and, again, it

19   could have been plus or minus a month or two, but it

20   was -- it was at a time when I was not expecting a

21   child to be walking.

22        Q     Okay.  And do you know anything of a

Alec Petrillo-Groh - March 10, 2021

Page 30

1        Certificate of shorthand reporter - notary public

2

3             I, Susan E. Alldridge, Registered Professional

4        Reporter, Certified Shorthand Reporter, the officer

5        before whom the foregoing deposition was taken, do

6        hereby certify that the foregoing transcript is a

7        true and correct record of the testimony given; that

8        said testimony was taken by me stenographically and

9        thereafter reduced to typewriting under my

10       supervision; that reading and signing was requested;

11       and that I am neither counsel for or related to, nor

12       employed by any of the parties to this case and have

13       no interest, financial or otherwise, in its outcome.

14

15            IN WITNESS WHEREOF, I have hereunto set my hand

16       and affixed my notarial seal this 27th day of March

17       2021.

18

19

20

21       NOTARY PUBLIC IN AND FOR THE DISTRICT OF COLUMBIA

Tyrone Lawson – April 14, 2021

Page 1

```
1              UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF COLUMBIA

3

4       _____
                                       )
5       QING LU,                       )
                                       )
6                   Plaintiff,         )
                                       )
7          vs.                         )    Civil Action No.
                                       )    1:20-cv-00461-APM
8       DISTRICT OF COLUMBIA, et al.   )
                                       )
9                   Defendants.        )
                                       )
10      _____)

11

12

13

14         VIRTUAL DEPOSITION OF TYRONE LAWSON

15            Wednesday, April 14, 2021

16                   9:42 a.m.

17

18

19

20

21

22      REPORTED BY: Lohna Burns
```

Tyrone Lawson - April 14, 2021

Page 22

1            THE WITNESS:  Okay.  Let me just -- I need

2    to do some clarification because my understanding

3    is -- are you asking me that -- is that what I

4    investigated, or did Ms. Lu make that claim?

5    BY MR. SCHLEICHER:

6        Q.    I'm asking did Ms. Lu make that claim?

7        A.    Yes.

8        Q.    Okay.  And as to the accuracy or not of

9    that claim, do you know why you were not assigned to

10   also investigate that along with the misconduct?

11           MR. DANIEL:  Objection.  Form.  You can

12   answer.

13           THE WITNESS:  No, I can't.  I can only

14   speculate.

15   BY MR. SCHLEICHER:

16       Q.    Okay.  Have you seen an investigation by

17   anybody else with the District of Columbia of the

18   issue of whether or not SB engaged in parental leave

19   fraud?

20       A.    No, I haven't.

21       Q.    At the time -- when did you start this

22   investigation of Luchi Lu?

Tyrone Lawson - April 14, 2021

```
1          A.    Yes, it was a birth certificate.

2          Q.    Okay.  A birth certificate.  Anything else

3    that you are aware of?

4          A.    The application that was submitted for the

5    Family Medical Leave Act.

6          Q.    Okay.  In your experience as an

7    investigator and a law enforcement officer, do you

8    know whether birth certificates are ever forged?

9                MR. DANIEL:  Objection.  Form.  You can

10   answer.

11               THE WITNESS:  Okay.  You saying in my

12   experience do I know of it being...

13   BY MR. SCHLEICHER:

14         Q.    Do you know -- do you have an opinion as

15   to whether or not birth certificates are sometimes

16   forged?

17               MR. DANIEL:  Objection.  Form.  You can

18   answer.

19               THE WITNESS:  Yes, I do have an opinion on

20   it.

21   BY MR. SCHLEICHER:

22         Q.    And what is that?
```

Tyrone Lawson – April 14, 2021

```
1                MR. DANIEL:  Objection.  Form.  You can

2       answer.

3                THE WITNESS:  My opinion is that anything

4       can be forged.

5       BY MR. SCHLEICHER:

6           Q.   And do you know of anything that the

7       District of Columbia did to authenticate the birth

8       certificate that SB provided in support of his paid

9       parental leave application?

10               MR. DANIEL:  Objection.  Form.  You can

11      answer.

12               THE WITNESS:  Okay.  Do I know of any

13      thing that the D.C. government did?

14      BY MR. SCHLEICHER:

15          Q.   Right.  To authenticate that birth

16      certificate.

17          A.   No, not -- no.

18          Q.   And have you -- the ███████ that was the

19      subject of the paid parental leave request by SB,

20      have you ever met that child?

21               MR. DANIEL:  Objection.  Form.

22      Foundation.  You can answer.
```

Tyrone Lawson - April 14, 2021

Page 32

1      D.C. stalking law, I answer yes.

2      BY MR. SCHLEICHER:

3           Q.   Okay.  Do you know whether the D.C.

4      stalking law contains a provision that says this

5      section does not apply to constitutionally protected

6      activity?

7                MR. DANIEL:  Objection.  Form.

8      Foundation.  Calls for legal conclusion.  You can

9      answer.

10                THE WITNESS:  Okay.  Are you asking me if

11     I know that?  No.  There may be some case law that

12     refers to that, but I don't know that the law says

13     that specifically.

14     BY MR. SCHLEICHER:

15          Q.   Did you read the text of the D.C. stalking

16     law prior to preparing this investigative report?

17          A.   Several times.

18          Q.   Who was the first witness or management

19     official you interacted with who used the word

20     stalking?

21          A.   I don't -- I don't recall any -- any

22     management person used the word stalking.

Tyrone Lawson - April 14, 2021

Page 33

```
 1        Q.    Of the interviews that you conducted, who

 2    was the first person who used the word stalking?

 3        A.    I don't recall anyone that I interviewed

 4    using the word stalking.

 5        Q.    What one specific action by Luchi Lu did

 6    you consider to be the clearest example of her

 7    knowingly and willfully stalking SB?

 8              MR. DANIEL:  Objection.  Form.  You can

 9    answer.

10              THE WITNESS:  Her conduct, her continued

11    course of conduct over something like three years.

12    BY MR. SCHLEICHER:

13        Q.    Okay.  And I understand you are relying on

14    a course of conduct.  I wondering within that course

15    of conduct, what is the one clearest example do you

16    believe of conduct that rises to the level of what

17    you consider stalking?

18              MR. DANIEL:  Objection.  Asked and

19    answered.  You can answer.

20              THE WITNESS:  Again, her continued course

21    of conduct of placing Mr. SB either in danger or in

22    fear of danger of losing his job, for one; and for
```

Tyrone Lawson – April 14, 2021

```
 1      to you there was ever a time that the disputes

 2      between SB and Luchi Lu might have broken out into a

 3      physical fight or something like that?

 4              MR. DANIEL:  Objection.  Form.

 5      Foundation.  You can answer.

 6              THE WITNESS:  I'm sorry.  Are you asking

 7      me if I thought that the interaction between Ms. Lu

 8      and SB could have at some point resulted in a

 9      physical fight?

10      BY MR. SCHLEICHER:

11          Q.   Did you ever believe that was a likely

12      outcome?

13              MR. DANIEL:  Objection.  Form.

14      Foundation.  You can answer.

15              THE WITNESS:  No, I did not.

16      BY MR. SCHLEICHER:

17          Q.   Based on your experience as a law

18      enforcement officer and misconduct investigator,

19      would you agree it's typical for a person who is the

20      subject of a whistleblower report to be upset about

21      it?

22              MR. DANIEL:  Objection.  Form.
```

Tyrone Lawson - April 14, 2021

Page 40

1      Foundation.  You can answer.

2                THE WITNESS:  Absolutely.  I was

3      terminated for a whistleblower complaint.

4      BY MR. SCHLEICHER:

5          Q.   The people that you reported as engaging

6      in misconduct, were they upset you had accused them

7      of wrongdoing?

8                MR. DANIEL:  Objection.  Form.

9      Foundation.  Can you answer.

10               THE WITNESS:  I can't say what other

11     people were feeling.

12     BY MR. SCHLEICHER:

13         Q.   Did you form an opinion about whether or

14     not the officers that you reported for violating the

15     Fourth Amendment were upset at your allegation?

16               MR. DANIEL:  Objection.  Form.

17     Foundation.  Assumes facts not in evidence.  You can

18     answer.

19               THE WITNESS:  I can't answer what other

20     people were feeling.  I would expect that they were.

21     BY MR. SCHLEICHER:

22         Q.   And in your own situation where you

Tyrone Lawson - April 14, 2021

1          MR. DANIEL:  Objection.  Form.  You can

2    answer.

3          THE WITNESS:  The first time she reported

4    it, no.  The next 20 times she reported it, maybe

5    yes.  I'm just hypothetically saying it was 20

6    times.  Yes, she did jump the chain of command.

7    BY MR. SCHLEICHER:

8      Q.    In your interview with SB and your review

9    of his written complaints, are you aware of him ever

10   using the term stalking?

11     A.    No, I'm not aware of it.

12     Q.    If SB had not complained about Luchi Lu's

13   conduct, do you have any reason to believe you would

14   have investigated her anyway?

15          MR. DANIEL:  Objection.  Form.  You can

16   answer.

17          THE WITNESS:  I'm not really clear on your

18   question.

19   BY MR. SCHLEICHER:

20     Q.    Sure.  Is there any reason you have to

21   believe that you would have ended up investigating

22   Luchi Lu even if SB had not complained about her?

Tyrone Lawson - April 14, 2021

```
1    of Sydney Lester, you say, quote, Mr. Lester said

2    that he has not met the child in person, but he

3    knows that -- I'll substitute SB -- has a toddler

4    ████████ who was born during Mr. B's use of FMLA in

5    ████████████.  Do you see that?

6        A.   Yes.

7        Q.   So according -- is it accurate to say,

8    according to your account, Sydney Lester told you

9    that he knew SB had a toddler ████████ born during

10   SB's use of FMLA in ████████████; is that right?

11       A.   Yeah, I would say yes, from my

12   recollection.

13       Q.   Okay.  Now if we go over to the interview

14   of Sydney Lester, which starts at Page 92 of the

15   overall exhibits today and we search for the word

16   FMLA, we see your question at -- in Lines 10 to 12,

17   Page 5, where you say, He went on FMLA at one time.

18            Do you see that?

19       A.   Yes.

20       Q.   And the next reference, if I search for

21   FMLA, is down in Page 135, so something entirely

22   different.  You are interviewing Ms. Lu.
```

Tyrone Lawson - April 14, 2021

1          So I'm wondering what -- would you be

2     surprised if there's no place in here that Sydney

3     Lester tells you, as you said in your interview of

4     him, that he knew SB had a toddler ███████ born

5     during use of FMLA in ███████████?

6          MR. DANIEL:  Objection.  Form.  You can

7     answer.

8          THE WITNESS:  Okay.  That -- Okay.  The

9     interview that I did with Sydney Lester was not

10    verbatim.  I don't do all my interviews verbatim

11    unless they is that important.  I paraphrase the

12    interview and what the person is saying.

13          So what that particular statement was with

14    regards to the child being born during FMLA period

15    would have been a compilation of what Mr. Lester

16    said during the interview that led me to believe

17    that the child Mr. Lester was referring to is the

18    same child that was born during the FMLA period.

19          Unless -- unless the -- the interview is

20    indented and/or in quotation marks, is when I try to

21    capture word for word what the interview entails or

22    what the person said during the interview.

Tyrone Lawson — April 14, 2021

1    and disturbed that Ms. Lu went so far as to find his

2    wife and stepmother, close quote.

3           That seriously alarmed and disturbed

4    phrase, would you agree that lines up with the

5    wording of the stalking statute in the District of

6    Columbia?

7           MR. DANIEL:  Objection.  Form.  You can

8    answer.

9           THE WITNESS:  I would say that it can be

10   considered as part of the language in the stalking

11   statute.

12   BY MR. SCHLEICHER:

13      Q.   Would you be surprised if we go to the

14   transcript here of your interview of SB and there's

15   no reference to them being seriously alarmed and

16   disturbed?

17          MR. DANIEL:  Objection.  Form.  You can

18   answer.

19          THE WITNESS:  No, I wouldn't.

20   BY MR. SCHLEICHER:

21      Q.   Why would you put the word seriously

22   alarmed and disturbed into SB's mouth if that's not

Tyrone Lawson - April 14, 2021

Page 79

```
1     up with the wording of the criminal stalking

2     statute?

3               MR. DANIEL:  Objection.  Form.  You can

4     answer.

5               THE WITNESS:  No, I did not.

6     BY MR. SCHLEICHER:

7         Q.   Do you think it's a coincidence that

8     multiple witnesses are recounted by you as -- with

9     words that line up with the stalking statute when we

10    don't see those words in their transcripts?

11              MR. DANIEL:  Objection.  Form.  You can

12    answer.

13              THE WITNESS:  Do -- do I think what, now?

14    BY MR. SCHLEICHER:

15        Q.   Do you think it's a coincidence that, when

16    you recounted these interviews, you used words from

17    the stalking statute, and then when we go to the

18    transcript, those words are not in there?

19              MR. DANIEL:  Objection.  Form.  You can

20    answer.

21              THE WITNESS:  No, because part of an

22    investigation or investigative report is that I take
```

Tyrone Lawson - April 14, 2021

1    my perception, my -- my view point of what a person

2    is saying, and then I transcribe it as to what it

3    means to the investigation of the topic and the

4    subject matter or to the target of the

5    investigation.

6             So if you tell me what -- if you tell me

7    one thing, I may interpret that to mean, well, I was

8    in fear of this women looking on -- going as far as

9    looking on the Internet and trying to find my

10   personal accounts to -- to interfere with my life.

11   BY MR. SCHLEICHER:

12       Q.    Did you have a personal dislike of Luchi

13   Lu from anything outside of you investigating her

14   whistleblowing?

15             MR. DANIEL:  Objection.  Form.  You can

16   answer.

17             THE WITNESS:  Not at all.  I didn't even

18   know Ms. Lu until this investigation.

19   BY MR. SCHLEICHER:

20       Q.    Okay.  On Page 27 of your investigative

21   report, do you see -- let's see, second paragraph

22   from the top, you say that during the interview, Ms.

Tyrone Lawson - April 14, 2021

Page 83

1          MR. SCHLEICHER:  Would you read us the

2     question, please question please?

3          (Question read)

4          MR. DANIEL:  Objection.  Form.

5     Mischaracterizes the witness's testimony.  He can

6     answer.

7          THE WITNESS:  I'm not saying that Ms. Lu

8     specifically said that.

9     BY MR. SCHLEICHER:

10     Q.   On Page 27 of your Report of Investigation

11     from Exhibit 1 that I have up on the screen, you see

12     that you recount there that Luchi Lu made reports or

13     interacted with Council Members Bonds, Naedau and

14     Silverman?

15     A.   Yes.

16     Q.   Did you think it was inappropriate for her

17     to interact with those three council members?

18          MR. DANIEL:  Objection.  Form.  You can

19     answer.

20          THE WITNESS:  Personally, yes.

21     BY MR. SCHLEICHER:

22     Q.   I see that you mention that she had gone

Tyrone Lawson - April 14, 2021

Page 100

```
 1    Lu had an opportunity, she would still continue to

 2    complain about the same issue.

 3    BY MR. SCHLEICHER:

 4         Q.   Are you aware of any evidence that she's

 5    continued to make reports about SB since you

 6    interviewed her?

 7         A.   No.

 8         Q.   Let's get the date of that.

 9              See on the screen from Page 32 of your

10    report she was interviewed on February 12th, 2019;

11    is that right?

12         A.   Yes.

13         Q.   I saw in the transcript of the interview

14    that you had told her about eight times that what

15    had gone on with SB was none of her business.  Do

16    you dispute that count?  We can do a word search.

17              MR. DANIEL:  Objection.  Form.  You can

18    answer.

19              THE WITNESS:  I'll stipulate to that.

20              MR. DANIEL:  If I can, just for a moment,

21    again, every time the witness stipulates, it's for

22    himself, but not on the behalf of the District of
```

Tyrone Lawson - April 14, 2021

1    Columbia.

2    BY MR. SCHLEICHER:

3        Q.   Do you believe as a general matter that

4    one employees's misconduct is none of the business

5    of another employee?

6            MR. DANIEL:  Objection.  Form.  You can

7    answer.

8            THE WITNESS:  Okay.  Say it again so I

9    can --

10   BY MR. SCHLEICHER:

11       Q.   Okay.  Yeah.  I'm wondering as a general

12   matter do you think one employee's conduct is none

13   of the business of another employee?

14           MR. DANIEL:  Objection.  Form.  You can

15   answer.

16           THE WITNESS:  Yes, I do believe it's the

17   business of all employees.

18   BY MR. SCHLEICHER:

19       Q.   Okay.  On Page 12 of your Report of

20   Investigation, Exhibit 1 -- hang on just a second.

21           Okay.  This is Page 12 of your

22   investigative report.  I see in your summary of your

Tyrone Lawson - April 14, 2021

1               "I don't care.  I don't care what somebody

2      else told you about somebody else."

3               And then Ms. Lu suggests you talk to Alec.

4               And you say, "I don't need to talk to

5      Alec."

6               So would you agree now that Ms. Lu

7      suggested you speak to this co-worker named Alec,

8      and that you declined to do so?

9          A.   Okay.  Yes.  Yeah, I agree.

10         Q.   Apart from SB, what person or office

11     within the D.C. government do you believe to be in

12     possession of the strongest proof that SB is

13     innocent of the claim of fraudulently obtaining paid

14     parental leave?

15              MR. DANIEL:  Objection.  Form.

16     Foundation.  You can answer.

17              THE WITNESS:  You say what person?

18     BY MR. SCHLEICHER:

19         Q.   Yes.  What person or office would have the

20     strongest proof in your mind that --

21         A.   DCRA Human Resource, Office of Human

22     Resource.

Tyrone Lawson - April 14, 2021

1       information while I was conducting Ms. Lu's

2       investigation?

3       BY MR. SCHLEICHER:

4            Q.    Right.

5            A.    Or if I came across it at any time?

6            Q.    Well, at any time.

7                  MR. DANIEL:  Objection.  Form.  You can

8       answer.

9                  THE WITNESS:  Yeah, I would believe -- I

10      believe that would be a serious violation.

11      BY MR. SCHLEICHER

12           Q.    Okay.  And based on your law enforcement

13      experience, is it your own opinion that that could

14      rise to the level of criminal fraud to obtain --

15                 MR. DANIEL:  Object --

16      BY MR. SCHLEICHER:

17           Q.    -- parental leave for a child that does

18      not exist?

19                 MR. DANIEL:  Objection.  Form.

20      Foundation.  You can answer.

21                 THE WITNESS:  I believe that submission

22      of -- of documents that were fraudulent would --

Tyrone Lawson - April 14, 2021

Page 116

1      would be a criminal act, the utterance of the

2      documents themselves.

3      BY MR. SCHLEICHER:

4          Q.    I see at the become of Page 4 of this

5      opinion that management concluded that your report

6      was unfounded.  And I'm wondering, did you -- did

7      you feel an obligation to trust management, or did

8      you stand by your view that there had been wrong

9      doing?

10              MR. DANIEL:  Objection.  Form.  You can

11      answer.

12              THE WITNESS:  Well, first of all, I never

13      knew that until they -- until I was -- I was faced

14      with a trial board.

15              So what's your question?

16      BY MR. SCHLEICHER:

17          Q.    Well, if you didn't know that until later,

18      then I withdraw the question.

19              I see on Page 5 of this opinion they talk

20      about the misconduct findings against you.  And it

21      uses this wording about Based on your inability to

22      understand the seriousness of your refusal to follow

1    CERTIFICATE OF STENOTYPE REPORTER - NOTARY PUBLIC

2

3        I, Lohna Burns, Court Reporter, the officer

4    before whom the foregoing proceeding was taken, do

5    hereby certify that the foregoing transcript is a

6    true, correct, and complete record of the

7    proceeding; that said proceeding was taken by me

8    stenographically and thereafter reduced to

9    typewriting by me; and that I am neither counsel

10   for, related to, nor employed by any of the parties

11   to this litigation and have no interest, financial

12   or otherwise, in its outcome.

13       IN WITNESS WHEREOF, I have hereunto set

14   my hand and affixed my notarial seal this 14th day

15   of April 2021.

16                          *Lohna Burns*

17                          LOHNA BURNS

18                          Notary Public in and for

19                          District of Columbia

20   My commission expires:

21   1/31/2023

22

Shirley Kwan-Hui – March 29, 2021

```
 1                UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF COLUMBIA

 3

 4      _____
                                      )
 5      QING LU,                      )
                                      )
 6                  Plaintiff,        )
                                      )
 7         vs.                        )     Civil Action No.
                                      )     1:20-cv-00461-APM
 8      DISTRICT OF COLUMBIA, et al.  )
                                      )
 9                  Defendants.       )
                                      )
10      _____)

11

12

13

14        VIRTUAL DEPOSITION OF SHIRLEY KWAN-HUI

15             Monday, March 29, 2021

16                  3:00 p.m.

17

18

19

20

21      REPORTED BY: Lohna Burns
```

Shirley Kwan-Hui - March 29, 2021

```
1     you said you understood there had been some

2     investigation of Ms. Lu's report, and they were

3     found not to be valid reports or not to be truthful

4     reports.  So I am trying to figure out was that

5     based on you reviewing the actual documents that SB

6     had submitted for his leave, or was that based on

7     hearing about someone else having conducted an

8     investigation?

9          A.   I -- I -- honestly, I think that I -- it

10    was from a briefing, but from whom, I don't recall

11    currently right now.

12         Q.   Okay.

13         A.   And I don't remember if I have actually

14    reviewed the documents or not.  So...

15         Q.   Okay.  And then to the question I don't

16    think I got to earlier, Director Chrappah, do you

17    remember any communications with him about Ms. Lu?

18         A.   I don't.  I don't remember if I had a

19    conversation with him about Ms. Lu or not.

20         Q.   Are you aware of whether or not anyone in

21    the mayor's office considered Ms. Lu's reports to

22    the mayor about SB to be inappropriate?
```

Shirley Kwan-Hui – March 29, 2021

1              MR. DANIEL:  Objection as to form.

2              You can answer.

3              THE WITNESS:  I do not recall.

4    BY MR. SCHLEICHER:

5         Q.    All right.  Are you aware of anyone in the

6    mayor's office indicating that Ms. Lu's reports

7    about SB were disruptive?

8              MR. DANIEL:  Objection as to form.

9              You can answer.

10             THE WITNESS:  I do not recall.

11   BY MR. SCHLEICHER:

12        Q.    Do you remember anyone at all indicating

13   to you that Ms. Lu's reports to the mayor were

14   disruptive or inappropriate?

15             MR. DANIEL:  Objection as to form.

16             You can answer.

17             THE WITNESS:  Would you repeat your

18   question, please?

19   BY MR. SCHLEICHER:

20        Q.    Sure.

21             So I had asked about whether or not

22   someone associated with the mayor's office had

Shirley Kwan-Hui – March 29, 2021

1    indicated to you that Ms. Lu's reports to the mayor

2    were either disruptive or inappropriate, and now I'm

3    asking if someone outside the mayor's office had

4    indicated to you that Ms. Lu's reports to the mayor

5    were inappropriate or disruptive.

6             MR. DANIEL:  Objection as to form.

7             You can answer.

8             THE WITNESS:  I do not recall.

9    BY MR. SCHLEICHER:

10       Q.    Did you ever hear reference to -- do you

11   remember anyone communicating to you that Ms. Lu had

12   stalked SB?

13       A.    I do not recall.

14             MR. SCHLEICHER:  All right.  Thank you for

15   your time.  I pass the witness.

16             THE WITNESS:  Thank you.

17             MR. DANIEL:  If you can just give us a

18   couple minutes, let me chat with Mr. Blecher, and we

19   will be right back in here.

20                  (Recess)

21             MR. DANIEL:  Mr. Schleicher and Deputy

22   Director, are you both with us?

Shirley Kwan-Hui - March 29, 2021

1    CERTIFICATE OF STENOTYPE REPORTER - NOTARY PUBLIC

2

3        I, Lohna Burns, Court Reporter, the officer

4    before whom the foregoing proceeding was taken, do

5    hereby certify that the foregoing transcript is a

6    true, correct, and complete record of the

7    proceeding; that said proceeding was taken by me

8    stenographically and thereafter reduced to

9    typewriting by me; and that I am neither counsel

10   for, related to, nor employed by any of the parties

11   to this litigation and have no interest, financial

12   or otherwise, in its outcome.

13       IN WITNESS WHEREOF, I have hereunto set

14   my hand and affixed my notarial seal this the 29th

15   day of March 2021.

16

17                    _____
                            Lohna Burns

18                    LOHNA BURNS

19                    Notary Public in and for

20                    District of Columbia

21   My commission expires:

22   January 31, 2023

Shirley Kwan-Hui — March 29, 2021

Page 18

1                CERTIFICATE OF DEPONENT

2

3           I hereby certify that I have read the

4      foregoing pages of my deposition testimony in

5      this proceeding, and with the exception of

6      changes and/or corrections, if any, find them to

7      be a true and correct transcription thereof.

8

9      _____

10                    Deponent

11

12     _____5/20/2021_____

13                     Date

14

15                NOTARY PUBLIC

16          Subscribed and sworn to before me this

17     _____ day of _____, 20___.

18     _____

19               Notary Republic

20     My Commission Expires:_____

21

22

Shirley Kwan-Hui - March 29, 2021

Page 20

1                              ERRATA SHEET

2

3       PAGE -- LINE -- CORRECTION/REASON

4         5          6          title is Deputy Director not Director

5         6          7          employees not employee

6         6          11          title is Official not officer

7         7          9          is not as

8         ____      ____      _____

9         ____      ____      _____

10        ____      ____      _____

11        ____      ____      _____

12        ____      ____      _____

13        ____      ____      _____

14        ____      ____      _____

15        ____      ____      _____

16        ____      ____      _____

17        ____      ____      _____

18        ____      ____      _____

19        ____      ____      _____

20        ____      ____      _____

21        ____      ____      _____

22        ____      ____      _____

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

QING LU, §
        Plaintiff, §
 §
v. § Case No. 20-cv-00461 (APM)
 §
DISTRICT OF COLUMBIA, et al., §
        Defendants. §

### PLAINTIFF DECLARATION IN SUPPORT OF HER
### MOTION FOR PARTIAL SUMMARY JUDGMENT

I, Qing "Luchi" Lu, am the Plaintiff in this whistleblower/First Amendment lawsuit and declare the following to be true and correct under penalty of perjury, based on my personal knowledge except where may be indicated to the contrary below:

1.   I am a Fire Protection Engineer in the D.C. Department of Consumer and Regulatory Affairs (DCRA).

2.   In my more than a decade as a Fire Protection Engineer with DCRA, I have consistently been rated as a high performer.

3.   Defendant Sydney Lester was my first-line supervisor during many of the events at issue in this suit and served as Proposing Official for the 10-day suspension.

4.   Defendant C.G. (Clarence Garret) Whitescarver was the boss of Mr. Lester's boss, and so my third-line supervisor for many of the events at issue, and he is the one who served as the Deciding Official in imposing the eight-day suspension on me.

5.   When he proposed a 10-day suspension, Sydney Lester was the Fire Protection Manager, DCRA, Permit Operations Division.

6.   When he imposed the eight-day unpaid suspension, C.G. Whitescarver was the DCRA Chief Building Official.

7.   Tiffany Crowe was the Chief Administrative Officer (CAO) during the period telework was in dispute and overlapping the disciplinary process.

8.   S.B., the primary subject of my disclosures, is a fellow DCRA fire engineer.

9.   In August 2016, I disclosed to management my belief that coworker S.B. was handling projects submitted by his wife's company, in violation of ethics/conflict of interest rules.

10.  HR Specialist Mia Brown and Special Investigator Tyrone Lawson were among those to whom I disclosed S.B.'s conflicts of interest and what I regarded as Defendant Sydney Lester's failure to take adequate correction action.

11.  Defendant Sydney Lester's initial response to my ethics disclosures was to the effect that there was no evidence of any wrongdoing, but the allegations were so serious that I had better produce my evidence.

12.  In a period overlapping my disclosures that S.B. engaged in paid parental leave fraud (i.e., by basing the request on a child I concluded likely did not exist), I was aware that my earlier disclosures about his ethics violation culminated in S.B.'s admitting fault and agreeing to pay a $1,000 fine.

13.  The fact that management (such as Defendant Lester) had discounted my ethics disclosures about S.B. and tried to persuade me there was nothing to them—yet S.B. went on to admit he broke the rules with his wife and paid a fine—was a consideration in my decision not to assume management was correct when it tried to persuade me that S.B. did not do anything wrong in relation to the 2016 request for paid parental leave.

14.  In contrast to Mr. Lester's doubting response to my ethics disclosures about S.B., in November 2016 the D.C. Board of Ethics and Government Accountability (BEGA) staff expressed great appreciation for my assistance and cooperation.

15.   I concluded that Investigator Lawson's investigation of me over the S.B. leave fraud issues was connected at least in part to my earlier ethics disclosures about S.B., based on facts such as that I had emailed Investigator Lawson earlier about the ethics issues and he included some of that email traffic with his Investigative Report (IR), he included in his IR an S.B. complaint about me that referenced my earlier ethics/conflict-of-interest disclosures, and during Lawson's interview of me he had me confirm I made the earlier ethics disclosures.

16.   A consideration in my conclusion that it was reasonable to believe it likely that S.B. engaged in serious wrongdoing that needed reporting (the parental leave fraud) was that his admission to the ethics violations confirmed for me that he and his wife (whose company's projects he got involved in handling) were willing to misuse his position to put their financial benefit above the interests of the D.C. government and the taxpayers. (I understand doing that to fall within the meaning of an "abuse of authority.")

17.   Another consideration in my concluding that S.B. would be capable of claiming paid parental leave for a nonexistent child was that in prior years I observed S.B. to erroneously report his hours worked and needlessly claim overtime.

18.   Another consideration in my concluding S.B. could have claimed paid parental leave for a nonexistent child was that I observed that fake birth certificates were readily available on the internet, so the fact he may have submitted one would not be conclusive if management did not bother to authenticate it.

19.   No one I dealt with related to my disclosures about the leave fraud issue told me that they had authenticated the supporting document(s) submitted by S.B. in support of the leave claim.

20.   Had a management official told me they had authenticated the document(s)—such as by contacting the issuing state for a birth certificate or the hospital to verify a document from it was accurate—I believe I would have dropped the matter.

21.   A consideration in my concluding that S.B. claimed paid parental leave for a nonexistent child was the impression I got that multiple components pointed to each other as the one that had done an investigation of my leave fraud claims, and referred it from one to another, without anyone assuring me that they saw authenticated documents first-hand.

22.   A reason that I continued to report the leave fraud issues even after management assured me that no wrongdoing occurred is that I continued to encounter new information—for example, the coworker's account about S.B. saying his child was walking around though this was within four months of the alleged birth—it caused me to again think fraud occurred.

23.   A consideration in my concluding that S.B. claimed paid parental leave for a nonexistent child was that my research of publicly available information on S.B. persuaded me he was scheduled to appear for a criminal (traffic-related offense) trial in the month following the claimed birth. (I understood him in his later deposition to confirm that I had been correct.)

24.   A consideration in my concluding that S.B. claimed paid parental leave for a nonexistent child was that I understood S.B. to have told coworkers on June 22, 2016 he would be gone a long time, but after the criminal case was closed on June 23, to have returned to work on June 24.

25.   A consideration in my concluding that S.B. claimed paid parental leave for a nonexistent child was my observation that S.B.'s wife posted publicly several times about unrelated

matters on Facebook on the day of the purported childbirth, while I did not see any posts mentioning a birth—something that did not make sense to me (as I also am a mother).

26.  A consideration in my concluding that S.B. claimed paid parental leave for a nonexistent child was the timing of when S.B.'s wife told the DCRA staff she was pregnant, as compared to my not then observing her to be noticeably pregnant, and then the child's being reported to have been born past the due date a couple of weeks later. (My understanding of pregnancies is based in part on my earlier having been pregnant.)

27.  A consideration in my concluding that S.B. claimed paid parental leave for a nonexistent child was that a customer alerted me she had seen S.B.'s wife at the office prior to the purported birth with what appeared to be a foreign object in an odd triangle shape under her clothes (as if to mimic pregnancy).

28.  A consideration in my concluding that S.B. claimed paid parental leave for a nonexistent child was that I understood a coworker to have told me that a date S.B. had shown pictures of a newborn actually was prior to the date later reported for its birth.

29.  A consideration in my concluding that S.B. claimed paid parental leave for a nonexistent child was that I understood a coworker to have told me that when S.B. was asked about how the baby was doing, S.B. responded that she was doing well and walking around, which puzzled the coworker (and me) because this was four or fewer months after the purported birth, versus my understanding—such as from being a parent myself—that babies typically don't take their first step until between nine and 12 months.

30.  A consideration in my concluding that S.B. claimed paid parental leave for a nonexistent child was that I understood S.B.'s wife—on a date later than the purported birth—to have had two conversations (one with an engineer, the other with a customer) in which she

mentioned her other children but not the one said to have been born in mid-██ (that was the basis for the paid parental leave).

31. Another consideration in my concluding that S.B. claimed paid parental leave for a nonexistent child was that it appeared to me from the families' *public* Facebook posts that it was not S.B./his wife who had a newborn and instead was S.B.'s stepmother.

32. A factor in my concluding that a coworker's fraudulently claiming paid leave for a nonexistent child likely would rise to the level of serious wrongdoing (for which my reporting would be protected) was that I understand our HR policies to prohibit the making of intentional misrepresentations and false statements under oath.

33. A factor in my concluding that a coworker's fraudulently claiming paid leave likely would rise to the level of serious wrongdoing (for which my reporting would be protected) was that I understand honesty to be important to the work of employees in positions like S.B.'s and mine. For example, we deal with fire safety issues, so if one of us did something dishonest in exchange for money it could result in a safeguard being missed and a person later being injured in a fire at an unsafe building.

34. A factor in my concluding that a coworker's fraudulently claiming paid leave for a nonexistent child likely would rise to the level of serious wrongdoing (for which my reporting would be protected) was that I understand such conduct could readily rise to the level of a criminal offense under multiple laws. For example, it would be a violation of a law, rule, or regulation to commit forgery or fraud.

35. A factor in my concluding that a coworker's fraudulently claiming paid leave for a nonexistent child likely would rise to the level of serious wrongdoing (for which my

reporting would be protected) was that the form I had looked at for use in getting the paid leave had the employee sign under oath and included a false statement warning.

36.   A factor in my concluding that a coworker's fraudulently claiming paid leave for a nonexistent child likely would rise to the level of serious wrongdoing (for which my reporting would be protected) is that I understood the public to usually have a strong interest in issues involving public corruption and how their tax dollars are spent.

37.   A factor in my concluding that a coworker's fraudulently claiming paid leave for a nonexistent child likely would rise to the level of serious wrongdoing (for which my reporting would be protected) was that I likewise understand the public to interested in situations in which a government employee/official is misusing the position for personal benefit.

38.   A factor in my concluding that a coworker's fraudulently claiming paid leave for a nonexistent child likely would rise to the level of serious wrongdoing (for which my reporting would be protected) was that BEGA took it very seriously when it came to agree with me that S.B. was misusing his job for the personal benefit of him and his wife.

39.   A factor in my concluding that a coworker's fraudulently claiming paid leave for a nonexistent child likely would rise to the level of serious wrongdoing (for which my reporting would be protected) was that I understood DCRA to prohibit employees from making knowingly false statements in relation to their jobs.

40.   A factor in my concluding that a coworker's fraudulently claiming weeks of paid leave would rise to the level of gross misuse/waste of public resources or funds is that the District would be deprived of the employee's services during the period of absence while

fraudulently receiving pay.  That is, S.B. would be getting paid without being there to do work.

41.   A factor in my concluding that S.B.'s fraudulently claiming parental leave would rise to the level of a gross misuse or waste of public resources was that I understood he took about eight weeks of leave. Using a rough salary figure of $100,000 a year, that would be more than $15,000 wasted for nothing in return if there were not really a child born. (Since S.B. worked in same job as me, I had a general idea of his salary.)

42.   A factor in my concluding that a coworker's fraudulently claiming weeks of paid leave would rise to the level of an abuse of authority is that it would involve an employee using his position to obtain a benefit (paid leave) to which he was not entitled.

43.   A factor in my concluding that it was reasonable to continue to believe S.B. engaged in leave fraud even when management said he didn't was that I understand it is not unusual for whistleblowers be told they should trust management that no wrongdoing took place.

44.   I was devastated in reading the Lawson IR to realize that he falsely made me out to be a stalker and even falsely claimed I admitted to the elements of criminal stalking. For example, it is difficult to believe that I would ever be promoted into a supervisory position if management and coworkers believe me to be a criminal stalker.

45.   It was during the discovery process in this suit that I first fully realized how many false statements about his witness interviews Investigator Lawson made in his report. Those and the false labelling of me as a stalker confirmed my belief the investigation was retaliatory. Whether or not it was retaliation to start it, he handled it in a retaliatory manner.

46.     Investigator Lawson demonstrated open hostility toward my engaging in disclosure activity, such as by telling me at least seven times during his interview of me that matters related to whether S.B. engaged in leave fraud were none of my business.

47.     In his interview of me, Investigator Lawson repeatedly pushed me to admit that I had gone to the media with my leave fraud disclosures and communicated it was improper for me to do so.  (This was even though no media outlet had picked up the story.)

48.     Even though I understand that management is prohibited from keeping employees from communicating with Council members, in the interview Investigator Lawson repeatedly pressed me to admit I contacted Council members and communicated I was wrong to do so.

49.     In the interview, Investigator Lawson directly ordered me not to share the disclosures about S.B. and leave fraud with anyone else other than HR, not even the media or Council members.

50.     During Investigator Lawson's interview of me, he repeatedly pushed me to acknowledge my report of parental leave fraud by S.B. was weak because I had never seen S.B.'s wife's "nude body" wearing a pillow or fake pregnancy belly.

51.     During Investigator Lawson's interview of me, he rejected my request that he interview my coworker Alec, whom I had cited as part of the basis for my belief that leave fraud occurred.

52.     When I attempted to tell Investigator Lawson what that coworker Alec had said about the leave fraud matter, Lawson stopped me, saying it would be hearsay.

53. Investigator Lawson lied when in his report he said I admitted that my leave fraud report was based on "speculation and conjure." What happened instead was that he asked me that question and then interrupted me before I could actually answer his question.

54. Investigator Lawson lied to management when his report *twice* claimed that I "admitted" to engaging in a course of conduct that aligned with a violation of the criminal stalking law. To the contrary, at no time during the interview did I admit my conduct would cause S.B. to fear for his safety; feel seriously alarmed/disturbed/frightened; or suffer emotional distress. Instead, I explained I meant well and did not mean to "hurt anybody or be malicious about something".

55. Between being falsely accused of criminal stalking (I count more than 20 uses of words like "stalked" and "stalking" in his IR), his orders to me in the interview not to communicate with the media or Council members, his angry manner of interacting with me in the interview, and his telling me over and over it was none of my business, I am less likely to be willing to make future disclosures about the leave fraud.

56. The proposed discipline, the imposed suspension, and CAO Tiffany Crowe's telling me my job may depend on dropping the leave fraud matter also make me less likely to make related disclosures in the future.

57. Part of the reason the 10-day suspension proposal was upsetting to me is that it was contrary to HR policies that call for progressive discipline where I would first get a formal written warning, then be proposed for a suspension of under 10 days, and only if that did not work would I get proposed for 10 or more days.

58. Consistent with what I read in the proposal and decision on the suspension, I had no previous formal disciplinary record in my employment with D.C.

59. I also was puzzled why the proposed suspension gave me six days to respond when I understand HR policies to require that I be allowed 10 days to respond where the suspension is proposed to be for 10 or more days.

60. I am not surprised my disclosures about leave fraud upset S.B., just as he was upset when I reported him for the ethics violation and he ended up admitting guilt and paying a fine.

61. While S.B. didn't like my reporting him, from what I observed we both continued to do our jobs and to perform at what was considered a high level by supervisors. There was never any disruptive confrontation between us in the workplace nor outside the office.

62. One of the reasons I found the suspension decision to be disturbing was that I understand HR policy to require a decision within 45 days, while Defendant Whitescarver's decision took more than 75 days.

63. My union initially invoked arbitration on my behalf as to the imposed eight-day suspension.

64. By later agreement with the District in December 2019, the scheduled arbitration was cancelled and this outcome agreed to be a "final determination" of the issues that were to be raised in the anticipated arbitration.

65. That is, we agreed no relief would be granted in arbitration, with the result that I now only may obtain whatever relief is available from this Court, versus the range of relief often available from a negotiated grievance process.

66. As compared to my February 2019 disclosures to the Mayor that were cited to discipline me and the June 2019 suspension decision, it was in August 2019 that I submitted a request to telework and then was approved for it by my supervisor.

67.   Chief Administrative Officer Tiffany Crowe was the one who had sent me the April 2019 email warning that my job could depend on my willingness to drop the claims of fraud

68.   Based on my observations of other employees' requests to telework, it was unusual for CAO Crowe to get involved in decisions about individual employees being approved/disapproved for telework.

69.   Ms. Crowe claimed that I could not be allowed to telework because I did not have access to VPN even though, as I alerted her, I had colleagues approved for telework with the same access to the network as I would have at home.

70.   These colleagues allowed to telework when I was not were not known by me to be whistleblowers.

71.   In spite of all the years I have worked at DCRA, I am not aware of any other employee ever being disciplined for misleading management.

72.   Defendant D.C. has acknowledged that it is in the public interest for employees to be "free to report waste, fraud, abuse of authority, violations of law, or threats to public health or safety without fear of retaliation or reprisal." D.C. Code Ann. § 1-615.51.

73.   Defendants Lester and Whitescarver relied on their positions and authority as D.C. government officials to propose and impose the suspension on me, such as by citing their job titles and using D.C. letterhead when they issued the documents to me.

74.   Notwithstanding that HR has communicated to me and the rest of the staff that we have the right to contact Council members, the former Chief Building Officer instructed me that I could raise concerns about leave fraud solely to HR from now.

75.   I tried hard to mitigate/keep to a minimum my damages from the events raised in the lawsuit. For example, I have tried to take training and enter special programs when offered

at work to help improve my resume and make it more likely I can be promoted (even though labelled a stalker); I have tried to continue to perform at a high level in spite of stress; I have sought professional care to try to make the stress and anxiety manageable, such as with counseling and medication; and I have pursued this lawsuit to try to get the discipline off my record as it also can easily hold me back from a promotion.

I have nothing else to add at this time.

Date Executed: _Feb 3, 2022_

*Qing Lu*
Qing Lu (Feb 3, 2022 18:42 EST)
Plaintiff Qing "Luchi" Lu

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

QING LU,                                     §
     Plaintiff,                         §
                                §
     v.                                    §          Case No. 20-cv-00461 (APM)
                                §
DISTRICT OF COLUMBIA, et al.,                §
     Defendants.                        §
_____

## DECLARATION AS TO AUTHENTICITY OF RECORDS

I, Karen R. Schleicher, am a custodian of records for the Schleicher Law Firm, PLLC and declare the following to be true and correct under penalty of perjury as to materials in Plaintiff's Appendix offered in support of her opposition to summary judgment: (1) the 508 pages of records at App. 3-510 are true and accurate copies of the original records/documents that were made and kept in the regular course of business of the firm; (2) the attached copies of the records/documents were made at or near the time of the information recorded; (3) it was the regular practice of the firm to record the information set forth in the attached records/documents; (4) the declarant is familiar with the records and the circumstances under which they were made; and (5) the law firm is not a party to the action set forth above.

More specifically: (1) Appendix pages 3-16 and 375-396 consist of filings from the ECF system; (2) pages 17-22 consist of a settlement agreement that the firm assisted in drafting; (3) pages 23-26 consist of a document obtained from BEGA's public website; (4) pages 27-37 consist of materials provided to Plaintiff by DCRA during the disciplinary process; (5) pages 38-51 consist of written discovery responses provided by Defendants; (6) pages 52-88 were produced by Defendants in discovery; (7) pages 89-341 were provided to the firm by a court reporting service, working from audio recordings provided during discovery by the Defendants (Tyrone Lawson interviews of witness conducted in preparation for his November 2018 investigative report that

appears at App. 54-88); (8) pages 342-365 were produced by Defendants in discovery; (9) pages

366-374 were downloaded from Defendant D.C.'s public website of HR materials; (10) page 397

was provided to the firm by Plaintiff as an email she received from a third-party; (11) page 398

was produced by Defendants during discovery; (12) pages 399-400 were provided to the firm by

Plaintiff from email communications she identified as having had with other D.C. employees; (13)

pages 401-497 are excerpts from depositions taken during discovery in this case; and (14) pages

498-510 comprise a declaration that Plaintiff signed on February 3, 2022.

Executed on: <u>April 15, 2022</u>

                                         Karen R. Schleicher
                                         Paralegal and Practice Manager

4/10/22, 12:39 PM          Carr: Former GVRA External Affairs Director Pleads Guilty to Identity Fraud, False Statements | Georgia Department of Law's Consumer Protection Division | Office of the Attorney General of Georgia Chris …

Case 1:20-cv-00461-APM Document 87-2 Filed 04/15/22 Page 513 of 516

[https://law.georgia.gov/press-releases/2022-04-04/carr-former-gvra-external-affairs-director-pleads-guilty-identity-fraud -- as viewed 4/10/2022]

# Carr: Former GVRA External Affairs Director Pleads Guilty to Identity Fraud, False Statements

**APRIL 04, 2022**

ATLANTA, GA – Attorney General Chris Carr today announced that Robin Folsom, the former director of external affairs for the Georgia Vocational Rehabilitation Agency (GVRA), has pleaded guilty to one count of Identity Fraud and three counts of False Statements. The charges stem from an investigation conducted by the Office of the State Inspector General (OIG) pursuant to a request from the GVRA regarding Folsom's use of Family Medical Leave.

"Those who work for the taxpayers of Georgia are expected to uphold high ethical standards and to fulfill their roles in an honest and transparent manner," said Carr. "State employees who break this trust in the course of their employment will be held accountable for their actions. Fraud and deception committed on state time and in association with one's job is unacceptable and will not be tolerated."

In May 2021, Folsom created a fictitious identity for the alleged father of her alleged children, and she subsequently shared the false information with GVRA to request time off for the alleged birth of her second child. During an interview with the OIG, Folsom falsely stated to an investigator that this fictitious person was real and that she had given birth to two children. Ultimately, because of Folsom's deception, she was granted 265 hours of leave under the Family Medical Leave Act, which she would not have otherwise been eligible to receive.

The judge accepted the plea on April 4, 2022, and sentenced Folsom to a total of five years to be served on probation, with a behavioral incentive date of three years under the First Offender Act. The judge also ordered Folsom to pay $12,307 in restitution to the State of Georgia and to complete 40 hours of community service, among other terms.

**Plf. Opp.
App. 513**

This case was prosecuted by the Prosecution Division's Public Integrity and White Collar Crime Unit and was investigated by the OIG.

# Contact Communications Director

**Kara Richardson**
**kmrichardson@law.ga.gov (mailto:kmrichardson@law.ga.gov)**

**Plf. Opp.
App. 514**

**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, LOCAL 2725**

**P. O. BOX 75960, WASHINGTON, DC 20013-5960**
**(202) 842-4540 Phone    (202) 289-4190 Fax**

President – Miranda D. Gillis    1ˢᵗ Vice President – Doreen Broomfield 2ⁿᵈ Vice President – Kermit Johnson
Secretary/Treasurer – Lisa Kelly    Sergeant at Arms – Richard Proctor
CHIEF STEWARDS
Ronald Fowler, DCHA    Kwyna Howard, DHCD    LaKeitha Johnson, DCRA   Neil Williams, DOEE
Robin Espy-Harlan, DOH    (Vacant) OSSE
BUSINESS AGENT, Richard W. Allison, II
MAllen@AFGE2725.com

June 30, 2019

Ernest Chrappah
Director,
Department of Consumer and
Regulatory Affairs
1100 4ᵗʰ St. SW
Washington, DC 20024

Re: Step 4 Grievance
    Issue: Eight Day- Suspension
    Employee: Qing (Luchi) Lu, Fire Protection Engineer

Dear Mr. Chrappah,

This grievance comes to you in accordance with the Collective Bargaining Agreement (CBA) between the District of Columbia Department of Consumer and Regulatory Affairs (DCRA) and Local 2725 of the American Federation of Government Employees (the Union) at Article 10 §B(1), Article 9 §B(2), and Article 10 §D(d).

The grievance asserts violations of the CBA at Article 2 §A(1), Article 9 §A, and D.C. Code §1-615.53.

**Nature of the Grievance**

By letter dated April 2, 2019, Qing (Luchi) Lu, Fire Protection Engineer was informed of the Agency's intention to suspend her for ten (10) days.  **(See Exhibit # 1)** On June 27, 2019, the grievant received a Final Decision suspending her for eight (8) days. **(See Exhibit # 2)**. The discipline was for the following charges (causes) against the Grievant:

Charge (1):    Violation of D.C. DPM §1605.4(b) Making False statements – Knowingly and willfully reporting false or misleading information or purposely omitting facts to any supervisor.

Violation of Contract - Article 9 §A is violated because:

Pursuant to Article 9 §A, the Agency may only discipline an employee for cause. Here, the Union argues that cause has not been proven.

Even if we accept the Agency's facts, just cause still cannot be proven. The Agency alleges that the action is premised upon the employee's dishonesty when reporting information to a supervisor. Though the Agency discussed the order in which complaints were filed and answered, not no point has the Agency provided evidence to support a conclusion that the grievant intended on deceiving anyone. **(see Exhibits #1 & #2)**

The grievant was not charged with negligent misrepresentation although this Local highly doubts that she could have been. What the Agency has essentially done is merely "assumed" that the statements made constitute dishonesty without any legal reasoning to reach such a conclusion. The Agency wholeheartedly neglected to address the grievant's mens rea. **(see Exhibits #1 & #2)** Accordingly, this charge must fail.

Violation of Whistleblower Protection found in D.C. Code §1-615.51 et. seq. as incorporated in the Parties' Agreement via Article 4§B.

AFGE, Local 2725 believes that numerous employees have made a grave error in judgement in this matter. The grievant's complaint is clearly a "Protected Disclosure" as defined in D.C. Code §1-615.52(6) because the grievant clearly was a disclosure of information that she reasonably believed evidenced gross misuse or waste of public funds and a violation of a federal, state, or local law, rule, or regulation. Said disclosure cannot be restricted to time, place, form, motive, context, forum, or prior disclosure made to any person by an employee.

D.C. Code §1-615.53(a) clearly states that a supervisor shall not take, or threaten to take, a prohibited personnel action or otherwise retaliate against an employee because of the employee's protected disclosure or because of an employee's refusal to comply with an illegal order.

Here, The Agency admits that the grievant was informed that she was limited to whom she could continue to make the protected disclosure which was illegal. The Agency, in essence, has admitted that it illegally attempted to chill the grievant's Whistleblower rights by limiting the person/office with whom she could report a real or perceived violation.

According to D.C. Code §1-615.52(5)(A), a prohibited personnel action includes but is not limited to: recommended, threatened, or actual termination, demotion, *suspension*, or reprimand; involuntary transfer, reassignment, or detail; referral for psychiatric or psychological counseling; failure to promote or hire or take other favorable personnel action; or retaliating in any other manner against an employee because that employee makes a protected disclosure or refuses to comply with an illegal order.

Here, the Agency made conclusory allegations of dishonesty; however, very thoroughly set forth the dates, times, and individuals to whom the disclosures were made. The truth of the matter is that dishonesty is merely a pretext for being a squeaky wheel at DCRA.

Not only has the Agency made a horrific error by disciplining the grievant for protected activity, D.C. Code clearly states in § 1–615.54 that an employee aggrieved by a violation of