UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| QING LU, | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | Case No. 20-cv-00461 (APM) |
| | § | |
| DISTRICT OF COLUMBIA, et al., | § | |
|     Defendants. | § | |

**PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION
TO HER MOTION FOR SUMMARY JUDGMENT**

**I. SUMMARY**

In this reply to Defendant's opposition (ECF No. 86) to Plaintiff's partial MSJ (ECF No. 77), Plaintiff continues to urge the Court to accept the unremarkable proposition that a public employer may not use a content-based restriction of free speech to discipline an employee for commenting on a matter of public concern, where as here no evidence is offered the punished speech caused disruption of operations. As well, no balancing test was conducted by the employer.

After more than a thousand pages of the parties' briefing and exhibits, these ten essential points remain true as to how the principles above played out in the life of Plaintiff Qing "Luchi" Lu, who is acknowledged by all parties to be a long-time high performer in work for the District:

1. Plaintiff was suspended without pay based on a single charge of deliberately misleading the Mayor on two days in February 2019, for reporting her contention that coworker S.B. engaged in paid leave fraud. Plf. MSJ App. [ECF No. 77-2] at 33.

2. Sydney Lester—the proposing official for the suspension admitted that (even) he isn't certain whether S.B. is innocent of the misconduct. Plf. Facts [ECF No. 77-1] ¶21. Defendants highlight

   how Plaintiff repeatedly disregarded their instructions to trust no fraud occurred—but do not go on to prove her report was false/a lie.

3. Defendants have offered no evidence that the February 2019 disclosures to the Mayor disrupted the work of the Mayor/her office.

4. Defendants have offered no evidence they bothered to weigh whether Plaintiff's reports on a matter of public concern (i.e., whether S.B.—a fire protection engineer—lied under oath) were so disruptive to the Mayor's work/office that they had to be squelched notwithstanding the public's traditional interest in the airing of issues involving fraud allegations against government employees.

5. Transcripts from interviews Tyrone Lawson cited in his Investigative Report on Plaintiff reveal he falsely claimed Plaintiff admitted to criminal stalking S.B. (Plf. Facts ¶87). Though his report went on to mention stalking over 20 times, Lawson admitted no witness he interviewed actually spoke of stalking (Plf. Facts ¶90).

6. Investigator Lawson, whose report was foundational to the later disciplinary suspension, in his interview of Plaintiff repeatedly challenged her about her contacts with media outlets (e.g., *Washington Post*—Plf. Facts ¶68; CNN—Plf. Facts ¶69; and WTOP—Plf. Facts ¶71) and with the D.C. City Council (e.g., Nadeau—Plf. Facts ¶74; Blackwell and Silverman—Plf. Facts ¶75). *See also* Plf. Facts ¶81 (media and council). Lawson then referenced

those contacts in his investigative report to support his conclusion Plaintiff had engaged in misconduct (e.g., Plf. Facts ¶¶83-86).

7. Next in time, the disciplinary proposal criticized Plaintiff for her communications with media and City Council (Plf. Facts ¶109-110), though D.C. employees' right to communicate with the council is protected by law. *See* D.C. Code §1-615.53(b). The disciplinary decision then adopted such "evidence, recommendations, rationale, and conclusions of the proposing official" (Plf. Facts ¶126).

8. S.B. described a $1,000 fine he had to pay when earlier admitting to ethics violations as "all initiated by Ms. Lu" and his complaint about her related disclosures was even quoted in the Lawson Report (Plf. Facts ¶17). Plaintiff's emails about the (eventually admitted) ethics violations were exhibit 11 to Lawson's report and Lawson questioned her on the emails in their interview (Plf. Facts ¶20, ¶19).

9. None of the proposing official, deciding official, or Plaintiff is aware of any employee other than Plaintiff who was disciplined for being said to have mislead management (Plf. Facts ¶140).

10. Management proposed discipline of Plaintiff "**only**" (emphasis original) for dishonest statements to management, but later swore in discovery responses that what they disciplined for [instead] was "a

course of harassing conduct over two and a half years" towards her coworker S.B. *See* Plf. Facts ¶¶107, 116-17.[1]

## II. REASONABLE BELIEF

While Defendants continue to argue it was never reasonable for Plaintiff to believe that she was reporting serious misconduct in relation to her assertions S.B. engaged in parental-leave fraud, all seem to agree that the leave fraud—if it occurred—would be serious misconduct. *See* Plf. Facts ¶¶94 (Lawson), 104-06 (Lester), 123-34 (Whitescarver), *and* 126 (S.B. "assumes" could be serious misconduct). Plaintiff also has set out at least 10 detailed reasons why it was reasonable for her to continue to believe the fraud occurred (Plf. Facts ¶23, 24, 28, 29, 30, 31, 32, 33, 34, and 36). Even Investigator Lawson was willing to admit believing fraud occurred could have been reasonable the first six to 12 months (Plf. Facts ¶36). So long as proposing official Lester—who also was Plaintiff's and S.B.'s immediate supervisor—remains uncertain if S.B. is innocent of leave fraud, how is it that Plaintiff was disciplined for refusing to acquiesce in trusting that S.B. is innocent?

## III. PARTICULAR DEFENSES PROPOSED FOR SUMMARY DISMISSAL

### *A. Fourth Defense—Claimed Absence of Protected Disclosure under D.C. WPA*

Plaintiff above and in her initial motion addressed that what she reported was in the nature of serious misconduct (e.g., violation of law in committing fraud/perjury) and why the information she was told and researched reasonably led her to conclude the fraud did occur. The fact management told her two, five, or ten times to trust them that no wrongdoing occurred is insufficient to make her belief unreasonable, particularly where management never went so far as

---

[1] Defendants erroneously claim (Dfs. Opp. at 7) Plaintiff seeks an advisory opinion on whether she stalked S.B. As above, Lawson acknowledges his more than 20 references in his report to stalking were included even though zero witnesses used the word (Plf. Facts ¶90). As well, his assertion she confessed to criminal stalking also was disproven (Plf. Facts ¶87). No worries there.

to assert it authenticated the documents that S.B. provided. Management similarly had told her there was no evidence of wrongdoing when she earlier asserted ethics violations by S.B., yet S.B. went on to admit to them and pay a $1,000 fine, so her suspicions were justified. Management's repeatedly assuring her HR didn't object to S.B.'s leave application did not rule out fraud.

Defendants claim Plaintiff knew the criminal trial for which she concluded S.B. was taking parental leave to cover for had been dropped, but what she instead asserted was that: (1) prior to the trial date S.B. took the parental leave, telling coworkers on June 22 he would be gone a long time; (2) the case was dismissed June 23; and (4) S.B. returned to work on June 24 notwithstanding his earlier statement he would be out for an extended period. *See* Plf. Facts ¶29; Plf. App. 349; Plf. App. 501 (dec. ¶23). These facts are consistent with someone taking leave in anticipation of possible jail time, then returning to work when the case instead turned out to get dismissed.

Plaintiff was disciplined for lying to the Mayor in reporting S.B. engaged in parental-leave fraud after she was subjected to a retaliatory investigation that relied in part on her earlier (sustained) disclosures of S.B.'s ethics violations. This may be compared to D.C. Code §1-615.53, which prohibits a supervisor from taking a personnel action or otherwise retaliating against an employee because of a protected disclosure, and with §1-615.52(a)(5)(A), which includes within prohibited personnel actions proposing and imposing a suspension, as well as other forms of retaliation among which are discretionary factfindings. Setting aside whether OGC's request for the Lawson investigation was retaliatory, the manner in which Lawson carried out the discretionary factfinding clearly was: fabricating witness testimony to support Lawson's finding of a criminal stalking violation and finding misconduct based on Plaintiff's contacting City Council members and media.

Under §1-615.52(8), a "supervisor" is someone who has the authority to recommend or take corrective action for, among other things, the violation of a law/rule/regulation. Lawson's report claimed that Plaintiff "grossly" violated personnel regulations and admitted she knew or should have known she was violating the criminal stalking law (Plf. App. 85). This was a discretionary factfinding (a specified WPA "other" form of retaliation) undertaken by someone who recommended action be taken, i.e, he declared Plaintiff violated criminal stalking law.

Even if Investigator Lawson is not deemed a WPA "supervisor," his report was the foundational basis for the disciplinary proposal, and that proposal in turn for the decision. Lawson's ill intent reached Plaintiff with his investigation, reaching via cat's paw into the proposal and on to the discipline. Lawson is the one who over and over told Plaintiff in his interview of her that whether S.B. committed leave fraud was none of her business, warned she had better not reach out to the media anymore, refused to interview her proposed witnesses, and even demanded (Plf. App. 217) Plaintiff admit she'd never seen S.B.'s wife nude during the claimed pregnancy.

Regarding the telework denial, Plaintiff established that CAO Crowe was well aware of Plaintiff's disclosures, as Crowe was new to the position yet put together a very detailed account of how management contended Plaintiff should have trusted they were correct when finding no reason to object to S.B.'s leave application. This letter was issued April 22, 2019—while the suspension proposal was issued but not yet decided—and came with Crowe's threat that Plaintiff Lu needed to consider "this matter closed, as your very job may depend on it" (Plf. Facts ¶96). Applying the largely parallel federal WPA, the Federal Circuit counseled against assuming a manager not the target of the original disclosures lacks retaliatory motive. *See, e.g., Miller v. DOJ*, 842 F.3d 1252, 1261-62 (Fed. Cir. 2016) *and Robinson v. DVA*, 923 F.3d 1004, 1019 (Fed. Cir. 2019). Defendants have not rebutted Plaintiff's claim her peers were allowed to work without a

VPN during the same period Ms. Crowe used Plaintiff's lack of a VPN as the justification for Plaintiff's being barred from [pre-COVID] telework.

As to the timing, Plaintiff sought telework starting in August 2019 (Plf. Facts ¶134) as compared to CAO Crowe's warning Plaintiff in April 2019 to consider the leave-fraud issue closed or put her job at risk (*id.*). While the longer the gap in time, the less likely the temporal relation is enough to infer retaliation, there is no bright-line test. *See Hamilton v. Geithner,* 666 F.3d 1344, 1357-58 (D.C. Cir. 2012). Here, proximity in time is not essential to suggest a relation, as Ms. Crowe made the threat to Ms. Lu to drop the matter as her "job may depend on it." This rare sort of direct evidence—telling the employee to quit reporting or she may be fired—reveals sufficient negativity toward Plaintiff's speech that a denial of telework not much later—when non-whistleblowers were being allowed to telework—makes retaliation far more than speculative.

### B. Fifth Defense—Claimed Absence of Matter of Public Concern or a Protected Disclosure

Defendants claim there is no way Plaintiff can reach from her disclosures about S.B.'s ethics violations back in 2016 all the way through to the investigation by Lawson in 2018 and then the 2019 proposal and decision to suspend her. It turns out Lawson and the management officials themselves successfully made the journey: asserting Plaintiff engaged in "two and a half years" of "harassing conduct" toward S.B., her coworker. The proposal itself references a claim Plaintiff persisted in her false claim against S.B. "for the past two and a half years." Plf. App. 27 (bottom of page). This dates it back from the February 2019 disciplinary proposal to the period in which Plaintiff made 2016 disclosures about the S.B. ethics violations. Remember Lawson included in his report as exhibit 11 emails Plaintiff sent (copied to Lawson) about the S.B. ethics issues.

Recall that Plaintiff asserted S.B. was violating conflict-of-interest/ethics rules in handling matters his wife submitted to the permit center, then Lester directed Plaintiff to produce her

evidence, she also met with BEGA, BEGA staff expressed great appreciation for Plaintiff's assistance, S.B. went on to admit fault and paid the $1,000 fine, and then S.B. laid the blame for the fine all at Plaintiff's feet and his complaint about her ethics report to BEGA was quoted in the Lawson Report. S.B.'s ethics violations were serious, consistent with a $1k fine. One suspects that, outside this lawsuit, D.C. would agree these were significant Plaintiff disclosures of conflict-of-interest violations by fire protection engineer S.B. in processing his wife's company's projects.

### *C. Sixth Defense—Claimed Lack of Contemporaneous Belief Report "Gross" Under WPA*

Someone making around $100,000 a year who takes off eight weeks (two months) of *paid* leave—so about $15,000 in cost to the government—and does so based on a non-existent child, and thus provides no benefit to the government and instead is away from the workplace for an extended period, has engaged in a gross waste of funds in Plaintiff's view. While larger amounts sometimes may not be a gross waste, here consider the benefit to the government is a negative one. This is not a situation in which something was purchased and turned out to be worth a bit less than its full cost; instead, this would be the equivalent of dumping $15,000 in a trash can and walking away. Whether Plaintiff *reasonably believed* S.B. engaged in such fraud is a separate question, which she has dealt with extensively above and in her initial motion. As set out there, new evidence continued to come to Plaintiff on a rolling basis and as it did, it would renew her belief that fraud occurred and so she would update her report to OIG or make it to someone else.

Plaintiff is not a lawyer, but knows enough to expect that lying to obtain a government financial benefit on a form that is under oath and cautions against false statements like this one (*see* Plf. Facts ¶40) was likely to be a crime. Management repeatedly told her there was nothing to worry about (as Lester had told her with regard to the earlier S.B. ethics violations) and that HR was okay with what S.B. had submitted. It did not tell her that someone bothered to authenticate

whatever was submitted. Plaintiff did not ask or expect to see S.B.'s leave application, but is allowed to wait until someone mentions the document(s) were authenticated before she assumes, based on management's word alone, that this time S.B. truly was innocent of wrongdoing.

True, mere disagreements over policy are not protected disclosures, such as in the *D.C. v. Poindexter,* 104 A.3d 848 (D.C. 2014) case cited by Defendants. Plaintiff also is aware she must demonstrate she reasonably believed her report falls into a protected category under the WPA, such as violation of law/rule/regulation. What she doesn't find in the law—and Defendants cite no cases holding this—is a requirement that her report be actually true. Or that she have firsthand knowledge or other smoking-gun proof S.B. again was corrupt at work. Here, there's no proof in the record the fraud didn't occur, such that Plaintiff's report was a lie, and we know the proposing official himself as of deposition remained uncertain whether S.B. was innocent of the fraud.

The WPA (D.C. Code §1-615.52(a)(6)) broadly protects disclosures without regard to "time, place, form, motive, context, forum, or prior disclosure." Nothing in that definition says "but only if based on firsthand knowledge." Circumstantial evidence can be enough to convict for a crime, so it is no leap to suggest it can support a whistleblower's reasonable belief. *See, e.g., U.S. v. Poston*, 902 F.2d 90, 94 n. 4 (D.C. Cir. 1990) (as to sufficiency for a criminal conviction). As one example (Plf. Facts ¶30), when Plaintiff saw S.B.'s wife posting on Facebook on other subjects on the day of the purported birth, but with no mention of being in labor or of a child being born, Plaintiff's own motherhood experience reasonably led her to conclude something was amiss.

### D. Seventh Defense—Claim that Plaintiff Caused Her Own Harm

Here Defendants suggest if Plaintiff had simply given up on making reports about S.B. and what she contended was his wrongfully obtaining paid leave, she would have suffered no harm. The same could be said of the ethics violations she earlier reported, for which S.B. lays at

Plaintiff's feet the full blame for his having to pay the $1,000 (versus blaming himself for choosing to handle permit matters submitted by his wife's business). Defendants' argument here has to assume that Plaintiff's reports were knowingly untrue, or the claim of self-harm might be applied to kill any whistleblower or free speech case—as in, "if only the whistleblower had stayed silent, they wouldn't have had to incur the expense of a suit." As addressed earlier, Plaintiff did not know her reports to be false, just as proposing official Lester is unsure if S.B. is innocent of leave fraud.

The First Amendment and whistleblower protection laws were adopted in part because it is easier to remain silent—even when speech is most needed—particularly when things run their natural course and retaliation is permitted. For example, the students in *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021), arguably could have avoided the difficulties of a lawsuit if only they had given up proselytizing, or simply stopped complaining once the college changed its policies in their favor. Yet the Supreme Court ruled in their favor that even a claim of $1 in damages was sufficient to preclude mootness for their assertions of constitutional violations.

Plaintiff is one of those people for whom observing wrongdoing at taxpayer expense is deeply troubling. The D.C. Council, in passing the Whistleblower Protection Act, and then later strengthening its protections, sent a message that even people like her are welcome in the District's workforce, and that reports of believed wrongdoing are to be encouraged. Yet the District in this case now takes the position that she is the one to blame for giving in to such inclinations. D.C. here applies its "See something, say something" instruction to staff instead as "See something, say something, then get suspended for not submitting in silence after we tell you you're mistaken."

### E. Eight Defense—Claim Plaintiff Did Not Mitigate Her Damages

Plaintiff testified to mitigating her damages by taking training and entering special programs as they were offered, to enhance her skills. She notes she continues to focus on remaining

a high performer and has sought professional healthcare to deal with the stress at work and related to the suit. In response, Defendants ding her for not spelling out that she applied for a promotion (though they don't assert such a slot has opened and she does not assert denial of one). Plaintiff's loss of pay is the eight days' suspension, so a promotion would be beyond mitigating her damages.

Defendants also complain that she abandoned the union arbitration in favor of this suit (though D.C., Plaintiff, and AFGE all signed off on that disposition). She was free to conclude that the union's level of representation was less likely to lead to a positive final outcome than would be an attorney's presentation of her case in a federal court. Without proof the union would get her a better result, Defendants cannot rely on that as proof of failure to mitigate. For example, if a settlement resulted in a reprimand, she remains worse off than non-whistleblowing colleagues: it could remain in Plaintiff's file for three years, the erroneous "stalker" finding by Lawson would still be alive, and she would be deprived of the opportunity to raise a further challenge. A message would be heard by other potential whistleblowers that the system in the end always wins, so better not to risk speaking out.

Plaintiff objects to, and asks the Court to strike, Defendant's exhibit at ECF NO. 86-10, page 1, which is a discussion between Plaintiff's counsel and the union attorney about settlement proposals from the City. *See* Fed. R. Evid. 408(a) (settlement negotiations generally inadmissible).

### F. The Claim the Same Action Would Have Been Taken Absent Any Impermissible Factor

Defendants here (in their opposition at 16) admit they disciplined Plaintiff "*because* she made false and misleading statements about S.B. to the Mayor on February 5 and 6, 2019" (emphasis original). Given that proposing official Lester admits he remains unsure if S.B. committed leave fraud, that should be reworded to "*because* some in management believed she made false and misleading statements to the Mayor." Put another way, if management gauged the

content of her communications more favorably, then she would not have been disciplined. This places the case firmly in the realm of content-based restrictions—an analysis for which the very uttering of the phrase foretells likely doom for the government action at issue. Add to that the fact the report was on a subject of public concern—wrongdoing by government employees.

Because the District targeted Plaintiff's speech based on its communicative content, the presumption generally would be that the challenged discipline is unconstitutional and may be justified only if the government proves it was narrowly tailored to serve compelling state interests. *Reed v. Town of Gilbert, Ariz.,* 576 U.S. 155, 163 (2015). The analysis is more complex with Plaintiff's being a government employee, but the District at minimum should have considered the harm to government efficiency in suppressing reports of public-employee fraud against evidence (there is none) that the February 2019 reports to the Mayor disrupted operations. The evidence shows Plaintiff's contacts with media were considered in deciding to propose a 10-day suspension, but not that management considered how First Amendment/WPA protections might apply.

The fact Plaintiff's earlier reports about S.B.'s ethics violations and then about leave fraud upset S.B. are unsurprising and not controlling. Consider that S.B.'s work-performance ratings did not decline (Plf. Facts ¶143). Investigator Lawson acknowledged it was typical for the subject of a whistleblower disclosure to be upset (Plf. Facts ¶144) and deciding official Whitescarver agreed that even an accurate whistleblower disclosure creates some disruption (Plf. Facts ¶188). Neither the First Amendment nor the D.C. WPA provide for a "heckler's veto" on protected speech. *See, e.g., Dhiab v. Trump,* 852 F.3d 1087, 1097 (D.C. Cir. 2017) (noting "heckler's veto" line of cases, barring government censoring of speech merely on basis may provoke violence or offend others). One cannot tell from the record if S.B. was upset at the disclosures to the Mayor that were the cited basis for the suspension being imposed, beyond his existing upset at paying the ethics $1,000 fine.

Defendants' claim that it was not the content, but the untruthfulness, of Plaintiff's report that got her disciplined is the same sort of circular logic that failed to persuade the Supreme Court in the recent *Shurtleff v. City of Bos., Massachusetts*, No. 20-1800, 2022 WL 1295700, at *4 (U.S. May 2, 2022). There, the City of Boston unsuccessfully argued that its refusal to fly a flag was based not on "the content of the Christian flag," but instead on "the fact that it was the Christian flag or [was] called the Christian flag." *Id.*

When government action regulates speech "because of the topic discussed or the idea or message expressed," it is facially content based. *City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, No. 20-1029, 2022 WL 1177494, at *4 (U.S. Apr. 21, 2022). A judgment that something is false is inherently content-based. Otherwise, the government would be allowed to ban what it deemed (knew?) to be false claims by a citizen of having received a particular medal. *See U.S. v. Alvarez,* 567 U.S. 709 (2012). Even demonstrable untruthfulness without a showing it was used to obtain an improper benefit typically is insufficient to override First Amendment protection. *Id.* at 723. While Plaintiff may have lesser rights at work because of being a government employee, that is counterbalanced by the topic at issue's being wrongdoing at taxpayer expense—a traditional subject of high public interest.

*In their own MSJ and their opposition to Plaintiff's, Defendants have cited no case in which a public employee loses a First Amendment or D.C. Whistleblower Protection Act case out of the gate purely based on a conclusion the report about a matter of public concern was false.* This is not a situation in which Plaintiff had firsthand knowledge of the falsity of a report such that the balancing test would be more easily weighed against her. At very worst, we have that she at some point in late 2018 saw S.B.'s wife in the office with a young girl, but this was without being able to confirm it if was a child claimed to be the same one for which parental leave was taken.

Defendants frame it as a matter of Plaintiff disrupting S.B.'s personal life, but once a public employee obtains a financial benefit from the government for something, particularly when questions of fraud arise, it becomes a matter of public concern. One can even find the salary of employees like S.B. online via a District search tool: dchr.dc.gov/public-employee-salary-information. If a child for whom a parent takes paid leave in fact exists, the parent involved presumably would find reports the child never existed to be more absurd than worrisome.

### G. Tenth Defense—Claim that Plaintiff's Injuries Were Not Proximately Caused by District Employees Acting Within the Scope of Their Employment

This defense appears more a leftover from a tort suit than something appropriate for the WPA or claims against individuals under 42 U.S.C. § 1983, consistent with the dearth of cases applying the concept under either statute. It needs striking as having no applicable legal basis.

Investigator Lawson was acting within the scope of role (though very poorly) for which he was employed when he mishandled the investigation by fabricating testimony about Plaintiff and including repeated references to her earlier disclosures about S.B. Then proposing official Lester—the supervisor of S.B. and Plaintiff at the time—acted within his expected role (again, poorly) in notifying Plaintiff she could be suspended for 10 days. Then deciding official Whitescarver performed duties within the scope of his employment when wrongly finding Plaintiff lied to the Mayor and so suspending her for eight days. Chief Administrative Officer Crowe had oversight for the telework program and so exercised her discretion within the scope of her employment to rule Plaintiff could not telework without a VPN. All four of these were within their scope of employment and official roles notwithstanding how they did their jobs caused Plaintiff's harm.

### H. Eleventh Defense—Legitimate and/or Non-Discriminatory Basis for Actions

Defendants acknowledge they disciplined Plaintiff because her reports on two days in February 2019 to the Mayor were judged by them to be lies. Absent proof under the D.C. WPA

that Plaintiff failed the "reasonably believed" test—which she elsewhere in this brief today and earlier in her initial motion demonstrates she meets—D.C. can't defend its actions under that law.

Defendants' late-in-the-game effort to substitute "two and a half years of harassment of S.B." as the justification for their discipline cannot be aligned with the proposal saying she is being charged "**only**" (emphasis original) for dishonest statements to management and then the decision narrowing it further to misleading reports Plaintiff made on two days in February 2019 to the Mayor. As deciding official Whitescarver confirmed in deposition (but contradicted himself within sworn interrogatory answers), the final charge was misleading the Mayor, not insubordination nor harassment, because that is what he received from proposing official Lester (Plf. Facts ¶117).

While Defendants are very sympathetic to S.B.'s anger over being the subject of Plaintiff's ethics and then leave-fraud reports, the Defendants fail to prove that the charged conduct (misleading the Mayor on two days in February 2019) in particular caused any disruption. Any broken relationship between S.B. and Plaintiff dates to at least 2016 and his paying the $1k fine. Absent the reports to the Mayor being shown to cause any disruption and absent the Defendants' having weighed Plaintiff's/the public's interest in her speech and its effect on government efficiency, there is no justification under the First Amendment for their content-based discipline of Plaintiff for speaking out on a matter of public concern.

Plaintiff Lu is the only DCRA employee known to have been disciplined for misleading management. If management's telling her to trust that it knows better than she does is sufficient to quash her free-speech rights, any District employee going forward readily can be denied them. The rule the Defendants would have this Court adopt seems to be, "If we repeatedly tell an employee to trust us no wrongdoing occurred as to an issue of public concern, but then they make another report on the same subject to someone new, we are free to discipline them for perceived lying,

without evidence the latest incident caused disruption." This cannot be what Council envisioned occuring when it passed and then expanded rights under the Whistleblower Protection Act.

### I. Twelfth Defense—Statute of Limitations

Defendants claim Plaintiff can't base a WPA claim on the investigation because suit was filed more than a year after she was interviewed. Plaintiff first received the completed Lawson investigation with the proposal on April 2, 2019, while the suit was filed February 18, 2020, so less than a year later (note: typo in suit date of 20*19* in Plaintiff's motion [ECF No. 77 at 25]).

It was not until she reviewed Lawson's completed report that Plaintiff could learn he formally ruled her to have engaged in misconduct, cited media and City Council contacts as part of that, chose to reference materials from her earlier ethics disclosures to justify the findings, and falsely alleged her to have admitted to violation of criminal stalking laws. (And not until she was able to get the audio witness interviews during civil discovery and have them transcribed did she learn that Lawson's accounts of witnesses saying she stalked S.B. entirely were fabricated.)

## IV. RESPONSE TO DEFENDANTS' OBJECTIONS TO PLAINTIFF'S FACTS

While Plaintiff understands MSJ practice not to allow the movant to file a separate reply rebuttal to the non-movant's disputes with movant's statement of facts, Plaintiff did want to respond to some of the *objections* Defendants raised in their opposition to Plaintiff's MSJ:

- Defendants object, such as in response to Plf. Facts ¶16, that Chief Administrative Officer Crowe improperly is used as an undesignated Fed. R. Civ. P. 30(b)(6) entity witness. Plaintiff responds that the District does not have an entity-wide motive or lack of it. It can only act through its managers such as Crowe—someone who warned Plaintiff as to the leave fraud reports that, "You need to consider this matter closed, as your very job may depend on it" (Plf. App. 36-37).

Rule 30(b)(6) is not a shield Defendant D.C. can use to avoiding probing of whether its managers had retaliatory motive. As well, the text of FRCP 30(b)(6) directs that it does not preclude depositions by other means—it is simply one option for obtaining evidence.

- Defendants' response, at note 1, to Plf. Facts objects to Plaintiff's using a document (Plf. App. 400) without a Bates number and other documents that include highlighting of some text. Plaintiff responds that the Bates number was 787, but apparently it was lost when the footer ("App. Plf. Partial MSJ") was inserted. If any other Bates numbers seem to be missing but are needed, Plaintiff's counsel will research them and provide the numbers to Defendants' counsel upon request. As to highlighting MSJ documents, Plaintiff's counsel understands it not only permissible, but that some courts require it.

- Defendants object in multiple places to Plaintiff's relying on her declaration drafted after discovery closing. Plaintiff refers them to Fed. R. Civ. P. 56(c)(1)(a) and (c)(4), which specifically authorize the use of declarations/affidavits in MSJ proceedings. There is no duty to produce a declaration/affidavit prior to the date that it exists.

- Defendants object, such as for Plf. Facts ¶19, to Plaintiff's reliance on (court-reporter-produced) transcriptions of Defendants' audio recordings of Lawson's investigative interviews. Such transcripts were the only way to prove the substantial variance between what Lawson reported having been said and what actually was said. The

unappealing alternative would have been to insist that the Court wade through the audio recordings. Notably, Defendants do not allege inaccuracies in the transcriptions of the Lawson audio recordings.

## CONCLUSION

This remains a case fundamentally about whether the District of Columbia can impose a content-based restriction (i.e., if someone in management perceives you to have lied, they get to suspend you) on an employee who spoke out *on a matter of public concern* (i.e., coworker asserted to have fraudulently taken eight weeks of paid leave) when there is no evidence of disruption from the punished February 2019 reports to the Mayor. Defendants conducted no balancing test before proposing/imposing suspension, ignoring public interest in airing allegations of tax-dollar fraud.

Nor did Defendants disprove Plaintiff reasonably believed her reports to be true, which is not surprising given that even the proposing official is not certain that S.B. is innocent of the fraud. Instead, Defendants only prove they (again) told her to trust that no S.B. wrongdoing occurred.

Plaintiff today has further documented that multiple ones of Defendants' affirmative defenses have no basis in law and fact, meriting their dismissal for pre-trial efficiency.

FOR SUCH REASONS, the Court is asked to grant Plaintiff's motion for partial summary judgment and to consider adopting some or all of her asserted undisputed facts for trial. In particular, affirmative defenses: Four (Defendants did not violate WPA), Five (Conflict of Interest Plaintiff reported not cause of her discipline), Six (Parental leave fraud allegation not "gross"), Seven (Plaintiff caused her own harm), Eight (Failed to mitigate damages), Ten (Any harm was not proximately caused by D.C. employees within scope of employment), Eleven (Legitimate, non-discriminatory reasons for D.C. actions), and Twelve (Barred by statute of limitations).

Respectfully Submitted,

SCHLEICHER LAW FIRM, PLLC
1629 K St., NW, Ste. 300
Washington, D.C. 20006
(202) 540-9950
(202) 683-6130 fax


By:  /s/ David R. Schleicher
       David R. Schleicher
       DC Bar No. 428001
       david@gov.law