# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| QING LU,<br><br>   *Plaintiff*,<br><br>  v.<br><br>DISTRICT OF COLUMBIA, *et al.*,<br><br>   *Defendants*. | Civil Action No. 1:20-cv-00461-APM |

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Under Fed. R. Civ. P. 12(d) and 56(b)(2)(A), Defendants District of Columbia (the District), Sydney Lester, and Clarence Whitescarver submit this Statement of Undisputed Material Facts in Support of their Motion to Dismiss and for Summary Judgment.

1. "In [the District of Columbia Department of Consumer and Regulatory Affairs (DCRA)] workplace Plaintiff" Qing Lu "is called "Luchi Lu.'" Ex. 8 at 2.

2. Plaintiff and S.B. were coworkers at DCRA from 2007, reporting directly to Mr. Lester as Fire Protection Engineers, until the end of 2019.  Ex. 1 at 36, 65; Ex. 12 at 40-41, 51-52.

3. Plaintiff has never held any other job with the District, is not a human resources officer, has no legal training, and has never reviewed S.B.'s electronic time sheets, leave requests, or personnel records.  Ex. 12 at 15, 44, 46-48.

4. Plaintiff "firmly believe[s]" S.B. is a "dishonest" person.  Ex. 12 at 51.

5. Plaintiff does not consider S.B. a friend or see him outside of work.  Ex. 12 at 50-51.

6. Plaintiff has seen S.B.'s wife with two boys "in the DCRA office, many, many times" and "naturally believed," without "any forensic proof or legal proof," that they were

S.B.'s sons because there was nothing about them that "don't add up or from the other

info sources that has any suspicion on it."  Ex. 12 at 81-82; *see also* Ex. 1 at 77.

7.      On June 27, 2016, Plaintiff wrote to the Office of the Inspector General (OIG) that she

was "sending this email to express my concern about conducts of my coworker [S.B.]."

Ex. 1 at 65.  Plaintiff continued, in part:

> At the end of April, [S.B.'s] wife stopped by the office.  She voluntarily . . .
> informed a male employee . . . that she was pregnant.  There was no any
> noticeable pregnancy on her body.  In the middle of May, [S.B.] announced
> his wife had given birth to a baby girl.  He showed photos of a baby to
> coworkers sitting near him. . . .  **Between May 19 (Thursday) and June
> 3rd (Friday), [S.B] was on <u>approved</u> fatherhood leave by using PFL
> (Paid Family Leave).**"
>
> While [S.B.] was at home on his paternity leave, his wife visited the office
> alone on June 2nd. <u>**WITHOUT**</u> <u>carrying the baby</u>, she was sitting in the front
> desk area, showing photos of a new born to the receptionist and to customers
> sitting in that area waiting for service, as well as some employees walking
> by.  In addition to briefing people the baby was doing well generally, she
> also voluntarily provided . . . some vivid details about 'her pregnancy and
> labor'  According to her, it was a past due pregnancy and induced labor!  If
> this were true, that would mean at the end of April she was only about one
> week from delivery, which a pregnancy can hardly go unnoticed, plus the
> fact she is almost 6 feet tall, heavy built.  These new details released by her
> have made the alleged pregnancy and baby birth even more suspicious.
>
> [S.B.] returned to work and on Monday June 6th.  He was quite responsive
> to inquiries from coworkers.  He is willing and open to socializing/chatting
> with customers about his baby.  He told them his baby cries a lot and does
> not sleep the whole night so he felt exhausted during the day.
> . . . .
>
> On the other hand, some finding from a government's publicly accessible
> website seemed to have linked [S.B.] to a sever violation.  Please click this
> link for detailed of the case.  http://casesearch.courts.state.md.us/casesearch/
>
> On March 6th this year, he was caught by Maryland Charles county sheriff
> for speeding and driving with suspended out-of-state license (DC license).
> This is a serious offense and may lead to prison time. . . .  When you scroll
> down to the bottom, you can find even though the trial was scheduled for
> June 23rd, a notices was serviced to him on as early as April 8th.
> . . . .

Till then, the whole episode of this baby drama – from the timing of the baby announcement to his office attendance and action – have seemed to be so in tune with the legal processing of his trial.  . . . seemed to be in strong consistency with my speculation that the baby set up could be a fraud . . . .

His intent seemed clear.  Some quite plausible yet not proven explanation would be:  As he was uncertain about the verdict from the pending trial, he created the whole thing and attempted to use the paternity leave (PFL) to conceal the possible prison time he may be sentenced to, so he thought nobody would know he's is prison, and at the same time still get paid while in prison, for at least 8 more weeks.

On June 23rd, he did NOT show up at work and the online record shows his case closed by nolle prosequi with a status change from A to C (Active to Closed?).  On June 24th, . . . he returned.

I am one of the people who concern whether or not the baby story is a fiction. I decided to be the one to bring it to your attention and investigation. Because we don't know what documents he used to get the HR approval and whether a government issued Birth Certificate was required for paternity leave. . . .

Ex. 1 at 65-68 (emphases in original).

8.      On August 11, 2016, Plaintiff wrote to Permit Operations Division Chief Gary Englebert, in part, that "on June 6th[*sic.*], the schedule was changed" and S.B. started doing Thursday afternoons.  Since then there was been a pattern:  [S.B.]'s wife – who is a permit runner – has always been coming to DCRA for permit **particularly on Thursday afternoons.** – if you have not observed this yet, you can start making your observations now."  Plaintiff continued, in part:  "I am brining this matter to you for your attention on the possibility of conflict of interest and the extreme self-serving intentions, to make sure we all work together to serve the very best interest of DCRA and there is no hidden self-serving agenda."  Ex. 5 at 9; *see* Ex. 1 at 65.

9.      On August 16, 2016, Plaintiff wrote Mr. Englebert again, stating, in part:

3

. . . .  We don't have any proof to assert that he has assigned his wife jobs . . . to himself, but our questions are:

- Is the management aware of this?
- Is there any monitoring policy or control mechanism at all to ensure we all are ethical and play fair fames when we are in business??

To be frank, among us the reviewer, we are not quite surprised by what [S.B.] has been doing, since the dealings with him for a decade has given us more than enough hints of his deep character problems, especially his unhealthy attitude towards money and extreme selfishness. . . .

As mentioned, Wednesday afternoons is my counter time.  However On July 27th (Wednesday) morning Sydeny Lester told me NOT to do it but let [S.B.] to do it 'because he is off the next day. This is amazing.  If you need a day off you go ahead.  Why do we have to switch for him? . . . .  It does not make any business sense.

Permit runner is an industry with low barrier and everybody can do it.  We do not know – from a strict legal point – whether this should be allowed as the lecturing from the ethics training is still lingering . . . .

Instances described are being seen by everybody.  At the same time there are some hearsays that may indicate some deeper / more grave problems of his conducts.  Since these hearsays are not directly from my observations, I cannot provide too much details.  But this is the hint:

1.  **Monitor his phone calls at his desk to make sure he is not soliciting or helping [his wife's business] to receive more business!**
2.  **Watch up his long term plan to make [his wife's business] a third party review company for DCRA.**

I know this link provides a complete list of permits that have been issued month by month by DCRA. . . .  But it would be quite time consuming to dig out permits that are issued to [his wife's business] and to her.  The best way for you to control . . . will be more people to watch him for you.

Ex. 5 at 6-7.

10.    Mr. Englebert forwarded Plaintiff's August 11 and 16 emails to DCRA's Office of the

General Counsel (DCRA OGC).  Ex. 5 at 6, 9.

11.    On August 23, 2016, DCRA OGC referred S.B. to the Board of Ethics and Government

Accountability (BEGA), writing in part, that it was doing so out of an "abundance of

caution" after Mr. Englebert and Mr. Lester "indicated . . . that [Plaintiff] has a long held

personal vendetta against [S.B.] for unknown reasons" and "that they believe this

allegation is unlikely to be true" but "agree[d] that they [could not] confirm whether the

allegation is true or not because they are not on the same floor as the employees when

they are at the permit counter, issuing permits." Ex. 5 at 5.

12.     On August 31, 2016, Mr. Lester wrote Plaintiff, in part:

> You have been a member of the Fire Protection Engineering Review team
> for several years and during that time you have made several allegation about
> the conduct of your co-worker [S.B.].  These allegations became more and
> more serious as time progressed.  You have made some recent allegations
> which have now placed us at a stage where the allegations have legal
> implications that cannot be ignored.  We have contacted our legal staff and
> at this time, after their review, there is no evidence to conclude any wrong
> doing.
>
> Since you have made these allegations, if you are in possession of any proof
> that backs up your allegations you should present them.  Both Mr. Gary
> Englebert and I are available to mee with you to discuss any proof that exists.

Ex. 1 at 60.

13.     "Around that time," Plaintiff says, in part, "Joyce Smith gave Plaintiff a slip of paper

with the tracking number of two applications that were submitted by S.Y.C. and reviewed

by S.B. . . .  On September 1, 2016, Plaintiff had a meeting with [Mr. Englebert] and

[Mr.] Lester as scheduled." Ex. 9 at 4.

14.     On September 1, 2016, DCRA OGC forwarded more information from Mr. Englebert to

BEGA, writing in part, that the information showed that S.B. had "conduced a fire review

of a permit submitted by his wife's company" and indicated that Mr. Englebert "is now

reviewing all of [S.B.'s wife's company's] permit applications to determine whether

there are any that show [S.B.] acted on these applications." Ex. 5 at 5.

15.   On September 2 and 8, 2016, DCRA OGC forwarded BEGA spreadsheets showing what

permits were connected to both S.B. and his wife.  Exhibit 5 at 3-4.

16.   On September 29, 2016, Plaintiff wrote to DCRA Human Resources (DCRA HR), in

part:

> In August, I reported to Gary Englebert my concern of a possible conflict of
> interest in [S.B.] conducts.  Gary relayed the information to Sydney Lester.
> Quickly, I received an email from Sydeny Lester . . .  He stated 'We have
> contacted our legal staff and at this time, after their review, there is no
> evidence to conclude any wrong doing.'
>
> I was surprised by his quick assertion since there was no reference to the
> facts work / investigation he has finished and how he can come to this
> conclusion.  On September 1st, Gary Englebert, Sydeny Lester and I had a
> meeting scheduled. . . .  [H]e demented me to provide proof and I did.
>
> A few days later, Gary Englebert informed me that IT people conducted a
> search by then it was found [S.B.] had reviewed seventeen (17) of his wife's
> jobs in the past few years . . . .  [T]he fact is S███ B███ has taken **TWO
> fatherhood leaves for TWO children**, one early in 2015, one this year a
> few months ago. . . .
>
> My understanding was:  A supervisor is expected to monitor and take action
> to remove issues concerning business operation and to serve the best interest
> of the agency.  It seems to me that Sydney Lester does not meet the standard.
>
> - He failed to identify and report this problem in the first place, which
>   has been going on for years.
> - After he received a report, he still did not take the initiative to locate
>   the problem. . . .  My point here is even I were not able to present any
>   proof immediately – due to my position in the organization and
>   limited access to certain information – that still does not mean the
>   problem was not in existence.
> - Sydney Lester, as a supervisor should have been the one to search for
>   and locate the problem, in which case the 'allegation' (his word)
>   would have become substantiation a long time ago.

Ex. 1 at 58.

17.   On October 31, 2016, Plaintiff wrote BEGA Investigator Ileana Corrales, in part:  "Is

there update you can provide?  As said, I do not know the job number of the 17 jobs

referred to.  If you need, you can provide the numbers and the I can send you the application of those jobs in PDF. . . ."  Ex. 5 at 1.

18.    On October 16, 2018, Plaintiff wrote, in part:  "He met her at the counter and started secretly doing her jobs until caught by BEGA.  He did many many jobs and he was fined $1,000 by BEGA in December 2016, for 2 jobs."  Ex. 1 at 139; *see also* Ex. 7 at 4 (March 5, 2017).

19.    On March 5, 2017, Plaintiff wrote to OIG, in part:

> . . . .  Speaking for myself, I NEVER saw her with a baby girl in DCRA's building, not even once.

> . . . .  [S.B.] took 3 weeks off in December.  My supervisor noticed one of my teammates that [S.B.] has a lot of paternity leave unused.  Since January 2017, he has been taking Monday and Wednesday off to consume his paternity leave."

Ex. 7 at 4.

20.    On May 15, 2017, Plaintiff wrote to OIG, in part:

> Let me tell you something Sir:  Even [S.B.] himself did not expect he could 'make it' this well and this far.  He took measured steps.  He used this PFL only for 2 weeks in 2016.  He finished the majority part of it between January and March of 2017 when he felt he was totally safe.  OIG should interview him.  When he is sitting in front of OIG investigation, you will find the answer in his eyes in 2 seconds.  Justice awaited!"

Ex. 7 at 18; *see also* Ex. 1 at 111-12, 142-43.

21.    Plaintiff testified that she heard "from my communication with my – like with the general public and also from report of my other co-workers, they saw S.B.'s wife have a very big waist, a belly.  I believed that she was wearing some precisely foreign object underneath her clothes to fake pregnancy," and that "[s]he always wears clothes.  I did not see that pillow."  Ex. 12 at 16; *see id.* at 17-18.

22.     On May 12, 2017, Plaintiff wrote to DCRA HR, in part:  "**He put a family shot in his cubicle since last November (still there) which the girl is a baby of another woman ([R.B.] who lives in Jamaica?!?!  If he really had a baby of his own, why wouldn't he have his own baby in photo?**"  Ex. 1 at 73 (emphasis original); *see id.* at 72.

23.     Plaintiff contacted OIG to see if they had any updated on her original complaint on January 11, 2017.  Ex. 1 at 52-54.

24.     On the afternoon February 1, 2017, OIG sent Plaintiff a D.C. FOIA response indicating that her complaint had been referred to DCRA as the agency "in the best position to address the issues raised." Ex. 1 at 56; *see id.* at 52-56, 62-63.

25.     On February 2, 2017, S.B. wrote to Deputy Chief Building Official (DCBO) Bailey and Mr. Lester, in part:

> I have remained fairly quite over the years since Ms. Luchi Lubegan her relentless pursuit of direct and indirect personal attacks against me at work. This all started in late 2007 towards early 2008 . . . and she still continues to do this for some unknown reason . . . .

> In recent months, she escalated this behavior . . . .  At that point it became very clear to me that her objective is to first damage my reputation here at work, smear my name throughout the Agency as someone that cannot be trusted (defamation of character), which obviously is designed as an attempt to end my career as a District Government employee.  Seeing that this is the case, it is a threat to my livelihood, which helps to put food on the family table, therefore threatening my family.

> Again, just a week ago during our morning meeting on 1/26/2017, which was held on the floor of the Permit Center, she found the time to do a google search on 'fake pregnancies' [ ] yes, bizarre!  Knowing that I was the Reviewer assigned to the Fire review counter after the meeting ends, she made sure that a printed copy of her google 'findings' was left on top of the stamps in the drawer for me to see it.  One may ask, what is her motive?  For me it was a direct non-verbal accusation at me (us) that my wife's pregnancy last year was faked in order for me to have been granted paid family leave (PFL)
> . . . .

> I believe this is clear harassment, and her conduct only serves to generate a hostile work environment; this need to be addressed as soon as possible and should be documented for the record.  This conduct does not belong in our work place!

Ex. 1 at 40; *see* 9-10, 39.

26.  DCBO Christopher Bailey provided DCRA HR a witness statement in February 2017

stating:

> Statement
> Location third floor POD office.
> Time during the POD Thursday meeting 9:10am
> On Thursday, February 2nd
>
> Ms. Luchi Lu, voiced a common in the q&a portion of the meeting abruptly changing the subject from office procedure to a personal statement began with a question to management 'how do we handle another employee using their wife with a fake belly to fake a pregnancy and then the father requesting family leave?'
>
> There was not any warning and no reason to bring this information and or comment to an office meeting.  I told Ms. Lu 'I do not understand your question and if it is not beneficial to this discussion she needed to clarify offline?'

Ex. 1 at 37; *see* 9-10, 39.

27.  Mr. Bailey forwarded S.B.'s email and his own account of the February 2, 2017 meeting

to DCRA Human Resources (DCRA HR) Officer Ingrid Jackson in the Office of then

Chief Administrative Officer (CAO) Walter Crawford.  Ex. 1 at 39-40, 9-10.

28.  On February 7, 2017, Plaintiff forwarded her OIG D.C. FOIA response to DCRA HR and

identified herself as the complainant, stated, in part, that she "originally[ ] thought OIG

would be in a better position to probe this case[ ] as . . . a law enforcement entity," and

asked "to hear some update from" DCRA HR as to "whether it has been substantiated

([S.B.] did not have a baby in May 2016), or unsubstantiated (he did)."  Ex. 1 at 62.

29.  On March 5, 2017, Plaintiff wrote to OIG, in part:

On February 10th I went upstairs to Mr. Crawford's office and had a conversation with him.  He advised me that there was no problem, the agency has verified the documents [S.B.] had submitted for paternity leave approval, he said 'the documents have met the government standard for an approval.'

Ex. 7 at 4; *see* Ex. 1 at 77.

30.   On February 10, 2017, at 1:32 p.m. Plaintiff wrote CAO Crawford and DCRA HR, in

part:

Thank you for taking the time to notify me [of] the result of this complaint.  It has been a little bit distraction given the prolonged investigation.  Now it has come to end makes a good relief.  I respect and take it as our agency's decision.

As stated, I was relying on my observation and comprehension as well as information voluntarily shared with me by several of my coworkers.  I handled my reports and all information professionally and responsibly.  Below is the original / first report I sent to OIG on June 16, 2016.  I just want to be totally candid and open with all you HR professional what I actually did, so as to clear out any misunderstanding, if any.

From now on, there will no more communications from me on this matter.  You have my word.  Thank you all for your time.

Ex. 1 at 64.

31.   On March 5, 2017, Plaintiff wrote to OIG, in part:

My mentality is:  Regardless whether it is going to be substantiated or not I am not doing anything wrong. . . .  By then, I really wanted to stop.  . . . . However, after DCRA received a letter from OIG on October 28 last year, which they knew there has been a lot suspicions that this may be fraud, DCRA should have taken some NEW actions to investigate by requesting NEW proof, they should not still go by the same/old documents which had been accepted in the first place.   DCRA should verify his medical insurance statement to see if there is a statement for 'induced labor' , and also request him to submit a government issued Birth Certificate.

I've been thinking of it during the weekend.  I don't want to form a negative impression of my agency's HR as if they don't take care of business seriously.  I trust there is something they see I don't see, while I also believe there is something I see they don't see.  So communication is key.  Driven by this kind of mindset, I prepared a report during the weekend of February 18 and 19, please refer to my attachment [V] vs. [L]-DCRA which I sent to my

agency . . . on Tuesday February 21st.  I included photos pasted from the **public profile** of [S.B.]'s wife's Facebook . . . .

Ex. 7 at 2; *see* Ex. 1 at 73; Ex. 7 at 7-13; Ex. 12 at 75-77.

32.   On September 19, 2017, Plaintiff wrote to the Executive Office of the Mayor (EOM), in

part::

> I then sent a report . . . with new evidence to DCRA's HR in February.  The
> contents of this report were not included in my 1st email to OIG.  They are 8
> months apart and approached from different directions, yet they matched
> materially to support the same conclusion: My coworker [S.B.] took 8 weeks
> government paid fatherhood leave WITHOUT having a baby.

Ex. 1 at 93-94.

33.   On Tuesday, February 21, Plaintiff wrote to DCRA HR, in part:

> Please see attachment, a fact and common sense based report with new
> information.  Sorry I did not keep my promise, but for a good reason,
> considering the coincidence of the SAME LAST NAME of baby [L], in
> case it was overlooked, in the first place I thought OIG was able to investigate
> it.  I just realized a lot of information can be verified in his PeopleSoft, under
> Dependents and Beneficiaries.

Ex. 1 at 74.

34.   On Friday, February 24, 2017, at 2:45 p.m., Plaintiff asked DCRA HR:  "Has this

provided some new perspective?" Ex. 1 at 74.

35.   On Friday, February 24, 2017, at 3:13 p.m., DCRA answered:  "This has not provided

any new perspective, the agency has confirmed all required documentation needed for an

approval." Ex. 1 at 74.

36.   On February 24, 2017, at 3:23 p.m., Plaintiff responded to DCRA HR:

> Woww.. We are just his coworkers, not law enforcement.  We can sense
> something wrong even from his eyes and facial expression when someone
> was asking him about baby.  I figured he may have submitted forged
> document but I certainly have no proof myself.  See if he would put
> Thanksgiving (Santa) photo there forever.

Ex. 6 at 1; *see* Ex. 12 at 89.

37.     On March 5, 2017, Plaintiff wrote to OIG, in part, about a February 27, 2017, phone call

with CAO Crawford:

> At this point, I felt very frustrated to pursue any further.  I have sensed very
> evidence unwillingness of my agency to take any initiative to investigate
> and to request any new proof.  I decided to talk to Mr. Crawford again.  I
> called Mr. Crawford from home using my cell phone, the conversation did
> not go well.  At this point, Mr. Crawford became very impatient.  He pretty
> much dominated the conversation.  This is what he delivered over the phone
> to me, not exactly word-for-word quest, but the gist:
>
>> Let me tell you there is no issue.  There's no issue with the agency
>> or the government.  We have verified the documents he submitted
>> for approval, everything is fine and there is no problem with it.  It's
>> time for you to go back to work.  This is an employee's personal life
>> and it's not your business.
>>
>> You reported to OIG.  OIG dismissed your case.  And now you come
>> back to the agency and you continue to harass an employee's
>> personal life.  I have told you and I'm telling you again:  there is no
>> issue.  The agency has no issue with it.
>>
>> You don't have complete information as we do.  You don't have the
>> entire information.  I read your report.  You draw your own
>> conclusion.  If you continue to be so stuck on an employee's
>> personal life, you will be dealt with.  You hear me?  Thank you.
>> . . . .
>
> Because he was too dominate, I was not able to defend myself on the
> 'harassing his privacy' part. . . .

Ex. 7 at 3*see* Ex. 1 at 93-94, 109.

38.     On September 15, 2017, Plaintiff wrote to her union shop steward, in part:

> I am sending this email with attachments to ask for your advice on this matter
> how to deal with HR and those management.  When you read the chains from
> the very bottom, you can see it has bothered and distracted me for a long time,
> especially when I called Walter Crawford on 2-27 this year, over the phone
> he used the word 'harassing' on me, I was very angry. . . .
> . . . .

. . . .   I am kind of inspired by Mr. Crawford wrong word he used on me.  I want to prove he is wrong!  . . . .

Ex. 1 at 93-94*see id.* at 18-19.

39.    On March 5, 2017, Plaintiff wrote OIG:

"If something is real, every detail shall add up automatically.  But there is something wrong about his having a baby, as outlined in my report . . . .  Thought there may be other possibilities, it is highly suspicious especially on the two names of the baby:  [V] and [L]. . . .  Things don't add up at all, there must be reason for it, we don't experience knots for no reason.

. . . .   I am here asking OIG **PLEASE DO NOT** transfer it to my agency this time . . . .

I would suggest a simple face-to-face interview will get you the most information.  DCHR . . . can also help verify the information he entered in his People Soft under Dependents and Beneficiaries.  OIG can check his Aetna, Kaiser statement to see if there is an item for induced labor for May 19th, and request Birth Certification.

If anything here is not clear, if OIG requires clarification or any new information, please let me know.

Ex. 7 at 4.

40.    Plaintiff's Facebook report concluded that S.B.'s wife posted a baby picture of one of their son's as a baby [V] in July 2016, and that they used the daughter [L] of a family friend [R.B.] to create the appearance of a daughter on S.B.'s wife's Facebook and S.B.'s cubicle in November 2016.  *See* Ex. 1 at 72-73, 77-79, Ex. 7 at 2-4, 7-13; Ex. 12 at 68-69.

41.    On May 10, 2017, at 1:46 p.m., OIG emailed Plaintiff:  "

This correspondence is in response to your complaint regarding time and attendance and Paid Family Leave fraud.  The Office of Inspector General (OIG) conduced an independent analysis of the documentation provided by the Department of Consumer and Regulatory Affairs (DCRA) and determined that no further action by the OIG is warranted.

Please be advised that the D.C. OIG considers this matter closed. . . .

Ex. 7 at 15; *see* Ex. 1 at 14.

42.     On May 11, 2017, Plaintiff responded to OIG:

> This case is closed by OIG based on analysis of documentation provided only by DCRA.  What about the other information including her Facebook provided by me? . . .  OIG shall not unilaterally rely on one source (DCRA) and totally ignored and excluded the other (my reports).  This approach itself is not independent and is unfair to me.
>
> . . . .
>
> Please do advise **what** will make new and acceptable proof to OIG to reopen this case.

Ex. 7 at 14.

43.     On May 12, 2017, at 12:03 p.m., Plaintiff wrote DCRA HR:

> I am sending this email as a follow-up and new inquiry to learn:  if I have NEW evidence to indicate this is a fraud, now is it good time to talk about it?  You know my allegation is: He does NOT have a daughter . . . .  He took 8 weeks government paid fatherhood leave WITHOUT having a baby.  I still believe that is the truth.  I know it sounds crazy.  My new evidence includes some changes on her Facebook and conversations between her and staff on the 2nd floor at permit center.

Ex. 1 at 72; *see id.* at 73.

44.     On May 12, 2017, at 12:44 p.m., DCRA HR responded:

> As it stands, all required documentation has been provided by the employee for approved Paid Family Leave (PFL).
>
> I refrain from personal opinions when making decisions related to my position and rely heavily on facts based on presentation of evidence; which in this case is confidential.  I would ask that you respect the required confidentiality of medical documentation and understand we would do the same for you, if the roles were reversed.
>
> I will not address why an individual chooses to represent or not represent a family member in their cubicle.  This is an individual's choice and not a requirement for any position in the agency."

Ex. 1 at 72.

45.   Plaintiff emailed BEGA about and with her allegations on May 10, 2017, at 3:38 p.m.,

and 4:34 p.m., and again on May 25, 2017.  Ex. 1 at 70-71, 77-79; *see also id.* at 80-81.

46.   On July 24, 2017, BEGA sent Plaintiff a letter via email stating that there was

"insufficient evidence to support a reasonable belief that a violation of the Code of

Conduct occurred."  Ex. 1 at 83; *see id.* at 81-82.

47.   On July 25, 2017, Plaintiff responded to BEGA, in part:

> . . . .  In this case, the evidence was totally from her own Facebook not
> anybody else's. . . . Bega shall not only rely on the paper they provided (and
> the interview) and at the same time totally ignore the co-existence of strong
> evidence presented by her own's Facebook as she is (supposed to be) the
> mother of the 'baby.'  This is a partial opinion.  Without a clearly outlined
> known definition of sufficiency, BEGA cannot conclude whether the
> evidence I presented is insufficient.  I am the complainant of this case, can I
> appeal?
>
> Yes, this case does involve an employee's spouse, who is so willing to
> cooperate in a deliberate fraud, but is does not involve a 'child'. . . .

Ex. 1 at 80; *see also id.* at 81.

48.   On August 3, 2017, Plaintiff responded to BEGA's rejection of her request for

reconsideration by stating, in part:  "If you have a definition and/or guidelines of

sufficient evidence, I will do my best to meet your standard."  Ex. 1 at 84; *see see id.* at

80, 85.

49.   On September 11, 2017, DCRA HR Officer Ingrid Jackson wrote Plaintiff:

> I apologize for my tardy response.  Based on my review of his records,
> [S.B.] has met all of the District government requirements in order to be
> eligible for the Paid Family Leave and has taken the Leave in accordance
> with the regulations.  Further review reflects that your concerns have been
> investigated by both the Office of the Inspector General (OIG) and the
> Board of Ethics and Government Accountability (BEGA).  The OIG and
> the BEGA informed the agency that they could not find any cause for the
> agency to take any disciplinary action against [S.B.] and that the case is now
> closed.

At this point, there is no further action required by representatives of the DC Department of Consumer and Regulatory Affairs (DCRA) or any other District government agency.

Please consider this the final response on behalf of the agency as the matter has been investigated and deemed closed.

Ex. 1 at 90.

50.   On September 15, 2017, Plaintiff wrote to her union shop steward, in part:

I am sending this email with attachments to ask for your advice on this matter how to deal with HR and those management.  . . . .  We firmly believe this is a fraud, it involves knowingly using and providing a forged document with intent to defraud, it is a felony crime.  He DOES NOT have a baby.  HR deliberately avoid finding the truth by NOT verifying the document he provided.  They are not only negligent but also abused the system.

As stated, it is very easy to prove there exists a human being if there is one and there are many ways to prove it. . . .

. . . .

How to handle this deadlock to reveal the truth and get myself out trouble?  I want to learn how to cope and deal those management on this situation.  I wanted to move on so I can totally concentrate on my work on this end.  Thank you !

Ex. 1 at 93-94.

51.   On September 19, 2017, at 11:07 a.m., Plaintiff emailed the Executive Office of the

Mayor (EOM) with her allegations, stating in part:  "My coworker [S.B.] took 8 weeks

government paid leave WITHOUT having a baby."  Ex. 1 at 92.

52.   On September 26, 2017, Plaintiff again wrote EOM, in part:

You don't' need to transfer to an agency you knew is irrelevant.  That would be waste of time of you, mine and that party.  Working on this matter with multiple DC government agencies, I have learnt the technique how an agency appeared to be doing something by carefully bypassing the very essential part, don't want to see it more."

Ex. 1 at 97; *see id.* at 96.

16

53.     On September 27, 2017, Plaintiff wrote EOM, in part:

> Lying about having a baby who is a human being shouldn't be easy.  Yet he made it well and this huge lie has passed three DC government agencies.  At DCRA we are amazed by [S.B.]'s feat, yet we are more amazed by DCRA's inaction.  We are expecting your office to take legitimate action to render the truth. . . .

Ex. 1 at 99.

54.     On September 27, 2017, EOM wrote Plaintiff, in part:

> This matter has been reported to and investigated by your agency, DCRA, the Office of the Inspector General, and the Board of Ethics and Government Accountability.  I have also discussed the report with DCHR.  Your allegations have been investigated by the aforementioned agencies and they have taken appropriate action.  Thank you for brining this to our attention, there will be no further action taken on our end.

Ex. 1 at 98.

55.     On November 27, 2017, Plaintiff wrote to the Director of DCHR, in part:

> I called you on Wednesday (11-22) and someone helped taking a message. I am waiting for your response.
>
> Long story short:  My coworker [S.B.] submitted a fake Birth Certificate in May 2016, his wife was wearing a silicone bump underneath her clothes and walking around in DCRA.  He received and took 8 weeks government paid paternity leave with no baby.  This is a fraud involving a forgery crime . . . .

Ex. 1 at 102.

56.     On November 28, 2017, the DCHR Director emailed Plaintiff, in part:  "Please know that DCHR, OIG[,] and BEGA looked into your allegations and found no merit to your claim. As explained to you by members of my staff, this matter is now closed."  Ex. 1 at 101.

57.     On February 20, 2018, Plaintiff sent an email from her personal account to her government account, addressed to her union representative under the subject heading "Request for a meeting," stating, in part:

I have forwarded you some of my emails about the fake baby before. [S.B.] claimed he had a baby born in May 2016, and he took 8 weeks government paid fatherhood leave. My stand is: The baby he took 8 weeks government paid fatherhood leave for does NOT physically exist in this world. In other words There was no baby. It is a fraud. – If it involved using a fake Birth Certificate, then he also committed a forgery crime . . . .
. . . .

Recently (and accidentally) I obtained an email which [S.B.] sent to Chris Bailey on 2-2-2017 . . . this is his harassment complaint he filed to DCRA and Mr. Crawford call me 'harassing' based on information in this email without verifying anything with me from my side.
. . . .

My main questions are:
- Why did he react to a Google Search with nobody's name on it?
- Why is his mind there for his wife?
- Why did he choose to relate a google search to his wife's pregnancy and then deny the connection?
- Why did a google search especially bother him?
- This sheet of paper is about FAKE pregnancy, if his wife's pregnancy is not fake, then that would mean this page has no bearing on his wife at all, why did he call it harassment" Why did he call it harassment TO HIM?

I need to hear from them why a google screen shot constituted harassment to him. Why is his mind there? DCRA did not very anything mentioned in this email with me, but just used this harassment word on me. It is unjust and unfair to me!"

Ex. 1 at 109-10; *see id.* at 111 D262 (follow up email on meeting with union representatives); *see also id.* at 18-19, 116-17.

58.   On March 8, 2018, Plaintiff wrote to DCRA Program Analysist (and training sexual

harassment officer) Rohan Reid, in part:

He attempted to use a false harassment on me to cover his own fraud" in February and March 2018.
. . . .

I don't want to talk to HR again since they did not put any record on me. I just felt it's unfair to me. I also had talked to my union. They advised me since HR chose to let it go just let it go. Otherwise I will become the problem not him.

Ex. 1 at 116-17; *see also id.* at 109-11, 117-19.

59.    On April 12, 2019, Plaintiff wrote, in part:

> During the process, I gradually realized that I'm overpowered, and in an
> endangerment that I have let biased DCRA decide if it is biased. I started
> contacting local media outlets, and City Council. In a hope their leverage
> can help bring out the truth. In all initial contacts, I did NOT mention his
> name until they clearly expressed interest in the story.

Ex. 3 at 32; *see id.* at 1.

60.    Plaintiff saw a little girl with S.B.'s wife in the ladies' room at DCRA in October 2018.

Ex. 12 at Ex. 12 at 75-77, 81-82.

61.    On October 16, 2018, at 2:27 p.m., Plaintiff sent an email to various D.C. Council email

addresses, writing, in part:

> I am sending this email to report an unbelievable fraud and forgery crime
> committed by one of my colleagues here at DCRA, and the negligence of
> many DC government agencies including the Mayor's office. . . .
>
> . . . . In May 2016, he submitted a FAKE birth certificate he bought online
> to DCRA's HR – literally a paper with the 2 words 'birth and 'certificate'
> on it, with his and his wife's name and a name they made up for the child
> who does NOT exist. His wife was wearing a silicone bump underneath her
> clothes and walking around DCRA  He took 8 weeks government paid
> paternity leave WITHOUT having a baby. This is a fraud and forgery crime
> . . . .

Ex. 1 at 135.

62.    On October 16, 2018, at 2:56 p.m., Plaintiff sent an email to various D.C. Council email

addresses in response ("Re:") to her earlier email, writing, in part:  "[T]hey allowed him

to continually file 'harassment complaint' and use the term 'harassment' to get away with

it." Ex. 1 at 138; *see id.* at 139.

63.    Plaintiff testified that she "always though this [R.B.] was family friend. It is beyond my

wildest imagination this lady is actually his stepmother" until "he told me. My step

mother, [R.B.], that's what he said, word-for-word" in the Third Floor Pantry.  Ex. 12 at 69; *see* Ex. 7 at 7, 15; Ex. 12 at 68-71.

64.    On November 2, 2018, Plaintiff requested an update on one Councilmember's referral of her complaint to OIG. Ex. 1 at 140.

65.    On November 8, 2018, at 11:21 a.m., Plaintiff asked the same Councilmember how OIG's "3rd time to review this same case" was going because "[t]here must be a definite conclusion, with proof."  Ex. 1 at 141.

66.    On November 26, 2018 wrote the same Councilmember, in part:

> We gathered some important information recently just wish to share with you. . . .  It is confirmed by his only family member that the girl in the Santa picture . . . is [S.B.]'s **paternal half-sister**. . . . [S.B.] is nearly 50 years old. Usually it is not common for a 50-year old to have a toddler half-sibling.  It will be up to your decision whether to share this with OIG.  Hope OIG staff are able to untangle the complicity, just in case [S.B.] brings this girl to OIG's office for an DNA test, since OIG has no knowledge he has a paternal half-sister.
>
> AFTER the fake girl of May 2016, he claimed he had another baby.  Last December (2017), 11 months ago . . . .  Nobody knows exactly whether this one is also a fake or not.  What we know is that he did NOT take paternity leave for this one.  It is possible he would negotiate to use the 8 weeks for this one to 'pay back' the fake one of May 2016.  If DC government finally gets him.  But the existence of this one is also a question mark.
>
> . . . .
>
> Here at DCRA we all say he is so 'lucky' .  Because usually even in within the same family, when it comes to something very wrong and very indecent it is usually hard to get full cooperation from the other half.  His wife is a sad exception. . . .    She has been so eager and devoted to colluding and conspiring with him on this fraud, from the very beginning. . . .

Ex. 1 at 142; *see id.* Ex. 1 at 143-44.

67.    On November 8, 2018, at 11:46 a.m., S.B. wrote CAO Crawford an email titled, "Workplace Harassment by Fellow Employee," stating, in part:

The harassment issue with Luchi Lu is on the rise again, or should I say, still persists. A few days ago (last week) while I was waiting in the 3rd office pantry to warm my lunch, she was also present using the microwave.  Mr. Lester also happened to show up while I was waiting.  Surprisingly, Luchi then proceeded to question me in her usual sarcastic manner about my daughter, implying that my Stepmother ([R.B,]) was actually my daughter's mother; still referencing the picture she saw on the Facebook of my Stepmother and my daughter.

Again today (11/8/2018), about 10:48am in the presence of Ms. Sharon Brown in the lobby Suite E340, she again, suggested to Ms. Brown (while I was discussing another issue with Ms. Brown), that she will be purchasing pillows to strap to her abdomen in order to obtain maternity leave, which <u>again</u>, is a direct accusation that my wife faked her pregnancy so that I could get family leave.

. . . . This is slanderous, and needs to stop.  This has been going on for over ten years.  How much longer do I really need to put up with this?  It's becoming unbearable!!

I am hereby requesting again, PLEASE do something, because whatever you did last time seemed to be having little or no effect on her behavior. This is causing great distraction each time I have to stop, restrain myself and refocus on my work.

Ex. 1 at 36.

68.  On November 28, 2018, DCRA OGC assigned Special Investigator Lawson to investigate S.B.'s November 8, 2018 harassment complaint.  Ex. 1 at 1-2; Ex. 13 at 13-14.

69.  Special Investigator Lawson produced an "Investigative Report" with exhibits that was subsequently relied on by Mr. Lester and Mr. Whitescarver in issuing Plaintiff's proposed and imposed discipline and is reproduced in full as Exhibit 1 (Bearing Bates Stamp Nos. Lu v. DC et al1-20-cv-00461_00000151-226, 228-301).  *See* Ex. 2 at 1; Ex. 4 at 142-432; Ex. 14 at 8-9, 14; Ex. 15 at 13.

70.  Investigator Lawson was aware of a settlement between BEGA and S.B. but did not look into that as part of his investigation.  Ex. 13 at 8-10.

71.    The Investigative Report included summaries of interviews taken by Investigator Lawson in November and December 2018 that corroborated the incidents described in DCBO Bailey's February 2, 2017 witness statement and S.B.'s February 2, 2017 and November 8, 2018 emails.  Ex. 1 at 4-10.

72.    Plaintiff testified that on February 5, 2019, she saw the Mayor and Acting DCRA Director Ernest Chrappah walking through the DCRA Permit Center, "stood up, approached," and told the Mayor that her coworker "submitted a fake document," his "wife likely was wearing a pillow underneath her clothes," and that she "hope[d] this time the agency can demonstrate some integrity."  Ex. 12 at 7-8, 24; that "I don't knew either way" whether S.B. had a child born in 2016, *see id.* at 12; that S.B.'s wife "always wears clothes" and "I did not see that pillow," *see id.* at 16; and that she did not see the documents that S.B. submitted for parental leave prior to February 5 or 6, 2019, *see id.* at 15, 27-30.

73.    On February 6, 2019, at 10:09 a.m., Plaintiff emailed the Mayor and Acting DCRA Director Ernest Chrappah, writing, in part:

> At DCRA, one male employee submitted a fake paper to the agency's HR in May 2016.  His wife (not a DC government employee) was a wearing a plastic bump / pillow underneath her clothes and walking around in DCRA. He received 8 weeks government paternity leave with NO baby.  A government employee dragged a pillow-wearing woman to the government's office and knowingly used a fake paper for 8 weeks government paid paternity leave is not only unethical, indecent, it's also a fraud and felony crime. . . .  Attached is a fake paper bought online.  The original copy has an embossed golden stamp on it and 'looks' very real.
>
> Plus don't forget the fact even a man can 'LOOK' pregnant. https://www.google. com/search?g=fake+pregnant+belly. . . . . . . .
>
> **. . . .   What if an employee refused to provide consent to investigating and called it harassment , what happens next?**

. . . .

DCRA, OIG, BEGA[,] and DCHR have worked together to use their government official power to make this crime go away. . . .  They used the each other's negligence to defend their own negligence. . . .  They used the governmental system and their official power to make this crime go away for 3 years.
. . . .

'Insufficiency' shall not be conveniently used by DC government to deter whistleblowing activities whenever the outcome doesn't seem to be desirable . . . . This standard of sufficiency should not be such as to deter any whistleblower . . . .

Madam Mayor and Director Chrapph, I hope in your new tenure, DC government and DCRA can demonstrate some principle and integrity, . . . tell right from wrong and bring the crime to justice. . . .  Hope your attention to this matter can help end the incompetence, negligence and dishonesty of many DC government agencies in handling this matter, and help make DC government a clean and ethical place.  In DC government, harassment is not tolerated.  Forgery is a felony crime, just like murder and rape, it should not be tolerated either.

 Nobody is above the law.  Nobody should walk away from the crime he committed without being punished by law. . . .

Please confirm receipt, so I know it is safely received by you both.

Ex. 1 at 147, 149.

74.   On February 6, 2019, at 10:15 a.m., Plaintiff replied to herself, the Mayor, and Director

Chrappah with S.B.'s photo, "name[,] and government contact."  Ex, 1 at 146

75.   On February 8, 2019, Plaintiff forwarded her February 6, 2019 emails to the Mayor and

Acting DCRA Director Chrappah to Investigator Lawson, stating in part:

There is circumstance I think I need to inform you openly for your decision.  A case – using fake document and wearing a pillow for paternity – in currently under review by Director Chrappah and the Mayor's Office (EOM).  Mayor Bowser visited DCRA on Tuesday (2-5) and I spoke with her about this fraud, Director Chrappah was standing by.  Mayor Bowser asked Director Chrappah to follow through and he is working on it now. . . .  It is being reviewed by OIG too as I informed you yesterday.

. . . .  The nature of this offense is criminal and the review is pending. . . .

Considering the different nature of these 2 complaints, and for my own self-protection purpose, can I meet with you at least AFTER Director Chrappah discovers the truth?  It won't be long now since the request is from the Mayor.  It's your decision I will respect and follow.

Ex. 1 at 145.

76.    Investigator Lawson interviewed Plaintiff on February 12, 2019, and issued an

Investigative Report on February 23, 2019, finding that Plaintiff "stalked and harassed"

S.B. and his wife and repeatedly "misrepresented and falsified information" about them.

Ex. 1 at 1, 10.

77.    On April 2, 2019, Mr. Lester issued an Advanced Written Notice of Proposed Suspension

of 10 Days.  Ex. 2 at 1.  The Notice of Proposed Suspension states, in part:

Charge:          DPM 1605.4(b) . . . .

. . . .  This disciplinary action will address **only** the dishonest statements made by Ms. Lu.

The evidence shows that when Ms. Lu first started filing complaints claiming that [S.B.] had fraudulently stated that he had a new baby girl in 2016 in order to get Paid Family Leave (PFL).  Ms. Lu has persisted with this false claim against a coworker for the past two and a half years.

[Citing and Discussing Exhibits in the Investigative Report]

The final act raised the level of dishonesty/false statements even higher when on February 5, 2019 Ms. Lu confronted Mayor Bowser and her party touring the Permit Center while visiting DCRA, aired her complaint and followed up with an email to the Mayor dated February 6, 2019 with the subject 'Report to Mayor Bowser – Wearing Pillow for paternity leave' . . . .
. . . .

Ms. Lu grossly violated Part 1, DC Personnel Regulations Chapter 16; Sect 1605.4(b) False Statements, including:  Misrepresentation, falsification, or concealment of material facts or records in connection with an official matter; Knowingly and willingly reporting false or misleading information or purposely omitting material facts to any supervisor.

> . . . .  The offenses are serious and do impair operational efficiency and continued up to February 6, 2019. . . .
>
> . . . .
>
> . . . .  It is hoped that the proposed 10 day suspension will impress upon her the need for her to stop engaging in making false statements about her coworkers.
> . . . .
>
> . . . .  In light of the numerous occasions on which Ms. Lu has been advised of the lack of evidence of her claims AND counseled to cease and desist, management believes that it will take at least a 10 day suspension to impress upon her the seriousness of her misconduct and that it must cease once and for all.

Ex. 2 at 1-4.

78.    On April 12, 2019, Plaintiff wrote in response to the Investigative Report:  "How do I possibly know he has a baby?" Ex. 3 at 5; *see id.* at 7; that "[S.B.] is the perpetrator of an alleged fraud and white collar crime.  He is the SUBJECT, not a VICTIM.  [S.B.] and his wife's emotional state (fear, safety disturbance, and distress) should be irrelevant to this official matter and before the law," *see id.* at 12; that "[t]he law should punish anyone who breaks the law";  that "[t]his is a task that I am not able to finish all by myself."; that "[p]ower and opinion do not substitute for truth.  I need to know fact," Exhibit 3 at *id.* at 13; and that she referred to herself as "a lunatically tenacious and genuinely confused person," *id.* at 37

79.    On June 27, 2019, Mr. Whitescarver issued a Notice of Final Decision reducing Plaintiff's "proposed suspension from ten (10) business days to eight (8) business days." Ex. 4 at 1.  The Notice of Final Decision stated, in part:

> This disciplinary action is based on the following **Disciplinary Charge:**
>
> On February 5, 2019 and February 6, 2019, while on-duty you, knowing and willfully reported false or misleading information or purposefully

omitted material facts to a supervisor, in this case the Mayor of the District of Columbia, in violation of DPM, Chapter 16, Section 1605.4(b)(4).

In your April 12, 2019, response to the Proposed Suspension Notice . . . you repeatedly stated that your comments were based upon personal observations, limited as they were, while also repeatedly acknowledge, via email records and statements, having been notified an incident of fraud or leave abuse by the alleged perpetrator, [S.B.]. Your statements and email communications to the Mayor, as cited above, willfully seeks to obfuscate the record of these investigations and interactions. Your responses indicate that you have not fully conceded to the conclusions of the investigation or supervisory direction provided to you in this case.

. . . .

. . . . **As stated in the Proposed Suspension Notice. . . .** The offenses are serious and do impair operational efficiency and continued up to February 6, 2019.

. . . .

. . . . **As stated in the Proposed Suspension Notice. . . .** It is hoped that the proposed 10 day suspension will impress upon her the need for her to stop engaging in making false statements about her coworkers.

. . . .

. . . . With respect to the respect to the reduction of the proposed suspension from 10 days to the final 8-day suspension, it was taken into consideration that during the intervening period . . . there have been no reported incidents of you having repeated the performance that necessitated the disciplinary action. It is with cautious optimism that a reduction in suspension time has been decided. However, it is also noteworthy that, according to records, your behavioral corrections in this matter in the past are often short-lived, limiting the scope of the suspension reduction to ensure that a lasting behavior correction will ensue.

. . . .

You are hereby suspended from July 16, 2019 through July 25, 2019.

Ex. 4 at 1-4.

80.     On June 13, 2019, CAO Tiffany Crowe distributed DCRA's first formal policy to

        provide employees with the opportunity to telework if they had all the technology they

        needed to perform their work from home.  Ex. 10 at 1, 3; Ex. 11 at 10; Ex. 16 at 8, 15.

81.     Ms. Crowe testified that "a key element of the policy" is where it "says, 'Where

        technologically possible,' and the reason that was actually put in the policy was because

        we were working to get [virtual private network] access for as many of the staff as we

        could.  At the time, this was preCovid, so the Office of the Chief Technology Officer

        was not just like giving out VPN willy-nilly at the time." Ex. 16 at 15; *see* Ex. 10 at 1;

        Ex. 16 at 15-18.

82.     Plaintiff did not have access to a VPN.  Ex. 12 at 36-37.

83.     On August 13, 2019, Plaintiff submitted a telework application to Mr. Lester.  Ex. 10 at

        9.

84.     Mr. Lester approved Plaintiff's telework application.  Ex. 12 at 34; *see* Ex. 11 at 7-8.

85.     Ms. Crowe "was not involved" in individual telework applications "[a]nd no other staff

        members contacted [her] directly like Ms. Lu" but she "was in a position to actually help

        Ms. Lu so [she] tried to do that" when she received her inquiries.  Ex. 11 at 7-8; Ex. 16

        at 13, 24-25.

86.     On September 30, 2019, CAO Crowe informed Plaintiff that the "screenshot" she had

        sent indicated that she did "not have access to Accela at home"—which was "a key

        requirement of [her] job"—because she did not have a VPN.  Ex. 11 at 4; *see* Ex. 16 at

        13, 15-16, 19-20, 26-27.

87.   As CAO Crowe understood the situation, "there are limited licenses" for VPNs so

Plaintiff's request was denied until an "additional inventory of VPNs" was available.

Ex. 11 at 2-4; *see* Ex. 16 at 26-27.

88.   On October 7, 2019, CAO Crowe explained that she was "not aware of the others

exactly situated" and "the policy clearly states that you must be able to do ALL of the

functions of your job from home, including access Accela and other network

applications."  Ex. 11 at 1; *see* Ex. 16 at 13-14, 17, 20-22.

89.    Ms. Crowe testified that, "as a matter of fact, most of the people on her team didn't

have a VPN at the time" and "[s]o most of them were not teleworking"; Ex. 16 at 17; *see*

Ex. 11 at 8-9; that she "asked the HR manager to let [her] know if there were people

who were teleworking who based on the policy should not have been and there were no

cases of that," Ex. 16 at 19, and asked for a technology officer to "let [her] know" when

DCRA obtained more VPN licenses, Ex. 16 at 27-28.

90.   On February 18, 2020, Plaintiff filed her Complaint [1].

Date:  February 4, 2022                                 Respectfully submitted,

                                                        KARL A. RACINE
                                                        Attorney General for the District of Columbia

                                                        CHAD COPELAND
                                                        Deputy Attorney General
                                                        Civil Litigation Division

                                                        */s/ Matthew R. Blecher*
                                                        MATTHEW R. BLECHER [1012957]
                                                        Acting Chief, Civil Litigation Division,
                                                        Section III

                                                        */s/ Adam P. Daniel*
                                                        ADAM P. DANIEL [1048359]
                                                        RYAN MARTINI [888241893]
                                                        Assistant Attorneys General

Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
Phone:  (202) 442-7272; (202) 724-7322
Fax:  (202) 400-2675; (202) 741-0555
Email:  adam.daniel@dc.gov;
ryan.martini@dc.gov
*Counsel for Defendants District of Columbia,
Sydney Lester, and C.G. Whitescarver*