### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| QING LU, | |
| *Plaintiff*, | |
| v. | Civil Action No. 1:20-cv-00461-APM |
| DISTRICT OF COLUMBIA, *et al.*, | |
| *Defendants*. | |

### PLAINTIFF'S RESPONSE TO DEFENDANTS'
### FIRST SET OF INTERROGATORIES TO PLAINTIFF

TO:    Defendant District of Columbia (and Defendants Whitescarver and Lester), by way of their attorneys via email: Michelle G. Hersh (michelle.hersh@dc.gov), Adam P. Daniel (adam.daniel@dc.gov), and Elizabeth G. Slover (elizabeth.slover@dc.gov).

Following are Plaintiff's responses to Defendant District of Columbia's First Set of Interrogatories to Plaintiff, served in accordance with the orders of the judge, pursuant to the FEDERAL RULES OF CIVIL PROCEDURE, and under the guidance of the FEDERAL RULES OF EVIDENCE. Thank you.

Respectfully Submitted,

SCHLEICHER LAW FIRM, PLLC
1629 K Street, NW, Ste. 300
Washington, DC 20006
(202) 540-9950

By: _____
David R. Schleicher        david@gov.law
DC Bar No. 428001

Served: September 8, 2020

**INTERROGATORIES**

1.      State your full name, address for the past 10 years, date and place of birth, Social Security number, driver's license number, all names by which you have been known, and the reasons for any name changes.

ANSWER:

**Full name:** Qing Lu. No official name changes.
                In DCRA workplace, Plaintiff is called "Luchi Lu."

**Addresses:**

**Date/place of birth:**

**Social Security Number:**

**Driver's license number:**

6.      For each person, other than an expert, with personal knowledge of facts and circumstances relating to the retaliation alleged in your complaint, whether or not included in your complaint, identify his or her name, address, telephone number; state the nature and substance of their knowledge; and, state what testimony you may elicit from such witness at the trial of this case.  For each individual listed, state the last time you or anyone acting on your behalf contacted that individual.

ANSWER:

Information provided here is in supplement to any provided by way of Plaintiff's disclosures and production of documents, those being incorporated by reference. Plaintiff is summarizing what she believes the listed persons to be aware of related to the retaliation claims, but as they are not under her control and she has not yet conducted depositions, she is not able to provide detail as to their knowledge of the facts. Plaintiff does not yet know who she may call to testify at trial beyond herself and Messrs. Lester and Whitescarver. Without reviewing Defendants' discovery responses, she is not even certain of who she wishes to depose. Nor does she know pre-discovery what testimony she may elicit from witnesses if she were to call them as trial witnesses, beyond confirmation of the assertions in her complaint. Also see any persons identified by the Defendants as having knowledge of relevant facts.

To the extent that Defendants seek a detailed disclosure of what Plaintiff's counsel may ask witnesses at trial, Plaintiff objects on the basis of work-product privilege (e.g., improperly seeking impressions and strategy of attorney). For persons who are current or past D.C. employees/officials, Plaintiff objects that their contact information is more readily available

(more convenient, less burdensome, less expensive to obtain) for the District than for her to research it. Without waiver of these objections/limitations, she provides the following information.

| | Name | Position | ~Date of Most Recent Communication | Potential Knowledge/Potential Testimony |
|---|---|---|---|---|
| 1 | Walter Crawford | Former Chief Administrative Officer | February 27, 2017 | Told Plaintiff in phone call of February 2017 that if she continued to pursue the disclosures about B██████, she would face negative consequences (" be dealt with"). Knowledge of B████s complaining about Plaintiff and of Plaintiff's concerns about B████, Plaintiff's related disclosures, that management was upset about the situation, and possibly that Plaintiff was disciplined for related reasons. |
| 2 | Lynn Underwood | Former Chief Building Officer | February 21, 2018 | Plaintiff received award for her performance at Velocity program in December 14, 2017. In February 2018, Plaintiff was removed from Velocity Program. Believed to have knowledge of Plaintiff's disclosures, that they upset management, and that Plaintiff was disciplined based on those disclosures. Instructed Plaintiff to raise related issues solely via HR. |
| 3 | Melinda Bolling | Former Director | April 20, 2018 | In April 20, 2018 meeting, told Plaintiff that even if she were right, it's not going to be validated. Believed to have knowledge of Plaintiff's disclosures, that they upset management, and that Plaintiff was disciplined based on those disclosures. Told Plaintiff and others that DCRA was done with the complaint—that it was closed. Ms. Bolling also is the person who received the October 28, 2016 referral from OIG of Plaintiff's report about B████ |

| | Name | Position | ~Date of Most Recent Communication | Potential Knowledge/Potential Testimony |
|---|---|---|---|---|
| 4 | Tyrone Lawson | DCRA Investigator | February 12, 2019 | Around November 28, 2018, DCRA Interim DGC Patricia Donkor and Assistant General Counsel Adrianne Lord-Sorensen met with Tyrone Lawson and instructed him to conduct an investigation against Plaintiff. Ms. Donkor provided an emailed complaint from Mr. B████ to former CAO Walter Crawford dated November 8, 2018, for which Mr. B████ copied Sydney Lester and Deputy CBO Chris Bailey. The investigation that followed is referred to and cited as a base for Defendant Lester's proposal on April 2, 2019. Conducted an investigatory interview of Plaintiff. Believed to have knowledge of Plaintiff's disclosures, that they upset management (and Mr. B████, and that Plaintiff was disciplined based on those disclosures. Knowledge of the investigation of Plaintiff's disclosures and/or B████'s complaint about being harassed. Presumably communicated with management officials about related matters. |
| 5 | Sydney Lester | Supervisor | April 2, 2019 | Proposed suspension of Plaintiff for 10 days. Believed to have knowledge of Plaintiff's disclosures, that they upset management, and that Plaintiff was disciplined based on those disclosures. Believed to have communicated directly with Mr. B████ about related issues. May have knowledge of Mr. B████s leave requests that may indicate whether he truly was absent for parental leave or if it appeared it was connected to the traffic court case instead. Also aware of Plaintiff's efforts to be approved for telework and obstacles she encountered. Knowledge of why he proposed suspension of Plaintiff. |
| | | | September 30, 2019 | On September 30, 2019, Plaintiff sent her fifth email to Chief Administrative Officer Tiffany Crowe to complain about the delayed processing of her telework application. She copied her complaint to Sydney Lester. |
| | | | October 2, 2019 | Crowe notified Plaintiff by email that her telework was denied. Crowe copied Sydney Lester. |
| | | | October 7, 2019 | Crowe confirmed the reason of denial was VPN access when Plaintiff was exactly situated as other employees who had been approved. Crowe copied Sydney Lester. |

|   | Name | Position | ~Date of Most Recent Communication | Potential Knowledge/Potential Testimony |
|---|------|----------|-----------------------------------|----------------------------------------|
| 6 | Tiffany Crowe | Chief Administrative Officer | April 30, 2019 | In an April 30, 2019 email (see earlier disclosure docs at 206), told Plaintiff that "You need to consider this [S██████ B██████] matter closed, as your very job may depend on it." Believed to have knowledge of Plaintiff's disclosures, that they upset management, and that Plaintiff was disciplined based on those disclosures. Also knowledge of whether Plaintiff was treated differently/more strictly than others regarding request to telework. |
|   |  |  | Sept. – Nov. 2019 | Interviewed Plaintiff for telework application. Took part in denial of Plaintiff's telework application. |
| 7 | Garett Whitescarver | Chief Building Officer | May 29, 2019 | Told Plaintiff that her pursuing of the matter reminded him of hypochondriasis. Told Plaintiff that if she continued, the next consequence would be termination. Believed to have knowledge of Plaintiff's disclosures, that they upset management, and that Plaintiff was disciplined based on those disclosures. |
|   |  |  | June 27, 2019 | Suspended Plaintiff without pay for eight days. Knowledge of why he did so. |
|   |  |  | September 30, 2019 | On September 30, 2019, Plaintiff sent her 5th email to Chief Administrative Officer Tiffany Crowe to complain about the delayed processing of her telework application. She copied her complaint to Garett Whitescarver. |
|   |  |  | October 2, 2019 | Crowe notified Plaintiff by email that her telework was denied. Crowe copied Whitescarver. |
| 8 | Tanya Ricks | HR Manager | Sept. – Nov. 2019 | Did not respond to Plaintiff's several emails and two meeting requests or show up for them. Believed to have knowledge of Plaintiff's disclosures, that they upset management, and that Plaintiff was disciplined based on those disclosures |
| 9 | Muriel Bowser | Mayor | February 2019 | Knowledge of Plaintiff's disclosures to her and whether or not they disrupted or impeded the work of the Mayor's office; also whether the Mayor's Office sought discipline of Plaintiff or otherwise communicated to management that Plaintiff's disclosures were inappropriate. |

| | Name | Position | ~Date of Most Recent Communication | Potential Knowledge/Potential Testimony |
|---|---|---|---|---|
| 10 | Brian K. Flowers | Interim Director BEGA | July – Aug. 2017 | Around August 02, 2017, 2:16 p.m., Flowers informed Plaintiff that allegations related to paternity and FMLA abuse were not within BEGA's primary jurisdiction. Can testify as to how that assertion and BEGA's actions with regard to such allegations against Mr. B████ compare to BEGA's stated mission. |
| 10 | Darrin Sobin | D.C. Director of Government Ethics (as of December 2016) | N/A | Knowledge of the December 2016 agreement with Mr. B████ admitting B████ violated ethics rules. |
| 11 | Robert Spagnoletti | Chair, BEGA (as of December 2016) | N/A | Knowledge of the December 2016 agreement with Mr. B████ admitting B████ violated ethics rules. |
| 13 | S████ B████ | D.C. employee | October 30, 2018 (pantry, 3rd floor) conversation about whether the girl in the photo was his daughter. | Knowledge of admission to ethics violation. Knowledge of whether or not Plaintiff's disclosures were accurate and/or reasonably believed. Knowledge of management's views about Plaintiff's disclosures. Knowledge of extent to which meaningful investigation conducted. |
| 14 | S████ C████-B████ (identified in the suspension proposal with first name of N████) | D.C. employee or contractor | N/A | Falsely alleged Plaintiff told her directly that she had not had the baby.  Plaintiff did not have a conversation with her. Likely knowledge of Mr. B████s admission to ethics violation. Knowledge of whether or not Plaintiff's disclosures were accurate and/or reasonably believed. Possible knowledge of management's views about Plaintiff's disclosures. Knowledge of extent to which meaningful investigation conducted. |
| 14 | David Schleicher | Attorney | ongoing | Knowledge of attorney fees/expenses incurred (relevant solely to any post-judgment motion for fees). Will not be testifying to the jury. |
| 15 | Luchi Lu | Plaintiff | n/a | Knowledge as to all claims in the complaint. Expected to testify at trial in confirmation of them and in rebuttal of any defenses raised to them. |

14

|  | Name | Position | ~Date of Most Recent Communication | Potential Knowledge/Potential Testimony |
|---|---|---|---|---|
| 16 | Ernest Chrappah | Director, DCRA | September 30, 2019 | On September 30, 2019, Plaintiff sent her fifth email to Chief Administrative Officer Tiffany Crowe to complain about the delayed processing of her telework application. She copied her complaint to Ernest Chrappah. Accompanied Mayor when Plaintiff made February disclosures, so may be aware of whether Mayor asserted Plaintiff's communications disrupted the workplace. |
| 17 | Chris Bailey | Deputy CBO | October 7, 2019 | Crowe confirmed the reason of denial was VPN access (though others do not appear to have been denied when lacking that access) Crowe copied Chris Bailey. Possible other knowledge as to telework denial basis. |
| 17 | Robin Davis medstarhealth.org 1133 21st St. NW Building 2, 6th Fl., Washington, DC 20036 Phone: (202) 416-2000 | Family doctor Since 2008 | ongoing | Observations of symptoms of stress experienced by Plaintiff and medications prescribed for anxiety and/or depression to Plaintiff. |
| 18 | Christine Wiley, Ph.D. 3845 S. Capitol St., SW Washington, DC 20032 (202) 562-4640 | Clinical Social Worker and Counselor | May 9th, June 6th, June 20th, July 11th August 1st, 2019 | Observations related to impact on Plaintiff of the stress and reputational damage. |
| 20 | [As to more minor matters, also see persons identified in answer to other interrogatories in this document.] | | | |

Plaintiff is not listing her husband ███████████ as any knowledge of retaliation would be second hand (hearsay) and she will not rely on testimony from him in summary judgment or at trial, in light of the marital communications privilege. Plaintiff is not listing dental care providers as she is not claiming any dental-related symptoms to have resulted from the reprisal. If Defendants nonetheless wishes for her to identify dental care providers over the past five years, alert Plaintiff's counsel.



10.      Describe in detail the complete factual basis for the "reasons it was reasonable for [you] to believe," Paragraph 37, "that the information that [you] provided evidenced . . . [the] wrongdoing," Paragraph 36, that your Complaint alleges you disclosed.  Your response should address every reason you intend to rely on in the adjudication of this matter, including but not limited to those you allege in Subparagraphs 37.1 to 37.7, and Paragraph 39 to Subparagraph 39.3; reference all documents and witness you relied on to form your beliefs; and include all communications that you alleged reported each incident from the time you first noticed such conduct through June 27, 2019.

ANSWER:

Note that Plaintiff's response here is in addition to her other answers on overlapping subjects, such as those identifying persons with knowledge of relevant facts. Plaintiff objects that this request is overly broad, calling for her to marshal her evidence, notwithstanding the burden of having to essentially set out much of her case in response to a single interrogatory, particularly at this early stage in the proceedings. Plaintiff further objects that this request contains discreet subparts (i.e., requests presented as a subset of an interrogatory when more properly presented as a free-standing request). For example, it asks not only for the factual basis for Plaintiff's reasonably believing her disclosures were accurate, but also to identify all communications that reported each event. This results in undercounting whether the total permissible number of interrogatories has been asked. The total number of interrogatories including discreet subparts exceeds the maximum allowable. Plaintiff also objects that the request seeks information of low importance to resolution of the issues in the case as to disclosures other than those identified in the proposed suspension notice and decision letter. Without waiver of those objections, Plaintiff offers the following information. (And as outlined in response to an earlier interrogatory, a government employee who fraudulently obtains paid leave is a matter of public concern for reasons such as that it is a misuse of position, a waste of funds, and likely a crime.)

See the documents earlier disclosed; for example, the earlier-disclosed December 2016 document in which Mr. B█████ admitted to violating ethical standards at work, which related to use of his position to favor his (future) wife. It is not farfetched to believe that someone who would do such a thing would fraudulently seek paid leave particularly by conspiring and colluding with the same partner.

Plaintiff relied in part on her observations in prior years of what looked to her to be Mr. B███'s erroneous reporting of hours and abusive claiming of overtime. For example, see Plaintiff's email to BEGA on November 2, 2016.

The fact that Mr. B███ may have submitted a birth certificate, or a medical certification of the anticipated birth, did not rule out fraud in Plaintiff's view, as fake ones are readily and inexpensively available on the internet. For example, see www.superiorfakedegrees.com/fake-birth-certificates and https://www.buyafakediploma.com/fake-birth-certificate/.

When Plaintiff sought confirmation that management authenticated the documents submitted by Mr. B███ to justify paid leave, management repeatedly refused to answer directly, instead insisting she accept their assumption and general assurance that they found no wrongdoing and that Mr. B███ nd his wife testified they did nothing wrong.

Witness Alec Petrillo-Groh told Plaintiff that HR never reached out to him (Alec) to request verification of the birth certificate he (Alec) submitted for his own paid family leave (childbirth) in 2016. Plaintiff asked multiple agencies if any one of them had verified the document Mr. B███ submitted to prove whether it was genuine or not. She could not get a straight answer to her question.

Plaintiff was aware of Mr. B███'s having a pending trial for a serious traffic violation, such that he might want to hide the reason for his absence from his employer. Plaintiff had heard this from Michael Mba and then she (as earlier disclosed) found related records online, such as by using  http://casesearch.courts.state.md.us/casesearch/

Mr. Mba is a DCRA Electrical Engineer. He is the water club manager of the 3rd floor who collects money from members (including Mr. B███) every month for drinking water being provided at the office. He formerly sat next to Plaintiff. Around May-July 2016, Mr. Mba

complained to Plaintiff on multiple occasions that Mr. B███ was months behind on his payment [believed to be $6/month then] for the club. Mr. B███ eventually responded he had no money left to pay the club because he had a legal matter and spent a lot of money on a lawyer for it.

Plaintiff had heard that around June 22, 2016, Mr. B███ told coworkers he would be away for a long time. From the online records it appears the court case was closed June 23, 2016. Mr. B███ returned to the workplace June 24, in contradiction to his stated plan to be gone for an extended period. Plaintiff concluded that he had obtained the paid parental leave to cover the period he expected to be in trial and/or possible to serve a relatively short jail sentence.

The coworkers from whom Plaintiff learned that Mr. B███ had said he would be gone from work for a long time were Arnold Carroll (Fire Protection Engineer, since resigned) and Samuel Mutia (Fire Protection Engineer). [As to their contact information and that of other current D.C. and former D.C. employees, Plaintiff notes that the District is in a better position than she is to locate it. Nonetheless, if the District cannot find a particular person, she will attempt to do so.]

Plaintiff's observations of the public Facebook postings of Mr. B███ and his family caused her to doubt that the claimed child had been born. For example, on the day the birth was said to have occurred, Mr. B███s wife made a handful of Facebook postings, but none mentioned her labor or the childbirth. In particular, on May 18, 2016 (date of claimed induction in hospital), Mr. B███s wife made three posts on her Facebook. On May 19 (date of claimed labor and childbirth) she made one post. None of them mentioned the birth of this baby. It seemed highly unusual to Plaintiff that a woman making a post on the day her own baby was born would not mention the baby/birth.

On May 25, 2016, at a social occasion after work, Mr. B████ stated his daughter had been born "last Thursday" (i.e., May 19, 2016).  But May 18, 2016 was Mr. B████'s last day in the office and before leaving he already had shown baby pictures to coworkers and claimed it was his new daughter. Plaintiff heard this from coworker Arnold Carroll.

His wife's posts from the day before and day of the purported delivery were later taken down from Facebook, while other postings remained up. As well, the child thereafter pictured with Mr. Brown and his wife appeared to be one who was elsewhere identified as the child of an out-of-country relative.  See the materials earlier produced as part of initial disclosures and the photos shown and discussed further below, as well as documents being produced today.



The conduct of Mr. B████and his wife at the office also caused Plaintiff to be dubious of the claimed birth. For example, his wife volunteered to Anthony LeCount Moore, DCRA employee, at the end of April 2016 that she was pregnant. But at the time, she was not noticeably pregnant, though she was later said to have given birth in mid-May, this being described as past the expected due date. Mr. B████s wife told Arnold Carroll, former DCRA employee, that she had a past-due pregnancy and induced labor. Plaintiff thought it would have made sense that she would be more visibly pregnant in the end of April. Plaintiff saw S████on May 17 and 18 in the office when she returned from vacation. It seems odd that Mr. B████ would be at the office on one or more days overlapping when his wife was in hospital and about to give birth.

One permit expeditor, Sheba Major, told Plaintiff she had seen Mr. B████'s wife at the office prior to the birth with what appeared to be a foreign object in an odd triangle shape under her clothes, as if to mimic pregnancy. A coworker, Alec Petrillo-Groh, told Plaintiff sometime in 2018 that when Mr. B████ was asked about how the baby was doing, he responded that she was doing well and walking around. But this was around August/September 2016, some four months after the purported birth, when babies typically don't walk unsupported until between nine and 18 months. The conversation between Mr. B████ and Petrillo-Groh occurred at the permit center (2nd floor of 1100 4th St., SW, 20024). Alec sat at Station 14 (Mechanical counter). S████ B████ sat at Station 15 (Fire counter).  Petrillo-Groh, in telling Plaintiff of this, said words to the effect of, "It's strange. I was like, what?"

At the counter, Alec Petrillo-Groh thanked Plaintiff for having reported the matter, adding that no one else seemed to care and indicating it should not be hard to determine the truth. Also added something about having thought this sort of situation could only happen in movies.

27

Mr. B██ claimed his fourth child was born in December 2017. In 2018, Petrillo-Groh also told Plaintiff at the counter that Mr. B████s wife visited the residential plan review office located on the 2nd floor of 1100 4th St., SW. Mr. B████'s wife met with Structural Engineer Wayne Ferguson. Ferguson asked how her family was. Mrs. B████told him that they had *two boys* and they were doing well. Petrillo-Groh was sitting here and heard it. Days later, on the 2nd floor, a DCRA customer asked Mr. B████s wife, "How's family?" This time she told the customer that their two boys were doing well *and* the newborn (December 2017) was doing well too. His wife did *not* mention the girl purported to be the subject of the paid parental leave Mr. B██ applied for in 2016.

Petrillo-Groh was sitting there and heard this. He told Plaintiff words to the effect of, "I knew he has a girl, but she didn't mention her. She told Wayne they have *two* children; she told this customer this same month that there were *three.*" Mr. B███ on one or more occasions was telling people they have *four* children and displayed multiple pictures of *four* children in his cubicle. In the audio-recorded interview on February 12, 2019, Plaintiff asked agency investigator Tyrone Lawson to interview Alec Petrillo-Groh to verify the walking-around-at-four-month-old story. The investigator flatly rejected it. This was sadly typical of how Plaintiff was expected to blindly trust DCRA.

(Plaintiff has not been able to determine whether Mr. B███'s claiming of paid family leave for a son said to be born in December 2017 also was fraudulent, but that does not appear to be relevant to the issues in the present case and so she will not here address peculiarities about that situation.)

From the pictures above, Plaintiff believed R██B███may have been the actual mother of the baby girl in question. S███B███ told Defendant Lester on October 30, 2018 that R██

28

B████ is his (Mr. B████s) stepmother. For example, based on the Facebook photos, it seems there are two "No. 5 grandchild"— one is a 4 or 5 year old *boy* (P1), one is an older *girl* (P3) who seems to be at her late teens or early 20s – both are #5, but two different persons of different gender. The has-to-be-a-cousin (in red box) in P2 becomes #7 grandchild (in red box) in P3. Observe that #5, #6 and #7 in P3 look much older than #5 in P1. Furthermore, if "three last grandkids" in P2 means consecutive #5, #6 and #7, it won't be explainable when these #6 and #7 in P2 become #9 and #10 in P4. These inconsistent claims about family members pictured on Facebook, at least when considered in the context of the contradictory comments and claims from Mr. B████ and his wife, further convinced Plaintiff it was reasonable to conclude that fraud had taken place. [Plaintiff will be glad to further explain in deposition how the various Facebook photos were part of what led her to conclude something fraudulent had occurred.]

On February 12, 2019, DCRA's investigator conducted an audio-recorded interview of Plaintiff. During the interview, Mr. Lawson scolded Plaintiff, saying that Mr. B████ had told him (Lawson) Mr. B████ wasn't able to bring the baby girl to office because of Plaintiff. Plaintiff had seen Mr. B████'s wife with a young girl at the end of October 2018 in the DCRA building. This inconsistency strengthened Plaintiff's belief that Mr. B████ lied about the real reasons for his not being able to bring the girl to office (e.g., because the girl lives in Jamaica with her real mother, who happens to be Mr. B████'s stepmother). That is, it appears Mr. B████ was able to show his paternal half-sister around only when his stepmother visited from Jamaica.

Also see documents being produced, with Adobe PDF bookmark of QLL.20180207.Fenit.Wapo.packet for further analysis of Facebook postings, incorporated here by reference.

Plaintiff objects that this request is redundant to information already provided. See

response to 19 above. She also is returning related authorization forms.

—————————————————————

**DECLARATION**

I declare under penalty of perjury of the laws of the United States of America that I have
reviewed the facts asserted in response to the interrogatories above and believe them to be true
and correct.

Qing Lu Sep 7, 2020 23:36 EDT)
_____

Signature of Plaintiff Qing Lu

Sep 7, 2020
_____

Date Signed

54