UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

+ + + + +

_____
                              :
IN THE MATTER OF:             :
                              :
QING LU,                      :
                              :
          Plaintiff,          : Civil Action No.
                              : 1:20-cv-00461-APM
     v.                       :
                              :
DISTRICT OF COLUMBIA,         :
et al.,                       :
                              :
          Defendants.         :
                              :
_____:

          Monday,
          March 1, 2021


DEPOSITION OF:


               QING LU


called for examination by Counsel for the

Defendants, pursuant to Notice of Deposition, via

Video Teleconference, when were present on behalf

of the respective parties:

**APPEARANCES:**

**On Behalf of the Defendants:**

**MATTHEW R. BLECHER, ESQ.**
**ADAM P. DANIEL, ESQ.**
**Assistant Attorneys General**
**Civil Litigation Division**
**400 6th Street NW**
**Washington, D.C. 20001**
**202-727-9624**
**matthew.blecher@dc.gov**
**adam.daniel@dc.gov**


**On Behalf of the Plaintiff:**

**DAVID R. SCHLEICHER, ESQ.**
**Schleicher Law Firm, PLLC**
**1629 K Street NW**
**Suite 300**
**Washington, D.C. 20006**
**david@gov.law**


**ALSO PRESENT:**

**AMIR AZADNIV, DC OAG intern**
**ANNA ELLISON, DC OAG intern**
**JOE TOWNSON, Videographer**

CONTENTS

WITNESS                DIRECT CROSS REDIRECT RECROSS


Qing Lu                  5    262



EXHIBIT NO.                                    PAGE


None.

```
 1                P-R-O-C-E-E-D-I-N-G-S

 2                                 11:13 a.m.

 3                VIDEOGRAPHER:  Here begins the video

 4      deposition of Qing Luchi Lu taken in the matter

 5      of Qing Lu v. District of Columbia, et al., in

 6      the U.S. District Court for the District of

 7      Columbia, Case No. 1:20-cv-00461-APM.

 8                Today's date is March 1, 2021.  The

 9      time on the video monitor is 11:13 a.m. Eastern

10      Time.  This deposition is being held remotely via

11      WebEx videoconferencing software.

12                The court reporter is Colleen Herbert

13      on behalf of Neal Gross Court Reporting.  I am

14      Joe Townson, the video camera operator, also on

15      behalf of Neal Gross.

16                Would Counsel please introduce

17      themselves and state who they represent,

18      beginning with the party noticing this

19      deposition?

20                MR. BLECHER:  Yes, good morning,

21      everyone.  My name is Matthew Blecher.  I'm here

22      to represent the District, Mr. Lester, and Mr.
```

1      Whitescarver in this action.  I have with me my

2      colleague, Adam Daniel, who represents the same

3      parties in this case.

4                MR. SCHLEICHER:  David Schleicher,

5      representing the Plaintiff.

6                MR. BLECHER:  And I suppose I should

7      add that we have two interns on the line, Anna

8      and Amir, who are just listening in.

9                VIDEOGRAPHER:  Will the court reporter

10     please swear in the witness, after which we can

11     proceed?

12     WHEREUPON,

13                        QING LU

14     was called as a witness by Counsel for the

15     Defendants, and after having been first duly

16     sworn, was examined and testified as follows:

17                   DIRECT EXAMINATION

18                BY MR. BLECHER:

19         Q     Okay, great.  So let's go ahead and

20     get into this.  Ms. Lu, as I said, my name is

21     Matt Blecher.  Adam and I represent the District

22     of Columbia, Mr. Lester, and Mr. Whitescarver in

1    the lawsuit that you filed against those

2    individuals and the District in Federal District

3    Court in the District of Columbia.

4             We are here today for your deposition.

5    I don't expect this to take very long, but if at

6    any point you have any questions for us about the

7    way this is proceeding, you need to speak with

8    your lawyer, or need a break for any reason, you

9    just need to say so.  Do you understand that?

10        A    Yes, I do.

11        Q    Great.  For purposes of this

12   deposition, we'll be using the same name

13   abbreviations that are used in your complaint, so

14   SB and SCB.  When I say SB, those are the

15   initials used in your complaint to refer to one

16   of your colleagues.  When I use those initials,

17   do you know who I'm speaking about?

18        A    Okay.

19        Q    Yes, you understand when I say SB?

20        A    Yes, I do.

21        Q    And the same question for SCB.  You

22   know who I'm referring to?

1      A      Yes, yes.

2      Q      Okay.  And we can agree to use those

3  initials for purposes of this deposition, okay?

4      A      Okay.

5      Q      Great.  I'd like to start on February

6  5, 2019.  You allege in your complaint and in

7  your discovery that you had an interaction with

8  the mayor that day.  Am I correct about that?

9      A      Right, yes.

10             MR. SCHLEICHER:  Don't forget to give

11  pause to make sure he's done with his question

12  before you answer.

13             THE WITNESS:  Okay.

14             BY MR. BLECHER:

15      Q      Can you tell me about that

16  interaction?

17      A      That day I was sitting at the second

18  floor of 1100 4th Street, DCRA Permit Center.  I

19  saw Mayor walk by and then I stood up, approached

20  her, and said ma'am, my name is Luchi.  In my

21  agency, there is a co-worker.  He submitted a

22  fake document.  His wife likely was wearing a

1    pillow underneath her clothes.  Together they

2    took eight weeks government paternity leave

3    without having a baby.  And Ms. Bolling, former

4    director, knew it.

5         Q    Okay, so let me just get

6    clarification.  You said your co-worker committed

7    a false document.  Is that what you said?

8         A    Yes, yes.

9         Q    And who -- besides yourself and the

10    mayor, who was present?

11         A    The director, Ernest Chrappah.  I

12    don't know how to pronounce his last name, C-H-R-

13    A-P-P-A-L.

14         Q    All right, before we go there, let me

15    just get some clarification on the communication

16    that you made to the mayor.

17         So you said a co-worker committed a

18    false document.

19         A    Yes.

20         Q    Am I correct that you were referring

21    to SB in that situation?

22         A    Yes, yes.

1        Q     Okay. At that point that you

2   communicated that to the mayor, what was your

3   basis for believing that that had happened?

4        A      There are a lot, I mean, in the past

5   few years, strongly support that there is no

6   baby.  When they were there, it's no baby,

7   logically, and highly likely, the document he

8   submitted was a fabrication or fake.

9        Q     Okay.  Ms. Lu, do you know whether SB

10   has a baby that was born in 2016?

11        A      He claimed so.

12        Q      I understand that.  My question is do

13   you know one way or the other, do you know?

14        A      I heard it, yes.  Sydney Lester

15   informed that he got a baby and also I heard it

16   from my other co-workers.

17        Q      Okay, I'm not sure I understand your

18   answer.  Do you know one way or the other whether

19   SB had a child that was born in 2016?

20        A      I heard it.  Mr. Lester told us, so I

21   knew from Mr. Lester.

22        Q      Okay, so Mr. Lester told you that SB,

1    in fact, had a child?

2            A     Yes.  And also other co-workers.

3            Q     Okay.  Which other co-workers?

4            A     Arnold Carroll.

5            Q     Could you spell that?

6            A     A-R-N-O-L-D, Carroll, C-A-R-R-O-L-L.

7            Q     Okay.  So Mr. Lester told you that SB,

8    in fact, had a child born in 2015, right?

9            A     Yes.

10           Q     Arnold Carroll told you the same

11   thing, correct?

12           A     Correct.

13           Q     Anyone else?

14           A     At this moment, I don't recall.

15           Q     And did those communications from Mr.

16   Lester and Arnold Carroll, did they happen prior

17   to your communication with the mayor on February

18   5th?

19           A     Of course, yes.

20           Q     Okay.  And so my question, and I don't

21   think that you've answered it, do you know, as

22   you sit here whether SB had a child that was born

1    in 2016?

2         A    When they told me, I heard it, that's

3    how I knew.

4              MR. SCHLEICHER:  He's asking whether

5    or not you know it was true?

6              THE WITNESS:  Oh, you ask me whether

7    it is true or not?

8              BY MR. BLECHER:

9         Q    Yes, that's what I'm asking you.  And

10   I apologize if I wasn't clear.

11        A    I do not believe he had a child in May

12   2016.

13        Q    Okay, I understand what you believe.

14   What I'm asking you is what you knew to be true.

15   Did you know, yes or no, that SB -- whether SB

16   had a child born in 2016?

17        A    Yes, I did know.  He took some time

18   off taking care of this child.  Then we changed

19   the counter schedule and Lester told us the

20   reason we need to change the counter schedule was

21   because he's taking some time off for his

22   newborn.

1      Q     I'm sorry, I still don't think I have

2   an answer to this question.

3            Ms. Lu, am I correct that you don't

4   know one way or the other whether SB had a child

5   who was born in 2016?

6      A     I speak with everyone and after the

7   child was born and there were several employees

8   they asked for him to bring the baby to the

9   office.  Did I answer your question this time?

10           MR. SCHLEICHER:  Matthew, if I'm not

11   being helpful, let me know.  I don't want to

12   interrupt your line of questioning.

13           Are you asking if she's certain or not

14   that he had a baby?

15           MR. BLECHER:  That is what I'm trying

16   to communicate.  Am I doing a poor job of it?

17           MR. SCHLEICHER:  It's just that she's

18   translating in her head, and I think the word

19   know is being translated as aware or something.

20           MR. BLECHER:  Okay.  Okay.  I got you.

21           BY MR. BLECHER:

22      Q     So Ms. Lu, SB claimed to have a child

1    born in 2016, is that right?

2           A      Correct.

3           Q      Do you know whether SB's

4    representation about having a child in 2016 was

5    true?

6           A      I don't know either way.

7           Q      Okay.  Okay.  You represented at the

8    outset that SB -- I can't remember if you said

9    committed or presented, but essentially submitted

10   false documentation about this child.  Do I have

11   that right?

12          A      I recently knew it from OIG's response

13   to my FOIA request.  I saw two papers with black

14   boxes.

15          Q      Okay.  Prior to speaking with the

16   mayor on February 5, 2019, had you seen the

17   documents that --

18          A      No.

19          Q      Let me finish.  Had you seen the

20   documents that SB submitted to support his

21   request for paternity leave in 2016?

22          A      No.

1          Q     Do you know what documents he

2     submitted?

3          A     During the grievance process, in one

4     of the emails between me and Tatum, who is the

5     DCRA management labor liaison officer, Tatum

6     wrote like he submitted acceptable medical

7     records.  That was the first time I knew what

8     documents SB actually submitted.  But I never saw

9     that document.

10          Q     Okay.  So just to be clear, at the

11     time that you approached the mayor on February

12     5th, 2019, you didn't know what documents SB

13     submitted along with his request for paternity

14     leave in 2016?

15          A     Correct.

16          Q     And so you don't know one way or the

17     other, whether those documents were true or

18     falsified.  Is that right?

19          A     I believe those documents are false

20     because based on my observation and some

21     reasonable belief and also input from other

22     employees, the baby does not exist.  If the baby

1  does not exist, the documents must be fake and

2  wrong.

3         Q     Okay.  And we'll get there.  My

4  question is narrower.  You never saw the

5  documents submitted in connection with SB's leave

6  request in 2016, is that right?

7         A     Correct.

8         Q     And you did not personally verify that

9  those documents were true and accurate?

10        A     Correct.

11        Q     You also said that you communicated to

12 the mayor that SB's wife wore a pillow.  Can you

13 say more about that?

14        A     I just told her, likely his wife was

15 wearing a pillow underneath her clothes.

16        Q     Okay.  When did that happen?  When did

17 you observe that?

18        A     When did I what?

19        Q     Sorry.  When did you see SCB wearing

20 a pillow under her clothes?

21        A     I did not see it.

22        Q     Okay, then how do you know that it

1    happened?

2         A     Well, you know from my communication

3    with my -- like with the general public and also

4    from the report of my other co-workers, they saw

5    SB's wife have a very big waist, a belly.  I

6    believed that she was wearing some precisely

7    foreign object underneath her clothes to fake

8    pregnancy.

9         Q     Okay, but did you yourself observe SCB

10   wearing a pillow under her shirt?

11        A     No.  She always wears clothes.  I did

12   not see that pillow.  I don't have -- yes.

13        Q     Okay, Did you yourself observe her

14   outside of her clothing with what appeared to be

15   a pillow under her shirt?

16        A     No.

17        Q     Okay.  That was information provided

18   you by somebody else?

19        A     Correct.

20        Q     Okay, and who is that individual?

21        A     A lot of them.  After the baby was

22   born, we had some conversations and the other

1    people, said yes, his wife was here like with a

2    big belly, like my neighbor, Chendi.  He said and

3    she sit in front of my seat and told me she's

4    going to have a baby.  When I saw her, at the end

5    of April 2016, she didn't look like pregnant at

6    all.

7         Q     Okay.  Who -- I need you to tell me

8    who the people are that you contend observed SCB

9    with what appeared to be a foreign object, a

10   pillow or something, under her shirt.  Who are

11   those people?

12        A     Okay.  Chendi, Said, and a customer,

13   Sheba Major.  I believe there were a lot of them,

14   because she was walking around in DCRA.

15        Q     Do you know whether any of those

16   individuals actually observed a foreign object

17   under SCB's shirt?

18        A     They only told me they have a big

19   waist, a belly.

20        Q     Would you please repeat that?

21        A     They only told me she had a real big

22   waist or belly on her abdomen.

18

1        Q    A real big -- could you just repeat
2    what you said?  A real big?

3        A    Belly.

4        Q    I'm sorry, are you saying baggie or
5    fatty or something else?

6        A    B-E-L-L-Y.

7        Q    Oh, big belly.  Gosh.  Thank you.

8        Okay, well, that seems pretty
9    consistent with pregnancy, a woman with a big
10   belly.  Would you agree with that?

11       A    Not in a couple of days.  When I saw
12   her at the end of April 2016, it looked like she
13   had nothing, and just in a couple of days, not
14   likely.

15       Q    Okay.  So your contention that SCB had
16   something artificial under her shirt, that's not
17   based on any observation that you made
18   personally.  Am I right about that?

19       A    Correct.

20       Q    That's information provided by these
21   individuals, Said, Sheba, the folks that you
22   named.  Is that right?

1       A       Chendi.  Yes.

2       Q       And you don't know one way or the

3   other whether any of those individuals actually

4   looked up SCB's shirt?

5       A       No, I don't.

6       Q       Okay.  You said that you told the

7   mayor there that SB and SCB basically colluded to

8   take eight weeks of leave fraudulently.

9       A       Yes.

10      Q       When you made that communication to

11  the mayor, did you know that to be true?

12      A       I believe it is true.

13      Q       Okay, but you didn't know?

14      A       I don't know.  I give my reasonable

15  belief.

16      Q       Let's put a pin in that.  I want to

17  make sure that I have a clear understanding of

18  everything that you communicated to the mayor on

19  that day.  So it was the falsified document

20  thing.  The wife wore a pillow.  Eight weeks of

21  fraudulent leave.  Did you communicate anything

22  else to the mayor on February 5, 2019 that you

1    recall?

2          A     No.

3          Q     And is there any other documentation

4    of that communication that would help refresh

5    your memory of anything else that you

6    communicated to the mayor?

7          A     No, I don't recall.

8          Q     Okay, and there's no recording of your

9    communication?

10         A     I don't know.  I don't know if the

11   mayor recorded or not.  I did not.

12         Q     That was a poor question.  You are not

13   in possession of a recording?

14         A     No.

15         Q     And do you have any notes that you

16   might have taken after that communication that

17   would reflect what you said to the mayor?

18         A     After I spoke with her, I sent her an

19   email.

20         Q     I understand and we'll get to the

21   email, but what I'm asking you if what you

22   communicated to her on February 5th.  Do I have

```
 1          everything that you said?

 2                  A       Yes, you do.

 3                  Q       Okay.  And so you mentioned that

 4          Ernest Chrappah was also present?

 5                  A       Right, correct.

 6                  Q       And that would be -- I supposed he was

 7          acting director of DCRA at that point, is that

 8          right?

 9                  A       I don't know if he was acting or

10          seated.  I don't know.

11                  Q       Okay.  Was there anyone else present?

12                  A       I didn't pay attention.

13                  Q       Okay, so as you sit here to the best

14          of your knowledge, you don't know one way or the

15          other whether anyone else was present to overhear

16          that conversation?

17                  A       I don't know.

18                  Q       Okay.  At any time while you were

19          communicating to the mayor, was Director Chrappah

20          not also present?

21                  A       He was present.  He was there.  The

22          conversation was short.
```

1      Q      Okay.  And he was present the whole

2   time?

3      A      Yes, the whole time.  It was just a

4   couple of minutes, yes.

5      Q      Do you have any reason to believe that

6   you would have -- that you said something to the

7   mayor that Director Chrappah did not also hear?

8      A      I do not know.

9      Q      But there's nothing that would lead

10  you to that conclusion?

11     A      I do not know.  When I was talking to

12  the mayor, I looked at the mayor and also I can

13  see the director was standing by.  Yes, that is

14  what I saw.

15     Q      Okay.  Did you observe Director

16  Chrappah listening to you?

17     A      Director what?  Can you please repeat?

18     Q      Yes.  You observed Director Chrappah

19  listening to you communicating to the mayor, is

20  that right?

21     A      I was not sure if he was listening.

22  Physically he was standing by.

1         MR. BLECHER:  Okay.  Was he looking at

2    you?

3         MR. SCHLEICHER:  Did you hear that

4    question?

5         THE WITNESS:  I didn't pay attention

6    who he was looking at.  When I was talking to

7    someone, I look at that person.  I did not pay

8    attention who the director was looking at in that

9    few minutes.  I don't know.

10         BY MR. BLECHER:

11    Q     Okay.  And just in terms of so I

12    understand the spatial orientation, was the

13    director standing next to the mayor?

14    A     Correct.

15    Q     And they were within a couple of feet

16    of one another?

17    A     I don't know how many feet.  He was

18    accompanying the mayor.

19    Q     How did the mayor react to your

20    communication to her?

21    A     She said, why did he do that?  I said,

22    I don't know.

1          Q      Anything else?

2          A      Yes.  She turned to the director like

3     something like you will follow up with her and I

4     turned to director, too.  I said I hope this time

5     the agency can demonstrate some integrity.

6          Q      Okay.  Was that the end of the

7     conversation?

8          A      Yes.

9          Q      Was that the first time you had met

10    the current mayor?

11         A      Yes.  No, no.  He came to DCRA and

12    addressed a meeting.  I don't know what year,

13    what time.  Yes.

14              MR. SCHLEICHER:  Are you saying he

15    when you are referring to the mayor?

16              THE WITNESS:  Oh, I'm sorry, she.

17              BY MR. BLECHER:

18         Q      Okay, and so was the first time that

19    you had spoken to the mayor directly?

20         A      Correct, that was the first time I

21    spoke with her.

22         Q      And prior to that interaction, had you

1    made any allegations related to SB to the mayor?

2         A     You mean September 2017 or '18, I

3    don't remember exactly.  I requested a meeting

4    through EOM's website.  I wanted to meet with her

5    to let her know something like this happened,

6    like abuse of taxpayers' money.  That request was

7    declined or rejected, so I did not get a chance

8    to meet.

9         Q     Okay.  And do you know who rejected

10   your request for a meeting with the mayor?

11        A     It was an online request.  They ask

12   you to fill out the reason why you want to see

13   the mayor for. I just entered it accordingly.

14   And then, I received an email, it said something

15   like your request was denied or something like

16   that.

17        Q     Okay.  I understand.  So am I correct

18   that you don't know, one way or the other,

19   whether a person rejected your request for a

20   meeting with the mayor, whether that was some

21   sort of automated response?

22        A     Without looking at that document, I

1    guys can't see my screen.

2              BY MR. BLECHER:

3         Q    So the email that starts at the bottom

4    of 297, Ms. Lu, is this the email that you

5    referred to when you say that you sent an email

6    on February 6, 2019 to the mayor and the director

7    of DCRA?

8         A    Yes, it is.

9         Q    Okay.  And this document is sent

10   February 6, 2019 at 10:09 a.m.  And the subject

11   is report to Mayor Bowser, wearing pillow for

12   paternity leave.  Is that right?

13        A    Yes, correct.

14        Q    Okay.  Great.  This February 6, 2019

15   email, do you contend that this, too, was a

16   protected disclosure for purposes of your D.C.

17   Whistleblower Protection Act claim?

18        A    I believe so.

19        Q    Okay.  And you also contend that this

20   was protected activity for purposes of your First

21   Amendment claim.  Am I right about that?

22        A    Correct.

```
 1          Q    Okay.  I'd like to walk through the
 2     content of this email with you.  And I have some
 3     questions about it.
 4               The first sentence, it just says I am
 5     sending this email to report a paternity fraud
 6     that has been going on for almost three years.
 7               I assume that refers to the allegedly
 8     fraudulent leave taken by SB in 2016.  Is that
 9     correct?
10          A    Correct.
11          Q    Okay.  The next paragraph, the second
12     sentence says at DCRA one male employee submitted
13     a fake paper to the Agency's HR in May of 2016.
14               Did I read that right?  Do you see
15     where I am?
16          A    Yes, yes.
17          Q    Okay.  The male employee, is that SB?
18          A    Correct.
19          Q    What is the fake paper that you refer
20     to there?
21          A    The document submitted.
22          Q    Okay.  Between your February 5, 2019
```

1   communication with the mayor and the sending of

2   this email, did you review the documentation that

3   SB submitted in support of his 2016 paternity

4   leave request?

5           A    No, I didn't.

6           Q    Okay.  So am I correct that prior to

7   sending this email you had never reviewed the

8   documentation submitted by SB in connection with

9   his 2016 leave request?

10          A    Correct.  And nobody let me review it.

11          Q    Okay.  So you also had no opportunity

12  to verify it yourself.  Is that right?

13          A    Correct.

14          Q    So when you say that it was fake, you

15  actually had no personal knowledge that that

16  document was fake.  Am I right about that?

17          A    I firmly reasonably believe it is

18  fake.

19          Q    Okay.  But your statement here is not

20  that you believe that it might be fake.  It's

21  that it is fake.

22          A    Yes.

1          Q     Okay.

2          A     I believe.

3          Q     But you didn't know for certain that

4     he submitted fake documentation.  Are we on the

5     same page?

6          A     I am not 100 percent sure.

7          Q     You go on to say, the next sentence,

8     his wife, not a D.C. government employee, was

9     wearing a plastic bump/pillow underneath her

10    clothes and walking around in DCRA.

11         A     Correct.

12         Q     Am I correct that you never actually

13    saw SCB wearing a plastic bump or pillow

14    underneath her clothes?

15         A     Correct.  HR didn't see it either.

16         Q     You go on to say, the next sentence,

17    he -- he still means SB, right?

18         A     So where?  Are we on the same

19    paragraph or you jumped?

20         Q     Same paragraph, the very next

21    sentence.  He received eight weeks government-

22    paid paternity leave with no baby.  Is he -- the

1        he you're referring to, that's still SB?

2              A      Correct.

3              Q      The allegation that he received eight

4        weeks government-paid paternity leave, how do you

5        know that to be true?

6              A      From what HR told me.  They said

7        there's no problem.  Like we reviewed like the

8        document.  He made the application, the document,

9        there's no problem.  If it is not paid family

10       leave.  He does not need to submit an

11       application, right.  When he submit application,

12       I believe it is for paid family leave.  That's

13       what you need to apply for.

14             Q      Is that your understanding of how the

15       paid family leave -- or the family leave policy

16       works?

17             A      Yes, to my knowledge.

18             Q      So, to your knowledge, is there no

19       situation where a person requests leave for the

20       birth of a child and doesn't get paid for it?

21             A      I'm not aware.

22             Q      Okay.

1    several times.

2         Q      A government employee dragged a

3    pillow-wearing woman, I'm in the very next

4    sentence --

5         A      Yeah.

6         Q      -- pillow-wearing woman to

7    government's office and knowingly used a fake

8    paper for eight weeks government-paid paternity

9    leave is not only unethical, indecent, it's also

10   fraud, a felony crime per D.C. Code 22-3241.

11        A      What do you want?  I wrote them, yeah.

12   I saw them.  And I hear you are reading them.

13        Q      The government employee referenced in

14   that sentence, is that SB?

15        A      Correct.

16        Q      Okay.  I don't think you told me

17   before that he dragged his wife around at DCRA.

18   Did that happen?  Did you witness that?

19        A      Yeah, his wife.  A lot of people say

20   his wife was walking around, and also including

21   Sheba Major.  She noticed some like weird, a

22   triangle shape underneath her clothes.

1        And I, myself, saw her at the end of

2   April of 2016.  On that day, Agne (phonetic) told

3   me that she told Agne like, hey, you know what,

4   I'm pregnant.  I did see her on that day.  And on

5   that day, she did not look pregnant to my eyes.

6            MR. SCHLEICHER:  I think he's asking

7   you about the SB bringing her to the -- where you

8   said dragged her around the office.

9            THE WITNESS:  Mm-hmm, yeah, she was

10  walking around in the office.

11           BY MR. BLECHER:

12       Q    In the next paragraph, third sentence,

13  it says to our best knowledge D.C. government

14  does not verify the document they received.  If I

15  am wrong, please don't hesitate to correct me.

16       A    Oh, okay.  Yeah.  Is there --

17       Q    Hold on.  I'm sorry.  Let me go back

18  to the question I just answered.  I just thought

19  of something.  I apologize.

20           The sentence that says a government

21  employee dragged a pillow-wearing woman to

22  government's office.  Can we go back to that for

1   a second?  Do you see where I am?

2        A    Yes.

3        Q    Is it your understanding that SB was

4   with SCB at the time that she was allegedly

5   wearing a pillow --

6        A    Yeah.

7        Q    -- in DCRA?  He was there with her?

8   Is that your understanding?

9        A    Yeah, at the end of April of 2016, I

10  saw his wife, and also I saw them together.  His

11  wife came to DCRA almost every day.  I always saw

12  them together, yes.

13       Q    Okay.  You testified earlier that you

14  didn't see this pillow situation.  Am I wrong?

15       A    Correct.

16       Q    I'm correct, right?  You didn't

17  actually observe her with a pillow under her

18  shirt.

19       A    Correct.

20       Q    That was information provided by

21  another person?

22       A    Right.

1    Lester then.  Sydney Lester told me, she herself,

2    already approved my application.

3              It is now with HR.  She referred it to

4    a Tiffany Crow (phonetic).  And then I (audio

5    interference) and asked how long it is with my

6    telework application.

7              Ms. Crow -- did you mean to --

8              MR. SCHLEICHER:  I think we're getting

9    an echo.

10             THE WITNESS:  Oh, okay.  Can I

11   continue?

12             MR. BLECHER:  Yes.

13             THE WITNESS:  Oh, okay.  And then I

14   sent an email to Ms. Crow.  I said when, what is

15   the problem with where we are with application?

16             She said, if you want to know where it

17   is, you check my schedule and schedule a meeting

18   with me.  Then I checked her schedule and had a

19   meeting.

20             I waited in the conference room for

21   about 30 minutes.  Nobody showed up.  She also

22   told me when you schedule a meeting of the HR

1     manager, Ms. Reed (phonetic).

2              So, I sent both of them a meeting

3     invitation.  Then I sat in that conference room

4     at that time.  Neither of them showed up.

5              Then I went to the fifth floor where

6     Ms. Crow's office is.  And I asked the

7     receptionist to call her, to remind her that I

8     have a meeting with her.

9              And then that receptionist said okay,

10    you can come into her office.  Then I came in her

11    office.  She said, oh, I forgot.  I thought the

12    meeting is in my office.  I'm sorry for your

13    wait.  Or something like that.

14              Then I just asked her, I said how soon

15    can I start?  She said oh, let me tell you, your

16    application was actually already approved by your

17    supervisor.

18              But, I am doing the working out.  Do

19    you have access to a high speed internet and a

20    VPN?  Something like that.

21              Then I went home and I logged on DC

22    VPN.  I did not have access.  It might have said

1    something, you don't have a number, or you don't

2    have a VPN.

3                    I captured that link.  I sent that

4    back to her.  I said, I do have high speed

5    internet.  It says there should be other things.

6    But, I do not have access to VPN.

7                    It didn't say I needed it.  Then I

8    asked her, are you still involved?  Did you have

9    any meetings with other teleworker applicants

10   about their telework ever, because I knew her

11   position was CAO Chief and (audio interference).

12                   And no.  This one is so special for me

13   that it had to be in my telework application.

14   Even the fact that my application was already

15   approved by my supervisor.

16                   And then I kept pushing her for an

17   update.  Eventually I think sometime in October,

18   the first two days, I received an email from her.

19                   And then she said your telework was

20   denied or something.  And the denial was purely a

21   technical reason or something like that.

22                   I'm confused.  I had a prior review

1    where we have a lot of other reviewer instruction

2    or something.

3            I then -- and then I went to my

4    coworkers, oh, what's their names?  Sitra

5    (phonetic) and Behon (phonetic).

6            I asked them one by one, do you have

7    access to a file and a VPN from home?  They said,

8    no.  No, we don't.

9            And then Sitra even showed me an email

10   from HR manager which it was like a

11   congratulations, your telework application was

12   approved and all that.

13           Then I asked them, how soon you got

14   this approval?  And they told me that you don't

15   deal with HR.  You -- once your supervisor

16   approves it, it's all, you can start.

17           That's about two weeks.  Okay.  Then

18   I realized, my -- it's more than two months.  And

19   I asked them if the HR office have a meeting on

20   that?  They said no.  We don't even talk to HR on

21   this matter.

22           And then I talked to Chris Bailey

```
1          Q     Oh, it's a database.  Okay.

2          A     For -- for review.

3          Q     And you need it to do your job?

4          A     No.  I do not.  Without Accela, I

5    still can do my job.

6          Q     Okay.  So you don't use Accela for

7    your job?

8          A     Not necessarily.

9          Q     Can you explain that, please?

10         A     That is something if you have, it's

11   good.  If you don't have, it does not affect your

12   ability to do your job.

13               It's because we now do new jobs in

14   project docs.  And also probably in 2015 I had my

15   right shoulder frozen shoulder.  I have to do

16   therapy.

17               At that time, Sydney Lester allowed me

18   to work from home.  And I never had home access

19   to Accela.  But, I could always do my work.

20         Q     I honestly don't understand.  I mean,

21   so do you use Accela in your job or not?

22         A     If I have access to it, I use it.  If
```

1       I do not have access, I can still do my job

2       without any -- without any, you know, bad things.

3                  So, I can still continue to do my job.

4       Not affect even.

5            Q     Okay.  So you do use it when you have

6       access to it.  But, if you don't have access to

7       it, you don't use it.

8            A     If I don't have access to it, I can do

9       my job the very same way.  Just like the other

10      engineers.

11           Q     You said you -- two structural

12      engineers had been approved, Sitra and Behom,

13      Behon, is that what you said?

14           A     Right.  Correct.  And Behon.  Ms.

15      Sitra, and Mr. Behon.

16           Q     And you're a fire protection engineer?

17           A     Yes.

18           Q     That's -- that's different, right?

19      Structural and --

20           A     Well, yes.  The name is different,

21      correct.

22           Q     Okay.  Do they report to the same

1    supervisor?

2         A     Yes.  They report to Samir.  Now I

3    report to Samir too.

4         Q     Okay.  At the -- at the time that your

5    telework request was denied you reported -- they

6    reported to Mr. Lester?

7         A     They did not report to Lester.  Both

8    of them at that time reported to Samir.  And I

9    report to Samir too, right now.

10        Q     I'm trying to get apples to apples.

11   So, in 2019, did you -- you reported to Mr.

12   Lester, correct?

13        A     Correct.

14        Q     Okay.  And in 2019, these two

15   individuals, the structural engineers you've

16   mentioned, they reported to Mr. Lester or to

17   someone else?

18        A     Samir.

19        Q     Okay.  And at what point were you

20   reassigned from Lester to Samir?

21        A     In December 2019, I received a paper

22   from HR that told me from that day, Samir would

1    be my supervisor.

2        Q    Okay.  So, after this alleged denial

3    of your telework request.  Which you said was in

4    October.

5        A    Yes.

6        Q    Okay.  And the structural engineers,

7    do they use Accela?

8        A    I do not know.  I don't know whether

9    they use that or not.  It's probably a personal

10   habit if they use it or not. You can ask them.

11       Q    You don't know.  Okay.  So, are you

12   aware of any other employees who experienced

13   delays in getting their telework requests?

14       A    I do not know.  I myself have talked

15   to both Behon and Sitra and myself.  I did not

16   ask any other people.

17            I do not know who else was doing

18   telework.

19       Q    You only asked these two individuals?

20       A    Yes.  These two.

21       Q    Okay.

22       A    I was talking to them and asked the

1    questions.

2         Q    Why did you ask these two individuals?

3    They weren't supervised by the same people.  They

4    didn't do the same job.

5              Why did you ask them and not, I don't

6    know?

7              MR. SCHLEICHER:  Okay.  Did you finish

8    your question?

9              MR. BLECHER:  Yeah.

10             THE WITNESS:  Do I go ahead?

11             MR. SCHLEICHER:  Yeah.

12             THE WITNESS:  The telework is not like

13   a review discipline ability.  We both are plan

14   reviewers.

15             I myself do not know any technical

16   reason why a fire plan reviewer should have

17   access to Accela to do telework, while structural

18   engineers can do telework without them.

19             I do not have any logical technical

20   reason for that.  I think we are about the same.

21   We both are plan -- we all are plan reviewers.

22             MR. BLECHER:  Uh-huh.  Right.  So my

1    have some question about the work that you do,

2    and things like that.

3                    I hope this doesn't take long.  Like

4    I said, I'm about half way through the stuff that

5    I was going to ask you.

6                    I hope to be done before five o'clock.

7    But, I do need to grab a sandwich and use the

8    restroom.

9                    So, can we take, I mean, how much time

10   do you guys need to fuel yourselves?

11                   MR. SCHLEICHER:  About until 2:30.

12                   MR. BLECHER:  Okay.  Let's take 25

13   minutes.  We'll see you guys at 2:30.

14                   MR. SCHLEICHER:  Okay.

15                   VIDEOGRAPHER:  Going off the record at

16   2:05 p.m.

17                   (Whereupon, the above-entitled matter

18   went off the record at 2:05 p.m. and resumed at

19   2:35 p.m.)

20                   VIDEOGRAPHER:  We're going back on the

21   record at 2:35 p.m.

22                   MR. BLECHER:  Okay.  Ms. Lu, welcome

1     back.  I'm going to go ahead and try and push

2     through a bunch of this.  I'm going to take some

3     time to organize, and I hope this goes quickly.

4                 BY MR. BLECHER:

5          Q     You are a fire protection engineer.

6     Is that right?

7          A     Yes, I am.

8          Q     Okay.  How long have you been in that

9     position?

10         A     Since October 2007.

11         Q     Okay, so that's quite a bit of time.

12    And have you ever had any other jobs within the

13    District government?

14         A     No.

15         Q     Okay.  So you've never worked for

16    BEGA?

17         A     I never worked for BEGA.  No.

18         Q     Okay, you never worked for the OIG?

19         A     No.

20         Q     You never worked for DCHR?

21         A     Uh-uh.  No.

22         Q     What are your duties as a fire

130

1    protection engineer?

2        A      I review for construction code and

3    DCMR and NSTA code, to determine whether the

4    application and detecting for documents are in

5    code compliance or not.

6              If yes, I will go ahead to approve

7    this job.  If not, I put HSB in the system, which

8    literally stands for code for collections, and I

9    cite a code paragraph to let them know why I

10   cannot approve them.

11             And also I do other things:  answer

12   emails, questions over the phone, and things like

13   that, as a fire protection engineer.

14       Q      Okay.  Are you in any way involved in

15   the processing of applications for family leave?

16       A      No.

17       Q      So you have not ever personally been

18   involved in the process of reviewing, granting or

19   denying a request for family leave?

20       A      No.  Applying for a paid family leave,

21   I don't know what year.  Before this, when my mom

22   was very ill, and then they grant me, I

1        Q    Okay.  In your work as a fire

2   protection engineer, are you responsible for

3   monitoring any employee's time and attendance?

4        A    No.

5        Q    Do you have any access to anyone's

6   PeopleSoft records, other than your own?

7        A    No.

8        Q    Have you ever logged into SB's

9   PeopleSoft account?

10        A    Have I ever what?

11        Q    Logged into SB's PeopleSoft account?

12        A    Of course not.

13        Q    Have you ever viewed any of his

14   timesheets?

15        A    No.  Not he submitted.

16        Q    Okay.  Have you ever viewed any of his

17   leave requests?

18        A    No.  He did not copy his leave

19   requests to me.

20        Q    Okay.  I guess more generally have you

21   ever, in any other manner, ever been privy to any

22   of SB's personnel information related to his

136

1    time, attendance or leave?

2           A      No.

3           Q      You just said that SB didn't copy his

4    leave requests to you?  What did you mean by

5    that?  Copy it to you?

6           A      When he -- for leave, he started with

7    either HR or supervisor.  They didn't say, okay

8    Lucy, I need some time off for my daughter.  He

9    did not say that to me.

10          Q      Oh, okay.  So what you meant to say is

11   you weren't involved in those communications.

12          A      Of course not.

13          Q      Okay, okay.  Geez.  I have to ask.

14   Does your job as a fire protection engineer, does

15   it have any, like legal components to it?

16          A      Has any what?

17          Q      Like a legal aspect?

18          A      I do not know.  For once, I

19   represented the agency in providing expert

20   witness at one of the court case involving DCRA

21   time review, and I was put on the witness stand

22   and provide expert opinion at a court.  That

1    happened once.

2         Q    Okay.  So you served as like a

3    fact/expert hybrid witness for the agency?

4         A    Yes.

5         Q    That makes sense.  I do that all the

6    time with DCRA.  You guys do good work.  But

7    other than that, do you have any legal education

8    or training?

9         A    Legal, based on the training, no.

10        Q    Okay.  Other than your employment

11   since 2007 as a fire protection engineer, have

12   you ever held any other jobs in which you were

13   responsible for any human resource-related

14   activities?

15        A    No, sir.

16        Q    Okay.  Any other jobs involving legal

17   advice or legal research?

18        A    No, sir.

19        Q    Okay.  You are a registered

20   professional engineer in the District?  Is that

21   correct?

22        A    As well as in Maryland.

1    understood that correctly.  So from 2007 when you

2    started at DCRA, until you're assigned to a

3    different supervisor in 2019, you and SB, you

4    basically worked for the same team under the same

5    supervisor?

6           A     Correct.

7           Q     Okay.  And was that supervisor

8    Mr. Lester the entire time?

9           A     Yes.

10          Q     Oh, okay.  Well that's easy.  Do you

11   have a personal relationship with SB?

12          A     Please.  What do you mean by personal

13   relationship?  Define it.

14          Q     I didn't understand what you just

15   said.  Oh, define it?

16              MR. SCHLEICHER:  Define it.

17              THE WITNESS:  No.  No, not much.  No.

18              MR. BLECHER:  I don't really

19   understand the question you just asked.

20              BY MR. BLECHER:

21          Q     So do you see him outside of work at

22   all?

1          A     No, I do not.

2          Q     Okay.  You've never been to any non-

3     work event with him?

4          A     No.  Well if you mention I never saw

5     him outside the work, I have to correct myself.

6     On May 25, there were about 15 to 20 of us plan

7     reviewers.  We have a dinner together in an

8     Indian restaurant near the Union Station.

9               I attended that event.  So did SB.  So

10    we both were at the same event on that day.

11    Business in the restaurant.

12         Q     Okay.  And other than that, you guys

13    just don't hang out ever?

14         A     No.

15         Q     All right.  And do you consider him a

16    friend?

17         A     No.

18         Q     Okay.  Have you ever?

19         A     What?

20         Q     Have you ever considered him a friend?

21         A     No, I did not.  He's one of my

22    coworkers.

1          Q     What is your opinion of SB, if any?

2          A     SB is very talkative, communicative,

3     eloquent, articulate, and dishonest.

4          Q     Okay.  You believe that he is

5     dishonest.

6          A     I firmly believe he's dishonest.

7          Q     Okay.  And is that based on this

8     parental leave situation, or something else?

9          A     Something -- also something else, in

10    addition to this paid family leave.

11         Q     Okay.  How long have you thought SB

12    was dishonest?

13         A     Oh, my God.  For years at least.

14         Q     Since 2007, or was there some event

15    later that led you to feel that he was dishonest?

16         A     Back to date, I reported some problems

17    I observed to Sydney Lester before we moved into

18    the current location, which is 1100 4th Street.

19    Before that, we were at 941 North Capital, very

20    close to Union Station.  I reported some problems

21    of him, of SB to Lester.

22         Q     Okay.  What were the problems?

1          A       Time vesting.

2          Q       I'm sorry.  Maybe I missed that.

3     Could you say it again?

4          A       Time vesting.  He manipulated the

5     timesheet.  Manipulate the timesheet.

6          Q       Okay.  Can you say more about that?

7          A       Sure.  At that time, we were required

8     to sign in and sign out using some papers.  For

9     every week, we got five sheets of paper.  The

10    most recent one is always on top.  The old ones

11    were at the bottom.

12               At that time, I was sitting 36 inches

13    away from SB.  And I found his strategy to

14    inflate the timesheet one, the following.

15               For example, he came in on Monday at

16    9:25.  He put the timesheet immediately on the

17    same day.  Then when Wednesday comes, he's going

18    back Monday and put any time there, like a 7N, or

19    something like that.  So did his -- the partial

20    time.  It's not -- so in this way, so he's late

21    every day in the morning, and leave early in the

22    afternoon, he still would be able to get a lot of

1    overtime.

2              For once, I reported it to Mr. Lester.

3    Sydney Lester laughed and decide code.  Lucy,

4    stay out of it.

5         Q    Okay.  Would you know what year that

6    was?

7         A    Eighteen -- before we moved to

8    Safeway, to 1100 4th Street.

9         Q    I don't know when you guys moved.  Do

10   you --

11        A    March 2010.  That was before this

12   date.  And then after we moved this stage and the

13   management was scheduled until March.  Instead of

14   using five sheets of paper per week, we used one

15   sheet for the whole week and advised him, SB,

16   speak please.

17             (Audio interference.)

18             MR. BLECHER:  I don't know -- I don't

19   think I -- I'm not sure if you broke up or I'm

20   just having a hard time understanding you.

21             BY MR. BLECHER:

22        Q    So did you say that at some point

1    there were no longer five sheets, there was one

2    sheet, and then he was leaving the time blank?

3         A    Correct.

4         Q    Okay.  And what was the result of

5    that?  I mean how did that help him with his

6    time?

7         A    Of course.  And then there's no proof

8    of his time, especially when he comes late and

9    leaves early, in the PeopleSoft, because he can't

10   put anything.

11             When he was not working eight hours,

12   he could still put eight hours or more, and it

13   becomes untrackable, since he elected those

14   plans.

15             A plan can have many interpretations.

16   Right?  If they were -- own proof for that, it

17   leave them blank.

18             Well every other employee, we just

19   waited.  We did put the real time of arrival and

20   the real time of departure.

21        Q    Okay.  So do I understand correctly

22   that at some point before PeopleSoft, DCRA was

1        A      Do I recall what?

2        Q      Do you know what time those posts were

3    made?

4        A      No.  I don't have that good memory.

5    But if you refer to Mr. Tyrone Lawson's report,

6    there is a little clip -- screenshot there.  It

7    may have some time there, and --

8        Q      Okay.  Right.  I understand that you

9    have objections to SB's time and attendance

10   issues.  But do you otherwise have an opinion

11   about his work performance?

12       A      No, I don't.

13       Q      Your opinion -- your allegation about

14   the validity of SB's paternity leave in 2016,

15   when did you first start to suspect something was

16   up?

17       A      June 27, 2016 I sent my first report

18   to OIG hotline.

19       Q      Okay.  That was your first report to

20   OIG.  But presumably you started to investigate

21   the situation prior to that.  Am I right about

22   that?

1          A       Well I don't know what you mean

2     exactly.

3          Q       Okay.  You made a complaint to the

4     OIG, you just said, June 27, 2016.  The subject

5     matter of that complaint was your allegation that

6     SB was, you know, fraudulently claiming paternity

7     leave.  When did you first start to get

8     suspicious that SB was engaging in that conduct?

9          A       Okay.  That was by the end of April.

10    I wrote several times in many like emails, at the

11    end of April 2016.  When I returned to the third

12    floor in my office from the second floor, Asmi

13    told me that, did you see SB's wife?

14              I said yeah, I saw her on the second

15    floor, walking around.  And then Asmi told me,

16    like, you know what?  She offered to tell me

17    she's pregnant.  I said oh.  It's quite possible

18    you got a positive result.

19              And then about two weeks later, or

20    about two weeks later, then everybody could see

21    that was -- I said that's not possible,

22    especially for another who had already had

1    several babies.

2              And also at that time, Arnold Carl

3    told me that SB's wife offered to tell him is a

4    past due pregnancy was induced, the labor.

5              To me, past due pregnancy means at the

6    end of April, it should have more evident.  To

7    me, there's no need for a woman to offer to tell

8    a male stranger -- especially when her husband

9    was not present -- like hey, you know what?  I'm

10   pregnant.  I just found it very unusual, in my

11   perspective.

12        Q     Okay.  So end of April 2016, you see

13   SCB at DCRA.  And you contend that at that point,

14   she did not appear pregnant to you.  Do I have

15   that right so far?

16        A     Correct.

17        Q     Okay.  On the day that you saw SCB at

18   DCRA, at the end of April 2016 -- well first let

19   me ask, do you remember the date that you saw

20   her?

21        A     No, not the date.  I only remember

22   it's at the very end of April 2016.

1          Q     Okay.  When you saw her that
2     day -- was it just one day?
3          A     Yeah, I saw her around almost every
4     day, but including that day when she was walking
5     around in the office.
6          Q     Okay.  So I'm just trying to get to
7     the bottom of this.  So you see her at the very
8     end of April.  Before then, when was the last
9     time you saw SCB?
10          A     I do not remember.  I don't make a
11     note of what day I particularly saw her.  I don't
12     have a note for that.
13          Q     And did you see her prior to that in
14     April?
15          A     Yeah, probably.  She was a frequent
16     visitor.  Almost like every day.  In DCRA, she
17     was a permanent vendor.  At that time, she helped
18     her clients to obtain building permits.  That was
19     her business.  Her job.
20          Q     Okay.  So is it your testimony that
21     you saw SCB every day in the month of April?
22          A     Almost.

1      Q     Okay.  And at what point did you learn

2  that she was claiming she was pregnant?

3      A     I don't know.  Never knew whether she

4  was pregnant or not.

5            MR. SCHLEICHER:  He's asking when did

6  someone tell you she was saying she was pregnant.

7            THE WITNESS:  Oh, that was after the

8  baby was born.  And also, before that, Asmi told

9  me that she offered to tell Asmi she's pregnant.

10            BY MR. BLECHER:

11      Q     Basically you seem to care a lot about

12  this.  Is that an accurate characterization?

13      A     What do you mean?

14      Q     This feels really personal to you.

15  Does this feel personal to you?

16      A     Who?

17      Q     Your allegations against SB and SCB,

18  and about the existence of their child.

19      A     This is not personal.  I believe they

20  committed a fraud.  According to the Washington,

21  DC Whistleblower Protection Act, I was making

22  protected disclosure.

```
 1           A     Yeah.  Sa'id and Arnold were speaking

 2     near him.

 3           Q     Do you know for a fact that Sa'id saw

 4     baby pictures?  Or you just --

 5           A     Not that -- Arnold Carl told me in

 6     person.

 7           Q     Alright.  This is where I'm confused.

 8     This says that you heard this from Arnold Carl.

 9     Right?

10           A     Correct.

11           Q     Which means Arnold Carl was the source

12     of the information.  This doesn't suggest to me

13     that Arnold Carl was the person that viewed the

14     pictures.  But is that what you're saying now?

15           A     I do not know.  Arnold Carl told me

16     that SB had showed him the picture and told him

17     that was her daughter.

18           Q     Showed Arnold Carl pictures.

19           A     Correct.

20           Q     Okay.  Is Arnold Carl still a current

21     colleague of yours?

22           A     Is Arnold Carl what?
```

1              MR. SCHLEICHER:  Still a current

2      colleague of yours?

3              THE WITNESS:  No, no, no, no.  Not

4      anymore.

5              BY MR. BLECHER:

6         Q    Do you have current contact

7      information for Arnold Carl?

8         A    No, I don't.

9         Q    What was Arnold Carl's title before he

10     left DCRA?

11        A    Professional engineer.

12        Q    Oh, he's like you.  Okay.  And are you

13     familiar with the concept of an ultrasound?

14        A    What's that?

15             MR. SCHLEICHER:  Ultrasound?

16             THE WITNESS:  Whose ultrasound?

17             BY MR. BLECHER:

18        Q    Are you familiar with the concept of

19     an ultrasound?

20        A    Yes, I do.  Uh-huh.

21        Q    And it's often used to image the

22     inside of a woman's stomach, to view a baby.

1          A      Yeah.  Right.  Mm-hmm.

2          Q      Do you know that Arnold Carl didn't

3    see an ultrasound image, for example?

4          A      In Arnold Carl's word, he used the

5    word picture.  And I'm not sure whether in Arnold

6    Carl's head, picture and ultrasound are the same

7    thing or not.

8          Q      Okay.  Okay.

9          A      Can I continue?  I'm not finished yet.

10         Q      I know.  It goes on.  I'm going to

11   just ask questions as we go.  I hope that's okay.

12         A      Sure.

13         Q      Please continue.

14         A      Okay.  SB claimed that his fourth

15   child was born in December 2017.

16         Q      Wait.  Where are you now?

17         A      Oh, I am in field -- It's the question

18   ten, to answer your interrogative question ten.

19         Q      Okay.  What page of the document are

20   you on?

21         A      I'm on 28 in my document, in my book,

22   28.

173

1          Q      Okay, so you're skipping ahead.  Can

2     I ask you a question about, there's a statement

3     on 26?

4          A      Sure.  Go ahead.

5          Q      You say, SCB, her post from the day

6     before and day of the purported delivery, were

7     taken down from Facebook, while other postings

8     remained up.

9          A      Yes.

10         Q      When you say they were taken down,

11    what do you mean by that?

12         A      They are invisible from a public view.

13    Invisible.

14         Q      Right.  So, what you mean is, you

15    could no longer see them.

16         A      Correct.

17         Q      Do you remember when you first noticed

18    that they were no longer visible to you?

19         A      I do not remember the first day I

20    noticed it, but I remember once I noticed them, I

21    wrote an email to BEGA or to WHO (phonetic), and

22    I referred to this fact, that all other postings

1    were there, but for these two days all postings

2    were deleted.

3                I used the word deleted.  To me, that

4    means I no longer see them.  I was not sure

5    whether if this is BEGA or what.  I no longer see

6    them when he said they were deleted.

7        Q    Okay.  And do I understand you, that

8    you wrote that email to BEGA, making that

9    allegation about them being deleted, around the

10   time that you noticed that they had been --

11       A    It's about --

12       Q    I'm sorry, say -- can you just say

13   what you said again?

14       A    Yeah, it's about the same time.

15       Q    Okay.

16       A    I noticed it, and then I reported it

17   to BEGA.  I'm not sure how many days earlier they

18   took it off before I noticed that.  I don't know.

19       Q    Okay.  Okay.  All right.

20       A    Can I continue?

21       Q    Yeah, please do.

22       A    SB claimed his fourth child was born

1    Q    Did you do it on government time?

2    A    No, I don't think so.  When I --

3    Q    Ever?

4    A    No, it's probably -- I don't think I'm

5    viewing Facebook on duty.  And when I'm at work,

6    I do my work.

7    Q    Mm-hmm.  Okay, and I just -- again, I

8    don't follow this.  You're saying these four kids

9    don't belong to these parents.  Is that right?

10    A    I'm saying there are some

11    unexplainable math here in the top-right picture,

12    number five is a boy.  In the lower-left, number

13    five is a 20-something girl.  Neither the gender

14    nor the age matches.

15    Q    Oh, man.  Okay.  And I'm sorry.  How

16    does this demonstrate that SB fraudulently

17    claimed paternity leave in 2016?

18    A    Oh, yeah.  That is something try to

19    cover -- some family member trying to cover.  But

20    the hole is too deep to fill.  That's why they

21    made this type of mistake.

22             You cannot make this type of a huge

1    lie, that's how many children you actually have.

2    This is a lifetime lie that requires life

3    commitment.

4              (Simultaneous speaking.)

5         Q    The caption for this top-left photo

6    says, memorable photo for my three last

7    grandkids, their first tour of the White House

8    with dad and other Grandma RB and a cousin.

9         A    Correct.

10        Q    Did I read that right?

11        A    Yes.

12        Q    So, this isn't SCB in this picture.

13   This is one of the grandmas.  Right?

14        A    Correct.  Right.  Mm-hmm.

15        Q    Okay.  And it appears that this is one

16   grandma commenting on another grandma's photo.

17   Right?

18        A    I do not know.

19        Q    Well, what -- I mean, this is your

20   investigation.  So you don't know who the person

21   is that posted this photo?  How they're related

22   to the family?

1          A      Yes, I pasted here.  It's up to

2     multiple interpretations.  I paste it here.  I

3     torn it out.  There are two number fives.  And

4     also the boy in the upper-left that lady put her

5     hand on, it's the same boy on the lower-left.

6                So, that must be a grandkid.  So,

7     there are three kids.  The one in pink shirt and

8     the one Mr. -- I see hold with his hands so many

9     times in DCRA.  So, I assume the two boys are his

10     grandson and biological son.

11          Q      All right.  Look, clearly you've

12     studied these pictures more than I have.  So, I'm

13     just going to try and have you tell me basic

14     biological information about these people.

15                And look, if you don't know it, just

16     say I don't know, so we don't waste a bunch of

17     time.  Okay?  So, let's start with the top-left

18     picture that's on page 26 of your discovery.

19     From left to right, the kid with the box around

20     him, do you know who that person is?  Do you know

21     their name?

22          A      Which one?  So, what color of shirt

1    the boy --

2                    MR. SCHLEICHER:  At the bottom.

3                    MR. BLECHER:  From left to right.

4                    THE WITNESS:  Okay, okay, okay.  Yeah,

5    huh?

6                    BY MR. BLECHER:

7        Q      What is that person's name?

8        A      I don't know.

9        Q      Okay.  Moving to the right, the woman

10   that's standing, do you know what that person's

11   name is?

12       A      RB.

13       Q      Okay.  Who is RB?

14       A      At first, I thought she was a family

15   friend.  October 2018, I heard it directly from

16   SB, that this woman is his stepmother.

17       Q      Whose stepmother?

18       A      SB's stepmother.

19       Q      Okay.  So, it's your testimony that

20   this is, to the best of your knowledge, that the

21   person in the striped dress in this picture is

22   SB's stepmother.

1         A      Not my knowledge.  SB told me RB is

2    SB's stepmother.

3         Q      Okay.  That's your understanding.  So,

4    that's your best understanding.  Okay.

5         A      That's what he told me.  My

6    stepmother, RB, that's what he said, word-for-

7    word.

8         Q      Okay.  And before that, am I correct

9    that you reported that this was some sort of

10    family friend?

11         A      Yes, I always thought this was family

12    friend.  It is beyond my wildest imagination this

13    lady is actually his stepmother.

14         Q      Okay.  So, you were at least wrong

15    about that.  And then, moving to the right, the

16    littlest child in the picture, who is that?

17         A      This is the boy I saw many times, that

18    his wife and SB brought to our office all the

19    time.

20         Q      I don't think that's a boy.  That

21    looks like a girl to me.  So --

22              (Simultaneous speaking.)

1      Q      The child that RB is holding.

2      A      Oh, that's a boy.

3             MR. SCHLEICHER:  Yeah, sorry.  It's

4      the picture to the right there.

5             THE WITNESS:  On the first row.

6             MR. SCHLEICHER:  Are you still on the

7      top picture on the left?

8             MR. BLECHER:  Yeah.  I'm going to

9      figure out who all these people are, in her

10     opinion.

11            BY MR. BLECHER:

12     Q      So, third person in from the left,

13     top-left picture, to the best of your knowledge,

14     Ms. Lu, based on your investigation of this

15     family over a period of three years, who is that

16     person?

17     A      Which one?  The boy or the girl?

18     Q      The third human being in from the left

19     in that picture.  She's being held.

20     A      Oh, that lady was holding in her arms?

21     Q      Yes, the child that's being held in

22     the woman's arms.

1     it seems that in P-2 means consecutive,

2     number 5-6-7, it really is explainable when --

3     and seven, becomes nine.

4              They even made claims about family

5     members' pictures on Facebook, at least the one

6     considered in the context of the contradictory

7     comments and the claim from Mr. SB's wife,

8     further convinced the Plaintiff it was reasonable

9     to conclude that fraud had taken place.

10             Plaintiff will be glad to further

11     explain in depositions, how the realized Facebook

12     photos are part of what led her to conclude

13     something fraudulent had occurred.

14             MR. SCHLEICHER:  Can she take a five-

15     minute break?

16             MR. BLECHER:  Yeah, of course.

17             VIDEOGRAPHER:  Going off the record at

18     4:03 p.m.

19             (Whereupon, the above-entitled matter

20     went off the record at 4:03 p.m. and resumed at

21     4:10 p.m.)

22             VIDEOGRAPHER: Going back on the record

1   at 4:10 p.m.

2            MR. BLECHER: Hey, listen, I'm sorry.

3   You're going to hear some, like, noise in the

4   background for a second.  My dog just ate dinner,

5   and she has this toy that makes noises, and she

6   always plays with it after she eats.  It just

7   takes a second, and I apologize.  So, well this

8   is great, work from home stuff.

9            BY MR. BLECHER:

10       Q    All right, so, I just want to circle

11  back on this Facebook thing real quick, Ms. Lu.

12  Just because I don't fully have my head around

13  it.  And I'm not going to beat a dead horse here,

14  but the top left picture on Page 26 of your

15  responses to the District's interrogatories, that

16  picture, you said that that small child being

17  held by the lady in the striped dress, that's

18  SB's half-sister, is that what you said?

19       A    Correct.

20       Q    Correct.  And can you just explain for

21  me again what the basis for that conclusion is?

22  What your evidence of that is?

1          A     Oh, well, I submitted a lot of that.

2     You know, people, there is one picture that is

3     not included in this.  The comment was, my last

4     three children.  So there must be three children

5     were her grandchild, right.  That girl cannot be

6     included in there.  Because all the address

7     reads, they are the lady's grandchildren except

8     for that girl.  So that girls is not.

9               And that lady is holding that girl in

10    her arms so I believe the girl is her daughter.

11    And as SB stated himself, this lady is SB's

12    stepmother.  So this girl is SB's (audio

13    interference).  And he called her a daughter.

14         Q     Okay.  So it is just, there's one,

15    there's a Facebook post that you rely on that

16    allows you to draw the conclusion that this is

17    SB's half-sister?

18         A     The girl.

19               MR. SCHLEICHER:  Wait till he finishes

20    his question.  I'm sorry, go ahead and finish

21    your question, Matthew.

22               MR. BLECHER:  That's my question.

1          BY MR. BLECHER:

2      Q    Is it one Facebook post or is there

3  other evidence?

4      A    It's not one.  If you counted, there

5  are four of them on Page 26.  And also, there are

6  other pictures in Mr. Tyrone Lawson's report.

7      Q    Okay.

8      A    Even on Page 26 is not one, there are

9  four of them.

10      Q    Okay.  So I have a copy of the report.

11  And I have these interrogatory responses.  Let me

12  ask this question.

13          Did you rely on any other evidence,

14  other than what's in these interrogatory

15  responses, what's in the report and what's in the

16  documents that you already produced to the

17  District in this lawsuit, that you contend

18  supports the conclusion that that child in that

19  women's arms, the women in the stripped dress, is

20  SB's half-sister?  Her half, yes, half-sister.

21      A    Yes, understand.  My co-worker, Joe

22  Embery, ask his wife, how come we see your two

1    boys all the time, we never saw your daughter.

2    His wife responded, oh, we don't want people to

3    see her.  We don't people to comment on her.

4            At the same time, she didn't seem to

5    have problem with people see and comment on her

6    two boys.  To me this is very suspicious.

7            And also from Lawson's interview of me

8    on February 12th, 2019, Lawson yelled at me like,

9    why SB cannot bring the daughter to the office is

10   because of, I'm not sure whether SB told his or

11   he made it up.

12           And also, if anything, the fact is, SB

13   did bring a girl to the office.  At least I saw

14   it once.  So I believe this is not on me that SB

15   is not able to bring the girl to the office, it's

16   about availability.

17           Because this girl does not live in his

18   house.  He could bring the girl to the office

19   when the girl's mother brings her to the United

20   States for a reason.

21           So I add those things up.  That's my

22   understanding why he's lying.

1       Q    Okay.  So, did I hear you say that you

2  have seen the kid that is allegedly SB's

3  daughter, right?  You've seen the child?

4       A    Yes.  I did not know I saw a girl.

5  I'm not sure who she is.  I saw that girl with

6  his younger boy in the lady's room on the second

7  floor of 1100 4th Street.

8       Q    When was that?

9       A    I don't know.  That was 2008.  2008.

10  Yes, I was in the, 2009.  2008.

11      Q    2018?

12      A    Correct, 2018.  I'm sorry.

13      Q    Okay.  And you saw the child.  Was she

14  with SB?

15      A    I saw that child with her, that

16  biological little boy, in the lady's room on the

17  second floor of 1100 4th Street.

18            And however, in the interview Lawson

19  told me SB was not able to bring the baby to the

20  office was because of me.  I don't understand.

21      Q    Okay.  And when did Lawson tell you

22  that?

1          A      On February 12th, 2019 during the

2     audiotaped interview.

3          Q      Okay.  So you saw the kid and you

4     concluded from seeing the kid, with SCB that the

5     child doesn't exist?

6          A      There was a girl on that day in the

7     lady's room.  I don't know who she is.  It's just

8     there, yes, there was a girl.

9          Q      How is that the plausible conclusion

10     to draw?

11              I mean, isn't it equally plausible

12     that that's her child?  That that's SCB's child?

13          A      Well, then the Facebook thing won't be

14     explainable at all.  And also, there was stories

15     about they had two children, three children, four

16     children.  I don't think people usually make that

17     type of mistake when it accounts to how many

18     children you have.

19          Q      Okay.  So do you agree with me that

20     it's at least plausible that the child that you

21     saw at the end of October 2018 with SCB was SCB's

22     daughter?

1          A      No, I don't.

2          Q      Okay.  You said that SCB, someone told

3     you that SCB doesn't want people to see her

4     daughter.

5          A      Right.

6          Q      Who told you that?

7          A      Embery.

8          Q      Who?

9          A      Joe Embery.  J-O-E, E-M-B-E-R-Y.

10         Q      Who is that person?

11         A      Someone who, he was a, took the

12    weather, a partner on the 2nd floor.  Then he was

13    dismissed.

14         Q      And this Joe Embery person, he told

15    you that, he told you that or he told someone

16    else that and then you heard it?

17         A      I do not know whether he told someone

18    else.  He told me.

19         Q      Okay.  Let me just circle back and

20    make sure I have an answer to the Facebook

21    question.  So, is there any other evidence,

22    Facebook related evidence, that is not in your

1    interrogatory responses, captured in the

2    investigative report or produced to the District

3    of Columbia in discovery in this case --

4                  (Simultaneous speaking.)

5         Q      Let me finish the question.  Let me

6    finish the question.

7                  On which you rely to support your

8    conclusion that the child in this picture, that's

9    being held by the women in the stripped dress, is

10   SB's half-sister?

11        A      From those pictures, I see they're

12   off.  This girl, highly likely, is SB's half-

13   sister.

14                 MR. SCHLEICHER:  Okay.

15                 THE WITNESS:  And also, any --

16                 MR. SCHLEICHER:  Hang on just a

17   second.  He was asking, is there any other

18   evidence you have other than what's in Lawson's

19   report and the interrogatory answers that you've

20   otherwise produced to the District, that makes

21   you believe that's attached to that specific

22   question?

1              THE WITNESS:  Not really.  This

2       lawsuit or this inquiry almost covered

3       everything.  And we provided answers in there

4       with a reference to Embery.  Yes, that's pretty

5       much my source of my information that support my

6       conclusion.

7              MR. BLECHER:  Okay, so to put it

8       differently, I'm not going to be surprised later

9       on with some other pictures that I've never seen

10      before, that it's already in my possession, I

11      just need to piece it all together, is that

12      right?

13             THE WITNESS:  I don't know what you're

14      referring to.  I don't know.

15             MR. SCHLEICHER:  He's just asking, are

16      you keeping any, have you given all the pictures

17      over to the District government that you have

18      that you think proves that SB is half-sister?

19             THE WITNESS:  Yes.  I got all those

20      from the public view of his or her Facebook, yes.

21      And I presented it to OIG hotline and whoever I

22      did.

205

1          BY MR. BLECHER:

2          Q     When you saw the SCB with the girl,

3     who SB alleges is his daughter, in October of

4     2018 at DCRA, I think you said that SCB also had

5     a son with her, a boy, is that right?

6          A     Yes.  Correct.

7          Q     How do you know that that was her son?

8          A     I don't know.  I don't think she dare

9     commit that many fraud.  And also, there is no

10    motivate for that one.

11               And that one he brought to office

12    several times.  And there is no like true name

13    for that one.

14               And also, there are true names for

15    this girl and some other Facebook stuff from

16    family members.  There was no mentioning of that

17    boy that was born earlier.

18          Q     Okay.  So have you ever seen that

19    child before?

20          A     Which child?

21          Q     The child, the son, the boy that was

22    with SCB in October of 2018.

1      A      So that younger boy, as well as the

2    older boy in DCRA office, many, many times.

3      Q      Okay.  And how do you know that that

4    child is SB's son?

5      A      Oh, there is no evidence to suggest

6    that either way.  So I naturally believed he is.

7    There was no like something that don't add up or

8    from the other info sources that has any

9    suspension on it, so I assume that one is his

10   biological son.  And I don't --

11     Q      And just --

12     A      -- so I don't have any forensic proof

13   or legal proof.  So, it's said that's his son and

14   I believe that boy is his.

15     Q      You allege in the complaint, and also

16   in these interrogatory responses, that you

17   observed, in prior years, what looked to be SB

18   erroneously reporting hours and claiming

19   overtime.  Is that what we talked about before

20   with the time sheets, the physical time sheets,

21   or is that referring to something else?

22     A      Yes.  Yes.

1          Q     Okay.  Yes, that refers to the time

2     sheet thing?

3          A     Correct.

4          Q     Okay.  I think we talked about this

5     but I'm going to ask just to make sure.  You

6     allege in a number of places that just because SB

7     may have submitted a birth certificate or a

8     medical certification of anticipated birth, it

9     does rule out fraud because fake ones are

10    available on the internet.

11         A     Yes.

12         Q     You don't --

13               (Simultaneous speaking.)

14         Q     Am I correct that you don't know

15    whether SB in fact submitted a birth certificate

16    in connection with his request for family leave?

17               You don't know if he submitted that

18    documentation?

19         A     I knew recently, well, I received some

20    response from OIG to my full inquiry request that

21    I saw two big black boxes there.  So I don't know

22    what they are.

1               And at some point DCRA labor

2   management, the liaison officer, Tatum told me in

3   one of his emails, like he submitted acceptable

4   medical records.

5          Q     Okay.

6          A     I knew what actually submitted.

7          Q     Right.  So that's the point I'm just

8   trying to make is you don't actually know what he

9   submitted?

10         A     Well Tatum told me.

11         Q     No.  You said that Tatum told you

12  medical records, you don't know what those

13  records were, right?

14         A     (No audible response.)

15         Q     Is that yes?

16         A     I said yes.  I don't know exactly what

17  is submitted.

18         Q     Okay.  So you never saw the

19  documentation that he submitted, right?

20         A     I saw two black boxes.

21         Q     Right.  Two redacted pages?

22         A     Correct.

1        Q      So you don't, you have no evidence

2    that he submitted a fake certificate?

3        A      No.  That is my fairly reasonable

4    belief and inference.

5        Q      I'm just --

6        A      I legally --

7        Q      I'm just trying to get on the same

8    playing field here.  The answer to my question

9    is, no, you don't know whether he submitted a

10    fake certificate or not?

11             MR. SCHLEICHER:  Objection.  Asked and

12    answered.

13             BY MR. BLECHER:

14        Q      Okay.

15        A      I do not have proof.  Like what is

16    submitted.  I don't even know what he submitted

17    until Tatum told me it was a acceptable medical

18    records.  That's my best knowledge, acceptable --

19             (Simultaneous speaking.)

20        Q      When did you get that information that

21    it was an acceptable medical record?  When did

22    you receive that correspondence?

1          A       From Tatum in, let me see.  Likely

2    March.  No, no, no, likely April or May.  After I

3    received the proposed suspension for ten days.

4                 Mr. Tatum provided advice and whatever

5    using for expert knowledge in one of emails.  He

6    referred to, he submitted acceptable medical

7    records.  That was the first time I knew what he

8    submitted.

9          Q       Okay.  So that's after the February

10   5th, 2019 interaction with the Mayor?

11         A       Correct.

12         Q       And that's after the February 6th

13   email, right?

14         A       Right.

15         Q       Right.

16         A       That's after I received the proposal

17   suspension.

18         Q       Got you.  When you, I don't think I

19   asked this, forgive me if I did, when you saw SCB

20   in April of 2016, and your observation was that

21   she didn't appear pregnant to you, do you

22   remember what she was wearing that day?

1          A      No.  No.

2          Q      No.

3          A      I only remember, she didn't look

4    pregnant.  I don't remember what she was wearing,

5    no.

6          Q      Would you agree with me that there are

7    like some articles of clothing that a pregnant

8    women can wear that extenuate her pregnancy

9    versus cover it up?

10         A      I do not know.  Not even the shape of

11   belly, it's also the walk you know.  It's also

12   the walk.  The walk.

13             She walked pretty much in a nimble,

14   walking around anywhere.  She didn't look like

15   have a nine months pregnancy.

16             The walk is so different between a

17   women who has labor due in days and not labor.

18   It's not like the shape or the something about

19   the belly, it's also about the walk.

20         Q      Okay.  Is it your contention that all

21   pregnant women carry their pregnancy the same?

22         A      I think for her, like, it's not a

1    first time mother, almost a, if not more than six

2    feet tall, well, basically I don't believe at

3    that time she was nine months pregnant.  No, I

4    don't.

5              Or even probably more than nine months

6    taking into the factor that was past due or

7    something like that.  Nobody knows how many days

8    have you.  Not like that.

9              And also from the seventh, she offered

10   to tell, okay, I'm pregnant.  Usually a nine and

11   half month pregnant woman don't have to tell

12   others like this, the body tells itself.

13        Q    My wife was pregnant about a year ago

14   so this is kind of personal for me, so I'm just

15   trying to like wrap my head around this because

16   we had friends that were pregnant at the same

17   time.  As you sit here, is it your opinion that

18   every women carries pregnancy the same way, that

19   everybody changes at the same time and that there

20   are no clothes that a women can wear to cover up

21   her pregnancy, is that what I understand you to

22   be saying?

1    think we are done.  David, do you want to

2    instruct the witness as to her right to read and

3    sign.

4              MR. SCHLEICHER:  Yes.  We do want to

5    have her review and sign.

6              MR. BLECHER:  Great.

7              VIDEOGRAPHER:  Okay.  Going off the

8    record at 5:36 p.m.

9              (Whereupon, the taking of deposition

10   in the above-entitled matter was concluded at

11   5:36 p.m., signature having not been waived.)

12

13

14

15

16

17

18

19

20

21

22