Tiffany Crowe - February 11, 2021

```
 1              UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLUMBIA

 3

 4    _____
                                   )
 5    QING LU,                     )
                                   )
 6              Plaintiff,         )
                                   )
 7         vs.                     )    Civil Action No.
                                   )    1:20-cv-00461-APM
 8    DISTRICT OF COLUMBIA, et al. )
                                   )
 9              Defendants.        )
                                   )
10    _____)

11

12

13

14         VIRTUAL DEPOSITION OF TIFFANY CROWE

15            Thursday, February 11, 2021

16                  12:18 p.m.

17

18

19

20

21

22    Reported by:  Cappy Hallock, RPR, CRR
```

Tiffany Crowe - February 11, 2021

1

2                    Virtual Deposition of TIFFANY CROWE,

3       held via WebEx Remote.

4

5

6                    Pursuant to Notice, the Virtual

7       Deposition of TIFFANY CROWE was taken commencing

8       at 12:18 p.m. on Thursday, February 11, 2021

9       before Cappy Hallock, Registered Professional

10      Reporter, Certified Realtime Reporter, and Notary

11      Public in and for the State of Maryland.

12

13

14

15

16

17

18

19

20

21

22

Tiffany Crowe - February 11, 2021

```
 1      APPEARANCES:

 2

 3          ON BEHALF OF PLAINTIFF:

 4              DAVID R. SCHLEICHER, ESQUIRE

 5              Schleicher Law Firm, PLLC

 6              1629 K Street, NW, Suite 300

 7              Washington, D.C. 20006

 8              202-540-9950

 9              davod@gov.law

10

11          ON BEHALF OF DEFENDANTS:

12              MATTHEW BLECHER, ESQUIRE

13              Assistant Attorney General

14              Civil Litigation Division, Section III

15              Office of the Attorney General for the

16              District of Columbia

17              400 6th Street, NW

18              Washington, D.C. 20001

19              202-442-9774 (P)   202-730-0586 (F)

20              matthew.blecher@dc.gov

21                  -and-

22
```

Tiffany Crowe - February 11, 2021

```
1       APPEARANCES:   (Continued)

2

3               ADAM P. DANIEL, ESQUIRE

4               Assistant Attorney General

5               Civil Litigation Division, Section III

6               Office of the Attorney General of the

7               District of Columbia

8               400 6th Street, NW

9               Washington, D.C. 20001

10              202-442-7272 (P)   202-400-2675 (F)

11              adam.daniel@dc.gov

12

13

14

15

16

17

18      Also Present:  Luchi Lu

19                     Qing Lu

20                     Amir Azadniv

21                     Anna Ellison

22      Reporter:  Cappy Hallock, RPR, CRR
```

1                      I N D E X

2          Deposition of TIFFANY CROWE

3                 February 11, 2021

4

5     EXAMINATION BY:                        PAGE

6            Mr. Schleicher                    6

7            Mr. Daniel                       71

8            Mr. Schleicher                   76

9

10                    -o0o-

11

12                 E X H I B I T S

13

14    CROWE                                  PAGE

15    Exhibit 10  6-13-19 Telework Policy     56

16            Transmittal Letter

17

18                    -o0o-

19

20

21

22

Tiffany Crowe - February 11, 2021

```
 1              P R O C E E D I N G S

 2                   - - - - -

 3    WHEREUPON,

 4                   TIFFANY CROWE,

 5            A Witness called for examination, having

 6    been first duly sworn, was examined and testified

 7    as follows:

 8                   EXAMINATION

 9    BY MR. SCHLEICHER:

10        Q     Good morning, Ms. Crowe.  I am David

11    Schleicher, and I will be asking questions on

12    behalf of the plaintiff in this lawsuit, Ms. Lu.

13    If you ask you something that you cannot hear or

14    does not make sense can you let me know that?

15        A     Yes.

16        Q     And to make sure the court reporter

17    can get an accurate transcript, I will try not to

18    interrupt you and if you can do the same for me,

19    that will help.  Is that all right?

20        A     That's fine.

21        Q     Have you had your deposition taken

22    before?
```

1    expect it to go more than half an hour.

2              THE WITNESS:  Okay.

3              MR. DANIEL:  We can reconvene this

4    deposition at 4?

5              MR. SCHLEICHER:  Yes.  It that all

6    right with everyone?  Is it all right with the

7    court reporter?

8              THE REPORTER:  That's fine.

9              THE WITNESS:  That's fine.

10             MR. SCHLEICHER:  Okay.

11             We will talk to you at 4 then if you

12   will just log back on at that time.

13             All right, thanks.

14             (Deposition suspended at 1:26 p.m.)

15             (On the record at 4:19 p.m.)

16             MR. DANIEL:  Ms. Crowe you are still

17   under oath from before.

18             Mr. Schleicher, back to you.

19                EXAMINATION (Continued)

20   BY MR. SCHLEICHER:

21        Q    I'm going to ask you some questions

22   now about Ms. Lu and the telework program.  At the

Tiffany Crowe - February 11, 2021

1    time you were the chief administrative officer

2    what was your role in the telework program?

3         A    Well, I helped draft the policy.  So

4    when I started there was a policy that had been

5    sort of in the works.  So I helped draft the

6    policy and get it reviewed by legal, reviewed by

7    DCHR, compared it to other agency telework

8    policies, disseminated it and I managed HR which

9    had, like, the telework program as one of its

10   functions.

11        Q    Okay, and how often would you get in

12   decisionmaking as to particular employees being

13   allowed to participate or being approved to

14   participate or not?

15        A    Well, since this was the first time

16   that DCRA had an official telework policy there

17   were a lot of questions about the policy itself.

18   A lot of managers sought guidance on their

19   authority to approve, sort of the parameters of

20   the policy, would ask my advice and get feedback

21   on it.  So fairly common to give feedback and

22   advice.

Tiffany Crowe - February 11, 2021

1      Q      Okay.

2      A      To managers.

3      Q      And about when did that, was that,

4   like, June of 2019 that it started?

5      A      Yes, that sounds right.  June, around

6   that period.  I think we issued the policy in June

7   or July but probably around June.

8      Q      Okay, so this --

9      A      There were several drafts.  Let me

10  pull it up.  I think it was June that we issued

11  the policy.  It's one of the exhibits, right?

12     Q      No, actually it's not.

13     A      Okay.  I can --

14     Q      Do we need to send it to the court

15  reporter and have it brought up?

16     A      That's okay.  I can continue.

17     Q      It's for our record purposes here.

18            MR. SCHLEICHER:  I will take her word.

19            MR. DANIEL:  Okay.

20            MR. SCHLEICHER:  If she tells me she

21  is reading a date off the policy, I trust her.

22            THE WITNESS:  And Adam, like, if you

Tiffany Crowe - February 11, 2021

Page 55

1    decide that you want it I'm happy to wait or find

2    it or whatever.

3              MR. DANIEL:  I will send it to you

4    just so we know exactly what we are talking about

5    and then I will send it to you as well, David.  We

6    will send it in as our Exhibit 1.

7              THE WITNESS:  I know the parameters of

8    the policy pretty well.  The date that it was

9    signed by the director ...

10             MR. DANIEL:  This will be Defense

11   Exhibit 1.

12             David, should this go in as your

13   Exhibit 10?

14             MR. SCHLEICHER:  That's fine.  Either

15   way.

16             MR. DANIEL:  Mr. Schleicher, if you

17   can confirm that that is what you are referring to

18   and want, I will send it to her.

19             MR. SCHLEICHER:  I don't see it yet.

20   You're sending that another way?  You're sending

21   it by e-mail?

22             MR. DANIEL:  Yes.

Tiffany Crowe - February 11, 2021

Page 56

1          THE REPORTER:  Please let me know if

2    you want to go off the record.

3          MR. SCHLEICHER:  I'm sorry, I thought

4    we were.

5          Yes, off the record.

6          MR. DANIEL:  It's on me.  I apologize.

7          (Discussion off the record.)

8          (Plaintiff's Deposition Exhibit No. 10

9    was marked for identification.)

10          MR. SCHLEICHER:  Let's go back on the

11   record then.

12   BY MR. SCHLEICHER:

13       Q    Now that you have had a chance to look

14   back at the telework policy, what was your

15   response about whether it was in June that it was

16   approved?

17       A    Yes, it was in June.

18       Q    So June of 2019, this would have been

19   a few months after the April 22nd, 2019 letter

20   that we looked at earlier?

21       A    Yes.

22       Q    And what is your understanding about

Tiffany Crowe - February 11, 2021

1    when Ms. Lu first was allowed to telework?

2         A    I don't know when she was first

3    allowed to telework.

4         Q    Let me ask it this way then.  Do you

5    have any reason to dispute that she was not

6    allowed to telework until the staff generally went

7    out related to Covid issues and began teleworking?

8         A    I don't have any reason to dispute

9    that, no.

10        Q    And is it correct that Ms. Lu

11   contacted you on multiple occasions to express

12   concern that she was not being allowed to

13   telework?

14        A    She contacted me about the status of

15   her telework application several times, yes.

16        Q    Okay, and what steps did you take to

17   ensure that she was not improperly being denied

18   the ability to telework?

19        A    I didn't take any steps to see that

20   she was improperly -- not improperly being denied.

21   My assumption is never that someone is being

22   improperly denied unless there has been that

Tiffany Crowe - February 11, 2021

Page 58

1    accusation, and she never accused her supervisors

2    or the Agency until this matter, as far as I know,

3    of improperly denying her, but she did want to

4    know why she had not been approved.

5              And so while I did advise managers

6    about the policy, typically I was not involved at

7    this level in terms of the staff because no

8    managers really needed me to do that.  And no

9    other staff members contacted me directly like

10   Ms. Lu e-mailed herself several times and, you

11   know, I see my role as someone who is there to

12   help facilitate.  I knew the policy.  I knew sort

13   of, like, the answers to the questions that the

14   managers were asking, and was in a position to

15   actually help Ms. Lu so I tried to do that.

16        Q    And did you have an audit conducted by

17   HR of people who were teleworking as part of

18   trying to figure out what was going on with

19   Ms. Lu's situation?

20        A    I believe in one of Ms. Lu's e-mails

21   she said she knew of several people similarly

22   situated who were already teleworking and I said

Tiffany Crowe - February 11, 2021

Page 59

1    that was news to me.  Now, these applications were

2    approved at the manager level unless there was,

3    like, a formal -- a formal appeal or some reason

4    it had been escalated to me, so all of the

5    approvals were done at the managerial level.  So

6    when she said there were several people similarly

7    situated to her I asked who those people were.  I

8    didn't get any names so that's when I asked the HR

9    manager to let me know if there were people who

10   were teleworking who based on the policy should

11   not have been and there were no cases of that.

12        Q    And is it correct that Ms. Lu had been

13   approved by the supervisory chain to telework?

14        A    I don't know about that.  I know based

15   on Ms. Lu's e-mails and her admission she said

16   that she had submitted it to her supervisor and

17   her supervisor said that he had given it to HR.

18   So I took her at her word that her supervisor said

19   it was fine for her to telework but they thought

20   there were some questions so they escalated it to

21   me.

22        Q    And so what did you understand to be,

1    ultimately to be the reason that she was not being

2    allowed to telework?  Was there something she was

3    missing or --

4         A    Yes.  So a key element of the policy,

5    so in the first, like, introductory paragraphs it

6    says, "Where technologically possible," and the

7    reason that was actually put in the policy was

8    because we were working to get VPN access for as

9    many of the staff as we could.  At the time, this

10   was preCovid, so OCTO was not just like giving out

11   VPN willy-nilly at the time.  There was some staff

12   who had them, some staff who didn't.  Plenty of

13   staff could not telework so customer service

14   staff, anyone front-facing the inspectors at the

15   time were not teleworking, they were field based

16   but they still had to come in to their desk to do

17   desk work.

18         So we had whole categories of

19   employees who based on the technology and what

20   their job required were not eligible for telework.

21   So for Ms. Lu, I believe she was a plan reviewer,

22   and pardon me if the title is not exactly correct,

Tiffany Crowe - February 11, 2021

```
1       but part of what plan review requires is working

2       in a system called ProjectDox which is web-based

3       and a system called ACCELA which is web-based but

4       requires VPN.  So Ms. Lu, if I remember correctly,

5       did not have a VPN at the time which is

6       required -- was required to get into ACCELA.

7            Q     And VPN, you mean a virtual private

8       network?

9            A     Yes.

10           Q     And is it correct that that is not --

11      that's not a piece of equipment but that's a

12      software or an app that routes internet traffic so

13      as to better protect its contents?

14           A     Correct.

15           Q     So what did it take for someone to be

16      authorized to use the VPN?

17           A     You had to be provisioned by -- with

18      an account so you put in a request to the help

19      desk and then to the extent that we had licenses

20      or the proper number of accounts they would issue

21      them as they became available.

22           Q     And were you able to find out why she
```

Tiffany Crowe - February 11, 2021

Page 62

1    had not been authorized to use a VPN?

2         A      No, and as a matter of fact, most of

3    the people on her team didn't have VPN at the

4    time.  So most of them were not teleworking, as I

5    understood it to be the case, and that's why her

6    supervisors likely escalated it to me or told her

7    to contact me, because they weren't -- they didn't

8    feel like they were equipped to continue managing

9    it, I guess, so ...

10        Q      And were the people who went out for

11   telework due to Covid issues, do they all have

12   VPNs?

13        A      So we had to set up -- so the answer

14   is no, we didn't, and it actually was kind of a

15   challenge.  So the people who had VPNs were --

16   because it was an emergency situation and we

17   didn't really have much of a choice based on sort

18   of the decisions that were made about the public

19   health emergency.  We worked with OCTO to -- our

20   IT team -- when I say we I mean the agency --

21   worked with OCTO to create web-based network due

22   to the emergency so that people could log in using

1      that while we waited on the VPNs to be

2      provisioned.

3              So this was something that we had

4      actually been working since launching the telework

5      policy, to get everybody VPN.  It still hasn't

6      been done.  We weren't really in control of that.

7      We had to make the request of OCTO, but with Covid

8      we had to find an alternative so people could do

9      work in the meantime.  You know, just the regular

10     administration of the telework policy was not an

11     emergency in which we would create a whole subweb

12     virtual network since it is a privilege and not a

13     right.

14         Q    Was there anything having to do with

15     her having recently been suspended that kept her

16     from being approved for telework?

17         A    No.

18         Q    She had mentioned two structural

19     engineers, I'm going to spell their names.  First

20     one, B-i-h-o-n, last name B-e --

21         A    I'm sorry, would you repeat that?

22         Q    Sure.

Tiffany Crowe - February 11, 2021

Page 64

1          A      Is there an exhibit with their names

2     in it?

3          Q      No.

4          A      Is there an e-mail or anything?

5          Q      It's not in our exhibits.  I will

6     spell them.  It's Bihon Debasse and Sitra Ibrahim.

7     Okay, the spelling is B-i-h-o-n, last name

8     D-e-b-a-s-s-e.  And the second person is

9     S-i-t-r-a, and last name I-b-r-a-h-i-m.

10              These are two structural engineers

11    that Ms. Lu has identified as not having a VPN but

12    still being allowed to telework for an extended

13    period prior to the Covid issues.  Did the audit

14    that you had conducted identify whether or not her

15    claim in that regard is true?

16         A      No.  I didn't hear that so ... and

17    that's why I was asking if there was an exhibit,

18    like if these names were provided to me by Ms. Lu

19    or another person.  That way I could check, but I

20    did not receive those names from HR as people who

21    likely were violating the telework policy nor did

22    their manager escalate any sort of question or

Tiffany Crowe - February 11, 2021

1    issue with regard to their telework to me, so ...

2         Q    Okay, and did you -- did you say that

3    you did ask Ms. Lu for names of other people who

4    were similarly situated but were allowed to

5    telework?

6         A    Yes.  When she said that she knew lots

7    of people who were teleworking and she didn't

8    understand why she wasn't able to I asked her,

9    like, well, who.  Can you tell me who.  While

10   simultaneously trying to get her VPN because it

11   was a policy and not too many people were eligible

12   for telework because of the nature of their job,

13   but you could certainly do plan review if you had

14   a VPN remotely.

15        So the same day I had a conversation

16   with her I reached out to the person who at the

17   time was the help desk manager, asked about the

18   status of our VPN accounts, how many we had,

19   whether or not we had any left.  He informed me

20   that they didn't but he would let me know when

21   they got some, and when we did have additional

22   VPNs I alerted HR because Ms. Lu, I believe, had

Tiffany Crowe - February 11, 2021

1     continued to stay in contact with HR and they kept

2     me apprised.  And so as soon as they were

3     available I wanted to make sure that she received

4     one, so ...

5          Q     And when was that?

6          A     I don't know.  I know we met in

7     October, I think -- September, October.  It was

8     sometime after we met to talk about her issues.

9          Q     In 2019?

10         A     I think -- at this point I can't

11    believe that it's 2021 and we have been out of the

12    office for almost a year at this point.  So, yes,

13    it was 2019.

14         Q     Okay.

15               So it's your understanding that she

16    was eligible to have a VPN assigned and sometime

17    around the time or after she met with you, like

18    around October of 2019?

19         A     Yes.  The eligibility question was a

20    matter of technology.  Like, did you have what you

21    needed to be able to do your job fully from home.

22    And the reason that we left that as a managerial

Tiffany Crowe - February 11, 2021

1    decision with these parameters around was if

2    you're somebody who works in ACCELA you need a

3    VPN, and because a manager knows what kind of work

4    each person is assigned and the best way to make

5    sure that they are able to do that work.

6         Q    And would you be surprised if, even

7    though you had identified the next available VPN

8    to be assigned to her, that she still was not

9    allowed to telework until the Covid pandemic?

10        A    I don't know that I would be

11   surprised.  I think it would depend on sort of the

12   nature of her work at the time, whether or not her

13   supervisor had had successful experiences with

14   telework and that sort of situation with the

15   nature of their work.

16             I know when we went to telework a lot

17   of the plan reviewers were complaining because the

18   screens were small and at the office they have

19   very large screens that they use that require, you

20   know, several square feet of space.  So, you know,

21   that was something that was deemed to be a

22   requirement of the job, let's say, at the time.

Tiffany Crowe - February 11, 2021

Page 68

1          I wouldn't say that I was surprised.

2    I never heard that but I wouldn't necessarily be

3    surprised.

4          Q    If she was approved twice at the

5    supervisory level would you be surprised if she

6    still was not able to until the pandemic hit?

7          A    If she was approved twice at the

8    supervisory level after speaking with me?

9          Q    Prior to speaking with you.

10         A    I guess I don't understand the

11   question.  So at the supervisory level, part of

12   the reason that I can't speak to whether or not it

13   was approved at the supervisory level is that they

14   felt the need to escalate to me where individual

15   applications typically were not escalated to me.

16   If the supervisor approved it then the person is

17   teleworked.  Does that make sense?  So for the

18   supervisor to advise someone to contact me, my

19   assumption was that there was an issue there.

20         Q    Okay.

21         A    And so I treated it as such, so ...

22         Q    My understanding is that Sydney Lester

Tiffany Crowe - February 11, 2021

1    had approved it in August and Christopher Bailey

2    in November.  Is it possible that Ms. Lu initiated

3    on her own, contacted you rather than the

4    supervisor advising her to contact you?

5         A    I don't --

6              THE WITNESS:  Sorry, go ahead.

7              MR. DANIEL:  Calls for speculation.

8              But go ahead and answer.

9         A    I guess it's possible.  I assumed --

10   in her e-mail she said my supervisor said that

11   they sent my application to you.  And so I -- it

12   does call for a lot of speculation about how that

13   conversation went or how Ms. Lu came to believe

14   that I was the person to contact about this.

15        Q    Okay.

16             And are you the one that indicated

17   that you needed to have a meeting in person with

18   Ms. Lu to figure out what was going on?

19        A    Yes.  There were a lot of e-mails,

20   like I said.  I was a little confused about why I

21   was being involved in this, if it was already

22   approved, you know.  And so it was only through

Tiffany Crowe - February 11, 2021

1     these conversations that I came to understand that

2     she didn't actually have a VPN, which her

3     supervisor said she needed to do her work.

4              So they, knowing the policy and

5     knowing that's what is required for her job and

6     knowing she didn't have a VPN, I was just a little

7     confused about the situation and wanted to see how

8     I could help.  So I told Ms. Lu rather than going

9     back and forth with e-mail that we should have a

10    conversation.

11       Q    Okay, and what would have been

12    Mr. Lester's role in dealing with telework as to

13    Ms. Lu?

14       A    Was he her supervisor at the time?

15       Q    Well, he has indicated that he has

16    been her supervisor at least at some point.

17       A    I guess I would have to know whether

18    or not he was her supervisor to know what his role

19    is.

20       Q    Okay.

21            MR. SCHLEICHER:  That's all that we

22    have.  Mr. Daniel, do you have any questions?

Tiffany Crowe - February 11, 2021

Page 71

1          MR. DANIEL:  I have just a couple

2     quick follow-ups on this and then maybe go back to

3     something from earlier this afternoon.

4                    EXAMINATION

5     BY MR. DANIEL:

6          Q     Ms. Crowe, you testified that you took

7     actions to help Ms. Lu get a VPN when it was

8     escalated to you.  Was it common for somebody at

9     your level to get involved in acquiring a VPN for

10    an employee at Ms. Lu's level?

11         A     Not an individual employee, no.  Not

12    typical and I can't think of another case where I

13    did.

14         Q     Okay.  And when you heard from her

15    what actions did you take to get her a VPN?

16         A     So after I understood the situation to

17    be where she needed a VPN to work in ACCELA to do

18    her work, I contacted Bill Hager who at the time

19    was the help desk manager in managing our

20    relationship with OCTO to get the VPNs, asked him

21    if we had any licenses available, asked him how

22    long before we got some and asked him to let me

Tiffany Crowe - February 11, 2021

Page 72

```
1     know when we did.

2          Q     And who is OCTO?

3          A     The Office of the Chief Technology

4     Officer, that's the District's centralized

5     technology to the Agency.

6          Q     So you had to go outside of DCRA to

7     get her a VPN?

8          A     Yes, through Bill and the IT team.

9          Q     But it was unusual for somebody -- at

10    the time that you were the chief -- the CAO?

11         A     Yes, the chief administrative officer.

12    And so if you think about the program, as the

13    employee submits a request, manager approves, if

14    there is an issue, the division had reviews.  If

15    there is any kind of question HR would typically

16    be a place where they could ask the questions.

17    And then HR, there was a HR manager and a manager

18    over that and then me.  So it would not have been

19    typical the way that this played out.

20         Q     Did anybody in that chain tell you

21    that you should not get her a VPN?

22         A     No.
```

Tiffany Crowe - February 11, 2021

Page 73

1        Q    So you typically -- where you describe

2   trying to get her a VPN is trying to expedite the

3   process for her?

4        A    I definitely was trying to expedite.

5   If that was the only barrier, then yes.

6             MR. SCHLEICHER:  Objection, leading.

7             You can answer.  Sorry.

8        A    As I understood it, that was the only

9   barrier to Ms. Lu being able to telework.  So it

10  seemed like if this was what we were trying to do

11  for the employees, at that point not very many

12  employees were teleworking.  So we launched this

13  policy and there were a lot of restrictions for

14  teleworking.  So for someone who met all of the

15  other criteria, to that extent I tried to see what

16  we could do, especially because she had contacted

17  me, so ...

18       Q    If we can go back, do you have the

19  exhibits from earlier?

20       A    The policy?

21       Q    No.  The exhibits that we looked at

22  this morning.

Tiffany Crowe - February 11, 2021

Page 74

```
 1        A     Yes.

 2        Q     If you can pull up -- sorry, still ...

 3    plaintiff's designation here.

 4              So if you can go back to, this is

 5    looking at the deposition exhibit you were looking

 6    at earlier, Exhibit 4.  It's on Page 31.

 7        A     Okay.

 8        Q     It's also up on the screen here as

 9    well.

10        A     Okay.  I see it.

11        Q     And so you recognize this as an e-mail

12    from yourself?

13        A     I do.

14        Q     Can you see the date on it?

15        A     April 30th, 2019.

16        Q     And what is the subject of this

17    e-mail, the title?

18        A     Matter Closed.

19        Q     Okay.

20              Can you read just to yourself the

21    first sentence after "Ms. Lu"?

22        A     Yes.
```

Tiffany Crowe - February 11, 2021

Page 82

1    UNITED STATES OF AMERICA )

2    STATE OF MARYLAND       )

3

4              I, CAPPY HALLOCK, the reporter before

5    whom the foregoing deposition was taken, do hereby

6    certify that the witness whose testimony appears

7    in the foregoing deposition was sworn by me; that

8    said deposition is a true record of the testimony

9    given by said witness.

10             I further certify that I am neither

11   counsel for, related to, nor employed by any of

12   the parties to the action in which this deposition

13   was taken; and further that I am not a relative or

14   employee of any attorney or counsel employed by

15   the parties hereto, or financially or otherwise

16   interested in the outcome of this action.

17

18                              _____

19

20                              Cappy Hallock, RPR, CRR

21

22   My Commission expires January 19, 2025