## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

―――――――――――――――――――――――――

|  |  |
|---|---|
| **QING LU,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | )     **Case No. 20-cv-00461 (APM)** |
| **DISTRICT OF COLUMBIA***, et al.,* | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

―――――――――――――――――――――――――

### <u>MEMORANDUM OPINION</u>

### I.

Plaintiff Qing Lu is an employee in the District of Columbia Department of Consumer and Regulatory Affairs ("DCRA"). Beginning in June 2016 and over the next three years, Plaintiff repeatedly accused her coworker, S.B., of fraudulently claiming eight weeks of paid paternity leave based on his wife's "fake" pregnancy. She first reported her belief to the D.C. Office of the Inspector General ("OIG"). That same month, Plaintiff accused S.B. of ethics violations in issuing permits to his wife's company, despite admitting to not having proof. A few months later, OIG referred Plaintiff's fraudulent-leave allegations to DCRA, and in February 2017, DCRA found the allegations were unsubstantiated. Despite the investigation's findings, Plaintiff continued to contact OIG and DCRA with "new evidence." In May 2017, OIG informed Plaintiff that the investigation was closed and "no further action was warranted." A few days later, Plaintiff took her complaints to the Board of Ethics and Government Accountability ("BEGA"). Plaintiff got the same response from BEGA.

After not receiving the response she wanted from DCRA, OIG, or BEGA, Plaintiff wrote to the Executive Office of the Mayor, three D.C. Councilmembers, and various media outlets,

including CNN, WTOP, NBC Universal, *The Washington Post* and *The City Paper*.  She continued to allege that S.B. submitted a fake birth certificate and that his wife wore a "fake pregnancy belly" so that he could secure paternity leave.  Plaintiff did so despite having no evidence to support her claims, and in the face of investigations by the DCRA, OIG, and BEGA finding no cause for disciplinary action against S.B.

S.B. complained to his supervisors about Plaintiff's harassing conduct in November 2018, accusing her of levying personal attacks over 10 years, including the fake pregnancy allegations. After S.B.'s complaint, DCRA assigned Special Investigator Tyrone Lawson to investigate S.B.'s claims.  In February 2019, in the midst of Lawson's investigation, Plaintiff repeated her allegations to D.C. Mayor Muriel Bowser *in person* and via email.

Lawson conducted a three-month-long investigation, resulting in a 150-page report.  The investigation ("Lawson Report") concluded that Plaintiff "routinely misrepresented and falsified material facts" in her official complaints, was "insubordinate on numerous occasions," "willfully reported false or misleading information to her supervisors on several occasions," and made false statements during interviews in connection with the investigation.  Defs.' Mot. to Dismiss & for Summ. J., ECF No. 79 [hereinafter Defs.' Mot.], Ex. 1, ECF No. 79-1 [hereinafter "Lawson Report"], at 2.  Based on the Lawson Report, Defendant Sydney Lester (S.B. and Plaintiff's immediate supervisor) recommended a 10-day suspension of Plaintiff.  Lester's supervisor, Defendant Clarence Whitescarver, agreed with the recommendation to suspend Plaintiff but reduced the suspension to eight days.  Plaintiff's suspension was premised on the false and misleading statements she made to the Mayor and her "assertion that the investigatory process [was] flawed," which had "an unacceptable impact toward degrading public confidence in the

conduct of the District government[] and its processes." Defs.' Mot., Ex. 4, ECF No. 79-4 [hereinafter Final Suspension Notice], at 3.  After receiving the suspension, Plaintiff filed this suit.

Plaintiff brings claims under the District of Columbia Whistleblower Protection Act, D.C. Code § 1-615.51, against the District of Columbia ("the District") and the supervisors responsible for imposing the suspension, Sydney Lester and Clarence Whitescarver (together, "Defendants").  She also asserts violations of the First Amendment under 42 U.S.C. § 1983 against Lester and Whitescarver.  Before the court are Defendants' motion for summary judgment and Plaintiff's partial motion for summary judgment.  Defs.' Mot.; Pl.'s Mot. for Partial Summ. J., ECF No. 77 [hereinafter Pl.'s Mot.].

As discussed below, Plaintiff has failed to bring forward sufficient evidence to support her claims.  Accordingly, Defendants' motion for summary judgment is granted and Plaintiff's partial motion for summary judgment is denied.

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A material fact is one that is capable of affecting the outcome of the litigation, and a genuine dispute exists when "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In assessing a motion for summary judgment, the court looks at the evidence in the light most favorable to the nonmoving party and draws all justifiable inferences in that party's favor.  *Id.* at 255.

"To defeat a motion for summary judgment, the non-moving party must offer more than mere unsupported allegations or denials."  *Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 17 (D.D.C. 2011).  Its opposition must be "supported by affidavits, declarations, or other competent

evidence, setting forth specific facts showing that there is a genuine issue for trial." *Elzeneiny v. District of Columbia*, 125 F. Supp. 3d 18, 28 (D.D.C. 2015).   Summary judgment, then, is appropriate when the nonmoving party fails to offer "evidence on which the jury could reasonably find for the [nonmovant]." *Anderson*, 477 U.S. at 252.

### III.

### A.

The court starts with Plaintiff's § 1983 claims.   Pl.'s Original Compl., ECF No. 1 [hereinafter Compl.], ¶¶ 11, 13.   Plaintiff alleges that Defendants[1] violated her First Amendment rights when they suspended her for reporting "her belief that S.B. committed benefit[s] fraud." Compl. ¶ 18.2.   Defendants respond that Plaintiff's speech is about a "personnel workplace dispute," and not a matter of public concern, and therefore does not enjoy constitutional protection; they also argue that the First Amendment does not protect "false statements about verifiable facts." Defs.' Mot. at 52–53.   Even if the speech is protected, Defendants continue, they had "adequate justification to suspend [Plaintiff] for eight (or ten) days based on the District's needs as an employer." *Id.* at 56 (cleaned up).

It is well established "that a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers*, 461 U.S. 138, 142 (1983).   However, "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom" because "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006).   The Supreme Court has made clear

---

[1] With respect to the court's discussion of Plaintiff's § 1983 claims, "Defendants" refers only to Lester and Whitescarver.   Plaintiff has not brought a § 1983 claim against the District.

that the government, as an employer, has broader powers than the government has as a sovereign. *Waters v. Churchill*, 511 U.S. 661, 671–72 (1994). However, because "a citizen who works for the government is nonetheless a citizen," the Court has held that if "employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Garcetti*, 547 U.S. at 419.

"As a general matter, *Pickering* [*v. Board of Education*, 391 U.S. 563 (1968)] and its progeny continue to be the meter by which the First Amendment rights of public employees are measured." *Baumann v. District of Columbia*, 795 F.3d 209, 215 (D.C. Cir. 2015) (internal quotations omitted). The D.C. Circuit uses a "four-element test to determine whether a public employee has established a claim of retaliation in violation of his First Amendment rights." *LeFande v. District of Columbia* (*LeFande II*), 841 F.3d 485, 493 (D.C. Cir. 2016).

To survive summary judgment, Plaintiff must proffer sufficient evidence to show that: "(1) [she spoke] as a citizen on a matter of public concern; (2) [her] interest in speaking on matters of public concern . . . outweigh[s] the government's interest in promoting efficiency; (3) [her] protected speech [was] a substantial or motivating factor in prompting the retaliation; and (4) the government must be unable to show that it would have reached the same decision absent the protected speech." *Id.* at 494. "The first two elements involve questions of law" for the court to resolve, and the "second two implicate questions of fact." *Id.* Because the court finds in Defendants' favor as a matter of law on the first two elements, it does not reach the third and fourth.

### 1.

*Private Citizen Speaking on a Matter of Public Concern.* "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a

given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48.  The overall inquiry is whether the "objective of the speech—as determined by content, form, and context— was to bring wrongdoing to light or to further some purely private interest." *Kubiak v. City of Chicago*, 810 F.3d 476, 483 (7th Cir. 2016) (internal quotation marks omitted).

*Content.*  Content is "the greatest single factor in the *Connick* inquiry." *Desrochers v. City of San Bernardino*, 572 F.3d 703, 710 (9th Cir. 2009) (internal quotation marks omitted).  Speech is not of public concern when it "deals with individual personnel disputes and grievances and . . . the information would be of no relevance to the public's evaluation of the performance of governmental agencies." *LeFande v. District of Columbia* (*LeFande I*), 613 F.3d 1155, 1159 (D.C. Cir. 2010) (internal quotation marks omitted).  "On the other hand, speech that concerns issues about which information is needed or appropriate to enable members of society to make informed decisions about the operation of their government merits the highest degree of first amendment protection."  *Id.* (internal quotation marks omitted).  The "public interest is near its zenith when ensuring . . . that public funds are not purloined or wasted." *Handy-Clay v. City of Memphis*, 695 F.3d 531, 543 (6th Cir. 2012) (internal quotation marks omitted).

Plaintiff argues that her speech regarding "an employee's fraudulently obtaining payment from the District" is a matter of public concern because it brings "official misconduct to light." Pl.'s Opp'n to Defs.' Mot., ECF No. 87 [hereinafter Pl.'s Opp'n], at 26–27 (internal quotation marks omitted).  According to Plaintiff, the fact that multiple District agencies investigated S.B.'s paternity leave application and found nothing wrong "does not make [her] disclosures any less of [a] public interest."  *Id.* at 28.  Defendants, for their part, argue that "the First Amendment does not protect statements that express or imply a verifiably false fact," and that Plaintiff was "not speaking on a matter of public concern because she was making demonstrably false and misleading

statements about facts that had been repeatedly verified for her" by the DCRA, OIG, and BEGA. Defs.' Mot. at 52, 54 (internal quotation marks omitted).

Defendants' argument that Plaintiff's speech does not touch on a matter of public concern because it is demonstrably false or misleading is unavailing. Other than intentionally or recklessly false statements, "truthfulness . . . is not relevant in determining whether the speech involves a matter of public concern." *Westmoreland v. Sutherland*, 662 F.3d 714, 720 (6th Cir. 2011). Defendants do not argue Plaintiff's statements were intentionally or recklessly false. Because Plaintiff's speech concerned whether "public funds are . . . purloined or wasted," *Handy-Clay*, 695 F.3d 543, and is at least nominally related to the "public's evaluation of the performance of governmental agencies," *LeFande I,* 613 F.3d at 1159, the content factor weighs in Plaintiff's favor.

*Form.* The form factor considers to whom the speech was communicated. A "limited audience weighs against a claim of protected speech," *Desrochers*, 572 F.3d at 714 (cleaned up), and speech is more likely to be considered public if communicated to the press, as opposed to an internal-employee-grievance process. *See, e.g.*, *Kubiak*, 810 F.3d at 483 ("The fact that [Plaintiff's] complaints about [her coworker] were directed up the chain of command suggests that [Plaintiff's] speech did not address a matter of public concern."). Plaintiff's complaints were largely "directed up the chain of command," but she also contacted local politicians and news outlets to share her concern about S.B.'s alleged abuse of parental leave and the resulting misuse of public funds. Defs.' Mot. at 2–3, 41. The form factor of the *Connick* inquiry thus weighs in Plaintiff's favor. *Cf. Desrochers*, 572 F.3d at 718 (finding no public concern where the "subject matter of the speech before us at best relates only marginally to issues of public concern, the

7

grievances were motivated by a personal dispute, and the [plaintiffs'] concerns were never relayed to the press or the public" (internal quotation marks omitted)).

*Context.*  Regarding the context of Plaintiff's speech, the inquiry is whether Plaintiff spoke to "bring to light actual or potential wrongdoing" or whether the speech is more "accurately characterized as an employee grievance."  *Connick*, 461 U.S. at 148, 154.  Despite Plaintiff's insistence that her speech was directed at bringing S.B.'s wrongdoing to light, the record tells a different story.  There is substantial evidence that leads the court to find that Plaintiff's actions were rooted more in a long-standing personal grievance than in bringing malfeasance to light.  This finding requires an extended discussion of the facts.

Plaintiff's accusations began as early as June 2016, when she wrote to OIG that she suspected that S.B.'s "baby story [was] a fiction" because his wife had "no . . . noticeable pregnancy on her body" the month before S.B. took paternity leave.[2]  Lawson Report at 65, 68.[3] Plaintiff expressed her belief that S.B. was facing "a serious offense [which] may lead to prison time" (speeding and driving with a suspended license) that was scheduled for trial during his paternity leave, and that this timing somehow was "consisten[t] with [her] speculation that the baby setup could be a fraud."  *Id*. at 66–68.  In other words, Plaintiff speculated that S.B. made up his wife's pregnancy and the need for paternity leave in order to serve jail time without tipping off his employer.

In August 2016, Plaintiff emailed DCRA accusing S.B. of improperly assigning permits to his wife's company, noting "the possibility of conflict of interest and the extreme self-serving intentions."  Defs.' Mot, Ex. 5, ECF No. 79-5 [hereinafter Defs.' Ex. 5], at 9.  That month, Lester

---

[2] Plaintiff alleged S.B.'s wife faked two pregnancies, one early in 2015 and one in May 2016.  Lawson Report at 58.
[3] Quotes from the Lawson Report reference direct statements made by Plaintiff.  The court uses ECF pagination for all Exhibits.

emailed Plaintiff, noting that "for several years . . . you have made several allegation[s] about the conduct of" S.B. that have become "more serious as time progressed," and the recent ethics-permitting allegations had "legal implications that cannot be ignored."  Lawson Report at 60. Lester informed Plaintiff that there was "no evidence to conclude any wrong doing [sic]," and asked her to present "proof that backs up [her] allegations."  *Id.*  Plaintiff agreed to provide evidence, but when the two met Plaintiff instead demanded Lester provide evidence, asking "what information have you provided to draw [the] conclusion that there was no . . . wrong doing [sic]?" *Id.* at 58.  In September 2016, Plaintiff emailed two other DCRA employees complaining about Lester's response to her ethics complaint, lamenting that "even [if] I [was] not able to present any proof immediately – due to my position in the organization and limited access to certain information – that still does not mean the problem was not in existence," and that Lester "should have been the one to search for and locate the problem."  *Id.*  In December 2016, S.B. was fined $1,000 for the seemingly less serious violation of "[taking] official action on permit applications submitted by his spouse, on behalf [of] her company."  Pl.'s Mot., Pl.'s App'x, ECF No. 77-2, at 23–26.

Meanwhile, Plaintiff continued to accuse S.B. of benefits fraud.  In October 2016, OIG referred the fake-pregnancy complaint to DCRA to investigate.  Lawson Report at 56.  In February 2017, Plaintiff emailed DCRA asking for an update on whether her allegations had been "substantiated, unsubstantiated, [or found] inconclusive."  *Id.* at 62.  DCRA notified Plaintiff that month that the investigation had "come to an end," and for a moment Plaintiff seemed to accept this conclusion, writing that "there will [be] no more communications from me on this matter." *Id.* at 64.  However, soon after, Plaintiff emailed DCRA with new evidence that she hoped would "provide[] some new perspective."  *Id.* at 74.  It did not.  *Id.* ("This has not provided any new

perspective[;] the agency has confirmed all required documentation needed for an approval [of parental leave.]").

Undeterred, the next month, March 2017, Plaintiff sent a four-page email with six attachments to OIG , demanding to see S.B.'s child's birth certificate.  Defs.' Mot, Ex. 7, ECF No. 79-7 [hereinafter Defs.' Ex. 7], at 2, 4.  On May 10, 2017, OIG informed Plaintiff that they "conducted an independent analysis of the documentation provided by [DCRA] and determined that no further action by the OIG is warranted."  *Id.* at 15.

Plaintiff did not accept that answer.  Six days later she filed a complaint with BEGA, alleging that S.B. "abused his Paid Family Leave by purchasing, or forging, a document to deceive the government about the birth of his daughter."  Lawson Report at 83.  In July, BEGA informed Plaintiff that "[a]fter an interview with [S.B.] and a review of relevant documents obtained by BEGA investigators, there [was] insufficient evidence to support a reasonable belief that a violation of the Code of Conduct occurred."  *Id.*  In September, DCRA Human Resources confirmed that DCRA, OIG, and BEGA investigated Plaintiff's concerns and "they could not find any cause for the agency to take disciplinary action against [S.B.]," and told Plaintiff to "consider this the final response on behalf of the agency as the matter has been investigated and deemed closed."  *Id.* at 90.

At this point, Plaintiff had been informed by *three* government agencies that, after an investigation and review of records, her allegations were unsubstantiated.  But that did not dissuade her.  Plaintiff wrote to the Executive Office of the Mayor ("EOM") in September 2017.  *Id.* at 95. Shortly after, EOM responded that the matter had been investigated and "no further action [would be] taken."  *Id.* at 98.  Still, Plaintiff continued to raise the same allegations to DCRA, OIG, and BEGA over the next two years.  *See, e.g.*, *id.* at 113–118.  During this time, she also contacted the

media about S.B.'s alleged fake pregnancy scheme.  *See, e.g.*, *id.* at 119–20, 128–29.  In October 2018, Plaintiff took her allegations to the D.C. Council.  *See id.* at 135–144; Defs.' Mot., Ex. 3, ECF No. 79-3, at 32.  S.B filed a complaint with his supervisors in November 2018.  Lawson Report at 2–3.

In February 2019, after S.B.'s complaint, Plaintiff took her accusations to the highest-ranking District of Columbia official: Mayor Bowser.  During a visit by the Mayor, Plaintiff approached her and the Acting DCRA Director *in person* and told them that S.B. "took eight weeks [of] government paternity leave without having a baby" and his "wife likely was wearing a pillow underneath her clothes."  Defs.' Mot., Ex. 12, ECF No. 79-12 [hereinafter "Lu Deposition"], at 7:22–8:3.  The next day, Plaintiff emailed Mayor Bowser and the Acting DCRA Director repeating her claims about "a paternity fraud that has been going on for almost 3 years" and accusing government officials of using "their official power to make this crime go away."  Lawson Report at 146–47.  These contacts came more than two-and-a-half years after her initial complaint.

Despite making repeated allegations of wrongdoing over the course of years, Plaintiff never once supported any of them with evidence.  Instead, she continued to demand that the agencies investigate and produce evidence to confirm her mere suspicion that S.B.'s wife faked her pregnancy.  *See, e.g.*, Defs.' Ex. 7 at 3 (stating on March 5, 2017, "I have sensed [a] very evident unwillingness of my agency to take any initiative to investigate and to request any new proof"); *id.* at 2 (same email demanding that DCRA "verify [S.B.'s] medical insurance statement to see if there is a statement for induced labor, and also request[] him to submit [a] government issued Birth Certificate" (internal quotation marks omitted)).

Given this extensive record, the court believes the context factor weighs heavily in Defendants' favor.  It is clear that, however valid Plaintiff's initial report of her concerns might

have been, over time her speech related primarily to a personal grievance with S.B. and actually "concerned a private issue."  *See Kubiak*, 810 F.3d at 484.

*Weighing of Factors.*  Evaluating the content, form, and context of Plaintiff's speech, the court holds that these factors tip in favor of treating Plaintiff's speech as a matter of public concern. Although the court finds that Plaintiff's speech ultimately related to a personal vendetta, her motive "is relevant as part of the context in which the speech was made," but it is not dispositive of the inquiry.  *Id.* at 483.  The Sixth Circuit's decision in *Handy-Clay* supports this conclusion.  There, the plaintiff similarly alleged that city employees were abusing city leave and payment policies. *Handy-Clay*, 695 F.3d at 536.  The plaintiff repeatedly raised her concerns "about corruption and malfeasance in the City Attorney's Office" to the City Attorney, the Senior Legal Attorney, the acting Deputy City Attorney, the Chief Administrative Officer, a city payroll employee, and a city councilman.  *Id.* at 536–37.  No action was taken in response, but plaintiff "nevertheless continued to contact" the City Attorney and various employees in the Mayor's office "regarding her suspicions" that city employees were abusing leave policies and requested an investigation.  *Id.* at 537.  Plaintiff was fired.  She then sued the City for retaliation in violation of, amongst other things, her First Amendment rights.  *Id.*  The district court dismissed her First Amendment claim, finding that plaintiff was not speaking on a matter of public concern because her complaint "had the ring of internal office politics."  *Id.* at 543 (cleaned up).  The Sixth Circuit reversed, explaining that the "district court should have looked not at the motivation for speaking but at the content of the speech."  *Id.* at 543–44.  The court held that, even if the plaintiff was partially motivated by personal grievances, her "communications alleging corruption and mismanagement by public employees . . . [constituted] speech on a matter of public concern."  *Id.* at 544.  So, too, here.

Defendants argue that "Plaintiff's years long effort to get someone to develop proof of her allegations that her coworker made up a daughter to obtain parental leave is . . . a personnel workplace dispute." Defs.' Mot. at 52. This court generally agrees. However, a public employee can still be speaking on a matter of public concern even if they were motivated by personal grievances in addition to the public concern. *See Chappel v. Montgomery Cty. Fire Protection Dist. No. 1*, 131 F.3d 564, 574 (6th Cir. 1997) ("[T]he argument that an individual's *personal* motives for speaking may dispositively determine whether that individual's speech addresses a matter of *public* concern is plainly illogical and contrary to the broader purposes of the First Amendment."); *Montery v. City of Yonkers*, 890 F.3d 386, 400 (2d Cir. 2018) (reaffirming that an "individual motivated by a personal grievance can simultaneously speak on a matter affecting the public at large").

Although the court finds that Plaintiff was speaking on a matter of public concern, her First Amendment interest in the speech ultimately was "limited." *Connick*, 461 U.S. at 154. The Supreme Court's decision in *Connick* is instructive. There, the plaintiff distributed a questionnaire to colleagues regarding her supervisors and certain office policies. The Court found only one question was related to a matter of public concern, and thus Plaintiff's speech "touched upon matters of public concern in only a most limited sense" and was actually more "accurately characterized as an employee grievance concerning internal office policy." *Id.* The Court explained that the limited First Amendment interest did not require her employer to "tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships." *Id.* The Court cautioned that "a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern." *Id.* at 152. Plaintiff in this case enjoys a limited First Amendment interest for the same reasons. Though touching on

a matter of public concern, Plaintiff's speech over time about a single employee's alleged benefits fraud primarily took on the character of a personal grievance against S.B.  Plaintiff was not complaining about systemic violations by her employer; rather, her "whistleblowing" amounted to a multi-year, dogged effort to hold a single employee accountable for an alleged fraud for which she never produced any evidence and which no investigation found substantiated.  Her First Amendment interest in her speech therefore was "limited."

### 2.

*Pickering Balancing Test.*  The second prong of the *Pickering* test requires courts to "consider whether the governmental interest in promoting the efficiency of the public services it performs through its employees outweighs the employee's interest, as a citizen, in commenting upon matters of public concern." *Bowie v. Maddox*, 642 F.3d 1122, 1133 (D.C. Cir. 2011).  The analysis "involves a sliding scale, in which the amount of disruption a public employer has to tolerate is directly proportional to the importance of the disputed speech to the public." *Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 472 (3d Cir. 2015) (internal quotation marks omitted); *see, e.g., Connick*, 461 U.S. at 150 ("*Pickering* unmistakably states . . . that the state's burden in justifying a particular discharge varies depending upon the nature of the employee's expression."); *Hernandez v. City of Phoenix*, 43 F.4th 966, 977 (9th Cir. 2022) ("The more substantially an employee's speech involves matters of public concern, the weightier the government employer's interests must be in preventing disruption of the workplace or impairment of the employer's mission."); *Miller v. Clinton County*, 544 F.3d 542, 548 (3d Cir. 2008) ("The balancing we must undertake is a fact-intensive inquiry . . . and must yield different results depending on the relative strengths of the issue of public concern and the employer's interest.").

The inquiry is "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987) (citing *Pickering*, 391 U.S. at 570–573). The government employer needs to articulate some threat to maintaining discipline and harmony. *See Wainscott v. Henry*, 315 F.3d 844, 852 (7th Cir. 2003) (finding *Pickering* balancing test weighed in employee's favor when employer's reasoning "fail[ed] to persuade [the court] that a potential threat to discipline or harmony exists"). However, "a showing of actual disruptiveness is not required; a government employer is allowed to consider the potential disruptiveness of the employee's speech." *Baumann*, 795 F.3d at 217; *see Connick*, 461 U.S. at 152.

Defendants argue that "resisting your employer's repeated independent determinations that your coworker submitted sufficient documentation to qualify for parental leave both impairs discipline and interferes with the regular operation of the enterprise, and that making allegations directly to your coworker that his wife did not give birth to a daughter for whom he took parental leave . . . impairs harmony among coworkers." Defs.' Mot. at 54 (cleaned up). Plaintiff responds that she "was disciplined not based on allegations of harassment, but because she was deemed to have lied to [Mayor Bowser] on February 5 and 6, 2019," and argues that there is no evidence that the Executive Office of the Mayor ("EOM") was disrupted by Plaintiff's comments. Pl.'s Opp'n at 29.

Plaintiff's argument misses the mark. First, Plaintiff's view of the reasons for her suspension is too myopic. To be sure, the disciplinary charge for which she was held responsible was "knowingly and willfully report[ing] false or misleading information or purposely omit[ing]

15

material facts to a supervisor," namely, the Mayor.  Final Suspension Notice at 1.  But Whitescarver made that determination based on the whole body of her conduct, including her harassment of S.B.  Whitescarver said that his decision to discipline Plaintiff was based upon, among other things, "a full review of the supporting documentation" of the suspension recommendation by Plaintiff's immediate supervisor, Lester.  *Id.*  Lester's recommendation in turn referenced the 150-page Lawson Report and its numerous exhibits.  Defs.' Mot, Ex. 2., ECF No. 79-2, at 1–3.  Whitescarver therefore was aware of Plaintiff's full history of making baseless allegations against S.B.

Moreover, in finding that Plaintiff had been untruthful or misleading to the Mayor, Whitescarver found that Plaintiff willfully "obfuscate[d]" the truth by failing to disclose the "variety of District agencies, officials, supervisors, and investigator(s)" that had notified her "the matter had been investigated and closed without having identified an incident of fraud or leave abuse by the alleged perpetrator, Mr. [S.B.]."  Final Suspension Notice at 2.  Whitescarver's decision, by referencing the findings of no wrongdoing by multiple investigations and Plaintiff's refusal to accept them, therefore necessarily rested on the entirety of Plaintiff's actions.  *Id.* ("Your responses also indicate that you have not fully conceded to the conclusions of the investigations or supervisory direction provided to you in this case.").  Her suspension therefore was not simply about the single incident with the Mayor.

Second, the question is whether the harmony in Plaintiff's workplace was impaired, not whether the harmony at EOM was impaired.  And, as to her workplace, the employer need not prove "actual disruptiveness," a showing of the "potential disruptiveness of the employee's speech" is sufficient.  *Baumann*, 795 F.3d at 217.  And on that score, the Supreme Court has said courts generally must defer to the employer's assessment of the impact of an employee's behavior

on the workplace.  *Waters*, 511 U.S. at 673 ("[W]e have consistently given greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large.").  Here, Whitescarver justified Plaintiff's suspension based on the adverse workplace consequences of her conduct. Among other things, he found: (1) "[t]he offenses are serious and do impair operational efficiency"; (2) Plaintiff's use of "work time" to continue to make baseless allegations of fraud and abuse demonstrated an "apparent disregard to the adverse effect in the workplace for [her] actions," which was an "aggravating factor"; (3) "persistent, unsubstantiated allegations of impropriety on the part of an agency employee, together with an assertion that the investigatory process is flawed due to findings that do not support your allegations does have an unacceptable impact toward degrading public confidence in the conduct of the District government[] and its processes"; and (4) the suspension "will impress upon her the need for her to stop engaging in making false statements about her coworkers."  Final Suspension Notice at 2–3.  The court must give "substantial weight to [Whitescarver's] reasonable predictions of disruption, even when the speech involved is on a matter of public concern."  *Waters*, 511 U.S. at 673.

There is also ample record evidence to support Whitescarver's assessments.  S.B. eventually complained to the former Chief Administrative Officer, Walter Crawford, copying Lester and Deputy Chief Building Official Christopher Bailey.  Lawson Report at 2.  S.B. called Plaintiff's "direct accusations that [his] wife faked her pregnancy so that [he] could get family leave" "slanderous" and "unbearable," and he accused Plaintiff of "creat[ing] a hostile work environment."  *Id.* at 3.  The record shows Plaintiff interrupted work meetings to ask questions like "how do we handle another employee using their wife with a fake belly to fake a pregnancy and then the father requesting family leave?"  *Id.* at 37.  Plaintiff left print outs of Google searches

of "fake pregnancy" in the office for S.B. to find.  *Id.* at 40.  Plaintiff confronted S.B. in the workplace about his wife allegedly faking a pregnancy.  *Id.* at 36.  If "a government employer can intervene *before* an employee's speech actually disrupts the functioning of an office," they can certainly intervene *after* the speech causes disruption.  *LeFande II*, 841 F.3d at 494 (emphasis added).  Additionally, *Connick* explained that the "manner, time, and place" in which speech is delivered matters.  *Connick,* 461 U.S. at 153.  The fact that Plaintiff primarily "exercised her rights to speech at the office supports [the District's] fears that the functioning of [the] office was endangered."  *Id.*

Furthermore, factors that are irrelevant to the public concern inquiry, such as tone and truthfulness, are relevant at the second prong of the *Pickering* balancing test.  The "inappropriate tone of the speech . . . could play a critical role in ascertaining the existence and likelihood of disruption," because comments are more likely to "impair discipline or employee harmony if they are phrased in less elevated—and more opprobrious—terms."  *Munroe*, 805 F.3d at 457 (internal quotation marks omitted).  Additionally, "the truthfulness of [an employee's] statements may be relevant . . . in striking the appropriate balance between the employee's right to free speech and the employer's interest in efficient administration."  *Westmoreland*, 662 F.3d at 721.

Both of these factors weigh in Defendants' favor.  Plaintiff's disdain for S.B. and her supervisors is evident in her testimony and emails to the various government agencies she enlisted in investigating S.B.  Plaintiff testified that she "firmly believe[s] [that S.B. is] dishonest," showing that her persistence in making allegations was, at least in part, a product of her animosity towards S.B.  Lu Deposition at 143:6.  In emails, she wrote that S.B. has "deep character problems, especially his unhealthy attitude towards money and extreme selfishness."  Defs.' Ex. 5 at 6. Plaintiff's tone throughout the record appears "opprobrious" and even she acknowledged that she

"sounds crazy." Lawson Report at 72–73. Plaintiff accused DCRA of "deliberately avoiding finding the truth by NOT verifying the document [SB] provided," and of "not only negligen[ce] but also abus[ing] the system." *Id.* at 94. In her email to Mayor Bowser, Plaintiff accused DCRA, OIG, BEGA, and DCHR of "work[ing] together to use their governmental official power to make this crime go away" and using "each other's negligence to defend their own negligence." Lawson Report at 146–47.

With respect to truthfulness, DCRA, OIG, and BEGA investigated Plaintiff's complaints, and found insufficient evidence to suggest S.B. and his wife had faked a pregnancy. *See supra* pp. 9–10. "[A]n employer may defeat a First Amendment retaliation claim if supervisors reasonably believed, after an adequate investigation, that [the employee's] testimony was false, even if it actually was true." *Swetlik v. Crawford*, 738 F.3d 818, 828–29 (7th Cir. 2013) (finding "the defendants were justified in bringing termination charges against [the plaintiff] on the basis of the[ir] investigation report" (internal quotation marks omitted)). *Swetlik* is not binding on this court; however, the reasoning is persuasive here. Plaintiff's allegations were investigated by the DCRA, OIG, and BEGA. Lawson Report at 98. None substantiated Plaintiff's allegations. Even taking all inferences in Plaintiff's favor, this court finds Defendants "genuinely and reasonably believed, based on an adequate investigation" by three government agencies that Plaintiff's allegations were false. *Swetlik*, 738 F.3d 828.

In performing the balancing, courts must consider whether the challenged government action is tailored to address the harm that the government allegedly aims to protect. *Baumann*, 795 F.3d at 216. The government bears the burden of justifying its adverse-employment action. *Id.* Plaintiff was suspended for 10 days following the Lawson Report, and her suspension was eventually reduced to eight days. Final Suspension Notice at 3–4. This court thinks the challenged

government action (Plaintiff's eight-day suspension) was tailored to address the harm (impaired harmony amongst coworkers, disrupted workplace, and damage to public confidence) that the District aimed to protect.  Final Suspension Notice at 3–4 ("It is with cautious optimism that a reduction in suspension time has been decided.  However, it is also noteworthy that, according to your records, your behavioral corrections in this matter in the past are often short-lived, limiting the scope of the suspension reduction to ensure that a lasting behavioral correction will ensue.").

For the reasons stated above, the court finds that "[t]he personal context in which [Plaintiff's complaint's] arose, in addition to the tangential connection between the issues of public concern and the overall thrust of [her complaints] so minimizes any public concern in the subject of her expression as to tip the First Amendment balance in favor of her employer," *Miller*, 544 F.3d at 551, and that the suspension was a "speech restriction . . . necessary for [DCRA] to operate efficiently and effectively." *Garcetti*, 547 U.S. at 419.

The court grants Defendants summary judgment motion with respect to Plaintiff's § 1983 claims.  It therefore need not reach the argument that Lester and Whitescarver enjoy qualified immunity.  Defs.' Mot. at 60.

## B.

The court now turns to Plaintiff's District of Columbia Whistleblower Protection Act ("DCWPA") claim.  The DCWPA prohibits supervisors from "threaten[ing] to take or tak[ing] a prohibited personnel action or otherwise retaliat[ing] against an employee because of the employee's protected disclosure."  D.C. Code § 2-223.02(a) (2020).  The DCWPA defines a "protected disclosure" to include:

> any disclosure of information, not specifically prohibited by statute, by an employee to a supervisor or to a public body that the employee reasonably believes evidences: (A) Gross mismanagement in connection with the administration of a public program or the

> execution of a public contract; (B) Gross misuse or waste of public resources or funds; (C) Abuse of authority in connection with the administration of a public program or the execution of a public contract; (D) A violation of a federal, state, or local law, rule, or regulation, or of a term of a contract between the District government and a District government contractor which is not of a merely technical or minimal nature; or (E) A substantial and specific danger to the public health and safety."

*Id.* § 2-223.01(7).

A plaintiff asserting a DCWPA claim must make a prima facie case "[1] that he made a protected disclosure, [2] that a supervisor retaliated or took or threatened to take a prohibited personnel action against him, and [3] that his protected disclosure was a contributing factor to the retaliation or prohibited personnel action." *Baumann*, 795 F.3d at 219.  If a plaintiff establishes a prima facie case, the burden shifts to the employer to "prove by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by [the DCWPA]."  *Coleman v. District of Columbia*, 794 F.3d 49, 54 (D.C. Cir. 2015).

To qualify as protected whistleblowing, the complaint must disclose "such serious errors by the agency that a conclusion the agency erred is not debatable among reasonable people."  *Id.* at 53.  "At the summary judgment stage, the central question is whether a reasonable juror with knowledge of the essential facts known to and readily ascertainable by the employee could find that the employee disclosed an objectively serious governmental act of gross mismanagement, gross misuse or waste of public funds, abuse of authority, a material violation of local or federal law, or a substantial and specific danger to public health and safety."  *Id.* at 58 (cleaned up). Whether the employee made a protected disclosure is often a "fact specific inquiry."  *Id.*

Plaintiff's Complaint alleges violations of the DCWPA based on gross misuse of public funds, abuse of authority, and violation of a federal, state, or local law.  Compl. ¶¶ 32–34.

Defendants argue that Plaintiff did not make a protected disclosure because "she never had a reasonable belief" that she was reporting serious government misconduct.  Defs.' Mot. at 63. Plaintiff responds that the DCWPA does "not require proof that a disclosure is factually accurate for it to be granted protection."  Pl.'s Opp'n at 3.  The court agrees with Plaintiff that the disclosure does not need to be proven factually accurate to get DCWPA protection; however, the belief has to be reasonable, and Plaintiff's belief falls short of any measure of reasonableness.

*Gross Misuse of Public Funds.*  The term "gross misuse of funds" refers to "a more than debatable expenditure that is significantly out of proportion to the benefit reasonably expected to accrue to the government."  *District of Columbia v. Poindexter*, 104 A.3d 848, 857 (D.C. 2014). Plaintiff argues that the government would suffer "a loss from S.B.'s absence, while he got two months of paid leave for a non-existent child."  Pl.'s Opp'n at 43.  Fair enough, if true.  But the court agrees with Defendants that "there is no legally significant evidentiary basis for a reasonable jury to conclude" that S.B. was obtaining parental leave through fraud and forgery.  Defs.' Mot. at 64.  Over the course of years, Plaintiff failed to proffer any actual evidence that S.B. was abusing his paternity leave; yet she continued to accuse him of wrongdoing despite at least three investigations finding none.  Plaintiff testified that she never personally observed S.B.'s wife "wearing a pillow under her shirt" and did not know anyone who had.  Lu Deposition at 15:19– 19:9.  Plaintiff told DCRA that she could "sense something [was] wrong" and that she "figured [S.B.] may have submitted forged document[s] but I certainly have no proof myself."  Defs.' Mot., Ex. 6, ECF No. 79-6.  The lack of evidence is fatal to Plaintiff's DCWPA claim based on the misuse of public funds.  No reasonable jury could find that Plaintiff held a reasonable belief that she was exposing a "gross misuse of funds."

The D.C. Court of Appeals' decision in *Poindexer* supports this conclusion.  In *Poindexter*, the plaintiff argued that she had made a protected disclosure on the basis of a gross misuse of public funds because she had "reason to believe" two coworkers "were being paid for time and work they were not performing, and thus 'stealing time from the government' by not accurately reporting their hours on the sign-in sheet."  *Poindexer*, 104 A.3d at 857.  The Court of Appeals found that this did not constitute "gross misuse of funds" because plaintiff "failed to proffer any evidence showing that [her coworkers] falsified their official time and attendance records submitted to the OCP timekeeper," and therefore "there was no legally sufficient evidentiary basis for a reasonable jury to conclude that appellee's evidence showed a 'protected disclosure' on this basis."  *Id.*  The same is true here.

*Abuse of Authority.*   Under the DCWPA, a claimed abuse of authority must be "in connection with the administration of a public program or the execution of a public contract." D.C. Code § 2-223.01(7)(C).  Plaintiff argues that S.B. abused his authority by committing fraud and abusing "his position as a D.C. employee to wrongly benefit himself without a valid basis or benefit to the government."  Pl.'s Opp'n at 43.  Defendants argue there is "absolutely no basis to conclude that S.B. abused his authority by applying for parental leave or that anyone gave preferential treatment to his application."  Defs.' Mot. at 65.  The court agrees with Defendants. Even if S.B. did submit false family-leave documents—and there is no evidence that he did—this still would not rise to the level of an abuse of authority under the DCWPA because S.B. did not abuse *his* authority in connection to administering a public program or executing a public contract.

*Violation of a Federal, State, or Local Law.*  To qualify as a protected disclosure under the DCWPA, the alleged violation of law must be "not of a merely technical or minimal nature." D.C. Code § 2-223.01(7)(D).  The inquiry is not whether the conduct was "ultimately determined

to be illegal, but whether [plaintiff] reasonably believed it was illegal." *Freeman v. District of Columbia*, 60 A.3d 1131, 1141 (D.C. 2012). A "reasonable belief turns on whether a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee could reasonably conclude that the actions of the government evidence illegality." *Harris v. D.C. Water & Sewer Auth.*, 172 F. Supp. 3d 253, 261 (D.D.C. 2016). Plaintiff argues that if S.B. fraudulently submitted a paternity-leave application, "chances are it violated laws against fraud, false statements in government records, and perjury." Pl.'s Opp'n at 43. That is true as far it goes. But for the reasons explained above, *supra* pp. 21–23, Plaintiff's belief that S.B. had committed a criminal offense was not reasonable.

Accordingly, the court holds that Plaintiff has failed to sustain with sufficient evidence her claim under the DCWPA.

## IV.

For the foregoing reasons, Defendants' Motion for Summary Judgment, ECF No. 79, is granted, and Plaintiff's Motion for Partial Summary Judgement, ECF No. 77, is denied. A final, appealable order accompanies this Memorandum Opinion.

Dated:  September 23, 2022

Amit P. Mehta
United States District Court Judge